1       IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF OKLAHOMA

3
UNITED STATES OF AMERICA,            )
4                                     )
                                      )
5            Plaintiff,               )
                                      )
6    vs.                              )        CASE NO. CR-18-227-SLP
                                      )
7                                     )
JOSEPH MALDONADO-PASSAGE,            )
8                                     )
                                      )
9            Defendant.               )
10                                    )

11                    * * * * * *

12       TRANSCRIPT OF AUDIO-RECORDED PROCEEDINGS

13          BEFORE BERNARD M. JONES

14        UNITED STATES MAGISTRATE JUDGE

15             OCTOBER 4, 2018

16                 * * * * * * *

17

18

19                  **APPEARANCES**

20      Ms. Amanda Maxfield-Green, Assistant United States Attorney,
     U.S. Attorney's Office, 210 West Park Avenue, Suite 400,
     Oklahoma City, Oklahoma 73102, appearing for the United States of
21   America.

22      Mr. William Earley and Mr. Kyle Wackenheim, Assistant United
     States Public Defenders, 215 Dean A. McGee, Suite 124, Oklahoma
23   City, Oklahoma 73102, appearing for the defendant.

24

25   Proceedings recorded by digital audio recording; transcript
     produced by computer-aided transcription.

```
 1                     EXAMINATION INDEX
                                           PAGE
 2
     EVIDENCE ON BEHALF OF THE GOVERNMENT:
 3
     MATT BRYANT
 4      Direct Examination by Ms. Maxfield-Green.......  5
        Cross-Examination by Mr. Earley............... 37
 5      Redirect Examination by Ms. Maxfield-Green..... 64
        Recross Examination by Mr. Earley............. 68
 6      Further Redirect by Ms. Maxfield-Green........ 71

 7

 8   EVIDENCE ON BEHALF OF THE DEFENDANT:

 9   LISA SPARKS
        Direct Examination by Mr. Earley.............. 72
10      Cross-Examination by Ms. Maxfield-Green....... 75

11

12   Reporter's certificate.........................102

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  (Proceedings audio-recorded on October 4, 2018.)

2           THE COURT:  Well, good morning to all of you.

3       The Court calls the case of United States vs. Joseph

4  Maldonado-Passage, Case No. CR-18-227-SLP.  This matter comes on

5  for a hearing on the Government's motion for detention.

6       Counsel, if you will, please make your appearances.

7           MS. MAXFIELD-GREEN:  Amanda Maxfield-Green and Charles

8  Brown for the United States.

9           MR. EARLEY:  William Earley and Kyle Wackenheim for

10 Mr. Maldonado-Passage, and we're ready to proceed.

11          THE COURT:  Thank you so much.  And is the Government

12 in compliance with the Justice For All Act?

13          MS. MAXFIELD-GREEN:  We are, Your Honor.

14          THE COURT:  Thank you so much.

15      Are there any announcements or preliminary matters before we

16 begin here today?

17          MS. MAXFIELD-GREEN:  Not from the Government, Your

18 Honor.

19          THE COURT:  Anything, Mr. Earley?

20          MR. EARLEY:  No, Your Honor.

21          THE COURT:  Thank you so much.  As you all know, the

22 question before this Court is whether the defendant should be

23 detained pending trial in this case, and in particular the Court

24 considers whether there are any conditions or combination of

25 conditions that will:  One, reasonably assure the appearance of

1   the defendant at trial; and, two, reasonably assure the safety of

2   the community.

3       Now, before we begin with the evidence and argument, I

4   wanted to hear from the parties with respect to the applicable

5   burden.  This is not a presumption case; is that correct,

6   Ms. Green?

7               MS. MAXFIELD-GREEN:  It is not, Your Honor.

8               MR. EARLEY:  That's correct.

9               THE COURT:  Thank you all so much.

10      Then, as you all know, this Court will consider -- we will

11  proceed, but in proceeding I want you all to be reminded the

12  Court has received the pretrial services' report, both the

13  initial and the supplemental report that was prepared by

14  Mr. Williamson, who I note is in the courtroom here today.

15      Thank you for being here, sir.

16      And that is one piece of evidence that this Court will be

17  considering as it proceeds in making this decision here today.

18      With that, I will now turn to the Government for the

19  presentation of evidence.

20              MS. MAXFIELD-GREEN:  Thank you, Your Honor.  The

21  Government calls Special Agent Matt Bryant to the stand, please.

22              THE COURT:  Special Agent Bryant, if you'll step

23  forward.

24      (Witness sworn.)

25              THE COURT:  Thank you.  If you'll have a seat and pull

1  that mic towards you.

2                          **MATT BRYANT,**

3                      **DIRECT EXAMINATION**

4  **BY MS. MAXFIELD-GREEN:**

5  **Q.**   Good morning, Special Agent.  Could you please state your

6  name and your job title for the record here today?

7  **A.**   My name is Matt Bryant.  I'm a special agent with the U.S.

8  Fish and Wildlife Service.

9  **Q.**   And are you the lead case agent assigned to the

10  investigation of Joseph Maldonado-Passage?

11  **A.**   Yes, ma'am.

12  **Q.**   Have you received investigative assistance from any other

13  agencies?

14  **A.**   Yes, ma'am.

15  **Q.**   Which agency is that?

16  **A.**   The FBI.

17  **Q.**   How long have you been a federal agent?

18  **A.**   I have been a -- I have been in law enforcement for 32

19  years.  I have been in federal law enforcement with the Fish and

20  Wildlife Service for 25 years, 18 of those as a special agent.

21  **Q.**   And what did you do for the years prior to your 25 years as

22  a special agent?

23  **A.**   I was in law enforcement in the U.S. Air Force.

24  **Q.**   Now, what type of crimes do you typically investigate as a

25  special agent for the U.S. Fish and Wildlife Service?

1  A.    The majority of the crimes that I initiate (sic) are

2  relative -- related to wildlife trafficking; that is, the

3  international movement or interstate movement of illegally taken

4  or transported wildlife, usually wildlife species that are

5  protected by state law or federal law such as Endangered Species

6  Act.

7  Q.    Now, how long have you been investigating Mr. Maldonado?

8  A.    I initiated an investigation in approximately 2016.

9  Q.    And have you been continuously investigating him up to the

10  present?

11  A.    Yes, ma'am.

12  Q.    What was the original focus of your investigation into

13  Mr. Maldonado when it began in 2016?

14  A.    It was initiated as a wildlife trafficking investigation;

15  illegal transfer of animals for commercial purposes in interstate

16  transport.

17  Q.    Did the focus of that investigation then expand in late 2016

18  or early 2017?

19  A.    It did.

20  Q.    And what did it expand to encompass?

21  A.    During the initial investigation we learned of a potential

22  murder-for-hire plot.

23  Q.    So are you fully knowledgeable about the entire

24  investigation underlying the two counts of the use of interstate

25  facilities and the commission of murder for hire that has been

1    alleged against Mr. Maldonado in the indictment filed in

2    September?

3    A.    Yes, ma'am.

4    Q.    Does the Government's evidence for those charges in the

5    indictment include recorded phone calls in which Mr. Maldonado

6    discusses his plot to hire someone to kill Carole Baskin?

7    A.    Yes, ma'am.

8    Q.    Does the Government's evidence involve a recorded

9    conversation between Mr. Maldonado and an undercover FBI agent

10   discussing Mr. Maldonado's plot to hire the agent to kill Carole

11   Baskin?

12   A.    Yes, ma'am.

13   Q.    Now, up until June of this year, June of 2018, where was

14   Mr. Maldonado living?

15   A.    I believe since approximately 1999 Mr. Maldonado was a

16   resident on the property known now as the Greater Wynnewood

17   Exotic Animal Park.

18   Q.    Is that in Wynnewood, Oklahoma?

19   A.    It is.

20   Q.    In June of this year, did Mr. Maldonado still own that

21   property and the zoo?

22   A.    It is my understanding that in 2016 Mr. Maldonado gave the

23   rights of ownership to the zoo to Jeff Lowe, but he still resided

24   on the property and was known as the entertainment director for

25   the zoo.

1   Q.   Did Mr. Maldonado move off of the zoo property on or about
2   June 15th of this year?
3   A.   Yes, ma'am.
4   Q.   Why?
5   A.   My understanding is, during the investigation Mr. Lowe and
6   Mr. Maldonado began to have disagreements over the management of
7   the park.  Mr. Lowe discovered that funds had been used
8   improperly, claimed embezzlement and some forgeries, confronted
9   Mr. Maldonado.  They had subsequent disagreements over that that
10  eventually led to the separation and Mr. Maldonado's move.
11  Q.   So on or about June 15th Mr. Maldonado started to move away
12  from the zoo; is that correct?
13  A.   That is my understanding, yes.
14  Q.   What did you learn from your investigative contacts about
15  the actions that Mr. Maldonado was taking as he was moving away
16  from the zoo?
17  A.   My understanding, that when he decided or was preparing to
18  move the zoo, he moved multiple animals that belonged to him.
19  These are exotic animals, valuable animals, arguably, that he had
20  had.
21       He moved them to numerous facilities throughout the United
22  States.  He also moved a lot of his personal property to a --
23  it's a shed or a storage building on property in Pauls Valley.
24  This property is owned by his niece, but his mother resides in
25  the residence located on that property.

1    In addition, he and -- he gained the assistance from other

2 staff members there at the zoo.  He cleaned out his office,

3 multiple files, paperwork, et cetera, contacted a zoo employee

4 and had him bring a tractor up to the office.  Whereby, all these

5 files and receipts, et cetera, he instructed the employee to take

6 into the back of the park, to burn it all and to use extra gas to

7 be sure it burned.

8 **Q.**   Now, when Mr. Maldonado left the Wynnewood area, did he

9 leave behind family in that area?

10 **A.**   His mother, Ms. Shirley Schreibvogel, lives in the Pauls

11 Valley area.  His niece, who's the caretaker of Ms. Schreibvogel,

12 also lives in Pauls Valley.  He has a sister, I believe Ms. --

13 Ms. Pam.  I'm not sure of her last name.  I can't remember.  She

14 lives in Ardmore, Oklahoma.

15 **Q.**   About how old are Mr. Maldonado's parents?

16 **A.**   I believe they are in their 80s.

17 **Q.**   What is the relationship like between Mr. Maldonado and his

18 niece, Chelsi Putman?

19 **A.**   Estranged.

20 **Q.**   When Mr. Maldonado left the zoo property in Wynnewood, did

21 his spouse, Dillon Passage, leave the property with him?

22 **A.**   Yes, ma'am.

23 **Q.**   At the time that he left -- and at this time, the summer of

24 this year, you were still investigating Mr. Maldonado; is that

25 true?

1  A.   That is correct.

2  Q.   At the time that he left the zoo property, did you know

3  where he went?

4  A.   I did not.

5  Q.   Did any of the investigative contacts that you had at that

6  time know where he went?

7  A.   No, ma'am.  There was speculation that he had left to go to

8  Texas, Florida, Tulsa, different places, possibly even Belize.

9  Q.   Now, prior to June of 2018, was Mr. Maldonado known to be

10  active on social media, like Facebook and YouTube?

11  A.   Yes, ma'am.

12  Q.   Did his usage of social media change around that time?

13  A.   During that same period of time, Mr. Maldonado turned his

14  Facebook off.

15  Q.   Did he continue to post YouTube videos?

16  A.   I'm not sure about YouTube videos.  I believe he

17  sporadically used a -- it will come to me in just a minute.

18  I'll remember in a minute.  It's another social media --

19  Instagram.  That's what I couldn't pull up.

20  Q.   Okay.  Now, what did you -- you didn't know where he went

21  when he left the park.  You testified to that.  What did you

22  later learn about where Mr. Maldonado and his spouse went after

23  they left the Wynnewood property?

24  A.   I later learned that he had rented property -- and the

25  property was discovered to be a Craigslist ad -- but the property

1    was located in Yukon, Oklahoma.

2    **Q.**   Okay.  Did he -- did you interview the landlord of that

3    property?

4    **A.**   I did.  She stated that Mr. Maldonado and Dillon Passage

5    rented the property from her, signed a lease agreement on

6    June 15th.  And during that time period, he paid cash for the

7    down payment, paid cash for up to three months' rent, paid cash

8    for a pet deposit of approximately 1,600, and also asked the

9    landlord to keep the utilities in her name and he would pay cash

10   for those.

11   **Q.**   And how much was the rent for that property per month?

12   **A.**   It was $2,000 a month.

13   **Q.**   And he paid three months up front in cash?

14   **A.**   Yes, ma'am.  Plus a deposit, I believe.

15   **Q.**   Okay.  So a total of $8,000 towards rent and deposit?

16   **A.**   Yes, ma'am.

17   **Q.**   Did Mr. Maldonado tell the landlord why he was moving

18   there?

19   **A.**   No, he did not.

20   **Q.**   How long did Mr. Maldonado stay at this property in Yukon?

21   **A.**   Approximately from June to the middle part of August.

22   **Q.**   Did Mr. Maldonado give a notice to the landlord that he was

23   leaving?

24   **A.**   No, ma'am.

25   **Q.**   What were the circumstances of his leaving?  How did his

1  landlord discover it?

2  A.   They were picking up after one of the storms had came

3  through in August time frame.  And the landlord said she had been

4  in contact with Mr. Maldonado as he had been residing there.

5       When they went there to check on the property, they noticed

6  the property belonging to Mr. Maldonado was not there at the

7  house.  They checked the residence and realized all the property

8  had been gone -- had been removed.  She subsequently tried to

9  contact Mr. Maldonado via text and via telephone call but got no

10 response.

11 Q.   In leaving, did Mr. Maldonado essentially forfeit some of

12 the cash he had given her?

13 A.   She informed me that, yes, he left without fulfilling the

14 entire time that he had paid to stay and without retaining his

15 deposit money.

16 Q.   Now, on or about August 9th, did Jeff Lowe make a post on

17 social media that was directed at Mr. Maldonado?

18 A.   He did.

19 Q.   Can you give us the gist of that post?

20 A.   He made a social media post in, like you said, in the middle

21 of August time frame that suggested something to the effect that

22 he had been working with authorities for approximately a year and

23 directed the comment at Joe that he was loaded with information.

24 Q.   So this post on August 9th was made about a week before the

25 landlord discovered Mr. Maldonado had left without notice?

1    **A.**    That's correct.

2    **Q.**    Now, by mid to late -- to late August, where was

3    Mr. Maldonado living?

4    **A.**    I had no idea where he had moved to.

5    **Q.**    At the time you did not know where he had gone?

6    **A.**    Right.

7    **Q.**    Where did you ultimately discover that he had moved to after

8    leaving Yukon?

9    **A.**    Gulf Breeze, Florida.

10   **Q.**    And what -- based on your investigation, what were the terms

11   of his living arrangements in Gulf Breeze, Florida?

12   **A.**    I learned that he was leasing property there and the

13   utilities from the property were in someone else's name who were

14   a resident of Oklahoma.

15   **Q.**    Now, throughout July and August, did Mr. Maldonado post --

16   make some posts on his Instagram account, his social media

17   account?

18   **A.**    Yes, he did.

19   **Q.**    And did he do that under his Joe_Exotic Instagram account?

20   **A.**    Yes, ma'am.

21   **Q.**    Based on what he placed in these posts, where did it appear

22   that Mr. Maldonado had moved to?

23   **A.**    It appeared he was living in Belize.

24   **Q.**    Show you Exhibit 1.  And you have got Mr. -- Special Agent,

25   you have got a paper copy there in front of you, if that's

easier.

Okay.  Is this an Instagram post from the Joe_Exotic Instagram account?

**A.**    It is.

**Q.**    Okay.  Could you read us the caption, the first caption there?

**A.**    "Joe_Exotic:  So he wants to call this home.  Okay.  I give in."

**Q.**    Now, based on the hashtags that are there, where does it appear that -- where did -- what does the post indicate with its hashtags of where this was?

**A.**    The locations indicate hashtag Belize, hashtag Mexico, hashtag Caribbean beach.

**Q.**    And to your knowledge, is this a picture of Mr. Maldonado's spouse?

**A.**    It is.

**Q.**    And let's look at the bottom or B part of this exhibit. Exhibit 1B.  And is this just the bottom of the comment section of this same post?

**A.**    Yes, ma'am.

**Q.**    Does it appear that this post was made on July 22nd of this year?

**A.**    It does.

**Q.**    Show you Exhibit 2A.  Is this another post from the Joe_Exotic Instagram account?

1  A.    It is.

2  Q.    And can you read us just the black text there, the first

3  caption line under -- next to Joe_Exotic?

4  A.    "Joe_Exotic:  Home finally."

5  Q.    And based on the hashtags that are listed in that post,

6  where does it -- where does at least this post indicate that

7  that's a picture of?

8  A.    Says hashtag Belize, hashtag Mexico.

9  Q.    And let's look at 2B.  And is this just the bottom of that

10  same post, comment section of that same post?

11  A.    Yes, ma'am.

12  Q.    And based on the date there listed at the bottom, is that

13  post made on August 23rd of this year?

14  A.    Yes, ma'am.

15  Q.    So during this July and August time frame, was Mr. Maldonado

16  communicating with his mother, Shirley Schreibvogel?

17  A.    That is my understanding, yes.

18  Q.    Did Ms. Schreibvogel know that Mr. Maldonado was living in

19  Gulf Breeze, Florida?

20  A.    No, ma'am.  According to my investigation, Ms. Schreibvogel

21  believed that Mr. Maldonado was living in Mobile, Alabama.

22  Q.    Okay.  You testified earlier that Mr. Maldonado moved some

23  of his belongings from the zoo to a building on Chelsi Putman's

24  property in Pauls Valley; is that correct?

25  A.    Yes, ma'am.

Q.   Based on your further investigation, did Mr. Maldonado then have those same belongings moved in at some point in August?

A.   Yes, ma'am.  According to my investigation, Mr. John Finley, who was a close associate of Mr. Maldonado, went to the facility where the stuff was stored and the facility was locked.  He was not able to get into it.

     He subsequently broke into the shed and received -- and retrieved computers and files and other paperwork.  Mr. Finley said that this was done at the direction of Mr. Maldonado, who wanted to get the stuff moved out of that building before it was discovered or found.

Q.   And do you know where that was moved to?

A.   Mr. Finley advised that he had taken it back to Davis, Oklahoma, and it was stored in a utility trailer.

Q.   So on September 7th, the date of Mr. Maldonado's arrest, was he still in Gulf Breeze, Florida?

A.   Yes, ma'am.

Q.   And how did you discover where he was living in order to effectuate that arrest?

A.   Up until that time, I had no idea exactly where Mr. Maldonado was, but after the indictment -- the arrest warrant, we were able to -- to approach the judge and obtain a ping order for cell phones that we believed were being used by Mr. Maldonado.  Subsequent to the data, the GPS data location discovered from those warrants, we were able to determine that

1  Mr. Maldonado was in Gulf Breeze.

2  **Q.**   And the phone numbers that you used for that information,

3  were you able to use the phone number that Mr. Maldonado had been

4  known to use for the months and years prior to this summer?

5  **A.**   No, ma'am.  According to information in my investigation,

6  the -- Mr. Maldonado no longer used that phone and obtained a new

7  phone around the same time that he left the park.

8  **Q.**   Based on your previous investigation into Mr. Maldonado, did

9  he appear to be knowledgeable about the fact that a cell phone

10  can be used to locate you -- locate you by GPS coordinates?

11  **A.**   Yes, ma'am.

12  **Q.**   At the time of -- at the time of Mr. Maldonado's arrest, did

13  he have a job?

14  **A.**   No, ma'am.

15  **Q.**   Did Mr. Passage, his husband, have a job?

16  **A.**   Not that I'm aware of.

17  **Q.**   Were you present for Mr. Maldonado's arrest on

18  September 7th?

19  **A.**   No, I was not.

20  **Q.**   And why is that?

21  **A.**   Because it -- the arrest was effected in Gulf Breeze,

22  Florida.  I was in Oklahoma at the time.

23  **Q.**   So was the arrest handled by the law enforcement available

24  in Gulf Breeze, Florida?

25  **A.**   Yes, the U.S. marshal's task force in that area.

1  Q.   Now, are you part of the U.S. marshal's task force here in

2  the Western District of Oklahoma?

3  A.   I am.

4  Q.   And as part of that task force, do you routinely go out with

5  U.S. marshals to make arrests?

6  A.   Yes, ma'am, I do.

7  Q.   Have you investigated the details of Mr. Maldonado's arrest?

8  A.   Yes, ma'am.

9  Q.   Are you aware of what Mr. Maldonado's version of the arrest

10 is?

11 A.   Yes, ma'am.

12 Q.   And what has he said about that?

13 A.   My understanding is Mr. Maldonado claimed that during the

14 time that he was arrested he was tackled to the ground by

15 multiple U.S. marshals and during that he suffered multiple

16 broken ribs.

17 Q.   Based on your subsequent investigation, was that a true

18 statement?

19 A.   No, ma'am.

20 Q.   What did you do to investigate the circumstances of the

21 arrest?

22 A.   I reviewed U.S. marshals' arrest reports and then contacted

23 supervisors and arresting officers to determine the circumstances

24 involving his arrest.

25 Q.   Showing you Exhibit 3, please.  Are you familiar with this

1   document?

2   **A.**   Yes, ma'am.

3   **Q.**   Okay.  And what is this?

4   **A.**   This is email communication between U.S. Marshal Service

5   here in Oklahoma City, myself, as we were looking into claims of

6   Mr. Maldonado's broken ribs.

7   **Q.**   Okay.  And I believe this email chain starts at the bottom,

8   with the bottom one; is that correct?

9   **A.**   Yes, ma'am.

10  **Q.**   Okay.  If we can go down -- look at that second page, Page 2

11  of 3.  And this appears to be an email from Dominic Guadagnoli?

12  **A.**   Yes, ma'am.

13  **Q.**   Okay.  If you can read into the record starting at "what I

14  witnessed and personally engaged in was this."

15        Special Agent, do I need to bring you your glasses?

16  **A.**   Please, yes, ma'am.

17            MS. MAXFIELD-GREEN:  May I approach, Your Honor?

18            THE COURT:  Yes.

19            THE WITNESS:  What page was that?

20  **Q.**   (By Ms. Maxfield-Green)  I'm sorry.  It's on Page 2.

21  **A.**   All right.

22  **Q.**   And starting with "what I witnessed and personally engaged

23  in was this."

24  **A.**   "What I witnessed and was personally engaged in was this:

25  He was being brought to a standing position, searched incident to

1   arrest and placed into the cruiser.  No statement or complaint of
2   pain or discomfort were made by MP," meaning
3   Mr. Maldonado-Passage, "at this point.  MP was cuffed in front
4   and had leg-irons placed on him and made no complaints of pain or
5   discomfort.  I spoke to MP personally and he displayed no
6   physical symptoms of pain, labored breathing or discomfort and
7   spoke with a normal tone of voice.  I identified myself as the
8   OIC," which is officer in charge, "on scene and interviewed him
9   and MP made no complaints to me.  He was allowed access to his
10  phone and spoke to his husband and made no statements to him of
11  pain or discomfort or excessive force used.
12  Q.   Okay.  And I'm going to stop you there.  And move on to the
13  bottom, "what I have learned is this," paragraphs below that.  If
14  you could read the first two paragraphs there.
15  A.   Okay.  "It is my understanding that the receiving DUSM,"
16  which is deputy United States marshal, "nor the booking DUSM
17  received any complaints of pain or injury.  To the best of my
18  knowledge and research, MP made one statement while in custody or
19  during court proceedings at the federal courthouse.  Information
20  is that he made the statement that his ribs, quote, hurt to the
21  DUSM while being brought to a courtroom and never made mention of
22  it again.  This DUSM also affirmed that at no time did MP appear
23  to be in any pain or ill other than his own statement."
24  Q.   Okay.  And I'll stop you there.  Now, if we move on to the
25  very first page, the subsequent email to this one, direct you

1  there to Page 1 starting with "Dominic."

2      Now, does this appear to be an email to the previous writer

3  from Investigator Chris Forehand?

4  **A.**   Yes.  It appears Officer Chris Forehand was actually

5  involved in the arrest and was responding to Dominic regarding

6  his actions during the arrest.

7  **Q.**   Okay.  Could you read the material from "Dominic" on?

8  **A.**   "Dominic, when I observed MP walking across the parking lot,

9  I waited until he walked near my car.  I made myself visible to

10  him and told him to get on the ground at gunpoint.  MP complied

11  and went down to the ground all by himself.  I walked up to him

12  and grabbed his hands and cuffed him.  From my knees down, I was

13  holding MP to the ground while I placed cuffs on him.  After he

14  was cuffed, he was picked up without incident.  No force was used

15  at all."

16  **Q.**   Okay.  I'm going to direct you to Exhibit 4.  What is this a

17  photo of?

18  **A.**   That is Mr. Maldonado being placed into the police car right

19  after his arrest.

20  **Q.**   Based on your experience, having arrested people before,

21  does he appear to have been tackled to the ground?

22  **A.**   No, ma'am.

23  **Q.**   Is he showing, in this photo at least, any signs of physical

24  distress?

25  **A.**   Not that I can determine from the photo.

 1  Q.    Based on your investigation, has Mr. Maldonado made suicidal
 2  statements while he's been incarcerated since his arrest?
 3  A.    Yes, ma'am.
 4         MS. MAXFIELD-GREEN:  And let's pull up Exhibit 5, Jane.
 5  Q.    (By Ms. Maxfield-Green)  Can you describe briefly to us who
 6  he made a suicidal statement to and where he was when he made it?
 7  A.    Mr. Maldonado was being held in custody awaiting transport
 8  to Oklahoma City.  I believe he was in Atlanta at the time when
 9  he called Mr. John Finley.  I believe the date was 9/23.
10  Q.    Okay.  And was that just about ten days ago?
11  A.    Yes, ma'am.
12  Q.    If we can play Exhibit 5, please.
13        (Audio played in open court.)
14  Q.    (By Ms. Maxfield-Green)  Okay.  Special Agent, who was
15  Travis Maldonado?
16  A.    Travis Maldonado is Mr. Maldonado's deceased husband.
17  Q.    So is this statement that Mr. Maldonado wants to go live
18  with Travis, does that appear to be a suicidal statement that he
19  would end his life?
20  A.    Yes, ma'am.
21  Q.    Did Mr. Maldonado -- and was that John Finley on the phone
22  that you referred to earlier?
23  A.    That was John Finley.
24  Q.    Did Mr. Maldonado make a second statement to a different
25  caller to the same effect?

1   **A.**   Yes, ma'am.

2   **Q.**   Okay.

3         MS. MAXFIELD-GREEN:  If I can have Exhibit 6, please.

4      (Audio played in open court.)

5   **Q.**   (By Ms. Maxfield-Green)  Okay.  Now, in that call did

6   Mr. Maldonado state that he wanted to, quote, peacefully -- that

7   he needed the $450 so that he could, quote, peacefully go live

8   with Travis?

9   **A.**   He stated that.

10  **Q.**   All right.  Special Agent Bryant, you stated that you're

11  familiar with all of the conduct related to the indictment; is

12  that correct?

13  **A.**   Yes, ma'am.

14  **Q.**   And does Mr. Maldonado's offense conduct involve a history

15  of making violent threats?

16  **A.**   Yes, ma'am.

17  **Q.**   What kind of threats and what medium has he been known to

18  use?

19  **A.**   During my investigation, I learned and discovered threats on

20  social media, YouTube, Facebook directed towards Carole Baskin,

21  primarily.  These were threats of violence or threats of wishing

22  her harm.

23  **Q.**   Now, just briefly, if you can, give us a little history on

24  who is Carole Baskin and how -- what was her initial involvement

25  with Mr. Maldonado or their initial relationship, if you will?

**A.**    My understanding is that Ms. Baskin and Mr. Maldonado have
had a history of disagreements, and I believe the disagreements
initially started way back in the early 2000s or over
Mr. Maldonado's acquisition of animals, use of animals, ownership
of animals, et cetera.  That disagreement escalated to the point
where a civil lawsuit was eventually filed by Ms. Baskin.

Ms. Baskin is also a zoo owner in Florida.  The subsequent
civil lawsuits ultimately resulted in -- I believe it was 2011
that they -- a judgment was issued against Mr. Maldonado for
approximately $1 million.  And since that time, I believe
Ms. Baskin has attempted to -- to obtain those funds.

**Q.**    So just going back briefly to the source of the dispute.
Both Carole Baskin and Mr. Maldonado own exotic animal parks,
correct?

**A.**    They do.

**Q.**    And is the source of the dispute issues like cub breeding?

**A.**    Cub breeding is one; cub petting is another, yes, ma'am.

**Q.**    Okay.  Is Mr. Maldonado indicted in connection with his
attempt to -- I'm sorry.

Let me go briefly back to -- so the disputes between the two
of them about the proper ownership of exotic animals, and that --
that escalated to litigation.  Is that what you testified to?

**A.**    That's my understanding, yes, ma'am.

**Q.**    Was that a civil litigation, a lawsuit brought in federal
court?

 1  **A.**   Yes, ma'am.

 2  **Q.**   And now, is Mr. Maldonado indicted in connection with his

 3  attempt to arrange for the murder for hire of this same person,

 4  Carole Baskin?

 5  **A.**   Yes, ma'am.

 6  **Q.**   And you have already testified that you're aware of various

 7  social media threats that Mr. Maldonado has made.  I'm going to

 8  direct you to Exhibit 7.

 9       (Audio played in open court.)

10            THE COURT:  Can we restart that so that I can hear,

11  because I'm having difficulty hearing it and I want to make sure

12  that they can hear as well.  Is that as loud as it will get?

13            MS. MAXFIELD-GREEN:  I'll try to --

14            THE COURT:  Thank you.  Getting a little older.

15            MS. MAXFIELD-GREEN:  Can we take a microphone?

16            THE COURT:  I was going to suggest that.

17            MS. MAXFIELD-GREEN:  There's one right over there.

18            THE COURT:  Is it coming through the speakers or the

19  television itself?

20            MS. MAXFIELD-GREEN:  Speakers.

21       And, Your Honor, this is the only one that has kind of this

22  volume issue.

23       (Audio played in open court.)

24  **Q.**   (By Ms. Maxfield-Green)  Okay.  And for the benefit of both

25  special agent and the Court, is that a video of Mr. Maldonado,

 1  first?

 2  **A.**    Yes, ma'am.

 3  **Q.**    Was it posted in January of 2012?

 4  **A.**    Yes, ma'am.

 5  **Q.**    So that -- would that have been posted subsequent to the

 6  initiation of Carole Baskin's litigation against Mr. Maldonado?

 7  **A.**    Yes, ma'am.

 8  **Q.**    And do you -- what was -- what were the general allegations

 9  in that litigation, by the way?

10  **A.**    I don't want to say incorrectly, because the civil law is

11  not my expertise, but I believe it was copyright infringement,

12  some -- some other things along that line.

13  **Q.**    Okay.  Now, back to the video that was posted in January

14  of 2012 after that litigation had been filed.  Did Mr. Maldonado

15  say -- directly address Carole in that video?

16  **A.**    Yes, ma'am.

17  **Q.**    And did he say, "If you think for one minute I was nuts

18  before"?

19  **A.**    Yes, ma'am.

20  **Q.**    And then did he state that he was the most dangerous exotic

21  animal owner in the country --

22  **A.**    Yes, ma'am.

23  **Q.**    -- or something to that effect?  And then did he conclude by

24  saying, "Before you bring me down, it is my belief you will stop

25  breathing"?

1  **A.**   Yes, ma'am.

2  **Q.**   Let's look at Exhibit 8.  And is this a post from

3  Mr. Maldonado's Facebook page?

4  **A.**   Yes, ma'am.

5  **Q.**   And was it posted on about October 17th of 2013?

6  **A.**   Yes, ma'am.

7  **Q.**   Can you read us the text of that post, please?

8  **A.**   "Such a wonderful day.  Went to the doctor yesterday, now I

9  have to have surgery on Monday to remove some glands,

10  parentheses, pray they're not cancer, close parentheses.  They

11  are taken over my left armpit so bad I can't move my arm.  Better

12  yet, Janice Haley, remember our deal, first one ever to get a

13  terminal illness, Tampa will be less one more person."

14  **Q.**   Does Carole Baskin live in Tampa, Florida?

15  **A.**   Yes, she does.

16  **Q.**   Show you Exhibit 9.

17     (Audio played in open court.)

18  **Q.**   (By Ms. Maxfield-Green)  All right.  Was that post made on

19  YouTube on about February 17th of 2014?

20  **A.**   Yes, ma'am.

21  **Q.**   Let's take a look at Exhibit 10.  Is this a post from

22  Mr. Maldonado's Facebook page?

23  **A.**   Yes, ma'am.

24  **Q.**   And was it a post that was made on about March 28th of 2014?

25  **A.**   Yes, ma'am.

1  Q.  Can you read what the post says?

2  A.  "OMG, look what just came in the mail for my birthday.  I

3  will cherish this forever," dot dot dot.

4  Q.  And based on your knowledge of this investigation, who is

5  that a picture of?

6  A.  It is a picture of Ms. Baskin's head in a mason jar.

7  Q.  Let's go to Exhibit 11.

8         THE COURT:  Ms. Green, again, what was the date of that

9  one?

10         MS. MAXFIELD-GREEN:  That was March 28th of 2014.

11         THE COURT:  Thank you.

12  Q.  (By Ms. Maxfield-Green)  Now, does this -- to your

13  knowledge, did Mr. Maldonado have a YouTube TV channel called Joe

14  Exotic TV?

15  A.  Yes, ma'am.

16  Q.  Does this appear to be the comment section from that

17  channel?

18  A.  It does.

19  Q.  Okay.  And if you look there, there's a -- is there a post

20  there that shows Joe Exotic moderator as the poster?

21  A.  It does.

22  Q.  What does that post say?

23  A.  "Joe is going to Florida to commit suicide in eight days."

24  Q.  Okay.  And if you'll scroll down to the second page of that

25  exhibit.  Is this a continuation of the comment section for

1  that -- that YouTube channel?

2  **A.**  It is.

3  **Q.**  Is there another post there that says Joe Exotic moderator?

4  **A.**  It does.

5  **Q.**  What does it say?

6  **A.**  Murder-suicide.

7  **Q.**  And was that posted on or about August 27th of 2015?

8  **A.**  It was.

9  **Q.**  All right.  Let's look at Exhibit 12.

10  (Audio played in open court.)

11  **Q.**  (By Ms. Maxfield-Green)  And based on the video itself

12  there, was that a YouTube posting that was made on September 17th

13  of 2015?

14  **A.**  Yes, ma'am.

15  **Q.**  All right.  And let's look at Exhibit 13, please.

16  (Audio played in open court.)

17  **Q.**  (By Ms. Maxfield-Green)  Is this a posting from

18  Mr. Maldonado's Facebook page?

19  **A.**  Yes, ma'am.

20  **Q.**  What is he doing in this video?

21  **A.**  He is using a shotgun to shoot a target.

22  **Q.**  Does the target burst into flames?

23  **A.**  It does.

24  **Q.**  What is the caption of this video?

25  **A.**  "Oh Carole."

1 **Q.**   Have you interviewed Ms. Baskin recently?

2 **A.**   Yes, ma'am.

3 **Q.**   When did you interview her last?

4 **A.**   Most recently, last Monday, I believe.

5 **Q.**   Does she have concerns for her safety if Mr. Maldonado is

6 released pending trial?

7 **A.**   Ms. Baskin told me that she has never been more scared for

8 her life than she is now.

9 **Q.**   What does she believe -- why does she feel that way?

10 **A.**   She informed me that Joe's potential release from custody

11 would put her at great risk of harm because Joe would have

12 nothing to lose and could follow out his initial plans to have

13 her killed or could have his, as she says, his cultish followers

14 do it for him.

15      She also commented that he would be allowed to have access

16 to his animals, which are valuable, that he could gain money and

17 even come to Florida himself.

18 **Q.**   Have you interviewed Mr. Maldonado's niece, Chelsi Putman?

19 **A.**   I have.

20 **Q.**   Does she have concerns for her safety if Mr. Maldonado is

21 released?

22 **A.**   Yes, she does.

23 **Q.**   Let me just clarify, does Ms. Putman live in Oklahoma?

24 **A.**   Yes.  She is the -- she is Mr. Maldonado's niece.  She's the

25 granddaughter of Shirley Schreibvogel.

1   **Q.**   And is that Mr. Maldonado's mother?

2   **A.**   It is.

3           MR. EARLEY:  Your Honor, I'm going to object to this

4   line of questioning.  This particular person that we're talking

5   about apparently is not associated with the charges.  To my

6   knowledge, there have been no allegations that there have been

7   threats in the past, certainly nothing verifiable, no charges, no

8   protective orders or anything like that.  So this is all maybe

9   just interesting family talk, but I don't think it has anything

10  to do with the issues here today.

11          THE COURT:  Ms. Green, how do you respond?

12          MS. MAXFIELD-GREEN:  Your Honor, because of

13  Ms. Putman's relationship to Mr. Maldonado's mother and because

14  of the fact she lives right here in Oklahoma, I think her

15  concerns are relevant based on Mr. Maldonado's circumstances now

16  and what she fears he might approach her or his mother for.

17          THE COURT:  Well, certainly, I think -- well, let me

18  just say, I think that rules of evidence generally don't apply in

19  these proceedings, and certainly I note the objection.  The Court

20  certainly is interested as it considers to what degree the

21  defendant poses a threat to the community, and I think that she

22  would be considered in that definition.  So on that, I'm going to

23  overrule the objection.

24      Please continue.

25          MS. MAXFIELD-GREEN:  Thank you, Your Honor.

1  Q.   (By Ms. Maxfield-Green)  Special Agent Bryant, based on

2  Ms. Putman's relationship with Ms. Schreibvogel, what are her

3  specific concerns with regard to Mr. Maldonado?

4  A.   According to Ms. Putman, she is now the caretaker of

5  Ms. Schreibvogel and has the power of attorney assisting

6  Ms. Schreibvogel with finances.  Ms. Putman has indicated that

7  Mr. Maldonado uses his mother's account to access money or to

8  hide funds that he has.  And since she is now involved with the

9  power of attorney over Ms. Schreibvogel's funds, she has stopped

10  funds being transferred to Joe, or the use of his mother's

11  account by Mr. Maldonado.

12       She says because of all of this, she has created a situation

13  where she has stopped access to funds to Joe and, therefore,

14  could potentially be thought of as a severe threat to Joe and

15  could be harmed.

16  Q.   Has Mr. Maldonado posted online threats against Ms. Putman

17  in the past?

18  A.   Yes, he has.

19  Q.   What were the nature of those threats?

20  A.   I can't remember.

21  Q.   Did he ever state that he was going to send a biker gang to

22  look for her and her family?

23  A.   Yes, ma'am, he did.

24  Q.   Based on those threats, did Ms. Putman move?

25  A.   She did.  She -- during that time period, she packed her

1    children up and left Garvin County.

2    **Q.**    What is Mr. Maldonado's current relationship like with

3    Mr. Lowe, the current owner of the Greater Wynnewood Exotic

4    Animal Park?

5    **A.**    My understanding is that they are no longer friends nor

6    business partners and do not get along.

7    **Q.**    Since his arrest, has Mr. Maldonado made statements to

8    others, including the media, that he thinks Jeff Lowe set him up

9    or framed him on his current charges?

10   **A.**    Yes.

11   **Q.**    Has Mr. Lowe, at least in some regard, made statements that

12   he has cooperated with the authorities?

13   **A.**    He has.

14   **Q.**    What's the -- what is the current status of the zoo under

15   Mr. Lowe's ownership?

16   **A.**    My understanding is Mr. Lowe is in the process of

17   dismantling the zoo with intentions to move it to another

18   location in Oklahoma.

19   **Q.**    Is Mr. Lowe currently in possession of exotic animals that

20   Mr. Maldonado owns or used to own?

21   **A.**    There are numerous animals that Mr. Maldonado had on his

22   permit, his USDA permit, that were left at the facility when he

23   departed.

24   **Q.**    And is Mr. Lowe currently in custody of those animals?

25   **A.**    Yes, ma'am.  He's currently been taking care of them for

1  several months.

2  Q.   Now, Special Agent Bryant, are you aware of an incident that

3  occurred at an exotic animal park in Zanesville, Ohio, in 2011?

4  A.   Yes, ma'am.

5  Q.   And can you just tell us briefly what happened in

6  Zanesville, Ohio?

7  A.   The individual in Zanesville, Ohio, I believe for some

8  reason he released approximately 50 exotic animals into the local

9  community.  Those animal species included lions and tigers and

10  other big animals.  This individual then shot himself.

11  Q.   Was Mr. Maldonado interviewed on the national news about

12  that incident in Zanesville, Ohio?

13  A.   Yes, ma'am.

14  Q.   Let's look at Exhibit 15.

15       (Audio played in open court.)

16  Q.   (By Ms. Maxfield-Green)  So in that interview did

17  Mr. Maldonado state that if it were -- in response to the

18  question about the Zanesville incident, refer to that if

19  something -- if someone tried to take his animals away, there

20  would be a small Waco?

21  A.   He made that statement.

22  Q.   Let's look at Exhibit 16.

23       (Audio played in open court.)

24  Q.   (By Ms. Maxfield-Green)   Is this a YouTube video that

25  Mr. Maldonado posted on about October 1st of 2014?

1  A.   Yes, ma'am.

2  Q.   Based on your investigation into Mr. Maldonado, has he been

3  known to possess firearms?

4  A.   Yes, ma'am.

5  Q.   What sorts of firearms?

6  A.   Our investigation has revealed that he's possessed numerous

7  handguns, shotguns, rifles, to include assault rifles.

8  Q.   Has he posted pictures on social media of himself using

9  firearms and pictures of the firearms he possesses?

10 A.   Yes, ma'am.

11 Q.   Show you Exhibit 17.  Is this a Facebook post from

12 Mr. Maldonado's Facebook page?

13 A.   Yes, it is.

14 Q.   And was that made on about July 12th of 2013?

15 A.   Yes, ma'am.

16 Q.   And what is he doing in this photo?

17 A.   He is posing with a small assault rifle, it appears.

18 Q.   What does the caption say?

19 A.   I can't read it.

20 Q.   You have got that in front of you, that Exhibit 17.

21 A.   There it is.  Sorry.  "Joe's new gun.  Bring it on, bitch."

22 Q.   Okay.  Let's look at Exhibit 18.  Is this another post from

23 Mr. Maldonado's Facebook page?

24 A.   Yes, it is.

25 Q.   And what is he doing in this photo?

1  **A.**   He's posing again with a small -- looks like a small assault

2  rifle, probably the same photo from before.

3  **Q.**   All right.  And was this post made on May 16th of 2014?

4  **A.**   Yes, ma'am.

5  **Q.**   And let's look at Exhibit 19.  Is this a post from the

6  Facebook page Joseph A. Maldonado-Passage's Facebook page?

7  **A.**   Yes, ma'am.

8  **Q.**   What is this a photo of?

9  **A.**   Multiple firearms and weapons.

10  **Q.**   When Mr. Maldonado was arrested on September 7th, were any

11  of his guns seized?

12  **A.**   No, ma'am.

13  **Q.**   Does the Government know how many guns Mr. Maldonado

14  possesses?

15  **A.**   No, ma'am.

16  **Q.**   Does the Government know where the guns Mr. Maldonado has

17  possessed are?

18  **A.**   Not all of them, no, ma'am.

19  **Q.**   Did you recently learn that Mr. Maldonado sold some of his

20  guns at some point this summer?

21  **A.**   Yes, ma'am.

22  **Q.**   Did you learn that he specifically chose not to sell one of

23  his guns?

24  **A.**   Yes, ma'am.

25  **Q.**   Which one?

A.   It is the weapon on -- that he is holding in Attachment 18.
It is a white AR-15 platform assault rifle.

Q.   Based on your investigation, what reason did Mr. Maldonado
give for not selling this particular gun?

A.   He stated this gun was not for sale because this gun was for
Carole.

     MS. MAXFIELD-GREEN:  Your Honor, that's all the
questioning we have on direct.

     THE COURT:  Thank you so much.

     Mr. Earley, are you ready?

                    **CROSS-EXAMINATION**

**BY MR. EARLEY.**

Q.   Let me talk to you a little bit about the events -- or
offenses that are charged in the indictment.  So you have been
investigating this for about two or three years from a wildlife
angle; is that right?

A.   That's correct, sir.

Q.   Okay.  So you started -- when did you say your
investigation -- '15?

A.   2016.

Q.   2016.  All right.  And during that period of time, did you
make visits to the zoo, to the premises?

A.   No, sir.

Q.   Do other agents visit those premises?

A.   Not during that time, no, sir.

1   **Q.**   Well, are there any regulations that require the USDA or

2   Fish and Wildlife to look at either documents or the conditions

3   that the animals are being held under?

4   **A.**   USDA is responsible for that, sir.

5   **Q.**   All right.  Your group didn't do it, but were other

6   government officials routinely at that zoo?

7   **A.**   Yes, sir.

8   **Q.**   Because they're required to make sure that the animals are

9   being taken care of, correct?

10  **A.**   Yes, sir.

11  **Q.**   All right.  So did any of your compadres from the other

12  agency that deals with this advise you of any wrongdoing going on

13  at that zoo?

14  **A.**   As far as their inspections go and the animal welfare stuff,

15  I was not engaged with them regarding that information.

16  **Q.**   So apparently, then, there are no government reports, at

17  least that you have seen or been advised of, that would indicate

18  that there was anything wrong going on at that zoo in 2014, '15,

19  '16, correct?

20  **A.**   Other than maybe some USDA infractions that they might have

21  encountered during their inspections, but nothing that was

22  brought to my level as a possible take or harm to an endangered

23  species.

24  **Q.**   Now, we went through all of these various little videos that

25  have been dredged up from many, many years ago, it appears, and

1    it looks like Mr. Maldonado-Passage is not a big fan of Carole

2    Baskin, right?

3    **A.**    That's correct.

4    **Q.**    But these are on -- these are public, are they not?

5    **A.**    Yes, sir.

6    **Q.**    So these are scripted videos that he's put out there for

7    anybody to watch, correct?

8    **A.**    Yes, sir.

9    **Q.**    So none of this has been kept a secret or something that's

10   been discussed behind closed doors, correct?

11   **A.**    Yes, sir.

12   **Q.**    All right.  And, in fact, you know, if -- if you look at

13   Exhibit 7, it actually looks like it's some sort of call-in show;

14   is that right?

15   **A.**    I'm sorry.

16   **Q.**    It's the video that he's doing from some studio, it appears.

17   **A.**    Yes, sir.  I'm familiar with that.

18   **Q.**    Yeah.  And that's the one, I guess, where he says something

19   to the effect before you bring me down, my belief will be you

20   will stop breathing or something to that effect, correct?

21   **A.**    Yes, sir.

22   **Q.**    And that is from January of 2012?

23   **A.**    Yes, sir.

24   **Q.**    Then Exhibit 8 was some sort of post.  I didn't actually see

25   that there was a date on that, and I don't have a copy of the

1  exhibit so I couldn't tell you.

2       So that particular post is from October 17th, 2013, correct?

3  **A.**   Yes, sir.

4  **Q.**   Almost five years ago?

5  **A.**   Yes, sir.

6  **Q.**   All right.  And I assume that since that is available to

7  you, this is not on some private setting, this is just available

8  to anyone on Facebook?

9  **A.**   Yes, sir.

10 **Q.**   Okay.  And Exhibit 9 was, it looks like, again, another

11 little video or skit from a show that was back in February

12 of 2014, correct?

13      (Audio played in open court.)

14          THE WITNESS:  Yes, sir.  I'm not disagreeing with you

15 at all, I just don't have a copy of that one there to see the

16 date on it.

17 **Q.**   (By Mr. Earley)  But it's a show, right?

18 **A.**   Yes, sir.

19 **Q.**   You can go and watch it; anybody can watch it?

20 **A.**   Yes, sir.

21 **Q.**   If you're interested.

22 **A.**   Yes, sir.

23 **Q.**   Correct?

24      All right.  So again, it appears that Mr. Maldonado-Passage

25 is putting out in the public his frustration with what Ms. Carole

1  Baskin has been doing to him through the court system, correct?

2  **A.**  Yes, sir.

3  **Q.**  In fact, let me ask you, you stated that the judgment in

4  that civil case was in 2011; is that right?

5  **A.**  That's my understanding, yes, sir.

6  **Q.**  Okay.  So there's a judgment entered in 2011.  The

7  litigation by this woman hasn't quit to this very day, has it?

8  **A.**  No, sir.

9  **Q.**  And it's cost, I would assume, a fortune for both parties to

10  continue to litigate whatever this lady's litigating, correct?

11  **A.**  I would assume.

12  **Q.**  Is it your understanding that there are also other animal

13  groups out there that have been filing lawsuits and suing

14  Mr. Maldonado-Passage?  PETA, for example?

15  **A.**  Oh, yes.  I understand that, yes, PETA and Mr. Maldonado

16  have had some issues.

17  **Q.**  Also people from there have sued him causing him to incur

18  legal fees, correct?

19  **A.**  Yes, sir.

20  **Q.**  But it's primarily Ms. Baskin?

21  **A.**  Yes, sir.

22  **Q.**  And it's very obvious from his posts, his publicly available

23  posts and videos and his show, that he's frustrated with her,

24  correct?

25  **A.**  Yes, sir.

1  **Q.**   All right.  And these posts are -- well, 9 is from 2014;

2  Exhibit 10 was 2014; Exhibit 11, this YouTube TV channel comment,

3  was from August of 2015; Exhibit 12, 2015; the Exhibit 13 is

4  shooting the target that burst into flames.  I didn't quite get a

5  date on that.  Do you know the date on that?  The caption "Oh

6  Carole."

7  **A.**   Yes, sir.

8  **Q.**   Says October 1st.  Do you know the year?

9  **A.**   Mr. Earley, sir, I don't have -- I can't remember the year

10 of it.

11 **Q.**   All right.  But it's in the past?

12 **A.**   Yes, sir.

13 **Q.**   So let me ask you this:  When was the first time that you

14 were notified by either Ms. Baskin or some -- should I wait, Your

15 Honor?

16        THE COURT:  If you -- can we get it?  If you will, just

17 one second, Mr. Earley.  Let's try to get this -- we are on the

18 record here.

19        Go ahead.

20 **Q.**   (By Mr. Earley)  So when was the first time during your

21 investigation that you were contacted either by Ms. Baskin or a

22 representative of hers about any threats?

23 **A.**   It would have been in 2016.

24 **Q.**   So when we -- when we go back and we look at all of these

25 exhibits that the government has played concerning these --

1  these, you know, tirades that I guess Mr. Maldonado-Passage went

2  on on TV and Facebook and all of that, none of that was brought

3  to your attention, or to any other law enforcement's attention,

4  was it?  Did she complain about threats to law enforcement?

5  **A.**   She -- I believe she -- I am not -- she made no complaints

6  to my office or to me.

7  **Q.**   Right.  Are you aware of any law enforcement agency to which

8  she made a complaint about Mr. Maldonado's conduct or words?

9  **A.**   I'm not aware.

10  **Q.**   And you first became aware of this in 2016 based on -- on

11  what?  How did you become aware of these threats?

12  **A.**   I became aware of them when I was looking into Mr. Maldonado

13  for the wildlife trafficking.  I received some information that

14  he was threatening Ms. Baskin.

15  **Q.**   Who did you receive that from?

16  **A.**   I believe it was from a lady named Ms. Nassar (phonetic).

17  **Q.**   All right.  And was she somehow associated with Ms. Baskin?

18  **A.**   No, sir.

19  **Q.**   Okay.  So even up to that point are you aware of any contact

20  by Ms. Baskin or a representative of hers to law enforcement

21  complaining about these alleged threats?

22  **A.**   No, sir.

23  **Q.**   So I guess we can assume that Ms. Baskin took these for what

24  they are, just a bunch of outrageous videos and statements

25  because she certainly didn't think that a crime had been

1  committed?

2  **A.**    I don't know that.

3  **Q.**    Now, with respect to -- to what you have charged here -- and

4  I know you have been investigating this for probably, what, about

5  a year and a half, maybe, the threat part of this?

6  **A.**    Yes, sir.

7  **Q.**    Okay.  And I have been investigating it for about three

8  days.  So you know a lot more than me.  Okay?

9  **A.**    Yes, sir.

10  **Q.**    So as I kind of understand it, there are two allegations of

11  some sort of alleged hiring someone to cause harm to Ms. Baskin.

12  Would that be fair to say?

13  **A.**    Yes, sir.

14  **Q.**    Okay.  And if I'm understanding this correctly, the first

15  one deals with an individual who was working at the park; is that

16  correct?

17  **A.**    Yes, sir.

18  **Q.**    And was that Allen -- do you remember his name?

19  **A.**    Yes, sir.  Allen Glover.

20  **Q.**    Allen Glover.  So he is supposedly the first person involved

21  in the indictment, correct?

22  **A.**    That's correct.

23  **Q.**    And Allen Glover was, to your knowledge, an individual that

24  Mr. Lowe brought over, was a preexisting friend of his, correct?

25  **A.**    That's correct.

Q.   So when Mr. Lowe became part owner of the park and started involving himself in the operations, he had this old buddy of his come from South Carolina, correct?

MS. MAXFIELD-GREEN:  Your Honor, I object.  I think Mr. Earley's trying to litigate portions of the underlying case. And, I mean, our purpose -- of course, the Court can look at the weight of the evidence and that kind of thing, but our purpose here is to determine the detention status of Mr. Maldonado and not to impeach witnesses who are not here.

MR. EARLEY:  Your Honor, this goes to the weight of the evidence, and I think it's fair for the Court to take this information into consideration.

THE COURT:  Agreed.  I'm going to overrule the objection.  Please continue.

Q.   (By Mr. Earley)  So Mr. Lowe, who now has ownership or part ownership in this park, brings this felon, correct?  Mr. Allen is a felon, correct?

A.   Yes, sir.

Q.   Okay.  So he's a convicted felon.  He brings him in from South Carolina and he sets up shop there at the zoo, correct?

A.   Yes, sir.

Q.   All right.  And this man has serious alcohol and drug problems, correct?

A.   He does have some problems with alcohol and drugs.

Q.   And the first indication that there was going to be some

1  sort of plot, if you will, at least according to what I'm reading

2  the government's evidence to show, is when this Allen guy gets to

3  the location with Mr. Lowe.  I mean, is there any -- any

4  verifiable evidence that there was a plot to harm Ms. Baskin

5  before Mr. Folger started -- or what's his name?  Allen --

6  **A.**   Glover.

7  **Q.**   Glover.  Before Mr. Glover arrived.

8  **A.**   No.  The evidence that I'm aware of is that Mr. Maldonado

9  had made comments that he would like to find somebody to murder

10  Ms. Baskin.

11  **Q.**   Okay.  And apparently he made that comment in front of a lot

12  of people, right, according to your interviews?

13  **A.**   Yes, sir.

14  **Q.**   I mean, there were a number of employees, it was laid out in

15  the open.  Kind of like the videos, right?

16  **A.**   And some in private as well, but, yes, sir.

17  **Q.**   But as far as some -- some -- if you want to call it

18  verifiable plot, the government's evidence basically shows there

19  wasn't anything until this man arrived on the scene, right?

20  **A.**   Yes, sir.

21  **Q.**   All right.  And as far as Glover is concerned, there's

22  allegations, certainly in the indictment, that Mr. Maldonado

23  provided him cash, correct?

24  **A.**   Yes, sir.

25  **Q.**   And was the exchange of cash in this case, was that done in

1  front of an undercover officer or recorded?

2  **A.**   No, sir.

3  **Q.**   So the only evidence that there was any exchange of money

4  from Mr. Maldonado to Mr. Glover is what Mr. Glover told you?

5  **A.**   Yes, sir.

6  **Q.**   Or told other people, correct?

7  **A.**   That's correct.

8  **Q.**   All right.  So it's based solely on the uncorroborated

9  statement by Mr. Glover?

10  **A.**   Yes, sir.

11  **Q.**   Okay.  Now, the second scenario involves actually a

12  different individual, Mr. -- is it Garretson; is that right?  Is

13  that how that started?

14  **A.**   Mr. Garretson is, yes, somebody known to me in the

15  investigation.

16  **Q.**   Okay.  And -- well, Mr. Garretson actually met with you, did

17  he not?

18  **A.**   Yes, sir.

19  **Q.**   And he also is connected to Jeff Lowe, correct?

20  **A.**   Yes, sir.

21  **Q.**   All right.  And I just want to ask you if -- if this is

22  correct:  Mr. Garretson advised that -- before he decided to help

23  you with your investigation, he advised that Jeff Lowe told him

24  that he was kind of sick and tired of all the litigation and --

25  and that he wanted to have all this be over with, correct?

1 **A.**   Yes, sir.

2 **Q.**   And I'll just use his words.  Mr. Garretson tells the grand

3 jury, anyway, "So he asked me," that would be Lowe asked

4 Mr. Garretson, "if I would call Carole Baskin and offer to give

5 her Joe on a silver platter."

6    Did he tell you the same thing that he told the grand jury?

7 **A.**   Yes, sir.

8 **Q.**   So it was his plan, if you read a little bit further, to get

9 rid of Joe Maldonado-Passage and ask Ms. Baskin to walk away from

10 all of her litigation so that he could simply run the zoo and go

11 on and -- with the business, correct?

12 **A.**   Correct.

13 **Q.**   All right.  So it appears that -- and it was at that point

14 that Mr. Garretson kind of hooked up with you and you-all decided

15 to have him go in and do some undercover recordings, and then a

16 little bit later on introduce, hopefully, some undercover agent

17 into the process to see if you could get Mr. Maldonado-Passage to

18 incriminate himself, correct?  Is that pretty much how it went?

19 **A.**   Well, our plan was to have Mr. Garretson go in and record

20 conversations, yes, sir.

21 **Q.**   Okay.  And the reason you wanted to go down that path was

22 because I think everyone was in agreement that the deal, at least

23 up until the end of November, the deal with this Glover guy was

24 never going to really materialize, correct?

25 **A.**   We did not know that a hundred percent, no, sir.  We had

1  thoughts that it might not go through for sure, yes, sir.

2  Q.   Well, in fact, as of mid November of 2017, pretty much you

3  sort of ended the investigation on that end, correct?

4  A.   That's correct.

5  Q.   And so just a couple of weeks later is when you decided to

6  take this undercover FBI agent, or whoever he was, in and start

7  up this conversation with Mr. Maldonado, correct?

8  A.   The timing is correct, yes, sir.

9  Q.   All right.  Garretson also told you that the reason that he

10  was coming out with this information was because at one point he

11  was in the office with Mr. Lowe and Mr. Maldonado, correct, and

12  they were discussing a plan to kill Ms. Baskin, correct?

13  A.   That is correct.

14  Q.   And, in fact, his grand jury testimony indicates that Jeff

15  Lowe actually had pulled up maps on the computer and was

16  explaining to him how easy it would be to get to Ms. Baskin,

17  correct?

18  A.   Correct.

19  Q.   Okay.  So when you met with him a little bit later, you

20  weren't interested in Mr. Lowe, were you?  It's all directed at

21  Mr. Maldonado, correct?

22  A.   The information I had at that time was that Mr. Maldonado

23  had already paid Mr. Glover.  So, yes, the investigation and the

24  information that Mr. Lowe provided was directed towards

25  Mr. Maldonado paying Mr. Glover and I proceeded that way, yes,

1  sir.

2  Q.   All right.  Well, did you ever actively investigate Mr. Lowe

3  for threatening to kill Ms. Baskin?

4  A.   Yes, sir.  I did interview him regarding his knowledge of

5  that and Mr. Lowe stated that he did not have any involvement

6  with Mr. Maldonado.

7  Q.   Well, when did you interview him?

8  A.   I believe it was in late June or so.

9  Q.   Of this year?

10  A.   Yes, sir.

11  Q.   Okay.  Now, my question is, from November of 2017 going

12  forward, did you actively investigate Mr. Lowe for his threats to

13  kill Ms. Baskin?

14  A.   During portions of that time period, yes, we were also

15  monitoring Mr. Lowe and recording conversations with Mr. Lowe as

16  well.

17  Q.   At some point Mr. Lowe becomes aware of, I guess, your

18  investigation, correct?

19  A.   Yes.  In a way, yes, sir.  He -- he becomes aware of issues

20  that he alleges regarding Mr. Maldonado and the park finances.

21  At that time -- and some movement of some animal species at that

22  time also.  He -- I believe he contacts Mr. Garretson and says

23  that he wants to bring the information forward, or report

24  information that way.

25  Q.   Okay.  And so he kind of gets actively involved in trying to

1  assist you with gathering information from Mr. Glover, correct?

2  **A.**   Yes, sir.

3  **Q.**   All right.  And I take it -- did you direct what he did as

4  far as his meetings with Mr. Glover and anyone else?

5  **A.**   Yes, sir.

6  **Q.**   So you asked him to do certain things; is that right?

7  **A.**   Yes, sir.

8  **Q.**   Okay.  So do you recall that at some point in time

9  Mr. Glover had denied to Mr. Lowe that he ever went to Florida,

10 correct?

11 **A.**   That's correct.

12 **Q.**   And so Mr. Lowe needed to clean that little part up so that

13 Mr. Glover actually went to Florida.  And do you remember a

14 conversation that they had where he was pretty much directing

15 him, you know, no, I know you told me before that you didn't go

16 to Florida, but that's not true, is it; you actually went, right?

17 And Mr. Glover at one point says, well, if that's what I need to

18 say, I'll say that.  Do you remember that?

19 **A.**   I do remember that.

20 **Q.**   Okay.  So Mr. Glover is being steered in whatever direction

21 I guess Mr. Lowe thinks you want him to go.  Would that be fair

22 to say?

23       MS. MAXFIELD-GREEN:  Your Honor, I would like to renew

24 my objection.  We are really getting into the details of the

25 underlying charges here.  We're not here to try the case today.

1          THE COURT:  I totally agree.

2      Mr. Earley, I certainly want to give you leeway to provide a

3  zealous defense or advocacy of your client, but I do think that

4  we're venturing a little too far.  I certainly note the Court has

5  the ability to weigh the evidence and certainly I think you have

6  made a very compelling argument with respect to that factor that

7  I must consider.  If -- do you think you're going to be on this

8  much longer?

9          MR. EARLEY:  No, Your Honor.

10          THE COURT:  Okay.  Because I have -- I think you have

11  made your point.  Certainly I'm receptive to the argument.

12          MR. EARLEY:  Well, and my point is this, Your Honor:  I

13  realize that the grand jury made a probable cause determination.

14          THE COURT:  Right.

15          MR. EARLEY:  We all know how that works.  It's

16  one-sided from the government's view.  But there are other

17  factors and other evidentiary matters in this case that -- that

18  could certainly lead to an acquittal very easily, in my view.  So

19  I'm just trying to point that out for you.

20          THE COURT:  Well, and I appreciate that, but certainly

21  our very narrow purpose here is to ascertain whether he poses a

22  risk of flight or a danger to the community based on the factors

23  in 18 U.S.C. 3142(g), so I want to just make sure that we all

24  stay focused in that regard.

25      All right.  So for our purposes of the record, I'm going to

1    sustain the objection and would ask Mr. Earley to continue.

2    **Q.**   (By Mr. Earley)  All right.  Now, you did mention a Facebook

3    post that Jeff Lowe made on August 9 of this year, right?

4    Ms. Green asked you about that.

5    **A.**   Yes, I believe so.

6    **Q.**   And in that Facebook post, among other things, Mr. Lowe

7    is -- is stating to whoever he wants to state it to, "I guess the

8    hillbilly didn't know that I have been setting his ass up for

9    almost a year."  Do you recall that portion of his statement?

10   **A.**   Yes, sir.

11   **Q.**   All right.  Were you aware that in early June -- well, since

12   Mr. Lowe's cooperating with you, did he tell you that in early

13   June he had a confrontation with Mr. Maldonado-Passage's husband?

14   **A.**   Yes, sir.

15   **Q.**   And it almost resulted in, I guess, a fight?

16   **A.**   That's the way it was described to me.

17   **Q.**   Okay.  And Mr. Lowe, did he advise you that he had sent

18   messages to Mr. Maldonado-Passage's husband threatening him?

19   **A.**   No, sir.

20          MR. EARLEY:  May I approach the witness, Your Honor?

21          THE COURT:  Yes, you may.

22   **Q.**   (By Mr. Earley)  Ask you to look at that and tell me if

23   Mr. Lowe provided you that in your investigation.

24   **A.**   No, sir, I did not see this.  I do remember him saying one

25   time we had a conversation and this statement right here that he

1  said, I'm gonna knock the fag out of you.

2  **Q.**   So you don't remember him threatening to bulldoze the house?

3  He didn't mention that?

4  **A.**   I remember him having conversations about bulldozing the

5  house, but my recollection is it was in regards to cleaning up

6  the park.

7  **Q.**   Well, it wasn't in that context, was it?

8  **A.**   No, sir.

9  **Q.**   So with respect to Ms. Baskin currently, you talked to her

10  last Monday, correct?

11  **A.**   Yes, sir.

12  **Q.**   And she is afraid that he might get out and -- and come down

13  there and do her some sort of harm?

14  **A.**   Yes, sir.

15  **Q.**   Or some of his cultish followers, as she refers to them?

16  **A.**   That's what she said.

17  **Q.**   What cultish followers have you run into during your

18  investigation of this case?

19  **A.**   I have not.

20  **Q.**   And with respect to Ms. Putman, the niece, her concerns

21  are -- are that maybe he'll get his mom to give him money or

22  something like that.  Is that --

23  **A.**   That's correct.

24  **Q.**   Okay.  But I think you have said that she has power of

25  attorney; is that right?

1    **A.**    Correct.

2    **Q.**    She controls all the finances?

3    **A.**    Correct.

4    **Q.**    Okay.  So I assume that if Mr. Maldonado-Passage is going to

5    try to get some money out of his mother, he's going to have to go

6    through her first, correct?

7    **A.**    Yes, sir.

8    **Q.**    So it's very unlikely that she's going to give him any money

9    based on the way you have characterized this relationship,

10   correct?

11   **A.**    That's my understanding, yes, sir.

12   **Q.**    All right.  Now, we saw some pictures of -- and perhaps some

13   video where Mr. Maldonado-Passage is in possession of firearms,

14   correct?

15   **A.**    Yes, sir.

16   **Q.**    He's not a felon, is he?

17   **A.**    No, sir.

18   **Q.**    And to your knowledge is there any prohibition on him

19   possessing a firearm?

20   **A.**    No, sir.

21   **Q.**    Or firearms?

22   **A.**    No.

23   **Q.**    He can legally, constitutionally possess as many guns as he

24   wants, correct?

25   **A.**    Yes, sir.

1  Q.    Okay.  Is there anything illegal about him discharging a
2  firearm?

3  A.    No, sir.

4  Q.    Okay.  So the fact that there are guns and he's had guns in
5  his hands doesn't mean anything other than the fact that he can
6  possess guns and have guns in his hands, right?

7  A.    Yes, sir.

8  Q.    All right.  Now, Ms. Green asked you -- or stated or asked
9  you to confirm that you -- the government doesn't know how many
10 guns are in his possession; is that right?

11 A.    That's correct.

12 Q.    But you were told and your investigation showed that he
13 actually sold a number of guns; is that right?

14 A.    That's what I have learned, yes, sir.

15 Q.    When was that?

16 A.    I believe that they were sold in July.

17 Q.    All right.  So July of this year, correct?

18 A.    Yes, sir.

19 Q.    All right.  And, to your knowledge, you said, but he kept
20 one.  What's your information and who provided you that
21 information?

22 A.    Ms. Putman, Chelsi, provided the information to me regarding
23 a conversation that she had.

24 Q.    With who?

25 A.    A gentleman that was at the Wynnewood park that identified

1  himself to her.

2  Q.   All right.  Well, okay.  So is your knowledge that he sold

3  guns, is that from Ms. Putman as well?

4  A.   Yes, sir.

5  Q.   Okay.  So you don't have any independent evidence of that,

6  right?

7  A.   No, sir.

8  Q.   And so the evidence that he is still in possession of this

9  little mini AR-15 rifle or whatever it was, that's strictly based

10 on something that Ms. Putman told you, right?

11 A.   Correct.

12 Q.   But that she had heard from somebody else, correct?

13 A.   Yes, sir.

14 Q.   And you know how that somebody else knew that?

15 A.   He had -- he is the one that purchased them from

16 Mr. Maldonado.

17 Q.   Okay.  So that man didn't purchase that particular firearm,

18 correct?

19 A.   That's correct.

20 Q.   Okay.  We don't know if somebody else purchased it, you have

21 no evidence that maybe it was disposed of otherwise, correct?

22 A.   That's true.

23 Q.   Okay.  I want to go back to the more recent things that you

24 talked about here.  Your belief is that Mr. Maldonado-Passage

25 left the zoo around June 15th; is that correct?

1  **A.**    It's around the middle of June, yes, sir.

2  **Q.**    Okay.  And basically, wouldn't it be fair to say Mr. Lowe

3  kicked him out?

4  **A.**    I don't believe that, no, sir.

5  **Q.**    You don't believe that?

6  **A.**    I believe they had a confrontation.  I believe words were

7  discussed regarding him leaving, but I'm not aware of any

8  evidence that he was kicked off the property.

9  **Q.**    Well, but the run-in with his husband and the near assault,

10  that happened just a few days before that, correct?

11  **A.**    Right.

12  **Q.**    All right.  And did you or some other law enforcement person

13  observe him move property from the house or put it in this

14  bulldozer or Bobcat or whatever and go and burn it?

15  **A.**    No, sir.

16  **Q.**    So you're relying on what other individuals told you?

17  **A.**    Yes, sir.

18  **Q.**    Who would that be?

19  **A.**    A zoo employee.

20  **Q.**    All right.  You verified that he left the zoo and moved to a

21  residence in Yukon, correct?

22  **A.**    Yes, sir.

23  **Q.**    Okay.  And as best you can tell, he remained in Yukon until

24  the first week or two of August; is that right?

25  **A.**    Yeah, somewhere around the middle of August.

1  **Q.**   Was there anything going on, either in court, through a

2  criminal matter or a civil matter or anything else that prevented

3  him from going wherever he wanted to go?

4  **A.**   No, sir.

5  **Q.**   Okay.  So the fact that he -- he leaves the zoo and he goes

6  to Yukon and then he leaves Yukon a little bit later, that's all

7  completely free and legal, correct?

8  **A.**   Yes, sir.

9  **Q.**   All right.  And apparently there were posts that might have

10 indicated that he was going to go to Belize or he was actually in

11 Belize or maybe in Mexico or maybe in Alabama, maybe Florida.

12 Was there anything that prevented Mr. Maldonado-Passage from

13 going to Mexico, that you're aware of?

14 **A.**   No, sir.

15 **Q.**   Or to Belize or to California or wherever he wanted to go?

16 **A.**   No, sir.

17 **Q.**   He was free to do whatever he wanted to do during this

18 period of time, correct?

19 **A.**   Yes, sir.

20 **Q.**   So the fact that he may have gone from here to there to

21 there is just the fact that he moved, correct?

22 **A.**   Correct.

23 **Q.**   And apparently you were able to get a search warrant or a

24 warrant that allowed you to surveil the pings from his cell

25 phone, correct?

1  A.    Yes, sir.

2  Q.    How did you know what cell phone to look for?

3  A.    I learned that he had obtained new cell phones from

4  Ms. Putman, who was paying bills, and that he had obtained a

5  burner phone or a TracFone and another cell phone number.

6  Q.    Okay.  So she was -- she was paying the bills, so she knew

7  exactly, I guess, what the numbers were for the bills?

8  A.    Yes.

9  Q.    Okay.  So that wasn't very hard to find, right?

10 A.    No.

11 Q.    You learned that from her and she's more than happy to help

12 you, correct?

13 A.    Right.

14 Q.    And so based on those pings you were able to determine he's

15 in Gulf Breeze, Florida, right?

16 A.    Correct.

17 Q.    Okay.  And, again, I guess at that time he was free to live

18 there and stay there and do whatever he wanted, right?

19 A.    Yes, sir.

20 Q.    Okay.  Now, you said that as far as the -- the arrest itself

21 was concerned that there were multiple marshals involved; is that

22 right?

23 A.    I believe the actual arrest, there were two marshals that

24 took him down.  There were multiple marshals in the area.

25 Q.    Okay.  But he was -- either of his own volition or someone

1  else's, he was placed on the ground, correct?

2  **A.**   He was requested to go to the ground, yes, sir.

3  **Q.**   So as far as the methodology of what happens after that, I

4  believe that the report indicated that he grabbed his hands and

5  from the knees down he was holding Mr. Maldonado-Passage.  Do you

6  remember that?

7  **A.**   Yes, sir.

8  **Q.**   What kind of technique is that?

9  **A.**   It usually requires approaching from the side and a knee --

10  the officer's knees into the lower back or bottom of the suspect

11  while they lay prone and their hands are placed in the small of

12  their back and then they are cuffed.

13  **Q.**   Okay.  So the officer puts his knee on the individual's back

14  to hold him down, correct?

15  **A.**   Yes, sir.

16  **Q.**   While they're cuffing him.  All right.  And I understand

17  that perhaps the marshals involved didn't hear any complaints

18  from him at the time, but apparently when he was going to court,

19  which was a little bit later, he advised that he was in some

20  pain, correct?

21  **A.**   He advised his rib hurt.

22  **Q.**   Right.  Now, Mr. Maldonado-Passage was arrested

23  September 7th; is that correct?

24  **A.**   Correct.

25  **Q.**   He was held in a local county jail facility; is that

1  correct?

2  **A.**    I assume so, yes, sir.

3  **Q.**    For a little bit of time?  And then when he was being

4  transferred to the Western District of Oklahoma he made a stop at

5  the United States penitentiary in Atlanta, Georgia, correct?

6  **A.**    Yes, sir.

7  **Q.**    Are you familiar with the United States penitentiary in

8  Atlanta, Georgia?

9  **A.**    No, sir.

10  **Q.**    It's a high-level security institution with a lot of

11  violence.  And that's where he was held during his stopover,

12  correct?

13  **A.**    Yes, sir.  He was held in a detention facility for inmates

14  that were not yet charged.  My understanding is it is a separate

15  facility than the main holding facility.

16  **Q.**    And Mr. Maldonado-Passage has never been in jail a day in

17  his life, has he?

18  **A.**    Not that I'm aware of.

19  **Q.**    Okay.  So here's a man who gets arrested and is put

20  initially in a local county jail and then transferred to a Bureau

21  of Prisons facility and he makes some statements.  He's obviously

22  in distress, correct?

23  **A.**    Yes, sir.

24  **Q.**    In fact, at that point in time, when he's in Atlanta and he

25  makes those statements on the phone, do you know how long he had

1  been in jail?

2  **A.**    In Atlanta or total?

3  **Q.**    Total up to that point.  I don't remember the date of the

4  phone call that you referenced.

5  **A.**    It would have been approximately two weeks.

6  **Q.**    All right.  So he's been in jail, something he's completely

7  unfamiliar with, and he's telling people that he can't handle

8  this, correct?

9  **A.**    Yes, sir.

10  **Q.**    All right.  And he's in his, what, early 50s; is that right?

11  **A.**    Yes, sir.

12  **Q.**    Okay.  And certainly no history of going in and out of jails

13  and kind of being used to that lifestyle, right?

14  **A.**    Yes, sir.

15  **Q.**    All right.  So he's obviously -- sounds like he's pretty

16  depressed and pretty bummed out about the whole thing, right?

17  **A.**    Yes, sir.

18  **Q.**    Are you aware, based on your information from Bureau of

19  Prisons or any other facility, that he engaged in any suicidal

20  conduct?

21  **A.**    No, sir.

22          MR. EARLEY:  Could I have just a moment?

23          THE COURT:  Yes.

24  **Q.**    (By Mr. Earley)  The rental property in Yukon, that was --

25  was that rented in Mr. Maldonado-Passage's name?

1    A.    Mr. Earley, I believe the lease agreement had

2    Mr. Maldonado-Passage's name in it.

3    Q.    All right.  And with respect to your further investigation

4    about the property in Florida, was that in his name?

5    A.    I do not know.

6    Q.    You don't have any information that it wasn't?

7    A.    No, sir.

8    Q.    All right.  And during the course of your participation in

9    the investigation and your work with the United States Attorney,

10   approaching the grand jury, were you aware that

11   Mr. Maldonado-Passage had retained an attorney?

12   A.    Yes, sir.

13   Q.    All right.

14            MR. EARLEY:  Nothing further.

15            THE COURT:  Thank you so much.

16       Ms. Green, any redirect?

17            MS. MAXFIELD-GREEN:  Thank you, Your Honor.

18            THE COURT:  Before you -- do you need time to stand up

19   or anything, Special Agent?

20       All right.  Go ahead, Ms. Green.

21            MS. MAXFIELD-GREEN:  Thank you, Your Honor.

22                     <u>REDIRECT EXAMINATION</u>

23   <u>BY MS. MAXFIELD-GREEN:</u>

24   Q.    Special Agent, we're just going to touch on some of the

25   things that Mr. Earley discussed with you.

1      Mr. Earley asked you if Carole Baskin had complained about

2  the online threats that Mr. Maldonado had made against her and

3  you stated that to your knowledge she had not contacted law

4  enforcement about those threats.  To your knowledge, did she or

5  her lawyer contact the U.S. Attorney's office about those

6  threats?

7  **A.**   Are you asking prior to my investigation?

8  **Q.**   Not prior to your investigation.  During the pendency of

9  your investigation on the wildlife matters, did you become aware

10  that Ms. Baskin had contacted the U.S. Attorney's office about

11  the online threats?

12  **A.**   Yes, ma'am.

13  **Q.**   And did you become aware that the U.S. Attorney's office

14  began looking into the online threats and whether they rose to an

15  actionable level?

16  **A.**   Yes, ma'am.

17  **Q.**   Mr. Earley asked you about the plot that -- to murder Carole

18  Baskin that developed after Mr. Glover's arrival at the zoo,

19  correct?

20  **A.**   He did.

21  **Q.**   Okay.  Now, prior to Mr. Glover's arrival at the zoo, prior

22  to his discussions about it with Mr. Glover, about the murder of

23  Carole Baskin, had Mr. Maldonado solicited other people to murder

24  Carole Baskin?

25  **A.**   Yes, ma'am.

1   **Q.**   Had he solicited Mark Thompson in 2014?

2   **A.**   Yes, ma'am.

3   **Q.**   Had he solicited Ashley Webster in 2017?

4   **A.**   Yes, ma'am.

5   **Q.**   And have you interviewed both of those people?

6   **A.**   Yes, ma'am.

7   **Q.**   Now, Mr. Earley also asked you about what -- whether there

8   was any law enforcement or recording present at the time when

9   money changed hands between Mr. Maldonado and Mr. Glover to --

10  for the -- to fund the hit on Carole Baskin.  Recall him asking

11  you about that?

12  **A.**   Yes, ma'am.

13  **Q.**   And you testified, no, there was no law enforcement, no

14  recording of that moment, correct?

15  **A.**   Yes, ma'am.

16  **Q.**   After -- after the money had changed hands, were there

17  texts -- text messages by Mr. Maldonado referring to the fact

18  that he had paid Mr. Glover money?

19  **A.**   Yes, ma'am.

20  **Q.**   Were there phone call -- recorded phone calls involving

21  Mr. Maldonado where he refers to the fact that he had given

22  Mr. -- sorry -- that he had given Mr. Glover money?

23  **A.**   Yes, ma'am.

24  **Q.**   Now, Mr. Earley asked you if in November at some point you

25  believed that the plot to have Mr. Glover murder Carole Baskin

1  had fizzled, essentially, correct?

2  **A.**   Yes, ma'am.

3  **Q.**   Now, at that time, in November when you believed that that

4  plot had fizzled, did you still have concerns that Mr. Maldonado

5  would find another way to carry through on his plot?

6  **A.**   Yes, ma'am.

7  **Q.**   And in response to those concerns -- and were those concerns

8  based on Mr. Maldonado's ongoing conversations with

9  Mr. Garretson?

10  **A.**   That's correct.

11  **Q.**   And based on that, those ongoing concerns, was that the

12  reason the -- the undercover was introduced to Mr. Maldonado?

13  **A.**   That is correct.

14  **Q.**   You stated to Mr. Earley that you had not personally

15  encountered any of Mr. Maldonado's, quote, cultish followers.

16  **A.**   That's correct.

17  **Q.**   Are you aware that Mr. Maldonado has a history of having an

18  extensive online presence with an extensive online community of

19  supporters and followers?

20  **A.**   Yes, ma'am.

21  **Q.**   In viewing some of those social media posts, are you aware

22  that there are numerous people that support and echoed his hatred

23  of Carole Baskin?

24  **A.**   Yes, ma'am.

25  **Q.**   Did John Finley tell you that Mr. Maldonado had attempted to

1  kill himself immediately after the death of Travis Maldonado?

2  **A.**   Yes, ma'am.

3  **Q.**   What did he tell you about that?

4  **A.**   I don't want to misspeak, Ms. Green, but I can't remember

5  the exact things that Mr. Finley said.

6  **Q.**   Based -- did Mr. Finley's remarks to you reflect that

7  Mr. Maldonado had attempted to shoot himself after the death of

8  Travis Maldonado?

9  **A.**   That he was extremely distraught and he had fired his pistol

10  several times into -- he described it as into the TV and into a

11  propane can, and then made the comment to Mr. Finley that the gun

12  wouldn't fire anymore.

13  **Q.**   And was that in approximately October of last year?

14  **A.**   Yes, ma'am.

15       MS. MAXFIELD-GREEN:   Thank you, Your Honor.

16       THE COURT:   Thank you.

17  Anything, Mr. Earley?

18       MR. EARLEY:   Just a few questions.

19                      <u>**RECROSS EXAMINATION**</u>

20  <u>**BY MR. EARLEY:**</u>

21  **Q.**   You testified that a couple other folks had advised that

22  they were solicited by Mr. Maldonado-Passage to commit harm to

23  Ms. Baskin; is that right?

24  **A.**   Yes, sir.

25  **Q.**   Mr. Mark Thompson in 2014; is that right?

1   **A.**    That's what he said, yes, sir.

2   **Q.**    Did he report that to law enforcement?

3   **A.**    No, sir.

4   **Q.**    Okay.  So did he say why?

5   **A.**    Yes, sir.  He assumed with Mr. Maldonado's online threats

6 and him being vocal about his dislike of Ms. Baskin, that the FBI

7 probably already knew.

8   **Q.**    But he didn't go ahead and notify anybody?

9   **A.**    No, sir.

10   **Q.**    Did he think he was serious?

11   **A.**    He thought that Mr. Maldonado was a big talker, but also

12 that he was capable of doing it.

13   **Q.**    Big talker because he talked a lot, correct?

14   **A.**    Yes, sir.

15   **Q.**    And then you mentioned this other lady, Ashley Webber (sic)

16 in 2017.

17   **A.**    Yes, sir.

18   **Q.**    And did she go to law enforcement about that?

19   **A.**    No, sir.

20   **Q.**    All right.  So during the course of your investigation, are

21 you aware of any attempts by Mr. Lowe to solicit other

22 individuals to harm Ms. Baskin?

23   **A.**    No, sir.

24   **Q.**    Are you aware of Mr. Lowe attempting to get other

25 individuals to say that they were asked by Mr. Maldonado to harm

1  Ms. Baskin?

2  A.   I don't -- I don't know that I -- agree that I -- Mr. Lowe

3  find people to say they were asked.  I do know that in the course

4  of investigation I was asking Mr. Lowe if he knew of any other

5  people who had prior associations with Mr. Maldonado that may

6  have been solicited by him to do harm to Ms. Baskin.

7  Q.   And as far as this information received about him trying to

8  harm himself immediately, I guess, after his husband's death; is

9  that right?

10 A.   I don't know if it was immediately, but it was after his

11 husband's death.

12 Q.   It was in October, right?

13 A.   Yes, sir.

14 Q.   And his husband died in October?

15 A.   Yes, sir, that's true.

16 Q.   So that would have been -- I guess the extent of that was

17 that he had fired a gun at a TV and a propane tank, that's about

18 it?

19 A.   That's the way it was described to me, but he was extremely

20 distraught and had called Mr. Finley numerous times.  And when

21 Mr. Finley went to see him, he had a cell phone in one hand and

22 the gun in his other, was, like I described, from what Mr. Finley

23 said, was very distraught and made the comment that it wouldn't

24 fire again.

25 Q.   Okay.  So very emotionally upset and obviously grieving,

1  correct?

2  **A.**   Very upset, yes, sir.

3         MR. EARLEY:   Nothing further.

4         THE COURT:   Thank you so much.   You may step down,

5  Special Agent Bryant.

6         MS. MAXFIELD-GREEN:   Your Honor, could I have a brief

7  redirect?

8         THE COURT:   Sure.

9                       <u>REDIRECT EXAMINATION</u>

10  <u>BY MS. MAXFIELD-GREEN:</u>

11  **Q.**   Special Agent Bryant, you testified just now that Ashley

12  Webster did not report to law enforcement that Mr. Maldonado had

13  asked her to kill Carole Baskin; is that correct?

14  **A.**   That's correct.   I understand she reported it to Ms. Baskin,

15  to be -- that she was concerned for Ms. Baskin's safety, and

16  Ms. Baskin ultimately reported it.

17  **Q.**   Did Ashley Webster leave a voicemail on Ms. Baskin's phone?

18  **A.**   Yes, ma'am.

19  **Q.**   And was that voicemail subsequently turned over to your

20  investigation?

21  **A.**   Yes, ma'am.

22  **Q.**   And in that voicemail did she say that Mr. Maldonado was

23  trying to have Carole Baskin killed?

24  **A.**   Yes, ma'am.

25         MS. MAXFIELD-GREEN:   Thank you.

1        THE COURT:  Thank you so much.  Anything, Mr. Earley --

2        MR. EARLEY:  No.

3        THE COURT:  Thank you so much, you may step down.

4    Ms. Green, what --

5        MS. MAXFIELD-GREEN:  Government rests, Your Honor.

6        THE COURT:  All right.  Mr. Earley, any evidence?

7        MR. EARLEY:  Yes, Your Honor.

8    I have a -- one short witness, but then I do have some

9    proffers to make for the Court.

10        THE COURT:  Okay.

11        MR. EARLEY:  Lisa Sparks.

12        THE COURT:  Lisa Sparks.  Ms. Sparks, if you'll step

13    forward, please.  If you'll just stand right here, Mr. Lee will

14    administer the oath and then you -- you'll have a seat there

15    after.

16    (Witness sworn.)

17        THE COURT:  Thank you, ma'am.  If you'll have a seat,

18    pull the mic towards you as best as you can.

19                          **LISA SPARKS,**

20                     **DIRECT EXAMINATION**

21    **BY MR. EARLEY:**

22    **Q.**   Go ahead and state your name, please.

23    **A.**   Lisa Sparks.

24    **Q.**   Okay.  And, Ms. Sparks, you reside in the Western District

25    of Oklahoma; is that correct?

1  **A.**   Yes, I do.

2  **Q.**   All right.  And do you know Joe Maldonado-Passage?

3  **A.**   Yes.

4  **Q.**   And how do you know him?

5  **A.**   Campaigning event.  I met him there and he came to the door

6  and we just befriended each other and had a -- you know, have

7  connected ever since.

8  **Q.**   All right.  So when was -- when were you first introduced to

9  Mr. Maldonado-Passage?

10  **A.**   September of 2017.

11  **Q.**   Okay.  And have you had personal contact with him after this

12  campaign thing that you were at?

13  **A.**   Yes.

14  **Q.**   Okay.  And if you would, please, advise the Court of the --

15  the type of functions that you have been to and that you're aware

16  of that Mr. Maldonado-Passage does for the community.

17  **A.**   Oh, he does a lot for the community.  Thanksgiving, he has

18  dinners for Garvin County at his zoo for the people that can't be

19  fed and they get to see the zoo for free.  He does the same thing

20  at Christmastime.  He has Easter egg hunts at the zoo.

21       He was with Safari Dental and they did a community dinner

22  there around Thanksgiving time, same time he's doing everything

23  else, the campaigning and stuff like that.  Christmastime, he was

24  handing out blankets to the homeless people and giving them,

25  like, socks and gloves and stuff like that.

1  **Q.**  And were you present at some of these events?

2  **A.**  Many.

3  **Q.**  Many.  All right.  And this was just last year, correct?

4  **A.**  Correct.

5  **Q.**  All right.  And with respect to your contacts with him, do

6  you believe that the death of his husband had a significant

7  impact on him?

8  **A.**  Yes.

9  **Q.**  Okay.

10  **A.**  He's sad.

11  **Q.**  All right.  With respect to your conversations with him and

12  your interactions with him, did he ever vent to you about Carole

13  Baskin or some other person that he was having trouble with?

14  **A.**  No.  We didn't talk about that.

15  **Q.**  Okay.  Was he more interested in just the politics?  I guess

16  he was running for governor at the time.

17  **A.**  Yes, he was running for governor.  Political (inaudible) --

18  **Q.**  All right.

19  **A.**  That's what we talked about, trying to fix Oklahoma.

20  **Q.**  Now, the main reason that you're here, primarily, is you

21  have offered to allow Mr. Maldonado-Passage to reside with you if

22  he were released; is that correct?

23  **A.**  Correct.

24  **Q.**  Do you have any hesitation in telling the Court that you're

25  willing to let him reside with you?

1  **A.**   Not at all.

2  **Q.**   Do you believe that you would be able to allow probation

3  staff or anyone else who needed to to come to your home and check

4  on Mr. Maldonado-Passage?

5  **A.**   Anytime they want to.

6  **Q.**   Are you employed?

7  **A.**   Yes.

8  **Q.**   All right.  Obviously, you couldn't probably keep an eye on

9  him 24 hours a day or anything like that.

10  **A.**   Correct.

11  **Q.**   Correct?  But while he's in your home, are you willing to

12  advise the Court if he violates any of the rules that he's under?

13  **A.**   Yes.

14  **Q.**   Okay.  And as far as assisting him with basic needs, at

15  least to begin with, are you willing to do that as well?

16  **A.**   Yes.

17  **Q.**   And are you aware of other people in the community who are

18  willing to help Mr. Maldonado-Passage?

19  **A.**   Yes.

20  **Q.**   Okay.

21        MR. EARLEY:  I don't believe I have any further

22  questions, Your Honor.

23        THE COURT:  All right.  Thank you so much.

24    Ms. Green?

25        MS. MAXFIELD-GREEN:  Thank you, Your Honor.

| | |
|---|---|
| 1 | <u>CROSS-EXAMINATION</u> |
| 2 | <u>BY MS. MAXFIELD-GREEN:</u> |
| 3 | **Q.**   Ms. Sparks, so you told Mr. Earley just now that you were |
| 4 | first introduced to Mr. Maldonado in September of last year; is |
| 5 | that correct? |
| 6 | **A.**   Correct. |
| 7 | **Q.**   So you have known him for 12 months? |
| 8 | **A.**   Yes, a little over 12. |
| 9 | **Q.**   And you just testified that he -- you didn't talk about |
| 10 | Carole Baskin with him, right? |
| 11 | **A.**   Correct. |
| 12 | **Q.**   And that you mostly talked about political issues, correct? |
| 13 | **A.**   Correct. |
| 14 | **Q.**   And you told Mr. Earley that you do have a job.  Where are |
| 15 | you employed? |
| 16 | **A.**   Do I have to say exactly where?  Because I don't want people |
| 17 | to -- |
| 18 | MR. EARLEY:  Your Honor, may we approach? |
| 19 | THE COURT:  Yes. |
| 20 | (Whereupon an inaudible bench conference was had. |
| 21 | Thereafter the following took place in open court.) |
| 22 | THE COURT:  Ms. Sparks, I'm not going to require you to |
| 23 | answer that question.  All right? |
| 24 | THE WITNESS:  Thank you, Your Honor. |
| 25 | THE COURT:  All right.  Please continue, Ms. Green. |

**Q.**   (By Ms. Maxfield-Green)  We have established that you are
employed and you do have a job.  Including your commute time and
your working hours, about how many hours a day are you away from
your home?

**A.**   Nine.

**Q.**   Were you aware in August that Mr. Maldonado had moved to
Gulf Breeze, Florida?

**A.**   No.

        MS. MAXFIELD-GREEN:  Thank you, Your Honor.

        THE COURT:  Thank you.

    Anything, Mr. Earley?

        MR. EARLEY:  No, Your Honor.

        THE COURT:  Thank you.

    Ms. Sparks, thanks for being here.  You may step down.  You
are excused.  Thank you.

    Mr. Earley, I believe you want to make a proffer; is that
correct?

        MR. EARLEY:  Yes.  Actually a few, Your Honor.

        THE COURT:  All right.  Please proceed.

        MR. EARLEY:  First of all, I would like to proffer, and
I wasn't aware of this until right before court, but there's
another individual here, Ms. Regina Long, who's here at the
front.  She is apparently a resident of Texas but drove up here
in support of Mr. Maldonado-Passage and is very familiar with
him.

1    Also, during the course of our investigation, Your Honor,

2    prior to the hearing anyway, we came into contact with an

3    individual named Teresa Cagle-Finley.  She provided some

4    information to us about Mr. Maldonado-Passage's character.

5    Apparently she had a child, had a four- or five-year-old child

6    who was terminally ill.  One of the child's requests or bucket

7    list items, if you will, was to pet a tiger cub.  And

8    Mr. Maldonado-Passage took one up there to the state of Kansas to

9    fulfill that child's request and Ms. Cagle-Finley is very

10   grateful for that and it meant a lot to her and her family.  I

11   would proffer that he's probably performed over 80 similar acts

12   for other individuals.

13       I would also proffer that we were in communication with

14   Mr. Dan Good, who is an attorney in Oklahoma City.  Mr. Good was

15   retained by Mr. Maldonado-Passage in July of this year.

16   Mr. Maldonado-Passage approached Mr. Good because he was worried

17   about his safety, that was one of the issues.  Particularly, he

18   was concerned about Mr. Jeff Lowe.

19       Mr. Maldonado-Passage had also picked up, according to

20   Mr. Good, from social media that there were a lot of rumors that

21   he may be the subject of a criminal charge or criminal charges in

22   the near future.  So Mr. Maldonado-Passage retained Mr. Good to

23   see if he could find out are there charges pending against me or

24   is there an arrest warrant out there for me.

25       In addition, Mr. Maldonado-Passage asked Mr. Good to confer

1   with the prosecution and see if they would agree to sit down with

2   him before any further action was taken so that he could explain

3   his side of the story.  Mr. Good attempted to contact individuals

4   in the United States Attorney's office.  The only response that

5   he got from his inquiries was that their office could neither

6   confirm nor deny that there was an investigation or charges or

7   anything like that, but they did say we will let the office know

8   that he is represented in case something happens.

9       Mr. Good advised that Mr. Maldonado asked his -- asked him

10  if he was allowed to leave Oklahoma under the circumstances and

11  Mr. Good advised Mr. Maldonado that there are no charges pending

12  against you and to the best -- at least to the best of his

13  knowledge, I believe at that time, which was indeed correct.

14      He advised Mr. Maldonado-Passage that he was free to move

15  about just like any other citizen; he could go wherever he wanted

16  and, you know, whenever he wanted.  The only caveat was I need

17  you to stay in communication with me so that if something does

18  happen I can get ahold of you and we can make arrangements.

19      Mr. Good was aware that Mr. Maldonado-Passage was leaving

20  the state and that he intended to reside in Florida.  Mr. Good's

21  knowledge of Mr. Maldonado-Passage's arrest came from the news.

22  He was subsequently contacted by Ms. Green and advised that his

23  client had been arrested.

24      I would also proffer that prior to this hearing we were able

25  to do some investigation.  We were able to confirm that there was

1    a local gun store and the owner of that, or a person associated

2    with that store verified that, during the summer, earlier this

3    summer, Mr. Maldonado-Passage had sold several firearms to that

4    business.  We weren't given any additional information; probably

5    we'll have to do that through a subpoena, Your Honor.

6        With respect to Mr. Maldonado himself, I would advise the

7    Court that he would tell you that these -- these things that you

8    saw on television with respect to the television things were just

9    that, they were skits.  They were made for TV.  They had shock

10   value.  He's a showman.  That's how you get viewers and there's

11   nothing more to it than that.

12       With respect to guns, I would proffer that he would advise

13   there's only one gun left.  He does still have one firearm that

14   is not in his possession.  It was in possession of his husband.

15   To my knowledge, it has been placed in storage and it certainly

16   isn't available to him, but we are willing to surrender it to

17   someone, with the government witnessing that, as a condition of

18   release.  Also, he would corroborate the fact that the other

19   firearms that were in his possession, legally in his possession,

20   were sold at a local gun store before he left Oklahoma.

21       He would advise the Court that the effect of the tragic

22   death of his husband in October of 2017 did have a profound

23   effect on him.  He was not in his usual state of mind following

24   that tragic circumstance.  Not surprisingly, shortly after that

25   he poured himself into his work.  He began running for public

1   office and was just trying to do the best he could to keep his

2   mind occupied.

3       Mr. Maldonado advises that he will comply with any

4   conditions of release that this Court believes are necessary.  It

5   is important for him to be released to tend to business, in

6   particular only to do something to take care of the animals that

7   are still in his name.  He believes that currently they are being

8   unlawfully disposed of and that they are -- and that their safety

9   is at issue.

10      He is interested in getting out so that he can do the

11  paperwork that is required to have these animals placed in the

12  custody and care of another individual so that they can be

13  removed to take them to another facility.  I can advise the

14  Court, and this is part of this proffer, that Mr. Jeff Lowe, who

15  currently has all of these assets in his possession, recently

16  basically fired his attorneys in the civil suit that had been

17  going on for years and advised that he was going to remove his

18  animals from the premises, that somebody else was going to have

19  to take care of the rest of it, and that is in a public filing in

20  the civil case in this courthouse.

21      Mr. Maldonado-Passage would advise the Court that he was not

22  running from anything when he went to Florida.  He had heard

23  rumors that something was up, but that he always intended to face

24  this and absolutely had no desire to, you know, try to evade law

25  enforcement or anyone else.  I believe it was his hope that at

1  some point when this all came to light he would be allowed to

2  self-surrender because he had made arrangements with an attorney

3  prior to the filing of the indictment.

4       It is his desire to get out and put his family back

5  together, and it is his desire to be out so that he can confer

6  with his counsel and go through the thousands and thousands of

7  pages, and probably hundreds of hours of recordings, and Facebook

8  this and that that are involved in this case and involved in what

9  may be added to this case at a later date.  So that's important

10 to him.  His defense is important to him and his ability to

11 assist in his defense rides on his being out and available to

12 counsel.

13      I don't have any further proffer today.

14           THE COURT:  Thank you, Mr. Earley.  Before you leave,

15 let me inquire of you for just a second.

16      You know, the thing that I have to pause on, certainly as I

17 think about all that I have heard today, all that I read leading

18 up to today, if ever there was a case of a tale of two cities,

19 this is it.  All right.  What the government has argued and then

20 what is contained in the indictment is in many respects

21 completely at odds with what you-all have represented here today.

22 And so, of course, this Court has to look to the evidence and the

23 best evidence and the most credible evidence.

24      And what I am struggling with is you -- your client

25 described the exhibits that I saw here today, the videos, the

1  Facebook posts -- postings as just skits, but what I'm having

2  difficulty getting around is the fact that they were just skits

3  but they pertained to this woman whom he was involved in

4  litigation with and whom he, I guess -- I think at some point you

5  mentioned was frustrated maybe by the circumstance, or frustrated

6  with Carole Baskin.  And I'm trying to -- I'm struggling with,

7  well, how can I not believe what he has said.  Typically when

8  people show you themselves, you believe them, and he has shown

9  himself here.

10       And so why is the Court to take -- to prioritize in terms of

11  considering what information is most credible here, prioritize

12  his proffer as opposed to those videos that we have seen?

13            MR. EARLEY:  Well, a couple of reasons, Your Honor.  If

14  you reflect back, these things have been going on at least

15  apparently since 2012.  And as the testimony indicated,

16  apparently Ms. Baskin never really reported any of these as

17  threats on her life.  She probably took them as the same way that

18  Mr. Maldonado phrases them.  There's been no attempts that we

19  have heard about, no viable attempts to harm Ms. Baskin either in

20  2012, 2013, 2014, 2015, 2016, 2017 or in 2018; just these

21  allegations that the Government has that he was soliciting or

22  asking someone to do harm to her.  So you know, the fact that

23  this has been going on for so long a period of time I think leads

24  to the conclusion that they are just what they are.

25            THE COURT:  But doesn't that argument support this

1  Court's concern in the sense that this has been going on for

2  quite some time and it's gradually escalated and here we are in

3  this courtroom.  I think you would agree that your client is

4  frustrated.  I think you talked about some of his experiences in

5  the federal holding facility, which I think you can just isolate

6  as it pertains to that facility, that experience, given the lack

7  of a criminal history.  But there's still that frustration there.

8  There's a lot of things, and this has reached somewhat of a

9  tipping point.

10       So would not that argument, the fact that this has been

11  going on for quite some time, wouldn't that support, I think,

12  this contention that maybe he poses more of a danger now given

13  that we have reached this level?

14          MR. EARLEY:  Well, I think the fact we have reached

15  this level has lessened everything a lot.  I mean, the guy's a

16  public figure.  I mean, he's well known, not only in this state,

17  but probably others as well for who he is.  I don't think he

18  could go anywhere or do anything without somebody noticing that.

19       And I think what -- what we're going to get to here when I

20  start my argument is, yeah, you may have concerns, but that's not

21  really the end of the issue.  It's are there conditions that can

22  be imposed that would reasonably address those concerns.

23          THE COURT:  And what are those conditions?  What are

24  the alternatives that you would have this Court to consider?

25          MR. EARLEY:  Do you want me just --

1          THE COURT:  Yeah, just go ahead.

2          MR. EARLEY:  -- make my argument now?

3          THE COURT:  Let's go.  Yes, I would like to hear

4    argument.  Go ahead.

5          MR. EARLEY:  Let's start -- like I always do, I like to

6    start with the law.  And I'll just begin with that.  So you know,

7    the Court has to take into consideration the nature and

8    circumstances of the offense.  I'm not going to spend much time

9    on that.  But the weight of the evidence, the second factor, I do

10   think, which I was trying to kind of get at, was that this is

11   obviously -- this is obviously a very triable case.  There's

12   going to be a lot of difference of opinion on -- on a lot of

13   elements involved in this offense.  So this isn't one of those

14   where, you know, I'm here asking that someone who was a convicted

15   felon that got caught with a gun in their pocket, you know, that

16   there's no evidence to support that.  This is a much different

17   situation.  This is a case that I don't think the weight of the

18   evidence is that extreme and certainly not something that tips

19   the balance in favor of detention.

20        But you look at the history and characteristics of the

21   person, as the Court's required to do, physical and mental

22   condition.  I know that there are issues, physical issues that

23   are listed in the pretrial services report.  I'm not going to go

24   into those, but those are certainly, I think, a concern for

25   someone who is incarcerated and certainly something that requires

1  additional intervention from the marshal service if he were to be

2  detained.

3      I think you have heard issue or testimony here about some

4  threats that he allegedly made to harm himself.  I don't see that

5  as something that the Court needs to be concerned about.  I mean,

6  the one that we heard about outside of the jail setting was

7  something that supposedly the individual observed, which was just

8  immediately after his husband's death.  And I think the fact that

9  someone had just lost someone very important to them, a lot of

10  people are depressed and have thoughts -- I just don't see that

11  as something that the Court needs to be concerned about.

12      The fact that he may have stated that he wanted to harm

13  himself while he was at the Atlanta United States penitentiary, I

14  mean, again, as I was trying to get out with the agent, this man

15  has never been arrested or incarcerated in his life.  He's in his

16  early 50s.  And someone who's not used to that type of treatment,

17  certainly I -- I imagine has a lot of thoughts going through

18  their mind.  So I think that the fact that it appears those

19  matters have been resolved, he's no longer, at least to my

20  knowledge, considered a risk to himself by the facility, I think

21  that that's diminished and certainly isn't anything that the

22  Court needs to worry about.

23      You have to look at family ties.  He'd be the first to tell

24  you that the -- there's some real dissension among his family

25  members and some of them don't like him at all.  But the fact of

1   the matter is, he does have a mother and a father who reside in

2   this district.  If the Court wants to prohibit contact with his

3   mother except if authorized through the probation officer, you

4   could certainly do that.  But the agent's own testimony, he

5   resided down in this area from 1999 to 2018.  He has significant

6   ties to the community.

7       Employment, you know what, he's just going to have to find a

8   job, but there's a lot of people who get released on conditions

9   of release that are required to obtain employment and that's just

10  something he'll have to do.

11      His community ties, Ms. Sparks testified to some of the good

12  deeds that he does and that he has done for years.

13      His past conduct, again, no criminal history.

14      History relating to drug or alcohol abuse, nothing there.

15      Criminal history, nothing there.

16      Record concerning appearances in court.  Well, you know, as

17  far as any criminal appearances, he's never had to worry about

18  that in his life, but he certainly has been required and has

19  attended numerous court proceedings throughout all of these civil

20  actions that have been filed against him.

21      And then, of course, the last thing is the nature and

22  seriousness of the danger to any person or the community that

23  would be posed by his release.  I understand the Court is kind of

24  focusing on that factor at the moment.

25      I would argue, for all of those reasons I just went through,

1  flight risk I don't believe is even an issue and I would

2  believe -- you know, I recognize they only have to prove that by

3  a preponderance of the evidence, but let's look at what -- he has

4  significant ties, he hired an attorney and consulted with that

5  attorney and asked that attorney to communicate with the United

6  States Attorney's office.  He told that attorney he was leaving

7  the state and there was nothing that prevented him from doing

8  that.

9         THE COURT:  I think you have met your burden with

10  respect to that portion.  I'm focused now on the danger.  That is

11  what -- I was going to announce that, but go ahead.

12         MR. EARLEY:  All right.  So I think if you look

13  historically at this case -- and the Government has to prove that

14  he's a danger to someone or all of us or somebody by clear and

15  convincing evidence.  So there's no evidence that he has ever

16  posed a risk of violence to any human being.  There's no evidence

17  he's actually assaulted anyone, that he's done anything violent

18  toward any human being in his life.

19     These videos that you saw are several years old and they are

20  just several years old.  They are obviously something that's

21  staged.  I mean, if you look at it, it's like a production.  It

22  wouldn't surprise me if there's a teleprompter sitting in front

23  of him and he's being told or scripted what to say.

24     Are they in bad taste?  Yeah, probably they are, but they

25  are -- are they an indication of his true thoughts?  No, I don't

1  believe that the evidence suggests that because nothing has ever

2  been acted on as far as him trying to harm Ms. Baskin.  They're

3  efforts to get viewership.  I mean, that translates to supporters

4  and probably customers.  I don't know.

5      The fact that he will be here and this alleged victim is in

6  Florida I think is in and of itself enough to deny detention.

7  You know, the Government's going to -- you know, they have

8  already brought this out, well, he could incite others to cause

9  harm.  Well, you know, the Court can easily cover that by

10 imposing the condition that, if he's released, any computer or

11 cell phone that he possesses should be subject to a search by the

12 United States probation office.  That condition is kind of

13 routine in other types of cases that involve computers and access

14 to the Internet.  So that would be nothing new.

15     You know, this -- this, you know, home detention or home

16 incarceration, whatever you want to call it, I think that

17 addresses probably flight more than it does danger, but I think

18 it certainly would lessen any concerns the Court might have if he

19 were aware or if probation was aware of his location at any time,

20 24 hours a day, which they can do with electronic monitoring.

21     So you know, again, he's not going to go anywhere that

22 people don't recognize him.  All right?  So I think that that is

23 something that he knows.  I think that his conduct while he is

24 out will have a very big impact on his trial whenever it occurs,

25 and I think he's very well aware of that.

1    So I think that given the fact that, you know, this case

2    covers a lot of -- a number of different characters, plots and

3    subplots, so to speak, it certainly can still result in a verdict

4    of not guilty.  And to make this man sit in jail for however long

5    it is going to take to resolve this case is, I believe, clearly

6    contrary to the facts and contrary to the law.

7         THE COURT:  Thank you, Mr. Earley.

8    Ms. Green?

9         MS. MAXFIELD-GREEN:  Thank you, Your Honor.

10        THE COURT:  What say you as to counsel's assertion that

11   -- this bluster, skits, stale, what say you on that?

12        MS. MAXFIELD-GREEN:  Your Honor, I think that the best

13   evidence of what anyone's thoughts and feelings and intentions

14   are are their own words.  We apply that in every type of case.

15   And the fact that Mr. Maldonado posted his thoughts publicly for

16   everyone to see should not diminish their impact.  Certainly they

17   were done as part of a show, certainly they were done in a public

18   fashion.  But I -- I find it -- I sincerely disagree with

19   Mr. Earley when he says are they his true thoughts, no.  This is

20   not one comment he made one time about having animus toward this

21   woman.  This -- as the Court noted, he has had singular focus for

22   years, perhaps going on a decade on a vendetta against

23   Ms. Baskin.  And it's a vendetta that started with a business

24   dispute.  It started about a disagreement about the proper

25   exhibition and care of exotic animals that at best can be called

1  a philosophical disagreement about a business operation that

2  escalated to actions by Mr. Maldonado that caused Ms. Baskin to

3  sue him.

4       She did sue him.  She sued him in civil litigation.  It was

5  a -- it was a lawsuit put against him.  That -- that occurred in

6  2011.  The statements he was making online coincided with that

7  further escalated when the judgment was issued against him in

8  2013.  As best as I can determine, this started in 2006 and he

9  has had singular focus online and in his personal life of

10 discussing his hatred of this woman.

11      The best evidence of what he feels and what he is capable of

12 doing is his own words.  And the fact that it's on social media

13 is just -- is just no reason to minimize his importance.  We

14 would take those same statements very seriously if they had been

15 said in a private conversation.  Why would we not take them

16 seriously just because he considers himself a public figure and

17 wished to share those thoughts with a wider audience.

18      He has repeatedly stated that he is crazy, that we don't

19 know how crazy he is, that he is dangerous.  He's repeatedly

20 stated that before he gets taken down in some regard -- and he

21 has made references to his health, he's made references to losing

22 his zoo, people taking his animals -- he has said that before

23 that happens Carole Baskin will stop breathing, his words; she

24 will die first, his words; there will be one less person in

25 Tampa, his words; and that there will be a murder-suicide in

1 Florida.

2     He's explicitly warned us.  He's warned the world that he's

3 dangerous.  There's just simply no reason to disbelieve him now,

4 especially given his conditions -- the condition of his life

5 right now.  He has lost his zoo.  He has been accused of serious

6 crimes that carry ten years of imprisonment each.  He's looking

7 at a total of 20 years of imprisonment.

8     Many of his statements that he has posted online -- and with

9 a consistent theme, he has really never deviated from his

10 theme -- is that if he ever feels desperate he is going to act on

11 these impulses.  And I would submit that there is cause to

12 believe that he is desperate now.

13     And in conjunction with that, Mr. Maldonado's mental state

14 is not currently stable.  He's made at least two suicidal

15 statements in the last ten days.  He's expressed a desire to go

16 live with his dead husband.  I believe every -- the listeners to

17 those statements, as well as the Court and anybody who hears

18 them, can interpret that as a way of saying he wants to kill

19 himself.  Not only did he express the desire to kill himself, he

20 seems to have formulated some kind of plan to do so that involves

21 needing $450 in the confines of jail in order to make sure he can

22 do so peacefully.  He has gone from suicidal ideation to a

23 suicidal plan.

24     Now, there's just no reason to believe that his mental

25 state, albeit it may fluctuate from positive to negative, there's

1  no reason to believe it won't deteriorate again when he's outside

2  of prison and that he could cause himself harm or others harm.

3  The special agent testified that John Finley observed

4  Mr. Maldonado to be suicidal last year, after the death of his

5  husband.  Granted, again, extreme circumstances, sad

6  circumstances, desperate circumstances.  Mr. Maldonado is in

7  desperate circumstances now arguably.  That suicidal ideation or

8  attempt was confirmed in the pretrial services report by Chelsi

9  Putman.

10      Section 3142 states that the Court may consider the

11  potential danger to any person in the community that would be

12  posed by the person who's released.  Any person includes

13  Mr. Maldonado.  The government believes he's a danger to himself.

14          THE COURT:  So you would have this Court embrace a more

15  liberal interpretation of danger to the community?

16          MS. MAXFIELD-GREEN:  Yes, Your Honor.

17          THE COURT:  All right.

18          MS. MAXFIELD-GREEN:  And there is case law that

19  supports the -- that application.  And incidentally, the Tenth

20  Circuit has recently held, in U.S. v. Workman, that suicide --

21  and this is a quote from the case, "Suicide is, technically

22  speaking, one way that the defendant could not appear in court,"

23  and that, quote, The district court is thus within its discretion

24  to consider suicidal ideation in determining whether it can

25  reasonably assure the defendant's appearance.

1       It's -- it's kind of an interesting position, but I think
2   the Court has to think about that as well, that, you know, our
3   job is to assure that he appears for his trial and his concern --
4   the concern that he might harm himself conflicts with that
5   objective as well.
6           THE COURT:  And you don't believe -- Ms. Sparks
7   testified here today.  I found her to be very credible and
8   sincere.  You don't believe that home detention or house arrest
9   under her supervision would address those concerns?
10          MS. MAXFIELD-GREEN:  We simply do not, Your Honor.
11  Ms. Sparks described herself as an acquaintance of the past 12
12  months.  She does not have -- testified she does not have really
13  any knowledge about his thoughts about Carole Baskin or anything
14  to do with this case, which is to her detriment, if he's living
15  with her, to fully assess whether he might be a flight risk,
16  whether he might try to harm himself or others.  She simply
17  doesn't have the history with Mr. Maldonado to know what he's
18  like, what he's thinking, what he's trying to do.  And just for
19  the simple fact that she has a job, she's got to go do her life,
20  she can't sit and babysit him for 24 hours a day.  I just don't
21  know that -- I can't imagine that she has the either physical or
22  emotional sway with Mr. Maldonado to convince him to comply.
23      And as was elicited on -- with Special Agent Bryant,
24  Mr. Maldonado has difficulty with the truth.  He lies about
25  things that are demonstrably false.  Telling somebody you --

1  telling the world, again, through the news media that you have

2  multiple broken ribs because you were tackled to the ground

3  during your arrest, that's just simply not true.  And his ability

4  to lie when it's convenient to him puts him at risk -- put

5  Ms. Sparks at risk to be able to understand what his intentions

6  are, puts probation at risk for being able to effectively monitor

7  him on supervision.

8       And I think with the -- his mental state being what it is,

9  with the contentiousness that is between -- is obvious between he

10  and Mr. Lowe, Mr. Lowe has made no attempt to hide that he has

11  provided information to the government.  Mr. Lowe --

12  Mr. Maldonado has stated publicly that he believes that Mr. Lowe

13  set him up and has framed him on the current charges.  There's --

14  there's no reason to believe based on, again, his words, his own

15  words, that he would not attempt to harm Mr. Lowe, to cause some

16  kind of harm to the zoo, that he would not attempt to threaten or

17  intimidate witnesses in this matter.  And that's certainly a

18  factor the Court can take into account is is he prone to

19  obstructing justice or threatening witnesses.  All the witnesses,

20  or most of the witnesses in this matter are in a very small --

21  small space in the Western District of Oklahoma.

22       And, again, Mr. Maldonado is in a unique circumstance.  He

23  has lost his life's work of 20 years to a person he blames for

24  framing him on serious criminal charges.  And based on his past

25  conduct, his own words, it's just not reasonable to believe that

1    he is not some form of a danger to himself or the rest of the

2    community or witnesses in this matter.

3             THE COURT:  Thank you.  Do you have additional

4    argument, Ms. --

5             MS. MAXFIELD-GREEN:  Your Honor, we would also argue

6    that we have met our burden, which is simply preponderance of the

7    evidence on risk of flight.

8         With respect to -- Mr. Earley has characterized it

9    differently than the Government sees it.  The very nature and the

10   circumstances of this offense create a risk of nonappearance for

11   Mr. Maldonado.  And he's charged with two counts of murder for

12   hire.  The -- it's a lengthy imprisonment.  It's a possibility of

13   20 years if he were convicted.  The very length of that possible

14   sentence that is facing him could cause him to attempt flight.

15        The weight of the evidence, there was much said about the

16   weight of the evidence in this matter and whether it's a --

17   Mr. Earley's opinion that it's a triable case or not, the fact of

18   the matter is this isn't a case where it is all just he said she

19   said.  There are recordings of Mr. Maldonado talking about

20   murdering Carole Baskin.  That's evident from the four corners of

21   the indictment, that that evidence exists.  That's -- that's

22   powerful evidence that could cause Mr. Maldonado, in conjunction

23   with considering the sentence he is facing, to flee rather than

24   face trial.

25        His history of moving around, yes, he was free to move about

1  the country as he wished, but the timing of those moves, the

2  secrecy of those moves does indicate that Mr. Maldonado was

3  attempting to avoid what admittedly he believed, that there were

4  pending investigations or criminal charges.  He had a lawyer

5  trying to inquire into that.  At the very same time, he is moving

6  to Yukon, paying for everything in cash so he's leaving no paper

7  trail, moving to Florida.

8        His mother didn't know he was in Florida.  Ms. Sparks didn't

9  know he was in Florida.  She claims to be his close friend, a

10 close enough friend that he can reside with her.  She didn't know

11 he was in Florida.  He stopped using his cell phones, he stopped

12 posting on social media.  He's posting on social media as though

13 he's in a foreign country.

14       I think the circumstance -- although he was certainly free

15 to move, if he -- if he was moving with -- and was not attempting

16 to conceal his whereabouts, why go dark on social media?  This is

17 a person who's been posting on social media for a decade.  Why

18 attempt to hide from his mother where he is?  Why stop using his

19 old cell phone and get a burner phone?

20       We would submit that his past conduct, with respect to the

21 fact he is trying to rationalize all of that, the more reasonable

22 interpretation is that he was trying to hide his whereabouts.

23 And taking all those factors together and given that our burden

24 is a preponderance of the evidence in this matter, we believe

25 that we have established that he is a risk of nonappearance for

1  trial.

2       And, Your Honor, I just -- cycling back to the dangerousness

3  determination under 3142(g), the guns.  Mr. Maldonado is not a

4  felon.  His previous possession of guns has been fully legal.  He

5  is well known for being a gun enthusiast, knowledgeable about

6  guns, a collector of guns.  We displayed a picture with an entire

7  array of what were apparently his guns.  We don't know -- we have

8  no way of knowing how many he possessed, how many he still

9  possesses.  There's evidence he sold some of them.  We don't know

10  how many or where others remain.

11       We at least have some evidence that he specifically retained

12  one gun for Carole, in his words.  There are -- you know, there

13  are proffers that they were sold, but we just simply don't know

14  where they are.  And that -- I think that given all of the other

15  circumstances, his mental state, his tendency to play fast and

16  loose with the truth gives the Government serious concern about

17  his release.

18       Accordingly, the Government requests that the Court order

19  Mr. Maldonado's detention pending trial.

20            THE COURT:  Thank you, Ms. Green.

21       All right.  Let me take a 15-minute recess and then I will

22  be back to announce my ruling.

23       (Break taken.)

24            THE COURT:  All right.  Thank you.  I apologize for

25  that more extended recess.

1     The question before this Court is whether defendant should

2     be detained pending a trial in this case.  I have considered

3     whether there is any condition or combination of conditions that

4     will reasonably assure the appearance of the defendant at trial

5     and reasonably assure the safety of the community.

6     I have also considered the factors set forth in 18 U.S.C.

7     Section 3142(g), specifically the nature and circumstances of the

8     alleged offense, the weight of the evidence against the

9     defendant, the history and characteristics of the defendant, and

10    the nature and seriousness of the danger to others or the

11    community.  And in particular, I find that competent evidence has

12    been presented in this case that defendant has been charged with

13    the very serious crime of attempting to solicit a murder.  And

14    the evidence presented here today, I believe that of Special

15    Agent Bryant as well as the exhibits relied on by the Government,

16    I think appears to at least corroborate those charges for our

17    purposes here today and just reinforce the notion that they are

18    indeed serious.

19    While counsel for defendant has asserted various challenges

20    so as to undermine the credibility of certain witnesses and the

21    overall weight of the evidence, I think the probable cause

22    determination as established by the grand jury indictment is

23    sufficient, again, for today's proceeding.

24    As to the defendant's history and characteristics, the Court

25    notes that the absence of any history of drug or substance abuse.

1   I note those, which I think are favorable to the defendant.

2   However, the defendant is without a stable residence or

3   employment.

4        He has ties to the community and certainly has familiar

5   ties -- familial ties.  However, the latter I think we would all

6   describe, based on what we heard here today, as likely strained.

7        The defendant has some physical health issues of which the

8   Court has some concern, but the Court is most concerned with

9   defendant's mental health, which his own words and deeds, I

10  believe, have called into question here today.

11       As I think about the nature and seriousness of the dangers

12  to others or the community, concerns I articulated before, I

13  think the evidence presented is both clear and convincing.  And

14  the evidence I'm looking at, again, I have to look at the very

15  best evidence.  And I think, while I appreciate defendant's --

16  defense counsel's arguments on this matter, this Court disagrees

17  with the characterization of defendant's very violent and

18  offensive social media postings as being just skits.  These are

19  his words.  And as set forth in the indictment, it appears that

20  these words were on the verge of becoming actions and that

21  certainly is of concern to this Court.

22       Moreover, even if the Court agreed with defendant's counsel

23  as to the threats made against others as stated before,

24  defendant's mental health and multiple threats of suicide of

25  late, which the Court finds credible, leads to the conclusion

1  that he may be a threat to himself, which likewise supports a

2  finding of detention.

3      This Court has considered alternatives to this detention;

4  namely, placing defendant in the care and custody of Ms. Sparks,

5  whom I find incredibly sincere, but those alternatives aren't

6  enough to ensure defendant doesn't pose a danger to the

7  community, himself included.

8      For these reasons, and having considered all of the evidence

9  presented, this Court finds that there indeed is -- by clear and

10 convincing evidence there are no conditions or combination of

11 conditions of release that will reasonably assure the safety of

12 the community.  I do not find the existence of a preponderance of

13 the evidence with respect to the defendant's appearance at trial.

14     And with that, this Court orders that the defendant be

15 detained pending trial.

16     Is there anything further from the Government?

17         MS. MAXFIELD-GREEN:  No, Your Honor.

18         THE COURT:  Anything, Mr. Earley?

19         MR. EARLEY:  Not at this time, Your Honor.

20         THE COURT:  All right.  On that, I want to thank all

21 for being here today.

22     Thank you, Mr. Williamson, for your work in this matter.

23     I want to thank the United States marshal.

24     Wish the defendant well and he is remanded, therefore, to

25 the custody of the United States marshal.

1      We are adjourned.

2                          (Court adjourned.)

3                      REPORTER'S CERTIFICATION

4           I, Emily Eakle, Federal Official Realtime Court

5   Reporter, in and for the United States District Court for the

6   Western District of Oklahoma, do hereby certify that pursuant to

7   Section 753, Title 28, United States Code that the foregoing is a

8   true and correct transcript of the stenographically reported

9   proceedings held in the above-entitled matter and that the

10  transcript page format is in conformance with the regulations of

11  the Judicial Conference of the United States.

12                      Dated this 22nd day of January, 2019.

13

14

15                      **/S/ Emily Eakle**
                        EMILY EAKLE, RMR, CRR
16                      Federal Official Court Reporter

17

18

19

20

21

22

23

24

25