1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF OKLAHOMA

3

UNITED STATES OF AMERICA,          )

4                                   )

5          Plaintiff,               )

6   vs.                             )        CASE NO. CR-18-227-SLP

7                                   )

8   JOSEPH MALDONADO-PASSAGE,       )

9                                   )

10         Defendant.               )

11

12                   * * * * * *

13   EXCERPT OF PROCEEDINGS - TESTIMONY OF ALAN GLOVER

14                  VOLUME I OF II

15        BEFORE THE HONORABLE SCOTT L. PALK

16             UNITED STATES DISTRICT JUDGE

17                 MARCH 27, 2019

18                 * * * * * * *

19

20

21

22

23

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**APPEARANCES**

Ms. Amanda Maxfield-Green and Mr. Charles Brown, Assistant United States Attorneys, U.S. Attorney's Office, 210 West Park Avenue, Suite 400, Oklahoma City, Oklahoma 73102, appearing for the United States of America.

Mr. William Earley and Mr. Kyle Wackenheim, Assistant United States Public Defenders, 215 Dean A. McGee, Suite 124, Oklahoma City, Oklahoma 73102, appearing for the defendant.

EXAMINATION INDEX

**ALAN GLOVER**

    Direct Examination by Ms. Maxfield-Green..............   4
    Cross-Examination by Mr. Wackenheim...................  41

Reporter's Certificate................................  66

1          (The following record was made in open court on March 27,

2     2019, in the presence of all parties, counsel, and in the

3     presence and hearing of the jury.)

4          MS. MAXFIELD-GREEN:  Your Honor, the Government's

5     calling Alan Glover.

6          (WITNESS SWORN.)

7          THE COURT:  Mr. Glover, if you would have a seat and

8     adjust yourself to the microphone.  My understanding is that you

9     have some back issues that could complicate you sitting for

10    extended periods of time.

11         THE WITNESS:  Yes, sir.

12         THE COURT:  It would -- it's perfectly okay, if you get

13    to a position that you're becoming uncomfortable or in some level

14    of pain, if you would like to stand and use that microphone there

15    to your side or -- and stretch for a second and then return,

16    however you want to do it, just in order to accommodate for your

17    condition.

18         THE WITNESS:  Thank you, sir.

19                         <u>**DIRECT EXAMINATION**</u>

20    <u>**BY MS. MAXFIELD-GREEN:**</u>

21    **Q.**   Good afternoon, Mr. Glover.  Could you state your full name

22    for the record, please?

23    **A.**   Frank Alan Glover.

24    **Q.**   Mr. Glover, are you currently living in the State of

25    Oklahoma?

1  A.    Yes, ma'am.

2  Q.    Where are you living?

3  A.    At the zoo, GW Exotic Animal Park.

4  Q.    Is that in Wynnewood, Oklahoma?

5  A.    Yes, ma'am.

6        THE COURT:  Mr. Glover, can you pull that front

7  microphone a little bit towards you?  Thank you.

8  Q.    (By Ms. Maxfield-Green)  And are you working at the zoo?

9  A.    Yes, ma'am.

10 Q.    Mr. Glover, where are you originally from?

11 A.    South Carolina, Beaufort.

12 Q.    Mr. Glover, how far did you go in school?

13 A.    About fifth, sixth grade.

14 Q.    What kind of jobs have you had throughout your life?

15 A.    Tree work.

16 Q.    Is that trimming, like --

17 A.    Trimming trees, cutting trees down, yes, ma'am.

18 Q.    Okay.  Are you familiar with a person named Joseph Maldonado

19 or Joseph Maldonado-Passage?

20 A.    Yes, ma'am.

21 Q.    And do you -- based on your association with him, is it --

22 have you mostly just called him Joe?

23 A.    Yes, ma'am.

24 Q.    Do you see Mr. Passage in the courtroom here today?

25 A.    Gentleman sitting over there.  (Indicating.)

1          MS. MAXFIELD-GREEN:  Your Honor, can the record reflect
2    that Mr. Glover indicated the presence of the defendant?
3          THE COURT:  So reflect.
4    Q.   (By Ms. Maxfield-Green)  And, Mr. Glover, I'll just refer to
5    the -- him as Mr. Passage or Joe.  Okay?
6          Now, how was it that you came to meet Joe?
7    A.   From a friend I knew back in South Carolina, Jeff Lowe.
8    Q.   Okay.  And how did you know Jeff Lowe?
9    A.   I have worked for him before.
10   Q.   Okay.
11   A.   Through the years, through the years.
12   Q.   Through the years?
13   A.   Yes, ma'am.
14   Q.   And you worked for him in South Carolina?
15   A.   Yes, ma'am.
16   Q.   Okay.  And what was your understanding of how -- what
17   Mr. Lowe's position was with the zoo here in Oklahoma?
18   A.   He bought it and owned it.
19   Q.   Okay.  And how did you end up coming from -- how or why did
20   you end up coming from South Carolina here to Oklahoma?
21   A.   How did I get here?
22   Q.   Well, why did you come here?
23   A.   Oh, to help Jeff out.
24   Q.   Did he need some workers?
25   A.   Yes, ma'am.

1  Q.   And did you need a job?

2  A.   Yeah.

3  Q.   All right.  So about when did you move from South Carolina

4  to Oklahoma?

5  A.   Oh, it's been several -- I have been here several years.  I

6  went back once, back to South Carolina.

7  Q.   Okay.  So did you come here after Mr. Lowe took ownership of

8  the zoo?

9  A.   Yeah.  I believe he had it maybe three years once I -- when

10  I got here, something like that.  That's what I was -- heard.

11  Q.   Okay.  Once you got to the zoo, did Mr. Lowe put you to

12  work?

13  A.   Yes, ma'am.

14  Q.   What kind of jobs did you do at the zoo?

15  A.   Just odd jobs.  He knows my back was messed up, so he didn't

16  really put a lot on me.

17  Q.   Okay.  Did you do some -- did you do some landscaping and

18  tree work?

19  A.   Yes, ma'am.

20  Q.   Okay.  Did you get to -- was part of your job to interact

21  with the animals?

22  A.   Sometime I got a chance to.

23  Q.   Did you enjoy interacting with the animals?

24  A.   Yes, ma'am.  It was pretty nice.

25  Q.   So when you first got to Oklahoma, was Jeff Lowe still

1   living and working at the zoo?

2   **A.**   Yes, ma'am.

3   **Q.**   At some point after you got here, did he go live somewhere

4   else?

5   **A.**   Yeah.  He went to Vegas.

6   **Q.**   Now, when you got to the zoo, what was Joe's role?

7   **A.**   He was like the caretaker for everyday stuff, made sure it

8   got done.

9   **Q.**   Who did you consider your boss to be?

10   **A.**   Jeff Lowe, and Lauren Lowe now.

11   **Q.**   And what about on a daily basis when you were working around

12   the park and Mr. Lowe wasn't there, who was your boss?

13   **A.**   Joe would be.

14   **Q.**   What was it like for you working for Joe?

15   **A.**   Really hard to describe.  He's an asshole.  Treat his

16   employees like dirt.

17   **Q.**   Okay.  And did you have personal interactions with him that

18   made you feel that way?

19   **A.**   Say it again, ma'am.

20   **Q.**   Did you have personal interactions with him that made you

21   feel like dirt?

22   **A.**   Yes, ma'am.

23   **Q.**   How -- what did he do to make you feel that way?

24   **A.**   Well, he had his little -- everybody's got radios, but he

25   would downgrade me to the point where it was coming close to

1   blows, that's how bad it got.  And not only him; he would get

2   Eric or whoever, get Alan to do this and make sure he does not

3   stop all day.  And he's just -- he's really a cruel, cruel

4   person.

5   Q.   So he'd try to work you hard?

6   A.   Like a slave.

7   Q.   Okay.  And you made reference to the employees having

8   radios.  Did he say stuff over the radios that all the employees

9   could hear about you?

10  A.   Absolutely.  I was a rat, I was a -- all kind -- just really

11  bad stuff.  Like I say, it come close to blows.

12  Q.   Did you ever have blows with Mr. Passage?

13  A.   Nope.  I had many enough confrontations with him, though.

14  Q.   Were there occasions when Mr. Passage was nice to you or not

15  as disparaging to you?

16  A.   Yeah, there would be sometime, he'd take me to the store,

17  get me something to eat, whatever, go to the other restaurant and

18  work up there.

19  Q.   Okay.  So it wasn't -- there were instances where it was

20  okay?

21  A.   Yeah.  Seems like he was fishing for stuff, information,

22  basically.

23  Q.   Okay.

24  A.   You can't be that bad of a person and then turn around and

25  be somebody else.

1  Q.   So even when he was nice to you, you felt like that was --

2  A.   Oh, I knew it was bullshit -- bull.

3  Q.   Now, before you came to Oklahoma to work at the zoo, had you

4  ever heard of a person named Carole Baskin?

5  A.   Before I came to the zoo?

6  Q.   Right.

7  A.   No, ma'am, but I heard about it every day after I got there.

8  Q.   That was going to be my next question.  What did you hear?

9  A.   That he wanted to have that lady murdered or him murder her,

10 all kind of stuff.  It was crazy.  And not only did employees

11 hear it; people on the park could hear it.

12 Q.   Do you think customers overheard him?

13 A.   I'm sure they had to have.  They may have not known what was

14 going on, but we knew.

15 Q.   How often would he make comments about Carole Baskin?

16 A.   Pretty much every day, especially if something -- he got a

17 letter saying, you know, he's got to go back to court, whatnot,

18 he's flip a script.

19 Q.   Flip a script, does that mean --

20 A.   He would go apeshit.

21 Q.   Okay.

22      THE COURT:  Mr. Glover, I would ask you to please watch

23 your language unless you're delivering a quote.

24      THE WITNESS:  Yes, sir.

25 Q.   (By Ms. Maxfield-Green)  Now, did you -- did you have a good

1  idea of what he had against Carole Baskin, what the problem was?

2  A.   From my understanding, it was a major lawsuit.

3  Q.   Did you come to -- from listening to Joe, did you come to

4  find out where she lives?

5  A.   Yes, ma'am.

6  Q.   Where did she live, to your knowledge?

7  A.   He showed me on the computer one time of Big Cat Rescue.

8  Q.   And what state was that in?

9  A.   Florida.

10  Q.   When he showed you that on a computer, who was in the room?

11  A.   I was in the room only.

12  Q.   Just you and Mr. Passage?

13  A.   Yes, ma'am.

14  Q.   All right.  Mr. Glover, did Mr. Passage ever ask you to kill

15  Carole Baskin?

16  A.   He -- we have talked about it several times.

17  Q.   Did you have more -- did you have one conversation about it

18  or more than one conversation?

19  A.   We have had more than one conversation, several.

20  Q.   Now, do you recall October 6th when Mr. Passage's husband

21  died?

22  A.   Yes, ma'am.

23  Q.   Okay.  To the best of your recollection, was the first

24  conversation you had with Mr. Passage about killing Carole

25  Baskin, would that conversation have happened before October 6th

1   or after October 6th?

2   **A.**   I believe it was before he died, I'm thinking.

3   **Q.**   Now, what do you remember -- you have told us there was a

4   conversation where Mr. Passage and you were in a room and he

5   showed you her location on a computer.  Was that the first

6   conversation you had with him?

7   **A.**   No.  We have had conversations before I seen the picture of

8   her.

9   **Q.**   What do you recall about the -- to the extent you can

10  distinguish it in your mind -- the very first conversation you

11  had?

12  **A.**   Went out on the front porch, right before we was getting off

13  work, or actually when we were getting off work, because it would

14  sometime be 11:00, 12 o'clock at night when we'd get off.

15  **Q.**   And you're standing on the front porch -- and let me just

16  clarify, when you got there and were working at the park, did you

17  also live at the park?

18  **A.**   Yes, ma'am.

19  **Q.**   About how far off was the trailer you lived in?

20  **A.**   500 feet maybe, or yards.

21  **Q.**   So this conversation where you're on the front porch, the

22  front porch of what?

23  **A.**   Gift shop.

24  **Q.**   What do you remember about what he said?

25  **A.**   We was talking about it and he wanted to know could I get it

1  done.

2  **Q.**   Why do you think he asked you in particular?

3  **A.**   Well, probably because I was -- have the teardrop on my eye.

4  **Q.**   Did you say you have got a teardrop on your eye?

5  **A.**   Yes, ma'am.  It means two different things.

6  **Q.**   Okay.  Let me ask you first:  Are you referring to -- do you

7  have a -- the jury's on the other side of you.  Do you have a

8  teardrop tattoo under your eye?

9  **A.**   Yes, ma'am, I do.

10  **Q.**   Okay.  And in your experience, what is -- what do people

11  believe a teardrop tattoo means?

12  **A.**   You lost someone you really love or you have killed someone.

13  **Q.**   And do you think that Mr. Passage believed that you'd killed

14  someone?

15  **A.**   Yes, ma'am, I'm pretty sure.

16  **Q.**   And did you let him believe that that's what it meant?

17  **A.**   Yes, ma'am, I did.

18  **Q.**   Now, Mr. Glover, have you ever been convicted of a violent

19  crime?

20  **A.**   Yes, ma'am, I have.

21  **Q.**   What was it?

22  **A.**   Assault and battery with a highly aggravated nature.

23  **Q.**   When was that?

24  **A.**   I think I was about 17.

25  **Q.**   Okay.  Was that in South Carolina?

1    **A.**    Yes, ma'am.

2    **Q.**    Did you serve time in jail?

3    **A.**    Yes, ma'am.

4    **Q.**    About how long did you spend in jail?

5    **A.**    Probably about five years.

6    **Q.**    Okay.  Do you have any other convictions for violent crimes?

7    **A.**    Yes, ma'am.

8    **Q.**    What kind of crimes?

9    **A.**    Assault charges.

10   **Q.**    Okay.  Have you ever done any other stints in prison?

11   **A.**    Here and there.

12   **Q.**    All right.  So when he asked -- Mr. Passage asked you if you

13   could get it done, what did you tell him?

14   **A.**    Yeah, I could get it done.

15   **Q.**    Did he offer to pay you for killing her?

16   **A.**    Yes, ma'am.

17   **Q.**    How much did he offer to pay you?

18   **A.**    5,000 at first, and then after it was done he would take

19   care of me, basically.

20   **Q.**    And what did that mean to you, that he'd take --

21   **A.**    More money.

22   **Q.**    That he'd give you more money?

23   **A.**    Yes, ma'am.

24   **Q.**    So after that first conversation, did you have several more

25   conversations with Mr. Passage?

**A.**   Yes, ma'am.

**Q.**   In the other conversations you had with Mr. Passage about this, were there other people around or was it typically just you and him?

**A.**   Typically just I.

**Q.**   Did you discuss with Mr. Passage different ways of killing her?

**A.**   Yes, ma'am.

**Q.**   How did he want you to do it?

**A.**   Well, with a -- a bow, bow and arrow, which was kind of like a side bow and arrow, it was -- what's it called?

**Q.**   Is it a crossbow?

**A.**   Crossbow.  Thank you.  That, or a rifle he had.

**Q.**   Okay.  And what were your thoughts about -- what did you tell him your thoughts were about using a rifle?

**A.**   Well, I couldn't because I'm a felon.

**Q.**   And what -- can you explain for us why you couldn't because you're a felon?  What does that mean?

**A.**   If I got pulled over by a cop or anything, they would search my vehicle, they always do because of my record.

**Q.**   And --

**A.**   I couldn't afford to get caught with anything.

**Q.**   And is that because it's a crime for a felon to have a gun?

**A.**   Yes, ma'am.

**Q.**   In connection with his idea that you use a gun, did -- did

1  you ever go shooting guns with him?

2  **A.**   Yes, ma'am.

3  **Q.**   What was the purpose of shooting guns with him?

4  **A.**   Target practice, shooting at Tannerite.

5  **Q.**   What's Tannerite?

6  **A.**   Explosives.

7  **Q.**   Did he have any other gear that he thought you might be able

8  to use to go do it?

9  **A.**   He had like a camouflage suit that, you go out in the woods,

10  it would be pretty hard to see you.

11  **Q.**   And did he think that would be something you could take to

12  use?

13  **A.**   Yes, ma'am.

14  **Q.**   Did you ever have any conversations with him about where you

15  could be in terms of finding her?

16  **A.**   Oh, he was showing me he'd seen on the Internet somewhere or

17  another that she likes to take walks, walks somewhere, and that

18  would probably be a good place to do it.

19  **Q.**   Now, you had said that you were uncomfortable with the idea

20  of guns because you have this felony conviction.  Did you propose

21  any other ways of killing her to Mr. Passage?

22  **A.**   Yeah, I would cut her head off.

23  **Q.**   Did he seem okay with that?

24  **A.**   He was fine with it.

25  **Q.**   So over the course of those conversations, did you tell

1  Mr. Passage that you would murder Carole Baskin if he paid you to
2  do it?
3  **A.**   Yes, ma'am, I did.
4  **Q.**   At the time that you told him that, did you intend to
5  actually go kill Carole Baskin?
6  **A.**   No, ma'am.
7  **Q.**   What did you actually intend to do?
8  **A.**   Take his money and run.
9  **Q.**   Okay.  And why would you want to take his money and run?
10  **A.**   Because the way he treated me and the employees and the way
11  he acted, I was ready to get away from there because I had no
12  safety net when Jeff was gone.
13  **Q.**   I'm sorry.  Did you say you had no safety net?
14  **A.**   Yes, ma'am.
15  **Q.**   When Jeff was gone?
16  **A.**   (Witness nodded.)
17  **Q.**   Okay.  So you were ready to go back home to South Carolina?
18  **A.**   Yes, ma'am.
19  **Q.**   Now, during the time period that you were having these
20  conversations with Mr. Passage, or Joe, did you travel from the
21  zoo in Oklahoma down to Dallas?
22  **A.**   Yes, ma'am, I did.
23  **Q.**   And was anybody with you on that trip?
24  **A.**   Yes, ma'am, John Finlay.
25  **Q.**   John Finlay?

1    **A.**    Yes, ma'am.

2    **Q.**    And who is John Finlay?

3    **A.**    One of his wives, or husbands.

4    **Q.**    Is Mr. Finlay somebody who'd been in a relationship with

5    Mr. Passage?

6    **A.**    Yes, ma'am.

7    **Q.**    And did Mr. Finlay work at the park?

8    **A.**    Yes, ma'am, between the park and the restaurant.

9    **Q.**    Okay.  What was the purpose of the trip that you took to

10   Dallas with Mr. Finlay?

11   **A.**    To go pick up a fake ID, have one made.

12   **Q.**    Say again.

13   **A.**    To go pick up a fake ID, get one made.

14   **Q.**    Okay.  And why did you need a fake ID?

15   **A.**    For travels, motels, stuff like that.

16   **Q.**    Okay.  And travels and motels to go where?

17   **A.**    So I wouldn't be -- I wouldn't leave a paper trail.

18   **Q.**    And for your travel to where?

19   **A.**    To Florida to kill that lady.

20   **Q.**    Whose idea was the fake ID?

21   **A.**    Joe's.

22   **Q.**    Had you discussed with Joe how you were going to actually

23   travel from Oklahoma to Florida?

24   **A.**    Yes.  I think he wanted me to take a bus, but I wasn't going

25   for a seven-day ride.

Q.   Why -- what was concerning to you about a seven-day ride on a greyhound bus?

A.   My back for starters, but that would still leave a paper trail, so that's why I needed a fake ID.

Q.   All right.  Where did you go to get the fake ID?

A.   Dallas.

Q.   What kind of a place was it?

A.   Kind of a sign shop, I think.

Q.   How --

A.   Never mind.

Q.   Sorry about that.

     How did you know where to go in Dallas?

A.   Somebody told Joe about it.

Q.   And did you have, like, an address or a location?

A.   Yes, ma'am.

Q.   Did you make it to that location?

A.   Not at first, went to the wrong place.

Q.   Okay.  And then did you get turned around and get to where you needed to be?

A.   Yeah.  He got the correct address.  GPS I guess sent us to the wrong place.

Q.   Who got the correct address?

A.   John.

Q.   John Finlay?  Now, when you got there to the correct place, did you and Mr. Finlay go inside?

1  **A.**    Yes, ma'am, we did.

2  **Q.**    Did Mr. Finlay help you fill out the paperwork?

3  **A.**    Yes, ma'am.

4  **Q.**    Okay.  Did you have your photo taken for the ID?

5  **A.**    Yes, ma'am, I did.

6  **Q.**    Did they make the ID while you waited?

7  **A.**    Yeah.  It only took a couple seconds.

8  **Q.**    Who paid for the ID?

9  **A.**    Joe did.  He gave -- he gave John 200 bucks, which it only

10 cost a hundred.

11 **Q.**    What happened to the other hundred?

12 **A.**    John put that in his pocket.

13         MS. MAXFIELD-GREEN:  Can I have a minute to get my

14 exhibit list, Your Honor?

15         THE WITNESS:  How do you work this fucking thing?

16 **Q.**    (By Ms. Maxfield-Green)  All right.  And if we can see

17 Government Exhibit 20 that's been previously admitted.

18         THE COURT:  Hang on just a second.

19         THE WITNESS:  I'm getting it.  How you work it -- it's

20 heavy.

21      Go ahead, ma'am.  I apologize.

22         MS. MAXFIELD-GREEN:  That's okay.  I think we have got

23 more water coming here.

24         THE WITNESS:  Thank you.  Thank you, lady.

25 **Q.**    (By Ms. Maxfield-Green)  Okay.  And then while we're getting

 1  some water, if we could get Government Exhibit 20 up.  Oh, it's
 2  up.  I need to switch this.  Okay.  There we go.
 3     Okay.  If you'll look at that screen, do you recognize this?
 4  **A.**  Yes, ma'am.  That's the photo ID I got from Dallas.
 5  **Q.**  Okay.  And the name John Alan McDowell, how did you come up
 6  with the name John Alan?
 7  **A.**  Because John was with me and I seen McDowell on the -- some
 8  board that they had in there.  I just ran with it.
 9  **Q.**  And Alan is your name, correct?
10  **A.**  Yep.
11  **Q.**  Okay.  Is there any reason you picked an Arizona ID?
12  **A.**  Not really.
13  **Q.**  Okay.  The date of birth that's on there, is that your
14  actual date of birth?
15  **A.**  Yes, ma'am.
16  **Q.**  Do you still have this ID?
17  **A.**  No, ma'am.  I have looked for it, but I don't.
18  **Q.**  Okay.  Did you lose it somewhere?
19  **A.**  I think I discarded it.  That's a no-no too.
20  **Q.**  What's that?
21  **A.**  That's a no-no too.  Can't have anything like that on me.
22  **Q.**  Okay.
23  **A.**  Being a felon.
24  **Q.**  You discarded it because you didn't want it found on you?
25  **A.**  I'm pretty sure I did, ma'am.

1  **Q.**   Okay.  Now, after you got the fake ID made, did you and

2  Mr. Finlay stay in Texas or did you head back to Oklahoma?

3  **A.**   We was heading back to Oklahoma, but I think he got a call

4  and distracted us to go somewhere else for somebody to look at

5  the ID to tamper with it.

6  **Q.**   Okay.  So did you stop off on the way back to the zoo?

7  **A.**   Yes, ma'am.

8  **Q.**   And do you remember what town you were in?

9  **A.**   No, ma'am.

10  **Q.**   Okay.  Do you know who you were there to see?

11  **A.**   I met the guy before, but I didn't -- I don't really know

12  him know him.

13  **Q.**   Okay.  And you said that he was -- you went there so he

14  could tamper with the ID.  Do you know what he did with it?

15  **A.**   Took a file and files something off the bottom of it.  So I

16  think it was -- stated something that's not used for government

17  use or anything like that, something along the lines of that.

18  **Q.**   Okay.  And this person who altered the ID, was it your

19  understanding that he knew about -- about Joe's plan to have you

20  kill Carole Baskin?

21  **A.**   Yes, ma'am.

22  **Q.**   On the -- during the day that you traveled to Dallas, did

23  you try to reach -- try to reach Joe on the phone?

24  **A.**   I think we did because of -- first we didn't know the right

25  place, whatever.  Can you say that one more time, please?

1   Q.   Sure.  At any time on the trip to Dallas did you try to call
2   Joe on the phone?
3   A.   On the way to Dallas?
4   Q.   On the way or on the way back, at any time.
5   A.   Got lost.  I mean, we had to call to find out something, do
6   you know the right place going.  And I guess he either got a
7   phone call or he made a phone call to go get that scratched off
8   at that man's place.  Other than that, we went back to Wynnewood.
9   Q.   Okay.  So let me see if I understand you.  During the day,
10  either you or Mr. Finlay did, in fact, communicate with Joe on
11  the phone?
12  A.   I think so.  I didn't personally, I don't think.
13  Q.   Now, when you got back to the zoo from Dallas, did you check
14  in with Joe and let him know that you got the fake ID?
15  A.   Not really.
16  Q.   Okay.  At the point at which you had the ID, was Joe ready
17  to put the plan in motion and send you to Florida?
18  A.   No, ma'am, he was not.
19  Q.   Why wasn't he ready to do that?
20  A.   Because our agreement was $5,000 and he had -- he didn't
21  have five grand.
22  Q.   Okay.  And did -- did he think he -- did Mr. Passage say
23  anything to you about that he could get the money?
24  A.   Yeah.  He said just give him time, he was waiting on
25  somebody to come pick something up.

1   Q.   And do you know what that something was?

2   A.   Yes, ma'am, a liliger.

3   Q.   Is that a liliger?

4   A.   I think it's a liliger, yes, ma'am.

5   Q.   Okay.  So sometime after your trip to Dallas to get the fake

6   ID, did you have a conversation with the same guy that had

7   altered the ID?

8   A.   Yes, ma'am.  He came to the park one day.

9   Q.   And did Mr. -- I'll refer to him as Mr. Garretson.  I think

10  you have testified you weren't sure of his name.

11  A.   Yeah.  I'm pretty sure that's who it is, though.

12  Q.   Okay.  Did he ask you questions about the plan to kill

13  Carole Baskin?

14  A.   Yes, ma'am.

15  Q.   And did you tell him some of the details?

16  A.   Did I tell any details about what I was going to do or --

17  Q.   Did you tell him the details of the plan that you had

18  discussed with Joe?

19  A.   He knew.  He knew what was going on.

20  Q.   Okay.  Now, in that conversation did you try to make

21  Mr. Garretson, the guy that had altered the ID, did you try to

22  make him believe that you were going to go kill Carole Baskin?

23  A.   Yes, ma'am, I did.  I had to kind of -- because I thought he

24  was going to kind of like sneak in and take what I needed to get

25  out of there, was the money.

1  **Q.**   Okay.  You thought --

2  **A.**   I just needed the money so I could leave.

3  **Q.**   Okay.  And you thought Mr. Garretson might try to take that

4  money?

5  **A.**   Yes, ma'am.

6  **Q.**   Why did you believe that?

7  **A.**   He's a shady character.

8  **Q.**   Okay.  And did you think he might beat you to it?

9  **A.**   Yes, ma'am, and I would be stuck there.

10  **Q.**   Now, at the time you had that conversation with

11  Mr. Garretson, the guy that had tampered with the ID, did you

12  know that he was recording your conversation?

13  **A.**   Not at the time.

14  **Q.**   Are you aware that there is a recording of that?

15  **A.**   Oh, yeah.

16  **Q.**   And have you seen it before?

17  **A.**   Yes, ma'am.

18  **Q.**   And is that a true and accurate recording of your

19  conversation with him?

20  **A.**   Yes, ma'am.

21          MS. MAXFIELD-GREEN:  Government moves to admit

22  Exhibit 59 and -- 59 and 59-1, and that is the video of the --

23  video and a transcript.

24          THE COURT:  59 and 59-A?

25          MS. MAXFIELD-GREEN:  Sorry.  59 and 59-A.

1    THE COURT:  Mr. Earley -- or, I'm sorry,
2  Mr. Wackenheim?

3    MR. WACKENHEIM:  Same objection as to the transcript
4  that we lodged earlier, but other than that, no.

5    THE COURT:  Thank you.  The objection will be
6  overruled.  59 and 59-A will be admitted.

7    MS. MAXFIELD-GREEN:  And just for the Court's
8  knowledge, it takes place in six clips that are all incorporated
9  into 59.

10    (Video played in open court.)

11  Q.  (By Ms. Maxfield-Green)  Now, Mr. Glover, you were talking
12  to Mr. Garretson in great detail about a plan to kill Carole
13  Baskin; is that right?

14  A.  Yes, ma'am.

15  Q.  And at the time that you were -- and you put a lot of detail
16  in there, you seemed -- your attitude was pretty serious and you
17  talked about going after anybody that ratted on you.

18    MR. WACKENHEIM:  Objection, Your Honor; characterizing
19  his testimony.

20    THE COURT:  Sustained.

21  Q.  (By Ms. Maxfield-Green)  At the time that you were telling
22  Mr. Garretson all that, did you plan on actually going to Florida
23  to murder Carole Baskin?

24  A.  No, ma'am.

25  Q.  Now, you testified earlier that you had by that point -- had

1  convinced Mr. -- convinced Joe that you would kill Carole Baskin.
2  Were those conversations that you had with Joe similar to that
3  one that you had with Mr. Garretson?
4  A.   Yes, ma'am, sometime.
5  Q.   Okay.  So at some point after you got the fake ID did
6  Mr. Passage give you money, as you had discussed, to go to
7  Florida to kill Carole Baskin?
8  A.   Yes, ma'am.
9  Q.   About how long was it after you got the fake ID?
10  A.   Wasn't but a few days, I'm guessing.
11  Q.   To your recollection --
12  A.   Well, we had to wait for the man to come get that cat.  So
13  it was a couple of days later, few days.
14  Q.   And to your recollection, were you at the park for
15  Thanksgiving?
16  A.   This last one?
17  Q.   No, the Thanksgiving in 2017, during the time of all of
18  these conversations?
19  A.   I'm not sure if I was there for it.  I can't remember,
20  ma'am, I really don't, the date of it.
21  Q.   Okay.  So you testified that he did eventually give you some
22  money.  Where did Joe get the money?
23  A.   From selling that liliger.
24  Q.   Were you there when he sold the liliger?
25  A.   Yes, ma'am.  I'm -- I was the one who went to the play area

```
 1  to get it.
 2  Q.   And did you physically pick up the animal?
 3  A.   Yes, ma'am, I did.
 4  Q.   And what did you do with it?
 5  A.   Took it out to the back parking lot so the deal could be
 6  done.
 7  Q.   Did you put the cub in the car?
 8  A.   Yeah.  I handed it to the man and pretty -- yeah, pretty
 9  much put it in the car.
10  Q.   Did you see the person who was leaving with the cub?
11  A.   Yes, ma'am.  I didn't meet him, but I saw him.
12  Q.   Okay.  About how long would you say that you had the chance
13  to look at him?
14  A.   Couple of minutes.
15  Q.   Okay.  Had you -- was he a person you'd ever seen before?
16  A.   I can't say, ma'am.
17  Q.   What did he look like, to the best of your recollection?
18  A.   A hobo.
19  Q.   A hobo?
20  A.   (Witness nodded.)
21  Q.   Okay.  Was he?
22  A.   Not very well-dressed, car looked like he'd been living in
23  it.
24  Q.   Was he a big guy, little guy?
25  A.   Kinda heavyset.  Wasn't a very little guy, no.
```

1  Q.   Did he have hair or bald?

2  A.   He had hair, I'm pretty sure, I think.  I'm not -- I can't

3  say yes or no to that, ma'am.

4  Q.   And you only --

5  A.   Just for a few minutes.

6  Q.   You only observed him for a few minutes?

7  A.   I was more paying attention to the cat than I was him.

8  Q.   Okay.  Did you see this man give Joe the money?

9  A.   Yes, ma'am.

10 Q.   What did you see him give him?

11 A.   Envelope stuffed full of money.

12 Q.   Okay.

13 A.   Hundreds.

14 Q.   Was it -- appeared to be a thick envelope?

15 A.   About like that.  (Indicating.)

16      MS. MAXFIELD-GREEN:  If the record could reflect, I

17 believe Mr. Glover indicated a couple of inches.

18      MR. WACKENHEIM:  That seems accurate.

19 Q.   Around this same time, did you book an airplane ticket to

20 leave Oklahoma?

21 A.   Yes, ma'am.

22 Q.   Where were you going to fly to?

23 A.   To Savannah, Georgia.

24 Q.   Now, had you discussed with Joe that you wanted to go to

25 South Carolina first?

1    A.    Yes, ma'am.

2    Q.    And was he -- did he agree to that plan?

3    A.    He didn't care, as long as I got to Florida.

4    Q.    Did you tell him that you would go to Florida after you got

5    to South Carolina?

6    A.    Yes, ma'am.

7    Q.    How did you tell him you would get to Florida?

8    A.    I have got to get my license straightened out first and then

9    I'll get a vehicle and I'd be able to drive down there.

10   Q.    At the time, did you have a driver's license?

11   A.    No.

12   Q.    So did you intend to go to South Carolina to --

13   A.    Get my license straightened out?  Absolutely.

14   Q.    Now, did you book your own plane ticket or did you have some

15   help?

16   A.    I used my card, but somebody else did it because I don't

17   know anything about computers, so --

18   Q.    Okay.  And do you remember who the person was that helped

19   you book the ticket?

20   A.    If I saw her, I could tell you, but it's a lady from Boston.

21   Q.    How do you know she's from Boston?

22   A.    Her accent.

23   Q.    Okay.  And who paid for your plane ticket?

24   A.    I did.

25   Q.    Did you ask Joe to pay for it?

**A.**   Well, I was kind of getting the money out of it one way or another, so I wasn't really worried about the little plane ticket.

**Q.**   Okay.  After the man who bought the -- the liliger gave Joe the money, did he give you some money?

**A.**   Yes, ma'am.

**Q.**   About how long after that liliger was sold did he give you -- did Joe give you money?

**A.**   I want to say like the next day or so.

**Q.**   Okay.  Where were you when he gave you the money?

**A.**   In the office, at his desk.

**Q.**   Okay.  Did he give it to you in an envelope?

**A.**   Yes, ma'am.  It wasn't the same envelope, though.

**Q.**   It wasn't the same envelope?  What do you mean by that?

**A.**   It wasn't as thick as it used to be.

**Q.**   To your observation, it didn't have as much money as the first envelope?

**A.**   No, ma'am.

     THE COURT:  Mr. Glover, be sure and let the lawyers finish asking their question before you start to answer.  Okay?

     THE WITNESS:  Yes, sir.

**Q.**   (By Ms. Maxfield-Green)  Okay.  So, in your opinion, was it less money than was in the original envelope?

**A.**   Yes, ma'am.

**Q.**   And did you count the money?

1  **A.**   No, I did not.

2  **Q.**   Okay.  Did you eventually count the money?

3  **A.**   Yes, ma'am.

4  **Q.**   Okay.  Did you wait to count it until after -- after you

5  were alone?

6  **A.**   I went to the trailer to put it up.

7  **Q.**   To your recollection, how much was it?

8  **A.**   3,000.

9  **Q.**   Now, you had said earlier that you discussed $5,000 as the

10  initial payment?

11  **A.**   That's what it was supposed to be, ma'am.

12  **Q.**   Did you say anything to Joe about that?

13  **A.**   No, I didn't want to waste another minute there.

14  **Q.**   Now, on or about this same day did Joe ask you to give him

15  your personal cell phone?

16  **A.**   Yes, ma'am.

17  **Q.**   Was it during the same conversation -- go ahead -- was it

18  during this same conversation that he was giving you the money?

19  **A.**   Yeah, it was the same time.

20  **Q.**   Okay.  To your knowledge, why did he ask you for your --

21  **A.**   It was right before I was leaving, I know that.

22  **Q.**   He asked you for your phone right before you were leaving?

23  **A.**   Yeah.

24  **Q.**   Was it the -- maybe the same day that you took your flight?

25  **A.**   Could be, ma'am.  I won't swear to that.

1  Q.   Okay.  To your knowledge, why did he ask you for your phone?

2  A.   I really don't know, didn't care.

3  Q.   Did he give you a different phone?

4  A.   Yes, ma'am.

5  Q.   After your original phone, after you gave it to him, did you

6  ever see that phone again?

7  A.   No.

8  Q.   All right.  Okay.  Let's -- the phone that he gave you,

9  where did that come from?

10  A.   It was a pizza restaurant phone.  It belonged to the park.

11  Q.   Did you say the pizza restaurant phone?

12  A.   Yeah.

13  Q.   Okay.  And when he -- when he gave you that phone, did he

14  use it to give you any information he thought would help you?

15  A.   Yes, ma'am, he did.  He went back there to his desk, sat

16  down and he flipped up on the computer a Big Cat Rescue, what she

17  looked like, different pictures, different way she dresses and

18  whatnot, so I wouldn't kill the wrong person.

19  Q.   Did he use the phone to -- what did he -- what did he do

20  with the screen?

21  A.   Just like that (indicating), took a picture of it and saved

22  it on the phone.

23  Q.   Okay.  So at this point you -- Joe had given you money and a

24  new cell phone.  And then did you, in fact, take that flight to

25  South Carolina?

1    **A.**    Yes, ma'am, I did.

2    **Q.**    And did you fly out of Oklahoma City?

3    **A.**    Yes, ma'am.

4    **Q.**    Who drove you to the airport?

5    **A.**    Daffrey (phonetic) Saff.  I don't know her last name.

6    **Q.**    Was she another zoo employee?

7    **A.**    Yes, ma'am.

8    **Q.**    And just for the court reporter, was she known as Saff,

9    S-A-F-F?

10   **A.**    Guy or girl.

11   **Q.**    Okay.  That person was known as Saff?

12   **A.**    Yes, ma'am.  Female.

13   **Q.**    Now, when you left, did you take your belongings with you?

14   **A.**    Not all of it, just what I know I needed or wanted.

15   **Q.**    Okay.  When you left Oklahoma for South Carolina, did you

16   intend to come back?

17   **A.**    Maybe one day when Jeff -- if Jeff ever would have came back

18   here, I probably would have come back, but I didn't know when he

19   was coming.

20   **Q.**    Okay.  And where did -- where did you land?  You left

21   Oklahoma City and where did you fly into?

22   **A.**    Savannah, Georgia.

23   **Q.**    And how did you get from Savannah, Georgia -- when you

24   landed in Savannah, Georgia, where did you go?

25   **A.**    My daughter picked me up.

```
 1   Q.   And then did you drive to South Carolina?
 2   A.   Beaufort, yes, ma'am.
 3   Q.   All right.  Once you were back in South Carolina, what did
 4   you do?
 5   A.   Me?  I -- I stayed at my daughter's house that night.  She
 6   dropped me off at a friend of mine's, so I just hung out.
 7   Q.   Okay.  Did you get a job?
 8   A.   Yeah and no.  I mean, I kind of stayed with a friend of
 9   mine.  Basically all I do is clean his house, and that was for
10   rent, so I was all good for that.
11   Q.   Okay.  So you had a place to live if you cleaned this guy's
12   house?
13   A.   And the yard work, whatnot like that, so he didn't have to.
14   Q.   Okay.  Mr. Glover, after you made it to South Carolina, did
15   you ever, in fact, go to Florida?
16   A.   Yes, ma'am, I did.
17   Q.   About how long after you got to South Carolina did you go to
18   Florida?
19   A.   Couple of weeks maybe.  I'm not -- I'm not sure 100 percent
20   on that, ma'am.
21   Q.   How did you get there?
22   A.   Took a vehicle.
23   Q.   Did you have a driver's license at that time?
24   A.   No, ma'am.
25   Q.   Did you take a phone with you?
```

1  **A.**   No, I did not.

2  **Q.**   Did you take the money that Joe had given you?

3  **A.**   Oh, yeah.  Yes, ma'am.

4  **Q.**   Mr. Glover, before you left for Florida, when you got in the

5  car, were you drinking alcohol?

6  **A.**   Yes, ma'am.

7  **Q.**   How much alcohol?

8  **A.**   Probably too much to be driving.

9  **Q.**   Were you using drugs as well?

10  **A.**   Painkillers, cocaine.

11  **Q.**   So on the way driving from South Carolina to Florida, were

12  you drunk?

13  **A.**   Pretty much, yes, ma'am.

14  **Q.**   And were you high?

15  **A.**   Yes, ma'am.

16  **Q.**   Now, when you got to Florida, where did you go?

17  **A.**   To a beach.

18  **Q.**   Okay.  You ended up on a beach.  To your best of your

19  recollection, what town in Florida were you in?

20  **A.**   I'm not sure, ma'am, to be honest.  I don't know.  Wasn't

21  really paying attention.

22  **Q.**   Okay.  Did you believe you were in the Tampa area?

23  **A.**   I could have been.

24  **Q.**   But you're not sure?

25  **A.**   No, ma'am.

Q.   And again --

A.   I didn't really pay attention to the signs or nothing.  I just found a beach and found some people to party with.  I had money.

Q.   And were you consistently drunk and high during this trip?

A.   Pretty much, yes, ma'am.

Q.   When you went to Florida -- when you left for Florida, what, to the best that you can recall, what was it your intention to do?

A.   Go tell Carole, at base, what Joe's intentions are, how serious it is, that he wants her that dead.

Q.   You intended to go warn her?

A.   Yes, ma'am.

Q.   Did you ever go to Big Cat Rescue?

A.   No, ma'am.

Q.   Did you ever try to actually make contact of any kind with Ms. Baskin?

A.   I tried to look it up and then call her, but I don't think -- I mean, she's done been threatened so many times she ain't going to believe something like that over the phone.  That would have to be something you would have to do face to face. Say, I'm the person that was supposed to kill you, ma'am.

Q.   So that was your intent when you left South Carolina?

A.   To go tell her?

Q.   Yes.

1  **A.**    Yes, ma'am, it was, that she was at a very high risk of

2  being murdered.

3  **Q.**    And did you ever follow through with your intent to meet up

4  with her?

5  **A.**    No, ma'am.

6  **Q.**    And what did you do instead?

7  **A.**    Got drunk, running out of money, and I made my way back to

8  South Carolina.

9  **Q.**    About how long in total, to the best of your recollection,

10  were you in Florida?

11  **A.**    I'm guessing maybe a day, and then the trip back.

12  **Q.**    Okay.  Did you stay overnight?

13  **A.**    Yes, ma'am.

14  **Q.**    Where did you stay?

15  **A.**    On the beach with some people at their little resort.

16  **Q.**    Okay.  And then did you drive yourself back to South

17  Carolina?

18  **A.**    Yes, ma'am, I did.

19  **Q.**    And after you got back to South Carolina, did you eventually

20  get a different cell phone from the pizza phone that you had?

21  **A.**    Yes, ma'am.

22  **Q.**    And I say the pizza phone, I mean the phone from the pizza

23  restaurant.

24  **A.**    Right.  I still had both of them.

25  **Q.**    So for a period of time you had that phone that Joe had

1  given you, correct?

2  **A.**   Right.

3  **Q.**   And then did you also have a new phone?

4  **A.**   Right.

5  **Q.**   Do you have those phones now?

6  **A.**   You do.

7  **Q.**   I'm sorry?

8  **A.**   The Government does.

9  **Q.**   Okay.  Now, around this time did Mr. -- did Joe ever call

10  you and ask you how things were going, if you'd done it?

11  **A.**   He knows I haven't done it because it would be all over the

12  news.  I doubt if he was really going to call me back and forth.

13  That wouldn't make much sense neither.

14  **Q.**   Now, Mr. Glover, at some point you -- you stated that you

15  currently live in Oklahoma, so obviously you made it back here at

16  some point.  When you got back to Oklahoma -- well, let me ask

17  you first:  About when did you come back to Oklahoma?

18  **A.**   Day after July 4th, July 5th.

19  **Q.**   Would that have been in 2018?

20  **A.**   Let -- yes, ma'am.

21  **Q.**   And since you have -- once you got back to Oklahoma, did you

22  see Joe again?

23  **A.**   No.

24  **Q.**   Did you have any other conversations with him once you got

25  back to Oklahoma?

1   **A.**   This last time?

2   **Q.**   Yes.

3   **A.**   He wasn't even on the park.  He was already --

4   **Q.**   I'm sorry.  Go ahead.

5   **A.**   He had already been removed from the park.

6   **Q.**   Okay.  Now, after you came back to Oklahoma, were you

7   contacted by law enforcement about Joe's plan to kill Carole

8   Baskin?

9   **A.**   Yes, ma'am, I did.

10   **Q.**   And did you voluntarily agree to talk with federal agents?

11   **A.**   Yes, ma'am.

12   **Q.**   And did you voluntarily tell them the same things you have

13   told us here today?

14   **A.**   Yes, ma'am.

15   **Q.**   And did you voluntarily give them the phones that you still

16   had in your possession?

17   **A.**   Yes.

18   **Q.**   Now, Mr. Glover, has anyone with the Government, me or any

19   other lawyer or any federal agents, has anybody from the

20   government made you any promises or agreements with you that

21   you'll have immunity from prosecution?

22   **A.**   No, ma'am, I have not, which worries me.

23   **Q.**   I'm sorry?

24   **A.**   I said, I'm worried about that.

25         MS. MAXFIELD-GREEN:  Pass the witness, Your Honor.

```
 1          THE COURT:  Cross-examination, Mr. Wackenheim?
 2                     CROSS-EXAMINATION
 3  BY MR. WACKENHEIM:
 4  Q.   Mr. Glover, that last question was whether or not any
 5  Government agent had promised you immunity.  Do you remember
 6  that?
 7  A.   Yes, sir.
 8  Q.   Isn't it true that Mr. Lowe assured you that you might be
 9  able to get immunity?
10  A.   No, not really.  He don't have no idea either.
11  Q.   Well, did he communicate to you that he appeared to have
12  some sort of deal worked out where all you had to do was follow
13  his instructions?
14  A.   No, not really.  He said that as long as I told the truth,
15  everything would be fine.  That's how he put it to me.
16  Q.   There's a book in front of you with a blue cover, a white
17  book.  Do you see that?
18  A.   Uh-huh.
19  Q.   Can you open that up to the tab that says 21?
20  A.   I ain't going to be able to see it, so --
21          MR. WACKENHEIM:  May I approach, Your Honor?
22          THE COURT:  You may.
23  Q.   (By Ms. Maxfield-Green)  You have never seen that before,
24  have you?
25  A.   Oh, I can't barely see it now.
```

**Q.**   Yeah.  It's very small, but I'll represent to you that this
is an extraction report for the Samsung phone that you had.  Do
you remember which phone was the Samsung phone?

**A.**   No, sir, not right offhand, only -- I have bought many in my
life.

**Q.**   Was it the phone that had the broken screen on it?  Do you
remember that phone?

**A.**   I wouldn't be surprised if they all didn't have broken
screens.

**Q.**   Well, do you recall having text message conversations with
Jeff Lowe?

**A.**   Yeah, I'm sure I have had conversations.  He wanted to know
when I was coming back.

**Q.**   Did you also ask Mr. Passage when you could come back to the
park?

**A.**   I can't remember if I did anything like that or not.

**Q.**   Do you recall telling Mr. Passage that you missed the park?

**A.**   If I spoke to him, I'm pretty damn well sure I said that.

**Q.**   Do you recall Mr. Passage asking how soon you could get back
to the park?

**A.**   Seems like I have heard that, yeah.

**Q.**   Does that sound around February 26, 2018?

**A.**   Couldn't tell you the dates on that, sir.

**Q.**   Is it true that you generally have a problem with dates?

**A.**   I do, badly.  Dates, times, you name it.

1   Q.   Well, we'll get into those text messages in a bit.

2        Let's back up a bit.  You came to the park because -- well,

3   I was unclear.  How did you find out that Mr. Lowe had ownership

4   of the park?

5   A.   I think seen it online, Facebook or something like that.  I

6   was like, you know, let me give him a jingle.

7   Q.   How did you know Mr. Lowe?

8   A.   Met him from my brother.

9   Q.   You worked for Mr. Lowe?

10  A.   Have I or did he?

11  Q.   Yes, sir.

12  A.   My brother did; so did I.

13  Q.   What kind of work did you do for Mr. Lowe?

14  A.   Wholesale.

15  Q.   What is wholesale?

16  A.   He buys stuff that Walmart couldn't resell or whatnot, items

17  like that.

18  Q.   Did you ever do any of that in Louisiana with him?

19  A.   No, never knew he had a place in Louisiana.

20  Q.   You have done that for years with Mr. Lowe?

21  A.   I have known Mr. Lowe for years.  I have worked for him for

22  a little bit here and there.  True work is my gig.

23  Q.   Is it fair to say that you look up to him a bit?

24  A.   Yes, sir, because he took care of my brother.

25  Q.   How did he take care of your brother?

1  A.    My brother was dying of cancer and he helped him and helped
2  me.
3  Q.    By providing you employment?
4  A.    Say that again.
5  Q.    Did he give you a job?
6  A.    Yeah.
7  Q.    Okay.  And at -- I think you testified that you have had a
8  felony conviction since about 1985; is that fair?  When you were
9  about 17?
10  A.    Started, yeah.
11  Q.    So that kind of changes things; is that fair?
12  A.    Absolutely it changes things.
13  Q.    So was it about that time that you got the teardrop tattoo?
14  A.    Nope.
15  Q.    When did you get that?
16  A.    I got that in Louisiana.  When, I don't remember, just when
17  I was locked up in prison.
18  Q.    And I'm not sure you actually explained what it means to
19  you.  Why -- what does that tattoo mean to you?
20  A.    That I have lost a loved one that I cared a lot about.  My
21  grandmother, come to think about it.
22  Q.    But you're aware that some people see that tattoo and think
23  it means something else?
24  A.    I don't care what other people think.
25  Q.    Well, did you use that tattoo to convince Mr. Passage that

1   maybe you were capable of doing this thing you say he asked you

2   to do?

3   A.   To get that money from him, I would have let him believe

4   anything he wanted.

5   Q.   And that would be that a teardrop tattoo means someone's

6   capable of violence?

7   A.   I never said that.

8   Q.   Well, then what would Mr. Passage have believed about that

9   teardrop tattoo?

10   A.   I don't know what he believed.  I didn't care what he

11   believed.  I just wanted his money so I could leave him.

12   Q.   When you came to the park, how did you get there from South

13   Carolina?

14   A.   Which time?

15   Q.   The first time.

16   A.   I flew.  Jeff picked me up.

17   Q.   You didn't take a train ride?

18   A.   Nope.  Only been on one train and it didn't come here.

19   Q.   When you communicate with Mr. Lowe, is it through text

20   messages?

21   A.   To however I can get ahold of him.

22   Q.   Which would be text messages is one way?

23   A.   Phone calls, texts.

24   Q.   Facebook?

25   A.   Nope.  I don't have Facebook.

1  Q.   You do not?

2  A.   I did a long time ago, but I don't even -- it won't even go

3  to Facebook no more.  I don't know how to get to it.  I lost how

4  to get into it.

5  Q.   Before you lost it, were you able to use it to talk to Jeff

6  Lowe?

7  A.   Yeah.  That's how I found out about the zoo being -- needing

8  a place.

9  Q.   There's been some discussion that you -- one of the reasons

10  you went back to South Carolina was to get some Social Security

11  payments set up.

12  A.   Yeah, that too.

13  Q.   What do you get that for?

14  A.   I broke my neck and my back.

15  Q.   Okay.  So what -- is it disability for --

16  A.   Yes.

17  Q.   -- being unable to work?

18  A.   Yes.

19  Q.   So by working are you in violation of getting those

20  benefits?

21  A.   No, I'm not.

22  Q.   Why is that?

23  A.   Because I don't make no money.  I get a place to stay.

24  Q.   How about the tree work that you do?

25  A.   That was years ago.

```
 1   Q.   Were you getting Social Security disability at that point?
 2   A.   Probably not.  I have lost it, got it back, lost it, got it
 3   back.  It's like a yo-yo with the Social Security people.
 4   Q.   These drug and alcohol problems that you have talked about,
 5   when did those start for you?
 6   A.   Oh, shit.  Alcohol, I probably started drinking when I was
 7   maybe nine.
 8   Q.   And drugs?
 9   A.   Little later on in life.
10   Q.   So I guess it's fair to say that when you came to the park
11   the first time you still had --
12   A.   Yeah.  I had my medication for my back.
13   Q.   Okay.  Let me -- I know what you're -- you know what I'm
14   going to ask, but I have to finish --
15   A.   I have no idea what you're going to ask me.
16   Q.   Okay.  So let me finish the question.
17        When you were at the park that first time, did you have a
18   drinking problem?
19   A.   Yeah.
20   Q.   Did that affect your ability to work at the park?
21   A.   Little bit that I do, no.
22   Q.   Did you show up to work drunk?
23   A.   Nope.  No drunker than I am right now.
24   Q.   When you got off work late the night before, did you drink?
25   A.   Night before what?
```

1  **Q.**   That you showed up to work the following day?

2  **A.**   What are you going at with this?

3        THE COURT:  Mr. Glover, I'm just going to ask you to

4  listen to the question and do your best to answer it, if you know

5  the answer.

6        THE WITNESS:  I don't even know where he's going with

7  it.

8  **Q.**   (By Mr. Wackenheim)  Okay.  Let me rephrase.  That's fair.

9  It's a confusing question.

10    What time would you show up to work?

11  **A.**   Oh, sometime I would be out there 5 o'clock in the morning

12  working.

13  **Q.**   Okay.

14  **A.**   Because in the afternoon it's so hot you can't work.

15  **Q.**   Five o'clock every day?

16  **A.**   No, if I got up early.

17  **Q.**   Okay.  Were there times that you showed up to work hung over

18  from the night before?

19  **A.**   Never.

20  **Q.**   Were there times you showed up to work drunk?

21  **A.**   Never.  I stopped drinking about 7 o'clock at night, and the

22  way I drink, should be nowhere near my system by the time I get

23  up.

24  **Q.**   Can you understand that someone who supervises employees

25  might not want their employees to be drunk while working?

**A.** I'm sure.  It makes good sense to me.

**Q.** Or high on any number of drugs?

**A.** Makes sense.

**Q.** You talked a little bit about what you did at the park.  Do you remember talking about that?

**A.** Yeah, I did odd -- odd jobs, whatever I could do before my back started killing me.

**Q.** So what kind of odd jobs?

**A.** Taking out the trash to washing his truck, washing his truck, his limo, this -- just odd stuff.  Cutting the grass.

**Q.** Did you ever feel like Mr. Passage was asking you to do stuff that you didn't want to do?

**A.** No, doing stuff that I couldn't do, or if I could, I couldn't do it all day long like a slave.

**Q.** Would you tell Mr. Passage that?

**A.** In a certain type of way, yeah.  I just ignored him.

**Q.** Would you tell Mr. Lowe that?

**A.** I would tell him what was going on and he knew what was going on.

**Q.** Mr. Lowe knew that you and Mr. Passage had a -- a personality conflict is putting it nicely?

**A.** Yeah, you could say it like that.

**Q.** Or I could say significant -- or let me back that up.

You two didn't get along at the park; is that fair?

**A.** Nobody got along with him at the park.  That's fair.  How

1  long have you been with him?

2  Q.   At the park you showed up in, is it 2016?

3  A.   I'm not sure, sir.

4  Q.   Okay.  So there were people at the park before you got

5  there; is that fair?

6  A.   Oh, yeah.

7  Q.   And there's people that have been at that park for years,

8  yes?

9  A.   Uh-huh.

10  Q.   Is that a "yes"?

11  A.   Yes, sir.

12  Q.   Okay.  So they were able to work with Mr. Passage for years,

13  yes?

14  A.   Because he had nowhere else to go probably, or didn't have

15  enough --

16  Q.   And in the end -- in the end, that's your situation.  You

17  had nowhere else to go at that point.  You were looking for a

18  place to get out from, yes?

19  A.   Not from the zoo; Joe.

20  Q.   Okay.  Because Jeff Lowe was in Las Vegas, Nevada, correct?

21  A.   Yes, sir.

22  Q.   What was he doing out there?

23  A.   Whatever he was doing.

24  Q.   Well, you're close with him, right?

25  A.   Not that close.  I mean, he was doing play times on a bus,

1    as far as I know.  Other than that, no.

2    Q.    Would he ever send you photographs of some of the things he

3    was doing out there in Vegas?

4    A.    Oh, yeah.

5    Q.    Did it ever make you jealous to see some of the things he

6    was doing in Vegas?

7    A.    Not really.  I was having fun where I was at.

8    Q.    I thought you said you didn't like being at the park.

9    A.    No.  Not under his thumb, no.

10   Q.    So what did you like about being at the park?

11   A.    The meeting of women, girls, something he wouldn't allow.

12   Q.    I think you said you enjoyed working with the animals.

13   A.    Yes.

14   Q.    Is that fair?

15   A.    That's where that enjoyment comes from.

16   Q.    You like doing the play times?

17   A.    Anything.  I haven't done -- done a play time since I have

18   been back, if that's where you're going with this.

19   Q.    You learned quickly that Mr. Passage didn't like Carole

20   Baskin; is that fair?

21   A.    No, he didn't dislike her; he hated her.  There's a

22   difference between --

23   Q.    Right.  What I'm asking is that you learned that quickly?

24   A.    I learned that like the first day I got there.

25   Q.    Right.  Because he'll tell anybody that, right?

1  **A.**   Yes, sir.

2  **Q.**   He'll tell employees and the public?

3  **A.**   Yes.

4  **Q.**   He'll tell people so loudly guests might hear it?

5  **A.**   I'm sure they have heard.

6  **Q.**   Not a secret; is that fair?

7  **A.**   Ain't no secret.

8  **Q.**   How did Jeff Lowe handle these disagreements between you and

9  Mr. Passage?

10  **A.**   He called me up and asked me what actually happened, and I

11  would tell him exactly what would happen, and that would be the

12  end of it.  He would either reprimand me about it or stay away

13  from me.

14  **Q.**   Did you ever get the impression that Mr. Lowe was just tired

15  of hearing about you and Mr. Passage?

16  **A.**   Oh, I'm sure he was sick of hearing it, because I'm sure he

17  was on the phone every day with some thing.

18  **Q.**   So in the fall of 2017 you were ready to get out of that

19  park?

20  **A.**   Yes, sir.

21  **Q.**   You had had enough?

22  **A.**   Yes.

23  **Q.**   Yes?  Now, it's at this point that you claimed that

24  Mr. Passage asked you to kill Carole; is that right?

25  **A.**   Say that again, please.

1  **Q.**   This time period when you're ready to leave the park, that's

2  when you say Joe asked you to kill Carole?

3  **A.**   No, prior to that.

4  **Q.**   Okay.

5  **A.**   Way prior to that.  I'm not exactly sure how long, but, no,

6  it wasn't that close together by far.  We have spoke about it

7  many times.

8  **Q.**   When was the first time?

9  **A.**   I don't know the date.  I could tell you where it was, how

10  it was said, what -- you want me to go through that?

11  **Q.**   I believe the prosecutor can do that.  What I'm interested

12  in is the date.

13  **A.**   I don't know the date.

14  **Q.**   Well, I believe you testified on direct examination --

15  **A.**   I'm not sure --

16  **Q.**   Can I finish my question, please?

17       THE COURT:  Mr. Glover, I'm going to warn you again,

18  please don't interrupt.  Let him finish the question.

19    Mr. Wackenheim, I ask you to do the same, let him finish his

20  answer.

21       MR. WACKENHEIM:  Yes, Your Honor.

22  **Q.**   (By Mr. Wackenheim)  I believe you testified on direct

23  examination that the first time was before the death of

24  Mr. Passage's husband.

25  **A.**   Yes, you're right.

1   Q.   And if I told you that date was October 6th, 2017, would you

2   have any reason to think that's wrong?

3   A.   No.

4   Q.   Okay.  How much before that death?

5   A.   A month maybe.  I --

6   Q.   You just don't know?

7   A.   Within weeks.

8   Q.   Within weeks?

9   A.   Weeks, months.  I would go for a good month because all

10  the being pissy and then giving me rides to the store, doing

11  this, that, whatnot, taking me out to dinner, yeah, it had to be

12  a good month that I had to put up with that.

13  Q.   Have you had any conversations -- let me start over.

14       Before you left the park in 2017, did you have any

15  conversations with Mr. Lowe about what you were planning on

16  doing?

17  A.   No.  I was told not to.

18  Q.   Okay.  So is it what you're trying to -- your testimony is

19  that you were trying to make Mr. Passage believe you were serious

20  about this; is that right?

21  A.   Yes, sir.

22  Q.   And how did you tell Mr. Passage you were going to do this

23  plan?  What were you going to do to Carole?

24  A.   So I would not get picked up with a rifle or a crossbow, I

25  would get a knife when I got down there, in his little suit

1  thing, and kill that lady.

2  **Q.**   By doing what to her?

3  **A.**   Cutting her head off.

4  **Q.**   Have you ever done that before?

5  **A.**   No.

6  **Q.**   Have you ever helped anybody do that before?

7  **A.**   Never.

8  **Q.**   Do you have any experience with that?

9  **A.**   Never.  I can't even cut up a cow in the back.

10 **Q.**   What kind of -- well, and the reason you say you told

11 Mr. Passage this is because you're a felon and can't be found

12 with a gun, correct?

13 **A.**   Absolutely no.

14 **Q.**   Now, have you done some shooting practice with Mr. Passage

15 on the zoo?

16 **A.**   I have been out there when he was shooting.

17 **Q.**   Have you yourself fired --

18 **A.**   I have been out there with him shooting.

19 **Q.**   Have you yourself shot the gun --

20 **A.**   Nope.

21 **Q.**   -- with Mr. Passage?

22 **A.**   Nope.

23 **Q.**   I thought you also said that you can't have a fake ID.  Do

24 you remember that?

25 **A.**   I don't think you probably can, not by law, I guess.  I'm

1   not sure, but it wouldn't be good.

2   Q.   So circling back, the different methods discussed included a

3   knife, yes?

4   A.   Yes.

5   Q.   Tannerite, do you remember that?

6   A.   We were using Tannerite out there to shoot at.

7   Q.   What happens when you do that?

8   A.   It explodes.

9   Q.   Okay.

10  A.   If you hit the target.

11  Q.   Was that one of the methods discussed?

12  A.   Yes, sir.

13  Q.   Was that different than the rifle?

14  A.   No, that was the rifle.  I can't stab Tannerite.

15  Q.   So also a crossbow?

16  A.   Yes.

17  Q.   Okay.  Now, was this going to happen on this walking path

18  that you have talked about?

19  A.   Wherever I could find her that wouldn't be caught,

20  basically.  I had no idea where to even think about looking to

21  kill her, but that was where he made that choice is to do it on

22  that walk path.  What's the chance of me catching her on the walk

23  path?

24  Q.   So this November 6th journey down to Dallas to get a fake

25  ID, do you remember talking about that?

1   **A.**   To?

2   **Q.**   Just now.

3   **A.**   Yes, sir.

4   **Q.**   And that was done to hide your trail; is that right?

5   **A.**   I'm sorry.  Say that --

6   **Q.**   That's okay.

7         What was the reason for getting the fake ID?

8   **A.**   So I could get rooms or something like that so I didn't

9   leave a paper trail with my name on it.

10   **Q.**   But in the end you got a plane ticket with your name on it?

11   **A.**   Yes, but I was going to South Carolina, not Florida.

12   **Q.**   Did anyone ever purchase a bus ticket for you from -- to get

13   to Florida or South Carolina?

14   **A.**   No.

15   **Q.**   Any of these conversations in which Mr. Passage allegedly

16   asked you to kill Carole, was anyone else there during those?

17   **A.**   No, sir.

18   **Q.**   Were those recorded?

19   **A.**   Oh, it was recorded.  We just watched something.

20   **Q.**   Okay.  You're correct, we did watch some of those exhibits.

21   Did any of those exhibits show Mr. Passage asking you to kill

22   Carole Baskin?

23   **A.**   Did you -- I didn't see any.

24   **Q.**   So is it your testimony that Mr. Lowe had no involvement in

25   any of this?

1 **A.** None that I knew of.  I was told not to tell him.  The less

2 people knew the better off and -- go ahead.  I'm sorry.

3 **Q.** Are you finished?  Is there anything --

4 **A.** Yes, sir.

5 **Q.** Okay.  But according to your testimony, Mr. Finlay knew

6 about this, correct?

7 **A.** Yes.

8 **Q.** Mr. Passage knew about this, correct?

9 **A.** Yeah.  He was the one that orchestrated this.

10 **Q.** And Mr. Garretson knew about this, correct?

11 **A.** I believe so.  I didn't know 100 percent if he knew

12 everything or not, but I wasn't taking no chances, that's why I

13 tried to bully him from doing -- going in behind me.

14 **Q.** You testified on direct examination that the only thing you

15 were waiting for was the money.  Do you remember that?

16 **A.** Yes, sir.

17 **Q.** But weren't you -- I'll direct the Government to

18 Exhibit 59-A.

19     You had additional conversations with Mr. Garretson about

20 getting a -- a prostitute?

21 **A.** Yep, a hooker.

22 **Q.** Had you previously gotten a hooker from him?

23 **A.** No.

24 **Q.** Why did -- go ahead.

25 **A.** He was supposed to send me one, but he bowed out, I guess.

1  **Q.**  Why did you expect him to be able to get you one?

2  **A.**  Because he's that type of person.  We spoke about it when he

3  was scratching that stuff off the ID.  I asked him about getting

4  me pills, drugs.  Where I live, you can't find nothing.

5  **Q.**  We watched another clip -- and to be clear, you didn't know

6  that these were being recorded, right?

7  **A.**  No, sir.

8  **Q.**  So at one point you say -- well, you explain your reasons

9  why you're going to do what you're going to do.  Do you remember

10  watching that?

11  **A.**  Yeah.

12  **Q.**  Quote, "That's going to hurt me worse than anything else.

13  This is good for the fucking animals.  This is not about Joe."

14      Do you remember that?

15  **A.**  I'm pretty -- yes, sir, I do.

16  **Q.**  What did you mean about this is good for the animals?

17  **A.**  So his train of thought, if she's dead, she can't sue me.

18  She can't take all these animals and my property.

19  **Q.**  Right.  But the next thing you say is, this is not about

20  Joe.

21  **A.**  Right.  The animals come first.

22  **Q.**  And you said this why?  Why are you telling Garretson these

23  things?

24  **A.**  Because the animals come first, like I just said.  He's

25  secondary.  He's just fronting the money, giving me -- getting me

1  to go murder some lady to save that park, basically.  So, yes,
2  that does go first.
3  Q.   And you were talking to Garretson to make him think you were
4  serious?
5  A.   Yeah -- yes.
6  Q.   Because why?
7  A.   Did not want him getting into the money for me to leave on.
8  He would probably say that he knew somebody or he could get it
9  done, so I was just going to squash that right there, intimidate
10  him.
11  Q.   This is going to be your deal, no one else, you want to take
12  care of this?
13  A.   No.  You wording that one wrong.
14  Q.   Okay.  You don't want Garretson undercutting you --
15  A.   Involved.  I don't want him involved.  Me and him had a
16  deal, that's what was going to happen.  Nobody else is jumping
17  involved with it, screwing this up.
18  Q.   So you knew at that point that Garretson had the
19  conversations or the -- the ability to do this?
20  A.   He would go in the office with Joe at night several times
21  after me and Joe's communications about murdering this lady, and
22  I could think in my head that he is trying to convince Joe not
23  for me to do it, let him have somebody do it.
24  Q.   There was another clip when Garretson's asking if you're
25  going to take a bus.  Do you remember that?

1 **A.**   Yeah.  I remember on tape, but I don't remember we
2 discussing no bus.  I probably did, but -- I mean, I know I did.
3 It was on the --
4 **Q.**   And he's asking you if you're going to take a bus, and you
5 explain, when I came in with the boss, it was four days on a
6 train.  Do you remember saying that?
7 **A.**   I might have.
8 **Q.**   If that was part of the transcript, do you have any reason
9 to believe you didn't say that?
10 **A.**   No.  If it was on there, I said it.  It takes like a week on
11 a train or a bus.  I'm not riding on that.
12 **Q.**   But I thought you said you didn't take a train out to the
13 park.
14 **A.**   I did not take a train out of here or in here.  I may have
15 said that but didn't do that.
16 **Q.**   Were you drunk when you were making these statements?
17 **A.**   Nope.
18 **Q.**   Were you --
19 **A.**   I'm just like I am.  But when I'm aggravated, I get rattled.
20 I could show you.
21         MR. WACKENHEIM:  May I have a moment, Your Honor?
22         THE COURT:  You may.
23 **Q.**   (By Mr. Wackenheim)  Do you recall giving testimony in the
24 grand jury proceeding?
25 **A.**   Yes, sir.

1  Q.   Page 28 and 29.  You were under oath then, yes?

2  A.   Yes, sir.

3  Q.   And you were being asked about the video in which today you

4  say you were not drunk --

5  A.   Pretty sure I wasn't drunk that day.  I was just aggravated.

6  Q.   May I finish my --

7  A.   It was my day off.

8         MR. WACKENHEIM:  Your Honor, I would ask that the Court

9  instruct the witness to wait for the question.

10        THE WITNESS:  Sorry about that.

11        THE COURT:  Mr. Glover, I know it's late in the day,

12 but again, please let him finish the question.  Don't interrupt

13 him.  And then you can answer, if you know the answer.

14        THE WITNESS:  Yes, sir.

15 Q.   (By Mr. Wackenheim)  Now, do you recall being asked, quote,

16 "Now, in that conversation I showed you that video of, had you

17 been drinking that day?"  And you answered yes.

18 A.   I may have been.

19 Q.   So were you drinking that day?

20 A.   May have.

21 Q.   It's your testimony today that you may have?

22 A.   It was my day off.

23 Q.   Were you wearing a park uniform in that video?

24 A.   I don't wear uniforms.

25 Q.   Were you wearing a park uniform in that video?

 1  **A.**    It looked like a shirt, basically like this right here.

 2  **Q.**    So no?

 3  **A.**    I don't think it was.  I hardly ever wore uniforms.

 4           MR. WACKENHEIM:  Your Honor, this may be an appropriate

 5  breaking point.

 6           THE COURT:  I was going to ask you, how much do you

 7  think you have left?  If you have a fair amount left, we will

 8  break, but if you're anywhere close to wrapping up, it may be

 9  better that we can go ahead and finish.  How close are you?

10           MR. WACKENHEIM:  I cannot accurately estimate that

11  right now.

12           THE COURT:  More than 10 minutes, 15 minutes?

13           MR. WACKENHEIM:  Probably.

14           THE COURT:  Okay.  Ladies and gentlemen, we will take

15  our break for this evening.  Again, the usual admonishments:

16  Please don't discuss the case amongst yourselves; don't do

17  anything that would expose you to any kind of media accounts of

18  what's happened; you're limited to those things that happened

19  here in the courtroom only.  Please keep an open mind.  Don't

20  form any opinions yet.  And we will see you at 9 o'clock in the

21  morning.

22           Court will remain in attendance and seated while the jury

23  leaves the courtroom.

24           Mr. Glover if you could hang on just a second.

25           (Jury exited.)

1          (The following record was made in open court, in the

2     presence of all parties, counsel, and out of the presence and

3     hearing of the jury.)

4               THE COURT:  Mr. Glover, you may step down.  I would

5     remind you, you're still under subpoena and you'll be back at

6     9 o'clock in the morning for testimony.

7               THE WITNESS:  Yes, sir.

8               THE COURT:  Counsel, let's talk about timing real

9     quick.  I think what was represented to me, Mr. Earley, is that

10    you may have a witness that's not coming in until Monday?

11              MR. EARLEY:  Yes, that's the plan.

12              THE COURT:  Yeah.  Is there any risk, Government -- and

13    I'm not going to hold you to this, but just for estimate

14    purposes, is there any risk that you-all conclude your evidence

15    before 5:00 on Friday?

16              MS. MAXFIELD-GREEN:  Yeah, Your Honor -- yes, Your

17    Honor.  And depending on how much more Mr. Wackenheim has with

18    Mr. Glover, we could, I think, get to our last witness tomorrow.

19              THE COURT:  Why don't we do this, I would ask counsel

20    to get together after we recess and if you-all could kind of

21    discuss that, I -- I know counsel will do that in good faith

22    and -- and if there is -- if it looks like that's a possibility,

23    I -- Mr. Earley, I think I -- you might be prepared to -- should

24    you choose to put on any evidence, you might be prepared to do

25    that Friday, but even -- I'm going to charge you two with kind of

1    coordinating that and see.

2            MR. EARLEY:  I will advise the Court, as the Court's

3    aware, when we are appointed in cases and we have out-of-state

4    witnesses, those travel arrangements are made through the United

5    States Marshal's office in the district where the individual

6    resides.  I will get a message to those offices and to the

7    individuals, but I'm not quite sure about the short notice on

8    that, but I would --

9            THE COURT:  Yeah.  I understand the intricacies of

10   government travel.

11           MR. EARLEY:  Yes.  So anyway, I will get on it.

12           THE COURT:  Okay.  Well, I understand these are things

13   that may be out of our control, but I would -- my intent is is

14   that we not have to adjourn early for the week.  I would like to

15   keep charging ahead.  But again, if there's anything you can do

16   in that regard, please do so.

17       In the meantime, anything else from either party?

18           MS. MAXFIELD-GREEN:  No, Your Honor.

19           THE COURT:  Mr. Earley?

20           MR. EARLEY:  No, Your Honor.

21           THE COURT:  Court will be in recess.

22                        (Court adjourned.)

23

24

25

1                     REPORTER'S CERTIFICATION

2          I, Emily Eakle, Federal Official Realtime Court

3 Reporter, in and for the United States District Court for the

4 Western District of Oklahoma, do hereby certify that pursuant to

5 Section 753, Title 28, United States Code that the foregoing is a

6 true and correct transcript of the stenographically reported

7 proceedings held in the above-entitled matter and that the

8 transcript page format is in conformance with the regulations of

9 the Judicial Conference of the United States.

10                    Dated this 9th day of May, 2019.

11

12                   **/S/ Emily Eakle**
                    EMILY EAKLE, RMR, CRR

13                     Federal Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25