1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF OKLAHOMA

3
UNITED STATES OF AMERICA,        )
4                                 )
5          Plaintiff,             )
6    vs.                          )      CASE NO. CR-18-227-SLP
7                                 )
8    JOSEPH MALDONADO-PASSAGE,    )
9                                 )
10         Defendant.             )

11

12                  * * * * * *

13    EXCERPT OF PROCEEDINGS - TESTIMONY OF ALAN GLOVER

14                  VOLUME II OF II

15         BEFORE THE HONORABLE SCOTT L. PALK

16            UNITED STATES DISTRICT JUDGE

17                  MARCH 28, 2019

18                * * * * * * *

19

20

21

22

23

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

*Emily Eakle, RMR, CRR*

1
**APPEARANCES**

2
    Ms. Amanda Maxfield-Green and Mr. Charles Brown, Assistant

United States Attorneys, U.S. Attorney's Office, 210 West Park

3
Avenue, Suite 400, Oklahoma City, Oklahoma 73102, appearing for

the United States of America.

4
    Mr. William Earley and Mr. Kyle Wackenheim, Assistant United

5
States Public Defenders, 215 Dean A. McGee, Suite 124, Oklahoma

City, Oklahoma 73102, appearing for the defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     EXAMINATION INDEX

2

3  ALAN GLOVER (continued)

4     Cross-Examination by Mr. Wackenheim.................. 70
      Redirect Examination by Ms. Maxfield-Green.......... 95
5     Recross Examination by Mr. Wackenheim............... 98

6  Reporter's Certificate............................... 99

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (The following record was made in open court on March 28,
 2   2019, in the presence of all parties, counsel, and in the
 3   presence and hearing of the jury.)
 4             THE COURT:  Good morning, ladies and gentlemen.
 5   Welcome back.
 6        Mr. Glover, I remind you, you are still under oath.
 7        Mr. Wackenheim, you may continue with cross-examination.
 8                 CROSS-EXAMINATION (continued)
 9   BY MR. WACKENHEIM:
10   Q.   Mr. Glover, moving back to the three phones that you had.
11   Do you remember having three phones in this period of time?
12   A.   Yes, sir.
13   Q.   There was a phone you had before you left the park in the
14   fall of 2017?
15   A.   Yeah.
16   Q.   And you testified you gave that to Mr. Passage.  Do you
17   remember that?
18   A.   Yes, I did.
19   Q.   And then there was a second phone that you received at about
20   the same time.  Do you remember that phone?
21   A.   Yes, sir.
22   Q.   And that's kind of been called the pizza phone?
23   A.   Right.
24   Q.   Why are we calling it the pizza phone?
25   A.   It was bought for the pizza restaurant, to make phone calls
```

1  with -- in and out for takeout.

2  **Q.**  Did you take that with you to South Carolina?

3  **A.**  Yes, sir.

4  **Q.**  And did you get a third phone while you were in South

5  Carolina?

6  **A.**  Yes, sir.

7  **Q.**  And to your knowledge, all three of those phones, does the

8  Government have those?

9  **A.**  They have two, and the one I got now is the one I got when I

10  got here.  So that has nothing to do with this situation, the

11  phone that I have now.

12  **Q.**  Fair.  And we're not asking about any phone you have now.

13  But the three phones we just talked about, the earlier phones,

14  the Government has those phones, correct?

15  **A.**  Yes, sir.

16  **Q.**  And you gave them two of those phones?

17  **A.**  Yeah.

18  **Q.**  And who gave them the third phone?

19  **A.**  I'm not really sure how it got to them.

20  **Q.**  Okay.  But you know they have it?

21  **A.**  Yeah.

22  **Q.**  Okay.  Now, in the fall of 2017 when all these events

23  happened, you were complaining to Jeff Lowe you wanted off the

24  park, right?

25  **A.**  Yeah.

1  **Q.**   In fact, on October 26, 2017, you texted him --

2          MS. MAXFIELD-GREEN:  Your Honor, objection; hearsay.

3          THE COURT:  Mr. Wackenheim?

4          MR. WACKENHEIM:  Your Honor, it's his own statement.

5  These are -- I mean, I'm not asking about an out-of-court

6  declarant.  I'm asking about Mr. Glover's own statement from a

7  phone in the Government's possession whose authenticity has not

8  been called into question.

9          THE COURT:  Overruled.

10 **Q.**   (By Mr. Wackenheim)  Do you recall on October 26th, 2017,

11 texting Mr. Lowe, "Yeah, I know, I'm trying to get me a plane

12 ticket out of here"?

13 **A.**   I may have said that, yes.

14 **Q.**   And did you also ask -- well, do you also recall texting on

15 the same date -- actually, the next day, depending on how the

16 time zone works, but roughly the same time, quote, Should I get

17 my ass up in the morning and go to work like I always do, see how

18 it pans out.  If not, he'll get me a ticket tomorrow, F'g Jeff, I

19 don't want to leave here, I love this F'g zoo, dude."

20         Do you remember that?

21 **A.**   Yeah, I believe so.

22 **Q.**   And you're asking him what should I do?

23 **A.**   Basically.

24 **Q.**   And what did he tell you to do?

25         MS. MAXFIELD-GREEN:  Your Honor, objection; hearsay.

1          THE COURT:  Sustained.

2   **Q.**   (By Mr. Wackenheim)  As a result of your conversation with

3   Mr. Lowe, what did you decide to do?

4   **A.**   I eventually left.  That's why we're here.

5          MR. WACKENHEIM:  One moment, Your Honor -- well, we'll

6   move on.

7   **Q.**   (By Mr. Wackenheim)  And I think you had testified earlier

8   that you were waiting on some money before you decided to leave;

9   is that right?

10  **A.**   Yes, sir.

11  **Q.**   And you were waiting on money from someone who was going to

12  purchase a big cat, right?

13  **A.**   I was?

14  **Q.**   Well, somebody was.  You were waiting for money?

15  **A.**   Yeah.

16  **Q.**   And that was going to be from the purchase of a cat?

17  **A.**   From a cat, yes.

18  **Q.**   That was your testimony?

19  **A.**   Yeah.

20  **Q.**   And was it a man or a woman that was supposed to purchase

21  this cat?

22  **A.**   A man, it was a man.

23  **Q.**   Could you please boot up Clip 1 of Government's 59?

24         (Video played in open court.)

25  **Q.**   (By Mr. Wackenheim)  So when you were speaking to

1  Mr. Garretson, was it a man or a woman you were waiting for?

2  **A.**   I wasn't waiting on anybody.  I was waiting on Joe to get me

3  my money that I needed to leave with.

4  **Q.**   Was it your understanding that that money was coming from a

5  man or a woman?

6  **A.**   I believe a man.  A man brought it.

7  **Q.**   So but you told Garretson --

8  **A.**   I don't know who he got the money from.

9  **Q.**   When you were speaking to Mr. Garretson on that clip, did

10  you tell him you were waiting for a woman to bring the money for

11  Joe?

12  **A.**   If I did, it was a mistake.

13  **Q.**   Now, when you -- you testified you were the individual that

14  went and got this cub?

15  **A.**   Yes.

16  **Q.**   And gave it to a man?

17  **A.**   Yes, in the back parking lot.

18  **Q.**   And you described him as -- did you say hobo looking --

19  **A.**   Hobo, kind of hobo looking.  He was kind of --

20          THE COURT:  Mr. Glover, be sure and let him finish his

21  question before you start to answer.

22  **Q.**   (By Mr. Wackenheim)  So can you describe what you meant by

23  "hobo looking"?

24  **A.**   Raggedy clothes, raggedy car.  Looked like he lived in his

25  car, not somebody that should be buying a cat.

1   **Q.**   Did you notice anything distinguishing about his face?

2   **A.**   Bearded kind of roughly.

3   **Q.**   During your communications with Mr. Lowe, did he help you

4   figure out who you thought that person was?

5   **A.**   I'm not sure what you mean.

6   **Q.**   Well, at some point you identified who you delivered that

7   cub to, correct?

8   **A.**   Yes.

9   **Q.**   Who helped you identify who you delivered that cub to?

10  **A.**   I did.  I'm the one that saw the picture and I said that's

11  the person I'm sure I gave that cub to.

12  **Q.**   Who showed you that picture?

13  **A.**   I want to say the Government did, I believe.

14  **Q.**   Did Mr. Lowe previously show you that picture to confirm

15  whether or not that was the person?

16  **A.**   I'm pretty sure, yeah.

17  **Q.**   So the first time you confirmed who it was, that was with

18  Mr. Lowe asking you?

19  **A.**   Maybe so.  I'm not sure exactly which way it went, but yes.

20  **Q.**   In the white book, can you turn to No. 62 in front of you?

21  **A.**   We went through this yesterday.  I can't see it, sir.

22          MR. WACKENHEIM:  May I approach, Your Honor?

23          THE COURT:  You may.

24  **Q.**   (By Mr. Wackenheim)  What is that piece of paper in front of

25  you?

1  **A.**   It's a picture of the guy that I handed that tiger to, that
2  cub.

3  **Q.**   So you recognize that individual?

4  **A.**   Looks just like him, yeah.

5  **Q.**   The man that you delivered the cub to?

6  **A.**   Yes, sir.

7  **Q.**   Okay.

8         MR. WACKENHEIM:   Defendant moves for admission of
9  Exhibit 62.

10         THE COURT:   Any objection?

11         MS. MAXFIELD-GREEN:   No objection.

12         THE COURT:   Defendant's 62 will be admitted.

13  **Q.**   (By Mr. Wackenheim)   And so is that the individual you
14  delivered the cub to?

15  **A.**   Looks like it, sir.

16  **Q.**   Do you know his name?

17  **A.**   No, I do not.

18  **Q.**   Now, around this time did you -- I think you testified you
19  gave your phone to Mr. Passage.

20  **A.**   Yeah.

21  **Q.**   And why did you do that?

22  **A.**   He wanted it for some reason, and I didn't really care,
23  didn't ask why.

24  **Q.**   Had you had that phone for a long time before you gave it to
25  him?

1  **A.**    I have had a bunch of phones.

2  **Q.**    How about that phone?

3  **A.**    I'm not sure exactly how long.  It could have been several

4  months.  I guarantee it wasn't past six months.  I haven't kept a

5  phone like that in -- it get broke.

6  **Q.**    Would you be surprised to learn that that phone had over 600

7  contacts, people that you had saved in your phone?

8  **A.**    Oh, it's hard to believe, but it's possible.

9  **Q.**    And that you had over 3,000 text messages saved in that

10  phone, do you have any reason to disbelieve that?

11  **A.**    No.

12  **Q.**    And so you had no problem handing this phone over that had

13  all of this information to Mr. Passage?

14  **A.**    At the time I didn't.

15  **Q.**    But you knew it was going to be mailed to Mr. Lowe, correct?

16  **A.**    No, sir.

17  **Q.**    But didn't Mr. Lowe know that the phone was coming to him?

18  **A.**    Not that I know of.

19         MR. WACKENHEIM:  Would you play Clip 6?

20  **Q.**    (By Mr. Wackenheim)  I'm going to show you a portion of

21  Government's Exhibit 59.

22     (Video played in open court.)

23  **Q.**    (By Mr. Wackenheim)  So that's you on this recording,

24  correct?

25  **A.**    Sounded like it.

1    Q.    Talking to Mr. Garretson, correct?

2    A.    Yes, sir.

3    Q.    And you're talking about Mr. Lowe, correct?

4    A.    Yes, we were.

5    Q.    And when -- when you're describing Mr. Lowe, you say he's

6    not even answering my phone calls.

7    A.    Right.  He's --

8    Q.    And then Mr. Garretson asks really, and you say, he knows

9    what is going on.

10   A.    Oh, yeah, about what I was there to do at the park.

11   Q.    And then Mr. Garretson asks you, I thought he was coming

12   back next week.  Coming back from where?

13   A.    I would think Vegas.

14   Q.    And then you say, he could be, everybody thinks I'm going

15   there.

16   A.    Yeah, I spoke -- Joe and I had planned out to let people

17   know that I was going to South Carolina and then going to Vegas,

18   basically.

19   Q.    So that "everybody," that word did not include Mr. Lowe?

20   A.    Jeff didn't know nothing.  Not to my knowledge, he didn't

21   know nothing.  He wasn't supposed to know anything either.

22   Q.    Okay.  I think you testified that when you went to South

23   Carolina you were picked up by your daughter?

24   A.    Yes, sir.

25   Q.    But you didn't stay with her?

1  A.   No, sir.

2  Q.   You stayed with a friend, correct?

3  A.   Right.

4  Q.   What was your friend's name?

5  A.   Dave Teffer (phonetic).  I stayed there for a night and then

6  I went and stayed at a friend of mine's house for a while, while

7  I was there anyway.

8  Q.   And that second friend, is that the one whose house you

9  cleaned?

10 A.   Yes, sir, kept the yard up.

11 Q.   What was that friend's name?

12 A.   Paul White.

13 Q.   And where does Paul White live?

14 A.   South Carolina.

15 Q.   In Beaumont?

16 A.   Beaufort.

17 Q.   Beaufort.  I apologize.

18 A.   You all right.

19 Q.   But this whole time you're staying in contact with Mr. Lowe,

20 correct?

21 A.   He wouldn't even answer my phone calls.

22 Q.   But you had text message exchanges with him?

23 A.   Yeah.

24 Q.   And you were asked on direct examination if you had any

25 phone calls from Joe.  Do you remember being asked that question

1  yesterday?

2  **A.**    Yeah.

3  **Q.**    And I think your answer, and if I'm -- was he didn't -- no,

4  I had no -- well, you said -- let me back up -- that Joe didn't

5  need to call me because he would find out on the news.  Is that

6  more or less what you said?

7  **A.**    Probably.

8  **Q.**    But just to be clear, did you and Mr. Passage have any phone

9  calls while you were in South Carolina?

10  **A.**    I think we did.  I'm pretty sure we did, because that's what

11  it states, that I did, so yes.

12  **Q.**    When were those phone calls?

13  **A.**    I don't know.  I'm sure I was loaded.  I don't really

14  remember, to be honest with you.

15  **Q.**    And was it in February of 2018 you learned Mr. Passage

16  wanted you back on the park?

17  **A.**    Yeah.  I wasn't sure exactly what was going on because I --

18  I didn't know what anybody knew.  I just knew something wasn't

19  right and I couldn't get heads or tails out of nobody.

20  **Q.**    Well, around that time were you sending him messages about

21  him being in a car accident?

22  **A.**    Oh, yeah.  I heard he got in a bad accident, broke his hip

23  and whatnot.

24  **Q.**    And do you remember telling him how you missed being at the

25  park?

1   **A.**   Yeah, I'm sure I did.  That park means a great deal to a lot

2   of people.

3   **Q.**   Do you remember telling him how soon you could get back to

4   the park?

5   **A.**   Maybe.  Really had no intentions of coming back until I knew

6   somebody was going to be there to save me.

7           MR. WACKENHEIM:  Your Honor, I'm going to move for

8   admission of Defendant's Exhibit 21.  Pages 3 and 4 are the

9   relevant text messages back and forth between Mr. Glover and

10  Mr. Passage.  The jury's already seen excerpts of Mr. Passage's

11  responses.

12          THE COURT:  So are you singling out Pages 3 and 4 for

13  admission or are you wanting to admit the entirety of Defendant's

14  21?

15          MR. WACKENHEIM:  Well, I think we'll get to Page 2.  I

16  don't know if we're there yet.  I just -- I don't think there

17  is -- certainly Pages 3 and 4 at this point, we're moving for

18  their admission.  We can wait on Page 2.

19          THE COURT:  Government?

20          MS. MAXFIELD-GREEN:  No objection to Pages 3 and 4.

21          MS. DAVIS:  I think we should call it 21-A.

22          THE COURT:  Counsel, do you have any objection?  Can we

23  call that Defendant's 21-A to include Pages 3 and 4, just so

24  there's no confusion in the record?

25          MR. WACKENHEIM:  No, Your Honor.

1          THE COURT:  Counsel for the Government, Ms. Green, are

2   you fine with that?

3          MS. MAXFIELD-GREEN:  That's fine, Your Honor.

4          THE COURT:  Okay.  21-A will be admitted.  It's Pages 3

5   and 4 of Defendant's 21.

6   Q.   (By Mr. Wackenheim)  I think yesterday you said you had not

7   seen these types of reports, but we already know that these have

8   come from one of the phones you had in Florida.  I'm going to

9   direct your attention to --

10  A.   Never had a phone in Florida.

11  Q.   Excuse me.  South Carolina.

12       Number 361, you have a text message sent February 26th, "I

13  heard you got in a really bad car accident.  How are you doing,

14  sir.  I miss the park."  Do you remember that?

15  A.   I'm looking at it.

16  Q.   Again, "Hey, I would -- hey, would you tell everyone at the

17  meeting this morning I said hello, I'll see them soon, I love

18  them all."

19  A.   Yep.

20  Q.   What meeting are you talking about?

21  A.   Morning meetings, afternoon meetings.

22  Q.   And then from Mr. Passage, "Not bad, still have to fix my

23  hip."  What's he talking about there?

24  A.   Fixing his hip.

25  Q.   "Sure will," from Mr. Passage.  And then Mr. Passage asks,

1   "How soon can you get back?"  Do you remember him asking you

2   that?

3   **A.**   I'm looking at it.

4   **Q.**   And then, "My check comes in on the 1st, I see my doctor on

5   the 12th, the day after, would that be okay, sir."

6        What check are you referring to?

7   **A.**   Say that again, please, sir.

8   **Q.**   When Mr. Passage asks you how soon can you get back, you

9   respond, my check comes in on the 1st.  What check are you

10  talking about?

11  **A.**   Social Security check.

12  **Q.**   Following text, "Could you please have someone pick me up?"

13  **A.**   Yeah, I'm sitting there bullshitting him.  I had nothing

14  better to do.

15  **Q.**   "How is everything going on at the park, sir?"  So you are

16  still asking about how the park is going at that point?

17  **A.**   Yeah.

18  **Q.**   "Not bad."  And then, Mr. Passage, we saw this earlier, says

19  to you, "Miss you."  And in response --

20  **A.**   I must have been drunk.

21  **Q.**   You say, "Yeah, believe it or not, I miss you too.  That's

22  F'g crazy."  He says LOL and you tell him, "I never dreamed I

23  would say that."  Why did you never dream you would say that to

24  Mr. Passage?

25  **A.**   Because I just -- I must have been drunk, like I says.

1  **Q.**   And you sent a message that you do miss the zoo.  Do you
2  remember that message?

3  **A.**   I have seen it.  What time was this in the evening,
4  actually?  That would help me out a lot.

5  **Q.**   Well, we have heard testimony that this time right here is
6  six hours in the future.

7  **A.**   Okay.  Help me with that.

8  **Q.**   So that would have been in the morning.

9  **A.**   Wait.  What time in the morning, 3:00, 2:00?  Because I know
10 when I start drinking and I know when I quit.

11 **Q.**   So it's possible you're drinking while you're sending these
12 messages to him?

13 **A.**   I'm pretty sure I was.

14 **Q.**   Probably likely?

15      And you have a series of more exchanges, but it was not
16 until this exchange that we heard earlier, "Have you got ant
17 (sic) of the cash left?"  And that's from Mr. Passage.  Do you
18 recall that text message?

19 **A.**   Yeah.

20 **Q.**   And you say, "Not really, sir, but I can cash, Social
21 Security still owes me $3,760."

22 **A.**   Yep.

23 **Q.**   And what does Mr. Passage say to you?  "All good."  Because
24 he wanted you back at the park at that point, right?

25 **A.**   Yeah.

1  **Q.**   He wasn't worried about any of this cash, right?

2  **A.**   I didn't realize I made a mistake on stealing that money.

3  **Q.**   Now, you corrected me very quickly that you didn't take a

4  phone to Florida, right?

5  **A.**   Right.

6  **Q.**   Why?

7  **A.**   Didn't want -- I didn't need it.

8  **Q.**   Well, isn't it true that you have been -- go ahead.  I'm

9  sorry.

10 **A.**   I wanted to get away and go tell that lady that shit, but I

11 don't know.  I just couldn't do it.  I should have.

12 **Q.**   Isn't it true that you did not, in fact, go to Florida?

13 **A.**   Yes, I did go to Florida.

14 **Q.**   You did go to Florida?

15 **A.**   I just don't know if I got to the Tampa area.

16 **Q.**   Isn't it true you had conversations with Mr. Lowe about

17 whether or not you should tell authorities that you went to

18 Florida?

19 **A.**   Yeah.  He told me to tell them the truth.  That's why I came

20 back.

21 **Q.**   So we have heard you being recorded by Mr. Garretson.  Have

22 you ever been recorded by Mr. Lowe?

23 **A.**   I -- I don't know.  I'm not 100 percent sure about that, but

24 the Government found out information that I know I didn't tell

25 them, so somebody had to tell them.

1  **Q.**   So you have reason to believe that Mr. Lowe was recording
2  your conversations?
3  **A.**   Yeah.
4  **Q.**   Do you remember talking to him on June 21st, 2018?
5  **A.**   No, I do not.
6  **Q.**   And just to maybe put a landmark, that would have been about
7  two weeks before you came back to the park?
8  **A.**   This last time?
9  **Q.**   Correct.
10 **A.**   Probably.
11 **Q.**   Does that help you remember that conversation?
12 **A.**   No.
13 **Q.**   Okay.  Do you recall telling him, in the context of what's
14 going on, "I can say I went down there then."  Do you remember
15 telling Mr. Lowe that?
16 **A.**   No, I don't.
17 **Q.**   So if that's on a recording and it shows you saying that,
18 how would you explain that?
19 **A.**   Say I went down there for a day.
20 **Q.**   No.  How would you explain telling Mr. Lowe you'll say that
21 you went down there if you want me to?
22 **A.**   No, I never said nothing like that.
23 **Q.**   What did you say?
24 **A.**   What you just said, but it wasn't put like that.
25 **Q.**   Because you're --

1  **A.**  I said it because I went down there for a day and a half.
2  So that would be the damn truth, so you're getting it.  How I may
3  have said it, that is the truth.
4          MR. WACKENHEIM:  Your Honor, can we approach?
5          THE COURT:  You may.
6     (The following bench conference was held outside the hearing
7  of the jury.).
8          MR. WACKENHEIM:  Your Honor, I elected to do this at
9  the bench because this might be a long argument here, but
10  Defendant's Exhibit 20 -- and I'm referring to the first --
11  what's marked -- yeah, the first three pages.  The fourth page
12  I'll have to -- the first three pages.
13          THE COURT:  The first three pages including the
14  extraction report summary?
15          MR. WACKENHEIM:  Correct, Your Honor.  Correct.
16     These first three pages document a conversation between
17  Mr. Lowe and Mr. Glover shortly after Mr. Lowe begins cooperating
18  with Agent Bryant.  It is a sequence of -- of messages in which
19  Mr. Lowe and Mr. Glover discuss what to do, what to say to
20  authorities, and what Mr. Lowe has already told authorities so
21  that Mr. Glover is aware of what Mr. Lowe has already told.  And
22  in, what we would argue, in a manner to be consistent with what
23  Mr. Lowe has already said.
24     So we're going to move for these admissions.  I understand
25  that there may be a hearsay objection.

1          MS. MAXFIELD-GREEN:  Yes, Your Honor.  That's straight

2    hearsay.  They're out-of-court statements made almost -- most of

3    the text messages are from Jeff Lowe.  There's only a few that

4    are actually to Mr. Glover -- I'm sorry -- to Jeff Lowe from

5    Mr. Glover.  So all -- the majority of the statements are hearsay

6    on behalf of Jeff Lowe.

7          The statements by Mr. Glover are also still hearsay.  These

8    are all out-of-court statements.  They're trying to offer them

9    for the truth of the matter asserted.  He can cross-examine

10   Mr. Glover about whether Mr. Lowe told him what to tell

11   authorities and whether he suggested facts to him or anything

12   like that.  We don't -- he can do that without introducing

13   hearsay.

14          MR. WACKENHEIM:  Well, we don't -- step one, this isn't

15   hearsay.  Is it a statement -- is it made by an out-of-court

16   declarant?  Yes.  But is it offered for the truth of the matter?

17   Are we offering it for the truth of what Mr. Lowe said?  And we

18   are not.  We are offering it to show why Mr. Glover is testifying

19   the way he did, and, arguably, to impeach him when he denies that

20   Mr. Lowe told him these things.

21          So step one, I don't even think we get to hearsay.  We think

22   it's not being offered for the truth of the matter.

23          THE COURT:  Well, Mr. Glover hasn't denied that he said

24   these things, has he -- or that Mr. Lowe said these things, did

25   he?

1          MR. WACKENHEIM:  He has been -- as far as I remember,

2   correct me if I'm wrong -- but as I recall, he's testified

3   Mr. Lowe told me to say the truth, the truth, but there are

4   specific details in these text messages from Mr. Lowe to

5   Mr. Glover.  For example, looking at No. 76 on the first page,

6   Mr. Lowe tells -- "Alan told them that you probably saw a chance

7   to scam Joe out of some cash and took the chance," moving up,

8   "because Joe treated you like shit."  Moving up, "There you go,

9   proof I didn't know."

10       And, Your Honor, that's the story that Mr. Glover has had.

11   That's the story that we submit was given to him by Mr. Lowe.

12          THE COURT:  I mean, I think you can cross-examine

13   Mr. Glover about that without introducing the statement.

14          MS. MAXFIELD-GREEN:  And, Your Honor, Jeff Lowe was on

15   the defense witness list.  They have made no attempt to subpoena

16   him.  He is available to be a witness in this trial, if he would

17   be subpoenaed.  They have made no attempt to do that and they

18   can't attempt to get his testimony about Jeff Lowe in without

19   calling him.

20          MR. WACKENHEIM:  Well, I would just note that he's also

21   been a Government agent since as early as June 2018 and the

22   Government has elected not to call him as well.  And there has

23   been a number of hearsay statements that have come in when the

24   Government's offered them.  We're here simply -- we believe this

25   is material to our defense, could meet the residual exception as

1  well under the hearsay rules of the Federal Evidence Code.  And

2  arguably, it denies us our right to confrontation, because this

3  is material to our defense, to impeach.

4          MS. MAXFIELD-GREEN:  Your Honor, if the defense wants

5  to confront Jeff Lowe, they need to call Jeff Lowe as a witness.

6          THE COURT:  The fact of the matter is we have -- I have

7  allowed a fair amount of hearsay on both sides because of

8  weighing the context for a number of things.  And we have lapsed

9  into that -- a lot of attempts to -- I'm not necessarily saying

10 improperly -- but characterize some statements as not being

11 hearsay because they're not offered to prove the truth, but they

12 are bordering on getting far afield.  And I do find that to

13 introduce this entire text exchange between Mr. Glover and a

14 witness who is available, Mr. Lowe, I do think -- do think is

15 hearsay.

16      You can certainly call Mr. Lowe, should you choose.  You can

17 certainly cross-examine Mr. Glover about this.  But the objection

18 to introducing the entire content of this text exchange with

19 another person who's not testifying is sustained.

20          MR. WACKENHEIM:  Okay.  And just for clarification,

21 when I am cross-examining, I'm concerned about the detail in

22 which I'm able to ask him about his conversation with Mr. Lowe

23 because these messages give me specific questions, but those

24 specific questions might themselves draw an objection for

25 introducing the out-of-court statement.

1          THE COURT:  I'm sorry.  I didn't mean to interrupt.

2       I think the point is, is that with cross-examination you

3  have got some leeway.  I think you can simply make your point and

4  confront him about that without going into the statement.  I

5  think you can ask him about the theory that you're suggesting in

6  terms of -- and you can ask him about it without going into

7  quoting the -- the statement of Mr. Lowe.  We --

8          MS. MAXFIELD-GREEN:  In fact, we -- the Government

9  would object to Mr. Wackenheim simply quoting the text messages

10  and asking if that's what was said.

11         THE COURT:  Yeah, I think everybody understands that.

12         MR. WACKENHEIM:  I -- I won't even paraphrase.  I'll

13  zoom out even further than that.  But I just wanted to approach

14  because I knew this would be a lengthy --

15         THE COURT:  I appreciate that.  Thank you.

16       (The following record was made in open court, in the

17  presence of all parties, counsel, and in the presence and hearing

18  of the jury.)

19         THE COURT:  Nobody should have to hear that white noise

20  before noon.  We'll work on some elevator music.

21  **Q.**   (By Mr. Wackenheim)  Mr. Glover, is it fair to say that in

22  June of 2018 your communications with Mr. Lowe about Mr. Passage

23  increased; you started talking about him a lot more?

24  **A.**   Could have.  Can you be more specific?

25  **Q.**   Yes.  At that point is it when you learned that Mr. Lowe

1  believed that Mr. Passage was the subject of an investigation?

2  **A.**   When did I know this?

3  **Q.**   Well, was this -- these conversations --

4  **A.**   After I got back.

5  **Q.**   Okay.  So you --

6  **A.**   I didn't know anything until after I got back.  I was still

7  lost, and I'm still lost.

8  **Q.**   Fair.  You came back the day after the Fourth of July?

9  **A.**   Yes, sir.

10 **Q.**   So is it your testimony that before then you didn't know

11 anything about what's going on?

12 **A.**   Just, like, little bits.  He said he was off the park at one

13 time and I thought maybe -- I didn't understand.  He left and

14 went somewhere.  I didn't understand -- I figured he left and

15 went somewhere.  I didn't know there was a whole big storm

16 brewing down there and didn't know anything about it.  Didn't

17 know anything about the FBI really until I got back here, but I

18 knew I had to come back here.

19 **Q.**   So you didn't learn from Mr. Lowe that Mr. Lowe was working

20 with federal agents?

21 **A.**   Before I got back, yes, but that's why I had to come back.

22 **Q.**   And in those communications, you and Mr. Lowe are talking

23 about what you will say to federal agents?

24 **A.**   I'm sure that we -- I'm probably -- yeah.  I would think so.

25 I mean, I have never done this before.  I don't think he has,

1   so -- and then having to talk to him after stealing from him

2   also, that was pretty hard.

3   **Q.**   You testified yesterday that you did go to Florida, right?

4   **A.**   Yeah, I went somewhere in Florida.

5   **Q.**   Didn't take a phone with you, right?

6      Now, you're aware that phones have location information on

7   them, right?

8   **A.**   Yeah.

9   **Q.**   So someone, if they had the ability, could figure out where

10  a phone was at any time?

11  **A.**   Oh, yeah.

12  **Q.**   And isn't that why you didn't take a phone to Florida?

13  **A.**   Yeah, pretty much.

14  **Q.**   Or is it because the Florida story is made up?

15  **A.**   No, it is not made up about that story.

16  **Q.**   If you were going to confront Ms. Baskin to explain what was

17  happening, why would you be worried about taking a phone that had

18  location data on it?

19  **A.**   I just wasn't thinking about that.  It was just in -- I

20  thought about it; it drove me crazy.  I had to tell two people

21  back home what I was here to do, just to get it off my chest.  It

22  was bothering me that bad.

23  **Q.**   I mean --

24  **A.**   Nothing made up about this.

25  **Q.**   Isn't it -- isn't it a better story for you to go to

1  Florida?

2  **A.**   No.   It's just the truth.

3  **Q.**   But we can't verify that because you didn't bring a phone

4  with you, correct?

5  **A.**   I guess, yes.

6  **Q.**   Now, you said that when you went to Florida you wanted to

7  contact Ms. Baskin, and was it just walk up to her and tell her

8  what was going on?

9  **A.**   Yeah, basically.  A phone call wouldn't have -- she's done

10 seen so much videos of him wanting to kill her and acting,

11 pretending like he's shooting her head off, I don't think a

12 telephone call was going to make a bit of difference.

13 **Q.**   How about a telephone call to law enforcement?

14 **A.**   I know.  I'm stupid.  I wish I'd have never even done this.

15 **Q.**   Now, you learned that Mr. Passage was removed from the park,

16 right?

17 **A.**   Yeah.  Right before I got there, actually.

18 **Q.**   And that was Mr. Lowe that removed him from the park?

19 **A.**   Yes, that's what I understand.

20 **Q.**   And you're currently working -- sorry?

21 **A.**   Yes, sir.

22 **Q.**   And you're currently working at the park?

23 **A.**   I'm there, yes, sir.

24 **Q.**   And you're being paid by the owner of the park?

25 **A.**   I get a Social Security check.  He gives me a place to live.

1  **Q.**   Okay.

2  **A.**   He helps me out.  When I wasn't getting my check for so

3  long, yeah, he helped me out with, you know, giving me money.  It

4  has to go back to him.

5  **Q.**   You're in debt to Mr. Lowe?

6  **A.**   Well, a little bit.  I had $3,000 to pay him.  I got a

7  thousand left to pay him.

8  **Q.**   But you pay no rent where you live?

9  **A.**   He helps me with everything like that.

10  **Q.**   In exchange for you working there?

11  **A.**   Yeah.

12       MR. WACKENHEIM:  May I have a moment, Your Honor?

13       THE WITNESS:  He kind of takes care of me like that.

14       MR. WACKENHEIM:  No further questions.

15       THE COURT:  Thank you.

16  Redirect?

17       MS. MAXFIELD-GREEN:  Yes, Your Honor.

18                    <u>**REDIRECT EXAMINATION**</u>

19  <u>BY MS. MAXFIELD-GREEN:</u>

20  **Q.**   Mr. Glover, so Mr. Wackenheim was asking you about the man

21  that picked up the cat, that -- where the money came from.  Do

22  you remember that?

23  **A.**   Yes, ma'am.

24  **Q.**   Okay.  And it was a man that picked up the cat, correct?

25  **A.**   Yes.

 1   **Q.**   And you didn't know if he was going to be the ultimate
 2   owner, did you?
 3   **A.**   No, I did not.
 4   **Q.**   Is it possible that he could have been picking that cat up
 5   for somebody else?
 6   **A.**   Yes, very well.
 7   **Q.**   Okay.  Now, on direct you said that when you were around
 8   that man that you had about two minutes that you were around him,
 9   correct?
10   **A.**   Yeah, roughly.  Just enough to hand him the cat, or get
11   placed in the back of the car, and looking at the cat, and
12   then --
13   **Q.**   And at the time that you were around this man, you were
14   holding a liger cub, right?
15   **A.**   Right.
16   **Q.**   About how much did that liger cub weigh, do you think?
17   **A.**   35, 40 pounds maybe.
18   **Q.**   35 or 40 pounds.  So pretty big, right?
19   **A.**   They're solid, really thick animals.
20   **Q.**   Are they kind of squirmy?
21   **A.**   Can be.
22   **Q.**   Were you trying to be careful because could that animal
23   scratch or bite you?
24   **A.**   It could.
25   **Q.**   So is it fair to say that when you were around this man for

1  about two minutes you were preoccupied with the cat?

2  **A.**   Right.

3  **Q.**   And you remember -- you remember when you testified in grand

4  jury?

5  **A.**   Yes, ma'am.

6  **Q.**   And that the -- that it was me, I showed you one photo of a

7  man, correct?

8  **A.**   Right.

9  **Q.**   And you said, yeah, that's the guy.  Do you remember that?

10  **A.**   Yes, ma'am.

11  **Q.**   Okay.  Now, did I -- did I show you just one photo, correct?

12  **A.**   Right.

13  **Q.**   I didn't show you, like, ten photos, did I?

14  **A.**   No, ma'am.

15  **Q.**   And ask you to pick out the person you remember out of a

16  photo lineup of ten people?

17  **A.**   Right, right.

18          MS. MAXFIELD-GREEN:  Let's see.  Can I see

19  Government's -- no.  I'm sorry.  Defendant's 20.

20       And I'm sorry.  I'm looking at Defendant's 21-A.

21  **Q.**   (By Ms. Maxfield-Green)  Mr. Glover, this is -- has already

22  been established that this is a text message exchange between you

23  and Mr. Passage.  And on February 26th of 2018, Mr. Passage texts

24  you, "Hey, you got ant of the cash left?"  And I believe it

25  appears that that means "any."  So he was texting you, hey, you

1   got any of the cash left.  And this was in February of 2018.

2   What cash was he talking about?

3   **A.**   Money that I was sent down there with to kill Karen (sic)

4   Baskin, because I haven't done it yet.

5          MS. MAXFIELD-GREEN:  That's all for the Government,

6   Your Honor.

7          THE COURT:  Thank you.

8      Anything further, Mr. Wackenheim?

9          MR. WACKENHEIM:  Just a couple.

10                     **<u>RECROSS EXAMINATION</u>**

11  <u>BY MR. WACKENHEIM:</u>

12  **Q.**   So at grand jury Ms. Green showed you a photograph of that

13  man and you identified him, correct?

14  **A.**   Correct.

15  **Q.**   Earlier Agent Bryant showed you that photograph and you

16  identified him, correct?

17  **A.**   Yes.  It was the same person.

18  **Q.**   And even before that, Mr. Lowe showed you that photograph

19  and you identified him, correct?

20  **A.**   I believe so.

21  **Q.**   How old was that cub that you were holding?

22  **A.**   I'm not sure.  I really don't know.

23          MR. WACKENHEIM:  Thank you.

24          THE COURT:  Thank you, Mr. Glover.  You may step down.

25               (Conclusion of requested testimony.)

1                            REPORTER'S CERTIFICATION

2            I, Emily Eakle, Federal Official Realtime Court

3  Reporter, in and for the United States District Court for the

4  Western District of Oklahoma, do hereby certify that pursuant to

5  Section 753, Title 28, United States Code that the foregoing is a

6  true and correct transcript of the stenographically reported

7  proceedings held in the above-entitled matter and that the

8  transcript page format is in conformance with the regulations of

9  the Judicial Conference of the United States.

10                     Dated this 9th day of May, 2019.

11

12

13                     **/S/ Emily Eakle**

14                     EMILY EAKLE, RMR, CRR
                         Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25