1         IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF OKLAHOMA

3

UNITED STATES OF AMERICA,              )

4                                        )

5              Plaintiff,                )

6    vs.                                 )    CASE NO. CR-18-227-SLP

7                                        )

8    JOSEPH MALDONADO-PASSAGE,           )

9                                        )

10             Defendant.                )

11

12                      * * * * * *

13    EXCERPT OF JURY TRIAL - TESTIMONY OF JOSEPH MALDONADO-PASSAGE

14              BEFORE THE HONORABLE SCOTT L. PALK

15              UNITED STATES DISTRICT JUDGE

16                      APRIL 1, 2019

17                    * * * * * * *

18

19

20

21

22

23

24

25    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription.

1

## APPEARANCES

2      Ms. Amanda Maxfield-Green and Mr. Charles Brown, Assistant
United States Attorneys, U.S. Attorney's Office, 210 West Park
3  Avenue, Suite 400, Oklahoma City, Oklahoma 73102, appearing for
the United States of America.

4
       Mr. William Earley and Mr. Kyle Wackenheim, Assistant United
5  States Public Defenders, 215 Dean A. McGee, Suite 124, Oklahoma
City, Oklahoma 73102, appearing for the defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXAMINATION INDEX

PAGE

**JOSEPH MALDONADO-PASSAGE**

        DIRECT EXAMINATION BY MR. EARLEY.................  4
        CROSS-EXAMINATION BY MS. MAXFIELD-GREEN........... 94
        REDIRECT EXAMINATION BY MR. EARLEY...............111
        RECROSS EXAMINATION BY MS. MAXFIELD-GREEN........121


REPORTER'S CERTIFICATE................................125

1    (The following excerpt was made in open court on April 1,

2   2019, in the presence of all parties, counsel, and in the

3   presence and hearing of the jury.)

4    (WITNESS SWORN.)

5        THE COURT:  Mr. Earley, you may proceed.

6        MR. EARLEY:  And for the record, Your Honor, we are

7   calling Joseph Passage as a witness.

8                  **JOSEPH MALDONADO-PASSAGE**

9                   **DIRECT EXAMINATION**

10  **BY MR. EARLEY:**

11  **Q.**   Would you state your name, please?

12  **A.**   Joseph Maldonado-Passage.

13  **Q.**   Now, Mr. Passage -- can I refer to you as Mr. Passage?

14  **A.**   Yes, sir.

15  **Q.**   All right.  Now, we have also heard another name, I believe

16  it's Schreibvogel, if I'm not mistaken.

17  **A.**   That was my birth name, yes, sir.

18  **Q.**   All right.  And I don't know if the court reporter has ever

19  had it spelled for her.  So, if you would, just spell that for

20  the court reporter.

21  **A.**   Schreibvogel?

22  **Q.**   Yes.

23  **A.**   S-C-H-R-E-I-B, as in boy, V as in victor, O-G-E-L.

24  **Q.**   So Mr. Passage, what type of employment have you had during

25  your adult life?

1  A.   When I was in high school, I worked at a nursing home as a

2  nurse's aide.   When I graduated high school, I went through the

3  Texoma Police Academy in Dennison, Texas, and graduated as the

4  youngest police chief in the state of Texas's history.

5       In 1986, me and my brother and my first husband bought a pet

6  store in Arlington, Texas.   Did that for 16 years.   My brother

7  got killed in 1997, and me and my parents built the zoo there in

8  Wynnewood, Oklahoma, in memory of him.   And we opened in 1999.

9  Q.   All right.   So the zoo, the park that we have heard about in

10 testimony was something that you started?

11 A.   Yes, sir.

12 Q.   And that was based on -- on what?

13 A.   Well, when my brother got killed, he was the biggest part of

14 the pet store, so it was never the same.   So me and mama and dad

15 and Brian decided to sell the pet store.   And mom and dad got

16 $140,000 from the insurance company from my brother being killed

17 in a car wreck.   And my dad called it blood money, and he didn't

18 want anybody making any money off of that.   So he was going to

19 donate it to charity.

20      And you hear on TV how all the charities misuse money and

21 stuff, so we all kind of agreed to build this rescue zoo in

22 memory of my brother because one of his dreams was to go to

23 Africa and see the animals running free.   So we built -- built

24 the animal park there in Wynnewood, Oklahoma.

25 Q.   So describe the park.

1   A.    It's right off of I-35 and Exit 64.  It's 16 -- started out

2   with 16 acres.  It came with just an exterior fence and a roping

3   arena and an old barn and an old farmhouse.  And we started

4   building cages, and animals started coming in and they never

5   stopped.

6   Q.    So what was the source of these animals?

7   A.    Most of all the animals come from people that rehomed them

8   there because they had exotic animals, and they either couldn't

9   take care of them anymore, or they got too big, or the city laws

10  changed, or some state laws changed.  And over the course of 20

11  years, we probably rescued and rehomed more animals than anybody

12  in the United States.

13  Q.    So is it fair to say that over the years the facility grew?

14  A.    It grew tremendous, yes, sir.

15  Q.    All right.  So what was offered at the park as far as what

16  could the public do at your park?

17  A.    When we first started, we just had a gift shop and a few

18  cages and a -- in the gift shop we had a -- kind of a Subway shop

19  where my mom would actually be the cashier and make the Subway

20  sandwiches and stuff.  And over the years we incorporated a

21  traveling show where we did fairs and malls and stuff like that.

22  And people built cages in memory of people that they have lost,

23  so we called it a memorial park because animals got to live in

24  honor of people that passed away.  And there was actually three

25  people buried underneath their exhibits there at the zoo.

1     So it turned into 152 memorials as of when I left the zoo
2  last year.  And we turned it into a traveling magic show and
3  tiger show for nine years.
4  Q.   So did you offer any educational programs at the park?
5  A.   We -- after -- after we did the -- retired the magic show
6  and the traveling educational show, we built a stage that had
7  bleachers, and I did an educational show twice a day.
8  Q.   Now, at some point was there a video production facility
9  built at the park?
10  A.   I believe that started late 2011, maybe 2012.  We had a TV
11  studio where we videotaped everything going on in the park, and
12  we broadcasted it on a website called Joe Exotic TV.  And we
13  did -- brought animals on the show and taught people about
14  animals.
15  Q.   So Joe Exotic TV, was that something that was broadcast over
16  the Internet, essentially?
17  A.   Yes, sir.  It was -- it was on YouTube and the website, yes,
18  sir.
19  Q.   Okay.  And you talked about some of the things that you put
20  on the show to include things about animals.  What other things
21  were on the show?
22  A.   We did online auctions.  We raised money.  And in 2008, I
23  formed a corporation called the United States Zoological
24  Association, where we went around and helped people rebuild their
25  zoos instead of taking their animals away from them.  We taught

1  them how to -- to fix up their zoo so they could keep their

2  animals instead of always sending them to a sanctuary.  So we

3  raised money for that organization.

4       And then we had another thing online that we called the

5  Animal Miracle Network, where we reached out to people that were

6  terminally ill and dying, and we granted last wishes with animals

7  for people all over the United States for one of their last

8  wishes.  So we kind of did all of that on our TV show.

9  **Q.**   Did you have sponsors?

10  **A.**   We did have sponsors.

11  **Q.**   For example, who would sponsor your show?

12  **A.**   Seth Wadley Ford, the local Sonics, and the local

13  McDonald's.

14  **Q.**   Now, at some point was there another show developed for

15  broadcast?

16  **A.**   We did.  We created a second show with a complete separate

17  website called Joe Gone Wild.

18  **Q.**   So when was that developed?

19  **A.**   I want to believe maybe late 2013.

20  **Q.**   Okay.  And what was the content of the Joe Gone Wild show?

21  **A.**   It was -- it was pretty out there.  I don't know if you have

22  ever watched the movie Jackass, but we kind of incorporated it to

23  be after the movie Jackass because the crazier you got, the more

24  people watched it.  We ended up with 64 million viewers.

25       But the website had an age restriction to where you had to

1  be 18 years old, and you had to verify your date of birth in
2  order to watch the show.  And the webmaster that designed the
3  website had a chat room on one side, and people all over the
4  world could chat with each other during the show, and then they
5  could call into the zoo office and request requests or dare us to
6  do different things on the show for donations for the animals.
7  And at times we raised $20,000 in two hours.
8  Q.   Now, if you would, just -- and keep it as tame as possible,
9  but what kind of outlandish material would you -- would you do on
10 these shows?
11 A.   We had tons of costumes underneath the desk.  There was
12 times that we dressed up like we were in Jamaica, and we had big
13 drink glasses that we got at the state fair, and we put dry ice
14 in them and made them look like bongs, smoking weed on the thing,
15 even though I don't smoke weed.
16     We had -- I don't know if you have ever run into the diaper
17 people on Facebook, but there's a huge community of adult diaper
18 people on Facebook, and they called in and dared us to wear adult
19 diapers one night.  We did that for 500 bucks.  We had blowup
20 dolls.  It was -- it was pretty crazy.
21 Q.   All right.  Now, we saw a number of videos that the
22 government played during their case in chief.  Do you recall
23 those?
24 A.   Yes, sir.
25 Q.   All right.  And, obviously, all of those were kind of

1  centered on either animal rights or Carole Baskin, correct?

2  **A.**   Correct.

3  **Q.**   Where were those shows?  I mean, were they within the Joe

4  Exotic, or were they on the Joe Gone Wild?

5  **A.**   I can't be exactly because they didn't play the entire video

6  of the show.  Every show was recorded live.  And at the beginning

7  of every show it had disclaimers saying it was for entertainment

8  purposes only and viewer discretion advised and foul language

9  would be involved and all that, and some would go to YouTube

10 after they were recorded.

11 **Q.**   All right.  So were there shows that you produced or got

12 yourself involved in that had nothing to do with Carole Baskin?

13 **A.**   Thousands.

14 **Q.**   Give us an example of a show that you would do that didn't

15 have anything to do with Carole Baskin.

16 **A.**   On Joe Gone Wild or Joe Exotic TV?

17 **Q.**   Both.

18 **A.**   On Joe Exotic TV, we had little kid shows, where we had

19 little baby ducks and chickens and baby animals, and we taught

20 kids about, you know, how long they stay in the egg and how they

21 hatch and stuff like that.  And then on Joe Gone Wild, I picked

22 on Governor Kasich, I picked on PETA.  I mean, we -- it was about

23 anybody that had issues with having animals in cages or zoos or

24 anything or other facilities that thought that they could do

25 things and we couldn't.

1    **Q.**    So when these -- these videos that we saw here in court,

2    would you agree that there was some pretty outrageous stuff going

3    on in those videos?

4    **A.**    There was some pretty outrageous stuff going on.

5    **Q.**    Was there a purpose behind those videos?

6    **A.**    Yeah.  In the animal world, if I could make you look like

7    you're an abuser -- and -- and Carole made this website called

8    911animalabuse.org, or .com, where she had 92 of us on this

9    website.  And her opinion, to get around free speech, was that it

10   was her opinion that we abused baby tigers for allowing you to

11   pet them.  And the more that they can make you look bad, the more

12   money they can raise because people think that you are going to

13   stop them from doing that.

14        So I could take any one of you tonight and put you on my

15   website and say you chained a pit bull to your tree in your

16   backyard, and you never feed him, and by midnight tonight I bet I

17   could raise $2,000 on something that you're not even doing wrong.

18   In the animal industry, that's the key way to raise money is

19   they'll put stuff on each other's websites and badmouth people.

20   And the more viewers you have, the more money you raise.

21        And that's -- so the bad thing about that, though, is the

22   Humane Society of the United States, you know, sent in spies and

23   made videos about us.  The PETA sent in spies, and we have got

24   four FBI records to verify some of this.  And they would send in

25   spies to make videos, and they would put a video online and edit

1    it and make it look like the Humane Society videos that you see

2    on dogs shivering on TV right now.  That's all pre-made videos.

3    Okay?  And we could do the same thing with tigers and lions.  But

4    what they do is they prey on the mentally unstable to carry out

5    their crimes for them, and that is, to break into the zoo, cut

6    the cages open at night.

7         One morning, at 8 o'clock in the morning -- our manager,

8    John Reineke, has two prosthetic legs -- and a man drove all the

9    way from Mustang, Oklahoma, down there to cut the animals out of

10   their cages and kill -- kill John Reineke.  And it took 29

11   minutes on 911 to get the first officer at the park.

12        So a lot of the stuff that we portray on TV and our videos

13   is to look like these dangerous psycho mutts that you didn't want

14   to break into our zoo in the middle of the night because we are

15   armed, and we're not going to tolerate you coming in and cutting

16   our cages open.  And that was our -- our simple line of defense.

17   Q.   Now, in spite of the content of those shows, did you want

18   Carole Baskin dead?

19   A.   No.

20   Q.   Did Carole Baskin and your ongoing dispute with her actually

21   help you in some strange way?

22   A.   I -- I didn't know who Carole Baskin was until 2006, when I

23   picked up a newspaper in Oklahoma City, and here's this article

24   about this trashy little roadside zoo, and it was me, and the

25   person that they interviewed was Carole Baskin.  And over the

1  years, I would say we both probably made each other pretty

2  famous.

3  **Q.**   What was Big Cat Rescue Entertainment?

4  **A.**   Okay.  Big Cat Rescue Entertainment, I believe that come

5  about 2009 maybe, somewhere around there.  We had growed into two

6  road shows, two 18-wheelers and a tour bus.  And one 18-wheeler

7  was the animal show, and one 18-wheeler was my illusions, my

8  magic show.  And some of the malls -- we always did malls because

9  it was easy to market and you were guaranteed customers because

10 people came to the mall.

11      Okay.  So some of the malls wanted just the animal show, and

12 some wanted just the magic show, and some wanted both of them at

13 the same time.  So the animal show was Tigers In Need, and the

14 magic show was Mystical Magic of the Endangered.  Okay.  And then

15 whenever we both were at one location, instead of having two

16 posters and confusing people and everything else, we came up with

17 one name.  Okay.  And during that time, Big Cat Rescue had a

18 program called Cat Whiz.  Okay.  And anytime you showed up

19 somewhere, this program would flood the mall with 70, 80,000

20 emails and jam all of their computers up and their website up and

21 everything else with this, "Oh, these people are so horrible to

22 these baby tigers and this is abuse and you shouldn't allow

23 this."

24      Okay.  So I had a marketing director named Darren Stone that

25 came up with the idea, well, if she's going to send out 70,000

emails, let's make everybody think that it's her at the mall.  So
we called the Trade Commission and verified that she didn't own
the three words "Big Cat Rescue."  Okay.  She had a logo, and she
only owned it with the tiger jumping over the logo.  So he
created a logo with Big Cat Rescue, and we used the eyeballs from
a facility we had permission to in Colorado called Serenity
Springs.

Okay.  And when both shows were at one location, we used the
word and -- and the logo Big Cat Rescue Entertainment because it
was magic, and it was with big cats.  Made sense to us.  And then
everybody called back down to Florida and bitched at Carole.  Was
just a marketing way to pay back for flooding our clients with
70,000 emails.

Q.   Okay.  So as you were explaining that, my understanding
would be that Big Cat Rescue, the Carole Baskin entity --

A.   Correct.

Q.   -- they would contact the locations where you were doing a
show and do this email flood; is that correct?

A.   Yes, sir.

Q.   Okay.  So your purpose in forming this entity, Big Cat
Rescue Entertainment, was to kind of throw them off their game,
correct?

A.   Correct.

Q.   All right.  Did you get sued by Ms. Baskin for that?

A.   We got sued for trademark infringement, and then she

1  testified the other day that she sued me for copyright

2  infringement as well.  And that had absolutely nothing to do with

3  putting her face picture on anything.  It was a picture that I

4  got off of Facebook of three of her employees bashing rabbits in

5  the head and bloody, dead rabbits to feed to the tigers and

6  laughing about it.  So kind of give her a little taste of her own

7  medicine -- and I sent that picture to every rabbit rescue in the

8  country I could find, and she got a taste of her own medicine.

9  　　　So she went and bought the picture for $5 from the employee.

10 Three months after I posted it, she filed a copyright and

11 copyrighted it, and then she just out-moneyed me in a lawsuit.

12 Q.　Now, did she get a judgment from you -- or against you?

13 A.　Our lawyers at one point just said, you need to just quit

14 spending bad money after bad money, and just give her a judgment

15 of whatever she wants.  And so she got a million-dollar judgment.

16 And we didn't expect her to move that judgment to Oklahoma.  So

17 she moved that judgment to Oklahoma, and my lawyers recommended

18 just filing bankruptcy on the judgment, and she sued the

19 bankruptcy court as well.

20 Q.　All right.  So that initial lawsuit, the trademark and the

21 copyright, those were being litigated in Florida; is that

22 correct?

23 A.　That's where it started, yes, sir.

24 Q.　All right.  And before the case was moved here for

25 collection, were you required to litigate the case in the state

1  of Florida?

2  **A.**   Yes, sir.

3  **Q.**   So did it become pretty costly?

4  **A.**   We have -- we spent close to a quarter-million dollars.

5  **Q.**   All right.  Now, did that judgment affect you and the zoo at

6  that time?

7  **A.**   As in how?

8  **Q.**   Financially.

9  **A.**   We -- we spent a lot of money on lawyers, but we kept

10  operating.

11  **Q.**   All right.  Now, aside from the -- the lawsuits and the

12  judgment that Ms. Baskin has against you, what's your problem

13  with her?

14  **A.**   My problem is she's a hypocrite.  You know, just like some

15  of her other facilities in her -- within her little organization

16  she's created.  Her facility is in the middle of Tampa, Florida.

17  It's right next to a major highway.  She sells every kind of tour

18  under the sun:  Bone tour, feeding tour, kid tour, adult tour.

19  It doesn't matter.  I mean, I have taken one of her tours.

20       Her animals are on exhibit.  She can complain one month in

21  public, writing that there's too many tigers in America, and then

22  the next month she's rescuing one from Peru because there's none

23  in America that can hold a good story to raise donations, so

24  she's bringing in this tiger from Peru.  And she'll drive clear

25  across the United States to rescue a baby bobcat because baby

1   animals raise money better because everybody likes baby

2   everything, especially if you're going to rescue one.

3       So there's absolutely nothing except petting animals, which

4   she used to do before she made her millions, that -- that we do

5   any different than she does, except she wants to make every state

6   illegal except Florida so she can corner the market on exhibiting

7   tigers.

8   **Q.**   Now, did you have any disagreements with her position on

9   certain legislation?

10  **A.**   I -- I'm probably one of the biggest, most outspoken critics

11  of her legislation push that she's -- she's continuing to push

12  because -- like the Big Cat Safety Act that they are trying to

13  introduce right now, her organization that she started, which is

14  the global federation of animal sanctuaries, is the only one

15  exempt from this law they're trying to introduce.  And the way

16  that they're doing this is by making political donations to

17  different politicians in order to get these laws passed.

18      But the big thing was in Ohio, when Zanesville, Ohio,

19  happened with Terry Thompson, the guy that supposedly let all of

20  his animals out and shot himself and killed himself in

21  Zanesville, Ohio.  And that right there is what started the

22  controversy of -- I knew Terry and that wasn't something Terry

23  would have done, especially if you love your animals because you

24  know they're going to be massacred the minute you open the door

25  and let them run.

1    Not to mention that I do investigative reporting because I'm

2    a member of the United States Press, and I belly-crawled that

3    farm to do my story.  And to this day I don't believe that he

4    killed himself.  It was what they needed in order to make exotic

5    animal owners look crazy and passed a law in Ohio to make it

6    illegal to own exotic animals.

7        So after they started that, I testified in front of the

8    Senate and in front of the House on -- to try and stop that bill

9    that they were pushing through.  And they got it pushed through,

10   and they sent SWAT teams in peoples' homes and they took their

11   animals, and Carole's organization got quarter-million dollar

12   contracts to move animals from Ohio to California, and from Ohio

13   to Florida to their facilities, which are absolutely no different

14   than the facilities they were taking them from, except they came

15   with quarter-million dollar contracts of taxpayer money.  And

16   that's why I went after John Kasich, Governor Kasich.

17   **Q**.   So these disagreements that you were having with Ms. Baskin

18   about legislation, about what you did, did those things get

19   incorporated into your -- your on-air shows, so to speak?

20   **A**.   Absolutely.  Big time, because we raised money for peoples'

21   lawyers over in Ohio and everywhere else in the United States

22   that were fighting laws.  And we used the TV show to educate the

23   general public, such as you, of what's going on.  And -- and you

24   have a right under the Constitution of the United States to own

25   personal property.  And, unfortunately, tigers and lions and

1   animals are personal property.

2   Q.   And you may have already spoken to this, but with respect to

3   your on-air antics, did the viewership go up the nuttier it all

4   got?

5   A.   When we first started out, our -- our viewership was

6   pathetic because people just got bored with the same antics every

7   day.  Okay.  And that's where we tried the Joe Gone Wild thing,

8   and we started getting 60, 70,000 viewers a night, and it went

9   into the millions.  And the last time I saw the counter on our

10  YouTube was we had 64 million viewers from all over the world

11  that would sit up at 2 or 3 o'clock in the morning their time

12  just to watch our show at 7 o'clock our time.  And the crazier it

13  got, the more money we raised and the more people watched.  And

14  that flowed over even to my political thing is -- I tried to be

15  serious in politics, and I got no support, and the more

16  outlandish I got, the more real I got, the more support I got.

17  Q.   Now, as far as the park is concerned, did you discuss your

18  difficulties with Ms. Baskin at the park?

19  A.   I -- I never spoke to Carole Baskin at the park.  The only

20  time I have ever spoke to Ms. Baskin was face-to-face in Ohio at

21  one of the hearings, and I never even spoke to her during any of

22  the depositions.  It was always Mr. Howard.

23  Q.   But as far as your problem that you were having with her,

24  either legal or philosophical, did you talk about those things

25  with people at your park?

1  **A.**   Oh, every -- every day.

2  **Q.**   All right.  So who would be involved in those conversations?

3  **A.**   You know, the staff, at morning meetings or night meetings

4  or the management in the office.  It was no secret that, you

5  know, we're being sued, we're being watched.  And you never know

6  which employee is a plant because she had a bad habit of hiring

7  spies, and she had no problem bragging about that on her website.

8        So we -- we discussed, you know, what was right and what was

9  wrong going on at the park that -- that we needed to be careful

10  with.

11  **Q.**   Now, did you ever mention to park employees that you wish

12  Carole Baskin was dead?

13  **A.**   You know, there was -- there was never a time that I wished

14  she was dead.  There was many times of -- and I say this about a

15  lot of people -- is I don't understand why -- you know, I was --

16  I was raised to believe in God, and I don't understand why little

17  kids have to suffer so bad, and people that treat people like

18  that just get to live on and on and on without ever being in a

19  car wreck or something like that, and -- and why so many little

20  kids have to suffer.

21  **Q.**   Did you yourself get death threats?

22  **A.**   I had many death threats, and I turned them in to the

23  sheriff's office.  We sent them in to the FBI.  I actually have

24  the -- the FBI agent's number on my cell phone from the Norman

25  office.

1  Q.   All right.  Now, was your ability to run the park impaired
2  somewhat in 2014?
3  A.   I was extremely ill.  I threw up for 188 days.  And I went
4  to the doctors and my T-cell count was off the chart, and my
5  white blood cell count was off the chart.  So they automatically
6  thought I had AIDS.  And I took nine HIV tests within probably
7  four months, and every one of them came back negative.
8       So the next step was to think that I had cancer.  And so
9  they did several tests, and we never got to a PET scan, but they
10  did prostate surgery on me on October the 21st of 2014.  And all
11  of my -- I did that at Baptist Hospital, and two days later all
12  of my organs quit.  I went into kidney and liver failure and
13  spent almost 37 days in ICU and in the hospital there.  And the
14  doctors actually gave me -- because I would not take dialysis,
15  the doctors gave me two days to live.
16       So they did all they could with IVs and stuff.  And I sat
17  there and made God a deal because I had a really bad breakup with
18  John Finlay, and I was just an ugly person at that time.  And I
19  made a deal with God that if he let me walk out of that hospital,
20  that I would completely change my attitude.  And He let me walk
21  out of that hospital, and I practically raised John Finlay's
22  daughter.  And to this day, me and her are connected at the hip.
23  And from that time on I -- we quit the Joe Exotic Gone Wild, and
24  I tried to do what was right.
25  Q.   Now, did that cause you to reflect on whether or not you

1    were able to run this park by yourself?

2    **A.**    Well, I -- it was no secret on social media that -- that I

3    was in rough shape.  I was on IVs for the next year.  While I was

4    at work, I carried an IV bag with me.  I did my shows with IVs in

5    my arms.

6          And a gentleman by the name of Jeff Lowe contacted me on

7    Facebook.  He had tigers in South Carolina.  And we got to

8    talking, and he ended up buying a baby tiliger from me.  So him

9    and his original wife, Cathy, came to the park and picked up the

10   baby tiliger and stayed for an hour or so, and then they left.

11         Okay.  And then I get this phone call from this reporter out

12   in South Carolina that said that Jeff Lowe said that he owned

13   tigers in Wynnewood, Oklahoma, and in Colorado.  And I was like,

14   there is nobody that owns tigers in Wynnewood, Oklahoma, except

15   me.  So we kind of had a little disagreement there.  And then he

16   started to buy a facility out in Colorado.  And that was when me

17   and Travis Maldonado got married.  And Jeff flew us out to his

18   place to see his house and the facility that he was working on

19   buying and -- and we went skydiving for our honeymoon.

20         And he had this gigantic house.  I mean, it was a mansion,

21   and it had an indoor swimming pool in it and a Ferrari in the

22   driveway and a Hummer and flashing money.  And -- and he asked me

23   if I wanted to sell the zoo.  And I didn't exactly want to sell

24   the zoo, but I said, "Hey, I'm open for a partner, you know."

25   And I had IVs in my arm at the time when we flew out there and --

1   and he knew I was sick, and I was concerned whether or not I was

2   actually going to make it or not.

3        So we had talked about Carole and the lawsuits.  And my mom

4   and dad were adamant that my brothers and sisters were not going

5   to get possession of that property in order to sell it, and tear

6   it apart if something happened to me or mom and dad.  So Jeff

7   talked me into putting his name -- having mom put his name on the

8   deed of the land, a quitclaim deed.  And then through the

9   lawsuits with Carole, she had always said that -- my life

10  insurance policies were being paid by the zoo, so she had a

11  judgment against the original zoo.  So if I was to die, the

12  judgment should get my million-dollar life insurance policies,

13  okay, to pay off the judgment, since they were paying the

14  premiums.

15       So Jeff talked me into putting him on as 25 percent of the

16  life insurance and he would pay the premiums, so that way the zoo

17  was out of my life insurance, and it was in Jeff's hands.  So,

18  yeah, I -- I thought -- I just took him for face value, and I

19  thought, you know, these -- this man's got all this money, he can

20  take care of the animals if something happened to me, and he was

21  going to buy this place out in Colorado and help the place in

22  Oklahoma.

23       And so we went home.  And he called me again and asked if we

24  wanted to come out for a Halloween party.  So we flew -- he flew

25  us back there for a Halloween party.  And by then his name was

1  already on the land, and his name was already on all the health

2  insurance and all that.  And that's when I got the first taste of

3  how he treated his -- his original wife.  We came --

4  Q.  Let me back up for one minute because I want to go back to

5  something you said a little bit earlier.  When you originally met

6  him, you said that he purchased a baby tiliger.

7  A.  Correct.

8  Q.  What's a tiliger?

9  A.  Amongst everything else I do, I am the only person on this

10  planet who has produced a liger, a tiliger, a liliger and a

11  tigon.  And I worked very closely with the scientists of the

12  National Institute of Health and Texas A&M, providing DNA testing

13  and umbilical cords so they can study big cats and how they

14  evolved and how they're going to handle the climate change and

15  stuff.

16       And a tiliger is a tiger -- and you can do it in different

17  colors; you can use a white tiger; you can use an orange tiger or

18  a tabby tiger or a snow tiger -- and you breed that with a female

19  liger and you get a tiliger.  And the color variation depends on

20  what color of father you use.  For years it was believed that

21  ligers are sterile, and it's only male ligers that are sterile,

22  not female ligers.  But the trick is you can't put two adults

23  together or they're going to kill each other, so you have to

24  raise them together.  And that takes five years before they

25  become fertile enough and adult enough to breed, but the

discrimination between the two species is gone.  And that's why nobody does it because there's no money in it because you have to wait five years in between each step.  And I'm the only person in America that has made that fourth step -- actually, I'm the only person in the world that has made that fourth step, because after you hybrid them four times, the males are no longer sterile. It's just like a bengal cat or a Savannah cat that's bred with exotic animals.

Okay.  And the theory that the animal rights people like to use out there is they outgrow their bones.  I think you have heard that in here before.  Okay.  Or they're deformed or they're too big for their parents.

There has never been a recorded incident in our world of a hybrid cat born with a genetic flaw.  Okay.  A lot of people confuse genetics and birth defects, okay, as -- as the same thing, and it's not.  A birth defect happens from being cramped in the womb or something like that versus a genetic defect that is actually passed down a blood line.

Q.   Now, you sold this to Mr. Lowe; is that right?

A.   I did.

Q.   Was it legal to sell that?

A.   It's absolutely legal to sell any hybrid.

Q.   Now, Mr. Lowe has managed to kind of get into your business at this point; is that right?

A.   Yes, sir.

1  **Q.**   Were you still in the process of litigation with Carole
2  Baskin?
3  **A.**   Yes, sir.
4  **Q.**   Were you, at this time when Mr. Lowe starts to get on the
5  scene, still in settlement talks with the Baskins?
6  **A.**   When we were out there for Halloween, for his Halloween
7  party, when we flew back to Oklahoma City, we stayed in Oklahoma
8  City that night because the next morning I had mediation with
9  Howard Baskin, and we spent 10 or 11 hours in -- in mediation.
10  And me and Howard actually had it worked out to where he was
11  going to allow me to continue for the year, and then we would
12  stop cub petting and we'd stop breeding and we would simply
13  slowly close the zoo down.  But I needed to make sure that we
14  could pay our outstanding bills, you know, throughout that
15  period, and he understood that.
16       So at the end of the day, we had come to an agreement to do
17  all of this until he picked up the phone and called Carole.  And
18  part of that was a $5,000 payment every month toward the
19  settlement, okay, toward the judgment.  Okay.  But the thing that
20  we were worried about was we are cutting our funding of play
21  cages and everything else to make that $5,000 payment.  And in
22  case we couldn't, Carole wanted my mom and dad's house and
23  property that was completely paid for.  And that's when the
24  lawyer stepped in and said, absolutely not.  So that kind of went
25  to -- went to crap.

1   Q.   About what time period is this going on?

2   A.   November of 2015.

3   Q.   All right.  So in early 2016, who took over as the owner of

4   the park?

5   A.   Late February of 2015, Jeff Lowe created --

6   Q.   '15 or '16?

7   A.   '16.  I'm sorry.  Created three companies:  One was the

8   Greater Wynnewood Exotic Animal Park, which operated the zoo; one

9   was called Big Cat Institute, which was supposed to be a

10  nonprofit that trained interns to do what we do -- it turned out

11  to be nothing but a way to hide payroll.  The third one was the

12  Greater Wynnewood Development Group, which was in charge of the

13  land.

14  Q.   All right.  So who actually owned the zoo after February

15  of 2016?

16  A.   Jeff Lowe.

17  Q.   Now, did the name of the park change?

18  A.   It did.  It was -- it was the Garold Wayne Interactive

19  Zoological Park until February when they -- the board voted to

20  dissolution and close it.

21  Q.   Was there a reason behind the name change?

22  A.   Well, in order to shut one organization down and escape

23  the -- another judgment, it closed and had to, by law, change the

24  name to open up another organization.  So Carole would have to

25  start the lawsuits all over again.

1  Q.   At least that was the thought?

2  A.   That was the thought.

3  Q.   Now, had Lowe already got his name onto the insurance

4  policies at this time?

5  A.   Yes, sir.

6  Q.   Who all was on those policies?

7  A.   It was Jeff Lowe; in 2016, it was my husband, Travis

8  Maldonado; and then 25 percent went to John's little girl

9  Kimberlin.

10  Q.   All right.  What was your role at the park after Lowe took

11  over?

12  A.   Entertainment director.

13  Q.   And what did that mean as far as your daily work?

14  A.   Well, the -- the park had been basically branded with my

15  face for 20 years, close to 20 years.  So I put on all the shows.

16  I did the big tours twice a day at 11:30 and 2:30 every day.  I

17  did the ordering.  Most of the merchandise was all private

18  labeled with my picture on it and my name.

19      The bad part was my license was -- was there, along with

20  Beth Corley's license and Trey Key's license and Ryan Easley's

21  license.  And Jeff didn't have a license there at that time

22  because his license was still in South Carolina, but his cats

23  were there.  So we put all of his cats under my license, not Beth

24  Corley's license.  They were under my license.  And the reason

25  for that was is because he knew that I wanted to quit.  Okay.  So

1  it didn't matter how many noncompliant citations we got from the

2  USDA under my license, it wasn't going to affect anybody else

3  because I was going to turn my license in eventually because I

4  wanted out of it.  So almost everything that we did had to be

5  under my license, whether I owned the animals or not.

6  Q.   So how close in time to when Jeff Lowe took over had you

7  started having these thoughts about "I'm on my way out"?

8  A.   Well, they moved to Wynnewood the last part of November

9  of 2015, and they didn't have a place to stay.  They were in a

10  hotel for --

11  Q.   Who is "they"?

12  A.   Jeff and Lauren.  They left Cathy in Colorado that time

13  because Jeff got arrested for beating her up.  So they had to

14  rush out of Colorado.  Okay.  So they moved in my house with me

15  and Travis, and they stayed there for probably two, three months.

16  And that's when I found out everything in Colorado was rented.

17  He didn't own nothing.  He was behind on his payments on the

18  Ferrari and the house was rented.  He skipped out on the lease of

19  the house.  And by that time it was already too late because his

20  name was on everything in Wynnewood.

21       So I went to Tampa, Florida, to do a music video.  I think

22  it was in March of 2016.  And I did a music video with elephants

23  there at the Two Tail Ranch, and then I was a speaker at a

24  convention called Take Back the Conversation convention there in

25  Tampa.  And then I had a political rally at the same time, then I

1  came home.  And I came home and sat in the office and wanted to
2  quit.  I was just going to walk away at that point.  And he
3  talked me into staying there.

4      Okay.  So he builds this little cabin out of storage
5  buildings and -- for him and Lauren to move into.  So they
6  finally move into their own cabin.  And by that time the criminal
7  side started coming out, and I started seeing what kind of scams
8  they're running and -- and they turned the park into a front for
9  his criminal side.  And then it turned into their own little
10 private hunting ranch of young girls, and it just escalated from
11 there until I just couldn't stomach it anymore.

12 Q.  Now, about this time did Alan Glover show up on the scene?
13 A.  Alan showed up, I want to think it was probably April
14 of 2016.  He came from South Carolina.  He had worked for Jeff
15 out there with some liquidation companies or some -- some
16 liquidation stores or something.  But anyway, he came to work at
17 the zoo as a yard guy.

18 Q.  All right.  Was he your employee?
19 A.  He made it very clear he wasn't my employee.

20 Q.  Okay.  Now, was Lowe at the park on a daily basis?
21 A.  They lived on the -- on the park, and he was pretty much at
22 the park all the time through 2016.  And that's where they
23 started -- they had a little old lady in town that made clothes
24 for the funeral home.  And Jeff, in his liquidation history,
25 somehow or another got ahold of some -- of the singer Prince's

1  outfits and got sued by Prince.

2          MS. MAXFIELD-GREEN:  Your Honor, may we approach?

3          THE COURT:  You may.

4      (The following bench conference was held outside the hearing

5  of the jury.)

6          MS. MAXFIELD-GREEN:  Your Honor, I think we're starting

7  down a line of Mr. Passage -- he has a lot of what he believes

8  are criminal allegations against Jeff Lowe that are totally

9  unfounded and have -- there's no evidentiary support for at all.

10 He does not -- there's no good faith basis or extrinsic evidence

11 available to offer any of that, not that it would be admissible

12 anyway.  And I just don't think we can go down the line of let's

13 bring out every theory we have about Jeff Lowe's criminal -- we

14 have already had -- he's already said -- made comments about him

15 beating up his wife and the young girls at the park.  And I think

16 we're just headed down a road here that is:  A, irrelevant under

17 Rule 401; and, B, prejudicial, a waste of time, speculative, and

18 a variety of other things under Rule 403.

19         THE COURT:  Well, what immediately comes to mind is the

20 question was is Mr. Lowe at the park very often, and then I don't

21 know how that got to Prince, but -- all right.

22     Mr. Earley, I'll give you a chance to respond.

23         MR. EARLEY:  Well, that was not the answer that I was

24 seeking to solicit, but I will go back and maybe rephrase the

25 question.

1    THE COURT:  And I'm going to ask him to think about

2  your questions, and please answer your questions and then if you

3  have additional inquiry you will ask.

4    The objection is sustained.

5    (The following record was made in open court, in the

6  presence of all parties, counsel, and in the presence and hearing

7  of the jury.)

8    THE COURT:  Mr. Passage, I want to ask you to listen

9  very carefully to your lawyer's question and only answer that

10  question.  I think the question that Mr. Earley had asked you was

11  whether or not Mr. Lowe was at the park very often.  Please just

12  answer his question.  And then if Mr. Earley has -- wants

13  additional information, he'll ask you some followup questions.

14  Okay?

15    THE DEFENDANT:  Yes, sir.

16    THE COURT:  Thank you.

17  Q.   (By Mr. Earley)  All right.  I believe you did answer that

18  question, that he was there pretty much daily.  Would that be

19  fair to say?

20  A.   Through 2016, yes, sir.

21  Q.   All right.  And during that period of time was there an

22  off-site business with respect to either animal petting or a show

23  that Mr. Lowe was involved with?

24  A.   That started, I believe, along about March of 2017.  He had

25  a place in Oklahoma City called the Neon Jungle.

**Q.**   All right.  And was that basically just an offshoot of the business down there in Wynnewood?

**A.**   It was set up in a -- in a mall there in Oklahoma City to play with baby tigers, yes, sir.

**Q.**   All right.  Now, as far as Mr. Lowe is concerned, and his activities, did he eventually move out of state for long periods of time?

**A.**   March, April -- March through June is when the Neon Jungle was there.  And he hooked up with this lady from Las Vegas in the middle of that and started human trafficking in Las Vegas.

THE COURT:  Mr. Passage, again, the question was did he eventually move out of state for long periods of time.  I want you to listen to the lawyer's questions and answer those questions.

THE WITNESS:  He did.

**Q.**   (By Mr. Earley)  And where did he go?

**A.**   Las Vegas.

**Q.**   All right.  And as it concerns the park's business, and I mean animal business, what was your understanding of what Mr. Lowe was doing out in Las Vegas?

**A.**   He was supposed to go out there and -- and open up a company called The Jungle Bus and --

**Q.**   And what was that supposed to be?

**A.**   It was supposed to be where people could pay to get on this bus with the animals on the bus and go on, like, an hour or

1  two-hour drive and play with the animals on the bus, kind of like

2  you would a party bus.

3  **Q.**   All right.  Now, as far as his business interest out in Las

4  Vegas, was that contributing substantially to the park's income?

5  **A.**   It didn't contribute at all.

6  **Q.**   Now, I think you testified that you considered leaving the

7  park after Lowe got ingrained in it in 2016; is that correct?

8  **A.**   Yes, sir.

9  **Q.**   Did your desire to remain at the park change in 2017?

10  **A.**   It did.

11  **Q.**   What changed?

12  **A.**   The -- the more that they used the park as a front for

13  everything, the more the meaning of it being a memorial park and

14  representing people that have died went away.  And it just -- the

15  whole morals of what we worked 20 years for is -- was gone.

16  **Q.**   So you were even more inclined to get out of the business at

17  that point?

18  **A.**   Absolutely.

19  **Q.**   All right.  I want to switch gears with you for just a

20  moment and address some of the specific counts in the indictment.

21  Okay?

22  **A.**   Okay.

23  **Q.**   And the first set of counts I want to address are Counts 8,

24  and then 9 through 11.

25        So Count 8, if you recall, concerns an offer for sale to, I

1   think it was Darlene Cervantes; is that correct?

2   **A.**   Correct.

3   **Q.**   Do you remember that testimony?

4   **A.**   Yes.

5   **Q.**   All right.  And with respect to that particular text

6   exchange you had with Ms. Cervantes, explain that to the jury.

7   **A.**   Well, I have 19 Facebooks because they limit you to 5,000

8   friends.  So my office people would run all of my Facebooks and

9   answer my messages for me because I had to be out on the park

10  most of the time.

11       So I was in the office one day and Darlene, who is kind of

12  out there anyway, asked me if -- if she could buy a tiger.  And

13  that's when I asked her if she had a USDA license and asked her

14  which state and all that.  And I went to work and -- and Amber

15  continued that conversation via a radio because we carried

16  radios.  So it was between me and Amber.

17       But the easiest way -- and I probably have done this a

18  thousand times in the history of this park and being on the

19  road -- is somebody always walks up and say, how much would a

20  tiger cost me.  And the easiest way to end the conversation is

21  jack up a price to where you know they can't afford it, and the

22  conversation ended right there and you didn't have to go through

23  all of the legalities and spend 30 minutes with everybody that

24  wanted to buy a tiger.

25       So, you know, I would -- I told her a thousand bucks because

1   she was homeless.  She didn't have a thousand dollars and I knew

2   that conversation would stop.  No different than a conversation

3   at a magic show when I tell people it was $20,000, because you

4   know they ain't got it, and the conversation just ended right

5   there.

6   **Q.**   So was it your intention to offer these cubs for sale to

7   Darlene Cervantes?

8   **A.**   Pardon?

9   **Q.**   Was it your intention to offer those cubs for sale to

10  Darlene?

11  **A.**   No.  It was my intention to just say a price and she'd go

12  away, which she did.

13  **Q.**   Now, Counts 9 through 11 concerned a number of what

14  Mr. Finlay, I think, determined were sales.  Count 9,

15  November 16, 2016, a male tiger cub to Brown Zoo in Illinois.  Do

16  you recall that?

17  **A.**   I recall -- I recall that.

18  **Q.**   All right.  Was that a zoo-to-zoo transfer?

19  **A.**   It was.

20  **Q.**   What kind of license do you have?

21  **A.**   I have a Class C exhibitor's license by the United States

22  Department of Agriculture, the Animal Welfare Act, which allows

23  me the right to exhibit, breed, sell and transfer.  Because they

24  only have three licenses:  And it's an exhibitor's license, which

25  does it all; a breeder's license that only allows you to breed

1  and sell; or a broker's license so you can be the middleman in

2  between all the sales.

3  **Q.**   Mr. Finlay testified that, I guess in his opinion, the

4  transaction or this zoo-to-zoo transfer was a sale.  What is your

5  testimony with respect to this transaction?

6  **A.**   I don't remember every transaction, but, I mean, it could

7  have been.  But can I explain the forms?

8  **Q.**   Sure.

9  **A.**   Okay.  Under my license, I had peoples' animals that were

10  from Louisiana; I had Jeff's animals; I had some of my animals; I

11  had some of the circus animals because in order for them to be at

12  the zoo and us be open to the public, it doesn't matter who owns

13  them, you could bring your bobcat to my zoo, and I could exhibit

14  it and it still remain yours, but it's got to be on my inventory

15  in order to be legal.

16      Okay.  So anytime an animal or a baby tiger or anything was

17  taken off of my inventory, it has to come from Joe Maldonado.

18  Okay.  It can't come from you in Louisiana, because you're not an

19  exhibitor.  I'm the exhibitor, even though it's under my license

20  and you own the animal.  Okay.  So it's got to be from me to the

21  Brown Zoo.  All right.  And I don't sell that.  I didn't sell

22  that.  Jeff, the owner of the zoo, sold those.

23      So that's why they say donation on there, because I

24  transferred them off of my license to someone else for no charge,

25  and he made the sale between them and him.  And from day one,

1    when I knew what he was all about, I kept ledgers of my own to

2    verify every dollar and every sale.  And I logged in QuickBooks;

3    I earmarked every deposit that was made from cubs so I could

4    defend myself one day.

5    **Q.**   With respect to Count 10, that is a tiger female, 11 weeks

6    old, to TS in Indiana.  Do you recall that transaction?

7    **A.**   That one would be Tim Stark, and I remember that one very

8    well.

9    **Q.**   All right.  So was that the sale in interstate commerce?

10   **A.**   That one was actually free.  Depending on your inspector --

11   our inspector allowed us to use cubs between four weeks and 16

12   weeks.  Tim Stark's inspector's only allowed him to use cubs up

13   to 12 weeks old.  And that's the problem with the vague laws is

14   every inspector can read into what they want it to read in.

15        So the zoo made him a deal, if he took this one that was 11

16   weeks old that he could only use for one week, we would give him

17   a younger one for free, and that would get a bigger one out of

18   our zoo that we didn't have to grow up and feed for the rest of

19   his life.

20   **Q.**   All right.

21   **A.**   So that was not a sale.

22   **Q.**   And then also Count 11 is March 6, 2018, tiger, female, six

23   weeks old, again to Brown's, which is referred to as Oakridge Zoo

24   in Illinois.  Is that the same Brown's?

25   **A.**   It is the same folks.

1  Q.   So the same as Count 9.  Do you recall that?

2  A.   Without looking at my notes in QuickBooks and verifying that

3  deposit, but I would probably say it probably was.

4  Q.   A sale?

5  A.   Probably so.

6  Q.   By who?

7  A.   By the zoo.

8  Q.   But not you?

9  A.   Not me.

10  Q.   So if I'm understanding you correctly -- and -- of course,

11  we don't know what Brown's or Tim -- TS, whoever that is, has to

12  say about this, but you are simply passing them off of your

13  inventory to another zoo's inventory by creating the paperwork

14  that's associated with this; is that correct?

15  A.   Yes, sir.  And we did that with Beth Corley's inventory as

16  well.

17  Q.   All right.  And so whether or not this was being sold or

18  someone was providing a donation back for the animal, that was

19  between Mr. Lowe and that entity; is that correct?

20  A.   Correct.

21  Q.   All right.  So that's the substance of your testimony as to

22  why you're not selling anything, correct?

23  A.   I didn't sell anything and I didn't collect a dime for

24  myself, no.  It all went in his bank account.

25  Q.   So if Mr. Finlay, after one or all of these trips, came back

1  with cash or check or however these people may have been paying,

2  what -- and he handed it over to you, is that what happened?

3  **A.**   He would either give it to me, or if I wasn't there he'd

4  give it to one of the girls in the office.

5  **Q.**   What would happen to the money from there?

6  **A.**   It would be put on a deposit slip for the park, and on the

7  very bottom I would write "Jeff" so I knew what -- where the

8  money come from, and I would put it in the bank and I would log

9  it in QuickBooks as "cash Jeff."

10  **Q.**   All right.  I want to talk a little bit now about Counts 12

11  through 20, and these are labeled in the indictment as Lacy Act

12  false labeling of wildlife charges.  Do you remember the

13  substance of the testimony concerning these allegations against

14  you?

15  **A.**   Is that the vet certificates or the forms?

16  **Q.**   The forms and the -- the certificate of veterinary

17  inspection.

18  **A.**   I believe I do.

19  **Q.**   All right.  Now, I don't really plan to go through each one

20  of these individually with you, but, in substance, with the

21  exception of one of the counts, which involves a CVI form and

22  we'll talk about that separately.

23  **A.**   Okay.

24  **Q.**   But these are all counts dealing with what is alleged to be

25  a falsification of those delivery and receipt forms.  Do you

1  understand that?

2  **A.**    Yes, sir.

3  **Q.**    All right.  So with respect to those particular allegations,

4  tell us about your understanding of the forms and the information

5  that's required.

6  **A.**    The form is simply, like I explained before, to get it off

7  of inventory.  That's all the USDA cares about is where the

8  animal ended up.  Okay.  We were supposed to get where it's

9  coming from, where it's going to, both of our license numbers,

10  the animal information of what species it was, what sex it was,

11  approximately how old it was and what condition it's in, and then

12  who transported it and how it was transported, if it was

13  transported.  And that's all they required.  And we got some of

14  those on napkins from people.  I mean, they didn't even put them

15  on actual pieces of paper.

16  **Q.**    Well, there were forms that were introduced.  Do you recall

17  these?

18  **A.**    I do.

19  **Q.**    And, I mean, were those your forms?

20  **A.**    The ones -- okay.  Which ones are you talking about that

21  were introduced?

22  **Q.**    For example, the delivery form that went to Brown's Zoo.

23  **A.**    Okay.  Those were the zoo 's forms, yes.

24  **Q.**    All right.  So the delivery forms would have been developed

25  by who?

A.    Whatever secretary was in the office that created them on
Microsoft Word.

Q.    All right.  Now, there are -- on some of the forms there's
little boxes to check for sale, donation, exchange; on others
there's nothing, but there appears to be something written on
them about it's a donation.  Explain -- explain how that happens.

A.    How it gets written on there or how the forms are different?

Q.    How the forms are different.

A.    It depends on -- it was like whoever works in the office,
gives themselves the title as the office manager, redoes
everything.  Every time you hire one, they had to redo
everything.  And some of the forms would -- would come out with
the boxes on there.

      But what never made sense was if you put "sale" on there, it
never asked you how much you sold it for.  And it wasn't required
on the -- on the official form for the USDA, so nobody really
paid any attention to that.  And the reason why it was always
written "donation" on there is because the person that had the
license never got the money.  So the people whose license it was
actually did donate it.

Q.    Do you know why those options were even provided or why that
word was written on there if it wasn't required?

A.    I think -- I think Jeff and Lauren had done one inspection
one time while I wasn't at the zoo, and the inspector talked to
them about something, and they had the office girl redo the

1  forms.

2  **Q.**   All right.  To your knowledge, is that information, whether

3  it was a sale, an exchange or a donation, is that information

4  required by the United States Department of Agriculture?

5  **A.**   No.

6  **Q.**   Now, Count 18 is the certificate of veterinary inspection.

7  Have you seen those forms before?

8  **A.**   I have.

9  **Q.**   And how are those forms created?

10  **A.**   Those stay at the veterinarian office and either me or

11  Reineke or one of the girls in the office would call the vet and

12  give them what -- you know, the animal, the sex, the species, how

13  old it is.  And -- and then either Reineke -- Reineke done most

14  of it, John Reineke, as far as running the animal over to the vet

15  so Dr. Green can see it and then finish the exam, and bring back

16  the pink copy that we give the receiver at the other end.

17        So after the transaction is completely done, we don't even

18  have a copy of the certificate of veterinarian because the vet

19  keeps one to send to the state, she keeps one for her records,

20  and the pink one goes to the people to prove that they got it at

21  that end.

22        There was -- there was times that we would be actually in a

23  cage with an animal and we would be calling on the radio to the

24  office the information for them to call in to the -- to the vet.

25  And in 20 years, I don't ever remember telling a vet whether it

1  was an exchange, a donation or an exhibition or transfer.  We

2  never even -- we never even discussed that ever.

3  **Q.**  Well, with respect to Count 18, the June 12th, 2018, form

4  that Dr. Green testified about, did you advise her to place

5  "donation" or any other type of exchange on that form?

6  **A.**  Which animals are on there?

7  **Q.**  It's an African lion, male, eight years old, and an African

8  lion, female, eight years old.

9  **A.**  I did not even call that one in.  I had nothing to do with

10  that one or the transfer form.

11  **Q.**  All right.  That was in June -- specifically, the form is

12  dated June 12th, 2018.

13  **A.**  Correct.

14  **Q.**  Were you at the park that day?

15  **A.**  I was at the park, yes, sir.

16  **Q.**  But you don't recall having anything to do with the

17  information?

18  **A.**  I know I didn't.

19  **Q.**  Now, finally, with respect to the false labeling

20  allegations, there's Count 21.  And you may recall that is a form

21  that you were asked by Mr. Garretson to generate.  Do you

22  remember that?

23  **A.**  Yes, sir.

24  **Q.**  Do you remember that particular interaction with

25  Mr. Garretson?

1  **A.**    I don't remember it except for watching the video.

2  **Q.**    Okay.  So tell us about what you remember, why you created

3  the form, what the situation was with that.

4  **A.**    Apparently, by watching the video -- and to this day, all I

5  can do is be honest, I don't even remember that -- that video.

6  But he had asked for a copy of a disposition form for his lemur.

7  Okay.  And at that time he had a gentleman work for him that

8  stole all of his records and a bunch of other equipment, and he

9  was having trouble finding all of his receipts from where his

10  animals came from.  And he had previously purchased a lemur from

11  us, and that's why on the video I say, is this one the one we

12  lost, because I thought he was needing one to replace the one

13  that we lost.

14       And so apparently he said, no, it's the one from Omar.  And

15  I wasn't even thinking about an animal coming across state lines

16  being an endangered lemur.  I was more thinking because he was in

17  a hurry, because he claimed that he was going to be inspected by

18  the USDA, and he just needed to show that he had a lemur on a

19  disposition form.  It wasn't to get around the Fish & Wildlife or

20  anything, because in 20 years I have never seen them people.  So

21  it was just for that form.

22       And then I walked over, on the video, and Xeroxed it so we

23  had a copy of it, which even confuses me more because my

24  inspector knows exactly how many animals I got and what animals I

25  got.  And I would have not figured out how I would have covered

1  having a lemur, because he has the same inspector.  So the whole

2  damn thing was confusing to me.  I can't really answer why the

3  hell I did that.  I'm sorry about my language.

4  Q.   Well, did you create that form to create a false record to

5  try to fool the USDA somehow?

6  A.   Apparently I did.

7  Q.   Now, before we get into the remaining counts in the

8  indictment, I want to talk to you a little bit about late summer

9  of 2017 and then going into the fall.  What was your relationship

10  with Mr. Lowe like at that time?  How would you describe it?

11  A.   He was in Vegas primarily, most of the time.  And it was

12  really rocky because we got to know him and James real well.

13  They talked to each other, and James comes to the park and

14  they -- they just constantly are tape-recording each other and

15  tape-recording everybody they talk to, and it's just like a big

16  circle of drama.  And every time I would talk to James about how

17  bad I couldn't stand Lauren and what was going on with all of the

18  illegal stuff and -- and Vegas draining that zoo and money, he

19  would play that to Jeff.  And within a couple of hours of talking

20  to James, I would get a phone call getting an ass-chewing from

21  Jeff of why I'm talking about his wife or why I'm bitching about

22  money and so forth.  So it was -- it was pretty rocky.

23  Q.   Okay.

24          THE COURT:  Mr. Earley, is this a logical time for us

25  to take our lunch break or --

1          MR. EARLEY:  It's as good a time as any, yes.

2          THE COURT:  Okay.  Ladies and gentlemen of the jury, we

3    will take our -- counsel approach for just a moment.

4          (The following bench conference was held outside the hearing

5    of the jury.)

6          THE COURT:  Do you know -- I don't see by any stretch

7    of the imagination that we're going to instruct today.

8          MS. MAXFIELD-GREEN:  We would love that.  I don't know

9    how much longer he's going to go on.

10          THE COURT:  Well, what I'm trying to figure out is if

11    it makes sense for me to give the jury a little bit longer of a

12    lunch break and we do -- make our record about instructions

13    before we start back, which would give you-all a lunch hour,

14    still get it done without making them wait, or if it makes more

15    sense that we do it -- you know, I hate to do it on the afternoon

16    break because that takes the whole break up.  But if it looked

17    like this was going to last until near the end of the day, we

18    could do our instructions at the end of the day.  But if I'm

19    hearing that there is a possibility that we could instruct and

20    close, then why don't we do it -- I'll give them an hour and a

21    half for lunch.

22          Mr. Earley, do you -- how long do you think your record will

23    take on instructions?

24          MR. WACKENHEIM:  Not terribly long.  Yes, I'll be

25    handling that part.

1          THE COURT:  I'll give them an hour and a half for

2     lunch.  Does that work for everybody?

3          MR. EARLEY:  Yes.

4          MS. MAXFIELD-GREEN:  Certainly.

5        (The following record was made in open court, in the

6     presence of all parties, counsel, and in the presence and hearing

7     of the jury.)

8          THE COURT:  Ladies and gentlemen, what we'll do today

9     for our lunch break -- and this will prevent a premature or a

10    long break and having you guys wait in the afternoon -- I'm going

11    to give you a little bit longer break today for lunch.  We'll do

12    an hour and a half for lunch.  That will permit us to be able to

13    get back here before you, take care of some things before you

14    return, and then that way we'll just sail through the rest of the

15    day without having to have an interruption.  That's me knocking

16    wood.

17        So that being said, we'll -- ladies and gentlemen, for an

18    hour and a half.  Again, the admonition applies.  Court will

19    remain in attendance while the jury leaves.

20        (Jury exited.)

21          THE COURT:  Counsel, so they're coming back at 1:30.

22    If we come back at 1:15, we could make a record on instructions.

23    Is that sufficient time for everybody?

24          MS. MAXFIELD-GREEN:  Sounds good, Your Honor.

25          MR. WACKENHEIM:  Yes, Your Honor.

1          THE COURT:  Okay.  We'll be in recess until 1:15.

2      (Lunch break.)

3      (The following record was made in open court, in the

4  presence of all parties, counsel, and out of the presence and

5  hearing of the jury.)

6          THE COURT:  Record will reflect that the jury has not

7  been brought back in yet.

8      Counsel has been provided with -- and I understand that we

9  may be a tad bit premature, so I'll give both parties the

10 opportunity to re-raise anything that might develop from here on

11 out.  But for housekeeping purposes, I thought we could go ahead

12 and address jury instructions.

13     Counsel has each been provided with a draft copy of the

14 proposed instructions, which will be a collective of those

15 submitted by each side and those crafted by the Court.

16     With regard to the draft instructions, at least as we are

17 right now, government, do you have any objections to the

18 instructions as proposed?

19          MS. MAXFIELD-GREEN:  Your Honor, just one more second,

20 please.

21          THE COURT:  Sure.

22          MS. MAXFIELD-GREEN:  I don't believe we have any

23 objections, Your Honor.

24          THE COURT:  Thank you.

25     Mr. Wackenheim, I understand you were going to address the

1  jury instructions.

2          MR. WACKENHEIM:  Yes, please.

3          THE COURT:  Any objections by the defendant?

4          MR. WACKENHEIM:  Yes.

5      Now looking to Instruction No. 18 in the draft instructions,

6  this is a non-stock -- it's not a Tenth Circuit uniform jury

7  instruction on investigative techniques.  We're objecting to the

8  inclusion of that instruction.  Do acknowledge that there is an

9  unpublished decision from 2012, Johnson, at 479 Fed Appendix 811,

10 where at most the Court said it was not an abuse of discretion to

11 give it.  I know the government also cited there was a district

12 court case, Faust, which another judge in this district gave.  I

13 went back and looked, I did not see that it was objected to.  So

14 I don't know if it was at issue.  Just know that it's not a

15 uniform jury instruction; it's not needed in this case; and it

16 unnecessarily suggests that the government does not need to use

17 all investigative techniques.

18     If it is -- I'm not exactly sure why it needs to be stated

19 to begin with.  At some level it appears to diminish the

20 responsibility of the government to investigate its case.  And,

21 of course, it does include a sentence that the issue is whether

22 or not the government has presented sufficient evidence to

23 convince the jury of the defendant's guilt beyond a reasonable

24 doubt.  Part of the defendant's theory here is that the

25 government's investigative techniques resulted in the

1 | investigation of Mr. Passage to the exclusion of others, and even
2 | that is covered in a different instruction, that the guilt of
3 | others is not concerned.

4 | So if it's not an abuse of discretion to give it, I don't
5 | necessarily understand why it needs to be given at all,
6 | particularly when it's not a uniform instruction from the Tenth
7 | Circuit.

8 | THE COURT:  Okay.  That's the proposed 18.  Okay.

9 | MR. WACKENHEIM:  Yes, sir.  And then probably the more
10 | important, at least with respect to the Lacy Act counts, is our
11 | proposed instruction included a materiality requirement.  I know
12 | the Court's reviewed our proposed instruction.  And there is a
13 | split in authority at two different court levels, both of which
14 | are not binding on this Court.

15 | There's a Fifth Circuit case from 2001 which states that the
16 | Lacy Act does not have a materiality requirement.  What we're
17 | asking for is an instruction that requires the jury to find that
18 | any of those false statements as alleged are material, which,
19 | whether or not they have a natural tendency to influence, or if
20 | it's capable of influencing the decision of the decision-making
21 | body to which it's addressed.  We submit that that is a
22 | requirement of the Lacy Act in spite of the Fifth Circuit's
23 | decision from 2001.

24 | I'll note that we cited a case, Kokesh, it is a district
25 | court order.  It's from the Northern District of Florida.  It

1   comes 12 years after Fountain and does take a look at Fountain.
2   And the senior judge -- it wasn't even at issue; both parties
3   seemed to agree that materiality was not an issue, but this judge
4   decided that it was.  And I think it was well reasoned.
5        It began with discussion that materiality is an essential
6   element of most, if not all, fraud offenses.  But even more
7   important than that, if materiality is not a requirement of the
8   Lacy Act, which is a felony punishable up to five years for each
9   false statement, then it could apply to and criminalize all sorts
10  of innocuous falsehoods.  Now, I suspect the government will say
11  that the falsehoods here are not innocuous, but that is a
12  question for the jury, and that's why we submit that materiality
13  should be an element of the offense.
14           THE COURT:  So just 18, and then I believe 23 and 24,
15  which are the Lacy Act instructions?
16           MR. WACKENHEIM:  Yes, Your Honor.
17       And then if the Court doesn't have any questions about that,
18  we had proposed the Tenth Circuit pattern Instruction 1.16, which
19  was witness's use of addictive drugs.  That's a pattern
20  instruction.  We think that Mr. Glover's testimony was pretty
21  clear on the variety of substances that he ingested and was
22  addicted to, including at least cocaine and alcohol.  We think
23  that it's something for the jury to properly consider when it's
24  evaluating his credibility.  So we would request that that
25  instruction be used, modified to include alcohol as well.

1           THE COURT:  Wasn't his testimony, though, consistent
2      with that?  Didn't he readily admit, oh, yeah, I was using
3      alcohol and drugs and I don't remember but if that's what the
4      recording says I said, I said it?
5           MR. WACKENHEIM:  Right.  Well, there was -- I think
6      there is in dispute some testimony relating to events that were
7      not recorded, some conversations that he had with other
8      individuals, his motivations to give the story that he gave to
9      law enforcement, and just general credibility issues.  I mean, I
10     believe he testified that when he drove to Florida he was drunk
11     and/or high, intoxicated the whole way through.
12          So I think for that part of it, it's true that it undermines
13     his credibility.  And that is, in light of the pattern
14     instruction, an additional criteria that the jury should be able
15     to evaluate.
16          THE COURT:  Okay.  I know there was some discussion
17     about the definition for "consideration" in Instruction 19 in the
18     murder-for-hire elements, and there was some discussion about
19     whether or not there would be a replacement for "as consideration
20     for," and I believe the government was originally talking about
21     changing that to "in exchange for."
22          Do you still have an objection in terms of the
23     murder-for-hire instruction, No. 19?
24          MR. WACKENHEIM:  As proposed, we do not.  We believe
25     the definition --

1    THE COURT:  As proposed, no?

2    MR. WACKENHEIM:  Yeah.  The consideration definition

3 which was supplied, we believe covers the law on that.

4    THE COURT:  Okay.  Anything else?

5    MR. WACKENHEIM:  No, Your Honor.

6    THE COURT:  Thank you.

7    Response from the government.

8    MS. MAXFIELD-GREEN:  Yes, Your Honor.  I will try to go

9 in the order that Mr. Wackenheim did.  As to Instruction No. 18,

10 the government does propose that to -- as an instruction that

11 should be included on investigative techniques.  It is not a

12 uniform instruction, but it has been utilized a number of times

13 in this courthouse, as well as other courthouses.  It's kind of

14 become known as the CSI instruction.  It has become fairly

15 standard in the modern era where there's much more awareness and

16 publicity about various types of investigative techniques that

17 the government could use.  And I think it -- those issues have

18 been touched on in this case and it would be an appropriate

19 instruction here.

20    As for the materiality requirement, the only case that has

21 imposed a materiality requirement onto the Lacy Act is the Kokesh

22 decision, which is an unpublished district court decision from

23 the Middle District of Florida.  No other courts have adopted the

24 reasoning of that case.  And, in fact, the Fifth Circuit in

25 Fountain specifically addressed the issue of whether there was a

1  materiality requirement in the Lacy Act.  And in very detailed

2  reasoning, the Fifth Circuit explained that the materiality

3  requirement is not in the language of the statute of the Lacy

4  Act, and that if Congress had wanted to impose a materiality

5  requirement, it certainly could have and knows how, as it has in

6  numerous other criminal statutes.  And, therefore, we don't --

7  the government does not believe that this Court should impose any

8  kind of materiality requirement onto the Lacy Act.

9       THE COURT:  I think the final one was Pattern

10  Instruction 1.16, the use of --

11       MS. MAXFIELD-GREEN:  Yes, on the use of addictive

12  drugs.  The pattern instruction refers to the use of addictive --

13  actually, the abuse of addictive drugs.  The pattern instruction

14  does not address alcohol at all.  I think Mr. Glover's testimony

15  was certainly that -- that he was a user of alcohol, I believe he

16  also testified that he had used drugs.  I don't believe there was

17  any evidence or even testimony by him that he abused the drugs.

18  I think that might be an inference the jury could draw.  But to

19  the extent that they can assess his credibility based on what he

20  was -- had already testified to, I think his credibility could

21  very well be covered by the basic credibility of witnesses

22  instruction without having to impose the addictive drug

23  instruction and then also alter it with the inference of

24  addiction to alcohol.  So the government would object to that as

25  well.

1          THE COURT:  Okay.  Thank you.

2      Anything further, Mr. Wackenheim?

3          MR. WACKENHEIM:  No, Your Honor.

4          THE COURT:  Thank you.  I appreciate both parties' work

5  on this.

6      With regard to the objection by the defendant as to

7  Instruction No. 19 on the investigative techniques instruction, I

8  tend to agree with the government in that case, that that current

9  language, that instruction, while a non-pattern instruction, has,

10 in fact, been used here in the Western District on a number of

11 times; but also, as both counsel I think pointed out, in the

12 Johnson case, in the Tenth Circuit case, as the Court had held

13 that was, in fact -- that instruction was an accurate statement

14 of the law, and that objection will be overruled.

15     As to the materiality element in the Lacy Act instructions,

16 you know, again, I don't know that -- I mean, I understand

17 there's some -- at least some mild split out there.  The Fifth

18 Circuit does appear to be most on point.  And I agree with the

19 government that, you know, in the wisdom of Congress, if they

20 wanted -- if they wanted a materiality element, they would have

21 included it, and they certainly still could.  The -- you know,

22 the Kokesh decision, again, also is not particularly persuasive.

23 It's been, oh, I don't know, more than five years since that

24 decision came down.  And at least to our knowledge, no court has

25 relied on Kokesh for including a materiality requirement in a

1  Lacy Act violation.  And for that reason, the defendant's

2  objection to the Lacy Act instructions, inasmuch as wanting to

3  include a materiality component, will be overruled.

4      With regard to the defendant's proposed 1.16, the use of

5  addictive drugs, I also think that, for the reasons already in

6  the record and as described by the government, I think the

7  credibility of a witness instruction covers that.  I think the

8  parties fully cross-examined Mr. Glover on his drug and alcohol

9  abuse and his ability to recall or not recall, I think, was very

10 clearly -- for the jury to weigh.  So that request for that

11 instruction will be overruled.

12     As I said also, I understand we have some testimony

13 remaining and defendant has not rested, and so we can certainly

14 revisit the instructions if we need to, should something arise

15 that was not incorporated in your argument today.  I'll permit

16 the parties an opportunity to re-raise or add to any objections

17 or requests based on the testimony from here on out.

18     Anything else from either party in terms of the

19 instructions?

20          MS. MAXFIELD-GREEN:  No, Your Honor.

21          MR. WACKENHEIM:  No, Your Honor.

22          THE COURT:  Thank you.

23     Mr. Passage, if you want to take the stand.

24     (The following record was made in open court, in the

25 presence of all parties, counsel, and in the presence and hearing

1  of the jury.)

2         THE COURT:  Ladies and gentlemen, how are we doing on

3  temperature?  I have gotten reports that it is cold in here, but,

4  you know, this robe's like a parka so sometimes I'm a little

5  oblivious to that.  Are you-all cold?  Little mixed bag?  Maybe

6  we'll make a little minor adjustment and see how that goes.

7         Mr. Earley, you may proceed.

8  Q.   (By Mr. Earley)  Mr. Passage, I think we left off with your

9  relationship with Mr. Lowe, but I want to back up just for a

10 moment to go back to what we were discussing before, and that's

11 Counts 12 through 21.

12        Now, with respect to Government Exhibit 12, I believe this

13 deals with Count 19 in a delivery form.  Do you recognize that?

14 A.   Yes, sir.

15 Q.   All right.  Now, is this your handwriting on the form?

16 A.   Yes, it is.

17 Q.   And were you involved in the transaction itself?

18 A.   Yes, sir.

19 Q.   All right.  Tell us about that.

20 A.   This was right at the time that I was actually leaving the

21 zoo for good.  And I had this pair of lions that we were donating

22 to the Animal Haven Zoo up in Wisconsin.  And we -- what I done

23 was I billed them for the two drivers and the gasoline and the

24 truck to get -- to take them up there, and I -- if I remember

25 right, it was $3,200.  And we ended up blowing an engine on one

1  of the trucks and we had to send another truck to go get that

2  truck and another driver to go up there and rescue the other

3  drivers.  And we finally got it all done.

4       But anyway, by the time it was all over with, we didn't even

5  make any money to pay the gas and stuff to get it all done.  And

6  that is part of what our license allows me to do.  It's the same

7  as if I had FedEx do it or American Airlines or anybody else.

8  They would have charged the people for the gas and the trouble to

9  go up there and back because they couldn't come get them.

10 Q.   So was this form inaccurate with respect to any information

11 on it?

12 A.   Absolutely not.

13       MR. EARLEY:  Could you pull up Government Exhibit 13?

14 Q.   (By Mr. Earley)  Now, this is Count 20, which deals with the

15 form associated with the delivery to Branson Wild World, correct?

16 A.   Correct.

17 Q.   Do you remember the testimony about that?

18 A.   From who?

19 Q.   Mr. Finlay, I believe.

20 A.   I remember him saying that he's the one that delivered

21 these, yes, sir.

22 Q.   And that there was some money that was counted out and -- I

23 think by his girlfriend at the time.  Do you recall that?

24 A.   Yes, sir.

25 Q.   Okay.  What about this form?  Is that your handwriting?

1  A.    No.   This is not mine.   And actually, I wasn't even in the
2  state of Oklahoma when this transfer was done.
3  Q.    All right.   Did you have any participation in getting this
4  transfer arranged?
5  A.    I did.   Before I left the state -- and we'll probably get
6  into that later because I was threatened is the reason why I left
7  for a few days -- Branson Wildlife Park wanted to purchase the
8  serval and the African cat and the bats and everything else.   And
9  because I was leaving the park, we had a bunch of babies that I
10 had to get rid of because Jeff couldn't take care of them without
11 killing them, and nobody else at the park could raise them being
12 that little.

13        All right.   So I told Jim with Branson Wildlife Park on the
14 telephone that I had some baby lions that I would give him
15 because they were illegal to sell baby lions.   Since he was
16 buying the bats and everything else, if he would take these
17 babies because the rent house that I had up in Yukon at the time
18 ready to go to, we couldn't have the tigers or lions up there in
19 the rent house.

20        So technically, if you really want to complain about this
21 form, it should have said donate and sell instead of whoever
22 filled this out and just hit the donate box, because everything
23 on there was sold except for the two lion cubs.
24 Q.    All right.   Now, I believe your testimony right before we
25 broke was that in the summer of 2017 your relationship with

1  Mr. Lowe was pretty rocky.

2  **A.**    Very rocky.

3  **Q.**    All right.  What was your relationship with Mr. Garretson

4  like at this time?

5  **A.**    Me and -- me and James was never friends or close friends.

6  And I referred to him as a giant Chucky Doll because he's just

7  eerie all the time.  He's always up to no good.  Everything he

8  done was criminal.  And him and Jeff were tight, they were very

9  tight in everything they did.  So mine and his relationship,

10  there was none.

11  **Q.**    All right.  Now, what about Mr. Glover?  We haven't really

12  talked about him.  What was your relationship like with Alan

13  Glover?

14  **A.**    We hated each other.

15  **Q.**    Was there any time that you-all kind of got along?

16  **A.**    You know, he helped me with Travis's memorial for a few

17  days, and that's probably about the only time we got along.

18  **Q.**    All right.  What was your problem with Mr. Glover?

19  **A.**    Well, I mean, constantly drunk, would not come to a staff

20  meeting, sleeping with my mother-in-law, both of them doing meth.

21  I had to fire her from smoking meth in the commissary.  He just

22  wouldn't listen.  And he came with Jeff and they don't know

23  anything about the Oklahoma weather, and he just starts chopping

24  trees down and bamboo down, and this is protection that the

25  animals need from the wintertime, and it was October.  And -- and

1  he just wouldn't listen to anything.

2  Q.   Well, why didn't you fire him?

3  A.   I couldn't fire him.  He was -- they made that pretty clear,

4  that he worked for Jeff.  And in his testimony you heard that he

5  had nobody to save him all the time, like I was going to hurt him

6  or something.

7  Q.   Now, during this time period, did you believe that maybe

8  there was something going on between Lowe and Garretson as far as

9  it affected you and the park?

10  A.   Well, I mean, it started out that they were -- they were

11  manufacturing fake Prince clothes in the office and --

12  Q.   But --

13  A.   I mean, all of that is why we didn't get along, everything

14  they done criminal at the park.

15  Q.   Okay.  But did you think that they were spending a lot of

16  time together?

17  A.   They spent a bunch of time together.

18  Q.   All right.  And with respect to, you know, anything that

19  subsequently happened, were you aware that they were talking with

20  each other about ways to get you out of the park?

21  A.   I mean, at first, in late 2016, it didn't affect James, but

22  Jeff -- at that time I was taking CBD oil without THC in it

23  because I don't like smoking weed because I just can't handle the

24  high.  So I would open up a capsule of Amoxicillin -- this is

25  real important to --

1            MS. MAXFIELD-GREEN:  May we approach, Your Honor --

2        (The following bench conference was held outside the hearing

3   of the jury.)

4            MS. MAXFIELD-GREEN:  Your Honor, again, we have already

5   gotten Prince clothes back in, which seems apropos to nothing

6   that was asked.  He's now attempting to insert a story I know

7   very well that he wants to get out there about, again, totally

8   unfounded accusations, things we have no evidence for other than

9   his accusations.  There's no extrinsic evidence of any of this.

10  And I just don't -- and it doesn't seem relevant to anything

11  that's being asked.

12       I don't think that defendant can just give a rambling

13  narrative of every terrible thing he thinks someone who is not

14  subject to cross-examination has done.  That's --

15           THE COURT:  Well, and the question was is he aware

16  about these two talking about ways to get him out of the park,

17  which I understand has been part of the context of all of this.

18  But, Mr. Earley, where are we going -- we were getting -- it was

19  getting a little far afield.

20           MR. EARLEY:  Well, actually, I think -- what I

21  anticipate Mr. Passage testifying to is a couple of occasions at

22  the park:  One where he believed that someone, I think he thinks

23  it was Lowe, had put some hash oil into his medication.  He was

24  doing a show inside a tiger cage with some tigers in there, it

25  affected him, and it could have resulted in him being seriously

1  injured or killed.  The second thing that I anticipate he'll get

2  into is that there was at some point some perfume placed on his

3  boots.  Tigers react very aggressively to certain smells and

4  the -- the time that he went into the tiger pen, he was basically

5  attacked by a tiger.  This is actually on a video.

6      So there is a basis for it, at least the tiger attacking his

7  shoes.  And he believes that Mr. Lowe, with the assistance of

8  someone else, had put that into motion so that they could, you

9  know, have him seriously injured, somehow removed from the park

10 based on that.

11         THE COURT:  But is that not all just rank speculation

12 on his part?

13         MR. EARLEY:  Mr. Passage would testify that Mr. Lowe

14 actually admitted on Facebook or social media that he had

15 switched out his medication.  And the -- you know, I have seen a

16 video where the lions did go after his boots and after him, or at

17 least one of them.  He actually had to fire his weapon to get the

18 lion to get away before he could get out of the cage.

19         MS. MAXFIELD-GREEN:  Your Honor, number one, hearsay.

20 Whatever Mr. Lowe may have posted on Facebook about it is clearly

21 hearsay.  Any admission he made to anybody about it is hearsay.

22 I mean, there -- I will concede, on the government's side, we

23 have seen a video of him being dragged by his foot by an animal,

24 but there is just simply no way -- we can't -- we can't have a

25 trial of every perceived wrong that Mr. Passage believes is

 1   attributable to Mr. Lowe.

 2           THE COURT:  Yeah.  Mr. Earley, I just think it's -- I

 3   think it's well established in the evidence, at least the jury

 4   could believe or disbelieve that there's ample testimony that

 5   Mr. Passage and Mr. Lowe were at odds at various times on various

 6   ends of the extremities.  And I don't think it is a mystery, and

 7   it's clearly established that there's testimony that Mr. Lowe

 8   wanted him out of the park.  I think it's getting a little far

 9   afield to get into all these other things in terms of these

10   individual steps that he may or may not have taken.  It seems a

11   little tenuous to me, so I'm going to sustain the objection.

12           MR. EARLEY:  May I just sort of do a very summary

13   question to move him off this topic and move on?

14           THE COURT:  Well, it's hard for me to know what the

15   question's going to be, but we'll see what -- Ms. Green?

16           MS. MAXFIELD-GREEN:  I think that it has been

17   established, and maybe one more question would establish to his

18   satisfaction that he believed Mr. Lowe was out to get him or

19   trying to get him off the park in a variety of ways.  If that's

20   his belief, that's his belief, but all of this specific detail

21   that cannot be substantiated is irrelevant and prejudicial.

22           THE COURT:  I think that's fair.

23       (The following record was made in open court, in the

24   presence of all parties, counsel, and in the presence and hearing

25   of the jury.)

1          THE COURT:  I have made no progress on getting elevator

2    music instead of the white noise sound, but...

3    **Q.**   (By Mr. Earley)  Mr. Passage, was it your belief that

4    Mr. Lowe was trying to get you off the park?

5    **A.**   Yes.

6    **Q.**   All right.  Now, with respect to Fish & Wildlife Service,

7    you had frequent inspections by the USDA; is that correct?

8    **A.**   Very frequent.

9    **Q.**   Okay.  About how often did they come out to your park?

10   **A.**   Sometimes every month, sometimes you didn't see them for a

11   couple of months.  The inspectors have to show up every time

12   somebody calls in a complaint on you.  So that's another thing in

13   this industry is it's fun for one facility to keep calling in

14   fake complaints to another facility because it keeps the

15   inspectors coming and it just ties you up with paperwork.

16   **Q.**   Now, they would come at whatever frequency they would, but

17   did Fish & Wildlife ever inspect your premises?

18   **A.**   The Oklahoma Fish & Wildlife, I had to have an exhibitor's

19   license from them for native animals, like raccoons or black

20   bears or mountain lions and foxes and stuff like that.  The

21   Federal Fish & Wildlife, in 20 years I never seen a person from

22   the Federal Fish & Wildlife.  And that goes down to the

23   Endangered Species Act.  For 20 years nobody was concerned

24   whether or not I had a purebred Siberian tiger or a Sumatran

25   tiger.  And we sold tigers up until 2016, and then they -- they

1  put on this generic thing, okay, which is really just a policy,

2  it's not even a law by Congress.  And to this day, they still

3  don't have a form to tell how many tigers you have, how many are

4  born, how many die, where their bodies are after they die.  In 20

5  years, I have had probably 50-plus tigers pass away or

6  euthanized, buried in that back pasture, and nobody gives a damn.

7  Nobody.

8  Q.    All right.  I want to change the topic here to the fall,

9  now, of 2017.  Did anything happen during that time frame that

10  changed your entire way of thinking?

11  A.    I went to town to get my car fixed, and I got a phone call

12  that my husband shot and killed himself inside the gift shop.

13  Q.    When did that happen?

14  A.    October the 6th of 2017.

15  Q.    May sound like a silly question, but how did that affect

16  you?

17  A.    My entire soul died.

18  Q.    In the days following, did you get a chance to stay by

19  yourself and grieve your loss?

20  A.    I held a press conference the very next day, and I did my

21  show at 11:30, just like I was supposed to.  And I never took a

22  day off.  And I was even his preacher at his funeral.

23  Q.    Did you ever contemplate harming yourself?

24  A.    Yeah.

25  Q.    Who helped you get through the first few days of that?

1   **A.**   John and his daughter.

2   **Q.**   Now, we have heard testimony, a lot of testimony, about

3   these five tigers being put down in October 2017.  Do you recall

4   that?

5   **A.**   Yes, sir.

6   **Q.**   Did you do that?

7   **A.**   I did.

8   **Q.**   All right.  Tell the jury why you did that.

9   **A.**   After Travis died, I walked through the park every morning

10   looking at the clouds trying to see his face because I couldn't

11   dream about him or anything.  And I walked through and checked

12   the animals every morning, and I would have to ask myself what

13   the hell am I doing because I have all these crippled animals

14   that I am making suffer to be on display to suck donations out of

15   people.  And I was no better than -- than the facilities that we

16   talk bad about, or the people that we took the animals away from.

17        And me -- me and John Reineke talked about it.  And we owed

18   the vet so many thousand dollars already.  And to tranquilize a

19   tiger so a vet can give it a shot takes 45 minutes sometimes, and

20   it takes several hundred dollars worth of medicine, and then the

21   animal is just convulsing and throwing up and seizing until the

22   vet can even get to it.  And the shotgun was a half a second and

23   it was twice as fast.  And I had legal right, according to the

24   state of Oklahoma and the USDA, to do that.

25   **Q.**   How many years have you dealt with tigers and big cats?

1  **A.**   Close to 25.

2  **Q.**   Do you consider yourself very familiar with that species?

3  **A.**   I consider myself one of the world's experts in tigers.

4  **Q.**   Now, you had a veterinarian associated with the park,

5  correct?

6  **A.**   Yes, sir.

7  **Q.**   And that was Dr. Green?

8  **A.**   Dr. Green.

9  **Q.**   And you and Dr. Green, through your agreement, had developed

10  a euthanasia protocol, correct?

11  **A.**   Yes, sir.

12  **Q.**   And that protocol required Dr. Green to euthanize any animal

13  that needed it, correct?

14  **A.**   For the USDA license, yes.

15  **Q.**   All right.  Did you violate that protocol in October?

16  **A.**   The USDA license -- I would have gotten cited by the USDA as

17  a noncompliance for not calling the vet.  Wouldn't have been

18  anything criminal, but I was giving up my license anyway, so I

19  didn't care if I get wrote up.  The idea was to quit making all

20  these animals suffer for money.

21  **Q.**   Did you violate the law by euthanizing those animals?

22  **A.**   Absolutely not.

23  **Q.**   Now, explain why you think you did not violate the law by

24  euthanizing those five tigers.

25  **A.**   Because the state of Oklahoma says that you have the right

1  to shoot -- or euthanize your own livestock as long as it doesn't

2  -- "instantaneously" is the word that they use for it.  And this

3  law that they have charged me with is absolutely a law that is

4  extremely vague because Congress didn't enact this right, and

5  that's why the Trump administration is working on redoing this

6  law right now.

7       The word "take" is to pursue, harass, harm, shoot, kill,

8  wound, capture, or collect an endangered species.  That is for

9  something in the wild, that's not something born in a zoo or

10 every zoo owner would be arrested by now, and every circus owner

11 would be arrested for harassing an animal to make them jump

12 through a hoop.  This is for animals in the wild, has nothing to

13 do with this.  And if it did have something to do with animals in

14 captivity, I had 50 born, according to the last testimony you

15 heard the other day, and I euthanized five, so I should be

16 getting credit for 45 more.

17 Q.   After Travis died, what did you decide you were going to do?

18 A.   I was done.  I called Brittany Peet several times, crying

19 because of what Jeff put me through and James always holding my

20 teeth over my head because I have stolen teeth in my head thanks

21 to them two.

22 Q.   Now, had you met Ms. Peet before?

23 A.   Not before -- not before the Dade City Wild Things thing.

24 Q.   All right.

25 A.   Talked to her on the phone.

1    Q.   What was -- what was it like for you to meet Brittany Peet?

2    A.   I wished I'd have met her ten years ago.

3    Q.   Why?

4    A.   Because she was nothing like we all portray each other to

5    be.  She was a real human being with real feelings, and she

6    understood what position I was in, and she wasn't about just

7    killing animals like we all think PETA is about.

8    Q.   Did you think that she was someone who could help you get

9    yourself out of the park?

10   A.   She was helping me get out of the park.

11   Q.   All right.  Now, as far as your arrangements with Ms. Peet,

12   tell the jury what you had in mind.

13   A.   Me and my mom had a plan, and it was going to take a little

14   while because we had to jump through all of the civil litigation

15   hoops to do it.  But Carole was suing my mom for illegal transfer

16   of assets of the land because we changed the name from the first

17   park to the Garold Wayne Interactive Zoological Park.  So the

18   transfer of the land was an issue.

19          And we came up with the idea and the plan, and we ran that

20   by Howard Baskin, through a third person because we couldn't talk

21   direct to him because of the lawsuit, that mom was going to quit

22   fighting it and quit paying the lawyers.  So that way, Carole

23   could get -- win the judgment on the illegal transfer of assets,

24   which would void the land deed that Jeff was on and it would go

25   back to 100 percent of my mom owning the property.  And because

1  Jeff never paid the lease like they had a contract, she was going
2  to evict him.  And that would have got Jeff off the park.  And we
3  were working out a deal with PETA to work out with Carole to move
4  all the animals out, and let John Finlay cut the cages apart and
5  sell them for scrap iron in order to have us some private money
6  to move because Carole would have owned the land with that deal.
7  And that was our plan.
8  Q.    So effectively shut down the entire operation?
9  A.    Correct.
10 Q.    While this was going on, you're trying to work with PETA and
11 resolve issues with Ms. Baskin, was there still a lot of drama
12 going on at the park?
13 A.    It was constantly drama going on at the park.  I couldn't
14 even go to town.  I couldn't even go home and eat lunch.  My
15 house is inside the zoo.  And I would go home and eat lunch, and
16 I hear this screaming on the radio.  And I run out in the park
17 and here's one of my female workers laying there without an arm
18 and everybody standing there just looking at her like she has
19 some kind of disease.  And I kill myself trying to train my staff
20 for medical emergencies and animal emergencies, and then they let
21 the chimpanzees out, then they let the tigers out, then they let
22 the leopards out.  And then I go to town and my husband dies.  I
23 just couldn't take any more.
24 Q.    Now, during this same period of time, even prior to Travis's
25 death, did you become involved in some outside activities?

1  **A.**    I ran for public office, yes.

2  **Q.**    What did you run for?

3  **A.**    In 2016, I just -- I write a lot of letters to senators and

4  congressmen, and you never hear anything back ever.  You get a

5  form letter if you're lucky.  And I laid in bed one night and I

6  was like, how do a normal person like me and you ever get heard

7  in this country.  And I woke up the next morning and I filled out

8  my federal papers to run for president against Donald Trump as an

9  independent.  And I didn't know what I was getting into really.

10 And we didn't do it as a joke.  I was very serious about it.  And

11 I probably learned more in 11 months running for president than I

12 did in 12 years of school.  And an independent is not recognized

13 in this country, so you have to go to every state and get 140,000

14 signatures in order to get access to the ballot and pay a fee.

15 And I was the first person to ever make 37 ballots when it come

16 election time in November.

17        So after that, the night of the election, the Libertarian

18 party that had Gary Johnson running for president against Donald

19 Trump called me and asked me if I would change parties and run

20 for 2020.  And I thought, hell, yeah, if they're calling me from

21 the national Libertarian office to run for president, I'm game.

22 So the next morning I changed my parties and I was like, I don't

23 know if I can keep my mouth shut for four more years.

24        So the governor race in Oklahoma was up because she had

25 termed out.  So I signed up to run for governor of the state of

Oklahoma.  And for a year and a half they had to put up with me
on that stage with 15 others debating them.  So we as American
people that normally pay taxes and work out here for a living had
a voice.

**Q.**   Were you kept busy during the fall of 2017 with that as
well?

**A.**   I was in, I believe, six parades between Thanksgiving and
the first week of Christmas.  And I had Amber, John's girlfriend
at the time, and her three kids living in my house to keep me
alive.  And the -- you know, a lot of people give me a hard time
about getting married so soon, but I studied regression and I was
looking for every reason for Travis to come back.  And I believed
that God gave me Dillon to keep me alive.

**Q.**   Now, I believe you testified earlier that you have been to
Tampa, Florida, correct?

**A.**   Many times.

**Q.**   Okay.  Tell me what years you have been in Tampa, Florida.

**A.**   The entire time that we were fighting this litigation, we
went down there for depositions several times.  I flew down there
and went shark fishing and parasailing.  I took John and another
kid on a -- on a trip down there deep sea fishing.  I flew down
there to do the music video.  I actually flew down there to do a
protest in front of Carole's road that goes to her place.

**Q.**   When was that?

**A.**   Maybe 2012, somewhere around there.

1   **Q.**   Okay.  How about 2015 or '16, had you been down to Tampa?

2   **A.**   I think '15 -- I think '16 is when I did the music video

3   and -- and was running for president.  I did a presidential rally

4   there in Clearwater.

5   **Q.**   During those visits to Tampa, Florida, and particularly the

6   visits after the lawsuit and things started getting acrimonious

7   between the two of you, did you ever try to approach Carole

8   Baskin?

9   **A.**   I even went on a tour.  I paid a tour -- to go on a tour at

10   her facility to see what it looked like compared to ours.  I

11   never even saw Carole Baskin.  And -- and I have never emailed

12   her; I have never called her; I have never sent her a message on

13   social media.

14   **Q.**   Well, have you ever called her and threatened her?

15   **A.**   Absolutely not.

16   **Q.**   Have you ever delivered or sought to have delivered a threat

17   in writing?

18   **A.**   No, sir.

19   **Q.**   Now, prior to the fall of 2017, had anyone ever approached

20   you about hiring someone to kill Carole Baskin?

21   **A.**   Not that I can recall.

22   **Q.**   Now, let's talk about Count 1 of the indictment.  Count 1

23   charges that in November you inquired of Alan Glover if he would

24   travel to Florida to murder Carole Baskin in exchange for some

25   money.  Did you do that?

1  **A.**   I never talked to Alan Glover about this.

2  **Q.**   It also says that you told Glover that -- or that Glover

3  told you he would go to Florida to murder Carole Baskin in

4  exchange for some money.  Did he ever say that to you?

5  **A.**   No, sir.

6  **Q.**   Now, the indictment charges that on or about November 6th

7  you caused Mr. Glover to travel to Dallas to get a fake ID for

8  use in this proposed plot for him to go to Florida and kill

9  Carole Baskin.  Tell us about this ID situation.

10  **A.**   Okay.  In October, the last -- last week of October, Jeff

11  called me from Las Vegas and told me to call James and get the

12  address of where he goes and gets these fake driver's licenses

13  that they make to go lease fake addresses, and have Alan go down

14  there and get a fake driver's license because he needed to get a

15  bus to go back to South Carolina and fix all of his legal

16  problems and everything else he had back there.  And Jeff said,

17  and I may send him to Florida to take care of my problem.  That

18  was his exact words.  And we --

19  **Q.**   Was that in October?

20  **A.**   That was in October.  And we all forgot about it.  Jeff and

21  James never responded to me.  I -- we just forgot about it.  And

22  then Jeff called about a week, week and a half later and said,

23  did you ever get Alan that address.  So I called James again and

24  James sent me the address.  And I asked John if he'd take him to

25  Dallas because I didn't want anything to do with Alan in a car

1  for five hours, and I didn't want any part of whatever they were
2  up to because I had already received a tip through the little
3  canary grapevine there at the park that they were up to
4  something.  So that's when I called John on his way to Dallas and
5  told him to keep at least a block away from that place and do not
6  go in.

7  Q.   Now, according to your testimony, you were aware that Lowe
8  wanted him to travel to Dallas and get this ID, potentially for
9  going to Florida; is that right?

10 A.   That's what Jeff said, yes, sir.

11 Q.   Okay.  So did you provide Finlay a vehicle to go down there?

12 A.   That's the vehicle he always drove.

13 Q.   All right.  And did you tell him maybe find a different
14 vehicle, don't take one associated with the park?

15 A.   No.  We didn't have any other vehicles.

16 Q.   All right.  So it didn't bother you that there was a bumper
17 sticker or something on that vehicle that would associate the
18 vehicle with the park?

19 A.   No.

20 Q.   All right.  And what was your intention of keeping
21 Mr. Finlay a block or so away from the business?

22 A.   Because whatever they were up to, I didn't want John being
23 implicated in that.  And I think I said that on one of them
24 videos too, that we didn't want any part of it because mom's
25 nurse told me that they were up to something.

1  Q.   Now, what did you think they were up to?

2  A.   You know, between him and James, you never know what they're

3  up to because, I mean, they'll look on social media, at each

4  other, like they're fighting and they're best of friends.  It's

5  just -- it's a constant game between them two.

6  Q.   Well, did you question in your mind, why is Jeff telling me

7  things?  I mean --

8  A.   I questioned in my mind why Jeff was telling me things all

9  along because on September the 30th he sold a tiger in Las Vegas

10 to Paul Logan, the YouTube star.  And I got him to wire $2,000

11 back to the park so I would have a receipt of him selling that

12 tiger.  And he did.  And, I mean, it was -- it was just the

13 craziest thing because everything that they did they kept

14 providing me with exactly what I needed, copies of leases and the

15 whole nine yards.

16 Q.   Well, I believe Mr. Glover said something to the effect that

17 he thought you were trying to gather information or something

18 like that.  Do you recall that testimony?

19 A.   I remember him saying that I was fishing, and that's exactly

20 what I was doing.

21 Q.   So when you provided the information that would allow Finlay

22 and Glover to go down to Dallas and pick up an ID, did you do

23 that with the intention that Alan Glover used that to assist in a

24 plot to murder Carole Baskin?

25 A.   I didn't exactly know what they was going to use it for

1  because it was -- it was a toy ID.  I didn't even know if he

2  could get on a bus with it.

3  Q.    Now, the indictment also alleges that as part of this --

4  this plot that on November 25th you used the mail to send a cell

5  phone out to Las Vegas to conceal Glover's, I guess participation

6  or involvement in this plot.  What do you recall about the cell

7  phone?

8  A.    Okay.  Before all that -- there was a lot that happened

9  before that.  Jeff had -- Jeff had called me several times,

10  talking about him going to -- to South Carolina and him going to

11  Florida and --

12  Q.    Who's "him"?

13  A.    Alan.

14  Q.    All right.

15  A.    Okay.  And then Jeff gets arrested.  In between that all, I

16  think, was -- if I have got my timeline right -- I don't remember

17  when he got arrested.  It was -- it was close to Thanksgiving he

18  gets arrested.  And I had talked to James, and I repeated exactly

19  what Jeff told me because I know they're talking to each other.

20  And that made them both feel like, yeah, they got me in this

21  little web, but I was also consulting a police officer that --

22  that drove for me and -- and was my bodyguard.  And he kept

23  telling me, just don't cross the line, you can fish all you want

24  to get the information, but don't cross the line.  And I thought

25  crossing the line was actually hiring a man to go do this, you

1  know.  I didn't think asking questions was crossing the line

2  because I just wanted to know what the hell they were up to.  But

3  they were -- they were like high-pressure salesmen trying to sell

4  you a vacuum cleaner with extra parts.  They just nonstop.

5      It was all about Carole, Carole, Carole, Carole.  And then

6  Jeff said, give him three -- I mean, at that time I was texting

7  Jeff and saying, the man won't work for me, he won't come to a

8  meeting, he won't do this, he won't do that.  And I guess Jeff --

9  Alan was bitching at Jeff too about the same thing.  He didn't

10  want to work for me anymore.  He wanted to go home.

11      So Jeff calls me and says, give Alan $3,000 so he can get

12  his ass back to South Carolina and get his legal mess cleaned up,

13  and he'll be out of your hair.  Okay.  So --

14  **Q.**  Okay.  So we're covering a couple of extra things here.  So

15  hang with me.

16  **A.**  All right.

17  **Q.**  And we'll just cover that while we're on it.  Did you give

18  Alan Glover some money?

19  **A.**  I did.

20  **Q.**  And you did that because you were told to?

21  **A.**  I was directed by Jeff to give him 3,000 bucks to go home so

22  he had traveling money and living money because Jeff had retail

23  stores out in the east coast and he was going to go work for Jeff

24  out there.

25  **Q.**  All right.  So where did the money come from that you gave

1  to Glover?

2  **A.**   Out of the night deposits, just like Jeff told me to take it

3  out of the night deposits.

4  **Q.**   And what do you mean "night deposits"?

5  **A.**   Every night, and especially during the holidays, we just

6  kept every day's income in an envelope in the safe until the end

7  of the holiday, and then combine it all together and put it in

8  one deposit.

9  **Q.**   So are these like park admission fees and things like that?

10  **A.**   And the pizza restaurant money and both gift shop money,

11  uh-huh.

12  **Q.**   So the cash that you provided came from the business,

13  correct?

14  **A.**   Correct.

15  **Q.**   All right.  Now, along with that there's this allegation

16  about the cell phone.  Tell me what your participation was with

17  respect to this cell phone allegedly being mailed to Mr. Lowe as

18  part of this plot.

19  **A.**   After -- after I gave Alan the money, a couple hours later

20  he walks over into the office and he lays his cell phone on the

21  desk, and to this day I swear it didn't have a charger.  It was

22  just a cell phone.  And he says, here, we're supposed to mail

23  this to Jeff.  And I carried it in, and I give it to Brenda

24  because I didn't have his address.  And I said, Brenda, Jeff

25  wants you to mail this cell phone to him.  And that was the end

1  of it.

2  Q.    Was there any other discussion between you and Alan about

3  this cell phone?

4  A.    No.

5  Q.    Any discussion with Jeff about this cell phone?

6  A.    No, sir.

7  Q.    Now, there was testimony from Mr. Glover that you gave him

8  another cell phone.

9  A.    That was all a lie.

10  Q.    Did you give him another cell phone?

11  A.    Absolutely not, especially a company phone that we just

12  advertised several thousand dollars to order pizza with.

13  Q.    So did you see a phone on the day that he was leaving town?

14  A.    No, sir.

15  Q.    Did you use a phone that belonged to Glover to take screen

16  shots of information about Carole Baskin and her place?

17  A.    No, sir.

18  Q.    When did -- did you know that Alan Glover was leaving the

19  park on November 25th?

20  A.    I didn't even know he left.

21  Q.    When was the first time you figured out that he actually

22  left the park?

23  A.    Probably two or three days later.

24  Q.    Did you have anything to do with him making arrangements to

25  fly back to South Carolina?

1 **A.**   I didn't even know he took an airplane until this all

2 started.

3 **Q.**   Did you hire Alan Glover to kill Carole Baskin?

4 **A.**   Absolutely not.

5 **Q.**   Well, let's talk about the second count.  Do you recall the

6 recordings that were played between Mr. Garretson and you that --

7 in which Garretson is talking to you about this guy that he had

8 that could do things?  Do you remember that?

9 **A.**   Yes, sir.

10 **Q.**   Do you remember those conversations with Garretson?

11 **A.**   Pretty much.

12 **Q.**   When did you first hear from Garretson about this guy

13 that -- that he supposedly had?

14 **A.**   I don't even remember exactly, maybe mid September after I

15 had my teeth.

16 **Q.**   All right.  And so how did that come up?

17 **A.**   Well, can I back up just a little bit and fill you in on

18 that?

19 **Q.**   Well, if it has something to do with how this topic came up,

20 go ahead.

21 **A.**   I believe that -- that's the reason why this topic come up

22 is in -- in late June or August -- or July, I had a horrible,

23 horrible toothache and I needed two root canals and two crowns.

24 And James says, I have a CareCredit card that's about to

25 expire --

1          MS. MAXFIELD-GREEN:  Your Honor we'd object.  Same

2    objection as before; relevance and hearsay and prejudicial.

3          THE COURT:  Sustained.

4    **Q.**   (By Mr. Earley)  Okay.  Mr. Passage, what I need you to do

5    is talk about how this topic of Mr. Garretson's guy came up and

6    when it first came up.

7    **A.**   We were on the phone talking about my teeth.

8    **Q.**   Okay.  And that's fine.  And when was that?

9    **A.**   August -- September, August.  August, I think.

10   **Q.**   Okay.  So that's the first time that you heard Mr. Garretson

11   bring up some guy that he might have to -- to do something.  What

12   was it that this guy could do?

13   **A.**   Well, he called me; I didn't call him.

14   **Q.**   Okay.

15   **A.**   Okay.  And every time he called you, it was about Carole or

16   Jeff.  Okay.  So it was -- it was what information you know about

17   Carole, or what -- you know, is Jeff paying any bills, or what's

18   Jeff doing in Las Vegas.  And if I remember right, he just -- he

19   just said, is Carole still F'g with you.  And I said, yeah,

20   obviously, she never stops.  And he says, well, I know a guy that

21   can take care of it.

22         And -- and through this entire process -- you can watch

23   these videos -- and every time I use the excuse I have to sell a

24   cub or I ain't got no babies born, I ain't got no money.  It was

25   the easiest way to get rid of the man.

1  Q.   Well, just thinking back, maybe including the recordings and
2  maybe non-recorded contacts you had with Garretson, how many
3  times do you think he brought up his guy during the fall of 2017?
4  A.   Probably 10 or 12, at least.
5  Q.   Okay.  Did those remarks continue into December?
6  A.   Yes, sir.
7  Q.   All right.  Were those conversations that you started or was
8  the topic brought up by Garretson?
9  A.   It was always him calling.  And I believe one of them in
10  early December even -- I even lied to him and told him I had a
11  photo shoot in Dallas to get out of even the conversation, but I
12  was actually at a parade in Davis, Oklahoma.
13  Q.   Now, when he was contacting you in December and November
14  about this, were you still in discussions with Ms. Peet about
15  extricating yourself from the park?
16  A.   We were still moving tigers out and -- and cutting cages
17  apart.
18  Q.   Your decision to leave the park, how did that -- how did
19  that affect your thoughts about Carole Baskin?
20  A.   You know, after Travis died and dealing with that and
21  dealing with PETA's lawsuit to come get them first 19 tigers
22  and -- and having three kids that I'm not used to in the house
23  screaming and hollering and meeting Dillon on the 28th and six
24  parades to do and running for office and doing debates at the
25  same time, Carole Baskin didn't even enter my mind unless one of

1 them called and brought it up.

2 Q.   Did you ever agree, whether it's recorded or not, to meet

3 this guy before this December 8th meeting?

4 A.   He only had one recording of that, but he called like two or

5 three times, hey, I'm going to bring my guy up tomorrow.  And he

6 never shows up.  I'm going to bring him up Thursday, and he never

7 shows up.  Well, hey, you going to be around Friday.  You know

8 what, it's the same as always.  The man never done what he said

9 he was going to do.  So I just said, sure.  And I'll be damned if

10 they didn't show up.

11 Q.   Yeah.  Well, let's talk about December 8th.  Did you plan on

12 meeting with this person?

13 A.   No.

14 Q.   Now, he obviously did show up at the park.

15 A.   Yes, sir.

16 Q.   What were you doing at the time that they popped in on you?

17 A.   I don't recall, but I'm sure I was working the park doing

18 something.

19 Q.   Were you continuing to do your daily duties and do tours and

20 take care of animals and all that other stuff?

21 A.   Yes, sir.

22 Q.   Was that in addition to your concentration on your campaign?

23 A.   It was during the concentration on everything.  I mean, that

24 was the first day actually that -- well, no, Dillon had already

25 moved in and -- and even he was -- I mean, everybody was in and

1  out of the office the entire time.

2  Q.   Now, where did that -- where did most of that conversation

3  take place?

4  A.   In the office away from the gift shop.

5  Q.   Is that sort of a secretive, closed-off place?

6  A.   No, it's open.  Everybody had access to it.  It's just a

7  portable building that we had next to the big gift shop office

8  because we outgrew the gift shop office.

9  Q.   Now, what was your -- your gut feeling about this

10  conversation?

11  A.   I had a gut feeling it was an undercover cop.

12  Q.   Why?

13  A.   Because they were so high pressure.  I mean, it -- first of

14  all, they blocked the door.  I couldn't get out the door.  They

15  stood in front of the door.  I don't recall anybody ever sitting

16  down.  And you have got a giant Chucky and a guy that looks like

17  hell blocking the only door to get out of the building.  And

18  they're like, oh, we can kill her, we can do this, we can -- we

19  can drop the price down to 5,000 bucks.  You're really going to

20  drive to Tampa, Florida and stay there and -- and kill somebody

21  and come back on 5,000 bucks?  I can't even deliver a tiger that

22  cheap.

23  Q.   Did you think it was a setup?

24  A.   I believed it was a setup.

25  Q.   Now, there was a discussion about getting some money

1  together.  Do you remember that?

2  **A.**    I do.

3  **Q.**    Did you ever get money together?

4  **A.**    No.  And I told them -- I told them on the recording that I

5  had to sell some cubs to get some money, but I kept telling them

6  the same thing I heard from Jeff during his little setup because

7  at the same time he's -- he's trucking around with an undercover

8  FBI guy using stolen credit cards.

9  **Q.**    Did you ever provide Garretson money for the services of

10  Mark?

11  **A.**    Not a dime.

12  **Q.**    Now, there was this discussion about getting a gun for

13  purposes of carrying out this plot.  Do you remember that?

14  **A.**    That was their idea.

15  **Q.**    All right.  So did you ever try to go get a gun for Mark?

16  **A.**    No.

17  **Q.**    Now, there was also some discussion about getting some

18  phones, a phone for you and a phone for Mark so that you two

19  could communicate, and it wouldn't have anything to do with the

20  park.  Do you remember that?

21  **A.**    Yep.

22  **Q.**    Did you ever go and purchase any phones for you and Mark?

23  **A.**    Never even thought about it after they left.

24  **Q.**    So did you hire Mark to kill Carole Baskin?

25  **A.**    Absolutely not.

1 **Q.**   Did you take any further steps, as far as collecting money,

2 making inquiry about guns, inquiry about phones, anything that

3 would suggest you had any interest at all in carrying through

4 with what Mark and Mr. Garretson had proposed?

5 **A.**   Nope.

6 **Q.**   Now, we heard a little bit of testimony from Ms. Peet about

7 her trying to intervene and perhaps reach some sort of settlement

8 that would, you know, basically take care of not only them but

9 also the Baskin situation.

10 **A.**   Okay.

11 **Q.**   What was your understanding of what she was trying to broker

12 for you?

13 **A.**   Okay.  PETA had a separate contract of their own where I had

14 to get rid of all of the animals, and I could not ever own an

15 exotic animal again, couldn't have anything to do with anybody

16 that had exotic animals.  So I couldn't go to work for anybody

17 that had exotic animals.  And we were going to move all the

18 animals.  We were going to allow John Finlay to move into the

19 main house and cut the cages apart, and that's where we were

20 going to get our extra money.

21      Plus she had no problem coming up with $100,000 to replace

22 the money that mom paid for the land, but they didn't want Jeff

23 Lowe making a dime.  And that's what broke the deal was Jeff

24 wouldn't agree to anything because he wanted $400,000 to walk

25 away from it.  So we couldn't get Jeff out.  So that's why we

1  needed mine and my mom's plan to work on through.  And that's

2  what we were working on.  Between the lawyers and PETA and me and

3  mom, we were actually working on that plan up until I got

4  snitched out of having them investigated.

5  **Q.**    All right.  So there wasn't a settlement?

6  **A.**    No, sir.

7  **Q.**    And at least from your view, was that because Jeff Lowe

8  wouldn't sign on?

9  **A.**    It is because Jeff Lowe wouldn't sign off on it.

10 **Q.**    So after the first of the year, going into February, March

11 of 2018, what was your plan as it pertains to the park?

12 **A.**    Well, January the 2nd of 2018, I got my first traffic ticket

13 in my life -- running a stop sign -- and broke my neck and my

14 back and my right leg.  And I was in OU Medical Center for a few

15 days there.  And then I get home and I'm in braces.  And the --

16 the whole thing of leaving the zoo was still priority on my mind.

17      So we move some bears and some monkeys and some more tigers,

18 and then -- because Alan was finally out of my hair.  Every time

19 I moved an animal before Alan left, he 'd call Jeff and Jeff

20 would call and say, what are you doing moving this animal or

21 getting rid of this animal.  So I couldn't get rid of most of the

22 animals that were under my license until Alan was gone.

23      So after Alan was gone, and after I got out of the hospital

24 of having my wreck, we moved almost every primate in that zoo to

25 other facilities, except for the two chimpanzees and the one

1  primate pigtail macaque that John Reineke, the manager --
2  actually, it was his monkey.  So we got rid of all the primates.
3  We got rid of almost all the bears.  We only had three bears
4  left.  And we were still placing tigers at different private
5  facilities.
6       And Brittany was helping me organize all this, but we were
7  having troubles finding sanctuaries that had room for 200 tigers.
8  I mean, moving 200 tigers is a process, you just don't do it
9  overnight.  And June -- June -- I mean, they -- they come up with
10 this Carole thing, you know, a couple more times.  And then May
11 he got in some more legal trouble out there and -- and I was
12 feeding information to Brittany.  I was feeding information to
13 the district attorney in Las Vegas.  I was feeding information to
14 another man that was piping it up the USDA to -- Bernadette
15 Juarez is the top USDA for us, and she was supposed to be giving
16 some of this stuff to the FBI because he was selling skins and
17 teeth and everything out in Vegas from tigers.  And -- and so I
18 have got these screen shots and all of the information I needed.
19 If somebody would have just come and ask me, we could have
20 avoided this whole thing.
21 Q.   Well, did anybody ever come and ask you?
22 A.   To this day, nobody has.
23 Q.   Now, we heard a recording of a phone call that you had with
24 Mr. Finlay while you were being held in custody.  Do you recall
25 that?

1 **A.**   Yes, sir.  Yes, sir.

2 **Q.**   And during that phone call you suggested that he had told on

3 you.  Do you remember --

4 **A.**   Yes, sir.

5 **Q.**   Do you remember what -- what you said?

6 **A.**   I asked him -- I asked him who he's been talking to and he

7 said the FBI.  And I -- John, the only thing John knew was he was

8 taking Alan to Dallas to go to Florida.  Because if he'd have

9 told John the truth, John has a very low self-esteem, so he

10 always attaches himself to the wrong people because they become

11 his friend fast.  And he just wouldn't keep his mouth shut if I

12 would have told him the truth, so that's why I told him to park a

13 block away from the damn place so he didn't get implicated in

14 anything.  And what's he do, he walks right in the damn building.

15 **Q.**   So what did you mean during this conversation when you

16 accused him of selling you out, or whatever the exact words were?

17 **A.**   Well, I mean, he knew that the -- the direct orders came

18 from Jeff.  And I wanted to make sure that when he talked to the

19 FBI he didn't say it was just my -- my sending him down there,

20 that I wanted to make sure that he told them that Jeff is the one

21 who told us to send him down there.

22 **Q.**   All right.  Now, at any time did you intend for someone to

23 kill Carole Baskin in exchange for money or any other thing of

24 value?

25 **A.**   No.

```
 1            MR. EARLEY:  May I have just a moment?

 2            THE COURT:  You may.

 3            MR. EARLEY:  Pass the witness.

 4            MS. MAXFIELD-GREEN:  Your Honor, if I could just have

 5    an extra couple of minutes.

 6            THE COURT:  Sure.  Actually, ladies and gentlemen, it's

 7    sometimes a lot better if we don't interrupt you as -- we're at a

 8    natural break here, so let's take our afternoon break just a

 9    little bit early.  We'll break for 15 minutes, and please

10    remember the admonition.

11        If those in the courtroom would please remain seated as the

12    jury exits.

13        (Jury exited.)

14            THE COURT:  Counsel, my -- so we'll start back up at

15    about five 'til.  My intent is that we power through and -- and

16    finish at least with testimony today, even if that means we may

17    end up having to stay just a little bit late.

18        I don't know how much you have, Ms. Green, or any redirect,

19    but my plan is is that we get this wrapped up.  I don't see any

20    way that we're going to instruct and close this afternoon.  I

21    don't want to break those things up, but I also don't want to

22    break early today.  But at the pace we're going, I'm expecting

23    this will probably run us all the way to 5:00 anyway.  So even if

24    we go over a little bit, I'm going to assess that with the jury.

25        But my intent is that we finish Mr. Passage's testimony
```

1  today.  And then I don't know if you have anything additional

2  after that, Mr. Earley.  But anyway, so we'll be in recess until

3  about five 'til.

4       (Break taken.)

5       (The following record was made in open court, in the

6  presence of all parties, counsel, and in the presence and hearing

7  of the jury.)

8            THE COURT:  Ms. Green, cross-examination.

9            MS. MAXFIELD-GREEN:  Thank you, Your Honor.

10                      <u>CROSS-EXAMINATION</u>

11  <u>BY MS. GREEN:</u>

12  **Q.**  Good afternoon, Mr. Passage.

13       Mr. Passage, since you have been in jail, you have been

14  working on selling your life story to several different members

15  of the media, correct?

16  **A.**  I have been working on selling some of the footage from the

17  zoo and -- and the past.  And -- and one of them I had a contract

18  with in, like, 2017.

19  **Q.**  And Rebecca Chaiklin, is that how you say it?

20  **A.**  I have no idea how to say her last name.

21  **Q.**  Chaiklin is the best I can do.  Rebecca Chaiklin is one of

22  your filmmakers, correct?

23  **A.**  Correct.

24  **Q.**  And what about Eric Goode, he's one of your filmmakers,

25  correct?

1  **A.**   They're together.

2  **Q.**   Rebecca and Eric work together?

3  **A.**   Correct.

4  **Q.**   Is Rebecca in the courtroom today?

5  **A.**   Eric is.

6  **Q.**   So Rebecca and Eric, they're working on a film about your

7  life, right?

8  **A.**   We started a documentary way before Travis died.

9  **Q.**   Okay.  What about Teresa McCown?  She's one of your

10  filmmakers, correct?

11  **A.**   She used to be my producer before my studio burnt down.

12  **Q.**   And is she making a film about you as well?

13  **A.**   She hasn't asked for any footage or anything yet.  She

14  hadn't done anything.  I don't know what she's doing.

15  **Q.**   Well, you have gotten several thousands of dollars already

16  from Rebecca and Eric, correct?

17  **A.**   Correct.

18  **Q.**   And have you gotten several thousand dollars from Teresa

19  McCown for your story?

20  **A.**   I haven't gotten a dime from Theresa.  My husband has.

21  **Q.**   Okay.  And that's up into the several thousands of dollars,

22  correct?

23  **A.**   Correct.

24  **Q.**   And you have been negotiating with them ever since you have

25  been in jail, correct?

1  **A.**   Correct.

2  **Q.**   And it was Rebecca Chaiklin and Eric Goode who paid John

3  Finlay for an interview about you, correct?

4  **A.**   From my understanding, they paid a lot of people.

5  **Q.**   And this is all in connection with a film about your life,

6  correct?

7  **A.**   Correct.

8  **Q.**   Now, you and Mr. Earley covered a lot of stuff.  So I'm

9  going to try to go a little bit in order but --

10  **A.**   Okay.

11  **Q.**   Now, Mr. Earley talked to you about Darlene Cervantes.  Do

12  you recall that?

13  **A.**   Yes, ma'am.

14  **Q.**   And your testimony was -- and he talked to you about

15  Government's Exhibit 21, which is that text exchange with her,

16  correct?

17  **A.**   Yes, ma'am.

18  **Q.**   Now, your testimony was that you told -- you told her that

19  the cubs would be a thousand dollars just to get rid of her,

20  correct?

21  **A.**   Correct.

22  **Q.**   Okay.  But that -- you saw that text exchange in the

23  government's part of the case, right?

24  **A.**   I saw it, yes, ma'am.

25  **Q.**   Now, that text exchange went on from October to February,

1  correct?

2  **A.**   That -- that should explain that it wasn't a very serious

3  sale, was it?

4  **Q.**   But that whole text exchange was all about selling a couple

5  of tigers for a thousand dollars, correct?

6  **A.**   Correct.

7  **Q.**   Okay.  Now -- you have got to forgive me, I have got a lot

8  of notes here.

9  **A.**   You're all right.

10  **Q.**   So you told -- you said on direct that in 2014, in October

11  of 2014, you got extremely ill; is that right?

12  **A.**   Very ill.

13  **Q.**   And you got so ill, it sounds like you were on your

14  deathbed; is that right?

15  **A.**   I was.

16  **Q.**   And you made a deal with God, correct?

17  **A.**   I did.

18  **Q.**   That if you walked out of that hospital you were going to be

19  different and -- and kind of -- I can't remember what words you

20  used, but you were going to do better, I think you said.

21  **A.**   I was going to try and change, yes, ma'am.

22  **Q.**   And that was in October of 2014?

23  **A.**   That was.  October the 21st, to be exact.

24  **Q.**   Okay.  So do you remember on -- when we were talking to

25  Ms. Baskin, and during the government's case, we looked at a lot

1  of posts and videos of yours, correct?

2  **A.**  Correct.

3  MS. MAXFIELD-GREEN:  Can we see Government's

4  Exhibit 97, Jane?  Just blow that up.

5  **Q.**  (By Ms. Maxfield-Green)  Now, that's a post on your Facebook

6  page, right?

7  **A.**  It's a post on one of my Facebook pages.

8  **Q.**  And you had several, correct?

9  **A.**  I had 19 of them.

10  **Q.**  So this is one of them, correct?

11  **A.**  That is one of them.

12  **Q.**  Is that a photo of you standing at the coffin?

13  **A.**  That is.

14  **Q.**  And now, as I recall -- this one says, "I bought my good

15  friend Carole in Florida a Christmas present.  It even came with

16  me singing a farewell song."  That was posted on December 28th of

17  2014, correct?

18  **A.**  Mine says 21 hours.

19  **Q.**  Okay.  I think if you look in the lower right-hand corner

20  of when that's -- shows when that screen shot was --

21  **A.**  Oh, when the screen shot was taken.  Well, I mean, that

22  shows when the screen shot was taken, but that don't show when

23  the post was put up.

24  **Q.**  Okay.  Well, you heard the testimony on direct that Ms.

25  Baskin believed it was posted on about December 28th of 2014?

1 | **A.**    I heard a lot about what Ms. Baskin believes.

2 | **Q.**    So December 28th of 2014 would have been after you made your

3 | deal with God, correct?

4 | **A.**    Would have been a long time after that, but may I elaborate

5 | on that?

6 | **Q.**    No.  That -- I just -- December is after -- December 14 is

7 | after October 14, correct?

8 | **A.**    I was way too sick to be on top of that casket in December

9 | of '14.

10 | **Q.**    Okay.  If we can see Government's Exhibit 100, which was

11 | also played during the government's case.

12 |       (Video played in open court.)

13 | **Q.**    (By Ms. Maxfield-Green)  Okay.  So that video was posted on

14 | September 17th of 2015, correct?

15 | **A.**    All right.

16 | **Q.**    Okay.  And that would have been after October of '14,

17 | correct?

18 | **A.**    Correct.

19 | **Q.**    Okay.

20 | **A.**    Can we play the music video?

21 | **Q.**    I don't think we need to.

22 | **A.**    Well, it shows that --

23 |       THE COURT:  Mr. Passage, Mr. Passage, please just

24 | answer the questions.  Your -- Mr. Earley will have the

25 | opportunity to ask you additional questions if he wants to

1  elaborate for some additional information, but please just answer
2  the questions before you.
3          THE WITNESS:  Yes, sir.
4  Q.  (By Ms. Maxfield-Green)  Okay.  Mr. Passage, the best as I
5  understood your testimony on direct, you're telling us that you
6  never sold a tiger across state lines, right?
7  A.  Up until 2016 I sold a bunch of them.
8  Q.  Okay.  So you're -- let me get this right then.  Your
9  testimony is that after 2016 when the generic tiger loophole
10  closed --
11  A.  And I didn't own a zoo at that time.
12  Q.  So your testimony is that, after that point in 2016, you
13  never sold tigers, correct?
14  A.  I did not.
15  Q.  Okay.  And you -- is your testimony also that you never, in
16  the same regard, would have never falsified any documents to
17  cover up a sale like that, correct?
18  A.  I mean, all of the -- all of the documents that we fill out
19  are transfer forms and those are donated from whoever owned the
20  animal.
21  Q.  Now, Jeff and Lauren Lowe were back at the park by May
22  of 2018, correct?
23  A.  Yes, somewhere around there.
24  Q.  And you had a conversation with the two of them when you
25  were sitting at a desk in their house at the zoo, correct, on

1    about May 3rd of 2018?

2    **A.**   I think that conversation started in the office.

3    **Q.**   Okay.

4    **A.**   And overflowed through the house.

5    **Q.**   So you recall that conversation?

6    **A.**   I think so, if you're talking about the same one.

7    **Q.**   Okay.  And you're aware that conversation was recorded,

8    correct?

9    **A.**   Yes, ma'am.

10   **Q.**   Okay.

11              MS. MAXFIELD-GREEN:  The government moves to admit

12   Exhibit 62-1, -2 and -3, which are clips of that conversation,

13   Your Honor.

14              THE COURT:  Is there any objection from the defendant?

15              MR. EARLEY:  Well, we haven't actually seen these

16   exhibits, Your Honor.

17              THE COURT:  Parties approach.

18       (The following bench conference was held outside the hearing

19   of the jury.)

20              THE COURT:  These were not produced in discovery?

21              MS. MAXFIELD-GREEN:  They were produced in discovery,

22   Your Honor.  They have had this video for a long time.  What we

23   were discussing is that this is a conversation, kind of a

24   long-ranging conversation between Mr. and Mrs. Lowe and

25   Mr. Passage.  And the reason it is clipped into three little

1   parts is because we made every attempt to get as much of

2   Mr. Lowe's comments out of it, just enough for the context of

3   what they're talking about.  There are long sections where

4   Mr. Lowe is talking and making accusations.  We cut all that out.

5   It is pretty much cut down to just Mr. Passage's statements.

6        MR. EARLEY:  The only concern was that this -- this

7   particular video covered a lot of territory, to include

8   allegations of campaign finance --

9        MS. MAXFIELD-GREEN:  There is nothing in this exhibit

10  about campaign finance, embezzlement.  This is all -- the

11  comments that are being offered are being used to directly

12  impeach what Mr. Passage has said.  He is talking about sales of

13  tiger cubs to Mr. Engesser that had clearly happened at the few

14  months prior and his falsification of documents to cover that up.

15       THE COURT:  So, Mr. Earley, your concern was that it

16  went into some other areas?

17       MR. EARLEY:  Correct.

18       THE COURT:  And if the government's representing that's

19  not the case, do you have any objection to the exhibits?

20       MR. EARLEY:  No.

21       THE COURT:  Okay.

22     (The following record was made in open court, in the

23  presence of all parties, counsel, and in the presence and hearing

24  of the jury.)

25       THE COURT:  Ms. Green, could you repeat those numbers

1  again?

2          MS. MAXFIELD-GREEN:  Yes, Your Honor, the government's

3  moving to admit 61-1, 61-2, 61-3.

4          THE COURT:  Those will be admitted without objection.

5      (Video played in open court.)

6  **Q.**  (By Ms. Maxfield-Green)  Okay.  And that conversation was on

7  May 3rd of 2018, correct?

8  **A.**  I guess, yes.

9  **Q.**  Now, Mr. Passage, again, you -- it was your testimony that

10 you never sold endangered species cubs, lions or tigers, correct?

11 **A.**  According to this video right here, he was accusing me of

12 stealing his money from selling a cub.

13 **Q.**  Okay.  Were you intending to broker the sale of a litter of

14 lions from your jail cell?

15 **A.**  Do what?

16 **Q.**  Were you intending to broker the sale of a litter of lions

17 from your jail cell?

18 **A.**  Broker a litter of lions from my jail cell?  I don't have

19 any lions.

20 **Q.**  Now, you made phone calls from jail, right?

21 **A.**  Made a couple hundred.

22 **Q.**  Okay.  And you're aware that those calls are recorded,

23 right?

24 **A.**  I am.

25          MS. MAXFIELD-GREEN:  Government moves to admit

1    Exhibit 162 and 163.

2              THE COURT:  Any objection?

3              MR. EARLEY:  I'm sure they're among the thousands that

4    there are, but if Ms. Green's representing that they're phone

5    calls from the jail and that Mr. Passage is on them, I have no

6    reason to disbelieve her.

7              THE COURT:  So no objection?

8              MR. EARLEY:  No.

9              THE COURT:  162 and 163 will be admitted.

10             MS. MAXFIELD-GREEN:  162, Jane.

11        (Audio played in open court.)

12             MS. MAXFIELD-GREEN:  And if we can have 163, please.

13        (Audio played in open court.)

14   Q.   (By Ms. Maxfield-Green)  Okay.  Mr. Passage, on direct you

15   testified that -- that Jeff Lowe was selling tiger cubs, correct?

16   A.   At the zoo.

17   Q.   Okay.  And that you even kept a ledger where you kept track

18   of his tiger cub sales, right?

19   A.   I did.

20   Q.   Okay.  Now, so you knew, you know, back last year that Jeff

21   Lowe was selling tiger cubs.  Is that your testimony?

22   A.   Yes.

23   Q.   Why didn't you report that to law enforcement?

24   A.   I tried to report a whole bunch of stuff.

25   Q.   Who did you report the fact that Jeff Lowe was selling tiger

1   cubs to?  Did you report it to the U.S. Fish & Wildlife Service?

2   A.   I didn't report it to the U.S. Fish & Wildlife Service

3   because I have never seen one of them guys.  And when you call

4   the U.S. Fish & Wildlife, nobody ever knows nothing.  They

5   transfer you ten different times.  So I told the Garvin County

6   Sheriff's Department, I told the USDA, and --

7   Q.   Who did you tell at the USDA?

8   A.   I told the guy that was sending everything to Bernadette

9   Juarez.  And I told the investigator and the district attorney

10  out in Las Vegas because I had screen shots of him selling cubs

11  out there.

12  Q.   Okay.

13  A.   May I comment on your video?

14  Q.   I didn't have any questions about that.

15  A.   Okay.

16  Q.   Now, and just to understand the timeline and everything, so

17  Jeff Lowe -- it was your testimony that Jeff Lowe was in Las

18  Vegas from about May, June of 2017.  Is that when he left for Las

19  Vegas?

20  A.   Somewhere around there.

21  Q.   Okay.  And he -- sounds like he came back and forth a little

22  bit, correct?

23  A.   Whenever he run out of cubs.

24  Q.   So he came back about in April of 2018, correct, or came

25  back --

1   A.   For a little bit or for good?

2   Q.   For good.

3   A.   I think it was closer to May.  I'm not sure.

4   Q.   And that would have been 2018 when he came back for good?

5   A.   Well, he came back, supposedly for good, and then he left

6   again.

7   Q.   Now, you talked about this proposal from PETA, correct?  You

8   talked about that on direct?

9   A.   Yes, ma'am.

10  Q.   And you were here for Ms. Peet's testimony last Friday,

11  correct?

12  A.   Yes, ma'am.

13  Q.   Okay.  And so you heard her testify that any negotiation

14  with you that she was proposing did not involve Carole Baskin.

15  Did you hear that testimony?

16  A.   Okay.  She -- I forget exactly what she said, but the -- the

17  negotiations that she was working with me was with PETA, and

18  Carole would not agree to anything unless I agreed to PETA's

19  thing first.  That's what was going on.

20  Q.   Okay.  But Ms. Peet testified that the Baskins were not part

21  of a draft proposal she was giving you in January of '18,

22  correct?

23  A.   The draft proposal was PETA's draft, PETA's side of it.

24  Q.   Okay.  And you saw the email between you and Ms. Peet from

25  January 24th of 2018, correct?

1  A.    I don't recall we saw that email.

2  Q.    Well, it's Government Exhibit 160.  We can just look at it.

3  It's already been admitted.

4        Okay.  Now, this is an email from you to Ms. Peet on

5  January 24th, 2018, right?

6  A.    Yes, ma'am.

7  Q.    And it says, "Brittany, unless I'm blind or stupid, this

8  does not get rid of the judgment."  And it was Ms. Peet's

9  testimony that that judgment meant the litigation between you and

10  Carole Baskin.  Did you hear that testimony?

11  A.    Yes, ma'am.

12  Q.    Okay.  And it says, "nor help in any way to pay off our

13  legal bills and to make any money."  And that's what it says,

14  right?

15  A.    Yes, ma'am.

16  Q.    Okay.  And that email was from you to Ms. Peet in January

17  of 2018, correct?

18  A.    Correct.

19  Q.    Okay.  And you also testified that as part of your working

20  with PETA through the, I guess winter of 2017, 2018, you gave up

21  40 tigers, correct?

22  A.    Nineteen the first time and 20 the second time.

23  Q.    Okay.  Now, that first 19, were those -- those were the Dade

24  City tigers, right?

25  A.    Yes, ma'am.

1  Q.   Okay.  The ones that came in on the cattle trailer in July

2  of '17?

3  A.   Yes, ma'am.

4  Q.   Okay.  Now, you gave those up because PETA sued you to force

5  you to give them up, correct?

6  A.   Correct.

7  Q.   And then you gave them an additional 20, 21 tigers at some

8  other point?

9  A.   After I met Ms. Peet in person, yes.

10 Q.   Okay.  Now the tigers you gave them, those were your

11 nonbreeding males, right?

12 A.   No.  We gave them some pairs.

13 Q.   Okay.

14 A.   I believe we did.

15 Q.   Okay.  And we spoke about the passing of your husband on

16 October 6th of 2017, correct?

17 A.   Yes, ma'am.

18 Q.   And then -- that was Mr. Maldonado, correct?

19 A.   Correct.

20 Q.   And you're currently married to Mr. Passage, correct?

21 A.   Correct.

22 Q.   And you remarried him on -- I'm sorry -- you married him on

23 December 11th of 2017; is that correct?

24 A.   Correct.

25 Q.   So is that about eight weeks after Mr. Maldonado died?

1  **A.**    Couple of months.

2  **Q.**    And, in fact, the conversation that we listened to between

3  you and James Garretson and Mark Williams, the undercover, that

4  was just a few days prior to -- to your being married, correct?

5  **A.**    Correct.

6  **Q.**    Okay.  So you testified on direct with Mr. Earley that James

7  Garretson kept telling you that he could get you a hit man.  Is

8  that your testimony?

9  **A.**    Yes, ma'am.

10 **Q.**    Okay.  And you kept telling him that you needed to sell a

11 cub to get rid of him.  Is that your testimony?

12 **A.**    That is my excuse to always get rid of him, yes.

13 **Q.**    Now, when James Garretson kept coming to you and offering

14 you a hit man, you didn't report that to law enforcement,

15 correct?

16 **A.**    No.

17 **Q.**    You testified on direct you had a FBI agent's phone number

18 in your phone, correct?

19 **A.**    Correct.

20 **Q.**    But you never reported it to him, right?

21 **A.**    Never got any good response out of the last four things we

22 reported to him.

23 **Q.**    Okay.  And you're saying -- your testimony on direct was

24 that James Garretson brought you -- or brought Mark Williams to

25 the park to meet you.  We heard that whole recording, correct?

1  **A.**   Correct.

2  **Q.**   And that you -- I understand your testimony to be that you

3  knew that he was an undercover officer, correct?

4  **A.**   I had a gut feeling.

5  **Q.**   Okay.  And you didn't contact law enforcement about that,

6  did you?

7  **A.**   No.

8  **Q.**   You didn't confront James Garretson about it, did you?

9  **A.**   No, because I still needed to get some information of where

10 these girls were being held.

11 **Q.**   You didn't try to -- you didn't blow the undercover cop's

12 cover, did you?

13 **A.**   No.  He was still using stolen credit cards hauling that cop

14 around.  Why would I tell him I knew anything?

15 **Q.**   Okay.  And so the best I understand the remainder of the

16 testimony you did with Mr. Earley is that, essentially, pretty

17 much all of the government witnesses were lying about something,

18 correct?

19 **A.**   They were definitely lying about Robert Engesser.

20 **Q.**   Okay.  And Alan Glover's lying about pretty much everything?

21 **A.**   He's protecting his boss.

22 **Q.**   Okay.  And James Garretson's lying about pretty much

23 everything?

24 **A.**   About -- all I heard him testify was to the recordings that

25 we heard.

1  **Q.**   Okay.  John Finlay, is he lying?

2  **A.**   John Finlay was pretty on point except for he said we

3  delivered a hundred cubs over state lines, which is probably

4  right, but they weren't all after 2016.  But other than that,

5  John was probably your most honest witness you have had so far.

6  **Q.**   Okay.  Including the part where he said you called him when

7  he was on the way to Dallas and told him that the fake ID was so

8  that Glover could kill Carole Baskin?  Was he right about that?

9  **A.**   He had that backwards.  I told him that first, and I called

10 him and told him to stay away from that building on the way.

11 **Q.**   Okay.

12 **A.**   And Carole Baskin was lying.

13 **Q.**   Okay.  Thank you.  But you're telling the truth, correct?

14 **A.**   Yeah.  The -- the --

15 **Q.**   That's my question, Mr. Passage.  You're telling the truth?

16 **A.**   Yes, ma'am.

17        MS. MAXFIELD-GREEN:  No further questions, Your Honor.

18        THE COURT:  Redirect.

19                    <u>**REDIRECT EXAMINATION**</u>

20 <u>BY MR. EARLEY:</u>

21 **Q.**   Mr. Passage, how long have you been working with documentary

22 filmmakers?

23 **A.**   Since probably 2009, 2010.

24 **Q.**   Okay.  Let's -- let's just use the time frame of 2009 up

25 until you left in 2018.  In the spring of 2018, were -- was there

1  anybody there filming you or trying to document what you did at

2  the park?

3  **A.**    The last part of 2017, we documented when Travis died.  I

4  had to re-act spreading his ashes and the whole bit.  And then in

5  2018, they were out filming other people for the same

6  documentary.  And then when it got close to June and all hell

7  broke loose and I hid some animals out in Tulsa at a facility

8  over there, they videotaped me moving and hauling the animals

9  there and spent all day there.  And then I -- I ain't got nothing

10  to hide -- and then the next day they took me to a motel, and we

11  did a little bit of soft porn for the same documentary in my

12  underwear.  So I -- I've filmed with Allison Eastwood; I've

13  filmed with Japanese people for a Japanese film.  I have filmed a

14  lot of films.

15  **Q.**    So -- and apparently some news outfit, CNN or somebody came

16  and talked to you, right?  We saw a video clip of that.

17  **A.**    Years ago.

18  **Q.**    Yeah.  I mean, has that continued throughout the years?

19  **A.**    I -- I have been all over the world on TV, yes.  Yes, sir.

20  And talk shows.

21  **Q.**    So is the fact that someone is collecting footage that you

22  have from the park, is that something unusual?

23  **A.**    Not at all.

24  **Q.**    So what -- what is somebody working on right now, to your

25  knowledge?

**A.**   Well, Eric Goode and Rebecca is still working on the same documentary we started two and a half years ago.  And after I left the zoo, they downloaded several computers with probably 30,000 hours of video from -- because we filmed everything at the park -- I have got the girl losing her arm on tape; I have got it all.  Everything that happened at that zoo is on tape.

And -- and I signed a contract back in early 2016, '17 with Mr. Goode.  And he owed me 20 more thousand bucks, and that's what my husband has been living on since this all started because we -- they bulldozed my house; they bulldozed everything I own. I lost my car.  We have nowhere to live.  He's living with his mom and his sister in Texas.

And, you know, Mr. Goode even has Ms. Baskin on videotape that he has offered once or twice to show she was lying about that assault in Tampa, Florida, that happened in 2006 before I even knew her.

**Q.**   So this business about you collecting money or what have you from people, that's old news?

**A.**   It's from people that owe me money, yes, sir.

**Q.**   All right.  And I guess you have already said this, you have nothing?

**A.**   I have nothing.  If I walk out of here today, I have got to give this suit back.

**Q.**   Now, Ms. Green asked you about Government's Exhibit 97, which was this -- this photo that was supposedly posted on

1    Facebook December 28th, 2014.  You had some disagreement with the
2    date.
3    **A.**    Okay.  Well, first of all, Joe Schreibvogel's Facebook page
4    was being run by somebody out of the office.  Okay?  I run the
5    Joseph Maldonado-Passage page.
6         Second of all, we quit the magic show in 2011.  We retired
7    the magic show.  And that's me standing on top of a casket in one
8    of our main illusion shows, and they're trying to tell me that
9    was in 2014.
10   **Q.**    So, to your recollection, even though some screen shot may
11   show that it's in 2014, you believe that photo was actually from
12   2011, or thereabouts?
13   **A.**    Or thereabouts.
14   **Q.**    All right.  Now, Ms. Green showed you a video clip from
15   September 17th, 2015, suggesting that you -- you broke your deal
16   with God and you weren't changing your ways; you were going back
17   to your old ways.  Do you remember seeing that?
18   **A.**    I do.
19   **Q.**    Is that what that represents?
20   **A.**    No, it doesn't.
21   **Q.**    What do you think it represents?
22   **A.**    It represents a very, very professional music video that we
23   put out that she hates, and it's about her feeding her husband to
24   the tigers.
25   **Q.**    So this -- this is a music video?

1  **A.**   It is a music video.

2  **Q.**   All right.  Is that all that follows that introductory

3  comment by you?

4  **A.**   That is all that follows.

5  **Q.**   Now, your testimony is that up to 2016 you probably sold a

6  bunch of tigers; is that right?

7  **A.**   Yeah.

8  **Q.**   And it wasn't illegal then?

9  **A.**   Nobody ever DNA tested them to see if they were purebred

10  Siberian or Bengal.

11  **Q.**   Well, if they did would they have found that out?

12  **A.**   If they had something to compare it to.

13  **Q.**   All right.  So after 2016, your -- your story is that, hey,

14  I never sold any tigers.  Why are you saying that?

15  **A.**   Because Jeff claimed everything, whether he touched it,

16  whether he used it, whether he bought it, it become Jeff's.  And

17  I tried to get some of those animals out of there, and he told me

18  I owed $4.6 million for boarding, and that was through my legal

19  team.

20  **Q.**   Now, we saw that little video, or actually three little

21  clips of that video that Lauren Lowe had recorded.  Do you

22  remember that?

23  **A.**   Yes, sir.

24  **Q.**   Okay.  Do you remember that day?

25  **A.**   I do remember that day.

**Q.**   What do you remember about that day?

**A.**   That day started in the office, and he was throwing shit around and hitting file cabinets.  I thought they were going to beat the hell out of me because I have seen him beat up an employee before.  And we finally got out of that office, and then I took the paperwork and the bank statements down to his house to prove to him that he didn't know what the hell he was talking about, and it escalated there until I left.

**Q.**   Now, you said something to the effect that you had sold something to Mr. Engesser, a cub?

**A.**   I do remember saying that, but I made that up just to get out of the situation.

**Q.**   Okay.  So had you, on behalf of the zoo, had any transactions with Mr. Engesser?

**A.**   Yes, sir.

**Q.**   Okay.  Let me ask you this:  Whatever transactions you may have had with him, did they occur in November of 2017?

**A.**   I don't believe so at all, no, sir.

**Q.**   And I want to just go back.  Is it your testimony that you did not receive any money from Mr. Engesser in November of 2017?

**A.**   I know I did not.

**Q.**   The money that Lowe asked you to give to Glover came from where?

**A.**   The cash register deposits.

**Q.**   So if Mr. Engesser testified, and you heard him, that he

1  hadn't been there and he didn't buy a cub from you in November

2  of 2017, would that be true?

3  **A.**   That would be true.

4  **Q.**   Now, Ms. Green asked you about some phone calls that were

5  recorded --

6  **A.**   Yes, sir.

7  **Q.**   -- where you're brokering the sale of a litter of lions.

8  Did you hear that?

9  **A.**   I heard that.

10  **Q.**   All right.  So the first one, Government's Exhibit 162, had

11  something to do with Charlie somebody and some lions.  Tell the

12  jury what the conversation is about.

13  **A.**   Okay.  Dillon was living at his mom's and his sister's down

14  in Belton, Texas.  And Charlie over in Amarillo, Texas, used to

15  have a zoo open to the public, but PETA harassed him to the point

16  that he lost his USDA license, and he closed to the public, but

17  he still has his animals.  And every time he has a litter of baby

18  lions born, they end up dying because he don't know how to take

19  care of them.

20      So he would have -- call us and Reineke would -- because

21  Reineke lives in Texas, he would run over to Amarillo and pick

22  them up and save them.  Okay.  And we'd take them back to the

23  zoo.  So he was expecting a litter of babies, and we're all gone

24  from the zoo.  So I was going to have Dillon go pick them up over

25  there.  And it's perfectly legal; we're not selling anything

1   across state lines.  And I would have found a buyer from them --
2   for them from jail in Texas so Dillon had some money to live on.
3   Simple as that.  You don't even need a USDA license because
4   you're in the same state.
5   **Q.**   So there really wasn't anything illegal or underhanded or
6   anything having to do with that --
7   **A.**   Absolutely not.  And if -- if he would have got some cubs
8   and came to Oklahoma to stay and start -- because the laws in
9   Oklahoma are -- are better, he still wouldn't have been breaking
10  no laws because he's not going to be open to the public.  So he
11  doesn't need a USDA license.

12      And he doesn't need any license from the state of Oklahoma
13  because in 2006 we did have licenses here.  Okay.  And you had to
14  have a $50 permit to have a bear or a cat that grew to weigh over
15  50 pounds to keep or maintain on your premises.  And in 2006 I
16  was doing magic shows, and the game wardens wrote me some tickets
17  for leaving my property with my animals because they thought it
18  said keep them maintained on premises.  You couldn't leave your
19  premises with the animals.

20      So I hired a law firm in Pauls Valley, Oklahoma, and I filed
21  a lawsuit against the state of Oklahoma because in 1952 they
22  wrote a law that said they own all wildlife.  So if they're going
23  to own it and sell you a deer hunting license for a deer on your
24  property, they're going to pay to take care of it.  And I filed a
25  $380,000 boarding lawsuit against the state of Oklahoma and they

1  wrote me a $20,000 check and told me to go away, and they got rid

2  of all the laws.  And that's why we don't have any laws here.

3  **Q.**   Now, Government's Exhibit 163 was some reference to Charlie

4  and Greg Woody.  What was that about?  Do you remember that call?

5  **A.**   It was the same conversation.

6  **Q.**   Okay.

7  **A.**   It's just they cut it apart.

8  **Q.**   All right.  Now, I want to make sure I understand what this

9  situation was and what your testimony is with respect to PETA.

10  Now, this email, what were you talking about as far as the

11  proposal from PETA?

12  **A.**   Okay.  She sent me the draft.  Okay.  And it didn't have any

13  dollar figure in it.  It was just to close and quit doing all

14  this and that.  Okay.  And I sent that email back to her.  And

15  PETA, in order to get a place to close in Texas, paid the man

16  six -- and all he had was two bears -- paid the man $60,000 for

17  those bears, okay, and some of his circus equipment to move to

18  their facility, which is the Black Beauty Ranch in south Texas.

19  And that was -- I was referring to, because Jeff just wouldn't do

20  anything without any money.

21       So I put in there, I'm like, hell, you paid 60,000 bucks for

22  two bears.  I said, you're getting an entire zoo, the property

23  and everything.  And I needed some money to pay off the bills so

24  we didn't just stick everybody -- owing them money.

25  **Q.**   So if I understand correctly, you had to agree to PETA's

1  proposal, correct?

2  **A.**   Before we moved on to Big Cat Rescue's proposal.

3  **Q.**   All right.  So unless you and Mr. Lowe agreed to that

4  proposal that was sent to you by Ms. Peet?

5  **A.**   Correct.

6  **Q.**   Ms. Baskin wasn't going to enter into any negotiations with

7  you to resolve your problem with her?

8  **A.**   You are right.

9  **Q.**   All right.  Now, Ms. Green asked you about the transfer of

10  tigers, the second transfer.  The first one had to do with the

11  Dade City tigers, correct?

12  **A.**   Yes, sir.

13  **Q.**   So the second group that went out, that was you getting rid

14  of your own, correct?

15  **A.**   Yes, sir.

16  **Q.**   You weren't paid for that?

17  **A.**   No, sir.

18  **Q.**   And you thought that there were some pairs, correct?

19  **A.**   I believe there was, yes.

20  **Q.**   But what else was included in that transfer?

21  **A.**   Three bears, I believe.  Three black bears and some baboons.

22  I think there was a trio of baboons.

23  **Q.**   So as far as reducing your -- your inventory, did that lead

24  to you almost getting rid of all of the primates on your

25  property?

1  A.    That got rid of the big primates, and then we sent a bunch

2  of littler primates over to Tulsa.

3  Q.    Who assisted with that?

4  A.    Just the park staff that helped catch them.

5  Q.    So was that part of your agreement to -- with PETA to try to

6  reduce your inventory?

7  A.    Well, I told her that I was going to, and she was having

8  troubles finding a place to send everything.  And to this day,

9  because of the litigation, I haven't spoke to her directly.  We

10  have been going through somebody.

11  Q.    All right.

12          MR. EARLEY:  I believe that's it, Your Honor.

13          THE COURT:  Redirect -- I'm sorry -- recross.

14          MS. MAXFIELD-GREEN:  While we figure out what exhibit

15  number this is, I'm going to give it to defense.

16          THE COURT:  Okay.

17                    **RECROSS EXAMINATION**

18  BY MS. MAXFIELD-GREEN:

19  Q.    Okay.  Mr. Passage.

20  A.    Yes, ma'am.

21  Q.    You just testified that the filmmakers that you have been

22  communicating with, those were people from your past, correct?

23  A.    Yes, ma'am.

24  Q.    Okay.  And people that got in touch with you prior to all of

25  this, correct?

1  A.   Most of them, uh-huh.

2  Q.   Okay.  But you have been soliciting to shop your story

3  around to people since you have been in jail too, correct?

4  A.   I haven't been soliciting nobody because I can't reach out

5  to nobody.  There's been a whole lot of people email me to the

6  jail, yes.

7  Q.   Okay.  And so you're familiar -- you have been sending and

8  receiving emails in jail, correct?

9  A.   Yes.

10 Q.   And you're familiar that all those are logged, correct?

11 A.   Yes, ma'am.

12        MS. MAXFIELD-GREEN:  Okay.  Government's going to

13 introduce -- well, first let me lay a little more foundation

14 here.

15 Q.   (By Ms. Maxfield-Green)  Do you know Manuel Oteyza?

16 A.   I do.

17 Q.   Is he in the courtroom today?

18 A.   He is.

19 Q.   Have you emailed back and forth with him?

20 A.   Not as much as we have talked on the phone.

21 Q.   Okay.

22        MS. MAXFIELD-GREEN:  Government moves to admit Exhibit

23 165.

24        THE COURT:  Any objection?

25        MR. EARLEY:  No objection.

1         THE COURT:  165 will be admitted.

2   **Q.**   (By Ms. Maxfield-Green)  Now, this is an email from you to

3   Manuel Oteyza, correct?

4   **A.**   It is.

5   **Q.**   And are you familiar with Mr. Oteyza's other films?

6   **A.**   Blackfish.

7   **Q.**   That's one.

8   **A.**   Yes, ma'am.

9   **Q.**   And this was on November 17th, 2018, correct?

10  **A.**   It looks -- appear to be.

11  **Q.**   Does it say, "Manuel, just curious if you ever buy material

12  for your film.  I am desperate to get a rent house before my bond

13  hearing so I can go home until trial.  I have thousands of hours

14  of footage on computers from my studio at the zoo and on hard

15  drives, along with over 70 pages of my diary from the age of five

16  until now and after this experience.  I will make the biggest

17  advocate for animals you have ever seen.  I'm in need of $7,000

18  for deposits and rent to cover me until trial, or until I can get

19  home.  Just curious, Joe."

20       Is that what you wrote?

21  **A.**   Yes, ma'am.

22  **Q.**   Now, Mr. Earley asked you about that conversation with the

23  Lowes that we saw earlier, right?

24  **A.**   Yes, ma'am.

25  **Q.**   And your testimony, when Mr. Earley asked you about that, is

1  that I believe you said that you made that up to get out of the

2  situation.  Is that what you said?

3  **A.**   I did.  And it started in the office and I made up one in

4  there too.

5  **Q.**   That -- that was my only question.

6  **A.**   Okay.

7  **Q.**   Thank you.

8          THE COURT:  Parties approach.

9     (The following bench conference was held outside the hearing

10  of the jury.)

11         THE COURT:  I'm going to let Mr. Passage return to the

12  table.  I don't think that that's that big of a deal that the

13  marshal follows him.  You guys fine with that?

14         MS. MAXFIELD-GREEN:  I think that's all right.

15         MR. WACKENHEIM:  Yeah.

16     (The following record was made in open court, in the

17  presence of all parties, counsel, and in the presence and hearing

18  of the jury.)

19         THE COURT:  Mr. Passage, you may step down.

20                  (Conclusion of excerpt.)

21

22

23

24

25

REPORTER'S CERTIFICATION

I, Emily Eakle, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of Oklahoma, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 12th day of September, 2019.

**/S/ Emily Eakle**
EMILY EAKLE, RMR, CRR
Federal Official Court Reporter