IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   CR-18-227-SLP |
| | ) | |
| JOSEPH MALDONADO-PASSAGE, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM**

Respectfully submitted,

*s/ William P. Earley*
WILLIAM P. EARLEY
Bar Number 11293
KYLE E. WACKENHEIM
Bar Number 30760
ASSISTANT FEDERAL PUBLIC DEFENDERS
215 DEAN A. McGEE AVENUE, SUITE 109
OKLAHOMA CITY, OKLAHOMA  73102
TEL:  (405)609-5930
FAX:  (405) 609-5932
E-mail: william.earley@fd.org

# TABLE OF CONTENTS

SENTENCING MEMORANDUM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

NATURE AND CIRCUMSTANCES OF THE OFFENSES AND THE HISTORY
AND CHARACTERISTICS OF THE DEFENDANT. . . . . . . . . . . . . . . . . . . . . . . . . 1

*Nature and Circumstances of the Offenses.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*History and Characteristics of the Defendant.* . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE NEED FOR THE SENTENCE IMPOSED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

THE KIND OF SENTENCE AND THE SENTENCING RANGE ESTABLISHED
FOR THE APPLICABLE CATEGORY OF OFFENSE COMMITTED BY THE
APPLICABLE CATEGORY OF DEFENDANT AS SET FORTH IN THE
GUIDELINES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Obstruction of Justice.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Grouping of Counts 1 and 2.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Significant risk of the transmission of disease.* . . . . . . . . . . . . . . . . . . . . . . . . 12

PERTINENT POLICY STATEMENTS ISSUED BY THE SENTENCING
COMMISSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES
AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN
FOUND GUILTY OF SIMILAR CONDUCT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

THE NEED TO PROVIDE RESTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ATTACHMENTS

Letter in Support From Regina Long. . . . . . . . . . . . . . . . . . . . . . . . . Attachment 1

Letter in Support From Anne Patrick. . . . . . . . . . . . . . . . . . . . . . . . . Attachment 2

Letter in Support From Barbara E. Hoffmann. . . . . . . . . . . . . . . . . . Attachment 3

Letter in Support From Christine Hansen. . . . . . . . . . . . . . . . . . . . . . Attachment 4

Letter in Support From Hadlee Jackson. . . . . . . . . . . . . . . . . . . . . . . Attachment 5

Letter in Support From Patricia K. Hall-Jones. . . . . . . . . . . . . . . . . . Attachment 6

Letter in Support From Rebecca Davis.. . . . . . . . . . . . . . . . . . . . . . . Attachment 7

Letter in Support From Rochelle Hier (Shellie). . . . . . . . . . . . . . . . . Attachment 8

Letter in Support From Rebecca Paradis. . . . . . . . . . . . . . . . . . . . . . Attachment 9

Letter in Support From Sandra Gladwell. . . . . . . . . . . . . . . . . . . . . Attachment 10

## SENTENCING MEMORANDUM

Joseph Maldonado-Passage, through counsel, submits this Sentencing Memorandum addressing the statutory factors governing sentencing set forth in 18 U.S.C. §3553(a).  The primary directive in §3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2."  Pursuant to 18 U.S.C. §3661, "*no limitation* shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." (emphasis added).

## NATURE AND CIRCUMSTANCES OF THE OFFENSES AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### *Nature and Circumstances of the Offenses*

The specific acts concerning the offenses of conviction were the subject of a jury trial. The acts underlying the offenses of conviction are summarized in paragraphs 31 through 39 (alleged Murder-for-Hire Schemes) and paragraphs 40 through 63 (alleged Endangered Species Act and Lacey Act Violations) of the Presentence Report (hereinafter PSR).  Mr. Maldonado-Passage maintains his innocence.

### *History and Characteristics of the Defendant*

This Court presided over seven days of jury trial during which individuals testified to alleged wrongdoing of Mr. Maldonado-Passage.  Mr. Maldonado-Passage was painted as a liar, thief, animal abuser, and homicidal maniac.  This Court has also presided over civil matters involving Mr. Maldonado-Passage.  In these proceedings he has also been painted as a liar, thief, animal abuser, and homicidal maniac.

1

Sadly, this Court has been exposed only to the worst that the government and animal rights groups can assemble.  What this Court has not seen are the many positive aspects of Mr. Maldonado-Passage's life.  This Court must, by law, consider Mr. Maldonado-Passage's history and characteristics.  As it concerns his history and characteristics, there is more to Mr. Maldonado-Passage than his detractors care to acknowledge.  When the totality of Mr. Maldonado-Passage's life is taken into consideration, application of the §3553(a) factors reflect he does not deserve anywhere near what the government or the sentencing guidelines suggest as punishment.  The sentencing guidelines simply do not capture mitigating aspects of Mr. Maldonado-Passage's life that warrants a sentence below the advisory sentencing guideline range of punishment.

Mr. Maldonado-Passage lived to the age of 56 without a single criminal conviction in his history.  The Sentencing Commission simply assigns a person such as Mr. Maldonado-Passage a criminal history category of I and considers that factor addressed.  But how can this Court compare a criminal history category of I for a person 56 years old with that of a person 18 years old, 25 years old, or even 30 years old?  There is no comparison.  A person who has lived well over half of his life without any criminal convictions is markedly different than individuals half his age.

The good deeds that a man does over decades of his life also go unnoticed and unaccounted for when determining his punishment under the advisory sentencing guidelines. The Sentencing Commission simply says that it not important.  *See USSG §5H1.11.*  The government most likely ascribes some ulterior motive to Mr. Maldonado-Passage's past actions.  The truth is that hardly a day went by that Mr. Maldonado-Passage did not touch someone's life in a positive way.  The lives he touched include terminally ill children, terminally ill elderly people, souls lost to alcohol and drug use, others suffering from broken-

hearts, the poor, the homeless, and societal outcasts. These were the people that kept Mr. Maldonado-Passage grounded and what gave him the energy and desire to keep his park open. *See Attachments 1 - 10*.

The significant health problems that afflict Mr. Maldonado-Passage go unnoticed and unaccounted for when determining his punishment under the advisory sentencing guidelines. The Sentencing Commission says unless its "extraordinary," it simply does not matter what health issues may be present in a given case. *See USSG §5H1.4*. Mr. Maldonado-Passage has significant health issues that can potentially affect the length of his life, turning an advisory sentencing guideline sentence into a life sentence.

The significant family losses Mr. Maldonado-Passage suffered as a result of this prosecution go unnoticed and unaccounted for when determining the advisory sentencing guideline range of punishment. The Sentencing Commission simply says it does not matter. *See USSG §5H1.6*. But this prosecution caused Mr. Maldonado-Passage to lose all contact with his mother and father based on his incarceration. Distant relatives secreted his parents away so he could have no contact with them. Mr. Maldonado-Passage has had to deal with the passing of his mother while incarcerated. He must also deal with the reality that he will likely never see his father again.

The Court should also be aware that Mr. Maldonado-Passage has cooperated with PETA - People for the Ethical Treatment of Animals. At Mr. Maldonado-Passage's request his counsel facilitated an interview by two PETA attorneys. Mr. Maldonado-Passage spent eight to nine hours with PETA attorneys. Mr. Maldonado-Passage authorized his counsel to provide certain records and other information to assist in PETA's efforts to stop individuals involved in trafficking animals. It appears the government is satisfied with its

effort to disable Mr. Maldonado-Passage and has no interest in addressing the wrongdoing of others.

The nature and circumstances of these offenses and the history and characteristics of Mr. Maldonado-Passage warrant a sentence significantly below the advisory sentencing guideline range.

### THE NEED FOR THE SENTENCE IMPOSED

Mr. Maldonado-Passage acknowledges Congress deems using facilities of interstate commerce in the commission of a murder for hire warrants up to ten years of imprisonment. However, it is noteworthy that Congress has not attached a mandatory minimum sentence to this offense.  Congress provides the Court a wide range of sentencing options to allow the Court to address the mitigating and aggravating aspects of each individual case.

One factor this Court should consider is the actual risk that harm would come to the alleged victim of the offense.  This Court heard the testimony of Allen Glover.  Assuming, arguendo, Glover was hired by Mr. Maldonado-Passage or others to kill Carole Baskin, it is quite clear Glover posed no risk to Baskin.  Glover is/was a self-admitted drunk and dope fiend who was incapable of remembering anything, much less following through on any plan. His testimony on the crucial issue of traveling to Florida in connection with the scheme was as follows:

> Q. Now, when you got to Florida, where did you go?
> A. To a beach.
> Q. Okay. You ended up on a beach. To your best of your recollection, what town in Florida were you in?
> A. I'm not sure, ma'am, to be honest. I don't know. Wasn't really paying attention.
> Q. Okay. Did you believe you were in the Tampa area?
> A. I could have been.
> Q. But you're not sure?
> A. No, ma'am.
> Q. And again --

4

A. I didn't really pay attention to the signs or nothing. I just found a beach and found some people to party with. I had money.
Q. And were you consistently drunk and high during this trip?
A. Pretty much, yes, ma'am.

*Transcript of Glover trial testimony at p. 36, line 16 – p. 37, line 6.*

As it concerns the "hiring" of Mark, this Court is well aware of the fact Mr. Maldonado-Passage never took steps to hire the undercover agent beyond those set up by the government. There was no risk of harm to Carole Baskin.

With respect to the Endangered Species Act violations (hereinafter ESA violations), including the alleged killing of "wildlife," those matters are simply not deemed serious by Congress. These crimes are essentially misdemeanor permit violations and do not warrant a significant term of imprisonment. Moreover, the animals involved were generic tigers who by regulatory act may fit within the ESA, but are commonly understood not to be endangered tigers in the wild in need of the ESA's protections. Similarly, the Lacy Act violations are paperwork violations. Not even the Sentencing Commission deems the ESA violations and Lacey Act violations worthy of significant punishment. These crimes would at most warrant an advisory guideline range of 15 to 21 months.[1]

The nature of the offense conduct in this case does not suggest a lengthy sentence is necessary to promote respect for the law. Based on his history and characteristics, protection of the public and the need to deter Mr. Maldonado-Passage from additional criminal activity is of minimal concern.

Deterrence and protection of the public are more meaningfully addressed by the restrictive conditions that will govern Mr. Maldonado-Passage's conduct while on supervised

---

[1] This range assumes Mr. Maldonado-Passage's objection to the market value of the wildlife is overruled. *See PSR ¶73.* Counsel is excluding the two level adjustment for "creating a significant risk of infestation or disease transmission" applied by the Presentence Report writer. *See PSR ¶72.* The evidence simply does not warrant this adjustment.

release.   Mr. Maldonado-Passage's conduct and whereabouts will be subject to strict oversight.   He will be directed to refrain from any activity involving endangered or threatened species.   *See PSR ¶151*.   Under these circumstances, a sentence below the advisory guidelines will not diminish the seriousness of the offense.

### THE KINDS OF SENTENCE AND THE SENTENCING RANGE ESTABLISHED FOR THE APPLICABLE CATEGORY OF OFFENSE COMMITTED BY THE APPLICABLE CATEGORY OF DEFENDANT AS SET FORTH IN THE GUIDELINES

The Presentence Report provides an advisory sentencing guideline range of imprisonment from 151 to 188 months.   *PSR ¶138*.   Both parties have submitted objections to this calculation.   Counsel for Mr. Maldonado-Passage submit the following response to the government's request that an obstruction of justice enhancement be applied to the advisory sentencing guideline offense level calculation, the failure to group Counts 1 and 2, and the two level increase in the ESA violations and Lacey Act violations for "significant risk of infestation or disease transmission."

**Obstruction of Justice**

The United States Supreme Court authorizes this Court to punish Mr. Maldonado-Passage for exercising his statutory and Constitutional right to testify in his own defense by increasing the offense level computation for "obstruction of justice."   *United States v. Dunnigan*, 507 U.S. 87, 96 (1993).   To apply the adjustment, it is the government's burden to show Mr. Maldonado-Passage's trial testimony constitutes "perjury."   Perjury is giving "false testimony concerning a material matter with the willful intent to provide false testimony, rather that as a result of confusion, mistake, of faulty memory."   *Dunnigan*, 507 U.S. at 94.   The Supreme Court cautions that not every accused who testifies at trial will be subject to the enhancement.   For example,

6

an accused may testify to matters such as lack of capacity, insanity, duress, or self-defense. Her testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent.

*Id*. at 95.

Since the Supreme Court authorizes a "trial penalty" for defending oneself, this Court is tasked with determining whether the testimony cited by the government is perjury. Mr. Maldonado-Passage objects to the government's request to enhance the advisory sentencing guideline offense level computation based on "obstruction of justice."

The government references several passages from Mr. Maldonado-Passage's trial testimony in which he denies the allegations made against him. Mr. Maldonado either denies he acted with the intent to commit a specific offense or that he engaged in conduct that is deemed necessary to constitute the offense. In the order addressed by the government in its objection, Mr. Maldonado-Passage states:

Count 8: the cited testimony is nothing more than Mr. Maldonado-Passage's denial of an intent to commit the offense.

Counts 9 through 11: the cited testimony is no more than Mr. Maldonado-Passage advising the responsibility for the act fell on Jeff Lowe, the owner of the Park. Since the government charged Mr. Maldonado-Passage with aiding and abetting, the jury could have easily determined this testimony was not necessarily false, but insufficient to excuse criminal liability.

Count 10: Again, Mr. Maldonado-Passage's testimony was not an outright denial, but an explanation that the transaction did not qualify as a sale. Again, a denial of intent only.

Count 11: Mr. Maldonado-Passage testified responsibility for the act fell on Jeff Lowe or others. Since the government charged Mr. Maldonado-Passage with aiding and

7

abetting, the jury could have determined this testimony was not necessarily false, but insufficient to excuse criminal liability.

Counts 12 through 20:  Mr. Maldonado-Passage's testimony amounted to no more than a denial of intent.  The aiding and abetting allegation permitted the jury to consider the actions of others in assessing Mr. Maldonado-Passage's guilt.  As with the other allegations, a jury could have determined this testimony was not necessarily false, but insufficient to excuse criminal liability.

The overriding theme of Mr. Maldonado-Passage's testimony as it concerned the transfer forms was that the disposition of the identified animals was under the auspices of Jeff Lowe.  Lowe was the owner of the Park at this time and all business conducted with others was being conducted through Jeff Lowe.  As an example of Lowe's singular authority over Park business, the following is a text exchange on July 13, 2017, between Mr. Maldonado-Passage and Lowe concerning the acquisition of the Dade City animals:

```
To: Lowe -   Do we want to do this rescue
To: Lowe  -  2m 8 years
             2m 6 years
             2m 12 years
             4= 2m-2f 3 years
             3=M 1.5 white F 1 year f 1.5 years
             4=1m 8 years w 3f 6y
             m-1f 8 years
             1m-1f 6 years
             1f 5 months
From: Lowe - so 20
              cats 17 are breeding age? are they intact?
To: Lowe -   Yes 3 pregnut
From: Lowe - well, those cubs would feed the lot of them for
              a while anyway
From: Lowe - where are they?
To: Lowe -   Looks like a small city
To: Lowe -   Florida she will deliver
From: Lowe - you know me, the more the merrier, but we
              arent the smartest guys in the world. But I still
              say yes. lol
```

8

Concerning the murder for hire allegation in Count 1, Mr. Maldonado-Passage denied certain portions of the allegations made against him.  Importantly, his testimony was that it was Jeff Lowe who wanted to "send [Glover] to Florida to take care of [his] problem."  Since the government charged Mr. Maldonado-Passage with aiding and abetting, the jury could have determined this testimony did not excuse criminal liability.

Finally, concerning the murder for hire allegation in Count 2, it was not perjury for Mr. Maldonado-Passage to claim he did not hire "Mark" the undercover FBI agent to kill Carole Baskin.  Mr. Maldonado-Passage never gave "Mark" money or followed through with any "agreement" he reached with "Mark."  Mr. Maldonado-Passage's testimony amounted to no more than a denial of intent.

In each instance cited by the government it is entirely possible the jury found Mr. Maldonado-Passage's testimony truthful, but nonetheless found the testimony insufficient to excuse criminal liability or prove lack of intent.  This is precisely the scenario the Supreme Court cited as one way that a defendant exercising his or her statutory and Constitutional right to testify could avoid the penalty of additional punishment by testifying.

## Grouping of Counts 1 and 2

Mr. Maldonado-Passage objects to not grouping Counts 1 and 2 for purposes of the multiple count adjustment in USSG Ch. 3, Part D.  Upon consideration of the response of the Presentence Report writer to this objection, Mr. Maldonado-Passage provides the following additional arguments for grouping Counts 1 and 2.

Section 3D1.2(b), USSG, specifically provides that counts should be considered a single group when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."  A plain reading of this subsection requires Counts 1 and 2 to be grouped.

9

The case of *United States v. Scott*, 145 F.3d 878 (7th Cir. 1998), cited by the Presentence Report writer, does not dictate a different result.  The district court in *Scott* found USSG §3D1.2(b) required grouping of two separate schemes to kill the same individual.  The two schemes in *Scott* represented less of a composite harm than the alleged schemes in the instant case.  *Scott* actually involved two viable murder for hire schemes.  One scheme in which the defendant hired an individual who traveled from Indiana to Illinois to commit a murder, but was foiled in his efforts to complete the act by being arrested on an outstanding warrant.  The defendant concocted a second scheme a few months later with a different individual who, instead of committing the murder, pocketed the down payment money and advised the victim of the scheme.

In *United States v. Wilson*, 920 F.2d 1290 (6th Cir. 1990), the Court of Appeals reversed the district court's refusal to group six counts of violating 18 U.S.C. §1958.  In *Wilson*, the defendant made five recorded telephone calls to an individual to arrange the killing of his wife.  The defendant followed up with a letter containing a down payment for a hit man.  Each call and the letter formed the basis for the six counts alleged.  In reversing the refusal to group the offenses, the Court of Appeals stated:

> Grouping is required when the separate acts create a single "harm."  The Third Circuit has stated that "[t]he key to determining whether two offenses are sufficiently interrelated and involve substantially the same harm is whether the two offenses involve the same victim within the meaning of section 3D1.2." *United States v. Toler*, 901 F.2d 399, 402 (1990).  Moreover, Application Note 2 to section 3D1.2 states "[t]he term victim is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim."  Wilson's wife is the victim of all six acts and the six acts involve the same objective: her death.

*Wilson*, 920 F.2d at 1294.

In the instant case, the viability of either alleged scheme is highly questionable. Regardless, it is beyond dispute that the government alleged a single objective of all of the acts - the death of Carole Baskin.

Moreover, not even the federal government believed the Glover scheme posed a risk to Carole Baskin as the investigation into the alleged scheme ended in late November 2017. Indicative of Glover's real plans to exploit money out of Mr. Maldonado-Passage and get out of the Park, are a number of text messages between Glover and Lowe, and Garretson and Lowe.  In response to Mr. Maldonado-Passage's complaints about Glover not doing any work and sitting around drinking, Glover and Lowe have the following text exchange:

**October 26, 2017**

Lowe: It sounds like its going to be impossible for you to please Joe.
    I cant take this bitching every day from grown men.
Glover:    Yeah I know I'm trying to get me a plane ticket
    out of here
Lowe: ok

**October 27, 2017**

Glover:    I don't want to quit
Glover:    Should I get my ass up in the morning and go to
    work like I always do see how it pans out if not
    he'll get me a ticket tomorrow f*** Jeff I don't
    want to leave here I love this f****** zoo dude
Glover:    Please tell me what I should do

In a text exchange between Garretson and Glover on November 16, 2017, and November 21, 2107, days before Glover leaves for South Carolina, Glover and Garretson exchanged the following:

**November 17, 2017**

Garretson:    Thought u would be sitting on a damn beach in
    florida by now ..
Glover:    Things change

11

| Glover: | Been to Florida before didn't like it then I got to find me another Beach |
| Glover: | I got to go where the fish are biting you you know that |

**November 21, 2017**

| Glover: | yes I will be tomorrow I'm leaving Friday going back home tired of this s*** |
| Glover: | I guess Jeff we got me doing some things back in South Carolina for a minute these two got a house there in the business |

The second alleged scheme involved a single meeting with an undercover FBI agent injected into the investigation.  The "Mark" scheme was concocted by the government when it was apparent the Glover scheme was not going to bear prosecutorial fruit.  Acting on behalf of law enforcement, James Garretson on numerous occasions sought to persuade Mr. Maldonado-Passage to use "his guy" instead of Glover.  In effect, the government sought to substitute their undercover agent as the "hit man."  When Glover apparently was completely out of the picture in December 2017,  the government stepped up efforts to continue the plot to kill Carole Baskin by contacting Mr. Maldonado-Passage on numerous occasions.  Those contacts continued for several months, to no avail.

The "Glover" and "Mark" schemes represents one composite harm to the same victim and must be grouped pursuant to USSG §3D1.2(b).

**<u>Significant risk of the transmission of disease</u>**

Although the calculation of the offense level for the ESA violations and Lacey Act violations have no effect on the overall advisory sentencing guideline range, Mr. Maldonado-Passage addresses this adjustment to the extent it affects the Court's consideration of a variance.

12

The Presentence Report writer contends the adjustment is warranted because this case involved some instances of the falsification of Certificates of Veterinary Inspection claiming animals were inspected before interstate transport when they were not actually inspected. There is no evidence any animal was ill or disease ridden.

The Certificate of Veterinary Inspection is the responsibility of a veterinarian. Mr. Maldonado-Passage had nothing to do with these forms. In this case Dr. JoAnne Green testified she provided veterinarian services to the Park. Dr. Green testified she worked with John Reinke for many years at the Park and she trusted Mr. Reinke's judgment about the health of the animals. She had no concerns about the conditions at the Park and she would rely on Mr. Reinke's opinion about the health of an animal being transferred to complete the form if she did not actually inspect the animal. Given this process, there was little, if any, risk due to Dr. Green's non-inspection.

The cases cited by the Presentence Report writer are distinguishable. Each of these cases resulted in the enhancement because there was actual evidence of a real risk of infestation or disease transmission. In *United States v. Rodebaugh*, 798 F.3d 1281, 1298 (10th Cir. 2015), the defendant's conduct resulted in elk having direct nose to nose physical contact with each other and attracted the elk to the same site where they came into contact with urine and feces of multiple animals.

Similarly, in *United States v. Swan*, 100 Fed.Appx. 727 (10th Cir. 2004), the evidence presented reflected a significant risk of contamination of paddlefish roe because the processing method was "unsanitary," "they had no refrigeration equipment," and the residence "was pretty dirty." *Id*. at *1-2. Finally, in *United States v. Eyoum*, 84 F.3d 1004 (7th Cir. 1994), the adjustment was applied because a "federal public health regulation forbids the importation of a whole category of animals due to the substantial risk that they

13

will spread illness-causing bacteria." *Id*. at 1009.  No blanket prohibitions are present in the instant case.

The "significant risk of infestation or disease transmission" adjustment is not warranted in the instant case because there is no evidence that *Dr. Green's* occasional failure to inspect an animal prior to transport posed a "significant" risk of infestation or disease transmission.

## PERTINENT POLICY STATEMENTS ISSUED BY THE SENTENCING COMMISSION

The Presentence Report writer suggests the Court consider a sentence above the advisory sentencing guideline range because the ESA violations and Lacey Act convictions are essentially factored out of the sentencing equation because the are not serious enough to affect the combined guideline calculation.

As Mr. Maldonado-Passage pointed out in the Presentence Report objections, *PSR Addendum, p. 57-58*, the Introductory Commentary to the multiple counts adjustment (USSG, Ch. 3, Part D) states that the multiple count rules "seek to provide incremental punishment for **significant** additional criminal conduct."  Based on the value placed by the Sentencing Commission on ESA violations and Lacey Act violations, these counts simply do not rise to the level of being "significant" criminal acts.

The government made its choice on how to charge and prosecute Mr. Maldonado-Passage.  The government chose to combine two completely unrelated criminal scenarios in order to introduce highly prejudicial evidence against Mr. Maldonado-Passage that would not have been admissible if separate trials were conducted.  Mr. Maldonado-Passage's motion to sever the ESA violations and Lacy Act charges for trial was denied.  *Docs. 38, 55*. It is the government's charging decision that has rendered the ESA violations and Lacey Act

14

violations meaningless for guideline purposes, not an oversight on the part of the Sentencing Commission.

The government reaped the reward of its charging decision by obtaining convictions for the separate and distinct criminal scenarios tried together.  The government should not profit further by insisting this Court add additional punishment to the murder for hire convictions.  The fact of the matter is that the ESA violations and Lacey Act violations are simply not serious offenses according to Congress and the Sentencing Commission.

**THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT**

As it concerns disparity, the Court should bear in mind that Mr. Maldonado-Passage is the only individual who has been prosecuted in this matter.  The government's aiding and abetting allegation confirms that it is the government's view others were criminally responsible.  The fact Mr. Maldonado-Passage is the only person facing punishment results in unwarranted disparity.

**NEED TO PROVIDE RESTITUTION**

Restitution is not an issue in this case.

## CONCLUSION

The offense conduct and Mr. Maldonado-Passage's history and characteristics warrant a sentence significantly below the advisory sentencing guidelines given each of the statutory factors this Court must consider.

Respectfully submitted,

*s/ William P. Earley*
WILLIAM P. EARLEY
Bar Number 11293
KYLE E. WACKENHEIM
Bar Number 30760
ASSISTANT FEDERAL PUBLIC DEFENDERS
SUITE 109, 215 DEAN A. McGEE AVENUE
OKLAHOMA CITY, OKLAHOMA  73102
(405)609-5930   FAX (405) 609-5932
E-mail william.earley@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on this the 22nd day of October, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic filing to the following ECF registrants: Amanda Green and Charles Brown, Assistant United States Attorneys.

*s/ William P. Earley*
WILLIAM P. EARLEY

16