## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR-18-227-SLP |
| | ) | |
| JOSEPH MALDONADO-PASSAGE, | ) | |
| a/k/a Joseph Allen Maldonado, | ) | |
| a/k/a Joseph Allen Schreibvogel, | ) | |
| a/k/a "Joe Exotic," | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT'S SENTENCING MEMORANDA

TIMOTHY J. DOWNING
United States Attorney


s/*AMANDA GREEN*
AMANDA GREEN
Assistant U.S. Attorney
OBA No. 19876
210 w. Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (Office)
(405) 553-8888 (Fax)
Amanda.Green@usdoj.gov

## Table of Contents

Page

I.    The Probation Officer Properly Applied USSG § 2A1.5 in
      Calculating the Base Offense Level for the Murder-for-Hire Counts.....................1

II.   The Court Should Apply the Obstruction of Justice Adjustment
      Based on Mr. Maldonado-Passage's False Testimony At Trial..............................2

III.  The Court Should Treat the Two Murder-For-Hire Counts as Separate
      Offenses For the Purpose of Calculating the Total Offense Level .......................15

IV.   A Sentence Within the Guideline Range Is Sufficient, But Not Greater Than
      Necessary, To Comply With the Statutory Factors in 18. U.S.C. § 3553..............18

Conclusion .....................................................................................................................21

## **Table of Authorities**

**Page**

*United States v. Anderson,*
189 F.3d 1201 (10th Cir. 1999) ............................................................. 5

*United States v. Dunnigan,*
507 U.S. 87 (1993) ............................................................. 4, 5

*United States v. Gordon,*
875 F.3d 26 (1st Cir. 2017) ................................................. 16

*United States v. Mounkes*,
204 F.3d 1024 (10th Cir. 2000) ................................................. 5

*United States v. Scott*,
145 F.3d 878 (7   Cir. 1998) ................................................. 17

*United States v. Smith,*
81 F.3d 915 (10th Cir. 1996) ................................................. 5

*United States v. Summers,*
506 F.Supp.2d 686 (D.N.M. 2007) ........................................ 2

*United States v. Temkin,*
797 F.3d 682 (9th Cir. 2015) ............................................... 2

*United States v. Vasco,*
564 F.3d 12 (1 Cir. 2009) ................................................. 2

*United States v. Wilson,*
920 F.2d 1290 (6th Cir. 1990) ........................................... 16

## **Federal Statutes**

18 U.S.C. § 2 ................................................................................. 8

18 U.S.C. § 1958 ................................................................... 1, 2, 16

18 U.S.C. § 3553 ............................................................................................... 18

## **Other Authority**

U.S.S.G. § 2A1.5 ............................................................................................... 1

USSG § 3C1.1 ........................................................................................... 3, 4, 15

U.S.S.G. § 3D1.2 ......................................................................................... 15, 16

## UNITED STATES' RESPONSE TO
## DEFENDANT'S SENTENCING MEMORANDA

Defendant Joseph Maldonado-Passage has filed objections to the Final Presentence Report (Doc. 126), a Sentencing Memorandum (Doc. 124), and a Supplemental Sentencing Memorandum (Doc 127).  The United States responds as follows:

**I.        The Probation Officer Properly Applied USSG § 2A1.5 in Calculating the Base Offense Level for the Murder-for-Hire Counts.**

The jury found Mr. Maldonado-Passage guilty of Count 1 and Count 2 of the Superseding Indictment, both violations of 18 U.S.C. § 1958(a), use of interstate commerce facilities in the commission of murder-for-hire.  The index to the U.S. Sentencing Guidelines (USSG) directs violations of this statute to Section 2E1.4, entitled Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire.  That section directs that the probation officer should set the base offense level at <u>the greater of</u> 32 <u>or</u> "the offense level applicable to the underlying unlawful conduct."  Accordingly, the Probation Officer was required to apply USSG § 2A1.5, entitled Conspiracy or Solicitation to Commit Murder, which provides for a base offense level of 33, and also specifies that "[i]f the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder, increase by 4 levels."  Thus, Mr. Maldonado-Passage's base offense level for Count 1 and Count 2, before any adjustments, was correctly calculated to be 37.

Mr. Maldonado-Passage objects to the use of Section 2A1.5 because the applicable conduct overlaps with Section 2E1.4, and it results in a higher offense level.  However, he

1

concedes the probation officer's response that all of the courts deciding this issue have held that the offense level for violations of 18 U.S.C. § 1958(a) is properly determined under Section 2A1.5.  (*See* Doc 127, Suppl. Sent. Memo., at pp. 2-3) (citing *United States v. Temkin*, 797 F.3d 682, 693-94 (9th Cir. 2015); *United States v. Vasco*, 564 F.3d 12, 23 (1st Cir. 2009); and *United States v. Summers*, 506 F.Supp.2d 686, 696 (D.N.M. 2007)).  (*See also* Doc. 124, Sent. Memo., at p. 10) (citing *United States v. Wilson*, 920 F.2d 1290 (6th Cir. 1990), for a different proposition, but this case also considered the interplay between prior versions of these Sentencing Guidelines and held that the conduct involved in the defendant's use of facilities of interstate commerce in an attempt to have his wife killed was reached <u>both</u> by the sentencing guideline on use of interstate commerce facilities in the commission of murder for hire <u>and</u> by the guideline for solicitation to commit murder, and holding that the guideline with the greater base offense level was properly applied).

Accordingly, Mr. Maldonado-Passage's base offense level for the murder-for-hire counts is 37.

## II.     The Court Should Apply the Obstruction of Justice Adjustment Based on Mr. Maldonado-Passage's False Testimony At Trial.

The Presentence Report calculations of the applicable three adjusted offense levels (for Count Group 1, Count 1, and Count 2) failed to include the two-point adjustment for obstruction of justice, as set forth in Section 3C1.1 of the USSG.  The probation officer noted that this adjustment requires the Court to make specific factual findings independent

of the jury verdict before the enhancement can be applied.  The government contends that

there is ample basis for the Court to make such findings.

Section 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct
> or impede, the administration of justice with respect to the investigation,
> prosecution, or sentencing of the instant offense of conviction, and (2) the
> obstructive conduct related to (A) the defendant's offense of conviction and
> any relevant conduct; or (B) a closely related offense, increase the offense
> level by 2 levels.

USSG § 3C1.1.  Application Note 4 to this Section provides examples of conduct to which

this adjustment applies, including "***committing***, suborning, or attempting to suborn

***perjury***, including during the course of a civil proceeding if such perjury pertains to

conduct that forms the basis of the offense of conviction."  *Id*. at App. Note 4 (emphasis

added).

Application Note 2 states that:

> Limitations on Applicability of Adjustment.—This provision is not intended
> to punish a defendant for the exercise of a constitutional right. A defendant's
> denial of guilt ***(other than a denial of guilt under oath that constitutes***
> ***perjury)***, refusal to admit guilt or provide information to a probation officer,
> or refusal to enter a plea of guilty is not a basis for application of this
> provision. In applying this provision in respect to alleged false testimony or
> statements by the defendant, the court should be cognizant that ***inaccurate***
> ***testimony or statements*** sometimes ***may result from confusion, mistake, or***
> ***faulty memory*** and, thus, not all inaccurate testimony or statements
> necessarily reflect a willful attempt to obstruct justice.

*Id*. at App. Note 2 (emphasis added).

3

The Supreme Court has addressed perjury as obstruction of justice under USSG § 3C1.1 and held that "[u]pon a proper determination that the accused has committed perjury at trial, an enhancement of sentence **is required** by the Sentencing Guidelines." *United States v. Dunnigan*, 507 U.S. 87, 98 (1993) (emphasis added).  The Court stated that

> the enhancement provision is part of a sentencing scheme designed to determine the appropriate type and extent of punishment after the issue of guilt has been resolved.  The commission of perjury is of obvious relevance in this regard, because it reflects on a defendant's criminal history, on [his] willingness to accept the commands of the law and the authority of the court, and on [his] character in general.

*Id*. at 94.  The Court further opined that

> [i]t is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures [himself] in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process. The perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury.

*Id*. at 97–98.

In the Tenth Circuit,

> [a] finding of perjury in support of a sentence enhancement for obstruction of justice must contain two components.  First, the finding must encompass all of the factual predicates of perjury.  Second, the finding must specifically identify the perjured testimony. . . .

> The factual predicates of perjury are that a witness (1) gives false testimony under oath (2) concerning a material matter (3) with willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.

4

*United States v. Smith*, 81 F.3d 915, 918 (10th Cir. 1996) (internal citations omitted) (citing *Dunnigan*). *See also United States v. Mounkes*, 204 F.3d 1024, 1029 (10th Cir. 2000) ("Under *Dunnigan*, the sentencing court must find defendant's testimony false, material, and intended to affect the outcome of trial rather than a product of confusion, mistake or faulty memory.") (finding no error in the sentencing court's enhancement decision under § 3C1.1 for defendant's perjurious testimony). *See, e.g., United States v. Anderson*, 189 F.3d 1201 (10th Cir. 1999) (in sentencing defendant on drug conspiracy charges, district court satisfied requirements for application of obstruction of justice enhancement, based on perjury, with respect to its finding that defendant specifically testified with intent to cause jury not to find him guilty when he claimed that large amount of cash in his possession was not drug proceeds but was stolen from a coconspirator; court pointed to specific testimony it believed was intentionally false, and supported its finding with its observation of defendant's demeanor, and the testimony was material, as possession of large amounts of cash would be probative of defendant's involvement with illegal drug trade).

Mr. Maldonado-Passage testified under oath at trial. He specifically denied his guilt as to all conduct charged in the Superseding Indictment except Counts 3-7 and Count 21. He also attempted to cast guilt for those specific acts on various other individuals. His testimony was contradicted by numerous other witnesses and by recordings of his own voice. The jury heard Mr. Maldonado-Passage's testimony and found him guilty on all

counts.  The following specific excerpts of Mr. Maldonado-Passage's testimony are false, are material to the charged conduct, and were intended to affect the outcome of the trial, as opposed to a product of his confusion, mistake, or faulty memory.

With regard to Count 8 of the Indictment, offering tiger cubs for sale in violation of the Endangered Species Act, Mr. Maldonado-Passage testified:

> Q.   So was it your intention to offer these cubs for sale to Darlene
>        Cervantes?
> A.   Pardon?
> Q.   Was it your intention to offer those cubs for sale to Darlene?
> A.   No. It was my intention to just say a price and she'd go away, which
>        she did.

(Trial Transcript of Maldonado-Passage testimony at p. 36, lines 6-12).  Mr. Maldonado-Passage contends that this testimony was "nothing more than [his] denial of an intent to commit the offense." (Doc. 124, Sent. Memo., at p. 7).  In order to convict Mr. Maldonado-Passage of Count 8, the jury had to find that the defendant offered the cubs for sale and that he acted knowingly.  (Doc. 114, Jury Instructions, at p. 34).  Clearly the jury did not believe Mr. Maldonado-Passage's contention that he unintentionally or unknowingly offered the cubs for sale.  Because this testimony was false, material to the charged conduct, and intended to affect the outcome of the trial, it is perjury.

Counts 9-11 of the Indictment charged Mr. Maldonado-Passage with sales of tiger cubs in violation of the Endangered Species Act.  With regard to Count 9, he testified:

> A:   Okay.  So anytime an animal or a baby tiger or anything was taken off
>        of my inventory, it has to come from Joe Maldonado.  Okay. It can't
>        come from you in Louisiana, because you're not an exhibitor.  I'm the

exhibitor, even though it's under my license and you own the animal. Okay. So it's got to be from me to the Brown Zoo. All right. And I don't sell that. I didn't sell that. Jeff, the owner of the zoo, sold those. So that's why they say donation on there, because I transferred them off of my license to someone else for no charge and he made the sale between them and him.

(Trial Transcript of Maldonado-Passage testimony at p. 37, lines 16-25).

With respect to Count 10, Mr. Maldonado-Passage testified:

Q.      With respect to Count 10, that is a tiger female, 11 weeks old, to TS in Indiana. Do you recall that transaction?
A.      That one would be Tim Stark, and I remember that one very well.
Q.      All right. So was that the sale in interstate commerce?
A.      That one was actually free. Depending on your inspector -- our inspector allowed us to use cubs between four weeks and 16 weeks. Tim Stark's inspector's only allowed him to use cubs up to 12 weeks old. And that's the problem with the vague laws is every inspector can read into what they want it to read in. So the zoo made him a deal, if he took this one that was 11 weeks old that he could only use for one week, we would give him a younger one for free and that would get a bigger one out of our zoo that we didn't have to grow up and feed for the rest of his life.
Q.      All right.
A.      So that was not a sale.

(Trial Transcript of Maldonado-Passage testimony at p. 38, lines 5-21).

With respect to Count 11, Mr. Maldonado-Passage testified:

Q.      And then also Count 11 is March 6, 2018, tiger, female, six weeks old, again to Brown's, which is referred to as Oakridge Zoo in Illinois. Is that the same Brown's?
A.      It is the same folks.
Q.      So the same as Count 9. Do you recall that?
A.      Without looking at my notes in QuickBooks and verifying that deposit, but I would probably say it probably was.
Q.      A sale?
A.      Probably so.

7

| Q. | By who? |
|----|---------|
| A. | By the zoo. |
| Q. | But not you? |
| A. | Not me. |
| Q. | So if I'm understanding you correctly -- and -- of course, we don't know what Brown's or Tim -- TS, whoever that is, has to say about this, but you are simply passing them off of your inventory to another zoo's inventory by creating the paperwork that's associated with this; is that correct? |
| A. | Yes, sir. And we did that with Beth Corley's inventory as well. |
| Q. | All right. And so whether or not this was being sold or someone was providing a donation back for the animal, that was between Mr. Lowe and that entity; is that correct? |
| A. | Correct. |
| Q. | All right. So that's the substance of your testimony as to why you're not selling anything, correct? |
| A. | I didn't sell anything and I didn't collect a dime for myself, no. It all went in his bank account. |

(Trial Transcript of Maldonado-Passage testimony at p. 38, line 22, to p. 39, line 24).

Mr. Maldonado-Passage argues with regard to Counts 9 through 11 that this testimony is an attempt to advise the jury that the responsibility for the acts fell on Jeff Lowe, the purported owner of the zoo. He argues that "[s]ince the government charged [him] with aiding and abetting, the jury could have easily determined this testimony was not necessarily false, but insufficient to excuse criminal liability." (Doc. 124, Sent. Memo. at p. 7). Significantly, although the Superseding Indictment includes statutory references to 18 U.S.C. § 2, aiding and abetting, the jury was never instructed on the elements of that crime and indeed, the government never articulated this theory of the case at trial. (*See* Doc. 114, Jury Instructions). Accordingly, it is apparent that the jury found the liability for these acts fell squarely on Mr. Maldonado-Passage, and they found his testimony false.

8

It was also material to the charged conduct and intended to affect the outcome of the trial; thus it was perjury.

Mr. Maldonado-Passage argues with regard to Count 10 that his testimony was "a denial of intent only." (Doc. 124, Sent. Memo. at p. 7). However, he states that the cub that is the subject of that count was given to Tim Stark for free. This is a direct denial of the elements of the offense orf illegal sale of an endangered species. (Doc. 114, Jury Instructions, at p. 35). The jury found Mr. Maldonado-Passage's testimony to be false and convicted him on this count.

With regard to Counts 12 and 15-20, charging him with false labeling of wildlife under the Lacey Act, Mr. Maldonado-Passage testified:

> A. … And the reason why it was always written "donation" on there is because the person that had the license never got the money. So the people whose license it was actually did donate it.

(Trial Transcript of Maldonado-Passage testimony at p. 42, lines 17-20).

> Q. Well, with respect to Count 18, the June 12th, 2018, form that Dr. Green testified about, did you advise her to place "donation" or any other type of exchange on that form?
> A. Which animals are on there?
> Q. It's an African lion, male, eight years old, and an African lion, female, eight years old.
> A. I did not even call that one in. I had nothing to do with that one or the transfer form.
> Q. All right. That was in June -- specifically, the form is dated June 12th, 2018.
> A. Correct.
> Q. Were you at the park that day?
> A. I was at the park, yes, sir.
> Q. But you don't recall having anything to do with the information?

9

A.    I know I didn't.

(Trial Transcript of Maldonado-Passage testimony at p. 44, lines 3-18).

Q.    … Now, with respect to Government Exhibit 12, I believe this deals with Count 19 in a delivery form. Do you recognize that?
A.    Yes, sir.
Q.    All right. Now, is this your handwriting on the form?
A.    Yes, it is.
Q.    And were you involved in the transaction itself?
A.    Yes, sir.
Q.    All right. Tell us about that.
A.    This was right at the time that I was actually leaving the zoo for good. And I had this pair of lions that we were donating to the Animal Haven Zoo up in Wisconsin. And we -- what I done was I billed them for the two drivers and the gasoline and the truck to get -- to take them up there, and I -- if I remember right, it was $3,200. And we ended up blowing an engine on one of the trucks and we had to send another truck to go get that truck and another driver to go up there and rescue the other drivers. And we finally got it all done.  But anyway, by the time it was all over with, we didn't even make any money to pay the gas and stuff to get it all done. And that is part of what our license allows me to do. It's the same as if I had FedEx do it or American Airlines or anybody else.  They would have charged the people for the gas and the trouble to go up there and back because they couldn't come get them.
Q.    So was this form inaccurate with respect to any information on it?
A.    Absolutely not.

(Trial Transcript of Maldonado-Passage testimony at p. 58, line 12 – p. 59, line 12).

With regard to Count 20, Mr. Maldonado-Passage testified:

A.    … All right. So I told Jim with Branson Wildlife Park on the telephone that I had some baby lions that I would give him because they were illegal to sell baby lions. Since he was buying the bats and everything else, if he would take these babies. Because the rent house that I had up in Yukon at the time ready to go to, we couldn't have the tigers or lions up there in the rent house.  So technically, if you really want to complain about this form, it should have said donate and sell instead of whoever filled this out

10

and just hit the donate box, because everything on there was sold except
for the two lion cubs.

(Trial Transcript of Maldonado-Passage testimony at p. 60, lines 13-23).

Again, Mr. Maldonado-Passages argues that "the aiding and abetting allegation
permitted the jury to consider the actions of others in assessing [his] guilt." (Doc. 124,
Sent. Memo., at p. 8). Again, the jury was never instructed on that theory and nevertheless
convicted Mr. Maldonado-Passage of Counts 12 and 15-20, clearly finding his testimony
to be false. It was likewise material to the charged conduct and intended to influence the
outcome of the trial, and thus was perjury. It should be noted that the text messages
between himself and Jeff Lowe that Mr. Maldonado-Passage offers as "an example of
Lowe's singular authority over Park business," (Doc. 124, Sent. Memo., at p. 8) were not
introduced into evidence at trial and thus the jury did not consider them in reaching their
verdict.

Count 1 of the Superseding Indictment charged Mr. Maldonado-Passage with use
of interstate facilities in the commission of murder-for-hire in connection with his hiring
Alan Glover to murder Carole Baskin. The jury heard several recordings of Mr.
Maldonado-Passage discussing the plot with James Garretson, as well as the testimony of
Mr. Garretson, Mr. Glover, and John Finlay. With regard to Count 1, Mr. Maldonado-
Passage testified as follows:

Q.    Now, let's talk about Count 1 of the indictment. Count 1 charges that
      in November you inquired of Alan Glover if he would travel to Florida

11

Q.   to murder Carole Baskin in exchange for some money. Did you do that?

A.   I never talked to Alan Glover about this.

Q.   It also says that you told Glover that -- or that Glover told you he would go to Florida to murder Carole Baskin in exchange for some money. Did he ever say that to you?

A.   No, sir.

Q.   Now, the indictment charges that on or about November 6th you caused Mr. Glover to travel to Dallas to get a fake ID for use in this proposed plot for him to go to Florida and kill Carole Baskin. Tell us about this ID situation.

A.   Okay. In October, the last -- last week of October, Jeff called me from Las Vegas and told me to call James and get the address of where he goes and gets these fake driver's licenses that they make to go lease fake addresses, and have Alan go down there and get a fake driver's license because he needed to get a bus to go back to South Carolina and fix all of his legal problems and everything else he had back there. And Jeff said, and I may send him to Florida to take care of my problem. That was his exact words.

(Trial Transcript of Maldonado-Passage testimony at p. 75, line 22 – p. 76, line 18).

Q.   . . . Did you give Alan Glover some money?

A.   I did.

Q.   And you did that because you were told to?

A.   I was directed by Jeff to give him 3,000 bucks to go home so he had traveling money and living money, because Jeff had retail stores out in the east coast and he was going to go work for Jeff out there.

Q.   All right. So where did the money come from that you gave to Glover?

A.   Out of the night deposits, just like Jeff told me to take it out of the night deposits.

(Trial Transcript of Maldonado-Passage testimony at p. 80, line 17 – p. 81, line 3).

Q.   Now, there was testimony from Mr. Glover that you gave him another cell phone.

A.   That was all a lie.

Q.   Did you give him another cell phone?

A.   Absolutely not, especially a company phone that we just advertised several thousand dollars to order pizza with.

12

Q. So did you see a phone on the day that he was leaving town?
A. No, sir.
Q. Did you use a phone that belonged to Glover to take screen shots of information about Carole Baskin and her place?
A. No, sir.
Q. When did -- did you know that Alan Glover was leaving the park on November 25th?
A. I didn't even know he left.
. . .
Q. Did you hire Alan Glover to kill Carole Baskin?
A. Absolutely not.

(Trial Transcript of Maldonado-Passage testimony at p. 82, lines 7-20; p. 83, lines 3-4).

With regard to Count 1, Mr. Maldonado-Passage argues that although he denied certain portions of the allegations made against him, because he attributed the Glover plot to Jeff Lowe and "the government charged Mr. Maldonado-Passage with aiding and abetting, the jury could have determined this testimony did not excuse criminal liability." (Doc. 124, Sent. Memo., at p. 9). Again, the jury was never instructed on aiding and abetting in relation to any count of the Superseding Indictment, and the government did not advance that theory at trial. (*See* Doc. 114, Jury Instructions). The jury found Mr. Maldonado-Passage's testimony regarding Count 1 to be false, and they found him guilty. The testimony was not only false, but it was material to the charged conduct and intended to influence the outcome of the trial. As such, it was perjury.

Count 2 of the Superseding Indictment charged Mr. Maldonado-Passage with use of interstate facilities in the commission of murder-for-hire in connection with his hiring "Mark Williams," an undercover FBI agent to murder Carole Baskin. The jury heard the

13

recording of Mr. Maldonado-Passage's conversation with Mark Williams as well as the

testimony of Mr. Williams.  With regard to Count 2, Mr. Maldonado-Passage testified as

follows:

> Q.     Now, what was your -- your gut feeling about this conversation?
> A.     I had a gut feeling it was an undercover cop.
>        …
> Q.     Did you think it was a setup?
> A.     I believed it was a setup.
>        …
> Q.     So did you hire Mark to kill Carole Baskin?
> A.     Absolutely not.

(Trial Transcript of Maldonado-Passage testimony at p. 87, lines 9-11, 23-24; p. 88, lines

24-25).

> Q.     All right. Now, at any time did you intend for someone to kill Carole
>        Baskin in exchange for money or any other thing of value?
> A.     No.

(Trial Transcript of Maldonado-Passage testimony at p. 92, lines 22-25).

With regard to Count 2, Mr. Maldonado-Passage argues that it was not perjury for

him to claim that he did not hire the undercover FBI agent to kill Carole Baskin, and that

his testimony was "no more than a denial of intent."  (Doc. 124, Sent. Memo, at p. 9).  In

order to convict Mr. Maldonado-Passage of Count 2, the jury had to find that he acted "with

the intent that a murder be committed."  (Doc. 114, Jury Instructions at p. 31).  Thus, in

convicting him of Count 2, the jury found Mr. Maldonado-Passage's testimony regarding

his intent during his conversation with the undercover FBI agent to be false.  The testimony

was material to the charged conduct and intended to affect the outcome of the trial.

14

The foregoing portions of Mr. Maldonado-Passage's testimony under oath at trial establish that he committed perjury.   Accordingly, the government objects to the PSR's failure to include an adjustment for obstruction of justice pursuant to USSG § 3C1.1 and asks the Court to impose it.  Doing so will result in an adjusted offense level of 18 for Count Group 1 (the wildlife crimes) and an adjusted offense level of 39 for Count 1 and for Count 2 (murder-for-hire).

## III.   The Court Should Treat the Two Murder-For-Hire Counts as Separate Offenses For the Purpose of Calculating the Total Offense Level.

Mr. Maldonado-Passage objects to the determination by the probation officer that the two murder-for-hire counts (Count 1 and Count 2) should not be grouped for the purpose of calculating his total offense level.   Section 3D1.2(b) of the Sentencing Guidelines provides for grouping "[w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a **common scheme or plan**." USSG § 3D1.2(b) (emphasis added).   Application Note 4 further clarifies that grouping of counts under subsection (b) is only appropriate when the "counts [] are part of a **single course of conduct** with a single criminal objective and represent essentially **one composite harm** to the same victim." *Id*. at App. Note 4 (emphasis added).  The Application Notes provide several examples of counts that are <u>not</u> to be grouped together: "defendant is convicted of two counts of assault on a federal officer for shooting at the officer on two separate days" (App. Note 3); "robbery of the same victim on different occasions" (App. Note 4); and "defendant is convicted of two counts of rape

15

for raping the same person on different days" (*id.*).  The government agrees with the analysis of the probation officer that Counts 1 and 2 are not proper for grouping under USSG § 3D1.2(b).

Defense counsel concedes that the appropriate unit of prosecution for murder-for-hire charged under 18 U.S.C. § 1958(a) is a single plot to murder a single individual. *United States v. Gordon*, 875 F.3d 26, 37-38 (1st Cir. 2017).[1]  Thus, defense counsel argues that the conduct of which Mr. Maldonado-Passage was convicted in Counts 1 and 2 constituted a single, continuous plot to murder Carole Baskin.  The argument is premised on the fact that the government became aware of Mr. Maldonado-Passage's plan to use Mr. Glover as the hitman and attempted to convince him to use an undercover FBI agent instead, in order that the government could contain the threat to Ms. Baskin.  However, the evidence at trial established that Mr. Maldonado-Passage engaged in two distinct courses of conduct in order to devise two distinct plots to murder Ms. Baskin.  He made two, separate agreements with two hitmen, who were not working together or connected to each

---

[1] Mr. Maldonado-Passage's citation to *United States v. Wilson*, 920 F.2d 1290 (6th Cir. 1990), is wholly inapposite.  In that case, the defendant was convicted of six counts of murder-of-hire under earlier legal precedent for 18 U.S.C. § 1958(a), which permitted each use of a facility of interstate commerce to be charged as separate counts.  Thus, the defendant was convicted of making five phone calls and sending a letter all to the same hitman, all for the purpose of killing his wife.  The Sixth Circuit correctly found that these offenses should be grouped, thereby treating the six counts as a single plot to murder a single individual.

other in any way.  He devised two separate murder plans – Mr. Glover was to cut off Ms. Baskin's head with a knife; the undercover agent was to kill her with a pistol.

Defense counsel attempts to conflate the two plots into one by stating that "[w]hen Glover apparently was completely out of the picture in December 2017, the government stepped up efforts to continue the plot to kill Carole Baskin…."  (Doc. 126, Defendant's Objections to PSR).  As the evidence at trial established, although the government believed by December 2017 that the Glover plot had fizzled, Mr. Maldonado-Passage believed that it was still in play.  Significantly, Mr. Maldonado-Passage never called off the hit by Mr. Glover, even after he had met with the undercover agent and agreed to use him for the hit. Rather, he seemed to be employing a "belt and suspenders approach," waiting to see whether Mr. Glover – to whom he had already given $3,000 – was successful before he paid an additional $5,000 to the undercover officer.  Because Mr. Maldonado-Passage undertook two separate courses of conduct to make two separate plans, he created "separate instances of fear and risk of harm, not one composite harm."  *United States v. Scott*, 145 F.3d 878, 887 (7th Cir. 1998).  Indeed, Mr. Maldonado-Passage's conduct is more similar to the examples in the Application Notes of multiple instances of assault, robbery, and rape. Accordingly, Counts 1 and 2 should not be grouped in determining Mr. Maldonado-Passage's total offense level.  This will result in a total offense level of 41.

17

**IV.     A Sentence Within the Guideline Range Is Sufficient, But Not Greater Than Necessary, To Comply With the Statutory Factors in 18 U.S.C. § 3553**.

Mr. Maldonado-Passage's correct total offense level is 41, and his Criminal History is I, resulting in a sentencing guideline range of imprisonment of 324-420 months.  The government believes that a sentence within this range is fully appropriate to meet the sentencing factors in light of Mr. Maldonado-Passage's conviction on two felony counts of murder-for-hire, nine misdemeanor counts of violating the Endangered Species Act (ESA), and eight felony counts of violating the Lacey Act.

In imposing sentence, this Court must consider

> (2)  the need for the sentence imposed—
>    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>    (B)   to afford adequate deterrence to criminal conduct; [and]
>    (C)   to protect the public from further crimes of the defendant.

18 U.S.C. § 3553(a)(2).  In addressing these factors as well as the grouping issue, Mr. Maldonado-Passage's Sentencing Memorandum (Doc. 124) focuses much effort on his contention that there was no actual risk that harm would come to Ms. Baskin.  (*See id.* at pp. 4-5; pp. 11-12).  As an initial matter, it seems curious to contend that Mr. Glover, a convicted felon and "self-admitted drunk and dope fiend," who was willing to and capable of exploiting money out of Mr. Maldonado-Passage was unlikely to be the sort of person who could cause Ms. Baskin any harm.  At any rate, the relevant inquiry for the Court is not the actual capability or the intent of the <u>hitmen</u> that Mr. Maldonado-Passage hired.  The

18

relevant inquiry is the intent of <u>Mr. Maldonado-Passage</u>. The jury found that Mr. Maldonado-Passage hired two separate hitmen <u>with the intent that the murder of Carole Baskin be committed</u>. Mr. Maldonado-Passage <u>believed</u> that Mr. Glover could and would go to Florida, kill Ms. Baskin with a knife, and cut her head off. (Trial Transcript of Glover testimony at p. 16, lines 19-24). Mr. Maldonado-Passage believed that "Mark" could and would go to Florida and shoot Ms. Baskin with a pistol purchased from the flea market. (Trial Transcript of Williams testimony at p. 21, lines 7-18). It is Mr. Maldonado-Passage's willingness and ability to arrange these plots and his intent and belief that Ms. Baskin would be murdered that the Court must consider in evaluating the seriousness of the offense, promoting respect for the law, just punishment, adequate deterrence of criminal conduct, and protecting the public from further crimes by Mr. Maldonado-Passage. Significantly, Ms. Baskin was merely a business rival and a critic of Mr. Maldonado-Passage's animal handling practices, and someone whom he had never truly met in person. And yet he developed two separate plots to murder her. A sentence at the statutory maximum of 10 years per count, to run consecutively, is both necessary and sufficient to address such crimes.

If the court imposes consecutive maximum terms for the murder-for-hire counts, that would account for 240 months of the sentencing guideline range. The remaining 84-180 months of that guideline range could be satisfied by running consecutive sentences for any combination of the remaining 17 crimes of which he was convicted, which carry a

19

maximum statutory sentence of 49 years.  The dismissive language regarding these crimes that is used in Mr. Maldonado-Passage's Sentencing Memorandum (Doc. 124) in and of itself suggests that he requires a sentence that will emphasize the seriousness of offenses against wildlife, promote his respect for those laws, and adequately deter others and Mr. Maldonado-Passage from such conduct.  Indeed, Mr. Maldonado-Passage that violations of the Endangered Species Act, including the killing of "'wildlife'" (quotation marks in original) – meaning "generic tigers" "not … in need of the ESA's protections" – are "simply not deemed serious." (Doc. 124, Sent. Memo., at p. 5).  He also refers to the Lacey Act violations – which protect wildlife from illegal trafficking – as "paperwork violations." (*Id*.)  He further states that "these counts simply do not rise to the level of being 'significant' criminal acts." (*Id*. at p. 14).

Although these crimes may not be as serious as murder-for-hire, they have been codified by the United States Congress as federal crimes and should be accounted for in imposing sentence on Mr. Maldonado-Passage.  Significantly, he was not convicted of one or two random violations of the ESA or the Lacey Act; rather, he was convicted of 17 violations, which were representative of a pattern and practice of Mr. Maldonado's business over a number of years.  Moreover, the government introduced evidence at trial that, <u>even after he was arrested</u> in the instant case, Mr. Maldonado-Passage attempted to continue his wildlife trafficking from his jail cell. On or about October 5, 2018, he phoned his husband on a recorded jail phone call and instructed him to monitor the birth of a litter

of lions, and then obtain the lions immediately after their birth so that he could sell them for income.  These recordings were admitted at trial as Government's Exhibits 162 and 163, in response to Mr. Maldonado-Passage's denial that he had attempted to sell lions.  In Exhibit 162, Mr. Maldonado-Passage states, "you need that litter of lions…. Get them and take care of them, and I'll tell you how to get rid of them from there…. I'd really like you to get your hands on a litter of lions; that would help you out.  You won't have them more than a week or two.  Just trying to make sure you've got income."  In Exhibit 163, he tells his husband, "that litter should be due any day…. You need to collect and breed and sell. That's where the money's at."  Given this conduct, the Court should be concerned that failure to impose a significant punishment that clearly represents Mr. Maldonado-Passage's crimes against wildlife will fail to promote respect for the law and provide adequate deterrence.

## Conclusion

The government requests the Court to sentence Mr. Maldonado-Passage to a term of imprisonment within the sentencing guideline range of 324-405 months.

21

Respectfully submitted,

TIMOTHY J. DOWNING
United States Attorney

*s/Amanda Green*
AMANDA GREEN
Assistant U.S. Attorney
OBA No. 19876
210 W. Park Avenue, Suite 400
Oklahoma City, Oklahoma  73102
(405) 553-8700 (Office)
(405) 553-8888 (Fax)
Amanda.green@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of December, 2019, I electronically transmitted this document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Assistant Federal Public Defenders:
William P. Earley
Kyle E. Wackenheim

*s/Amanda Green*
AMANDA GREEN

23