**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 14, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JOSEPH MALDONADO-PASSAGE,
a/k/a Joseph Allen Maldonado, a/k/a
Joseph Allen Schreibvogel, a/k/a Joe
Exotic,

     Defendant - Appellant.

No. 20-6010

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:18-CR-00227-SLP-1)**
_____

Brandon Sample of Brandon Sample PLC, Rutland, Vermont, for Defendant-Appellant.

Steven W. Creager, Assistant United States Attorney (Timothy J. Downing, United States Attorney; Amanda Green, Assistant United States Attorney, on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

_____

Before **HARTZ**, **KELLY**, and **PHILLIPS**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

     It was a rivalry made in heaven. Joseph Maldonado-Passage, the self-

proclaimed "Tiger King," owned what might have been the nation's largest

population of big cats in captivity. Carole Baskin was an animal-rights activist who fought for legislation prohibiting the private possession of big cats. He bred lions and tigers to create big-cat hybrids—some the first of their kind. She saw the crossbreeding of big cats as evil. He built his business around using cubs for entertainment. She protested his events as animal abuse and urged boycotts.

The rivalry intensified after Baskin sued Maldonado-Passage for copyright and trademark infringement and won a million-dollar judgment. Maldonado-Passage responded by firing a barrage of violent threats at Baskin, mostly online. And he didn't stop there. Before long, he was plotting her murder. Twice, within weeks, he set about hiring men to kill Baskin—one, an employee at his park; the other, an undercover FBI agent.

Maldonado-Passage soon faced a federal indictment charging him with twenty-one counts, most for wildlife crimes, but two for using interstate facilities in the commission of his murder-for-hire plots. A jury convicted Maldonado-Passage on all counts, and the court sentenced him to 264 months' imprisonment.

On appeal, he disputes his murder-for-hire convictions, arguing that the district court erred by allowing Baskin, a listed government witness, to attend the entire trial proceedings. He also disputes his sentence, arguing that the trial court erred by not grouping his two murder-for-hire convictions in calculating his advisory Guidelines range. On this second point, he contends that the Guidelines required the district court to group the two counts because they involved the same victim and two or more

acts or transactions that were connected by a common criminal objective: murdering Baskin.

We hold that the district court acted within its discretion by allowing Baskin to attend the full trial proceedings despite her being listed as a government witness, but that it erred by not grouping the two murder-for-hire convictions at sentencing. Accordingly, we affirm the conviction but vacate the sentence and remand for resentencing.

## BACKGROUND

### I.    Factual Background

Joseph Maldonado-Passage goes by many names: The Tiger King, Joe Exotic, and Joe Gone Wild to name a few—all a play on his owning and operating the Greater Wynnewood Exotic Animal Park (the Park) in Wynnewood, Oklahoma. The Park housed several species of exotic animals, though Maldonado-Passage became widely known for his big cats—lions and tigers and crossbred hybrids.

But with fame came scrutiny. Outspoken critics condemned his practices, particularly his traveling road shows at which he charged mall patrons to take photographs with young animals—usually tiger cubs. Carole Baskin was one of these critics. Baskin is "known in the industry as an animal rights activist." Appellant's App. vol. 3B at 235. She owns Big Cat Rescue, a facility in Tampa, Florida, which she describes as a "sanctuary to about 60 exotic cats." *Id.* at 50; R. vol. 3 at 417. Because she believes that breeding big-cat hybrids is a "very cruel practice," Appellant's App. vol. 3B at 57, and that it's "abuse" to breed cubs to be

photographed for money, *id.* at 55, she began trying to discourage the malls along his route from hosting Maldonado-Passage's show. And when the shows went on, she and her supporters protested them.

After learning of Baskin's activities, Maldonado-Passage retaliated by renaming his road shows "Big Cat Rescue Entertainment," using similar lettering to mimic Baskin's "Big Cat Rescue." *Id.* vol. 3A at 289; *id.* vol. 3B at 4, 66. After some people confused her brand with his road shows, Baskin sued Maldonado-Passage and obtained a $1 million judgment for copyright and trademark infringement. Then she began trying to collect on it. Maldonado-Passage believed Baskin was trying to drown him in lawsuits to drive him out of business. Due to his ever-growing legal fees, he filed for bankruptcy.

Maldonado-Passage took to the internet to vent his anger with Baskin. He readily admits that he posted "some pretty outrageous stuff" online. *Id.* vol. 3D at 39. In one instance, he posted a picture of himself posing in a coffin with the caption, "I bought my good friend in Florida a Christmas present." *Id.* vol. 3B at 89–90. He also posted a Facebook photo of a jar containing a shrunken head made to look like Baskin's. He even recorded a video in which he fired a gun at a "Carole blowup doll." *Id.* at 111–12. As he put it, his stunts were just about the money: "the more viewers you have, the more money you raise." *Id.* vol. 3D at 40. As Baskin put it, his stunts showed that he was dangerously "obsessed" with her. *Id.* at 264.

But soon his threats weren't just words on Facebook. In August 2017, Maldonado-Passage took a fateful step and began plotting Baskin's murder. He

4

enlisted one of his park employees, Alan Glover, to kill Baskin, promising to pay him $5,000 up front and more money after the murder. Glover agreed, proposing to kill her by "cut[ting] her head off," though he testified that he never really intended on going through with it. *Id.* vol. 3C at 31.

In November 2017, Maldonado-Passage arranged for Glover to travel to Texas to get a fake ID so that Glover could book travel arrangements to Florida without revealing his identity. Despite their initial agreement, Maldonado-Passage paid Glover only $3,000 up front. Before Glover departed, Maldonado-Passage took Glover's phone and gave him a new one to use along the way. The new phone contained pictures of Baskin so that Glover "wouldn't kill the wrong person." *Id.* at 47–48.

Just a few days after getting his fake ID, Glover flew from Oklahoma to Georgia under a false name and then drove to South Carolina. After a few weeks there, he drove to Florida. He testified that he had planned on visiting Baskin to tell her about Maldonado-Passage's "serious" intentions to have her killed. *Id.* at 51. But he got no further than partying on Florida beaches. Glover suspected that Maldonado-Passage knew he hadn't committed the murder in light of his inaction and the lack of news coverage of Baskin's murder. Glover waited several months before returning to Oklahoma, without so much as ever seeing Baskin.

Before Glover returned, Maldonado-Passage began communicating with a friend, James, who introduced him to a man named Mark. Unbeknown to Maldonado-Passage, Mark was an undercover FBI agent. In December 2017, just one month after

Glover left for Florida, Maldonado-Passage and Mark discussed a plan to murder Baskin. Days later, Maldonado-Passage offered to pay Mark a $5,000 down payment for murdering Baskin and $5,000 more after the killing. At Mark's request, Maldonado-Passage agreed to get a pistol at a flea market to use for the murder. By February 2018, Maldonado-Passage had told James that he believed Glover had absconded with his money. And by March, Maldonado-Passage was still working on getting the money to pay Mark. But despite all his efforts, Maldonado-Passage's murderous plans failed, and his actions culminated in his eventual arrest.

## II.   Procedural History

In November 2018, a federal grand jury indicted Maldonado-Passage in a twenty-one-count indictment charging nineteen counts of wildlife crimes in violation of the Endangered Species Act, 16 U.S.C. §§ 1531–1544, and the Lacey Act, 16 U.S.C. §§ 3371–3378, and, as relevant here, two counts of using interstate facilities in the commission of a murder-for-hire plot, in violation of 18 U.S.C. § 1958(a)[1] and § 2. Count 1 pertained to his use of interstate facilities to arrange for Glover to kill

---

[1] This provision subjects to criminal liability anyone who causes another to travel in interstate commerce, "or uses or causes another (including the intended victim) to use the mail or any facility of interstate . . . commerce, with intent that a murder be committed . . . as consideration for . . . anything of pecuniary value." 18 U.S.C. § 1958(a).

Baskin; and Count 2, his use of interstate facilities to arrange for Mark to do the same.

The government listed Baskin as a trial witness, so Maldonado-Passage moved to sequester her from the courtroom under Federal Rule of Evidence 615. In response, the government argued that Baskin had a right to remain in the courtroom as a crime victim under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771. The court allowed her to remain in the courtroom, rejecting Maldonado-Passage's argument that Baskin couldn't qualify as a crime victim under the CVRA absent a showing that she had suffered physical harm from his crimes.

In support of Count 1, the government offered evidence at trial of a November 7, 2017 phone call recording between Maldonado-Passage and James. During the call, the men discussed how Glover had picked up a fake ID in Texas after Maldonado-Passage had instructed him to conceal his identity while traveling to Florida to murder Baskin. In addition, the government presented testimony that the FBI had analyzed the contents of the cell phone that Maldonado-Passage had given to Glover before he left, itself a facility of interstate commerce. The cell phone, which Glover took with him to Florida, contained photos of Baskin to help Glover identify her. And Glover testified that he received a cash down payment from Maldonado-Passage to kill Baskin after Maldonado-Passage sold one of his cubs.

In support of Count 2, the government played a recorded cell phone call[2] from December 5, 2017, in which Maldonado-Passage agreed to meet with James and Mark to discuss killing Baskin. The government also played a recorded conversation that took place when Maldonado-Passage, James, and Mark met up at the Park, in which Maldonado-Passage suggested that he could get a clean pistol from a flea market for Mark to commit the murder. Maldonado-Passage also suggested the best place to do it—on the bike path that Baskin took to work. When Mark agreed to commit the murder for $10,000, Maldonado-Passage said that he'd "get James the money," in part, by selling "a bunch of tigers." Appellant's App. vol. 3D at 183–84.

The jury convicted Maldonado-Passage on all counts. The district court sentenced him to 264 months' imprisonment, based on an advisory Guideline range of 262 to 327 months. In doing so, the court adopted the recommendations in the Presentence Investigation Report, including its recommendation against grouping the two murder-for-hire convictions under § 3D1.2(b) of the Guidelines.[3] On that point, the court reasoned that Maldonado-Passage had engaged in "two distinctly separate courses of conduct devising two separate plots [for] murder." R. vol. 3 at 1141. This appeal followed, and we have jurisdiction under 28 U.S.C. § 1291.

---

[2] The trial judge instructed the jury that the cell phone Maldonado-Passage was using for this call was a "facility of interstate commerce" in itself. Appellant's App. vol. 1B at 51.

[3] We agree with the parties that § 3D1.2(b) is the only applicable subsection.

## DISCUSSION

### I.  Sequestering a Witness

"We review for abuse of discretion a district court's sequestration decisions."
*U.S. ex rel. Bahrani v. ConAgra, Inc.*, 624 F.3d 1275, 1296 (10th Cir. 2010) (citation
omitted). But because a district court would "necessarily abuse its discretion if it
based its ruling on an erroneous view of the law," "we review subsidiary legal
questions de novo." *Johnson v. Spencer*, 950 F.3d 680, 701 (10th Cir. 2020)
(citations omitted).

Federal Rule of Evidence 615 includes this general rule: "At a party's request,
the court must order witnesses excluded so that they cannot hear other witnesses'
testimony." "But this rule does not authorize excluding . . . (d) a person authorized by
statute to be present." *Id.* One such statute is the CVRA, which grants crime victims
"[t]he right not to be excluded from any such public court proceeding, unless the
court, after receiving clear and convincing evidence, determines that testimony by the
victim would be materially altered if the victim heard other testimony at that
proceeding." 18 U.S.C. § 3771(a)(3). The CVRA defines a crime victim as "a person
directly and proximately harmed as a result of the commission of a Federal offense."
*Id.* § 3771(e)(2)(A).

Whether Baskin qualifies as a crime victim under the CVRA depends on
whether Maldonado-Passage's commission of the crimes "directly and proximately
harmed" her. *Id.* Maldonado-Passage urges us to interpret this as requiring *physical*
harm. And because "[i]t is undisputed that Baskin suffered no physical harm," he

9

contends that she can't qualify as a "victim" under the CVRA. Appellant's Opening Br. at 10. The district court disagreed; by allowing Baskin to remain in the courtroom, the district court necessarily determined that physical harm isn't a prerequisite, since all agree that she suffered no physical harm. We conclude the same.

Beginning with the text, § 3771(e)(2)(A) doesn't require *physical* harm. And Maldonado-Passage can't simply read that condition into the statute. We have reasoned that "this mode of statutory interpretation—which effectively adds words to the statute—is generally impermissible, and it is so here." *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 810 (10th Cir. 2020) (citations omitted), *cert. denied*, No. 20-1357, 2021 WL 2637869 (U.S. June 28, 2021).

What's more, we haven't required physical harm for a person to be a "victim" under the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A. *See, e.g.*, *United States v. Gallant*, 537 F.3d 1202, 1247–49 (10th Cir. 2008) (applying victim status under the MVRA to a person who had incurred expenses because of defendants' crime). This matters because "[t]he definition of 'victim' in the [MVRA and in the CVRA] . . . is virtually identical." *United States v. Speakman*, 594 F.3d 1165, 1171 n.3 (10th Cir. 2010) (citations omitted).[4] Accordingly, we hold that when

---

[4] The MVRA defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2).

10

a defendant's commission of a crime results in emotional or pecuniary harm, the harmed person qualifies as a crime victim under the CVRA.[5]

Here, Maldonado-Passage's commission of the murder-for-hire crimes directly and proximately caused Baskin's harms. After learning of Maldonado-Passage's original plan to kill her, Baskin "stepped . . . up" her security precautions, which already included carrying a firearm, installing security cameras at her home and business, installing blinds, and hiring security for her events. Appellant's App. vol. 3B at 92–93, 105–06. For a time, she even avoided going out in public. Later, she started taking different routes to work, leaving at different times, to avoid being seen. She testified that she "s[aw] every bystander as a potential threat" and never felt safe. *Id.* vol. 3D at 263. In short, because Maldonado-Passage's plan to have Baskin murdered was both the but-for and proximate cause of these emotional and pecuniary injuries, the district court acted within its discretion in allowing Baskin to stay in the courtroom as a crime victim under the CVRA.

## II.   Grouping the Two Murder-for-Hire Counts of Conviction

Maldonado-Passage argues that the district court erred by not grouping Counts 1 and 2 as "closely related counts" under § 3D1.2(b) of the Guidelines. Had the district court grouped the two counts, Maldonado-Passage's total offense level would have been 37. But not grouping the two counts led to an additional two offense levels, for a total of 39. *See* U.S.S.G. § 3D1.4(a). This increased his advisory

---

[5] Maldonado-Passage hasn't contested that Baskin suffered emotional or pecuniary harm.

Guidelines range from 210 to 262 months to 262 to 327 months.[6] We agree with Maldonado-Passage that the district court should have grouped the two counts.

"[W]hen reviewing a district court's application of the Sentencing Guidelines, we review legal questions *de novo* and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Wolfe*, 435 F.3d 1289, 1295 (10th Cir. 2006) (citation omitted). "Ultimately, our task in interpreting the Guidelines is to determine the intent of the Sentencing Commission." *United States v. Thomas*, 939 F.3d 1121, 1123 (10th Cir. 2019) (quoting *United States v. Rivera-Oros*, 590 F.3d 1123, 1129 (10th Cir. 2009)). In doing so, we apply "traditional techniques of statutory construction." *Id.* (citation omitted). Generally, "we interpret a word or phrase in a statute or the guidelines in accordance with its ordinary, everyday meaning." *Id.* (citations omitted). And we review de novo the district court's interpretation of the Sentencing Guidelines. *United States v. Maltais*, 961 F.2d 1485, 1486 (10th Cir. 1992) (first citing *United*

---

[6] The Sentencing Commission was mindful that the grouping rules could in unusual circumstances provide inadequate or excessive sentencing adjustments. U.S.S.G. § 3D1.4 cmt. background. In this regard, it spoke to a district court's latitude to depart from the guideline range to reach the proper sentence. *Id.* In the advisory-guideline regime post-*United States v. Booker*, 543 U.S. 220 (2005), courts can vary from the applicable sentencing range in accordance with 18 U.S.C. § 3553(a). Thus, the grouping decision may be less important than it was during the mandatory-guidelines regime.

*States v. Norman*, 951 F.2d 1182, 1184 (10th Cir. 1991); then citing *United States v. Agbai*, 930 F.2d 1447, 1448 (10th Cir. 1991)).[7]

Under § 3D1.2(b) of the Guidelines, courts must group counts as involving "substantially the same harm" if three conditions are met: (1) the counts involve the same victim; (2) the counts involve two or more acts or transactions; and (3) the acts or transactions are connected by a "common criminal objective."[8] The parties agree that the first two conditions are met. Thus, the grouping decision depends on whether the acts or transactions underlying the two murder-for-hire counts were connected by a "common criminal objective"—making them "closely related counts." U.S.S.G. § 3D1.2.

This decision is as straightforward as § 3D1.2(b)'s "common criminal objective" language is plain. An object is "something sought to be attained or accomplished; an end, goal, or purpose." *Object*, Black's Law Dictionary (11th ed.

---

[7] Within the context of grouping decisions under § 3D1.2, some other circuits have done the same. *See, e.g.*, *United States v. Vasquez*, 389 F.3d 65, 77 (2d Cir. 2004) (applying de novo review in assessing "whether grouping of offenses involving the same [victim] on different days [was] appropriate" under § 3D1.2); *United States v. Toler*, 901 F.2d 399, 402 (4th Cir. 1990) ("Since this issue [of grouping under § 3D1.2] involves a legal interpretation of guidelines terminology and the application of that terminology to a particular set of facts, we review de novo." (citation omitted)).

[8] Section 3D1.2(b) also provides an alternate route to grouping when (1) the counts involve the same victim; (2) the counts involve two or more acts or transactions; and (3) the acts or transactions constitute part of a "common scheme or plan." Because we conclude that Maldonado-Passage's two murder-for-hire counts group as part of a "common criminal objective," we do not consider whether the underlying acts or transactions of the two counts constitute part of a "common scheme or plan." *Id.*

2019). "Criminal" is something "[o]f, relating to, or involving a crime." Black's Law Dictionary, *supra*, *Criminal*. And "in common," means "[s]hared equally." Black's Law Dictionary, *supra*, *In Common*. Here, Maldonado-Passage hired two different hitmen on two different occasions, though his "end, goal, or purpose," was the same. Thus, the acts or transactions of the two counts shared a common criminal objective—Baskin's murder. Otherwise stated, the charged uses of interstate-commerce facilities shared the same criminal objective. Accordingly, by the plain text of § 3B1.2(b) itself, the district court erred by not grouping the two murder-for-hire counts.

Section 3D1.2 also states that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. § 3D1.2. The commentary explains that counts "represent[ing] essentially one composite harm to the same victim are to be grouped." *Id.* at cmt. n.4. At oral argument, the government asserted an uncertain belief that Baskin knew about the second murder plot, trying to establish that Baskin had experienced separate fear from each plot. But we see nothing in the record to support such an assertion.

The Guidelines examples do not undermine the plain meaning of "common criminal objective." At oral argument, the government suggested that Maldonado-Passage's murder-for-hire plots correspond to the rape and assault examples given in the commentary to § 3D1.2(b) as improper for grouping. For instance, the commentary provides that grouping is inappropriate if a defendant is convicted of "two counts of assault on a federal officer for shooting at the officer on two separate

14

days" or if a defendant is convicted of "two counts of rape for raping the same person

on different days." *Id.* § 3D1.2 cmt. nn.3–4. But these examples—involving two

separate instances of rape or assault to the same victim—differ from our situation.

Here, Baskin was neither murdered multiple times nor assaulted multiple times

during attempted murders. Her harm was one sustained, ongoing harm. She learned

that Maldonado-Passage intended to have her killed and lived with that fear. None of

the Application Note 4 examples, which specifically address § 3D1.2(b), speak to this

case's situation—successive plans to achieve the same criminal end. *See id.* § 3D1.2

cmt. n.4. Unlike the robbery victim mentioned in Note 4, in which a defendant robs

the same victim on different occasions, Baskin did not sustain "multiple, separate

instances of fear and risk of harm." *Id.* So the district court erred in finding that

Baskin had suffered individual harms—not a "composite harm"—from the two

murder plots. *Id.*; Appellant's App. vol. 3D at 246.

Moreover, the district court didn't specifically interpret the legal meaning of

the controlling § 3D1.2(b) text—that is, "connected by a common criminal

15

objective."[9] Instead, the court leaned on Application Note 4's language that "counts that are part of *a single course of conduct* with a single criminal objective and represent essentially one composite harm to the same victim are to be grouped together, even if they constitute legally distinct offenses occurring at different times." U.S.S.G. § 3D1.2 cmt. n.4 (emphasis added). Focusing on this language, the district court sided with the government: "[W]hile I do agree it was a close call, I do not believe that this was a single course of conduct as contemplated in the application notes of Section 3D1.2(b)." Appellant's App. vol. 3D at 247.

The district court reasoned that though a "broad, cursory view" of the two murder-for-hire plots pointed to a common criminal objective of murdering Baskin, the specific facts underlying the two plans diverged, making grouping inappropriate. *Id.* at 246. The court further noted that though "generally speaking," the two counts involved a common criminal objective to have Baskin murdered, Maldonado-Passage's acts related to "two distinctly separate courses of conduct devising two

---

[9] The district court's error in not interpreting and enforcing the plain text of "common criminal objective" distinguishes this case from *United States v. Patton*, 927 F.3d 1087 (10th Cir. 2019). In that case, the district court did interpret the Guidelines text at issue—"immediate flight," as used in U.S.S.G. § 3A1.2(c)(1). *Id.* at 1101–02. And we agreed with the district court's interpretation of that term. *Id.* at 1102. After that, we gave due deference to the district court's application of the Guidelines, reviewing for clear error in view of the fact-intensive inquiry needed to resolve "immediate flight." *Id.* at 1102–03. Though we acknowledge that "the standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work," *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018), because the district court here failed to engage in the proper legal analysis, we must address the underlying legal question.

separate plots to murder the same victim." *Id.* The court found separate courses of

conduct on grounds that the two counts involved separate hitmen, separate murder

plans, and separate timelines.[10] Thus, the court focused on the means, not the ends, of

Baskin's planned murder, not whether the acts underlying the two counts were

connected by a common criminal objective.

The district court's approach conflicts with our precedent. In *United States v.*

*Norman*, James Norman anonymously called an airline to report that a man aboard its

flight was carrying a handgun and explosives. 951 F.2d at 1183. But before law-

enforcement officers could respond, the airplane had landed, and its passengers

dispersed. *Id.* So two days later, Norman called the airline again, this time reporting

that the same man had boarded another of its flights carrying explosives. *Id.* Though

the man had not in fact boarded that flight, officers located him after he boarded

another flight and removed him from the airplane in handcuffs. *Id.* As it turned out,

Norman was lying to cause trouble for the man dating Norman's ex-wife. *Id.* at

1183–84. Norman confessed to his crimes and pleaded guilty to two counts based on

the two calls. *Id.*

After the district court declined to group the two resulting counts for

threatening communications, this court reversed. *Id.* at 1186. We noted that though

---

[10] The "single course of conduct" condition mentioned in Application Note 4 ties more naturally to § 3D1.2(b)'s second alternative—"constituting part of a common scheme or plan," than it does to that Guideline's first alternative— "connected by a common criminal objective." After all, a defendant who fails to achieve a criminal end may later try again with an unrelated course of conduct.

Norman had placed the two calls on separate days, his crimes were still "connected to his criminal objective of bringing harm to [his ex-wife's suitor]." *Id.* at 1185. We concluded that "there was only one course of conduct (making false reports to [the airline]), only one criminal objective (to harm [this man]), and only one composite harm to one victim (subjecting [this man] to arrest)." *Id.* at 1186. The similarities in *Norman* to Maldonado-Passage's case are obvious.

In the district court, the parties didn't raise *Norman*. Unsurprisingly then, the court didn't include *Norman* in its oral ruling declining to group the two counts. But on appeal, Maldonado-Passage raised *Norman* and relied primarily on that case at oral argument to support grouping. The government responded by trying to distinguish the case. In doing so, the government pointed out that in *Norman*, this court had to analyze the facts in the first instance because the district court had applied an inappropriate substantive-offense guideline. In other words, the government argued that unlike in the present case, the district court in *Norman* had not found the operative facts, meaning that this court had no fact findings requiring deference. But this gives the government no lifeline; in *Norman* and in this case, the underlying facts of the crime were undisputed.

Despite this, the government maintains that we should defer to what it describes as the district court's factual findings. The government argues that the district court determined as a fact that Maldonado-Passage had engaged in two distinctly separate "courses of conduct," which it contends is a question best left to the district courts on institutional grounds. Appellant's App. vol. 3D at 246.

18

For support, the government relies on *United States v. Garcia*, 946 F.3d 1191 (10th Cir. 2020). In *Garcia*, this court considered U.S.S.G. § 1B1.3(a)(2) which instructs that for "'offenses of a character for which [Guidelines] § 3D1.2(d) would require grouping of multiple counts,' relevant conduct includes 'all acts or omissions . . . that were part of the *same course of conduct* . . . as the offense of conviction.'" *Id.* at 1202–03 (alterations and ellipses in original) (citing U.S.S.G. § 1B1.3(a)(2)). We determined that under that provision, the same-course-of-conduct standard was a fact question, reviewed for clear error. *Id.* at 1203 (citations omitted). On this point, the government argues that we too must apply deference to the district court's factual determination that Maldonado-Passage's conduct amounted to two separate "courses of conduct."

Though "course of conduct" raises a fact question in the context of "relevant conduct" for sentencing under § 1B1.3(a)(2), *see, e.g.*, *id.* at 1202–03 (citations omitted), we conclude for a variety of reasons that § 3D1.2(b) presents a different situation.

First, as previously mentioned, § 3D1.2(b)'s text—not its commentary—controls. And that language requires that the acts underlying the two counts be connected by a "common criminal objective." The application note's use of "same course of conduct" must yield to the Guidelines' "common criminal objective" language—not the other way around. Though the text of § 1B1.3(a)(2) itself includes the term "course of conduct," § 3D1.2(b) does not.

19

Second, even in a § 1B1.3(a)(2) case (*i.e.*, *Garcia*), a court can't ignore that subsection's underlying framework—which in measuring "course of conduct" requires consideration of the "degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3 cmt. n.5(B)(ii). A legal error in misconstruing that framework would not be a fact finding.

Third, even assuming that § 1B1.3(a)(2)'s "course of conduct" meaning transports to § 3D1.2(b), a question we do not decide, the district court here didn't apply § 1B1.3(a)(2)'s course-of-conduct factors or explain how they might result in Maldonado-Passage's two murder-for-hire counts not being part of the same course of conduct. And in reviewing § 1B1.3(a)(2)'s three factors, we note that Maldonado-Passage's two counts meet those factors—his two murder-for-hire plots were similar, regular, and almost contemporaneous. *See id.*

Fourth, the purpose of the "course of conduct" language in § 3D1.2(b) differs from that of § 1B1.3(a)(2). Under § 1B1.3(a)(2), the course-of-conduct term *includes* for Guidelines offense-level calculations uncharged conduct that would have grouped under § 3D1.2(d) if charged and convicted. *See* U.S.S.G. § 1B1.3 cmt. n.5(A). The commentary to § 1B1.3(a)(2) provides as an example a defendant who engages in three drug sales of 10, 15, and 20 grams of cocaine "as part of the same course of conduct or common scheme or plan." *Id.* Under subsection (a)(2), even if the defendant is convicted of just one count resulting from a single drug sale, the total

quantity of drugs (45 grams) is used to determine the defendant's offense level if proved by a preponderance at sentencing. *Id.*

Yet under § 3D1.2(b), grouping *excludes* even convicted conduct for sentencing purposes. Considering the previous example, if the defendant were convicted of all three drug sales, a court would nonetheless group all charges for sentencing purposes if the counts were "part of a single course of conduct with a single criminal objective." U.S.S.G. § 3D1.2 cmt. n.4. Thus, a defendant fears a same-course-of-conduct finding for relevant-conduct purposes but cheers a same-course-of-conduct finding for grouping purposes. For all these reasons, we cannot analogize *Garcia* to § 3D1.2(b)'s realm.

Beyond this, the government's argument rests primarily on just one case, *United States v. Scott*, 145 F.3d 878 (7th Cir. 1998). There, Ms. Scott hired a hitman to kill her lover, but the plan failed when the hitman was arrested on his way to commit the murder. *Id.* at 881. While in jail, the hitman tried to get a cellmate to finish the job. *Id.* But Ms. Scott didn't need the help—she hired a second hitman by herself. *Id.* at 882. Fortunately for the victim, this second hitman wasn't so depraved as the first—he warned the target of the murder plan. *Id.*

At sentencing, then under the pre-*Booker*, mandatory-guidelines regime, the district court grouped the two murder-for-hire counts of conviction, but departed upward on grounds that the case was "atypical and outside the 'heartland' of cases considered by the Commission in formulating the grouping rule under U.S.S.G. § 3D1.2(b)." *Id.* at 883. Ms. Scott appealed the district court's upward departure, but

21

the government didn't cross-appeal the unfavorable grouping decision. *Id.* In affirming the upward departure, the Seventh Circuit noted that the defendant's two murder plots had been independent of each other and had been concurrently viable. *Id.* at 887. On the latter point, the court noted that "[t]he separate transactions enhanced the risk of harm" because the likelihood of the victim's death "increased twofold." *Id.*

*Scott* is unhelpful for the government. First, the district court in *Scott did* group the counts, and the Seventh Circuit didn't even consider, let alone reverse, that grouping on appeal. *Id.* at 883. So all of *Scott*'s language bearing on the grouping issue is dicta. Second, if anything, the Seventh Circuit appears to support the district court's decision to group the two counts. *See id.* at 887 n.3 ("Scott's case involves a departure from U.S.S.G. § 3D1.2(b), the guideline that requires forming a single group from different criminal offenses, in this case multiple violations of 18 U.S.C. § 1958."). In any event, we determine that *Norman* controls.

Accordingly, the two counts must be grouped under § 3D1.2(b).

## CONCLUSION

For the foregoing reasons, we affirm Maldonado-Passage's conviction but vacate the sentence and remand for resentencing.

22

**20-6010 –United States v. Maldonado-Passage**

**HARTZ, J**., Circuit Judge, concurring

I concur in the judgment and join the majority opinion through Part I of the Discussion section.  I write separately because I fear that some dicta in the opinion could be read as conflating "interpreting the guidelines" with "applying the guidelines to settled facts."

I agree with the majority that the district court erred by not grouping Counts 1 and 2.  Although the district court apparently thought that the two murder-for-hire plots shared a common criminal objective, it mistakenly (although quite understandably) thought that grouping would not be proper unless they were also part of the same course of conduct.  This error in interpreting the guidelines requires reversal.  That was all the majority opinion needed to say.  (I also agree that a district court determining whether the defendant had engaged in a "course of conduct" under USSG § 1B1.3 would be guilty of misinterpreting the guidelines if it did not consider "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses," USSG § 1B1.3 cmt. n.5(B)(ii), although that is irrelevant to our holding in this case.)

What concerns me is that the opinion could be read as saying that applying the guidelines to the facts of the particular case constitutes interpretation of the guidelines, at least when the historical facts are settled.  That would be contrary to settled circuit precedent and the federal statute that ostensibly governs the matter.  As noted by the majority opinion, we have said:  "[W]hen reviewing a district court's application of the

Sentencing Guidelines, we review legal questions *de novo* and we review any factual findings for clear error, *giving due deference to the district court's application of the guidelines to the facts*."  *United States v. Wolfe*, 435 F.3d 1289, 1295 (10th Cir. 2006) (emphasis added) (citation omitted).  This language derives from 18 U.S.C. § 3742(e), which states in pertinent part:  "The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and . . . *shall give due deference to the district court's application of the guidelines to the facts*." (emphasis added).  *See United States v. Brown*, 314 F.3d 1216, 1222 (10th Cir. 2003) (citing § 3742(e) in support of standard of review).[1]

Implicit in the language of both *Wolfe* and the statute is that there is more to applying the guidelines to a defendant than just making a legal interpretation of the guidelines (which we review de novo) and making findings of the historical facts (which we review for clear error).  There is still the business of making a "factual inference from undisputed basic facts." *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v.*

---

[1]  Although the Supreme Court stated in *United States v. Booker*, 543 U.S. 220, 259 (2005), that to render the Guidelines statute constitutional it "must sever and excise . . . the [statutory] provision that sets forth standards of review on appeal, including *de novo* review of departures from the applicable Guidelines range, *see* § 3742(e)," the Court has since then debated the interpretation of § 3742(e) and stated that it "take[s] no position on the extent to which [*Booker*] excised" that subsection beyond that subsection's requirement of de novo review of departures, *Greenlaw v. United States*, 554 U.S. 237, 252 n.7 (2008).  In any event, this court has continued to apply the same standard of review after *Booker*; and even in the absence of § 3742(e), our standard of review is in accord with general law, *see U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge*, LLC, 138 S. Ct. 960 (2018).

*Vill. at Lakeridge*, LLC, 138 S. Ct. 960, 968 (2018) (brackets and internal quotation marks omitted).  An example of such a factual inference would be a determination, made after the historical facts are resolved, whether a defendant's two crimes shared a "common criminal objective" or were part of the same "course of conduct."  Sometimes the district court could reasonably draw only one inference, such as the inference of a common objective in the case before us.  But the question may be more debatable if the two crimes were assaults, depending on how close they were in time, etc.  In both circumstances, we must give due deference to the decision of the district court, although that deference does not forbid us from reversing.  Our review is not de novo, as it would be if we were reviewing a district court's interpretation of the guideline.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                                    Jane K. Castro
Clerk of Court                                                      Chief Deputy Clerk

July 14, 2021

Brandon Sample
Brandon Sample Law Office
P.O. Box 250
Rutland, VT 05702

**RE:**      **20-6010, United States v. Maldonado-Passage**
             Dist/Ag docket: 5:18-CR-00227-SLP-1

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has
entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days
after entry of judgment. Please note, however, that if the appeal is a civil case in which the
United States or its officer or agency is a party, any petition for rehearing must be filed
within 45 days after entry of judgment. Parties should consult both the Federal Rules and
local rules of this court with regard to applicable standards and requirements. In particular,
petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is
permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35
and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:      Steven W. Creager
         Amanda L. Maxfield Green

CMW/mlb