1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF OKLAHOMA

3

UNITED STATES OF AMERICA,          )
4                                   )
                                    )
5              Plaintiff,           )
                                    )
6     vs.                           )      CASE NO. CR-18-227-SLP
                                    )
7                                   )
                                    )
8     JOSEPH MALDONADO-PASSAGE,     )
                                    )
9                                   )
                                    )
10             Defendant.           )

11

12                    *  *  *  *  *  *

13          TRANSCRIPT OF SENTENCING PROCEEDINGS

14          BEFORE THE HONORABLE SCOTT L. PALK

15             UNITED STATES DISTRICT JUDGE

16                  JANUARY 22, 2020

17                 *  *  *  *  *  *  *

18

19

20

21

22

23

24

25    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription.

1

**APPEARANCES**

2        Ms. Amanda Maxfield-Green and Mr. Charles Brown, Assistant
United States Attorneys, U.S. Attorney's Office, 210 West Park
3   Avenue, Suite 400, Oklahoma City, Oklahoma 73102, appearing for
the United States of America.

4
         Mr. William Earley and Mr. Kyle Wackenheim, Assistant United
5   States Public Defenders, 215 Dean A. McGee, Suite 124, Oklahoma
City, Oklahoma 73102, appearing for the defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Proceedings held on January 22, 2020.)

2          THE COURT:  This is the case of United States vs.

3     Joseph Maldonado-Passage, Case No. CR-18-227.  Comes on for

4     sentencing pursuant to guilty verdicts returned by a jury on

5     April 2nd, 2019.

6        Parties could please make their appearances for the record.

7          MS. MAXFIELD-GREEN:  Amanda Green and Charles Brown for

8     the United States.  We're accompanied by paralegal Jane

9     Eagleston, FBI Special Agent Andy Farabow, and U.S. Fish &

10    Wildlife Special Agent Matt Bryant.

11         THE COURT:  Good morning.

12         MR. EARLEY:  William Earley and Kyle Wackenheim for

13    Mr. Maldonado-Passage, and he's present, Your Honor.

14         THE COURT:  Morning.

15       Let me first ask, has the government complied with any

16    notifications as required by the relevant victim notification

17    statutes?

18         MS. MAXFIELD-GREEN:  We have, Your Honor.

19         THE COURT:  And, Counsel, is it your intent at some

20    point this morning to present any victim impact statement?

21         MS. MAXFIELD-GREEN:  Yes, Your Honor.  Ms. Baskin is

22    present in the courtroom and she wishes to speak.

23         THE COURT:  Don't let me overlook that, Counsel,

24    whenever the -- I'm not exactly sure when the -- a logical time

25    is to do that, but please don't let me overlook that.

1    I have reviewed the final presentence investigation report.

2  That was Document 121 filed October 1st, 2019.  That is in

3  addition to a final revised presentence investigation report,

4  Document 126, filed November 8th, 2019.  Also reviewed a

5  sentencing memorandum filed by the defendant which includes, I

6  believe, ten attached letters of support.  That's Document 124

7  filed October 22nd, 2019.  And a supplemental sentencing

8  memorandum filed by the defendant filed December 3rd of 2019

9  after the filing of the revised PSR.  And I have also reviewed

10  the government's response to the defendant's sentencing memoranda

11  filed December 16th of 2019.

12    Let me first ask defense counsel, have you and your client

13  had an opportunity to review and discuss the presentence reports,

14  including any addenda or revisions that may have been made since

15  the initial disclosure?

16        MR. EARLEY:  We have.

17        THE COURT:  And counsel for the government, have you

18  had the opportunity to review those materials as well?

19        MS. MAXFIELD-GREEN:  We have, Your Honor.

20        THE COURT:  There are a number of objections to the

21  presentence report.  Let me first inquire of the government, are

22  each of those objections still at issue?

23        MS. MAXFIELD-GREEN:  Yes, Your Honor, from the

24  government's side.

25        THE COURT:  And while I will certainly recognize both

1  parties for argument as to the objections, does the government

2  intend to call any witnesses or make any proffers either in

3  support of or in opposition to the defendant's objections?

4      MS. MAXFIELD-GREEN:  We do not, Your Honor.  The

5  government's position has been fully briefed, both in the PSR

6  objections and the sentencing -- the response to the sentencing

7  memorandum.

8      THE COURT:  Thank you, Counsel.

9      Same questions as to the defendant, Mr. Earley, are each of

10  your objections still at issue?

11      MR. EARLEY:  Yes, Your Honor.

12      THE COURT:  And does the defendant intend to call any

13  witnesses or make any proffers either in support of or in

14  opposition to the government's objections?

15      MR. EARLEY:  Your Honor, I think with -- as far as the

16  government's objections, no, Your Honor.  I think that's been

17  well briefed and that's all set out in the documents that have

18  been filed.

19      With respect to one of the objections that we raised, I do

20  intend to try to introduce, anyway, some exhibits in support of

21  that.

22      THE COURT:  Very well.

23      In that case, let's do this:  Mr. Earley, I will recognize

24  you for any evidentiary matters that you want to make -- or

25  introduce in support of your objections.

1          MR. EARLEY:  Your Honor, my -- I mean, there are a --

2   there's a laundry list of objections that were made.  And I

3   would --

4          THE COURT:  And let me -- sorry to interrupt, but let

5   me -- I will certainly give you the opportunity -- both sides the

6   opportunity to argue and advocate for the objections for or

7   against at the appropriate time, but in terms of -- and I have

8   some preliminary remarks about that as well, but if you want to

9   proceed in terms of any evidence or proffers.

10         MR. EARLEY:  Okay.  Well, I think with respect to the

11  objection that I would like to introduce some exhibits on, that

12  would take us to, I believe, the objections to Paragraph 78, 84,

13  90 through 93 and 96.  That's concerning the issue of whether or

14  not Counts 1 and 2 should be grouped under the sentencing

15  guidelines.  And I have -- and I don't know if the government's

16  objecting or not, but in support of those objections I have what

17  I have marked as Defendant's Exhibits 1 through 5.

18         What they are are text messages, essentially, between

19  Mr. Garretson and Agent Bryant over a period of time commencing

20  in January of 2018 through, I believe the last one is in May

21  of 2018.  So I have these in support of my argument about whether

22  or not this is a single composite harm under the sentencing

23  guidelines grouping rules or whether these are separate harms.

24         And I guess before I start talking about the exhibits, I

25  should move to introduce them and see if the government has any

1   objection.

2        MS. MAXFIELD-GREEN:  The government has no objections.

3        THE COURT:  Okay.  Defendant's Exhibits 1 through 5

4   will be admitted.

5        MR. EARLEY:  May I approach?

6        THE COURT:  You may.

7        MR. EARLEY:  And, Your Honor, I doubt there are too

8   many people back there who are in the know about what this is all

9   about, so if I could just say some preliminary remarks.

10       The sentencing guidelines are an important component of the

11  sentencing matter before the Court today.  And there are a number

12  of calculations that are involved in the sentencing guidelines.

13  It's very clear from the Supreme Court and the Tenth Circuit

14  Court of Appeals that a properly computed sentencing guideline

15  range is sort of the starting point for the Court's sentencing

16  analysis.  So the computation of the sentencing guidelines is

17  very important.

18       What's happened in this case is that when the sentencing

19  guidelines were computed Counts 1 and 2 were considered as

20  separate groups.  And -- and the way that works under the

21  guidelines is that if there are separate groups of criminal

22  activity and they're within a certain number of levels of each

23  other, then additional offense levels are added to the total

24  offense level calculation under the sentencing guidelines.

25       So what happened in this particular case, when the probation

1    office decided that Counts 1 and 2 did not constitute a single

2    group of offenses, but instead two separate groups, when you

3    calculate the sentencing guidelines, what happens is that you get

4    two additional offense levels added to the total offense level

5    calculation.

6         It all sounds pretty technical, and it is.  But, you know,

7    we objected to the non-grouping of Counts 1 and 2.  Application

8    Note 4 to the grouping rules under Section 3D1.2 of the

9    guidelines uses a separate harms analysis.  And what that means

10   is the Court needs to determine whether each group constitutes a

11   separate harm.  Factually in this case, it simply doesn't.

12        Ms. Baskin -- and, you know, contrary to other things where

13   you may be solely looking at what's in the mind of the defendant,

14   when you're looking at the grouping rules and whether or not

15   there are separate harms involved, you're actually looking at

16   what took place in the criminal activity, or alleged criminal

17   activity.

18        So here Ms. Baskin was advised by the government of the

19   alleged murder-for-hire scheme involving Mr. Glover, and that

20   certainly -- we have heard all about that during the trial.  But

21   then the issue came along about inserting the government's own

22   agent into this, that's the Mark murder-for-hire scheme, if you

23   will, which is Count 2 of the indictment.  So what you start to

24   see when you look at this in terms of harm, whether it's separate

25   harms or a composite harm, you have to look at exactly what

1    happened in the particular case.  And this is a classic, I think,

2    example of a single composite harm.  The case for a single

3    composite harm is strengthened, I think, under these factual

4    circumstances simply because the second scheme, or Count 2, was a

5    sting operation.  And under a separate harms analysis, there has

6    to be a harm involved not only in Count 1 to a victim, but also a

7    separate harm to a victim in Count 2.

8         Well, in reality Ms. Baskin was not placed in any harm based

9    upon the allegations of Count 2.  That was an undercover

10   operation; a sting operation, if you will.  So Count 2

11   realistically, factually, and any other way you want to look at

12   it, posed absolutely no risk of harm to anyone.

13        Moreover, I think the communications between James Garretson

14   and Agent Bryant during, not only December of 2017, but January,

15   February, March, April and May of 2018 reflect

16   Mr. Maldonado-Passage's complete lack of interest in pursuing any

17   further activity with Mark, the undercover agent.  And, for

18   example -- and these are just a few examples of text messages

19   that were provided during discovery -- in Defendant's Sentencing

20   Exhibit No. 1, there was the question that came up, I think,

21   after a conversation between Mr. Garretson and

22   Mr. Maldonado-Passage about him selling the zoo.  And what you

23   see in Defendant's Exhibit 1 is Agent Garrison saying, "Well, how

24   can Joe sell the zoo if it belongs to Jeff?"  And Mr. Garretson

25   responds, "He's begging Jeff to sign off on whatever he does.

1 Jeff will not sell out to PETA."

2      You know, at the trial the Court heard

3 Mr. Maldonado-Passage's testimony about how he wanted to

4 extricate himself from the park, from the business, and

5 everything else.  You heard the testimony from the individual

6 from PETA who testified about how Mr. Maldonado-Passage was

7 providing her and donating to her animals in his attempt to

8 reduce the inventory at the park.  This is an example separate

9 and apart from Mr. Maldonado-Passage's testimony that obviously

10 occurred between these two individuals where they're discussing

11 information passed along by Mr. Maldonado-Passage about his

12 willingness to get out of this.

13      And what happened after that?  So you see this first one in

14 Defendant's Exhibit 1.  Defendant's Exhibit 2, we fast forward to

15 February and, you know, the agent is going, "Hey, you get your

16 phone?  I need recordings.  We need to be moving on Joe.  Any

17 news?  Need to make stuff go this weekend."  They're trying to

18 get Mr. Maldonado interested again in meeting up with Mark.  This

19 is February.  He doesn't bite on it.

20      Defendant's Exhibit 3, we're in March.  Near the end of

21 March.  "Hear from Joe confirming meeting?  We need to make this

22 meeting happen during the morning.  Waiting on him to call back.

23 I'll try him again."

24      March 28th, the next day, "Never heard from Joe?  No."

25      April the 10th, Defendant's Exhibit 4, "Hear anything?  Did

1    Jeff make it back?  Jeff was arriving today.  About to check with

2    Joe.  Slow play and let's make -- let him make decisions, just

3    let him know Mark will be up if he wants to see him."  Again,

4    Mr. Maldonado-Passage makes no effort to contact the undercover

5    agent.

6          Defendant's Exhibit 5, May 16th, "This is getting silly,"

7    says Agent Bryant.  "Dang, we need coms," or communications,

8    "with Joe.  Thanks for all you're doing."

9          Mr. Garretson, "Well, I'll get it."

10         Later on Agent Bryant expresses his frustration, "Crud,

11   attorneys and FBI have been asking daily about Joe.  Man, I'm

12   really trying.  I'll get it," says Mr. Garretson.  "I know you

13   are.  Just the delay in meeting is frustrating us all."

14         So here we are all the way to the end -- or middle of May

15   and still the government is insisting on trying to get

16   Mr. Maldonado-Passage to bite on this undercover scheme.

17         So my point with these exhibits and my point with the

18   references to Mr. Maldonado trying to get out of the park is that

19   while the jury apparently felt that at some point, perhaps during

20   the meeting with Mark on December the 8th, 2017, apparently they

21   may have felt that that was sufficient for this crime to have

22   been committed.  There was absolutely no followup, and there was

23   absolutely no effort on Mr. Maldonado-Passage's part to get back

24   with either Garretson or the undercover agent to try to

25   perpetuate some scheme to cause harm to Carole Baskin.

1    So when you're looking at the separate harms analysis, there
2   are no separate harms.  This was one continuous event with one
3   single goal.  And, you know, trust -- when I say these things,
4   I'm dealing with a conviction and I'm not commenting on whether
5   or not the evidence was sufficient.
6           THE COURT:  I understand.
7           MR. EARLEY:  But I think it's very clear that this was
8   a single composite harm.  And by group -- by not grouping these
9   into a single group, it would be an erroneous calculation of the
10  sentencing guidelines and the two levels that are added as a
11  result of the grouping would be error.
12      And as far as evidentiary matters, I certainly have some
13  additional argument on the cross reference to solicitation, but I
14  don't have anything other than argument on that.
15          THE COURT:  Thank you, Counsel.
16      Let me ask counsel for the government, again, the -- and I'm
17  going to permit all the argument as to the application of the
18  various guidelines, but do you have any response in terms of the
19  evidentiary piece in terms of the -- the Defendant's Exhibits 1
20  through 5?
21          MS. MAXFIELD-GREEN:  Yes, Your Honor, just briefly.
22          THE COURT:  Sure.
23          MS. MAXFIELD-GREEN:  And our response crosses over with
24  the legal analysis as well.  I believe Mr. Earley's point, he's
25  trying to argue that there are -- is essentially one harm to the

1    victim created by the two counts of the indictment of which

2    Mr. Maldonado was convicted.  But what the -- the guidance under

3    the sentencing guidelines that the Court is supposed to focus on,

4    whether there is a single course of conduct with a single

5    criminal objective.  That's the standard the note puts forth for

6    deciding whether a grouping should occur.  And I'm kind of going

7    back to where Mr. Earley started, and he seems to -- to argue

8    that the Court should focus on what the actual harm to Ms. Baskin

9    was as opposed to what was in Mr. Passage's mind when he was

10   creating the course of conduct.  And I don't think there's

11   textual support for that in the guidelines.

12        There's no requirement that the harm must be actual to the

13   victim.  And, in fact, that would -- imposing a requirement like

14   that would essentially negate all of the crimes that are

15   discovered through sting operations and the use of undercovers in

16   which the investigation has contained the harm to any particular

17   victim, or undercover drug buys, that kind of thing.

18        I think the language of Application Note 4 that focuses on a

19   single course of conduct, that, by definition, would be the

20   defendant's conduct; the single criminal objective, that is the

21   defendant's criminal objective.  And when we're -- when you

22   consider that against the facts in this case, it was Mr. Passage

23   that created two separate courses of conduct to set in play two

24   separate murder-for-hire plans, one that involved Mr. Glover and

25   one that involved the undercover -- the undercover agent.

1      And while the -- Mr. Maldonado's interaction with the

2 undercover agent did not apparently extend beyond the

3 conversation in December, it -- he still went down that course of

4 conduct.  He created a separate -- a plot.  And it wasn't one

5 continuous event, as Mr. Earley argues.  And I don't think the

6 exhibits that he put forth do anything to rebut that.

7      All through the spring of 2018, which is the course of time

8 that those text messages were taking place that related to the

9 government's attempt to determine whether Mr. Maldonado-Passage

10 was going to reach out to the undercover officer again, all

11 through that period of time Mr. Glover was still at large, if you

12 will.  He was either in South Carolina or elsewhere.  He was not

13 in Oklahoma.

14      At trial or thereafter there has been no evidence that

15 Mr. Maldonado-Passage called off Mr. Glover or told him to -- you

16 know, that -- to withdraw from the plan that they had set out in

17 November.  Mr. Glover, you know, could have continued on a course

18 of conduct.  As far as Mr. Maldonado-Passage was concerned,

19 Mr. Glover could have completed the plan at any time.  There

20 was -- there was no withdrawal from that plan.  That's one course

21 of conduct that involves Mr. Glover.

22      The other course of conduct that was set into motion in

23 December of 2017 that involved the undercover had no overlap with

24 that.  There was no communication between the undercover agent

25 and Mr. Glover.  And, in fact, during the spring of 2018 the

1    government did not know the extent of Mr. Glover's involvement.

2    As was thoroughly established at trial, the government believed

3    in November of 2017 that the Glover plot had fizzled and it was

4    only in the summer of 2018 that the government became aware that,

5    in fact, Mr. Glover had been given money and cell phones and

6    other instructions about going to Florida to complete the

7    murder-for-hire plot.

8         So I think this well meets the -- the text of Application

9    Note 4 and the sentencing guidelines that there were two courses

10   of conduct with two criminal objectives.  They might have had the

11   same victim and the same desire for the ultimate outcome, but

12   there were two courses of conduct at play.

13        Thank you, Your Honor.

14             THE COURT:  Thank you.

15             MR. WACKENHEIM:  Your Honor, may I be briefly excused

16   to attend to another matter?

17             THE COURT:  Of course, Mr. Wackenheim.  And,

18   Mr. Wackenheim, if you get it wrapped up and get completed, just

19   come right back in.  You're fine.

20             MR. WACKENHEIM:  Thank you, Your Honor.

21             THE COURT:  Any further evidence or proffers,

22   Mr. Earley, in terms the objections?

23             MR. EARLEY:  I'm --

24             THE COURT:  Not argument yet, but just in terms of

25   evidence or proffers.

1    MR. EARLEY:  You know -- let me just ask -- I did an

2  objection, Your Honor, to Paragraph 34 of the presentence report

3  where I cited some text messages in support of my objection to

4  that particular paragraph.  It really doesn't have a whole lot to

5  do with any guideline calculation or anything, but if the

6  government is challenging that, I could introduce an exhibit to

7  show those text messages.  I don't know if it's necessary or not.

8            MS. MAXFIELD-GREEN:  We have no objection.

9            MR. EARLEY:  Then I don't have any further evidence,

10  per se.

11           THE COURT:  Okay.  Thank you.

12       As I think both parties have noted, and the Court has as

13  well, that there are a significant number of objections to the

14  PSR.  They tend to fall into a few different categories.

15       The government's objections are predominantly focused on the

16  position that the PSR did not include an enhancement for

17  obstruction of justice -- that was the fastest hearing ever,

18  Mr. Wackenheim.

19           MR. WACKENHEIM:  It's been moved, Your Honor.

20           THE COURT:  Did not include an enhancement for

21  obstruction of justice, and I believe those are accompanied by

22  objections to the paragraphs with the associated offense level

23  calculations, all of which the Court will rule on.

24       As to the defendant's objections, the Court recognizes that

25  the defendant exercised his right to trial on these charges and

1  that he continues to dispute his guilt.  And as such, there are

2  objections to the report -- the reported conduct relating

3  directly to the 19 charges of conviction, which the Court will

4  rule on accordingly.

5      The defendant's also objected to the consideration of a

6  substantial amount of other conduct reported in the PSR, which a

7  number of those positions don't have any impact at all on the

8  guideline calculations.  For some of those objections, I don't

9  think any ruling is going to be necessary.  However, the Court

10  will rule on those that are either directly addressed by the

11  evidence introduced at trial and/or may have some relevance to

12  the factors considered for sentencing found in Section 3553.

13      It appears to the Court that while all the objections and

14  positions of the parties were carefully considered, those

15  objections having the most impact in driving the determination of

16  the advisory guideline range were any adjustments as a result of;

17  first, the application of an enhancement for obstruction of

18  justice; secondly, whether Counts 1 and 2 are grouped for

19  guideline purposes, as we have just heard about; third, whether

20  the base offense level is determined by Section 2E1.4 or the

21  cross-referenced section of the guideline found in Section 2A1.5;

22  fourth, the application of an enhancement for the risk of

23  infestation or disease transmission that was found in guideline

24  Section 2Q2.1(b)(2)(B); fifth, the valuation of the animals at

25  issue; and then finally, whether the wildlife counts -- and I'll

1  refer to them collectively as the "wildlife counts," the Lacey

2  Act violations and the Endangered Species Act violations --

3  whether they were adequately accounted for in the guideline

4  calculation or whether some variance is appropriate.

5      Knowing that, I would ask counsel, as we move into argument,

6  I'll permit you to argue anything you want, but in the interest

7  of efficiency, knowing that context, I would invite you to focus

8  your argument on those provisions or those objections that may

9  have some direct impact on the guideline calculation or the

10  sentencing factors identified in Section 3553.

11      With that being said, the Court will now recognize the

12  government for any argument you have as to the objections.

13      MS. MAXFIELD-GREEN:  Your Honor, the government's

14  position has been fully set forth in the objections to the PSR

15  and the response in sentencing memorandum.  We would stand on

16  that.

17      THE COURT:  Okay.  Thank you, Counsel.

18  Mr. Earley?

19      MR. EARLEY:  Your Honor, as far as the obstruction,

20  there's not a lot to add to what I have already addressed in our

21  sentencing memorandum, and certainly the Court has the testimony

22  that the government 's relying on.  And it is, in fact, going to

23  be based -- your ruling will be based on whatever testimony there

24  was at trial that either supports or doesn't support that

25  adjustment, so I don't have any further argument with respect to

1  the obstruction.

2      Briefly, just in response to Ms. Green's argument about the

3  grouping.  You know, by grouping these two counts into a single

4  group for purposes of a guideline calculation, that's not going

5  to negate any undercover sting operations or convictions based on

6  that.  What it may negate is some grouping of any particular

7  crime, but it's not going to negate criminal activity or the

8  prosecution of criminal activity.  And further, you know, I -- I

9  think Ms. Green recognizes -- my argument is that there's a

10 single group.  And given the facts of this case, that group is

11 driven by Mr. Glover.

12     So whether Mr. Glover was still out and about in the spring

13 of 2018 or not is -- is just basically support for my argument

14 that there is a single harm here, a single harm that may have

15 carried through until whenever they decided that nothing else was

16 going to happen.  So it's the only harm that was actually out

17 there.

18     There was no harm that was given or that was posed by the

19 Count 2 conduct with the undercover agent, Mark.  I mean, I would

20 just point out that under the sentencing guidelines in Note 4

21 under 3D1.2 it specifically says, "Subsection (b) provides that

22 counts that are part of a single course of conduct with a single

23 criminal objective and represent essentially one composite harm

24 to the same victim are to be grouped together."  I don't think it

25 gets any clearer than that, and I suggest that splitting these

 1  two counts and counting them as separate groups is error.

 2          THE COURT:  Mr. Earley, before you move on from the --

 3  your grouping argument, let me ask, you mentioned in your earlier

 4  argument that -- if I understood you correctly, taking the

 5  position that because of the Count 2 being the utilization of an

 6  undercover officer there was never any real actual risk of harm,

 7  and as that may apply -- or at least how that may impact the

 8  grouping analysis.  I don't recall in the briefings, but do you

 9  have any authority that addresses the -- whether or not the risk

10  of harm is real?

11          That may have been a horribly worded question, but --

12          MR. EARLEY:  No, no.  No, I understand.  And I think

13  the short answer is no.  I do know that the -- the case -- let me

14  grab my presentence report.

15          The case cited by the probation office, there was actually a

16  grouping of those two or three, or I can't remember how many

17  counts there were.  The Court actually did group those as --

18          THE COURT:  I think there were five.

19          MR. EARLEY:   -- a grouping decision under the

20  sentencing guidelines.  The purpose of the appeal in that case

21  was to determine whether the Court's departure or variance

22  upward, based upon the fact that the Court didn't feel that the

23  total harm had been taken care of by the grouping, that was the

24  issue on appeal.  So, I mean, actually, the authority provided by

25  the presentence report writer is actually supportive of our

1    position with respect to the grouping.  Well -- and, no, I don't

2    have any authority, but I think it's very clear that what we're

3    looking at is a harm analysis under the grouping rules.  And, you

4    know, I'm not saying that an undercover sting operation can be

5    negated because there's no harm, what I'm just simply saying is

6    it just doesn't fall into the grouping rules, so that's it.

7            THE COURT:  Well, I guess what I'm getting at is if you

8    hypothetically had -- and I don't want to go down the road of a

9    bunch of hypotheticals -- but multiple instances of an individual

10   engaged in conduct which for all intents and purposes are

11   separate plots to commit murder for hire separated temporally by

12   time and space, but they were all with a different undercover

13   officer, each of those occasions there would never be any real

14   risk of harm.  And if I follow your logic, those could never be

15   grouped no matter how separate they were.

16           MR. EARLEY:  Well, you might get into some issue about

17   timing that might have some impact on it, but, you know, as far

18   as the Sentencing Commission is concerned, if it is the same

19   victim then it is in the single composite harm category and

20   that's just where you end up.  I mean, you know, again, we're

21   just talking about a guideline calculation, not about whether or

22   not there's a legal basis for a charge.

23           THE COURT:  I understand.  Thank you.

24           MR. EARLEY:  With respect to the cross reference, I do

25   want to make this very clear for the record, that I believe, and

1    I have set this out in some detail in my objections to the

2    presentence report, that there are serious Fifth and Sixth

3    Amendment issues implicated by cross referencing in this case.  I

4    mean, initially for purposes of the Fifth Amendment, just due

5    process and notice.  You know, what the presentence report did in

6    this case was take the sentencing guideline calculation that is

7    applicable to an entirely different crime than that for which

8    Mr. Maldonado-Passage was convicted, they have cross referenced

9    to solicitation to commit murder -- a crime that he was not

10   charged with, a crime that he was not convicted of -- and applied

11   the sentencing guideline calculation for that crime.

12       One of the main things that just jumped out at me after I

13   first saw the cross reference was, you know, it would have been

14   nice, I guess, if we had gone to trial on a solicitation to

15   commit murder, because in that statute there's a built in

16   affirmative defense.  And the affirmative defense is that the

17   individual kind of tried to back himself out of a situation and

18   could prove that by a preponderance of the evidence.

19       Well, if you recall the testimony, whether you want to

20   believe it or not, there's other evidence to support

21   Mr. Maldonado's testimony that he was trying to back out of this

22   whole thing.  He bought into the PETA donation thing, he worked

23   with Ms. Peet to try to get out of the park, he had obviously had

24   conversations with Mr. Garretson about selling the park and

25   trying to get out from under all of this.  That would have been

1  nice had we had the opportunity to face those types of charges in

2  a jury trial.

3  　　Instead what we do, we go through that whole process and

4  then here at the end we decide -- not we, but the government and

5  the probation office decide, well, you know, what it really looks

6  like is this crime, let's not worry about what he was indicted

7  on, let's not worry about what he tried to defend against and

8  let's not worry about, you know, what the guidelines are for what

9  he was actually convicted of.  And I -- those are serious

10 constitutional issues with respect to cross referencing.

11 　　I would also add this.  You know, these things are -- are

12 not matters that go unnoticed by the courts, especially the

13 Supreme Court.  And I haul this language out every now and then

14 when an individual is before a Court being sentenced on things

15 that they were never charged with and never convicted of.

16 Usually it's in the relevant conduct type of scenario, but in

17 Gall vs. United States, 552 U.S. 38, and at Page 60, it's a 2007

18 case, Justice Scalia in a concurring opinion, said this:  "The

19 Court," meaning the Supreme Court, "has not foreclosed as-applied

20 constitutional challenges to sentences imposed under the advisory

21 guideline system based on findings of fact by a judge rather than

22 a jury.  The door, therefore, remains open for a defendant to

23 demonstrate that his sentence, whether inside or outside the

24 advisory guidelines range, would not have been upheld but for the

25 existence of a fact found by the sentencing judge and not by the

1  jury."

2      In essence what they're asking you to do, Your Honor, is to

3  forget about the indictment, forget about the trial that we had,

4  and convict this man on a separate offense, an offense that he

5  was never charged with and never found guilty of.  And I believe

6  that not only do we have the Fifth and Sixth Amendment issues

7  implicated in this cross reference, but there is an as-applied

8  challenge that is here if -- if to any extent that this Court

9  deems solicitation to commit murder has any effect on the

10  sentence that is imposed.

11      So those are my arguments with respect to the cross

12  reference and I -- I would like the record clear that those are

13  the basis for our objections.

14      As far as the adjustment under 2Q2.1(b)(2)(B) as far as the

15  infestation and disease, I don't know -- I think I covered that

16  fairly well in the addendum, the arguments that we made there.

17      The valuation, I think you could probably summarize the

18  valuation arguments as -- certainly with respect to those counts

19  of conviction, we deny that, obviously -- but that if there is

20  going to be a valuation, it should be limited only to those

21  offenses for which Mr. Maldonado-Passage was convicted, not other

22  conduct that is listed in the presentence report.

23      And then if you want me to make comments about a variance or

24  departure at this point based on the wildlife calculation and not

25  having any effect, I was going to address that a little bit

1  later, but I can now.

2          THE COURT:  Mr. Earley, my intent was to get through

3  the objections such that we can arrive at a final guideline

4  calculation, and then in the context of argument as the

5  appropriate sentence I was going to permit the parties then to

6  argue for variance at that point.

7          MR. EARLEY:  I may just save my comments on that for

8  later then.

9          THE COURT:  Okay.  I think that would be fine.

10          MR. EARLEY:  All right.

11          THE COURT:  Ms. Green, any additional response from the

12  government at this point?

13          MS. MAXFIELD-GREEN:  Yes, Your Honor.

14      Just to address Mr. Earley's argument on the use of the

15  cross reference in the guidelines, he makes reference to due

16  process and notice issues.  I don't think that impacts -- I don't

17  think that's an issue in this case in the sense that the

18  guidelines are what they are.  They're -- the notice of the

19  guidelines is within the guidelines and there was no hiding --

20  hiding behind some kind of a surprise about that.

21      Mr. Earley's comment that the government decided to use

22  2A1.5 instead of 2E1.4, the U.S. attorney's office and the

23  probation office did not decide to do that.  The United States

24  Sentencing Commission that sets forth the sentencing guidelines

25  and promulgates them requires us to use the guidelines.  The way

1  the guidelines are written, the murder for hire cross reference
2  to solicitation for murder is required if the -- if the
3  solicitation for murder guideline is higher, which in this case
4  it is.  The text of the guidelines requires its usage.  And, in
5  fact, every court that has considered the tension between 2E1.4
6  and 2A1.5 has supported using the higher guideline regardless of
7  the apparent tension between those two.
8      And Mr. Earley argues that, you know, it is somehow unfair
9  or surprising that a solicitation for murder sentencing guideline
10  is being applied when his client was tried for murder for hire.
11  Notably, the statutory maximum to which Mr. Maldonado-Passage is
12  subject did not change and does not change with the application
13  of the guidelines.  The guideline range is advisory, as you know,
14  and the murder-for-hire sentencing -- the statutory maximum is
15  ten years.  And if he had been charged with and convicted of
16  solicitation of a crime of violence, as it is known in the United
17  States Code, he could have been subject to other higher statutory
18  maximums.
19      Thank you, Your Honor.
20      THE COURT:  Thank you, Counsel.
21      Let me first turn to the government's objection, which, as I
22  had indicated, effectively all of them turn on whether the
23  defendant obstructed justice by committing perjury, that being
24  his testimony at trial.
25      The relevant guideline section, as I think all parties have

 1  agreed -- and I do want to echo, I know that both parties
 2  indicated that they stood on their briefings.  I do want to
 3  commend both counsel for the government and the defendant.  The
 4  obstruction issue was extremely well briefed, it was extremely
 5  helpful to the Court.  It is, as the parties recognize, a bit of
 6  a slippery slope on making that evaluation of the defendant's
 7  testimony at his trial while balancing the notions of obstruction
 8  pursuant to the guidelines while at the same time being careful
 9  not to invoke any type of pejorative considered a trial penalty,
10  or chilling effect, and those are extremely important
11  considerations.
12       The relevant guideline section is found at Section 3C1.1.
13  The government correctly argues that Application Note 4 of this
14  section provides examples of obstruction which include, by all
15  accounts, committing perjury.  And in Application Note 2, which
16  guides the Court to be cognizant that inaccurate testimony or
17  statements sometimes may result from confusion, mistake or faulty
18  memory.
19       In order for the obstruction enhancement to apply in this
20  case, the Court must find that the defendant's testimony was
21  false, material, and intended to effect the outcome of the trial
22  as well as make any specific findings of each of those instances
23  of testimony that the Court finds rises to the level of perjury.
24  Certainly the jury rejected the defendant's claims of innocence.
25  That being said, as pointed out by the defendant, the findings of

1    guilt in spite of the defendant's testimony are not conclusive of

2    a determination of perjury.  Those are not mutually exclusive.

3    In a number of instances of testimony cited by the government, as

4    argued by the defendant, it is plausible the jury could have

5    accepted all or part of the defendant's testimony while still

6    finding him criminally responsible.  Of that, I think there is no

7    doubt.  The Court would agree that the convictions are not on

8    their face findings that the defendant's testimony was perjury.

9         Moving to the next steps of the analysis, the Court has

10   reviewed each of the numerous excerpts of the defendant's

11   testimony the government sites in support of the obstruction

12   enhancement.  And it is -- it is clear to the Court that the

13   evidence in this case supports the notion that the defendant

14   relied on a variety of word games in his testimony, deflected

15   blame, and attempted to create plausible deniability for his

16   criminal conduct.  But in the Court's view, with the caveat that

17   the Court certainly does not make any declaration that the

18   defendant's testimony was truthful, the Court does stop short of

19   making a finding that the testimony was, in fact, perjury.

20        The Court does note that while not finding the enhancement

21   for obstruction to justice will apply in this case, any issues of

22   credibility with the defendant's testimony could be taken into

23   consideration in the context of Section 3553 sentencing factors.

24        That being said, the objection to the absence of an

25   enhancement for obstruction of justice is overruled.

1      The associated calculation objections will, likewise, be

2  overruled in accordance.  There is also an objection by the

3  government to Paragraph 163, and that's in the factors that

4  warrant variance.  The guideline range, at least according to

5  163, is not particularly affected by the wildlife violations.

6  The sentencing guideline range is basically driven by the two

7  counts of use of the communication facility of murder for hire.

8      The government supports consideration of a variety of

9  variance factors to include the evidence of the defendant

10  attempting to broker the sale of a litter of lions from jail.

11  The defendant has weighed in as to Paragraph 163 as well, but

12  again, as it has no impact on the advisory guideline range, the

13  Court will address any variance based on this section at the

14  appropriate time.

15      Moving to the objections of the defendant, the initial

16  objections were to Paragraphs 14 through 63, which were general

17  objections to preserve the record noting that the defendant

18  maintains his innocence.  It is, in the Court's view, not

19  necessary to rule collectively on those objections.  I'll rule on

20  the specific objections as necessary, but in terms of the general

21  objection, I don't believe a ruling is necessary.

22      Paragraph 15, which was general background and describing a

23  number of the videos, the defendant objects to the

24  characterization of these videos as threatening and then requests

25  addition of some additional information in that paragraph

1   contained in the objection, which I won't read, but that

2   objection is overruled.  The videos and other social media were,

3   in the Court's view, threatening by any objective standard.  I do

4   take note of the suggested language in the objection and will

5   consider that as well.

6          Paragraph 18 and Paragraph 19, both objections in regard to

7   some video broadcasts, the defendant objects and wants to point

8   out that the doll that was used in the -- it would have been used

9   in other skits.  Those appear to be not actually objections to

10  the paragraph but the submission of some additional information

11  or language.  No ruling is necessary in that regard.  It has no

12  guideline impact.  The additional remark is noted, but I think of

13  limited relevance.

14         Same thing as to Paragraph 23, the defendant objects and

15  submits some additional information that that casket had been

16  used in a number of other videos and productions unrelated to

17  Ms. Baskin.  As to the previous objection, it's not necessarily

18  an objection to the inclusion of the information, but a

19  submission of additional information, and as such no ruling is

20  necessary and it has no guideline impact.

21         There were objections to -- by the defendant to Paragraphs

22  24, 24A and 26, all having to do with a variety of whether chats

23  or social media posts and the defendant objects and denies being

24  the author of those posts and points out it was not possible to

25  participate in a chat while doing a live show, further suggests

1  a -- my word will be "alibi," but anyway, an explanation that he
2  was on his honeymoon around the time of the September 11th post.
3  That objection will be overruled.  Although it has no guideline
4  impact, there's not enough evidence before the Court to make a
5  conclusive determination of who the author of these postings was.
6  But I do note that these postings are consistent with the
7  defendant's conflict with the victim in this case and other
8  remarks attributed to him on social media by direct witnesses who
9  testified at trial.
10      In terms of his suggestion that he could not have made the
11  September 11th post because of being gone on his honeymoon, the
12  Court notes that he does not say he was gone on September 11th,
13  only that he was on his honeymoon, and to quote the objection,
14  "around the time."  It's further notable that unless he was in a
15  location where he did not have Internet access, he certainly
16  could have posted that despite being out of town.  So that
17  objection will be overruled.
18      Objections to Paragraphs 28 and 29, again, dealing with some
19  social media postings, and the defendant lodged an objection to
20  those two paragraphs and indicates that the -- his position is
21  that the context that those were not threatening but he was
22  conveying his feelings about being threatened by activists who
23  were motivated by Ms. Baskin, that objection will be overruled.
24  Again, they're no direct impact on the guidelines.  And the Court
25  will note his claim regarding the context, although that tends to

1  belie any logic.  Neither post referenced the context the

2  defendant suggests, nor does the logic or bulk of the evidence

3  lead to that conclusion, but the Court will certainly take that

4  into consideration.  But the objection will be overruled.

5        The objection to the referenced murder-for-hire schemes the

6  PSR refers to throughout and a separate section to Counts 1 and 2

7  being schemes, plural, to which the defendant objects, which the

8  parties have thoroughly argued, that goes to the grouping

9  argument.

10       As noted by the probation officer, this is a close call.  In

11 a broad, cursory view, without analysis of the application notes,

12 this would be a case of two counts that involve the same speaking

13 and generally speaking a common criminal objective or common

14 scheme or plan to have that victim murdered, but the application

15 notes do lend valuable guidance.

16       The evidence in this case is that Counts 1 and 2 were not a

17 single course of conduct or representative of essentially one

18 composite harm to the victim in this case.  The evidence in this

19 case, as produced at trial, is that Mr. Maldonado-Passage engaged

20 in two distinctly separate courses of conduct devising two

21 separate plots to murder the same victim.  There were two

22 separate individuals, notwithstanding the fact that one of them

23 was an undercover agent, but two separate individuals who were

24 unrelated to each other and not working in concert together.

25 While there was some overlap in time, the plans progressed on

1    independent timelines in what the Court concludes were episodic

2    offenses with separate instances of fear, and in particular

3    separate risks of harm.  And I appreciate the defense argument

4    that there was never real harm based on the fact that one was an

5    undercover agent, but the fact of the matter is is that was not

6    what was in the mind of Mr. Maldonado.

7         And, in fact, I won't go into the detail, but there was even

8    discussions of two different means of committing the murder in

9    terms of the weapons and the locations and the opportunities.

10   And, again, while I do agree it was a close call, I do not

11   believe that this was a single course of conduct as contemplated

12   in the application notes of Section 3D1.2(b) and the objection

13   will be overruled.

14        With regard to Paragraph 32, that's dealing with some

15   communication between the defendant and the informant in April

16   of 2017.  The defendant denies the conversation asking the

17   informant about a potential killer or denies offering the

18   $10,000.  That objection will be overruled.  The paragraph

19   doesn't directly result in any impact to the ultimate offense

20   level and the guideline calculation, but the defendant's

21   objection is nonetheless in direct conflict with the witness's

22   sworn testimony to the jury.  And while those specific statements

23   were not recorded, the defendant had subsequent conversations

24   with the witness in this case that were recorded and consistent

25   with the nature of the conversations objected to in that

1  paragraph, all which is correctly reported by the probation
2  officer.  That objection will be overruled.
3      As to Paragraph 33, again, the defendant denies the entire
4  paragraph.  That will likewise be overruled.  Again, it doesn't
5  result in a direct impact to the guideline calculation and I
6  understand that it is in alignment with the defendant's claims of
7  innocence, but the objection is nonetheless in direct conflict
8  with the witness's sworn testimony to the jury and is correctly
9  reported by the probation officer.
10      Paragraph 34, again, the defendant denies the statements in
11  the paragraph and challenges the credibility of Mr. Glover.  As
12  in the prior objection, the witness referred to in this case
13  testified under oath at trial, whose credibility was ultimately
14  evaluated by the jury who ultimately convicted the defendant of
15  the conduct, including the information in that paragraph.  The
16  objection is essentially one of the defenses presented and
17  rejected at trial, so the objection will be overruled.
18      Paragraphs 35 through 39, again, additional conversations
19  between -- regarding the informant and the undercover to meet
20  with the defendant to detail the murder, I'm not sure that a
21  ruling is necessary on this one.  It does not appear to impact
22  the guideline.  It is unclear whether there was any evidence to
23  support the defendant's claim that he was simply trying to
24  uncover this plot.  I find it defies logic to suggest that he was
25  trying to protect the victim in any way.  But in terms as the

1    credibility of the informant, that was a defense it proposed to

2    and apparently rejected by the jury at trial.

3        With regard to Paragraph 41, defendant objects that he

4    falsely -- that he falsified or purposefully omitted any records

5    and reports that the cub book was another individual park

6    employee.  That objection will be overruled.  To the extent that

7    the information refers to charged counts, those denials were

8    evaluated and rejected by the jury that rendered guilty verdicts.

9    The paragraph correctly and accurately reports the information

10   from the investigation, which, other than the counts of

11   conviction, do not impact the guideline calculation.

12       With regard to Paragraph 42, that was regarding a sale of a

13   liliger cub.  The CVI listed wrong species and reported donation

14   and not sale.  The defendant objects, indicates another park

15   employee conducted the transaction, argues the transaction was

16   not illegal and the species notation was just a mistake.  That

17   objection will be overruled.  Regardless of whether or not

18   another park employee was involved, the defendant owned the park

19   and the animals, the witness reported dealing directly with the

20   defendant in this case.  Also, as indicated in the response, the

21   species identification of the forms was only one part.  There was

22   no addressing of the document indicating donation as opposed to

23   sale in the objection, which, again, is consistent with the

24   multiple violations that were the subject of the charges that the

25   jury heard the evidence and returned convictions.

1      In regard to Paragraph 43, the defendant objects challenging
2  the credibility of the witness and denies the information.  I
3  don't believe any ruling is necessary.  It has no direct bearing
4  on the guideline and is consistent with the counts of conviction
5  dealing with the sales of the large cats.
6      Paragraph 44, the defendant objects, denying the factual
7  accuracy.  That will be overruled.  That objection relates to
8  Count 12 of the indictment for which the jury heard evidence and
9  returned a verdict of guilty.
10      Paragraph 45, the defendant objects, claims the transaction
11  was Mr. Lowe's as owner of the park.  Again, I don't believe any
12  ruling is necessary.  It has no direct impact on the guidelines.
13  And although that count -- although that objection relates to the
14  dismissed count -- counts, plural, the conduct is consistent with
15  that in a number of the charged counts.
16      With regard to Paragraph 47, the defendant objects claiming
17  there was no value exchanged.  That, again, is overruled as to
18  the underlying facts.  As to the objection the transaction is
19  redundant to another referred to in the PSR, the probation
20  officer indicated in the report that the loss calculation had
21  been adjusted to avoid any possibility of double counting, so no
22  ruling is necessary in that regard.
23      With regard to Paragraph 48, the defendant had lodged an
24  objection reporting that the two tigers that were, in the words
25  of the report, were "offed," were euthanized by a vet, that

1  objection will be overruled.  Although the Court will note the
2  defendant's additional statement, the remainder of the paragraph
3  was not objected to.  But the Court will note the clarification
4  submitted by the defendant.
5       With regard to Paragraph 49 the defendant lodged objection
6  denying that the adult tigers had been sedated.  He denied the
7  tooth removals and claims that the tigers were in poor health and
8  needed to be euthanized, that they had been declawed and were of
9  advanced age at the time that he shot and killed those tigers.
10 That is overruled.
11      The pathology is contrary to his claim of the tigers' ages.
12 Regardless, the paragraph is provided for the context of motive,
13 which was to make room for additional tigers, and it was
14 uncontested that the proper procedures provided for by law were
15 not followed.  Nonetheless, it has no direct impact on a
16 guideline calculation.
17      With regard to Paragraph 50, the defendant objects, submits
18 the information reported in Paragraph 50 that the discussion was
19 not about a cub but a full-grown tiger.  It's overruled as to the
20 paragraph.  As to the conversation, it accurately reports the
21 agent's well-founded belief based on earlier conversations, but I
22 do take note of the defendant's submission that it is his belief
23 that that was not a discussion about the cub.  The remainder of
24 the conversation was not objected to.
25      With regard to Paragraph 52, the defendant objects, the

1  testimony at trial from that witness that there was no purchase

2  of a big cat from the defendant in November of 2017, and further

3  submits that sales after January 2016 would have been

4  attributable to Mr. Lowe, that's overruled.  As noted by the

5  probation officer, only the big cat purchases from the defendant

6  that were admitted by the witness were included in the loss

7  calculation.  Also, as noted by the probation officer and the

8  evidence introduced at trial, even after Mr. Lowe became involved

9  with the park, the defendant remained heavily involved in it, at

10  the very least a co-operator of the park.

11      With regard to Paragraph 54, the defendant denies the

12  factual accuracy.  Again, that's overruled.  The defendant's

13  objection is inconsistent with the finding of the jury and the

14  evidence introduced at trial.

15      With regard to Paragraph 55, the defendant objects, submits

16  that conversation that is referred to in that paragraph is

17  something to do with the informant trading fraudulent Care Credit

18  money to pay for an individual's dental work.  I don't think a

19  ruling is necessary.  There's no direct impact on the guideline.

20  There is various pieces of evidence in the record about those

21  allegations.  The relevance is a little unclear to the Court, but

22  I don't believe a ruling is necessary.

23      With regard to Paragraph 56, defendant objects, denying the

24  factual accuracy.  Again, that will be overruled.  The objection

25  is inconsistent with the finding of the jury and evidence

1  introduced at trial.

2       With regard to Paragraph 57, which the defendant objects to,

3  defendant objects indicating he was not involved in the

4  transaction which dealt with Mr. Finlay transporting a bobcat, a

5  tiger, four macaws and some other birds to a woman in California,

6  along with the associated information.  That will be overruled.

7  There's no impact on the guideline and those animals were not

8  included in the calculation, and that information came directly

9  from the witness who testified.

10      With regard to Paragraph 58, the defendant objects,

11  indicates the money that was transferred for some adult lions to

12  a zoo in Wisconsin was for transportation, not for sale, that it

13  is his position the animals were donated.  Again, the objection

14  will be overruled, without merit.  It's inconsistent with the

15  finding of the jury and evidence introduced at trial.

16      With regard to Paragraph 59, the defendant objects,

17  indicates the transaction referred to in Paragraph 59 was

18  conducted by another park employee, indicates he was in South

19  Carolina at the time.  Again, that objection will be overruled.

20  It's inconsistent with the finding of the jury and the evidence

21  introduced at trial.

22      With regard to Paragraph 60, defendant objects, indicated an

23  individual by the name of Greg Woody was responsible for the

24  CVIs, the veterinary inspection documents.  No ruling is

25  necessary as to count -- as to Paragraph 60.  That is not

1  included in the loss calculation or the guideline computation.

2      With regard to Paragraph 62, the defendant using another

3  person's license to conceal transfers, defendant objects, says

4  Ms. Corley was aware that her license was being used to keep the

5  animals from being taken for satisfaction of the Baskin judgment.

6  That objection will be overruled.  Again, it was consistent with

7  the actions of the defendant to conceal transfers as the evidence

8  demonstrated at trial.

9      Paragraph 63, which deals with, as has been previously

10  discussed somehow, the summary of the basis for the calculation

11  of the value of the animals, the defendant objects specifically

12  submitting that the full-grown tigers had no value and, in fact,

13  were a liability only and objects to the valuation of euthanized

14  tigers.  That objection will be overruled.  The probation office

15  correctly used the best available evidence to calculate

16  valuation, as explained in the PSR response to the objection,

17  including valuation information that was derivatively provided by

18  the defendant in some other matters.

19      I would also note that the valuation as described by the

20  probation officer was on the conservative side.  In the -- in the

21  occasions that there was a range, the probation officer used the

22  low end of the range.  And I would also submit that there was

23  also testimony in terms of the valuation of euthanized tigers,

24  there was testimony and evidence submitted that the defendant

25  made reference to pelts that he had at the taxidermist that could

 1  be sold, teeth and other various parts.  I think it is

 2  inconsistent with the evidence to suggest that the euthanized

 3  tigers had no value.

 4      With regard to Paragraph 72, that's the specific offense

 5  characteristic found in 2Q2.1(b)(2)(B), the significant risk of

 6  infestation or disease transmission potentially harmful to humans

 7  and/or wildlife, referring to the animals that were transported

 8  without veterinary inspection that will be ultimately placed with

 9  other animals, which accounts for a two-point increase in the

10  base offense level, the defendant objects and submits that

11  Dr. Green testified that she evaluated most animals for which she

12  created CVI inspection forms and submits that the circumstances

13  don't rise to the level of significant risk as no testimony was

14  produced at trial that any animal was sick.  That objection will

15  be overruled.

16      The guideline provision does not require the animal to be

17  sick.  It refers to risk.  And the PSR, which I will not fully

18  repeat here again in court, but the PSR contains the correct

19  analysis of that guideline provision, which the Court adopts.  It

20  is evident from the trial testimony that those animals were to be

21  transported and be in other facilities and around other animals.

22  It was clear from the testimony even the setup of the defendant's

23  park, these tigers and other big cats were together.  And when

24  they are transported to these other locations without an actual

25  veterinary inspection, therein lies the risk of any kind of

1   disease or infestation that can be transmitted from animal to
2   animal.  And I think the Court finds that that is precisely what
3   the guideline contemplates.
4        With regard to Paragraph 73, those are the calculations that
5   were initially introduced by Paragraph 63.  The finding -- the
6   recommendation of the probation officer that the market value was
7   more than $40,000 but less than $95,000, in
8   2Q2.1(b)(3)(A)(2)(ii), the value was determined to be $58,300,
9   which would result in an increase in six levels.  Defendant
10  objects, submits that the loss is $17,000, which would result
11  only in a four-level increase.  That objection is overruled in
12  part, and part of -- and part of it is moot.
13       As to the objections regarding the transactions in
14  Paragraphs 43 and 47 being duplicated, the probation officer
15  adjusted the calculations and did not include them separately in
16  that ultimate loss calculation.  The government concurred
17  regarding the sale of the four tigers detailed in Paragraph 46.
18  The probation office reduced the amount accordingly.  As to the
19  balance of the calculation, the PSR goes into a fair amount of
20  detail, the basis for those calculations, which the Court finds
21  is appropriate and adopts.
22       With regard to Paragraph 77, the defendant objects.
23  Those -- that's the adjusted offense level for the ESA, the Lacey
24  Act violations, submits the level should be 12.  That will be
25  overruled.  In light of the Court's findings that the risk of

1    infestation and disease was correctly applied and the valuation

2    correctly calculated, the adjusted offense level of 16 is

3    correct.

4         With regard to Paragraphs 78, 84, 90 through 93 and 96,

5    which deals with -- those are essentially calculation paragraphs,

6    the defendant objects based on the objections previously

7    discussed.  Those will be overruled in light of the previous

8    rulings on the objections.  The guideline is correct as

9    calculated in the PSR.

10        With regard to Paragraphs 78 again, 83, 84, 89, 91, 93, 96,

11   138 and 154, which are, again, all calculation offense levels,

12   defendant makes an objection specifically as to the impact of

13   those based on the cross reference to 2A1.5, that will be

14   overruled.  As conceded by the defendant in his supplemental

15   sentencing memorandum, the defendant's objection is largely a

16   policy disagreement with the cross reference and there's no

17   controlling authority finding error in the application of that

18   cross reference.

19        As further pointed out by the defendant, the Court fully

20   acknowledges the guidelines are advisory only.  And to the extent

21   the Court finds those policy considerations call for any

22   adjustment, the Court can clearly vary from the guidelines to the

23   extent necessary and supported by the facts of the case.  I do

24   agree with the government that I don't think it is a fair

25   characterization that the government or the probation officer

1  used any kind of discretion in selecting the guideline.  The

2  guideline provisions direct the cross reference in certain

3  instances.

4       As pointed out by the probation officer, there is an anomaly

5  in the guidelines based on -- at the time that the cross

6  reference was adjusted upwards, while the underlying guideline --

7  which was, I don't recall the -- the citation off the top of my

8  head -- was not adjusted accordingly either.  And so that

9  certainly lends to an anomaly in the guidelines, but, again, I

10 don't believe that there is any authority to suggest that it is

11 inappropriate to not apply the cross reference.

12      Finally moving into the category of offense behavior not

13 part of the defendant's relevant conduct, as to Paragraph 98, the

14 defendant denies he approached any witness, inquired about the

15 cost of hiring someone to commit a murder, I don't believe any

16 ruling is necessary.  It has no impact on the guidelines.

17      Paragraph 99, defendant objects to the statement that the

18 Dade City tigers belonged to him previously, claims only one

19 white cub was provided by him to Dade City during that relevant

20 time period.  I don't believe any ruling is necessary.  The

21 defendant's statement is noted.  It has no impact on the

22 guidelines or 3553 factors.

23      Paragraph 101, the defendant objects and that is based on

24 some information that was provided by Mr. Lowe.  No ruling is

25 necessary.  The defendant's statement is noted.  The Court fully

1   recognizes the cross-accusations that have been argued between

2   the defendant and Mr. Lowe.  However, Paragraph 101 does not

3   impact the advisory guideline range calculation, nor does it

4   impact the Court's analysis of the 3553 factors.

5        In terms of other criminal conduct, Paragraphs 106, 108 and

6   109, the defendant objects to the column heading of "prior

7   arrests," indicates he has never been arrested.  There is no

8   ruling necessary on that, but the Court does recognize that the

9   date of arrest is a column heading and not necessarily indicative

10  of the fact of an arrest.

11       In terms of substance abuse, Paragraph 123 and 124 and 146,

12  those have to deal with allegations of any kind of substance

13  abuse by the defendant and whether or not drug use was encouraged

14  or tolerated at the park, and the -- in particular,

15  Paragraph 146, dealing with a substance abuse condition as a

16  component of any kind of supervised release.  He denies any drug

17  use, denies encouraging or tolerating drug use at the park,

18  indicates he has fired employees for drug use and disputes the

19  substance abuse condition.

20       I don't believe any ruling is necessary as to 123 or 124.

21  It is notable that the presentence report includes both witness

22  information about alleged drug use by the defendant as well as

23  the defendant's denial of any kind of drug use.  The sentencing

24  materials also include other witness statements that are adamant

25  that the defendant did not abuse drugs.  It's not for the Court,

1   I don't believe, to draw that conclusion.  I think the evidence

2   is certainly in conflict and I don't believe there's any

3   necessary as to a conclusion as to Paragraphs 123 and 124.

4        As to the substance abuse condition, the objection will be

5   overruled.  That's the substance abuse component of any kind of

6   term of supervised release.  I do intend to order that as a

7   condition of any term of supervised release, but, as pointed out

8   by the probation officer, that condition can be dealt with at a

9   later time in the event that there are no substance abuse issues

10  evident, whether or not that is a modification of that condition

11  or simply no need to follow up on it.  I think that is

12  appropriately dealt with at that time.

13       With regard to Paragraph 163, again, both parties have

14  weighed in on whether or not the ESA, Lacey Act violations were

15  unaccounted for in the guidelines and whether or not they call

16  for any kind of variance, whether upward or downward, to which

17  the defendant has objected to the government's position.  I don't

18  believe a ruling is necessary.  The Court will address those

19  factors in the context of 3553 in the arguments for variance.

20       The final objection by the defendant, the Court having ruled

21  on the government's objection to the lack of enhancement for

22  obstruction of justice, the objection and response is resolved.

23       Let me ask either party, is there any objection hanging out

24  there that I have failed to address?

25       Counsel for the government?

1      MS. MAXFIELD-GREEN:  I don't believe so, Your Honor.

2      THE COURT:  Mr. Earley?

3      MR. EARLEY:  Your Honor, one thing that is not listed

4  in the presentence report, it came up at a later time -- and I

5  did discuss this with the probation office and I mentioned it to

6  the government -- as far as a condition of supervised release, in

7  the presentence report Paragraph 151 does state that the Court

8  should impose a condition where Mr. Maldonado-Passage, as a

9  condition of supervised release, should not possess any species

10 of animal listed as endangered or threatened under the Endangered

11 Species Act and be prohibited in the sale, transportation or

12 other transfer of such animal of their hides or body parts.  And

13 I would just state this, that I don't think that condition is

14 necessary.  I think that, as the Court's well aware, most of this

15 activity is regulated by the government and requires certain

16 licenses or permits.  And to the extent that it's a complete

17 prohibition on any possession of any animal that is listed under

18 the Act, I think it's too broad and Mr. Maldonado-Passage would

19 request that that not be imposed as a specific condition.

20     THE COURT:  Thank you.

21   Any response from the government?

22     MS. MAXFIELD-GREEN:  The government supports the

23 probation officer's recommendation.

24     THE COURT:  Mr. Earley, I will tell you that I have

25 absolutely zero question in my mind that that will be a

1 condition.  Mr. Maldonado has throughout this course of the

2 evidence demonstrated his intent and willingness to circumvent

3 the various regulatory statutes dealing with these animals and

4 I -- it is the Court's intent to leave absolutely zero wiggle

5 room that he should ever be involved in the possession or care of

6 these animals.  The objection will be overruled.

7   Having ruled on the objections, the presentence

8 investigation report will be adopted as the findings of the Court

9 for sentencing purposes.  The calculations in the report conclude

10 that the total offense level is 39, with a criminal history

11 category of 1, which results in an advisory guideline range of

12 262 to 327 months.

13   Do the parties agree with the advisory guideline range as

14 calculated?

15   Counsel for the government?

16     MS. MAXFIELD-GREEN:  Yes, Your Honor.

17     THE COURT:  Counsel for the defendant?

18     MR. EARLEY:  That's what the numbers say, but I do

19 object to the calculation based on all of my previous --

20     THE COURT:  Subject to the objections, do you agree

21 that the calculation is correct, though?

22     MR. EARLEY:  That is correct, Your Honor.

23     THE COURT:  Thank you.

24   I will now recognize the government for any argument you

25 have in regard to an appropriate sentence to include any argument

1  in terms of variance.

2        MS. MAXFIELD-GREEN:  Your Honor, the government stands

3  on its briefing and recommends only that the Court impose a

4  sentence within the advisory guideline range.  And that concludes

5  the government's remarks.  And at this time, the conclusion of

6  the government's presentation would include a statement from

7  Ms. Baskin.

8        THE COURT:  Please proceed in that regard.

9     You may proceed, Ms. Baskin.

10       THE WITNESS:  Thank you.  The conviction of

11 Mr. Schreibvogel Maldonado-Passage was made based upon only a

12 handful of vivid examples of his malicious intent to murder me.

13 The prosecution didn't need to present the daily barrage of

14 threats to harm, rape or kill me that were my daily experience

15 for the last ten years.

16    The evidence showed that over the course of many years he

17 tried to coerce others into killing me, and in the end resorted

18 to hiring others to kill me.  If he had succeeded in carrying out

19 his murderous plan, you might be calculating now what the value

20 of my life had been.  It's nothing short of a miracle that I'm

21 able to stand before you today and ask you to consider all that

22 he was able to take from me.

23    Because of his constant threats to kill me, I have found

24 myself seeing every bystander as a potential threat.  There is

25 nowhere that I have felt safe and, worse, no way that I feel I

1  can safeguard those around me.  So many of his threats involved
2  blowing me up so that he could thrill over seeing me burn to
3  death.  Even from jail, he gleefully talks about the prospect of
4  me dying a fiery death.  Anyone near me, my daughter, my mother,
5  my husband, my volunteers, my staff, they have all been in peril
6  because of his obsession with seeing me dead.  I live with the
7  guilt associated with the danger that my mere presence brings to
8  each of them.

9       There are two important things the Court might not know from
10  the trial.  The first is important because I believe
11  Mr. Schreibvogel Maldonado-Passage will claim ill health to
12  minimize his sentence.  In the 15 years that I have known him, as
13  a way to get sympathy, he's repeatedly claimed to be the victim
14  of various diseases, including cancer and worn a knee brace and a
15  cane that he clearly does not need.  The second thing is that
16  over the years numerous people who worked at his zoo contacted us
17  after they left the zoo and told us that every single day he
18  would rant about me.  They all characterized him as obsessed.

19       As you consider his sentence, I would just like you to take
20  into account that if this vicious, obsessed man is ever released
21  from jail, my life and my family's lives will return to what it
22  was like during the decade leading up to his arrest.  If he
23  completes his sentence and is released, we will end up spending
24  the rest of our lives constantly looking over our shoulders for a
25  threat to our lives.  I hope you will give us as many years free

1  of that threat as you can.  Thank you.

2          THE COURT:  Thank you, Ms. Baskin.

3      Anything else from the government?

4          MS. MAXFIELD-GREEN:  No, Your Honor.

5          THE COURT:  Mr. Earley, I will now recognize you and

6  Mr. Maldonado-Passage for anything you would like to say

7  regarding appropriate sentence, to include any argument for

8  variance.  And I don't know how much you have, Mr. Earley.  If

9  you want to have Mr. Maldonado-Passage remain seated until you're

10 ready for him, should he choose to make a statement, would be

11 fine.

12         MR. EARLEY:  That would probably be best.

13     You know, Judge, there's been a lot going on in this case, a

14 lot before and a lot after.  And, you know, oddly enough, most of

15 it played out on Facebook or other social media sites.  And, you

16 know, it's very tempting, I think, for me to perhaps get sucked

17 into responding to all of the various things that have been said

18 and done both before and after the trial, but I'm not going to do

19 that.  And I'm going to -- I'm going to be

20 Mr. Maldonado-Passage's attorney and I'm going to address what I

21 think is important in this case.  And what's important in this

22 case are the 3553(a) factors and the things that you must

23 consider as the judge in determining what sentence is sufficient

24 but not greater than necessary to accomplish the 3553(a) factors.

25         THE COURT:  And I would assure you, Counsel,

1  fortunately, I am not on Facebook, Twitter, whatever else.

2         MR. EARLEY:  Well, I say that because, you know, I know

3  Mr. Maldonado is a -- sitting over here wanting to respond to all

4  sorts of -- of things that have been posted about him and things

5  that are supposedly going on, but those things aren't relevant

6  today.  What's relevant today is how are you going to determine

7  what a fair sentence is under the facts of this case given the

8  convictions that we're having to deal with.

9      So let me just begin with the statutory factors in

10  Section 3553(a)(2), and those are kind of the general factors.

11  First of all, and I'm going to go in reverse order under

12  Subsection D, it's we need to consider a sentence to provide the

13  defendant with needed educational or vocational training, medical

14  care or other correctional treatment in the most effective

15  manner.  Well, you know, Mr. Maldonado-Passage doesn't need any

16  educational or vocational training that could be provided in a

17  prison.  And he does have medical issues and they are verified

18  medical issues that are listed in the presentence report.

19  They're not being trotted out as an excuse for a lower sentence.

20  They're there so that the Bureau of Prisons can respond to them.

21  But those things are dealt with probably better or maybe even, if

22  he's in prison, in the community.  So even the medical care

23  aspect of this is something that doesn't warrant a sentence of

24  confinement.  So there's nothing in the Subparagraph D

25  considerations that would warrant any sentence of confinement,

1 actually.

2      To protect the public from further crimes of the defendant.

3 You know, none of us can predict the future, but we do rely on

4 statisticians to do things like that.  And I can tell you that

5 the statistics show that individuals who are

6 Mr. Maldonado-Passage's age, who lack any history of drug use,

7 certainly any current or near history of drug use, and who have

8 absolutely zero prior criminal history in their lifetime,

9 statistically they are at the lowest end of any recidivist

10 formula.  So statistically it is very clear that given the

11 factors that you have with respect to this individual, he does

12 not need to be incarcerated to protect the public from further

13 crimes on his part.

14      With respect to affording adequate deterrence to criminal

15 conduct, that usually takes -- there are two aspects to that.

16 There's the general deterrence part of it, you know, those who

17 are out there and who may be similarly tempted to engage in the

18 same criminal activity.  Well, I think this prosecution has done

19 what the government wanted it to do, especially with respect to

20 the wildlife counts, as I'll refer to them.  I think this is one

21 of the very first, if maybe not the only prosecution of its type,

22 and I think the government has made their point to others out

23 there.  And I hope that if the government is serious about

24 prosecuting this type of activity that they don't intend to stop

25 with the man over here at this table.  I think there's plenty of

1    evidence to show that individuals who were involved in this
2    investigation were involved in just as many violations of the
3    law, but to date none have been prosecuted.
4        As far as specific deterrence to Mr. Maldonado himself, you
5    know, I think if there are any concerns about him engaging in
6    activity of this type again, those can all be dealt with with
7    conditions of supervised release, and I think the Court's already
8    made it perfectly clear you intend to make sure that his
9    conditions of supervised release cover that prohibition.
10       As far as deterrence from any sort of threats to Ms. Baskin
11   or anybody else who may be in a similar position, you know, these
12   -- and I'll talk about this here in just a moment when I get to
13   the offense itself -- but these things that occurred during this
14   period of time occurred under very particular circumstances that
15   I seriously doubt will ever be repeated again.
16       So that brings us to the question of imposing a sentence to
17   reflect the seriousness of the offense, promote respect for the
18   law, provide just punishment.  Within that, there are other
19   factors that, obviously, come into play, the sentencing guideline
20   range, the need to avoid disparity between others similarly
21   situated, the need to provide restitution if there is any.
22       So here's kind of what I would like to do with respect to
23   two things:  The history and characteristics of
24   Mr. Maldonado-Passage and the nature of the offense.  I would
25   like to talk about him briefly as an individual and then I would

1   like to talk about the place where all of this sort of

2   originated, his park.  And I would like to talk a little bit

3   about this prosecution.

4          You know, Mr. Maldonado-Passage is almost 57 years old.  And

5   I think one thing that I don't want the record to reflect is that

6   there's some indication that he does not sincerely love animals

7   and have a passion for animals.  I mean, if you look at his

8   history and characteristics, Your Honor, he was operating a pet

9   store for 16 years with his brother before he even opened this

10  animal rescue park.  He spent another 20 years doing that.  So

11  he's got over three and a half decades of his life dedicated to

12  the care of animals of every type.

13         He wanted others to experience what it was like to see

14  different types of animals, and he went out of his way to make

15  sure that individuals who wanted to had the opportunity to

16  experience what he experienced on a daily basis at his park.

17  Upon request, he went out of his way to see terminally ill

18  children, adults who were situated similarly to terminally ill

19  children, and he went out of his way to try to provide them an

20  encounter with animals as they wished.

21         We have, for example, a number of photographs that have been

22  taken over time where he took the time out of his day to go and

23  provide a little bit of joy in some individuals' lives who asked

24  him for it.  He did this on a number of occasions.  And this

25  spanned many, many years.

1      What else did he do?  Well, he was active in his community.

2   There's no question, no one's going to be able to deny that he

3   routinely put on Thanksgiving and Christmas celebrations where

4   the less fortunate were allowed to come to his park for free and

5   they were provided a free dinner.  Easter celebrations at his

6   park where individuals could come and enjoy the day, get some

7   benefit, get an Easter basket, see the animals, have a good time.

8      There's more to Mr. Maldonado-Passage than just what you

9   have heard in this trial in the course of seven days.  And his

10  good works and his lengthy time in the community without ever

11  violating the law are factors that this Court must take into

12  consideration.

13     Did he enjoy the limelight that all this brought?  I'm sure

14  he did.  There's no question.  This was his passion.  This park

15  was his passion.  It was his business, but I think as you saw in

16  the trial, and you don't have to believe his testimony to get

17  this, I think it's clear from all of the evidence the thrill of

18  being in the limelight and the total dedication to running this

19  park on a day-to-day basis was wearing on Mr. Mr. Passage.  There

20  were definitely hard times, financial hard times at the park.

21  This park cost him several significant relationships in his life.

22  And it was during the time of these offenses, alleged offenses,

23  that Mr. Maldonado decided it's -- I'm done.  I have to get out

24  of here.  He wanted out.  You can see from defendant's sentencing

25  Exhibit 1 that there were conversations between him and

1 Mr. Garretson about selling the park. You know from the
2 testimony of Brittany Peet that he was trying to dispose of the
3 inventory of animals at this park. You know, he even made peace
4 with his sworn enemy, PETA, to try to get himself extracted from
5 this place that had pretty much at this point in time basically
6 ruined his life.

7 So he began the effort slowly to extricate himself, and it
8 wasn't simple. There were legal challenges. As you can see in
9 Defendant's Exhibit 1, Mr. Lowe was not up to getting rid of this
10 park and he had the last say so. So they couldn't sell it
11 without his blessing.

12 So even though he was trying to get out of this, trying his
13 best to put all this behind him, it just simply wasn't going to
14 happen quickly. You know, a little bit about this place. I
15 mean, it operated for a long time. I have spoken to several
16 individuals who just called me out of the blue and wanted to talk
17 to me over the last couple of weeks.

18 One of them was a man from Kansas City. He called me to
19 tell me about his visits down at the park. They went three times
20 over a three-year period, the last about a couple of years ago.
21 And he just wanted me to know that when he went down there it was
22 a -- it was a good park, it was clean, he enjoyed himself.
23 Mr. Maldonado-Passage went out of his way to make sure that he
24 had a good time and that his family had a good time. He made a
25 point of telling me that nothing he saw at that park would give

1  him any indication that there should be any concern about the

2  health and wellbeing of any of the animals at the park.

3      A former employee of the park contacted me two weeks ago.

4  She, too, just wanted me to know, I never questioned anything

5  that was going on at the park, I never questioned

6  Mr. Maldonado-Passage's treatment of the animals or his

7  dedication to them.  Everything about her experience there was

8  positive.

9      And let's not forget this:  This is a highly regulated

10  commercial activity.  There are frequent and very thorough

11  inspections.  Sure, this place, like any place, like any

12  restaurant, they experience superficial violations of certain

13  codes, but never did the USDA or Fish & Wildlife have cause to

14  come in and try to shut this park down.

15      I mean, remember, the people who are inspecting this are

16  veterinarians.  They're there to look at the animals and to look

17  out for their wellbeing.  And no one during the course of this

18  park's existence ever tried to shut it down because of cruelty to

19  animals or failure to take care of their basic needs or anything

20  like that.

21      This was a stressful place for Mr. Maldonado-Passage.  I

22  mean, you have got to think about what he was -- he's running a

23  park with wild animals.  He's running a park where you have to be

24  on guard for the public's safety at every minute that the park is

25  open.  He's running a park where the employees may not have a

1  background that is conducive to trusting them to do what's right

2  on a daily basis.

3      You know, he went out of his way to help people who probably

4  were unemployable, people who had significant issues in their

5  past with either drugs or alcohol, people who had significant

6  issues with emotional or mental health issues.  He went out of

7  his way to help them find a place, and some of them found it

8  there, some of them -- some of them didn't.  But not only was he

9  worried about the public 24 hours a day, seven days a week, but

10  he was also worried about his employee's safety.

11      Another aspect of this, he too was worried about intruders

12  into his park.  You know, I have seen a video of a situation

13  where an individual came into his park, the man was trying to get

14  into cages and carry on all sorts of craziness.  He was

15  eventually hauled out by the local sheriff's office, but he too

16  had to live with individuals who were posing a threat to him and

17  his park.  They just happened to be on the other side of the

18  issue.

19      You know, Mr. Maldonado-Passage is a pretty polarizing

20  figure, from what I can tell.  I think you either like him or you

21  don't like him.  And I think that's clear.  I mean, you have

22  received some -- some things, some letters or whatever you want

23  to call them from some individuals who have their own bag of

24  rocks to carry.  But, you know, I would ask the Court to kind of,

25  you know, take it with a grain of salt when you hear certain

1  characterizations of Mr. Maldonado-Passage, certainly by former
2  employees or coworkers.
3        Lastly, I would like to say this with respect to this
4  prosecution:  Initially -- my initial observation is this, you
5  know, way back when this whole thing first started, we filed a
6  motion to sever Counts 1 and 2 from the wildlife counts and the
7  Court denied that motion.  But the -- trying the Counts 1 and 2,
8  the murder-for-hire counts, with the wildlife counts, I think,
9  had a significant impact on our defense.  There were certainly
10 potential witnesses who could testify to one aspect of the events
11 but not the other, and vice versa.  And so it did impact how this
12 case was tried.
13       So I just want to say this, not necessarily to the Court,
14 but to the extent that anyone who might be considered a
15 co-conspirator or an aider and abettor believes the fact that he
16 or she was not called as a witness by the defense and they're
17 taking that as a sign that we were afraid of their testimony, I
18 would just want them to be aware that nothing could be further
19 from the truth.  We were simply in a situation where we had to
20 make choices on who to call for what purpose.
21       As it concerns the seriousness of the offense, that's
22 certainly one of the major things that you have to take into
23 consideration.  I will go back to the testimony of Special Agent
24 Andy Farabow to kind of frame my comments about that.  The Court
25 may recall that Ashley Webster initially contacted Ms. Baskin and

1  advised her that Mr. Lowe and Mr. Maldonado-Passage were plotting

2  to do some harm to her.  And Agent Farabow, when he got involved

3  in the case, what he wanted to do was, well, let's just bring

4  everybody in, let's talk to these folks, let's just see what they

5  have to say and let them know, you know, what's going on here,

6  you know, impress them with the fact that, hey, if you're talking

7  about harming someone, you know, you're going to get yourself

8  into some pretty legal hot water.

9       Those -- that idea to bring everybody in and to get this all

10 out on the table, that was several months before the Alan Glover

11 plot was ever allegedly hatched.  But the most experienced and

12 professional law enforcement agent's opinion in this case was

13 cast aside.  And the reason it was cast aside was because the

14 Fish & Wildlife agent didn't want to compromise his investigation

15 into these paperwork violations.

16      So I believe had Agent Farabow's scenario played itself out,

17 had everybody been invited to the table, had they just taken an

18 opportunity to talk to this man, I believe these nonsensical

19 theatrics would have stopped and Ms. Baskin would have been

20 spared all these months of angst over whether or not her life was

21 or was not in danger.

22      I also would like to, you know, harken back to

23 Mr. Garretson's testimony concerning his conversations with

24 Mr. Lowe.  You know, there was this discussion about if

25 Mr. Maldonado-Passage was taken out of the equation Mr. Lowe

1    could help Mr. Garretson out with a hundred thousand dollars

2    because the park could be sold.  You know, there's some --

3    there's some evidence of that, if you look at Defendant's

4    Sentencing Exhibit No. 1.

5         So those things are out there.  And what they tell you is

6    this: That at some point after this December 8th meeting with

7    this Mark, Mr. Maldonado had no interest whatsoever in continuing

8    with any alleged scheme to cause any harm to Carole Baskin.  So I

9    think when you combine that with his capitulation to PETA, his

10   utter lack of interest in getting back to Mark on that part of

11   the alleged murder-for-hire scheme, his desire to sell the park,

12   they all tell you that at that particular moment in time,

13   December, perhaps earlier, even taking the evidence in the light

14   most favorable to the government, Mr. Maldonado-Passage had no

15   intention of harming anyone or following through with any alleged

16   threat.

17        So where are we at?  We are left with the sentencing

18   guidelines to deal with.  You know, on the -- what I'll call the

19   wildlife counts, you know, the guideline range is 21 to 27

20   months.  You know, that's a low guideline range.  I understand

21   that.  But, you know, if there's a problem with that guideline

22   range, the government needs to address that with Congress and the

23   United States Sentencing Commission.  They don't need to take it

24   out on Mr. Maldonado-Passage.

25        As far as the guideline range of 22 to 27 years on this

1 murder-for-hire scheme, you know, this Court sees a variety of

2 cases on a daily basis, cases that involve certainly more real

3 threatened harm than we have here, and certainly more cases that

4 involve actual threatened harm where the guidelines are nowhere

5 near that amount. And to the extent that the guidelines are

6 going to be based on solicitation to commit a crime of violence,

7 to the extent that the Court's going to consider them, I would

8 just say this: That I believe they clearly overstate the

9 seriousness of the offense in this case. The solicitation

10 guidelines are based upon statutory punishment ranges that go up

11 to life or 20 years, depending on the circumstances.

12      This crime, or these crimes, Counts 1 and 2, each carry a

13 maximum of ten years in prison. The guidelines that are

14 associated with the crime are usually tied to the severity of the

15 statutory punishment. And by using the solicitation guideline, I

16 think it clearly overstates the seriousness of the offense. And

17 again, you know, Congress provided you a range of zero to ten

18 years on murder-for-hire allegations. That's a broad range.

19 It's a range that would allow a Court to impose probation, it's a

20 range that goes all the way up to ten years.

21      I think Congress had envisioned that when a Court is faced

22 with sentencing an individual for this type of offense, the Court

23 will take into consideration the actual conduct that occurred

24 during the offense. You know, was there harm, was there a

25 serious injury but the person didn't die, was there an actual

1    attempt, were there shots fired or was this going on, was that

2    going on, or was it just simply a bunch of talk, a bunch of

3    ranting and raving by an individual.  So Congress gives you this

4    range so that you can deal with the type of conduct you have

5    before you.  And in this particular case, it's on the lower end

6    of the spectrum with respect to these types of offenses.

7        You heard the trial.  You heard Mr. Glover's testimony.  I

8    would just ask you to recall the fact that, you know, none of

9    this was ever going to result in anything, certainly with respect

10    to Count 2.  And even with Mr. Glover, he made that perfectly

11    clear.

12        So I think that an upward variance based upon the fact that

13    the wildlife counts don't get factored in is completely wrong in

14    this particular case.  I think a significant variance downward

15    from the sentencing guideline range is appropriate in this case.

16    Remember, you have a man who has never been convicted of a crime,

17    he doesn't have a history of any criminal activity, and I think

18    that to impose a sentence within the guideline range, or even

19    half the guideline range, or even a third of the guideline range

20    would be an injustice in this case based upon all of the facts

21    that you have before you.

22        THE COURT:  Thank you, Counsel.  Mr. Earley, does

23    Mr. Maldonado-Passage intend to address the Court?

24        MR. EARLEY:  Yes, Your Honor.

25        THE DEFENDANT:  Your Honor, I have been judged and

1  prosecuted since the day I was born, dealing with abuse and
2  discrimination to the point that I was made to shake my dad's
3  hand and promise never to come to his funeral because I'm gay.
4  Instead of turning that into a world of hate and drugs and
5  alcohol, I turned it into a world of helping sick people and
6  homeless people.  And by the letters that were submitted to, you
7  should be able to see that.

8       I made it 56 years out in the world without ever seeing
9  heroin, Suboxone or Fentanyl until I was made to sit in jail, and
10 I see it every day.

11      I have sat in jail and seen thousands of people come and go,
12 repeat this cycle over and over, violation after violation,
13 because doing drugs and exchanging medication have become their
14 way of life.  Then there's a handful of us that know that this is
15 not where a life needs to end.  I have learned everything I need
16 to learn in almost two years that I have been sitting in jail, to
17 admit that I have done some things and maybe not took the correct
18 path, to try and make it right.

19      Did I make videos without thinking of the backlash?
20 Absolutely, I did.  Did I make them in bad taste?  You bet.  Even
21 though I pushed the envelope and made an ass of myself sometimes,
22 the FBI agent that testified said I broke no laws by making the
23 videos.  Do I owe Ms. Baskin an apology?  Absolutely.  But this
24 is also a woman who bragged about paying someone to stalk at my
25 every move so she could harass every show I ever did and built an

1 entire website called 911 Animal Abuse about me so the general

2 public and the people that are out there mentally deranged would

3 think that I abuse animals on a daily basis.

4     Was her life ever in danger?  Absolutely not.  I was

5 doing -- I was doing what -- during the murder-for-hire counts,

6 what a police officer, license and sworn to protect and to serve

7 told me to do in order to get the information that we needed to

8 stop some of the crimes that were going on at the zoo.  This very

9 well-orchestrated play of the trial, the jury never got to see or

10 hear the police officer because the charges that were involving

11 him were dismissed the first day of my trial.  Just as Alan

12 Glover was allowed by the prosecution to commit and to get away

13 with perjury as they had the evidence laying on their table.  I

14 did not give him that cell phone.

15     But the perjury went on to four other witnesses as well.

16 Putting my trust in a police officer who is paid to protect me

17 was my first mistake.  My main focus was to gather the evidence

18 that I needed to put a stop to Jeff Lowe and James Garretson

19 using the zoo as a cover for credit card fraud, ID theft, mail

20 fraud and human trafficking.  I saw the faces of over 75 young

21 girls that were being bought and sold like cattle for the sexual

22 and financial pleasure of Jeff Lowe.  And I was there the day

23 that he blackmailed his female partner into this.

24     I got a text message from James Garretson bragging that one

25 of his whores were murdered in Fort Worth Texas.  And would I do

 1   this again?  I'm not sure, but I still have all the evidence and

 2   the proof that those girls are someone's kids and someone's

 3   daughters that are out there and I pray for them every day.

 4        As far as the animal charges, I was wrong for making false

 5   receipt for a lemur, but the more I gained his trust, the more

 6   information he gave me, like fake leases and credit card numbers

 7   and so on.  I never denied euthanizing five tigers that were

 8   crippled and old.  And, again, the jury was not given the vet's

 9   report of the body or the condition of the tigers because it

10   wasn't part of the agenda, which should have been, examining the

11   whole body and getting to the truth.

12        I have a license by a federal agency called the United

13   States Department of Agriculture Animal Plant Health and

14   Inspection Service as an exhibitor for the last 20 years, which

15   allowed me, under the United States Department of Interior's

16   watchful eye, to profit from exhibiting, breeding, selling exotic

17   animals of all kinds, including tigers.  And to this day I don't

18   believe the law is being read and understood the way Congress

19   wrote it in 1973 to mean.  All anyone sees is what they have

20   added without Congress's help.

21        The Endangered Species Act of 1973 amended clearly states

22   that federal legislation intended to provide a means whereby the

23   ecosystem upon each endangered and threatened species may be

24   conserved and provide programs for the conservation of those

25   species, thus preventing extinction of native plants and animals.

1 There has never been in the history of the United States a native
2 tiger or lemur, or a habitat for which them to live in, nor will
3 there ever will be.  They are protected from international trade
4 by a CITES treaty, but again, this is now for the law to decide
5 what Congress wrote, or only proceed by the animal rights agenda,
6 as the word "take" was meant for animals in the wild or animals
7 born and bred in a zoo.

8      So now I'm pleading to you, sir, since you're over the civil
9 cases and know all the players and what extent they will go
10 through to obtain the zoo that me and my parents built.  From the
11 encounter of the FBI in December until nine months later, I had
12 no with anyone, no agents, no threats, no videos to anyone.  I
13 worked with PETA to help me walk away from everything.  The
14 threats of my home being bulldozed, my husband being beat up and
15 knowing of the real crimes being done out of that zoo, I had to
16 escape.

17      And it still wasn't enough.  I moved to Florida, of all
18 places, and got a job washing dishes in a restaurant on the
19 beach.  And I still couldn't get away because Jeff Lowe put a
20 hundred thousand dollar price on my head, which caused the
21 confidential informant and the agents to have blinders on them.
22 And they had to do whatever they had to do to try and collect
23 that.

24      Now I have lost my home.  It is has been destroyed.
25 Fifty-six years of my life was in it.  I lost my zoo.  I lost my

1   animals, my vehicles.  My mom has died and nobody even knows
2   where my dad is anymore.
3       They couldn't get me arrested fast enough, so they could get
4   my parents put in separate nursing homes after 65 years of
5   marriage so they could not communicate so the ones who were
6   supposed to be protecting them could take their home, their land
7   and their life savings for free and make them die alone.
8       I'm telling you that you could make me rot in jail, but I'm
9   asking you to look at what congress put in the statute, and that
10  is zero to ten because they obviously knew that there would be a
11  reason for the zero at some point.
12      I have been in jail pushing two years.  And I know that I
13  did wrong and I know that it will never be back here again.
14  Please allow me to go return home and to rescue my dad.  My life
15  might suck right now, but I could not imagine the hell that he's
16  living being dumped in a nursing home with Alzheimer's and not
17  knowing who or where he is or that my mom is even dead.
18      But most of all, let me prove to you that a person can learn
19  just as much as a short time in jail as he can in a long time.  I
20  promise you, you will not be disappointed.  If you do find it and
21  wants to punish me more than I already have, would you please
22  consider a house arrest, a halfway house, or even a camp so I can
23  work and provide for my own healthcare, pay my debts to Big Cat
24  Rescue and try to save my marriage.
25      As you know, I have two incurable diseases, which is

1   hemoglobin anemia and CVID, and my time here is limited anyway.

2       I have assisted the State of Oklahoma Tax Commission in the

3   information they need to collect over a million dollars workman

4   comp fraud, the district attorney in Las Vegas, and offered to

5   help the City of Norman fire investigator for an arson case.  I

6   will continue to do what I need to do to help make the wrongs

7   that I know of right.

8       Evidence laid on the U.S. attorney's table in the form of

9   discovery material, text messages from Matt Bryant to James

10  Garretson saying Mark was a crooked cop, text messages from Alan

11  to Cheryl saying he got the phone from the AG pizza restaurant

12  manager, not me, but was not allowed to -- but was allowed to

13  continue to perjure himself over and over again.  Like the

14  recorded phone call where he admitted he had never went to

15  Florida but told the jury he did.  Text messages to Alan from

16  Jeff Lowe telling him what to say that would make me look guilty,

17  bank records proving Eric was lying about his pay to avoid paying

18  taxes for Jeff Lowe and that he was not there when I put the

19  tigers down, bank records proving Lauren Lowe lied about buying

20  the zoo for 70 or $80,000 when they paid nothing, two years of

21  canceled checks and photos of checks and text messages giving me

22  permission to use Jeff's signature stamp anytime to conduct

23  business, the copyright lawsuit involving Big Cat Rescue.

24  Ms. Baskin lied about me putting her face on obscene bodies when

25  it had nothing to do with anything except her staffing killing

1   innocent rabbits, the text messages from James and Agent Bryant
2   telling him he was to hurry and get me in jail, and he would do
3   anything to make that happen so he could collect from Jeff.

4        Alan Glover make a scene for the jury that I was an asshole
5   and I was so hard to work for, but it was up to me to make sure
6   that they didn't come to work drunk and hung over so any innocent
7   family that come to our zoo would be killed on a daily basis.
8   Alan arrived with Jeff Lowe in November of 2015, when Jeff conned
9   his way into the zoo pretending he was a millionaire and an
10  investor, finding out he had absolutely nothing, that it was all
11  lies and it was too late.  His name was already on everything.

12       By that February, the only respect he could give to the
13  staff was allowing them to break the rules and that was to drink
14  and do drugs on the property and become his friend.  This is what
15  made Joe the asshole he became, because it was up to me to punish
16  or fire them for violating park policies.  Well over 50 times I
17  put my life in danger to protect the staff, but most of all the
18  innocent customer's lives because they left gates open and let
19  tigers out, leopards out and chimpanzees, lies because a staff
20  member was either high or drink and over the parting with Jeff, I
21  am going to the -- I wanted to show you some court videos today
22  but my lawyers said that really didn't need to because proving to
23  you that I am not a liar is probably the most important thing of
24  my life.  You could sentence me to 20 years if you wanted to, as
25  long as I know that I'm telling the truth.  And a letter was sent

1   to you just this last week from Lauren Lowe documenting that I'm

2   HIV positive now?  I asked the medical staff at the jail Monday

3   to run an HIV test so once again I can prove to you, the Court,

4   and the world that Lauren Lowe is nothing but a liar and they

5   will reach to any -- stoop to any level they need to to get what

6   they want.

7       The day Trey Key brought his tigers out for boarding, Eric

8   lost part of his finger to a grizzly bear by biting it off

9   because he was drunk and hung over and stuck his fingers in a

10  cage.  I go to town to get my car fixed and Travis shoots himself

11  and dies in the gift shop because he's high on meth that his mom

12  gave him white sitting in the gift shop waiting for illegal drugs

13  to come FedEx from Jeff Lowe from Vegas.

14      Over the years I asked for help from the FBI.  I even had

15  their phone number on speed dial.  I never got any help from

16  anyone, but it was my face, my name always on the spot smeared on

17  TV for running such a dangerous zoo.  I had to escape, that's why

18  I trusted Mark Thompson, the local police officer, but I had to

19  get the dangerous animals out of the zoo first.  I couldn't just

20  walk away and leave them there.  That's when me and PETA started

21  working together.  We moved over 50 tigers, six bears, three

22  baboons, two chimpanzees.  And unless someone does something

23  else, someone's going to die at that zoo.  I just hope it's not

24  someone's child.  Again, I have learned what I need to do in the

25  almost two years that I have been in jail to make sure that

1 justice has been served.

2     And the last thing that I would like to just say on record

3 that I'm so confused about is the Endangered Species Act.

4 Straight off of the government website, it states right here that

5 private owners will be able to breed generic tigers without a

6 permit for sale or commercial purposes within their state.  It

7 never defines what "commercial purposes" are.  I could sell them

8 for beef jerky, according to this, if that's what I wanted to do.

9 And they charge me for the word "take" that Ms. Baskin on her

10 very own website says euthanization is clearly a take.  Doing so

11 for legitimate medical reasons would fall under the exemption one

12 above "generally accepted husbandry practices" by the Animal

13 Welfare Act, which is what I did and what I was licensed by.

14 It's just nobody bothered to dig up the rest of the tiger and

15 look at why I put them to sleep.  It was all about making me look

16 like some kind of murder for these murder-for-hire charges.

17     But in closing, I know I made mistakes and I know what I

18 have done wrong and I know it will never happen again, but I

19 would like to go save my dad.

20         THE COURT:  Thank you, sir.  Anything else?

21         THE DEFENDANT:  No, sir.

22         THE COURT:  Anything else, Mr. Earley?

23         MR. EARLEY:  No, Your Honor.

24         THE COURT:  May be seated.  Take a quick five-minute

25 recess.

1       (Break taken.)

2               THE COURT:  Is there any further argument from either

3       party?

4               MS. MAXFIELD-GREEN:  No, Your Honor.

5               MR. EARLEY:  No, Your Honor.

6               THE COURT:  In imposing the sentence in this case, I am

7       mindful of my statutory duty to impose a sentence that is

8       sufficient but not greater than necessary to fulfill the

9       objectives of sentencing under the Sentencing Reform Act, and I

10      take into account the factors mandated by 18, United States Code,

11      Section 3553, including the purposes for sentencing set forth in

12      Section 3553(a)(2), which state the need for the sentence.  And

13      Mr. Earley went through these very carefully and it was a very

14      thorough job, but just to repeat, to reflect the seriousness of

15      the offense, to promote respect for the law and to provide just

16      punishment for the offense, to afford adequate deterrence to

17      criminal conduct, to protect the public from further crimes of

18      the defendant, and to provide the defendant with needed

19      educational or vocational training, medical care or other

20      correctional treatment in the most effective manner.  And I

21      further consider, as set forth in 3553(a), the nature and

22      circumstances of the offense and the defendant's history and

23      characteristics, the kinds of sentences that are available, the

24      need to avoid unwarranted sentencing disparities among defendants

25      with similar records who have been found guilty of similar

1   conduct, the advisory sentencing guideline calculation and the

2   relevant guidelines policy statements and the need to provide

3   restitution to any victims of the offense.

4        In terms of those factors, I place significant weight on the

5   seriousness of these offenses.  As to Counts 1 and 2, the

6   defendant was convicted of counts involving efforts to have an

7   individual who he considered a professional rival, a threat to

8   his income, violently murdered in two separate schemes by two

9   different men.  The pattern of conduct is particularly troubling.

10  It escalated exponentially from Mr. Maldonado-Passage initially

11  engaging in some verbal social media banter to increasingly

12  threatening and outragous videos, culminating in the defendant's

13  hiring of Alan Glover to carry out this threat, and then later

14  hiring an undercover agent to commit the murder, at least by all

15  accounts when it became unlikely Mr. Glover was going to be

16  successful.

17       An objective look at all of the evidence in this case leads

18  to the fair conclusion that the defendant was consumed, if not

19  obsessed, with silencing Carole Baskin.  There's been a great

20  deal of discussion about what the likelihood of Mr. Glover

21  actually accomplishing this and talking about what amounts to his

22  incompetence, unpredictability, which cuts both ways.  Who knows

23  what this man would have done.

24       With regard to the Lacey Act and the endangered species

25  counts of conviction, the offenses were no less serious in the

1   context of the statutes.  And I say that, which I understand

2   compared to the murder-for-hire convictions which dealt with a

3   human life, I don't mean to compare the lives of those animals,

4   but in the context of those violations, those were extremely

5   serious.  And while I would agree that those wildlife counts are

6   consumed by the guideline calculation regarding Counts 1 and 2

7   and would result in no increase in the calculation, I do disagree

8   with the position that those violations should not be considered

9   significant criminal conduct.  There is certainly an argument

10  that the wildlife counts are individually significant, but I

11  specifically find that they are significant in light of the

12  volume of the violations.  Five violations involving the unlawful

13  killing of endangered species, four violations related to the

14  unlawful sales of endangered species, and eight violations

15  regarding the associated veterinary certifications and

16  documentation for the transfer of these animals.

17      Those violations collectively demonstrate that defendant was

18  engaged in a systematic trafficking of protected animals, which

19  included the unlawful killing of a number of them.  And it is

20  immaterial to me that the defendant disagrees with the

21  interpretation of the statutes or what is included as a protected

22  animal under the ESA.

23      In imposing a sentence today, I do intend to craft a

24  sentence that provides for punishment and deterrence resulting

25  from the wildlife violations, although that will not result in an

1    upward variance, but will instead being taken into account within
2    the advisory guideline range.
3         I place significant weight on the need for the sentence to
4    promote respect for the law.  There is minimal evidence in the
5    record demonstrating any respect the defendant has for the law
6    during the course of these criminal acts.  A significant example
7    of that is, in spite of your prosecution for these very
8    violations, evidence was introduced at trial of your attempt to
9    broker the sale of a litter of lions for financial gain for your
10   husband from the county jail while you were awaiting trial.
11        I also place significant weight on the need for the sentence
12   to serve as a deterrent.  And as Mr. Earley correctly pointed
13   out, there's two components of that, specific deterrence and
14   general deterrence.  So not only a specific deterrent for your
15   criminal conduct, but also a general deterrent to others who may
16   be engaged in or considering similar criminal conduct.
17        I note in particular that there was testimony during your
18   trial in regard to the falsifying of documents associated with
19   the transfer of these animals, that those actions were common in
20   the exotic animal community and multiple references to the lack
21   of enforcement of the governing statute.  I fully intend for your
22   sentence to serve as a deterrent for any person, including you,
23   who would choose to ignore the law.
24        Finally, it is of paramount importance in this case to
25   provide just punishment for your offense and protect the public

1   from further conduct you may engage in.  While you may be

2   effectively out of the exotic animal business, the issues which

3   motivated you to solicit the murder of Carole Baskin remain.  The

4   sentence I impose will certainly advance the goals of punishing

5   you for all of these offenses and will hopefully protect the

6   public from any future offenses.

7          In arriving at that sentence, I have considered the nature

8   and circumstances of your offense, Mr. Maldonado-Passage, as well

9   as your history and characteristics.  The nature and

10  circumstances were thoroughly presented at trial and have been

11  outlined in the PSR in great detail.  Your history and

12  characteristics were also well presented in the presentence

13  investigation report and your sentencing memorandum, and I have

14  considered those as well.

15         It does weigh in your favor -- in making a sentence

16  determination, it does weigh in your favor that you have a lack

17  of any meaningful criminal record.  I have also taken into

18  consideration your charitable acts, including the providing of

19  meals and admission to your park for the underserved during a

20  number of holidays, and which include a number of instances of

21  your engagement with terminally ill children and adults who I am

22  sure, as you suggested, appreciated being around, spending some

23  time with the animals that you kept at your facility.

24         The kinds of sentences that are available to you are

25  limited.  The facts and circumstances of this case demonstrate

1    that any sentence other than a significant term of incarceration

2    followed by a term of supervised release would not fulfill the

3    purposes of sentencing as providing for in Section 3553.

4        As to the consideration of the need for the Court to avoid

5    unwarranted sentencing disparities, I know you have argued in

6    your sentencing memorandum that the fact that you are the only

7    defendant facing punishment for these offenses, suggesting that

8    other individuals were criminally responsible, would result in an

9    unwarranted disparity.  I do not give weight to that argument, as

10   the factor to be considered is in regards to defendants who have

11   been found guilty of similar conduct.  It is not charging

12   disparity; it is sentencing disparity.  Uncharged individuals are

13   not the subject of the consideration for this factor.  And

14   finally, I also take into consideration the advisory guideline

15   range and the relevant guidelines policy statement.

16       Mr. Maldonado-Passage, please stand.

17       It is the judgment of the Court that the defendant, Joseph

18   Maldonado-Passage, is hereby committed to the custody of the

19   Bureau of Prisons for a total term of 264 months.  This sentence

20   consists of 108 months as to Count 1, 108 months as to Count 2 to

21   run consecutively; twelve months as to each of Counts 3 through

22   11, the misdemeanor counts, to run concurrently with the other

23   counts; and 48 months as to each of Counts 12 and 15 through 21

24   to run consecutively to the other counts, although concurrently

25   with each other.

1     Due to your inability to pay a fine, a fine is waived.  It

2  is recommended that you participate in the Federal Bureau of

3  Prisons Inmate Financial Responsibility Program at a rate

4  determined by the Bureau of Prisons staff in accordance with the

5  program.

6     Upon release from imprisonment, the defendant shall be

7  placed on supervised release for a term of three years.  This

8  consists of three years on each of Counts 1, 2, 12 and 15 through

9  21, and one year as to each of Counts 3 through 11, all such

10  terms to run concurrently.  Within 72 hours of release from

11  custody, the defendant shall report in person to the probation

12  office in the district in which the defendant is released.

13     The defendant shall comply with the standard conditions of

14  supervision adopted by this Court and shall not possess a firearm

15  or other destructive device and shall cooperate in the collection

16  of DNA as directed by law.

17     The Court is not imposing community service.

18     The defendant shall comply with the special conditions

19  listed in Part D of the presentence investigation report, which

20  will include the substance abuse evaluation and care and will

21  also include the exotic animal and protected animal provisions as

22  listed and previously discussed.

23     The defendant shall pay to the United States a special

24  assessment of $100 per felony count and $25 per misdemeanor

25  count, for a total of $1,225, which shall be due immediately.

1     Defendant is further advised that from such judgment,

2    sentence and conviction, the defendant has the right of appeal to

3    the United States Court of Appeals for the Tenth Circuit.  Also,

4    if the defendant cannot pay costs of the appeal, the defendant

5    may apply for leave to appeal in forma pauperis, that is, without

6    payment of costs for the transcript of the trial record and an

7    attorney at government expense.  Notice of appeal must be filed

8    with the clerk of this court within 14 calendar days or the

9    defendant may request the clerk to now spread the same of record.

10    Mr. Maldonado-Passage, you have conducted yourself for years

11    doing as you pleased, whether in your actions and reactions to

12    your conflict with the victim in this case, or in regard to your

13    handling of these protected animals and the laws regarding their

14    ownership.  It is clear from the evidence in this case that you

15    are convinced that you always know better and expect your

16    explanations and directives to be taken at face value.  You have

17    routinely attempted to explain away your conduct, including

18    today, blaming those around you, whether that is Carole Baskin,

19    law enforcement, business partners or your own employees.  Sir,

20    in spite of what you may believe, you are not the only in-step

21    person in an out-of-step world.

22    Mr. Earley, is there a request as to place of incarceration?

23    MR. EARLEY:  Yes, Your Honor.  Actually, two.  The

24    Federal Medical Center at Fort Worth, and if eligible the federal

25    prison camp at Pensacola.

*Emily Eakle, RMR, CRR*

United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5403

**EXHIBIT 9**

```
1              THE COURT:  At Pensacola?

2              MR. EARLEY:  Yes.

3              THE COURT:  That will be the recommendation of the

4   Court.

5         I touched on this briefly earlier, but the Court would

6   commend both counsel for the defendant and the government for

7   their thorough presentations, not only today but at trial.  There

8   were some difficult legal issues and both sides provided

9   thoughtful analysis of those issues, have been thorough and

10  professional, and the Court appreciates that.

11        The Court would also note that, particularly given the

12  volume of facts and legal issues in this case, the United States

13  Probation Office, through Officer Kali Funderburk, did an

14  exceptional job in identifying for the Court each of the -- and

15  the parities all of those issues that are relevant to sentencing

16  in this case, as well as the relevant guideline and policy

17  considerations in determining those sentences.

18        Anything else from either party?

19              MS. MAXFIELD-GREEN:  No, Your Honor.

20              MR. EARLEY:  No, Your Honor.

21              THE COURT:  Court will be in recess.

22                   (Court adjourned.)

23

24

25
```

1          REPORTER'S CERTIFICATION

2              I, Emily Eakle, Federal Official Realtime Court

3  Reporter, in and for the United States District Court for the

4  Western District of Oklahoma, do hereby certify that pursuant to

5  Section 753, Title 28, United States Code that the foregoing is a

6  true and correct transcript of the stenographically reported

7  proceedings held in the above-entitled matter and that the

8  transcript page format is in conformance with the regulations of

9  the Judicial Conference of the United States.

10             Dated this 2nd day of March 2020.

11

12

13             **/S/ Emily Eakle**

14             EMILY EAKLE, RMR, CRR
               Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

*Emily Eakle, RMR, CRR*
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5403     **EXHIBIT 9**