# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,          )
                                   )
    Plaintiff,             )
                                   )          Case No. 5:18-cr-00227-SLP
v.                                 )
                                   )
JOSEPH MALDONADO-PASSAGE,          )
a/k/a Joseph Allen Maldonado       )
a/k/a Joseph Allen Schreibvogel    )
a/k/a "Joe Exotic,"                )
                                   )
    Defendant.             )

## SENTENCING MEMORANDUM
## FILED UNDER SEAL

Respectfully Submitted,

*/s/ Amy M. Hanna*
Amy M. Hanna
Florida Bar No.: 0120471
*/s/ John Phillips*
John M. Phillips
Florida Bar No.: 0477575
212 N. Laura Street
Jacksonville, FL 32202
(904) 444-4444
(904) 508-0683 (facsimile)
Amy@floridajustice.com
JMP@floridajustice.com
Attorney for the Defendant

*/s/ Molly Hiland Parmer*
Molly Hiland Parmer
Georgia Bar No.: 942501
1201 West Peachtree Street
Suite 2300
Atlanta, Georgia 30309
(404) 795-5060
(404) 795-5117 (facsimile)
Molly@Parmer.law
Attorney for the Defendant

## TABLE OF CONTENTS

I.  INTRODUCTION…………………………………………… 1

II.  THE PROCEDURAL BACKGROUND AND THE UNBUNDLED

 RESENTENCING………………………………………...4

III.  THE ADVISORY GUIDELINES……………………………..6

IV.  18 U.S.C. 3553(a) FACTORS…………………………………12

 A. Legal Principles Regarding Imperfect Entrapment,
 Sentencing Manipulation, and Outrageous Government Conduct
 As a Sentencing Consideration under 18 U.S.C. §3553(a)……13

 B. The Nature and Circumstance of the Offense…………………16

 C. The History and Characteristics of the Defendant, Needed Medical Care,
 Respect for the Law, and Just Punishment……………………27

 D. Deterrence and the Protection of the Public……………………30

V.  CONCLUSION…………………………………………………32

## SENTENCING MEMORANDUM

COMES NOW the Defendant, JOSEPH MALDONADO-PASSAGE, by and through his attorneys of record, and hereby submits the following Sentencing Memorandum in an effort to assist the Court in fashioning a fair and reasonable sentence in this case.

## I.      INTRODUCTION

The United States Court of Appeals for the Tenth Circuit determined this Court should group Joseph Maldonado-Passage's two murder-for-hire convictions. *United States v. Maldonado-Passage*, 4 F.4th 1097, 1100 (10th Cir. 2021). It vacated Mr. Maldonado-Passage's sentence and remanded his case for resentencing. *Id*. This Court ordered the United States Probation office to file a Supplement to its Final Presentence Investigation Report ("PSR") in accordance with the Tenth Circuit's Order and Judgement and must now resentence Mr. Maldonado-Passage.

The Sentencing Guidelines promulgated by the United States Sentencing Commission (hereinafter the "guidelines") provide an advisory, rather than a mandatory regime for determining sentences. *United States v. Booker*, 543 U.S. 220 (2005). Although the guidelines are the starting point and the initial benchmark for sentencing, district courts may impose sentences within statutory limits based on appropriate consideration of all factors listed in 18 U.S.C. § 3553(a), and "[t]his sentencing framework applies both at a defendant's initial sentencing and at any subsequent resentencing after a sentence has been set aside on appeal." *Pepper v. United States*, 562 U.S. 476, 490 (2011) (citing 18 U.S.C. § 3742(g) ("A district court to which a case is remanded ... shall resentence a defendant in

accordance with section 3553") and *Dillon v. United States*, 560 U.S. 817, 828, 827, (2010) (distinguishing between "sentence-modification proceedings" under 18 U.S.C. § 3582(c)(2), which "do not implicate the interests identified in *Booker*," and "plenary resentencing proceedings," which do)).  In addition to the change in the advisory guidelines in this case, this Court should consider post-sentencing developments which have direct bearing on the 18 U.S.C. § 3553(a) factors, including newly discovered communications between the case agent and witnesses.

This Court should vary downwardly from the guidelines due to imperfect entrapment, sentencing manipulation, and outrageous government conduct, which should be considered under 18 U.S.C. § 3553(a)(1).  From decisions made in the initial stages of the investigation to charging decisions to overzealous sentencing recommendations, one thing remains clear: this case was about doing whatever it took to put Mr. Maldonado-Passage behind bars for as long as possible. From the onset of the investigation, the government had its sights set on convicting Mr. Maldonado-Passage of murder-for-hire, an offense which has far more sentencing exposure than would a wildlife violation.  The United States Fish and Wildlife Service ("USFWS"), the Federal Bureau of Investigation ("FBI"), and the prosecutors made it their mission to create such a crime, creating an intolerable degree of governmental participation in the criminal enterprise alleged in the indictment. Federal Agent Matthew Bryant, with the help of Jeff Lowe and others, succeeded in securing the indictment against Mr. Maldonado-Passage by threatening witnesses, concealing and destroying evidence, and fabricating wildlife violations.

3

In a June 5, 2018 interview, Agent Bryant told Lowe, "[w]e need an overt act. We need money changing hands." Lowe promised: "I can completely f*ing set him up." (*See* Attachment 1: June 5, 2018 FBI Interview). Unfortunately for Mr. Maldonado-Passage, that is exactly what happened. The question now before this court is how to resentence a person who stands before it for offenses that happened years ago due to the influence and suggestion of others, specifically the FBI agents and informants who devised the murder for hire plot.

The ultimate command of § 3553(a) is to impose a sentence that is "sufficient, but not greater than necessary", to comply with the sentencing purposes stated in the statute. This parsimony provision requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing—just punishment, deterrence, protection of the public, and rehabilitation of the defendant. Thus, although § 3553(a) requires the sentencing court to consider the applicable guideline range – or, in this case, the guideline range in the Supplement to the PSR – it is only one of several factors, and it is the parsimony provision that serves as "the guidepost for sentencing decisions post-*Booker*." *United States v. Ferguson*, 456 F. 3d 660, 667 (6th Cir. 2006). This Court should consider the totality of the circumstances in this case, including the government conduct involved, and sentence Mr. Maldonado-Passage significantly below the advisory guidelines, even after the grouping error is corrected. This memorandum explains why.

4

## II.   PROCEDURAL BACKGROUND AND THE "UNBUNDLED" RESENTENCING

On September 5, 2018, a federal grand jury returned an indictment against Mr. Maldonado-Passage in Case No. 5:18-cr-227. Mr. Maldonado-Passage was charged with twenty-one counts, including nineteen counts of wildlife crimes in violation of the Endangered Species Act, 16 U.S.C. §§ 1531–1544, and the Lacey Act, 16 U.S.C. §§ 3371–3378, and two counts of using interstate facilities in the commission of a murder-for-hire plot, in violation of 18 U.S.C. § 1958(a)1 and § 2. These charges stemmed from an undercover sting operation by the USFWS and the FBI that began in September of 2017. Mr. Maldonado-Passage went to trial and was convicted. A timely appeal followed. On July 14, 2021, the Tenth Circuit issued an opinion which affirmed Mr. Maldonado-Passage's conviction but vacated the sentence and remanded for resentencing.

Because the sentence was not vacated in part, Mr. Maldonado-Passage is entitled to an "unbundled" resentencing under *United States v. Shue*, 825 F.2d 1111 (7th Cir. 1987), *United States v. Hicks*, 146 F. 3d 1198 (10th Cir. 1998) and *United States v. Bazile*, 30 Fed. Appx. 830 (10th Cir. 2002).

The Seventh Circuit held in *Shue*, 825 F.2d 1111 (7th Cir. 1987):

> "[w]hen a defendant is convicted of more than one count of a multicount indictment, the district court is likely to fashion a sentencing package in which sentences on individual counts are interdependent. When, on appeal, one or more counts of multicount conviction are reversed and one or more counts are affirmed, the result is an "unbundled" sentencing package. Because the sentences are interdependent, the reversal of convictions underlying some, but not all, of the sentence

5

> renders the sentencing package ineffective in carrying out the
> district court's sentencing intent as to any one of the sentences
> on the affirmed convictions."

In *United States v. Bazile*, the court concluded the remand "[w]as not limited to a resentencing" on just one count and referenced *Hicks*, which held that "[w]here an appellate court had not 'specifically limited' the scope of the remand, a district court generally had discretion to expand the resentencing 'beyond the sentencing error causing the reversal.'" Absent specific guidance, when applying the "sentencing package" doctrine to cases involving resentencing after a direct appeal, the "[d]octrine generally permits the district court to resentence a defendant on convictions that remain after he succeeds in getting one or more convictions vacated – even if he did not challenge the convictions on which he is resentenced." *Hicks*, 146 F. 3d at 1202 (10th Cir. 1998) (citing *United States v. Smith*, 116 F. 3d 857, 859, (1997); *United States v. Diaz*, 834 F. 2d 287, 290 (2d Cir. 1987); *Shue*, 825 F.2d at 1114; *United States v. Pimienta-Redondo*, 874 F. 2d 9, 14 (1st Cir. 1989)).

Here, the sentencing error causing the reversal deals directly with the nature and circumstances of the offense, making the guidelines and the § 3553(a) factors interdependent.  In articulating its reasons for the original sentence imposed, this Court focused on the "two separate schemes" and the "pattern of conduct" involved and tied those things to the "significant weight on the seriousness" of the murder for hire counts. The court of appeals found that Mr. Maldonado-Passage had a "common criminal objective" when engaged in the conduct charged in the murder for hire counts, however, and

determined the counts should be grouped. Given the court of appeals ruling, this Court should reconstruct the sentencing package in this case to ensure that the overall sentence remains consistent with the guidelines, the §3553(a) factors, and the appellate court's view concerning the proper sentence in light of all the circumstances. This memorandum, therefore, addresses the full scope of sentencing considerations – both the advisory guideline range and an analysis of the factors – to assist the Court in fashioning a procedurally and substantively reasonable sentence in this case.

### III.    THE ADVISORY GUIDELINES

Mr. Maldonado-Passage was convicted of two counts of use of interstate facilities in the commission of murder-for-hire, in violation of 18 U.S.C. §1958(a). His PSR applies a cross-reference for these counts under USSG §2E1.4 and calculates the offense level under §2A1.5. According to the PSR, §2A1.5 was selected on the basis that Mr. Maldonado-Passage's underlying unlawful conduct amounted to conspiracy or solicitation to commit murder. His base offense level is 33 under this guideline, and four additional levels were added because "the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder." Even though Mr. Maldonado-Passage has zero criminal history points and is in Criminal History Category I, with an adjusted offense level of 37, his advisory guideline range is 210 – 262 months.

The §2E1.4 cross-reference is inappropriate, as detailed in Mr. Maldonado-Passage's objections to the PSR. As explained by the Ninth Circuit in *United States v. Temkin*:

In 2004, U.S.S.G. § 2A1.5 was amended as part of an effort to

7

> increase the penalty for homicide offenses; the base offense level for conspiracy or solicitation to commit murder was increased from 28 to 33.3 However, U.S.S.G. § 2E1.4, which falls in *694 the category of "offenses involving criminal enterprises and racketeering," remained unchanged. Before the 2004 amendments, solicitation to commit murder involving the exchange of money resulted in an offense level of 32 under U.S.S.G. § 2A1.5. Section 2A1.5 set forth a base offense level of 28 and provided a 4–level enhancement for the exchange of money. The offense level for the use of interstate commerce facilities in the commission of murder-for-hire under U.S.S.G. § 2E1.4(a)(1) was also 32. However, after the 2004 amendments, the offense level for solicitation to commit murder involving the exchange of money jumped to 37 under U.S.S.G. § 2A1.5, which set forth the new base offense level of 33, and, as before, added the 4–level enhancement for the exchange of money.

797 F. 3d 682, 693-94 (9th Cir. 2015).

While *Temkin* ultimately concluded the district court did not commit legal error by applying the cross-reference, other courts have also noted the discrepancy inherent in applying the cross-reference. *See e.g.., United States v. Vasco*, 564 F. 3d 12, 23 (1st Cir. 2009) (upholding the use of cross-reference challenged here, but noting it was "curious, as virtually every time a defendant is charged with the use of interstate commerce facilities in the commission of murder-for-hire, the underlying conduct will be solicitation to commit murder."); *United States v. Summers*, 506 F. Supp. 2d 686, 696 (D.N.M. 2007) (noting the defendant "correctly recognizes the redundancy in the guidelines" but nonetheless applying the cross-reference). Further, as discussed infra, a four-level enhancement is entirely inappropriate as there was no money exchange for completing the alleged murder for hire.

8

Although the calculation of the offense level for the violations of the Endangered Species Act and Lacey Act have no effect on the overall advisory sentencing guideline range, Mr. Maldonado-Passage addresses these enhancements to the extent it affects the Court's consideration of a variance. The PSR applies a two-level enhancement under §2Q2.1(b)(1), alleging the offense was committed for pecuniary gain or otherwise involved a commercial purpose. These five tigers were not "killed" for pecuniary gain, however. First and foremost, the tigers were humanely euthanized due to old age and health concerns, which was adopted and approved by the United States Department of Agriculture ("USDA"), Dr. Green, and John Reinke. (*See* Attachment 2: Affidavit of John Reinke). Furthermore, the testimony elicited at trial from Trey Key shows that he made a donation to the zoo for allowing him to board his cats there every fall. There is no evidence that money was given in exchange for "killing" these tigers.

A second two-level enhancement was applied under §2Q2.1(b)(2)(b), providing the offense "otherwise created a significant risk of infestation or disease by transmission potentially harmful to humans, fish, wildlife, or plants". But the case law cited is inapplicable and the enhancement should not be applied. According to the PSR, the enhancement is warranted because this case involved some instances of the falsification of Certificates of Veterinary Inspection claiming animals were inspected before interstate transport when they were not actually inspected. There is no evidence any animal was ill or disease-ridden. As such, no risk existed.

The Certificate of Veterinary Inspection ("CVI") is the responsibility of a

9

veterinarian and Mr. Maldonado-Passage had nothing to do with these forms. In this case, Dr. JoAnne Green testified she provided veterinarian services to the park. Dr. Green testified she worked with John Reinke for many years at the park and she trusted Mr. Reinke's judgment about the health of the animals. She had no concerns about the conditions at the park and she would rely on Mr. Reinke's opinion about the health of an animal being transferred to complete the form if she did not actually inspect the animal. Given this process, there was little, if any, risk due to Dr. Green's non-inspection, if any, as the evidence tells otherwise.

In Dr. Green's October 18, 2018 interview with Agent Bryant and Agent Farabow, she indicated she inspected the animals and completed the transfer paperwork: "It may not be the day I make the certificate, but I know that I have seen probably 90% of them. I'm sure there's been at a time or two where I've been too busy. And I'm just being completely honest with you." (*See* Attachment 3: October 18, 2018 FBI Interview).

According to the PSR: "On or about June 13, 2018, Maldonado-Passage sold two adult lions to Animal Haven Zoo in Wisconsin. Finlay reported receiving between $2,500.00 and $5,000.00 in cash, and brought this money back to Maldonado-Passage. Finlay later reported to agents that this was a lower than usual amount for lions, but Maldonado-Passage was trying to move a lot of animals and obtain money quickly so that he could leave the Park. The delivery forms for this transaction allegedly falsely reflected the animals were donated, and Finlay also reported that the animals were allegedly not inspected by a veterinarian as required and as reflected on the CVI forms."

First, it is important to note that John Finlay did not work at the park. He worked at the Safari Bar. He was not responsible for the care of the animals. He was not responsible for negotiating animal transfers. He was not responsible for the CVI paperwork. He was simply a hired driver. Second, Dr. Green told Agent Bryant and Agent Farabow that she did inspect these animals. She explained: "[t]he last month when Jeff went crazy and started doing all his thing, that's what I figured we were doing. Joe kept saying, 'We're moving the animals out, because they're my animals.' So we did the paperwork to get them out of there." (*See* Attachment 3).

The cases cited in the PSR in support of this enhancement are distinguishable. Each of these cases resulted in the enhancement because there was actual evidence of a real risk of infestation or disease transmission. In *United States v. Rodebaugh*, 798 F. 3d 1281, 1298 (10th Cir. 2015), the defendant's conduct resulted in elk having direct nose-to-nose physical contact with each other and attracted the elk to the same site where they came into contact with urine and feces of multiple animals.

Similarly, in *United States v. Swan*, 100 Fed. Appx. 727 (10th Cir. 2004), the evidence presented reflected a significant risk of contamination of paddlefish roe because the processing method was "unsanitary," "they had no refrigeration equipment," and the residence "was pretty dirty." *Id*. at *1-2. Finally, in *United States v. Eyoum*, 84 F.3d 1004 (7th Cir. 1994), the adjustment was applied because a "federal public health regulation forbids the importation of a whole category of animals due to the substantial risk that they will spread illness-causing bacteria." *Id*. at 1009. No blanket prohibitions are present in

11

the instant case.

The "significant risk of infestation or disease transmission" adjustment is not warranted in the instant case because there is no evidence that Dr. Green failed to inspect an animal prior to transport. As such, there is no "significant" risk of infestation or disease transmission.

Furthermore, the animals were not killed for pecuniary gain. The five tigers were not killed to make room for cats coming from Merriweather Circus. Trey Keyes paid the Zoo $5,000 to care for his cats while they were boarded there. He did it every year. The park manager, John Reinke, who was not called to testify "because we already have our conviction." Perhaps it had something to do with the fact that he provided the government with information that these animals were humanely euthanized due to old age, arthritis and improper declawing. (*See* Attachment 2). The animals were humanely euthanized due to health concerns, via a protocol adopted and authorized by the USDA and Dr. Green.

Another enhancement was applied under §2Q2.1(3)(a)(ii) providing "if the market value of the fish, wildlife, or plants exceeded $6,500, increase by the number of levels from the table in §2B1.1". The report valued the wildlife at $58,300.00 allowing for a six-level enhancement. The value is inaccurate as you cannot place a value on humanely euthanized tigers. Further, this enhancement punishes Mr. Maldonado-Passage doubly for pecuniary gain [§ 2Q2.1(b)(l)] and for market value of the wildlife [§ 2Q2.1(b)(3)(A)]. This double counting violates Mr. Maldonado-Passage's right to due process of law. *See United States v. Blake*, 59 F. 3d 138, 140 (10th Cir. 1995) (impermissible double counting occurs when

the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes.)

In addition to the arguments developed in this memorandum and included in the defense objections to the PSR, Mr. Maldonado-Passage reiterates and incorporates by reference the guideline objections and arguments made to his original PSR and at his original sentencing hearing. Mr. Maldonado-Passage's advisory sentence range should be 121 – 151 months, not the range calculated in the Supplement to the PSR. As detailed in this memorandum, however, the reasonable sentence in this case is far below either of those ranges.

## IV.    THE 18 U.S.C. §3553(a) FACTORS

The primary directive and ultimate mandate of 18 U.S.C. §3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary." Pursuant to 18 U.S.C. §3661, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Under §3553(a)(1), this Court should not only consider Mr. Maldonado-Passage's history and characteristics in fashioning a reasonable sentence, but also the nature and circumstances of the offense. This necessarily includes the conduct of the government and others in bringing about the charges of which Mr. Maldonado-Passage is now convicted. Because there are circumstances in this case that are of a kind or to a degree

not adequately taken into consideration by the Sentencing Commission, Mr. Maldonado-Passage asks the Court to exercise its discretion under *Booker* and its progeny and impose a sentence consistent with the dictates of 18 U.S.C. § 3553(a). In this case, that sentence is significantly less than the sentence recommended by the advisory guidelines.

### A. Legal Principles Regarding Imperfect Entrapment, Sentencing Manipulation, and Outrageous Government Conduct as a Sentencing Consideration under 18 U.S.C. §3553(a)

This Court should vary from the guidelines in this case because the nature and circumstances of Mr. Maldonado-Passage's offenses involve imperfect entrapment, sentencing manipulation, and outrageous government conduct. A definition for sentencing entrapment is difficult to synthesize because there is much variance among the courts. Black's Law Dictionary defines sentencing entrapment as "a government agent's inducement of a person to commit a crime, by means of fraud or undue persuasion, in an attempt to cause a criminal prosecution against that person." *Entrapment*, Black's Law Dictionary (11th ed. 2019). Sentencing manipulation is distinct from sentencing entrapment. Sentencing manipulation occurs whenever the "government unfairly exaggerates the defendant's sentencing range by engaging in a longer-than-needed investigation and, thus, increasing the [criminal conduct] for which the defendant is responsible." *United States v. Torres*, 563 F. 3d 731, 734 (8th Cir. 2009); *see also United States v. Garcia*, 79 F. 3d 74, 75 (7th Cir. 1996) (describing sentencing manipulation "when the government engages in improper conduct that has the effect of increasing a defendant's sentence."). Unlike sentencing entrapment, the focus for sentencing manipulation is

centered on the government's conduct. *See United States v. Ciszkowski*, 492 F. 3d 1264, 1270 (11th Cir. 2007). Created by the Supreme Court in 1973, the theory behind the outrageous government conduct defense is that – even if the defendant is predisposed to committing a crime – conduct by the government could be so inherently unreasonable and unfair that due process principles would bar the government from using the courts to obtain a conviction. *See United States v. Russell*, 411 U.S. 423, 431–32 (1973). These doctrines make clear that, in some cases, the government has tremendous influence on the nature and circumstances of an offense.   Evaluating the government's role in encouraging the defendant to commit an offense is therefore necessary to consider all of the circumstances of the offense under 18 U.S.C. § 3553(a). Declining to take into account imperfect entrapment, sentencing manipulation, and outrageous government conduct in this case is a violation of *Booker*.

This Court can consider imperfect entrapment as part of its consideration of "the nature and circumstances of the offense" under § 3553(a)(1). Other circuits have held that a district court may grant a downward departure based on the district court's finding that the government had engaged in aggressive encouragement that did not rise to the level of entrapment. *United States v. McClelland*, 72 F .3d 717, 725 (9th Cir. 1995). *See also United States v. Wise*, 976 F. 2d 393 (8th Cir. 1992). The Ninth Circuit has held a downward departure to be permissible even where the jury rejected a defense of entrapment at trial and the defendant initiated the criminal activity, so long as the defendant had not pled guilty. *McClelland*, 72 F. 3d at 725. "[E]vidence of imperfect entrapment, like evidence of

15

imperfect coercion, is in some cases a legitimate ground for departure because it may show that the defendant is both less morally blameworthy than an enthusiastic [defendant] and less likely to commit other crimes if not incarcerated." *Id.* at 726. The Sixth Circuit has cited to *McClelland* with approval, noting that "courts have utilized downward departures in cases where the government has induced a defendant to commit a crime, but the defense of entrapment is not warranted." *United States v. Coleman*, 188 F. 3d 354, 358 (6th Cir. 1999).

The Tenth Circuit recognizes sentencing manipulation or entrapment as a reason to both grant a departure under the guidelines and bestow a variance. *See United States v. Beltran*, 571 F. 3d 1013, 1017-1018 (10th Cir. 2009); *United States v. Lacey*, 86 F. 3d 956 (10th Cir. 1996). Sentencing manipulation occurs when the government participates in a way designed solely to increase the severity of a criminal sentence; the Tenth Circuit requires "outrageous governmental conduct" to find such manipulation. *Beltran*, 571 F. 3d at 1018. To establish outrageous government conduct in the Tenth Circuit, the defendant must prove either "(1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime." *See United States v. Dyke*, 718 F. 3d 1282, 1288 (10th Cir. 2013) (quoting *United States v. Pedraza*, 27 F. 3d 1515, 1521 (10th Cir. 1994)).   In determining whether the government has committed outrageous conduct, "the relevant inquiry is whether, considering the totality of the circumstances in any given case, the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice." *Lacey*, 86 F. 3d at 964 (10th Cir. 1996) (quotations

16

omitted).  In the case at hand, the conduct of Agent Bryant is so outrageous that due process principles would warrant a downward departure from the sentencing guidelines. Agent Bryant was excessively involved in creating the crimes with which Mr. Maldonado-Passage has been convicted, and he showed significant government coercion to induce Mr. Maldonado-Passage to commit them.

## B.  The Nature and Circumstances of the Offense

Consideration of the nature and circumstances of the offense must include review of the government's efforts to recruit the participants and convince them to remain in the operation until the arrests are made.  Whether or not the government conduct rises to a level to support a finding of sentencing manipulation or sentencing entrapment, as discussed *supra*, the nature and extent of the government's conduct should be reviewed by the sentencing judge and factored into the sentencing calculus under § 3553(a)(1).

Here, the murder-for-hire plot unraveled when the confidential informant, Mr. Garreston, tried to direct and coerce the plan at the direction of Agent Bryant.  When this first attempt failed, the government introduced an undercover agent to Mr. Maldonado-Passage. This attempt was also unsuccessful. There was no money exchange, no murder weapon, and no overt act in furtherance of the crime. As the government's attempt at making a case against Mr. Maldonado-Passage was falling apart, Lowe entered the scene. He was in trouble, facing criminal charges in Vegas for not having a proper license or permit for wild animals.  He saw his cooperation with the USFWS and FBI as an opportunity to help himself and achieve what he always wanted: Mr. Maldonado-Passage

17

gone, for good.  Despite the fact that Lowe had knowledge of the investigation days after Garreston became involved as a CI on September 18, 2017 (*See* Attachment 4: Affidavit of Jeff Lowe), Mr. Garreston's trial testimony provides Jeff Lowe became aware of the investigation five months into it.  Garreston later recants his trial testimony regarding the timing of Jeff Lowe's knowledge of the investigation.  (*See* Attachment 5: Affidavit of James Garreston). Jeff Lowe's first meeting with federal agents wasn't until June 5, 2018. For more than eight months, James Garreston was communicating with Jeff Lowe regarding the investigation into Mr. Maldonado-Passage.  Phone calls between the two were deleted or destroyed and not disclosed to the government or trial counsel for Mr. Maldonado-Passage. (*See* Attachment 4).  Any phone calls Mr. Garreston recorded with Mr. Lowe after September of 2017, with both of them fully aware of the investigation, would have proved they were working together to put Mr. Maldonado-Passage behind bars. Given the above, it is impossible to state for certain if the government and the defense were provided with pure, unedited, unmanipulated, and wholly complete information from James Garreston.

Shockingly, Agent Bryant was aware recordings were being deleted and did nothing to stop it. A May 19, 2018 text exchange between Mr. Garreston and Agent Bryant demonstrates Agent Bryant's knowledge of destruction of evidence (*See* Attachment 6: May 19, 2018 Text Messages):

Bryant:       Anything today?

18

| JG: | No finishing affidavits going thru recording every phone call I get gets recorded so have to delete a lot meeting jeff lowe today at Winstar should see joe tomorrow |
| Bryant: | What do you think about meeting sheriff? |
| JG: | Tell me when |
| Bryant: | Early afternoon tomorrow.  Definitely need Jaime |
| Bryant: | Meet Jeff |
| JG: | Get this crap otta way tomm hes gonna show me his new spot realtor count' meet us today and going to park to see all his new animals and joe..fingers crossed..tomm u will have all avidats and recordings promise |

From February 13, 2018 through September 22, 2018, Agent Bryant asked

Garreston for these recordings which were stored on his cell phone on at least 19 occasions,

including the below dates:

| February 13, 2018, | February 14, 2018, |
| February 23, 2018, | February 26, 2018, |
| February 27, 2018, | March 19, 2018, |
| March 20, 2018, | March 21, 2018, |
| April 2, 2018, | April 5, 2018, |
| April 27, 2018, | May 6, 2018, |
| May 19, 2018, | June 18, 2018, |
| June 19, 2018, | June 23, 2018, |
| June 27, 2018, | September 22, 2018 |
| September 26, 2018. | |

A February 26, 2018 text exchange between Mr. Garreston and Agent Bryant (*See*

Attachment 7: February 26, 2018 Text Messages) states:

| Bryant: | Phone yet?  Need recordings.  Need to meet with Joe and get Mark back in picture.  At least get statement recorded that he made the other day |
| James: | Call unin few got few ideas |

A March 20, 2018 text exchange between Mr. Garreston and Agent Bryant (*See*

Exhibit 8: March 20, 2018 Text Messages) states:

| | |
|---|---|
| Bryant: | Hoping semi comes today. I have to drive to FTW for meeting. I'd like to stop by and "shop" |
| James: | Me too |
| James: | Ill let u know min it pulls in |
| Bryant: | Just a reminder about recordings |

At the June 5, 2018 meeting, wherein Mr. Lowe and Mrs. Lowe met with Agent Bryant for the first time[1], Agent Bryant explained to Mr. Lowe what elements they needed to prove and what specific evidence they needed in order to make a charge stick. He explicitly coached him on how to set up Mr. Maldonado-Passage so the government could secure a conviction. This June 5, 2018 interview shows Agent Bryant's excessive involvement in the creation of the crime in this case. (*See* Attachment 1). He explains that "an overt act is needed" and "we need money exchanging hands." He further states "all right. Well before we set anything up like that, let's just see…. the murder-for-hire is number one." "All right what we got to do is get him out of his mouth acknowledging that he paid $3,000 to Glover." Agent Bryant continuously coached Lowe on how to get these words out of Mr. Maldonado-Passage's mouth, specifically stating, "I would say, "he's worried about coming back because he owes you $3,000.[2]"

On September 13, 2018, Special Agent Matthew Rogers and Resident-in-Charge Michael Merida interviewed Robert and Pat Engesser.   When asked about purchasing a

---

[1] James Garreston was also present and a part of this June 5, 2018 meeting, which was recorded by Agent Bryant.

[2] The undersigned includes some specific portions of the interview, but it must be read in its entirely to understand the excessive coercion by the federal agent and cooperating individuals.

lion cub in November of 2017, Engesser, who previously operated Jungle Safari, a traveling petting zoo, explained that he would not have purchased a cub in November because they (Jungle Safari) only traveled through the first week of December. He also denied ever receiving a liliger from Mr. Maldonado-Passage as they are "too hard to place once they are done traveling with the zoo." (*See* Attachment 9: USFWS Report # 40).

On September 13, 2017, September 14, 2018 and September 20, 2018, Indiana Department of Natural Resources Detective Sargent Brian Kaser investigated the whereabouts of Engesser during the subject time period and determined that on November 20, 2017 and November 21, 2017, Engesser was in Kokomo, Indiana checking on his truck repairs at Button Dodge and was not in Wynnewood, Oklahoma. (*See* Attachment 10: USFWS Report # 52). On October 29, 2018, Engesser was interviewed by Agent Bryant and Agent Farabow. Engesser again did not remember getting a cub from Mr. Maldonado-Passage in November of 2017. He confirmed he did not have, nor did he know anyone who had a red sedan, the type of car Allen Glover testified was the vehicle in which he placed the cub. (*See* Attachment 9).

Engesser testified along these lines at trial. He denied being in Wynnewood, Oklahoma in November of 2017. (Engesser Tr. Trans. 883:8-22.) Agent Matthew Bryant testified with ambiguity on this matter at trial:

> "Initially we believed it was Mr. Engesser, but as – today it could be Mr. Engesser, it may not be Engesser. We do not know."

> "Just say we have conflicting statements. Some people said he was there; Mr. Engesser said he was not. We cannon verify the total truth of either."

"And then when Agent Farabow and I interviewed him, I did have the same feeling, that Engesser may be telling the truth that it wasn't him."

(Bryant Tr. Trans. 909:7-12 – 910:6.)

Approximately one month before the trial was to begin, on February 13, 2019, Jeff Lowe recorded a phone call with Agent Bryant where the two discussed this issue. (*See* Attachment 11: February 13, 2019 phone call).  This recording was turned over to the undersigned around May of 2021, and was not previously disclosed to the government or counsel for Mr. Maldonado-Passage:

| | |
|---|---|
| Lowe: | Oh yeah. Well, I'm talking about with you and Joe. From a layman's viewpoint, I would not want to be him for any amount of money. You know what? I think you got him dead to rights. So ... |
| Bryant: | I think we have a strong case. We got some holes in some stuff and we'll have to see how much they try to exploit it, but |
| Lowe: | What do you think your holes are, though? You got him |
| Bryant: | Glover. |
| Lowe: | Yeah, he is a f**ktard. |
| Bryant: | The whole money exchanging hands. The only witness is Glover. |
| Lowe: | Huh. |
| Lauren Lowe: | Mm (affirmative). |
| Lowe: | But Glover, you can check his bank account from back then, and you could see that he was broke. So how did he get the money to go to Florida and live it up for a month? |
| Bryant: | Well, yeah. No, but we'll try on that. |
| Lowe: | And if you could get Joe's goddam phone and dump it, you'd see probably him and Glover talking. I don't know. Maybe he didn't, he might be smarter than that. |
| Bryant: | I tell you what I'd like to have his phone for. |
| Lowe: | Cub sales. |
| Bryant: | **I'd like to have his phone to see who in the hell it was that showed up that day, that got that liger.** |
| Lowe: | Yeah. Yep. I've thought about it many a time. |
| Lauren Lowe: | Which liger? |
| Lowe: | On Thanksgiving. |
| Bryant: | The one [crosstalk 00:27:46]. |
| Lauren Lowe: | Oh. |

| Lowe: | Engesser. Yeah. |
|---|---|
| Bryant: | **And I don't believe it was Engesser.** |
| Lowe: | Huh. Well |
| Bryant: | Engesser spilled his guts and told me about cub sales and money and wire transfers that I knew nothing about. **And he said that day was not me.** |
| Lowe: | Huh? Aren't there a lot more cub sales that you can prove? I can help you prove more. |
| Bryant: | Yeah, we can. But that's what we indicted.  That's what we can prove at the time. |
| Lowe: | Okay. |
| Bryant: | We'll use the others as– |
| Lowe: | So they will be brought up? |
| Bryant: | They would be brought up.  And sentencing in similar conduct. These aren't the only times he's done it. This was what we've charged him with. Look at all this other similar conduct. So, if you have a rnage to go from, … I'll just pick a number, one year to five years and show you all the other similar conduct, they're going to lean more towards the five years. |
| Lowe: | right, sentencing enhancements, is that what they call it? |
| Bryant: | Something like that. |

There is no ambiguity here as to what Agent Bryant discovered regarding Engesser in this call.  Nevertheless, federal agents and the government, <u>knowing</u> Allen Glover's testimony regarding the cub transaction to be false, allowed the entire dialogue regarding this cub sale to be presented to a grand jury and continue throughout trial.

An unprofessional relationship stated to develop between Agent Bryant and Garretson. A review of the text message exchanges between Garreston and Agent Bryant finds that in addition to the almost daily communication via text between the two, there were also approximately <u>45 message threads</u> where either Agent Bryant or Garreston ask the other to call.  In addition to text communication and the phone calls, the message

exchanges document approximately <u>21 message threads</u> coordinating lunches and in-person meetings.

A review of the USFWS Reports finds the Reports do not include any information concerning a majority of the phone calls, lunches, and in-person meetings. Agent Bryant's failure to formally report on his interactions with a confidential informant and any information developed therein is a violation of Mr. Maldonado-Passage's due process rights and subject to *Brady* violations. His unprofessional relationship with Garreston continued in greater depth with the Lowes. (*See* Attachment 12: June 26, 2018 text message exchange).

Bryant:  Call me
*Bryant (in green) sends a screen shot of his messages with Lauren Lowe (in grey)*

Tue, Jun 26, 6:18 PM

Hey Lauren. Have not heard from Jeff in couple days which is odd. Checking on him. Hope y'all are good!

Sorry wasn't aware. Been so busy around the park we crash out so early

I'll see if can text you later this evening

Garretson:  No governor
Bryant:  So sad…
Bryant:  Never heard from Jeff today, or yesterday … pretty shitty way to treat someone that went to bat for him with FBI and US Attorney. I convinced them to give him a change and now he won't even speak to me. Makes me look like an idiot
Garretson:  It sucks sorry man ill do my part

24

Bryant:   Just don't understand why…I wanted to trust him and believe him. He just made a fool of me. I hope he comes through but trust is damaged.

Garretson:  I understand fully

The depth of this unprofessional relationship is also referenced in a February 13, 2019 phone call (*See* Attachment 11) between Agent Bryant, Jeff Lowe and Lauren Lowe which was never disclosed to the government or provided to Mr. Maldonado-Passage's trial attorneys. Bryant is asking if he is being recorded and when Mr. Lowe states no, he goes on to provide advice on how to handle the legal issues Mr. Lowe is having with the USDA. He states "Bob will be your advocate, I believe that. Look, he was cooperative. He told us everything we wanted to know." During this same call, Bryant provides information about the innerworkings of the case and asks the Lowe's to "keep all this to yourself, obviously." He references the Motion to Sever that Mr. Maldonado-Passage's trial attorneys filed and that it was denied. He explains, "I think what they were thinking is that we get some jurors' heartstrings bleeding on shooting those cats and showing pictures of the tiger dig and all that. And they might be prejudicial where we're weak on the murder for hire." He further instructs Lauren Lowe on how to testify at trial.

As it relates to Count Two: the evidence shows Mr. Maldonado-Passage did not ask Mark to travel to Oklahoma to meet with him, Mr. Maldonado-Passage did not ask Mark to travel to Florida to kill Carole Baskin, and Mr. Maldonado-Passage did not take action on anything discussed in the meeting with Mark. AUSA Amanda Green admitted in her Netflix interview in Tiger King that "the government doesn't have any evidence that Mr.

Passage actually obtained any of the phones or the pistol and he certainly did not give any money to the undercover agent." Plot two failed.

Mr. Maldonado-Passage would like this Court to consider the unusual amount of outside pressure he was under throughout the investigation. A review of the text message exchanges between Garretson and Agent Bryant find that Garretson communicated with Mr. Maldonado-Passage at least <u>39 times</u> via text message, phone calls and in person after the December 8, 2018 meeting with Mark. <u>None</u> of those attempts by Garretson resulted in any action on the part of Mr. Maldonado-Passage.

This Court should take into consideration how the government's role in setting up the murder for hire counts; the hours of telephone calls between Mr. Lowe and Agent Bryant, most of which were unrecorded and undisclosed (*See* Attachment 3); the way Agent Bryant directed text messages, phone calls and in-person meetings; the confidential informant's persistent importuning of Mr. Maldonado-Passage; together with Mr. Maldonado-Passage's clean record, affected the circumstances of the offense in such a way as to make Maldonado-Passage less culpable. These facts highlight the undeniable problem with the government's charges, in particular the murder for hire charges, which require proof that Mr. Maldonado-Passage "promised or agreed to pay anything of pecuniary value in consideration for the commission of the murder." Based on the recent disclosures, we know that these details did not matter to Mr. Lowe, or, apparently, USFWS, the FBI, and the prosecutors.

For those working on behalf of the government, Agent Bryant provided protection.

Not coincidentally, Allen Glover's driving under the influence cases in South Carolina were placed on a suspended sentence until Mr. Maldonado-Passage's trial concluded. He asked for immunity in exchange for cooperating with the government. In an undisclosed meeting on April 18, 2019 between Agent Bryant, another USFWS agent, Lauren and Jeff Lowe, the following comments were made:

Jeff Lowe:   … and he's down there. He's on the bulldozer today, front-end loaders. Allen's down there on the excavator.

Bryant:   Really?

Jeff Lowe:   Mm-hmmm. You ought to go down there, scare the shit out of him.

Bryant:   Yeah, I couldn't do that to him. That poor-

Lauren Lowe: Yeah, you could.

Bryant:   That poor man. I got to like him throughout the case [inaudible] and it would scare him to death if I was to go down there and

do,   well, I tried, buddy. I tried to keep ya out of trouble.

This conversation demonstrates that Agent Bryant provided or promised to provide protection to Mr. Glover for providing favorable testimony. He was told during trial prep that if he did what they asked, then no charges would be brought against him now or in the future. (*See* Attachment 13: Affidavit of Allen Glover). Jeff and Lauren Lowe were also promised some sort of immunity for cooperating.

Those whose testimony was unfavorable to the government were threatened with criminal charges. Engesser got out of the animal business and no longer has a USDA license. Dr. Green was threatened with criminal charges or losing her veterinary license.[3]

---

[3] Undersigned counsel has not yet met with Dr. Green, but this information was relayed by her to other parties.

(*See* Attachment 2).  Garreston had more than just a stolen lemur; he had credit card fraud and illegal cub sales the government could bring.

The murder-for-hire case against Mr. Maldonado-Passage involves outrageous government conduct under the Tenth Circuit's standard, given Agent Bryant's excessive involvement in creating the crime. Lowe, Garreston, Agent Bryant, and the government were motivated to push this concocted, convoluted plot forward no matter how ridiculous and unbelievable it became. Mr. Maldonado-Passage joked about the death of Carole Baskin for years. But no one took him seriously, not even law enforcement. This is clear from his spotless criminal record. He was never investigated nor charged nor convicted of attempting to kill Carole Baskin, despite his performative banter, until this case.  But when Agent Bryant started working with Jeff Lowe, who had Glover wrapped around his finger, and threatened every single witness that testified at trial, a prosecutable murder-for-hire plot materialized at the hands of the government.

### C. History and Characteristics of the Defendant, Needed Medical Care, Respect for the Law, and Just Punishment

Mr. Maldonado-Passage incorporates by reference the mitigation shared in his first sentencing memorandum and at his previous sentencing hearing. This Court is familiar with Mr. Maldonado-Passage's trial and convictions but must also consider his personal character well beyond what was paraded before the jury. Prior to his arrest, Mr. Maldonado-Passage provided support and positivity to terminally ill children, terminally ill elderly people, souls lost to drug and alcohol abuse, others suffering from broken hearts,

the poor, the homeless, and societal outcasts. He welcomed everyone to the park, especially those who needed help, with no questions asked. He was generous and non-judgmental.

In addition to his personal characteristics, Mr. Maldonado-Passage has medical conditions which should be considered by this Court in fashioning a reasonable sentence. COVID-19 has caused an unprecedented global public health crisis. The disease has spread exponentially, shutting down businesses, schools, jobs, courts, countries, and life as we know it. People with primary risk factors, including age and the immunocompromised, face a particularly high risk of suffering severe health effects or dying should they contract the disease. Mr. Maldonado-Passage has been diagnosed with common variable immunodeficiency (CVID) which is an immune system disorder that causes low levels of the proteins that help fight bacterial and viral infections. Treatment requires regular intravenous infusion therapy.

COVID 19 has thrown into serious question whether a defendant like Mr. Maldonado-Passage – a non-violent, 57-year-old, first-time offender who poses no danger to the public – should be incarcerated, when supervised release and an additional condition of home detention is an available and a productive alternative to warehousing a vulnerable individual. Placing Mr. Maldonado-Passage into the federal prison population at the present time presents significant health risks. Recently, in addition to CVID, there is some concern that he perhaps has an undiagnosed cancer. At this time, he has been instructed to visit his physicians regularly and continue to undergo additional testing and scans. All of this testing has been delayed due to lockdown at the prison because of COVID. Meanwhile,

the cyst in his stomach is growing. His condition is rapidly deteriorating. Under the present public health emergency, it would be consistent with § 3553(a) for the Court to impose on Mr. Maldonado-Passage a sentence that he can serve without undue risk to his health.

The BOP and the government have acknowledged the serious health crisis that COVID-19 poses to the federal prison population. The BOP has already released thousands of inmates to home confinement. In addition, courts in this district and across the country have granted a large number of compassionate release motions, finding "extraordinary and compelling" circumstances in light of the serious health risks caused by COVID-19 and recognizing that "the best—perhaps the only—way to mitigate the damage and reduce the death toll [of inmates from COVID-19] is to decrease the jail and prison population by releasing as many people as possible." *United States v. Nkanga*, 450 F. Supp. 3d 491, 492 (S.D.N.Y.), reconsideration denied, 452 F. Supp. 3d 91 (S.D.N.Y. 2020).

In addition to the considering the pandemic in reducing prison sentences, a district court in the Northern District of Illinois recently cited outrageous government conduct as part of its analysis of "extraordinary and compelling" circumstances in granting a motion for compassionate release. *See United States v Conley,* Case No. 11 CR 0779-6 (N.D. Ill. Mar. 4, 2021). In *Conley* – a false stash house case – the court found that compassionate release was warranted based on the injustice and unfairness of a prosecution and resultant sentence which was "devoid of true fairness" and served "no real purpose other than to destroy any vestiges of respect in our legal system and law enforcement that this defendant

and his community may have had." *Id.* The same government conduct concerns involved in false stash house cases – fabricating crime, excessive government involvement in the creation of the offense, and strategically enhancing a defendant's sentence – are at play in the case at hand. Cases involving imperfect entrapment and outrageous government conduct do not promote respect for the law. They do the opposite. Sentencing Mr. Maldonado-Passage to a below-guidelines sentence is the only way to satisfy the objectives of § 3553(a), which requires a court to consider these factors.

## D. Deterrence and the Protection of the Public

A lengthy period of incarceration is a sanction, and just one of many available to lawbreakers in our society. One of the purposes of incarceration is punishment, another is rehabilitation. It serves other purposes as well; specifically, deterrence and protecting the public. But in Mr. Maldonado-Passage's case, a lengthy prison sentence does not serve the purposes it typically does for criminal defendants. The need to incapacitate criminals via incarceration is far weaker in the case of first time, middle-aged, infirmed criminals like Mr. Maldonado-Passage, and particularly in those who were induced by the government to commit their offense. As detailed in this memorandum and shown in the attachments, Mr. Maldonado-Passage is significantly less culpable than the typical offender given the government conduct in this case. At Mr. Maldonado-Passage's original sentencing hearing, this Court felt a need to protect the public from any future offenses given "the issues which motivated [him] to solicit the murder of Carole Baskin remain." But his motivation was influenced by federal agents and undercover informants and is not

31

of his own design. Therefore, the need for incapacitation is significantly less.

This Court should consider the fact that Mr. Maldonado-Passage will probably never again be convicted of a criminal offense. Prior to this case, he had not been convicted of even a minor offense. The United States Sentencing Commission has found that ". . . offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points.[4]"

Second, the deterrence rationale for traditional incarceration is shortsighted in cases where defendants are less predisposed to commit an offense in the first place. A prison sentence significantly below the guidelines will have the same deterrent effect on Mr. Maldonado-Passage, and would still be a serious, meaningful sanction for his conduct. Additionally, giving Mr. Maldonado-Passage a lengthy prison sentence is not a deterrent to other potential offenders. This is directly refuted by the findings of the Department of Justice's National Institute of Justice. According to the NIJ, 1) the certainty of being caught is a vastly more powerful deterrent than the punishment, 2) police deter crime by increasing the perception that criminals will be caught and punished, and 3) increasing the severity of punishment does little to deter crime[5]. While there might be a gut level appeal to an argument about how a long sentence of imprisonment for Mr.

---

[4] *See* Research Series on the Recidivism of Federal Guideline Offenders, United States Sentencing Commission, www.ussc.gov/publicat/Recidivism_FirstOffenders.pdf (May 2004).

[5] *See* National Institute of Justice, Five Things About Deterrence, https://nij.ojp.gov/topics/articles/five-things-about-deterrence (May 2016).

Maldonado-Passage would create general deterrence, the vast body of social science research on the subject tells us that this argument is wrong.

## V. CONCLUSION

For the foregoing reasons, as well as those that will be adduced at the sentencing hearing, counsel for Defendant respectfully request that the Court impose a sentence significantly below the advisory sentencing guidelines.