# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,      )
                             )
      Plaintiff,            )
                             )      Case No. 18-227-SLP
v.                          )
                             )
JOSEPH MALDONADO-PASSAGE,    )
a/k/a Joseph Allen Maldonado     )
a/k/a Joseph Allen Schreibvogel   )
a/k/a "Joe Exotic,"          )
                             )
      Defendant.         )

# MOTION FOR NEW TRIAL

Respectfully submitted,

_/s/ John M. Phillips_
John M. Phillips
Florida Bar No.:0477575
_/s/ Amy M. Hanna_
Amy M. Hanna
Florida Bar No.: 0120471
212 N. Laura Street
Jacksonville, FL 32202
(904) 444-4444
(904) 508-0683 (facsimile)
Attorneys for Defendant
amy@floridajustice.com
jphillips@floridajustice.com

_/s/ Molly Hiland Parmer_
Molly Hiland Parmer
Georgia Bar No.: 942501
1201 West Peachtree Street
Suite 2300
Atlanta, Georgia 30309
(405) 795-5060
(405) 795-5117 (facsimile)
Attorney for the Defendant
Molly@Parmer.law

**TABLE OF CONTENTS**

**PROCEDURAL HISTORY** ........................................................................................................ **3**

**INTRODUCTION** ..................................................................................................................... **4**

**NEW EVIDENCE** ..................................................................................................................... **5**

    James Garretson ...................................................................................................................... 5

    Allen Glover ............................................................................................................................. 6

    Jeff Lowe ................................................................................................................................. 7

    Lauren Lowe ............................................................................................................................ 9

    John Reinke ........................................................................................................................... 10

**BRADY VIOLATIONS** ......................................................................................................... **10**

    Recordings ............................................................................................................................. 11

    Brittany Medina .................................................................................................................... 11

    Chealsi Putman ..................................................................................................................... 12

    Ashley Webster ..................................................................................................................... 12

    Bryant Communications ....................................................................................................... 12

    Tiger Excavation .................................................................................................................. 13

**GIGLIO** ................................................................................................................................. **14**

    Allen Glover .......................................................................................................................... 14

    Dr. Joanne Green .................................................................................................................. 14

    James Garretson .................................................................................................................... 15

    John Finlay ............................................................................................................................ 15

    Jeff Lowe .............................................................................................................................. 15

**NAUPE** ................................................................................................................................. **16**

    The Government Created The Crime ..................................................................................... 17

    Maldonado had not engaged in criminal activity prior to the government's involvement ....... 18

    Absent The Government's Involvement, No Crime Would Have Occurred .......................... 19

        **Plot One** ........................................................................................................................ **20**

        **Plot Two** ........................................................................................................................ 20

        **Plot Three.** ..................................................................................................................... 22

**PROSECUTORIAL MISCONDUCT** .................................................................................... **23**

**CONCLUSION** ...................................................................................................................... **24**

# TABLE OF AUTHORITIES

**Cases**

*Brady v. Maryland*, 373 U.S. 83 (1963). ................................................................... 10

*Dodd v. Trammell*, 753 F. 3d 971 (10th Cir. 2013). ................................................ 23

*Giglio v. United States*, 405 U.S. 150 (1972) ......................................................... 10

*Kyles v. Whitley*, 514 U.S. 419 (1995). ..................................................................... 5

*Matthews v. Workman*, 577 F. 3d 1175 (10th Cir. 2009) ...................................... 23

*Naupe v. Illinois*, 360 U.S. 264 (1959). ................................................................. 16

*Torres v. Mullin*, 317 F. 3d 1145(10th Cir. 2003) ................................................. 23

*Trammell v. McKune*, 485 F.3d 546 (10th Cir. 2007) ............................................ 10

*United States v. Archer*, 486 F. 2d 670 (2d Cir. 1973) .......................................... 21

*United States v. Bagley*, 473 U.S. 667(1985). ....................................................... 11

*United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981) .................................... 21

*United States v. Coates*, 949 F. 2d 104 (4th Cir. 1991) ........................................ 20

*United States v. Dyke*, 718 F. 3d 1282 (10th Cir. 2013). ...................................... 17

*United States v. Garcia*, 793 F. 3d 1194 (10th Cir. 2015). ................................... 16

*United States v. Keats*, 937 F.2d 58, (2d Cir.) ...................................................... 21

*United States v. Mosley*, 965 F. 2d 906 (10th Cir. 1992) ...................................... 17

*United States v. Russell*, 411 U.S. 423 (1973). ..................................................... 17

*United States v. Stevens*, 978 F. 2d 565 (10th Cir. 1992). ....................................... 5

*United States v. Twigg*, 588 F. 2d 373 (3d Cir. 1978) ........................................... 19

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,               )
                                        )
    Plaintiff,                          )
                                        )          Case No. 5:18-227-SLP
v.                                      )
                                        )
JOSEPH MALDONADO-PASSAGE,               )
a/k/a Joseph Allen Maldonado            )
a/k/a Joseph Allen Schreibvogel         )
a/k/a "Joe Exotic,"                     )
                                        )
    Defendant.                          )

### MOTION FOR NEW TRIAL

Defendant, JOSEPH MALDONADO, by and through undersigned counsel respectfully moves this Court pursuant to Rule 33 of the Federal Rules of Criminal Procedure, for an Order vacating the judgment of his convictions and sentence and ordering a new trial and in support thereof states as follows:

**Maldonado requests an evidentiary hearing and that he be produced for that hearing.**

### PROCEDURAL HISTORY

Following his trial, Maldonado was convicted for two counts of the use of interstate commerce facilities in the commission of a murder for hire; and seventeen counts of violations of the Lacey Act and Endangered Species Act. He was sentenced to 22 years in prison. Maldonado appealed his sentence and conviction. The Tenth Circuit Court of

Appeal confirmed the convictions, but vacated the sentence and remanded to the district court for re-sentencing.

On January 28, 2022, Maldonado was re-sentenced by the district court to 21 years. An appeal is forthcoming. Defendant requested leave to file an oversized brief in support of his Motion for New Trial [DE 21], but this Court denied the request because of Defendant's "scant explanation." [DE 213].[1] Defendant incorporates and adopts all factual and legal arguments herein from Defendant's Motion for New Trial attached as *Exhibit 1* to Defendant's Second Motion for Leave to File an Oversized Brief [DE 214].

## INTRODUCTION

Mr. Maldonado has spent 1,252 days incarcerated, but what happened between February 6, 2014 and September 7, 2018 was not a proper investigation or a fair prosecution. It was filled with lies, manipulation, betrayal, jealousy and greed. Lines were crossed, limits were pushed, rules were broken, and the law was violated every step of the way. The behavior of our own federal government is shocking. The agency we expect to protect us has done just the opposite. They have violated Maldonado's Due Process Rights over and over again. Justice must prevail.

PCC obtained the following during their investigation of this case: recorded phone calls from James Garretson, ("Garretson') captured during his tenure as a confidential informant for the government (*See Exhibits 3,4,14-27, 29-66 and 68-100)*; recordings

---

[1] While the Defendant believes the Court's ruling to be vague, he files this Motion out of an abundance of caution to preserve the timing of his ability to seek this relief.

from Jeff Lowe ("Lowe") and Lauren Lowe (*See Exhibits 119, 126-130 and 137*); photographs and videos from the Lowes (*See Exhibit 131); Affidavit of Garretson (*See Exhibit 10); Affidavit of Lowe (*See Exhibit 125*); Affidavit of Lauren Lowe (*See Exhibit 133); Affidavit of Allen Glover ("Glover") (*See Exhibit 112)*; and Affidavit of John Reinke ("Reinke") (*See Exhibit 113).The investigation conducted by PCC combined with the evidence obtained therein so strongly undermines confidence in Mr. Maldonado's verdict that justice demands that his conviction be vacated.

## NEW EVIDENCE

To succeed on a motion based on newly discovered evidence, the defendant must show that: (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal." *United States v. Stevens*, 978 F. 2d 565 (10th Cir. 1992). "The touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence*." Kyles v. Whitley*, 514 U.S. 419 (1995).

**James Garretson**

James Garretson turned over his phone containing hundreds of recordings stored on an app called Cherbino. The recordings revealed perjury by witnesses, fabrication and manipulation of evidence, outrageous government misconduct, prosecutorial misconduct, threats and coercion of witnesses and immunity deals from the government. (*See Exhibits 3, 4, 14-27, 29-66, 68-100.*)

Garretson's recordings could not have been discovered due to the fact that he intentionally deleted and withheld the recordings. The recordings provide both exculpatory and impeachment evidence directly related to the criminal investigation into Maldonado as outlined briefly above and further in the corresponding exhibits. The phone also reveals clear evidence of identity fraud, theft and witness collusion. Had the jury heard this evidence, there is more than a reasonable probability the outcome would have been different.

**Allen Glover**

The information Glover provided PCC included not only recanted testimony, but his motivations to lie during the criminal trial. (*See Exhibit 112, 114, 115 and 116.*) Glover's recantation not only impeaches his credibility, but it also provides exonerating evidence for Maldonado, which was partially confirmed by the FBI in their own post-trial investigation (*See Exhibits 123 and 124.*) Glover admits testimony regarding the exchange of money for his agreement to kill Carole Baskin was false which has also been corroborated by Reinke. (*See Exhibit 113.*) Glover further admitted Maldonado did not **take** his phone and Maldonado did not **give** him a phone.  The words take and give matter

here, as his testimony that Maldonado took his phone and gave him another one, established the elements needed for a conviction for the use of interstate commerce in a murder-for-hire.

Glover's phone extraction differed from what the government produced[2]. (*See Exhibits 120-121.*) Messages between Agent Bryant and Glover that had not been previously disclosed to trial defense counsel. (*See Exhibit 117 and 118.*) In this exchange, Glover gave Bryant the name of his roommate, so that Agent Bryant could confirm Glover's the dates he was living in South Carolina. Again, this is information was not disclosed to trial defense counsel.

Had trial defense counsel had the benefit of knowing about the fabricated text messages and recorded calls, there is a reasonably probability that the outcome of the trial would have been different. Furthermore, without Glover's now recanted testimony, the Government would not have been able to establish the elements needed for Count 1 of the Superseding Indictment.

**Jeff Lowe**

In addition to providing verbal testimony and perfecting an affidavit, Lowe turned over cell phones with text message exchanges and recordings of phone calls between himself and Agent Bryant (*See Exhibits 119, 126 − 130.*); a photograph of the tiger excavation and a video of the tiger excavation. (*See Exhibits 131 and 132.*)

---

[2] This is also a clear *Brady* violation

The video, photograph and recordings produced to PCC during the post-trial interviews document that 1) there were six tiger skulls and not five; 2) the willful destruction of evidence; 3) Garretson's active participation in identity theft during the trial; 4) Bryant's willful misconduct regarding the collection of evidence; 5) Bryant's willful misconduct regarding the destruction of evidence 6) Bryant's willful obstruction of another pending USDA federal investigation; and 7) Bryant continued need to ask witnesses to lie for him are obviously and grossly impeaching to both Garretson and Bryant. The recordings were obtained in real time, during the criminal investigation and trial. The recordings provide an authentic view of the inner workings of Bryant's handling, or miss-handling, of the investigation and evidence.

Lowe has also produced a fraudulent rental application, using a false identity created by Garretson, which goes to the heart of the issues of the criminal trial. Much of the evidence against Maldonado included the allegation he asked Glover to get a fake ID so he could travel undetected. However, in reviewing the lease agreement, it is abundantly clear Garretson and Lowe were actively involved in criminal identity theft at that time, which is further substantiated by the content of Garretson's phone.

Lowe's evidence also provides context to evidence the government did produce. For instance, many third parties were highly motivate in the prosecution of Maldonado, including PETA, ALDF, HSUS, and even National Geographic as documented in e-mails produced. However, evidence provided by Lowe and Garretson show highly impeachable misconduct by Bryant and Maxfield-Green, including Bryant being featured as a hero in

his ally, Sharon Guynup's work. Additionally, Lowe's evidence reveals instances of producers of *Tiger King* buying evidence, who not only paid witnesses before, during and after the trial, but purchased evidence under "licensing agreements."

The new evidence at the very least creates reasonable doubt. It not only challenges character, but the recordings document a deliberate effort by Lowe and Bryant to misrepresent facts and to alter evidence in such a way as to inappropriately influence the outcome of the trial. Bryant's verbally expressed need, which was captured in recordings, to spin and twist and outright lie, indicates their awareness that the unaltered testimony and evidence were favorable to Maldonado.

**Lauren Lowe**

Lauren Lowe recanted a portion of the testimony she offered at trial.(*See Exhibit 133.*) During the trial, Lauren Lowe testified that she received a cell phone in the mail from the zoo. Her testimony was significant in that Glover's phone that was shipped to her was material in securing the indictment on the first Count of the Indictment. Lauren Lowe admits that what she received was actually "a summons from PETA regarding Tim Stark." She could not say for certain that the package from the zoo "contained Frank Allen Glover's phone." (*See Exhibit 133*). This is corroborated by a text message she turned over to PCC. (*See Exhibit 136.*) Here, the recantation and supporting evidence are significant. Without the original testimony, the government would not have been able to demonstrate one of the core elements needed in establishing the crimes charged.

She also admits participation in the fabrication of evidence; her participation with Bryant when breaking into Maldonado's home and taking undisclosed items; Bryant's use of Chealsi Putnam as a cooperating witness; and Ashley Webster's romantic involvement with Glover. All evidence that the government was aware of but failed to turn over to trial defense counsel, warrants the granting of a new trial for Maldonado.

**John Reinke**

In addition to his affidavit (*See Exhibit 113*), Reinke provided new information regarding the five euthanized tigers and falsification of reports by Bryant. Reinke's affidavit supports the recanted testimony of Glover regarding money to leave the park, not to kill Carole Baskin. His statements contradict the false testimony of Eric Cowie as the tigers were humanely euthanized because of age and serious health issues. Reinke stated federal agents "changed my testimony in this report to favor the State's case." All is evidence that would have changed the outcome of the case if the jury had heard it.

## BRADY VIOLATIONS

*Brady* safeguards defendants from prosecutorial foul play with respect to favorable evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To establish a *Brady* violation, a defendant must demonstrate that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material to an issue at trial. *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Trammell v. McKune*, 485 F.3d 546, 551 (10th Cir. 2007). The *Brady* inquiry considers evidence cumulatively, and importantly, imposes

on the prosecution a "duty to learn any of the favorable evidence known to others acting on the government's behalf in the case." *Id.* The prosecution's duty to disclose evidence favorable to the accused includes the duty to disclose impeachment evidence as well as exculpatory evidence. *Id.* The evidence only needs to be "favorable to the accused," *Brady* at 87, and create a "reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 681 (1985). A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 682

**Recordings**

All recordings from Garretson and Lowe were intentionally withheld or destroyed, despite the government's knowledge of the existence of these recordings. Over 389 recordings were not disclosed. The evidence contained in these recordings demonstrates the perjury committed at trial, the witnesses true motivation in cooperating with the government, the misconduct of the lead investigators and AUSAs, efforts to gain information on trial defense counsel's strategy, promises of immunity and more. If this evidence was properly turned over to trial defense counsel, there is a reasonable probability the outcome would have been different, so much so that the charge might not have even ensued.

**Brittany Medina**

Brittany Medina was present for many meetings with Bryant, but she was never disclosed as a witness. In fact, she witnessed the August 2017 bike path conversation in

the zoo office and would have testified that it was Lowe not Maldonado who pulled up the map of Carole Baskin's home and discussed ways to kill her. She would have corroborated Maldonado's testimony and refuted the testimony of Garretson and Glover. Exculpatory and impeachment evidence that had the jury heard it, there would have been a different outcome.

**Chealsi Putman**

PCC discovered Chelasi Putman was working as a cooperating individual for the government throughout the entire criminal investigation. She was in regular communication with Bryant and was alleged to have had a romantic relationship with Bryant, by her Uncle, Yuri Schreibvogel (*See Exhibit 133 and 134.*) She texted Lauren Lowe that she was trying to get Maldonado "arrested for years and years," and we now have evidence of her financial reward for doing so. None of her calls or messages were turned over to trial defense counsel. An evidentiary hearing is necessary to determine her level of cooperation and the information she provided to the government.

**Ashley Webster**

Similarly, Webster was a cooperating witness. In a video dated April 26, 2020, Ashley Webster admitted she returned to zoo on at least one occasion to obtain more information for the federal government. (*See Exhibit 141.)* It was also undisclosed that she was sleeping with the alleged hitman, which Bryant purposefully withheld, which would have impeached his credibility at trial. Glover also admits to having a sexual relationship with

her, which was known by Bryant and hid from the defense. An evidentiary hearing is necessary to determine her level of cooperation in the investigation.

## Bryant Communications

During the investigation Bryant offered cooperating individuals the opportunity to contact him on his personal cell phone. (*See Exhibit 143.*) None of these communications were turned over to trial defense counsel, despite their discovery requests. Similarly, text message correspondence involving Bryant appears to be edited or altered in some way. The altered versions do not account for the entirely of the conversations held between Bryant and those he engaged to cooperate with the investigation. (*See Exhibit 144.*)

The concealment of these messages and calls leads to the reasonable conclusion that this text messages or calls contained exculpatory information. These messages were not accessible to trial defense counsel because the phone was kept in the exclusive possession of Bryant. Bryant's concerted effort to lie, alter, and conceal evidence requires an evidentiary hearing.

## Tiger Excavation

The government purposefully failed to recover and examine the bodies of the tigers, which had potentially exculpatory value in that their examination would have corroborated Maldonado and Reinke's claims the animals were of old age, arthritic and declawed.  A proper excavation and forensic review of the entirety of the tigers would have shown the animals were not healthy and that the euthanization was humane. It would have refuted the governments theory that it was done to provide money for the zoo.

The government acknowledged the evidence of the bodies to be potentially exculpatory when it directed the exhumation of the heads only so as to not confuse the jury and to prevent Maldonado from defending himself with arguments "that [the tigers] had illnesses." (*See Exhibit 125, 145 and 146*.) The AUSAs instruction to Bryant to only remove the heads was deliberate. The AUSAs were not following the investigation through to its natural outcome, but rather working towards a specific outcome – to prejudice the defense and inflame the jury. (*See Exhibit 128.*) Additionally, an evidentiary hearing is necessary to determine why six heads were removed, but only five were reported. There is a reasonable probability that the sixth head would have supported Maldonado's position the animals were properly euthanized, ultimately resulting in a different outcome.

Furthermore, an evidentiary hearing is necessary to determine why a glorified photo shoot was done by the lead investigators during the pendency of Maldonado case. (*See Exhibits 110 and 132.)* This photo shoot removed the skulls from evidence packaging, destroyed the chain of custody and further destroyed the exculpatory value of the animals.

## GIGLIO

In. *Giglio*, 405 U.S. at 161, The United States Supreme Court decided that the government's failure to disclose the immunity agreement violated due process.

**Allen Glover**

At trial, Glover was asked by the government and trial defense counsel if he was promised immunity. (Trial Tr. 650: 1-7; 12-23). In fact, quite the opposite occurred. Glover revealed that AUSAs told him "If [he] did what they asked then no charges would be

brought against me now or in the future." [See *Affidavit Allen Glover Ex. 2*]. This is further

corroborated by Bryant's own admission wherein he states "If I was to do down there and

go, well, I tried buddy, I tried to keep you out of trouble." (*See Exhibit 119.*)

**Dr. Joanne Green**

Doctor Green was not asked about immunity at trial, but Garretson tells a caller that

"he was present when the government called Dr. Joanne Green and said, 'if you don't go,

you're going to get arrested.'" (*See Exhibit 43*).   PCC spoke with Dr. Green, who did not

want to get involved, but was able to confirm some level of coercion.

**James Garretson**

Garretson testified at trial that he was not given immunity. (Trial Tr. 579:

19-25: 580:7-20). However, Garretson was provided immunity from a lemur sale

and years of illegal credit card fraud. His immunity was revealed in phone calls

turned over to PCC and by his own admission in his affidavit. (*See Exhibits 9, 10,*

*31, 33, 35.*)

**John Finlay**

Finlay's immunity for testifying favorably for the government is set out in calls

between Johnson and Bryant. (*See Exhibit 19*) and text messages between Garretson and

Bryant. Finlay was apparently threatened with charges to prosecute him related to videos

of criminality, but no such videos exist despite Lowe and Bryant claiming they do. These

calls also demonstrate the fear Bryant had over this information getting out.

**Jeff Lowe**

While Jeff Lowe did not testify at the trial, he was a cooperating witness for the government. In addition to his affidavit (*See Exhibit* #), his immunity was revealed in recordings between Lauren and Bryant and Garretson and Johnson (*See Exhibits 30 and 137.*) These recordings also confirm Lauren Lowe's immunity in exchange for her cooperation.

Despite the governments knowledge of witnesses engaging in illegal criminal activity throughout the investigation and continuing post-trial, none of these witnesses have been criminally charged. Not one. Yet, the prosecution stands by the fact that they were never offered immunity. The new evidence provides differently. Witnesses were coerced into testifying favorably for the government. The nondisclosure of these promises, constitutes a violation of due process requiring a vacated conviction and sentence.

## NAUPE

The Due Process clause is a procedural shield for defendants against the threat of convictions by false evidence. *Naupe v. Illinois*, 360 U.S. 264, 269 (1959). In *Garcia*, "A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material. *United States v. Garcia*, 793 F. 3d 1194, 1199 (10th Cir. 2015).

At trial Garretson lied about who knew he was working as a confidential information for the government. (Trial Tr. 556:23-25.) The government knew his testimony was false, because they too, had direct knowledge that other individuals knew of his work as a confidential informant in this case. This is corroborated by Garretson's trial prep meeting where Johnson called Garretson and the AUSAs were putting questions

on a post-it note to Garretson in order to elicit defense trial strategy. Furthermore, the government had direct knowledge Medina, Lauren Lowe, Lowe and the Baskins knew of Garretson's work as a CI since inception.

Garretson's perjury hid the self-serving nature of the information Lowe provided to Garretson.  It also concealed the fact that communication between Garretson and Lowe was not spontaneous and / or authentic dialogue between a confidential informant and an alleged criminal co-conspirator. Furthermore, it created the false impression that Garretson was a confidential informant for the government who captured pure, authentic, unadulterated recordings, when in actually, there was nothing *confidential* about his work.  The evidence he provided the government was anything but authentic.

## OUTRAGEOUS GOVERNMENT MISCONDUCT

The Supreme Court of the United States has held the conduct of law enforcement agents can be "so outrageous that due process principles would absolutely bar the government from invoking judicial processed to obtain a conviction." *United States v. Russell*, 411 U.S. 423 (1973). Since *Russell*, the Tenth Circuit has recognized the viability of the defense. The Tenth Circuit first recognized it in *United States v. Mosley*, 965 F. 2d 906 (10th Cir. 1992), the court held, "when the government's conduct during an investigation is sufficiently outrageous the courts will not allow the government to prosecute offenses developed through that conduct." The central question is whether the government agents acted in a way that offends the universal sense of justice regardless of

the defendant's predisposition to commit a crime. Federal courts have struggled to define its requirements with any degree of precision, finding instead the inquiry revolves around the "totality of the circumstances." *See Mosley* at 965; *see also Lacey*, 86 F. 3d 956, 964 (10th Cir. 2013). The Tenth Circuit has held that a defendant asserting the outrageous government conduct defense bears the burden of proving either 1) excessive governmental involvement in the creation of the crime, or 2) a significant governmental coercion to induce the crime. *United States v. Dyke*, 718 F. 3d 1282, 1288 (10th Cir. 2013).

**The Government Created The Crime**

The government was excessively involved in creation of the crime of which Maldonado was convicted. There is no bright line test for determining a point at which the government's involvement becomes excessive, but there are a few guiding principles. The government is free to infiltrate an ongoing criminal enterprise, "induce a defendant to repeat or continue a crime or even induce him to expand or extend previous criminal activity." *Mosley* at 911. However, "where the government essentially generates new crime for the purpose of prosecuting it or induces a defendant to become involved for the first time in certain criminal activity, as opposed to merely interposing itself in an ongoing criminal enterprise, such conduct has occasionally been held to be outrageous." *Id.*

The government in this case did not infiltrate an ongoing criminal enterprise, induce the defendant to repeat or continue a crime, or induce him to expand previous criminal activity within the bounds of permissible investigative conduct. Here, prior to the inception of the federal government's undercover operations, there was no criminal enterprise to

infiltrate. Maldonado had not engaged, or even attempted to engage in criminal activity, nor was he manipulated into doing so.

*Maldonado had not engaged in criminal activity prior to the government's involvement*

Maldonado was not engaged in criminal activity prior to the government's involvement. While Maldonado's threats to Carole Baskin may be unsettling to some, they must be interpreted with the commands of the First Amendment in mind. Maldonado made no serious expression of an intent to commit an act of unlawful violence to Carole Baskin prior to government involvement. While there is a point at which speech becomes criminal, Maldonado's speech never crossed that line. He had no date, no plan, no means to execute a plan, no materials, no expertise, and no intent to make Carole Baskin feel intimidated or threatened.

Prior to the government's involvement, Maldonado had never acted nor attempted to act on any of the ideas he discussed with individuals at the Greater Wynnewood Exotic Animal Park and the mere fantasy- even an unsettling kind- is not without more, criminal. Hence, why Maldonado was never charged prior to the government's involvement.

**Absent The Government's Involvement, No Crime Would Have Occurred**

In *United States v. Twigg*, 588 F. 2d 373 (3d Cir. 1978) the nature and extent of police involvement was so overreaching as to bar prosecution of two individuals for illegal manufacture of methamphetamine. In that case, the government purchased all of the supplies which was purchased by the defendants at the direction of the government agent. When the defendants had trouble locating a production site, the government, at no cost to

defendants, "found the solution" by providing a site. *Id.* The government agent "was completely in charge and furnished all of the laboratory expertise. Neither defendant had the know-how with which to actually manufacture methamphetamine. The assistance they provided was minimal and then at the specific direction of [the agent]." *Id.* An important factor in outrageous government misconduct is "how eagerly and actively" the defendant participated in the crime, finding it a "necessary corollary…. of our inquiry into whether the government engineered and directed the crime from start to finish. *Id.*

Here, Maldonado had little to no participation in the plans. The participation he did provide was manufactured and set in motion by the government- not the other way around. Without the government's involvement, Maldonado had no plan to carry out a murder and while he joked of hurting Carole Baskin, he had never taken even the most basic step toward making it a reality.

***Plot One***. When Garretson began contacting Maldonado in his newfound capacity as a confidential informant, it was obvious Garretson always used encouragement and prodding. He was under pressure from Bryant. (*See Exhibit 10*) The only evidence of Maldonado engaging in a conversation to allegedly murder Baskin is testimony from Glover and Garretson that he "pulled up a map and discussed ways to kill her." However, we now know that it was Lowe who initiated this conversation while Maldonado sat in the back of the office and didn't engage in conversation at all . (*See Affidavit of Garretson, Glover and Medina Interview.*)

The evidence presented at trial was that Maldonado instructed Glover to travel to Texas to obtain a fake ID in order to buy a bus ticket to Florida. However, we now know of Garretson's habit of creating fake IDs and using them to further his criminal enterprise, including rental properties for Lowe.

**Plot Two.**  This plot also failed. And again AUSA Maxfield-Green admits to such in her Netflix interview. In support of Count 2, the government played a recorded cell phone call from December 5, 2017, in which Maldonado-Passage agreed to meet with James and Mark to discuss killing Baskin" At trial, the judge instructed the jury that the cell phone Maldonado was using for this call was a "facility of interstate commerce" in itself. [Appellant's App. vol. 1B at 5]. When using an informant in a murder-for-hire investigation, the government must not manufacture the interstate nexus required for jurisdiction. Such actions may be grounds for reversal. *See, e.g., United States v. Coates*, 949 F. 2d 104 (4th Cir. 1991) (reversal of convictions where only basis for Federal jurisdiction was interstate calls government agent arranged for sole purpose of creating Federal jurisdiction); *United States v. Archer*, 486 F. 2d 670 (2d Cir. 1973). Such cases are typically analyzed by courts as outrageous government misconduct or government overreaching. *See, e.g., United States v. Keats*, 937 F.2d 58, 65 (2d Cir.), *cert. denied*, 112 S.Ct. 399 (1991); *United States v. Bagnariol*, 665 F.2d 877, 898 n.15 (9th Cir. 1981), *cert. denied*, 456 U.S. 962 (1982); *United States v. Hall*, 536 F.2d 313, 327 (10th Cir.), *cert. denied*, 429 U.S. 919 (1976).

Here, the government inserted the UCE when the Allen Glover plot failed. Garretson arranged this call with the UCE at the direction of Bryant and for the sole purpose of creating federal jurisdiction. The evidence presented shows that Garretson made two calls to Maldonado regarding "his guy," but Mr. Maldonado blew it off. He expressed no interest in learning more about him. Growing impatient and under extreme pressure from Bryant to get it done, Garretson engaged in a call to Maldonado while in the presence of the UCE to set up a meeting. Not at the direction or request of Maldonado, but rather by Garretson's own actions at the direction of Bryant. Bryant specifically instructed Garretson what to say and how to phrase the words in the conversation to make sure he "got the words out of Joe's mouth." When Garretson phrased the way he would initiate the call, Bryant again corrected him. During this meeting Maldonado never specifically agreed to a plan. He never provided money, a weapon, or a place in furtherance of the plan. Following this meeting, Garretson engaged in over ten communications with Maldonado in an attempt to get him to take the bait. Not once or at anytime thereafter did Maldonado engage in an overt act to commit a crime. The conversations leading up to Maldonado's arrest do not support the government's view that Maldonado was an active an eager participant in the crime.

**Plot Three.** Plot one failed. Plot two failed. Bryant was frustrated. The AUSAs were frustrated. Their investigation wasn't going as planned. So, they decided to involve Lowe. It is no mere coincidence that Jeff Lowe gets arrested in Las Vegas, and upon return home to Oklahoma immediately thereafter starts working with federal agents to set Maldonado

up. In the initial meeting, they discuss ways they can set up Maldonado and certain things they need to be able to prove in order to "make the charges stick." Lowe admits that "Glover would do anything for him." Suddenly the pieces fit for federal murder-for-hire charges. The cell phone was shipped to Vegas to hide Allen's whereabouts, Allen did, in fact, travel to Florida. The murder for hire money came from a $3,000 cub sale. Everything fell into place because of Lowe, who acted at the direction of Bryant as evidenced by the newly discovered recordings.

However, we now know that Jeff wanted the cell phone shipped and the date it actually arrived is unknown. Allen went to Florida, but with no intent to commit a murder. In fact, he never intended to commit a murder. (*See Exhibit 112*.) And we know from a recorded call between Bryant and the Lowes, that the federal government knew a cub sale didn't occur to fund the murder for hire. (*See Exhibit 128*.)

Lowe worked with Glover, Garretson and Bryant in order to make the puzzle pieces fit so they could put Maldonado behind bars. The AUSAs and Bryant's persistent efforts to induce Maldonado to commit this crime, combined with the creation of a story to fit all the essential elements of the crime, demonstrate that absent the governments involvement and help from their cooperating witnesses, Maldonado would never have been charged with these crimes.

The confidential informant and undercover agent, acted under pressure and with direction from Bryant and FBI agents - not Maldonado.  Maldonado was an unknowing participant.  He simply answered the phone.

Plot one failed, plot two failed and plot three was created at the hands of the federal government. Here, the totality of the circumstances reveals a sequence of events where the conduct of law enforcement agents is so outrageous that due process principles should absolutely bar the government from invoking the judicial process of this Court to obtain a conviction.

## PROSECUTORIAL MISCONDUCT

It is clearly established that prosecutorial misconduct, if it occurs, can "create constitutional error in one of two ways." *Matthews v. Workman,* 577 F. 3d 1175, 1186 (10th Cir. 2009). First, prosecutorial misconduct can prejudice 'a specific [constitutional] right . . . as to amount to a denial of that right.'" *Id.* When this occurs, one need not show that his entire trial was rendered fundamentally unfair. *Dodd v. Trammell*, 753 F. 3d 971, 990 (10th Cir. 2013). Instead, he must show "that the constitutional guarantee was so prejudiced that it effectively amounted to a denial of that right." *Torres v. Mullin*, 317 F. 3d 1145, 1158 (10th Cir. 2003).

PCC retained Mr. Doug Kouns who is a former Special Agent and Supervisory Special Agent of the FBI.  During his 22 years, Mr. Kouns investigated and supervised investigations related to violations of Federal Crimes. (*See Exhibit 148- CV of Doug Kouns.*) Mr. Kouns' affidavit (*See Exhibit 144*) outlines his opinions on the errors and misconduct on behalf of the federal government related to Maldonado's case. All his opinions are within a reasonable degree of certainty as an expert in investigatory practices and techniques. In addition to the opinions of Kouns, The AUSAs also provided

false information to a grand jury twice (*See Exhibit 128*); Took "souvenirs" from the defendant (*See Exhibit 125*); allowed false testimony to go uncorrected as outlined in *Giglio* above; and hung a bullseye with the defendant's face on it in a government office. (*See Exhibit 125.*)

## CONCLUSION

The integrity of the justice system should afford a jury the opportunity to hear and evaluate the evidence. In Maldonado's case, the jury was not given the opportunity to hear important testimony that bore on important issues in the case. The new evidence obtained by PCC directly contradicts the government's theory presented at trial and shows the level of misconduct that occurred throughout the entirety of the case. Maldonado respectfully request this Honorable Court consider this Motion, the attached exhibits, order an evidentiary hearing and grant the relief requested herein.

Respectfully Submitted,

/s/ Amy M. Hanna
Amy M. Hanna
Florida Bar No.: 0120471
/s/ John M. Phillips
John M. Phillips
Florida Bar No.: 0477575
212 N. Laura Street
Jacksonville, FL 32202
(904) 444-4444
(904) 508-0683 (facsimile)
*/s/ Molly Hiland Parmer*
Molly Hiland Parmer
Georgia Bar No.:  942501
1201 West Peachtree Street
Suite 2300
Atlanta, Georgia 30309

(405) 795-5060
(405) 795-5117 (facsimile)
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 10, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF and a copy hereof has been furnished to those registered participants of the ECF system.


/s/ Amy M. Hanna
Amy M. Hanna
Florida Bar No.: 0120471
/s/ John M. Phillips
John M. Phillips
Florida Bar No.:0477575
212 N. Laura Street
Jacksonville, FL 32202
(904) 444-4444
(904) 508-0683 (facsimile)
Attorneys for Defendant
amy@floridajustice.com
jphillips@floridajustice.com

I HEREBY CERTIFY THAT THE INFORMATION CONTAINED HEREIN IS TRUE
AND CORRECT

_____
JOESPH MALDONADO-PASSAGE

_____ 12-3-21 _____
DATE