## IN THE UNITED STES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18-227-SLP |
| v. | ) | |
| | ) | |
| JOSEPH MALDONADO-PASSAGE, | ) | |
| a/k/a Joseph Allen Maldonado | ) | |
| a/k/a Joseph Allen Schreibvogel | ) | |
| a/k/a "Joe Exotic," | ) | |
| | ) | |
| Defendant. | ) | |

# MOTION FOR NEW TRIAL

Respectfully submitted,

*/s/ Amy M. Hanna*
Amy M. Hanna
Florida Bar No.: 0120471
*/s/ John M. Phillips*
John M. Phillips
Oklahoma Bar No.: 34877
212 N. Laura Street
Jacksonville, FL 32202
(904) 444-4444
(904) 508-0683 (facsimile)
amy@floridajustice.com
jphillips@floridajustice.com

# TABLE OF CONTENTS

**PROCEDURAL HISTORY** ........................................................................................ **1**

The Indictment and Trial ....................................................................................... 1

The Appeal ............................................................................................................. 2

Re-sentencing ........................................................................................................ 2

Post-conviction relief ............................................................................................ 2

**INTRODUCTION** .................................................................................................... **3**

**NEW EVIDENCE** .................................................................................................... **3**

Garretson's Undisclosed Recordings .................................................................... 4

Perjury by James Garretson .................................................................................. 12

Allen Glover's Affidavit ....................................................................................... 18

Perjury by Allen Glover ....................................................................................... 19

Allen Glover's Cell Phones .................................................................................. 20

Allen Glover's Relationship with Ashley Webster ............................................... 21

Jeff Lowe Affidavit .............................................................................................. 22

Jeff Lowe Recordings and Electronics ................................................................. 23

Extortion .............................................................................................................. 24

Lauren Lowe Affidavit ......................................................................................... 25

Lauren Lowe Text Messages ................................................................................ 26

Lauren Lowe Perjury ............................................................................................ 27

Yurri Schreibvogel Interview ............................................................................... 27

John Reinke .......................................................................................................... 28

The Tigers ............................................................................................................ 29

National Geographic ............................................................................................ 29

Tiger King ............................................................................................................ 31

**BRADY VIOLATIONS** ........................................................................................... **32**

Garretson Recorded Calls .................................................................................... 34

Government Issued Recorder ................................................................................ 35

Brittany Medina ................................................................................................... 35

Ashley Webster .................................................................................................... 36

Chealsi Putman .................................................................................................... 37

Agent Bryant Communications ................................................................. 37

The Tiger Excavation ............................................................................... 39

**OUTRAGEOUS GOVERNMENT CONDUCT** ....................................... **41**

The Government Created the Crime ......................................................... 43

Absent The Government's Involvement, No Crime Would Have Occurred ................ 44

The recordings .......................................................................................... 48

**GIGLIO VIOLATIONS** ................................................................................ **49**

Allen Glover ............................................................................................. 51

Dr. JoAnne Green ..................................................................................... 52

James Garretson ........................................................................................ 52

John Finlay ............................................................................................... 52

Jeff Lowe .................................................................................................. 53

**NAUPE VIOLATIONS** ................................................................................ **53**

James Garretson ........................................................................................ 54

Allen Glover ............................................................................................. 55

**PROSECUTORIAL MISCONDUCT** ......................................................... **55**

**CONCLUSION** ............................................................................................ **60**

# TABLE OF AUTHORITIES

*United States v. Archer*, 486 F. 2d 670 (2d Cir. 1973)........................................49

*United States v. Garcia*, 793 F. 3d 1194 (10th Cir. 2015) .................................57

*also Farrar v. Raemisch*, 924 F. 3d 1126, (10th Cir. 2019) ................................24

*Berger v. United* States, 295 U.S. 78, (1935) .....................................................36

*Brady v. Maryland*, 373 U.S. 83 (1963) .............................................................36

*California v. Trombetta*, 467 U.S. 479 (1984) ....................................................22

*California v. Trombetta*, 467 U.S. 479, S. Ct. 2528 (1984) ................................57

*Dodd v. Trammell*, 753 F. 3d 971,(10th Cir. 2013).............................................58

*Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110 (E.D. Okla. 2019). .......................54

*Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110,  (E.D. Okla. 2019) .......................59

*Giglio v. United States*, 405 U.S. 150 (1972) .....................................................36

*Giglio v. United States*, 405 U.S. 150, (1972) ....................................................53

*Kyles v. Whitley*, 514 U.S. 419 (1995) ...............................................................36

*Kyles*, 514 U.S. at 43 .........................................................................................21

*Lacey*, 86 F. 3d at 964........................................................................................46

*Macklin v. Dowling*, No. CIV-19-375-C, 2019 U.S. Dist. LEXIS 166893 (W.D. Okla. Aug. 30, 2019)..........................................................................................23

*Martin v. City of Albuquerque*, No. CIV 14-1011 JB/GBW, 2015 U.S. Dist. LEXIS 162691, (D.N.M. Nov. 9, 2015)...................................................................54

*Matthews v. Workman,* 577 F. 3d 1175, (10th Cir. 2009) ...................................58

*Matthews*, 577 F. 3d at 1186 .............................................................................59

*Mosley*, 965 F. 2d at 910.....................................................................................46

*Naupe v. Illinois*, 360 U.S. 264, (1959)...............................................................57

*Stickler v. Greene*, 527 U.S. 263, (1991)...........................................................36

*Torres v. Mullin*, 317 F. 3d 1145, (10th Cir. 2003)............................................59

*Trammell v. McKune*, 485 F.3d 546 (10th Cir. 2007) ........................................36

*United States ex rel. Burnett v. Illinois*, 619 F. 2d 668,(7th Cir. 1980) ............57

*United States v. Bagley*, 473 U.S. 667 (1985) ....................................................37

*United States v. Bagnariol*, 665 F.2d 877, (9th Cir. 1981) ...............................50

*United States v. Buchanan*, 891 F.2d 1436, (10th Cir. 1989) ............................58

*United States v. Coates*, 949 F. 2d 104 (4th Cir. 1991)......................................49

*United States v. Dyke*, 718 F. 3d 1282, (10th Cir. 2013) ...................................45

*United States v. Hall*, 536 F.2d 313(10th Cir.)..................................................50

*United States v. Harris*, 997 F. 2d 812,(10th Cir. 1993) ...................................45

*United States v. Keats*, 937 F.2d 58,  (2d Cir.) 112 S.Ct. 399 (1991);.............50

*United States v. Lacey*, 86 F. 3d 956 (10th Cir. 2013) .......................................45

*United States v. Montgomery*, 676 F. Supp. 2d 1218 (D. Kan. 2009)...............................44

*United States v. Mosley*, 965 F. 2d 906 (10th Cir. 1992) ...................................................45

*United States v. Russell*, 411 U.S. (1973)..........................................................................45

*United States v. Stevens*, 978 F. 2d 565 (10th Cir. 1992)....................................................6

*United States v. Twigg*, 588 F. 2d 373 (3d Cir. 1978).........................................................47

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 5:18-227-SLP |
| v. | ) | |
| | ) | |
| JOSEPH MALDONADO-PASSAGE, | ) | |
| a/k/a Joseph Allen Maldonado | ) | |
| a/k/a Joseph Allen Schreibvogel | ) | |
| a/k/a "Joe Exotic," | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION FOR NEW TRIAL

Defendant, JOSEPH MALDONADO, by and through undersigned counsel respectfully moves this Court pursuant to Rule 33 of the Federal Rules of Criminal Procedure, for an Order vacating the judgment of his convictions and sentence and ordering a new trial and in support thereof states as follows:

**Mr. Maldonado requests an evidentiary hearing and that he be produced for that hearing.**

## PROCEDURAL HISTORY

**The Indictment and Trial**

On September 5, 2018, a federal grand jury returned an indictment which accused Mr. Maldonado of two counts of the use of interstate commerce facilities in the commission of a murder for hire and aiding and abetting; nine counts for violations of the Endangered Species Act; and nine counts for violations of the Lacey Act.  The Government dismissed

1

counts 13 and 14 before trial.  Following the trial, Maldonado was convicted for all 19 counts and sentenced to 22 years in prison.

**The Appeal**

In an appeal, Maldonado disputed his convictions arguing that the district court erred by allowing Baskin, a government witness, to attend the entire trial. He also disputed his sentence on grounds that the district court erred by not grouping the two murder-for-hire convictions in calculating the advisory guideline range. The Tenth Circuit Court of Appeal confirmed the convictions, but vacated the sentence and remanded to the district court for re-sentencing.

**Re-sentencing**

On January 28, 2022, Maldonado was re-sentenced by the district court to 21 years in prison.  An appeal was filed.

**Post-conviction relief**

Maldonado requested leave to file a brief in excess of the page limit at 255 pages [DE #211]. The Court denied Maldonado's Motion and asked the government to respond. In the interim, Maldonado filed a 25-page brief and incorporated all arguments in the initial brief. This Court struck Maldonado's 25-page Motion for New Trial [DE #215]. Despite knowledge of the overwhelming amount of new evidence turned over to post conviction counsel, the Court entered an order arbitrarily limiting Maldonado's motion to 65 pages. Maldonado cannot possibly outline the significance of every piece of new evidence as it pertains to violations of his constitutional rights within the page limit. As such, Mr. Maldonado, request additional briefing of the issues outlined herein.

2

## **INTRODUCTION**

On behalf of Joseph Maldonado-Passage ("Maldonado"), Post-Conviction Counsel (hereafter "PCC") examined all evidence associated with both the criminal investigation and trial.  PCC reviewed information extracted from electronic devices offered by James Garretson ("Garretson"), Allen Glover ("Glover"), Jeffrey Lowe ("Lowe") and Lauren Lowe.  In examining those devices, PCC discovered information that was intentionally not turned over to trial defense counsel and intentional acts of grave misconduct by the prosecuting and investigating agencies.  The newly discovered evidence consists of photographs, videos, text messages and recorded calls among cooperating individuals that so strongly undermines confidence in Maldonado's verdict, that justice demands his conviction be vacated.

## **NEW EVIDENCE**

The Tenth Circuit explains that to, "succeed on a motion based on newly discovered evidence pursuant to rule 33 Fed. R. Crim. P., the defendant must show that: (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal." *United States v. Stevens*, 978 F. 2d 565 (10th Cir. 1992).

"When deciding a motion for new trial, the court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred." *United States*

*v. Evans*, 42 F. 3d 586, 593 (10th Cir. 1994). "The touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence*." Kyles v. Whitley*, 514 U.S. 419 (1995). The newly discovered evidence provided within this Motion demonstrates that the absence of this evidence prevented Mr. Maldonado from receiving a fair trial. Therefore, we present the following newly discovered evidence:

**Garretson's Undisclosed Recordings**[1]

Garretson served as a confidential informant for the United States Fish and Wildlife ("USFWS") during the federal investigation of Maldonado. (*See Exhibit 7.*)  Garretson testified at trial that he used an app on his personal phone to record calls with subjects of the investigation at the direction of USFWS Special Agent Matthew Bryant ("Bryant") (Trial Tr. 553: 8-25.)  Garretson went on to state he voluntarily turned "all of the conversations that" he was, "able to record" to Bryant. (Trial Tr. 553:1-25).

Garretson was interviewed by PCC on June 15, 2021 and July 31, 2021.  (*See Exhibit 8 and Exhibit 9*.)  At the conclusion of the July 31, 2021, interview, Garretson executed an Affidavit admitting to misconduct and perjury.  (*See Exhibit 10*.)  Garretson provided PCC with two cell phones he used throughout the criminal investigation.  PCC examined the

---

[1] Each of the calls presented within this motion document different aspects of misconduct. A single recording may have several issues that warrant investigation. The undersigned cannot lay out the importance of each call due to page constraints, but they are attached hereto and must be viewed in their entirety.

phones and discovered four hundred and seventeen (417) previously undisclosed recordings of phone calls stored in an app called "Cherinbo." (*See Exhibit 11.*) Additionally, there were two hundred and sixty-six calls which contained zero (0) data, which means they were either selectively not recorded or deleted. The existence of the recordings clearly demonstrates Garretson lied when he testified that he "voluntarily" turned over, "all of the conversations that" he was, "able to record."

Furthermore, Garretson continues to lie about the existence of the recordings to this day.  In a January 7, 2022 interview with the FBI, Garretson told the agents that he turned over all the recordings to Bryant and denied deleting any messages. (*See Exhibit 152.*)  The existence of the recordings and evidence of deleted recordings and messages cannot be disputed. Garretson's admissions regarding the withholding or the destruction of evidence – unilaterally deleting recordings - are relevant to the principal issues of the criminal case. (*See Exhibits 8, 9, and 25.*) Additionally, the government was aware this testimony was false and allowed the false testimony to stand uncorrected.  (*See Exhibits 19, 25 and 50.*)

In addition to the *Brady* violations regarding the recordings, the **content** of the recordings demonstrates that during the criminal investigation and trial 1) Garretson lied to government agents regarding aspects of the criminal investigation (*See Exhibits 15, 23, and 59.*); 2) Garretson conspired with the federal government to lie about aspects of the criminal investigation (*See Exhibits 17, 24, and 27.*); 3) Garretson conspired with the federal government to intentionally suppress relevant and exculpatory recordings (*See Exhibits 15-19.*); 4) Garretson conspired with agents for the government to "twist" testimony (*See Exhibit 19 and 31.*); 5) Garretson conspired with law enforcement to

fabricate evidence (*See Exhibits 15-19.*); 6) Garretson conspired to murder Lowe (*See Exhibits 14 and 144.*); 7) Garretson engaged in crimes involving identity theft (*See Exhibits 90, 96, 98, 99, and 100.*); 8) Garretson planned to use recordings captured during the investigation to discredit a potential defense witness (*See Exhibits 25, 26, and 32.*); and 9) Garretson planned to lie during the criminal trial. (*See Exhibits 21, 40, 43, 48, 60, 68 and 69.*)

The recordings demonstrate 1) the federal government, including Bryant, knew undisclosed recordings and messages existed (*See Exhibits 15-19, 26, and 50.*); 2) how Bryant circumvented due process by instructing a confidential informant and other witnesses for the government to lie about aspects of the criminal investigation (*See Exhibits 24 and 37.*); 3) how Bryant willfully refused to collect relevant evidence (*See Exhibits 15-19.*); 4) how Bryant instructed a witness to fabricate evidence (*See Exhibits 15-19.*); and 5) how Bryant used one of the undisclosed recordings as a weapon to exclude a potential defense witness. (*See Exhibits 14-19.*)  Bryant's knowledge that Garretson was recording all of the calls is demonstrated when he is heard asking Garretson if he is being recorded. (*See Exhibit 23.*)

Garretson was required to record phone calls with Maldonado, Lowe and "anybody else [he] encountered that seemed to have knowledge about these things" and he testified to such. (Trial Tr. 552:16-2:553:1-2.) However, Garretson was selective in what recordings he turned over. All of Garretson's recordings of Bryant, AUSA Maxfield Green, Paul Malagerio ("Malagerio"), Eric Goode, ("Goode") Brittany Medina ("Medina") and Jeff

Johnson ("Johnson") should have been turned over as they all individually provided information about Maldonado as it related to the criminal investigation and trial.

The recordings of Goode (hereafter "Goode") were directly relevant to the issues of the criminal investigation into Maldonado, acts of perjury, trial strategy and collusion of witnesses. Specifically, how Garretson, Lowe, Lauren Lowe and others conspired to set up Maldonado. (*See Exhibits 22, 29, 49, 52, 55, 56, 57, 66, 67, 73, and 80.*)

The recordings of Malagerio were directly relevant to the issues of the criminal investigation into Maldonado.  Malagerio was an unofficial cooperating witness for the government under the direction of Bryant.  (*See Exhibit 28.*) The discussions captured in the calls between Malagerio and Garretson were centered around the criminal investigation of Maldonado and life after.  Specifically, perjury, manipulation and fabrication of evidence, witness threats, trial strategy, and other exonerating information. (*See Exhibits 21, 25-28, 32, 36, 39-42, 45-48, 50, 58, 60, 63, 72, 82, 94, and 95.*)

In March 2019 recordings, Bryant altered the context of one of Garretson's recordings of Johnson **against** Johnson in his successful attempt to have Johnson, an exculpatory witness, excluded from testifying at trial.  (*See Exhibits 14, 20, 30, 37, 38, 54, 59, 61, 70, 74, 81 ,84, 91 and 169.*) On February 20, 2019, Johnson called Garretson and told him he was on the way to kill Jeff Lowe (*See Exhibit 14.*) The following day, Garretson spoke with Bryant and discusses the death threats. (*See Exhibit 15.*) Bryant encouraged Garretson to report the conversation to the local police. Later that day, Garretson advised Bryant that he contacted the police and left a message with someone to have Sheriff

Rhoades call him back. No details were left by Mr. Garretson as to what his call was about or why he wanted Sheriff Rhoades to call him back.

On March 12, 2019, Bryant and Garretson had a phone call wherein they discussed Johnson destroying their credibility at trial (*See Exhibit 16.*) Bryant states "I mean, it is so stupid. I mean, we got to beat Jeff Johnson. We got to beat the little twerps that sit there behind their keyboard at night and drink because they don't have a life." Bryant is worried and "pissed off" that Johnson "made him out to be a freaking blooming lunatic agent … I'm going to get just crucified on the stand over that because of it." Bryant further stated, "And [Johnson] turns on us like that. I am so livid. I got a meeting at the (Prosecuting) attorney's office at 9:00 in the morning to figure out how…." This Facebook post was never turned over and was "mysteriously" removed from the Facebook page. (*See Exhibit 172.*)

The recording demonstrates how **the AUSAs** prosecuting this case, Amanda Maxfield-Green and Charles Brown, **had knowledge of exculpatory evidence** and were attempting to suppress it.  During this call, Bryant also indicated he would check on Sheriff Rhoades not returning Garretson's call regarding the Jeff Johnsons death threats. Garretson expressed his desire to not testify and get out of all of this. Bryant replied "Yeah, I get it dude. But then Jeff Johnson wins." The recording ends mid-conversation.

On March 13, 2019, Garretson called Agent Bryant to let him know the good news. Johnson's phone call was recorded in his call app. Bryant responds "All righty, two can play at this game." (*See Exhibit 17.*)  However, this isn't a game to Mr. Maldonado.  A subsequent call happens that same day where Bryant indicates he spoke with Sheriff

Rhoades and the death threat was never reported. Bryant urged Garretson to report the call. (*See Exhibit 18.*)

On March 18, 2019, Bryant called Garretson.  (*See Exhibit 19.*)  Bryant stated, "Hey, just to double-check, [Amanda Maxfield- Green] wants me to send her an email. **We're going to try and battle Jeff Johnson before he gets to the defense attorney** or prepare for that. Can you remember what he said to you Friday?"

We now get a glimpse into what had Bryant and the AUSAs so worried.  At this time, Bryant and the AUSAs, Amanda Maxfield-Green and Charles Brown, agents of the federal government, are trying to find a loophole to exclude an exculpatory witness. The call goes on to state:

| | |
|---|---|
| Bryant: | "Alrighty, did he say anything about recordings that he had on me or anything or was he just bitchin…." |
| Garretson: | No, he didn't say anything about any recording or anything, no. |
| Bryant: | Just what I'd said about Finlay and holding that over his head? |
| Garretson: | Yeah. That's all he said is basically that, "I have texts from Matt saying to get the Finlay video so you can dangle it over his head," or something like that. |
| Bryant: | Yeah, cool. Well, if he's going to threaten a witness, and somebody he knows is a witness, and my understanding was that you explained to me it was like, "And if you go up there and testify against Joe, I'm going to be up there every day and I'm going to beat your ass," or something like that. |

This is undisputedly false. Bryant and Garretson were fully aware this was not the context of the call. The entire call with Johnson was recorded. (*See Exhibit 14.*) Garretson reminded Bryant it was recorded multiple times throughout this call.  In no way, shape or

form did Johnson threaten to beat up Garretson, let alone beat him up for testifying against

Maldonado.   Following the meeting with AUSA Amanda Green and AUSA Charles

Brown, Bryant attempted to legitimize excluding Johnson from testifying at trial, even if it

involved altering and falsifying evidence.

Later in the call:

| | |
|---|---|
| Bryant: | If you listen to that, make a couple of little notes so I can be precise as possible. |
| Garretson: | oh, okay, yeah. I'll do that. |
| Bryant: | and I'll send this email to Amanda and then we'll provide that to the attorney's office. Did he say he was called by the defense, or did he say he was going to see the defense? |
| Garretson: | He said he had a meeting with Joe's lawyers on Thursday and… |
| Bryant: | On Thursday. |
| Garretson: | Alright, well I'll go listen to it word for word. |
| Bryant: | I can get that thing down. Like I said, don't transcribe the whole thing, but you can give me a – |
| Garretson: | Bits and pieces of it? Yeah. |
| Bryant: | Just so I have that he threatened you and what did he say in the threat, that type of deal. |

(*See Exhibit 19.*)

This recording, despite the government knowing of its existence, was not turned

over to trial defense counsel.  Furthermore, the contents were materially altered when "bits

and pieces" were transcribed to the AUSAs in an effort to exclude Johnson from testifying

at trial . These recordings from March 23, 2019 also document how the federal government

including AUSA Green, AUSA Brown and Bryant, used a confidential informant to

covertly obtain information regarding trial defense counsel's planned defense strategy. (*See

Exhibits 20, 21, 26, and 27.*)

PCC discovered recordings, photographs of various fake identification cards; screen shots of names; dates of birth; and Social Security Numbers that demonstrate Garretson was actively involved in identity theft crimes during the criminal investigation. (*See Exhibits 3, 51, 54, 90, 91, 96, 98, 99, 100 and 161.)* Also of significance is that one of these false identifications was used to rent Lowe's rental home in Las Vegas; which happened to be the location to which the cell phone associated with the Count 1 of the Superseding Indictment was mailed. PCC discovered a copy of the lease agreement for the Las Vegas residence. (*See Exhibit 64.)* This agreement confirms Lowe and Garretson's active, on-going involvement in identity theft during the investigation. Both the Las Vegas residence and Glover's fake ID were subjects of extensive testimony presented at trial.

Garretson's own admissions captured on these recordings regarding twisting testimony and planning testimony with the intent to misrepresent the facts are material and relevant to the criminal case, specifically Maldonado's innocence. (*See Exhibits 17, 19, 31, 37, 43, 48, 715, 78, 79, and 87.)* Had the jury known of this, Garretson's credibility would have been destroyed and the true motive for Glover's fake ID would have been called into question, directly undermining the verdict.

Given the pretrial assurances from the government regarding discovery and Garretson's perjured testimony, Maldonado and trial defense counsel could not have known of the existence of these undisclosed recordings. The impact this information would have had on the jury is unmeasurable. They would have questioned the integrity and motive of the witnesses, including the federal government and the evidence presented at trial.

Maldonado has long maintained he was set up in connection with the charges against him.  However, Maldonado **believing** that he was set up is not the same as **knowing** how he was set up or **knowing** that evidence existed proving he was set up. The latter of which we now know to be true.

**Perjury by James Garretson**

During the criminal investigation and trial, Garretson, at the direction of the federal government, went to great lengths to conceal the truth from the jury and this Court. Garretson's intent to hide information was initially revealed post-trial during Season 1 of the *Tiger King* series which aired on March 20, 2020. (*See Exhibit 13*.)  In those interviews, Garretson asked: "You're not gonna show this to the defense attorney when I lay it out? [laughs] Don't…don't free that mother fucker." His intent to withhold exculpatory evidence was solidified by his own recordings. The instances of perjury are outlined as follows:

During direct examination, the government asked Garretson, "Why did you agree to cooperate with the Government?  Garretson replied that it was "Just the right thing to do at the time." (Trial Tr. 552: 14-15).  Despite his testimony at trial, many calls reveal Garretson was motivated by money, revenge and a hatred of Maldonado's sexuality.  (*See Exhibits 8, 9, 24, 27, 30, 32, 33, 34, 35, 48, 54, 60, 63, 82, and 83.*)

In his own words, Garretson's bragged that his testimony was "whatever I wanted to tell them."  *(See Exhibit 60.)*  And as established above, Garretson lied about the existence of hundreds of undisclosed recordings.  When reviewing the content of those recordings, PCC discovered Garretson's testimony at trial was riddled with lies.

Garretson's relationship with the victim, Carole Baskin, is relevant to the principal issues of the criminal case. (*See Exhibits 5, 9, 21, 27, 33, 43, and 44*.) His testimony at trial was that he knew of her from the animal industry, was unaware if she ever filed a complaint against him, and that he never met her. (TT: Page 530, Line 8 – 11.) In fact, the exact opposite is true. In 2007, the Secretary of Agriculture revoked Garretson's privilege to engage in activities that required an Animal Welfare Act license.  (*See Exhibit 6.*)  Under this Order, Garretson was "permanently disqualified" from obtaining, holding any Animal Welfare Act license either directly or indirectly through any corporate or other device or person. Garretson had a hatred for Baskin due to her role in having his USDA licensed revoked.  His hatred carries on to present. (*See Exhibit 164.*) In the recordings and post-trial interviews, Garretson discussed a relationship with both Howard and Carole Baskin that existed before, during and after the criminal investigation and trial.  (See Exhibits 5, 8, 9, 27, 43, 44, 108, and 109.)

Under direct examination, Garretson testified about an August 2017 conversation about murdering Carol Baskin on the bike path she used to bike to and from work (hereafter the "bike path conversation").  Garretson testified that present for the conversation was "Jeff Lowe and Joe Passage."  (Trial Tr. 547: 20-25: 548: 1-2).  PCC's investigation of this case has found that this testimony provided by Garretson under oath was false; the government was aware that the testimony was false; and the government allowed the false testimony to stand uncorrected.

In the June 15, 2021 interview with PCC, Garretson admitted that present for the bike path conversation was "me, Brittany Medina and Jeff Lowe."  (*See Exhibit 8.*)

Independent of PCC's re-investigation of this case, Garretson and Medina were interviewed by Goode on March 11, 2021.  (*See Exhibit 104.*)  In that interview Medina stated, "So, you got Jeff and Lauren talking about that. Me and James were just standing there listening."

Bryant was present in the court room when Garretson testified, "It was me, Jeff Lowe and Joe Passage" who were present for the bike path conversation.  However, Bryant knew this testimony to be untrue.  In the March 11, 2021 interview with Goode (*See Exhibit 104*), Garretson admitted Medina attended his meetings with Bryant, including the very first meeting where, "We had to talk about everything. The first meeting, **Jeff Lowe shown us** the bike paths. (Emphasis added.) The original meeting referenced was the September 14, 2017 interview at Two Frogs Restaurant with Bryant and Agent Markley ("Markley"). (*See Exhibit 106.*) Although not included in that report, Medina attended and participated in this interview.  Given these statements, Bryant was fully aware that Medina was present during the bike path conversation and yet he allowed Garretson's testimony to stand uncorrected.

Additionally, PCC discovered Bryant and Garretson lied about Medina's presence during the bike path meeting (and Medina's involvement in the investigation itself) because Garretson wanted to keep "Brittany [Medina] out of it." (*See Exhibit 9.*)  Additionally, Medina admitted in that interview that she would have testified in favor of the defense. (*See Exhibit 104.*)

Also noteworthy is that in a March 26, 2019 recording, Garretson admitted to having a recording of the bike path conversation itself.  (*See Exhibit 26.*)  Other Garretson

recordings indicate the government was also in possession of this recording. (*See Exhibits 26,43, and 50.*)  A recording that was not produced to trial defense counsel. Establishing yet another *Brady* violation.

Garretson lied during the trial when he was asked about why Maldonado would think he knew where to get a fake ID.  (Trial Tr. 599: 8 and 608: 6 – 14.) PCC's investigation of this case has found that this testimony provided by Garretson under oath was false.  In the post-trial examination of Garretson's personal cell phone, PCC discovered recordings of Garretson actively engaged in identity theft crimes and crimes involving securing financing in fictious names during the criminal investigation, specifically the fall of 2017.  (*See Exhibits 3, 51, 54, 90, 91, 96, 98, 99, 100 and 152.*)  Those crimes include Garretson and Lowe securing a residential lease in one of their false or stolen identities during the subject criminal investigation. (*See Exhibits 64 and 152.*) This connects Garretson to Lowe and confirms their co-participation in fraudulent credit card schemes. Glover's reasons for getting a fake ID and the Lowe's fraudulently obtained Las Vegas residence were both of significance in securing the indictment against Maldonado and as subject testimony provided by Garretson, Glover, Lauren Lowe, Brian Hess and Maldonado. The government used testimony regarding the fake ID together with testimony regarding the mailing of the cell phone to "establish the elements needed to prove the use of interstate commerce in the commission of a murder for hire." (*See Exhibit 107.*)

Garretson went on to testify that the medical credit he offered to Dylan West was in his understanding "legal." (Trial Tr. 599: 9-21).  Given the evidence of on-going

15

participation in criminal identity theft described above together with testimony provided by Reinke regarding Garretson's fraudulent use of medical credit, these statements are false. (*See Exhibit 113*.)

Garretson testified that he had been unable to record his phone calls with Lowe between November 2017 and January 2018, "due to problems [he] was having with the phone." (Trial Tr. 587:17-23). PCC's re-investigation of this case found this statement to be false. In the July 31, 2021 interview with PCC, Garretson admitted he "deleted a lot of Jeff's [Jeff Lowe] and Bryant calls." (*See Exhibit 9.*) Garretson's testimony was false and he knew it was false.

Despite not being legally permissible, Garretson testified that during the criminal investigation, he legally purchased tiger cubs from Maldonado. (Trial Tr. 534-537.) Additionally, it was well known to the government that during the investigation, Garretson was running Ringling Animal Care which offered tiger cub petting and exhibits with ESA protected animals. (*See Exhibit 110.*) Further, Bryant interviewed witnesses at Ringling. He also took his family for a tour at Christmas time. *(See Exhibit 28 and 111.)* Yet, Garretson was not investigated or charged with any infractions related to violation of the 2007 Order. In fact, Garretson bragged in recordings and interviews that both Bryant and the Baskins provided him "protection" from the USDA. (*See Exhibits 4, 8, 9, 33, and 34.*)

Under examination at trial by AUSA Maxfield-Green, Garretson testified that no one "outside of law enforcement" knew he was cooperating with the Government. (Trial Tr. 556: 23-25.) PCC's investigation of this case found this statement to be false and that the government knew this statement made under oath was false. Medina, Lowe, Lauren

Lowe, Howard Baskin and Malagerio all knew Garretson was working with the Government "in the fall of 2017." *(See Exhibit 9, 27, 28, 104, 125, and 133.)*

Garretson testified he did not have a financial interest in "getting rid of Mr. Passage." (Trial Tr. 582: 13-24). This testimony was false. The content of the recordings exposed Garretson's plans to corner the cub petting market once Maldonado was safely behind bars. (*See Exhibits 24, 27,32, 35, and 82.*)

There was no mistake in Garretson's testimony. The perjury was not only impeaching, it was material to the principal issues involved and intended to affect the outcome of the trial. The perjury directly challenges all of the testimony presented by Garretson and the sufficiency of the charging document and the verdict. During the trial, Garretson provided uncorroborated eye-witness testimony regarding alleged crimes associated with Counts 1 and 2 of the Superseding Indictment. Garretson's testimony provided context to the recordings of Maldonado and Glover. Some of the recordings he provided, had no mention of names, dates, places or even what the speaker was talking about. Garretson's testimony filled in those blanks. Garretson has admitted that he could have been planning his own murder for hire. (*See Exhibit 9 and 49.*)

In connection with Count 2, the evidence offered at trial was a December 5, 2018 recording and a December 8, 2018 text message wherein Garretson called Maldonado to allegedly arrange a meeting with "my guy" a.k.a. the undercover agent. (*See Exhibit 101.*) It was Garretson who explained to the jury, "My guy" was the undercover agent. Without Garretson's testimony, there would have been no indictment or trial.

17

According to the Department of Justice Manual, Bryant was (and is) a member of the prosecution team as, "[m]embers of the prosecution team include federal, state and local law enforcement officers participating in the investigation. *See also Kyles*, 514 U.S. at 437. "The most rudimentary of the access-to-evidence cases imposes upon the prosecution a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath." *California v. Trombetta*, 467 U.S. 479, 480 (1984). As outlined above, at times, Bryant knew Garretson was lying and allowed that testimony to stand uncorrected. When the Government failed to correct the perjured testimony of Garretson, they suppressed evidence including the existence of any other relevant recordings, his financial interest in the outcome of the investigation and his established relationship with the Baskins.

**Allen Glover's Affidavit**

In the course of the re-investigation of this case, PCC interviewed Glover in person on June 10, 2021, September 9, 2021 and September 10, 2021. At the conclusion of the September 10, 2021 interview, Glover completed an Affidavit including admissions that he worked with Lowe to fabricate text messages and scripted recorded calls with the intent of falsely implicating Maldonado in a murder-for -hire that was actually attributed to Lowe. (*See Exhibit 112*.) Glover also admitted that Lowe, "created the entire murder-for-hire plot from start to finish." and that "[Lowe] worked with" Bryant, "to create, direct and coerce the murder-for-hire plot." The allegations of the fabrication of evidence are corroborated by the Garretson recordings (*See Exhibit 61*), Lowe's Affidavit. (*See Exhibit 125*.) and Lauren Lowe's Affidavit. (*See Exhibit 133*.)

**Perjury by Allen Glover**

In addition to fabricating evidencing during the investigation, Glover provided false testimony during the trial.  Glover testified that Maldonado offered to pay him for killing Carole Baskin.  (Trial Tr. 623: 23.) PCC's investigation of this case found that all of Glover's statements regarding the $3,000.00 were untrue.  According to his Affidavit, Glover, "stole $3,000" from Maldonado-Passage and his testimony that the "$3,000 came from the cub sale on November 24, 2017" was "not accurate."  In support PCC offers statements made by Reinke.  (*See Exhibit 113.*) In his Affidavit, Reinke stated "No money was ever given or loaned to Allen Glover to kill Carole Baskin."  The money was given to Glover to get him off of the Park.

Glover admitted his testimony that Maldonado took his personal cell phone (HTC phone) was untrue.  (Trial Tr. 641:22-23.) Glover also admitted that Maldonado-Passage gave him "a different phone" to take to Florida was untrue.  (Trial Tr. 642:11.)  Glover has now admitted that he **stole** the "pizza phone." In his Affidavit, Glover admitted to **taking** "the phone from a recently fired employee named A.J."  The words take and gave matter in that the government used these in establishing the crimes charged.

These statements are supported by concurrent text messages recovered from Maldonado's cell phone (*See Exhibit 114.)*  On December 5, 2017, Lowe messaged Maldonado, "Fucking Allen stole the pizza phone."  Additionally, the FBI's extraction report of the ZTE phone / pizza phone includes a real time text exchange between Glover and Newest Best Friend who is Kelci Saffrey and Glover and Cheryl Ann talking about the phone Glover stole from AJ. (*See Exhibit 115 and 116.)*

19

"The standard for evaluating whether witness recantation warrants relief is whether it would have changed the trial result or whether it would have a probable effect on the verdict." *Macklin v. Dowling*, No. CIV-19-375-C, 2019 U.S. Dist. LEXIS 166893, at *17 (W.D. Okla. Aug. 30, 2019). Recantation can justify a new trial only if it contains sufficiently significant new evidence, and if it, rather than the witness's inconsistent trial testimony, will probably be believed." *Id.* at 707-08; *see also Farrar v. Raemisch*, 924 F. 3d 1126, 1129-30 (10th Cir. 2019).

Like Garretson, Glover's testimony was unique.  He provided uncorroborated eye witness testimony that Maldonado paid him $3,000 to murder Carole Baskin and that the money came from a cub sale.  The government used Glover's now-know-to-be-false testimony to establish the elements needed in proving the use of interstate commerce in the commission of a murder for hire.  Glover's recantation is supported by the independent statements of Reinke and contemporaneous text messages exchanges with four different individuals and therefore, in accordance with *Macklin* and *Farrar* warrants a new trial.

**Allen Glover's Cell Phones**

In addition to providing verbal testimony and perfecting an affidavit, Glover provided PCC with three cell phones used during the criminal investigation and trial which included the HTC phone that was allegedly mailed to Lowe and Lauren Lowe in Las Vegas in November of 2017; the Samsung Galaxy Luna Pro phone which he used while Glover was in South Carolina from November of 2017 through July of 2018; and an LGE phone which was the phone Glover used when he returned to the zoo after July of 2018.

When examining Glover's cell phones, PCC discovered the federal government withheld text messages and phone calls which were relevant to the defense of Maldonado. Glover's LGE phone contained undisclosed messages and calls between Bryant and Glover regarding a potential witness in South Carolina. (*See Exhibit 117 and 118.*) Also attached to this Motion are the previously undisclosed text exchanges between Glover and Bryant recovered from Glover's personal cell phone used from August of 2018 through the trial. (*See Exhibit 122.*)  These tend to prove that Glover did not travel to Florida to kill Carole Baskin. This witness was never disclosed despite Glover telling Bryant he would know the timeline of when he was in South Carolina. Yet another *Brady* violation.

PCC also compared the FBI extraction reports to the extractions performed in house. (*See Exhibits 120, 121, and 168.*)  Of note is that the government's extraction report had one text message between October 29, 2017 and November 17, 2017.  It was between Garretson and Glover.  In PCC's review of Glover's phone, there were 101 text exchanges between Garretson and Glover during this time. Yet another *Brady* violation.

**Allen Glover's Relationship with Ashley Webster**

Glover admitted he had a sexual relationship with Ashley Webster while she was living and working at the zoo.  Glover "did not disclose [his] relationship with this witness at any time to the government." (*See Exhibit* 112.) Despite this, we know Bryant was made aware of this by Lauren Lowe and never disclosed this evidence to the defense.  (*See Exhibit 138.*)

Recently, the FBI contacted Glover in the course of their investigation regarding the content of his Affidavit.  On November 12, 2021, Glover told the FBI that, "what he said

21

in court was not the truth and it is weighing on him." (*See Exhibit 123*.)  The FBI spoke with Glover again on January 5, 2022. (*See Exhibit 124.*) In that interview, Glover stood, "by the comments in the affidavit regarding his perjury."  Glover admitted, "he was screwed by Jeff Lowe and pushed into a corner by the government."  Glover explained he felt, "pressure from the agents and attorneys he agreed to testify in the matter that he did but now he regrets it."

In further support of the pressure Glover was under, PCC offers a February 6, 2022 Instagram posting by Lowe which included direct threats to Glover including, "I have a couple of phone calls that you might want to listen to before you put your stupid head on the sacrificial alter for Joe." (*See Exhibit 154*.)  As presented later in this Motion, when Lowe and Bryant could not get their way, they resorted to extortion.

**Jeff Lowe Affidavit**

PCC interviewed Lowe in person on May 19, 2021, May 20, 2021, August 5, 2021 and August 6, 2021. At the conclusion of the August 6, 2021 interview, Lowe completed an Affidavit. (*See Exhibit 125*.) According to his Affidavit, Lowe knew Garretson was working as a confidential informant since the beginning, which was not disclosed to trial defense counsel. (*See Exhibit 170.*) Lowe also admitted to fabricating evidence and that his February of 2018 text messages with Glover were both "created" and "staged."  Lowe admitted to pre-scripting and orchestrating calls between himself and Glover.  These manipulated recordings and text message exchanges were introduced as evidence as trial and used in securing the indictment and verdict.

**Jeff Lowe Recordings and Electronics**

In addition to providing verbal testimony and perfecting an affidavit, Lowe turned over hard drives and cell phones with photographs, videos, text message exchanges and recordings of phone calls between himself and Agent Bryant. (*See Exhibits 119, 126 – 130, 155, 156, 158 and 159.*) The recordings demonstrate Lowe and Lauren Lowe were heavily involved with witnesses and evidence associated with the criminal investigation and trial. At times, Lowe served as a go between for Bryant. (*See Exhibit 126 and 127.*) This is further corroborated by a phone call between Lowe and a *Netflix* producer wherein Lowe admits to the manipulation and fabrication of evidence to secure the conviction. Specifically, "that it was coached and this thing was set up and the murder for hire shouldn't stick." (*See Exhibit 159.*)

In a February 13, 2019 call (*See Exhibit 128)* Bryant interfered and obstructed another federal agency's (USDA) investigation of Lowe and Bryant also asked a government witness to lie about aspects of the criminal investigation. In doing so, Bryant demonstrated an awareness that his actions were wrong. Bryant also admitted a part of the indictment was inaccurate – Robert Engesser did not buy a tiger cub from Maldonado on November 22, 2017. Therefore, given Bryant own words in this recording, Bryant presented misleading, if not outright false, testimony during the trial when he testified about Robert Engesser and the cub sale. (Trial Tr. 909: 1-14.) The government, **knowing** the testimony regarding the cub transaction to be false, allowed the entire dialogue regarding this cub sale to continue to secure the indictment, the superseding indictment and

throughout trial.  The federal government let it stand uncorrected, not once, not twice, but three times.

**Extortion**

PCC has discovered extortion on behalf of the cooperating government witnesses throughout this case. (*See Exhibits 157, 161 and 162.*) Lowe used undisclosed evidence and his authority as employer and landlord to threaten and intimate witnesses into testifying on behalf of the prosecution. Lowe's intentions in withholding evidence are best outlined in a single text message sent to Bryant on March 28, 2021. (*See Exhibit 150.*)  It is both an apology and a confession by Lowe, "I never wanted this information to come out because I know that Joe deserves to be in prison."  Here, Lowe planned to use the evidence against Bryant and the government.

On June 19, 2018, Lowe recorded Lauren Lowe and Amber Eastep, Finlay's former girlfriend and then employee of Lowe, talking about a compromising video depicting Finlay in a compromising way.  (Not attached because of content but located in pretrial Discovery Disc 2 and is titled MP_1122 20180619 WS310138.)  This video was then used as a means to threaten Finlay into testifying against Maldonado by Bryant, Lowe, and Johnson.  Bryant admitted to using this recording / video over Finlay's head in text exchanges and recordings with Garretson (*See Exhibits 19 and 163.*) and Johnson (*See Exhibit 163.*)

Bryant was clearly afraid Johnson had a compromising recording of him including this alleged video. (*See Exhibit 21.*)  This was one of the reasons he suppressed Garretson's recordings and also one of the reasons he fabricated evidence.  Bryant would eventually use that evidence to exclude Johnson from testifying or even attending the trial in person. (*See Exhibits 14-19.*)   Furthermore, Agents further ignored clear evidence Lowe was actively trying to obtain "in person" infiltration of Baskin's movements while calling her, threatening her and publicly discussing killing her without ramification. He even offers a reward for someone to infiltrate her park in August of 2017, "I will give a \$5,000 cash bonus to anyone that is accepted into Big Cat Rescue's volunteer program. Just deny knowing me or anything about **my** park when you are interviewed. This is my way of helping Carole Baskin get the best people she could possibly find to work there. Send in those volunteer applications and when you are accepted, send me the details of your duties. Once I verify and confirm that you have supported me and/or Joe, I will pay your sign on bonus. Keep your friends close and your enemies closer, right Carole?" (*See Exhibit 162.*)

**Lauren Lowe Affidavit**

PCC interviewed Lauren Lowe in person on May 19, 2021, May 20, 2021, August 5, 2021 and August 6, 2021. At the conclusion of the August 6, 2021 interview, Lauren Lowe completed an Affidavit. (*See Exhibit 133.*) The content of Lauren Lowe's affidavit consists of statements regarding the fabrication of evidence in an effort to falsely implicate Maldonado in the crimes charged and statements regarding Bryant illegally breaking into Maldonado's personal residence and removing evidence.  Evidence that to this day has not been disclosed.

Lauren Lowe's Affidavit is significant for two reasons. The first is that Lauren Lowe recants a portion of the testimony she offered at trial on November of 2017, she received a package from the zoo at her then current residence: 6645 Natalia Court, Las Vegas, Nevada. Inside the envelope was a cell phone. (Trial Tr.713: 1-14). Her testimony was significant in that what happened to Glover's phone after November 25, 2017 was a principal issue in this case.

In her Affidavit, Lauren Lowe admitted that what she received on the November 27, 2018 was actually "a summons from PETA regarding Tim Stark." Lauren Lowe's recantation is corroborated by a November 28, 2017 text message exchange between Lowe and Maldonado that said, "Hey, that package arrived today. It had a Peta summons." (*See Exhibit 136.)* Here, the recantation is significant. Testimony that a phone was mailed to an address fraudulently leased by the Lowe's with the help of Garretson goes to the heart of the indictment and verdict.

**Lauren Lowe Text Messages**

Lauren Lowe also provided PCC with her cell phones used during the criminal investigation and trial. When examining the content, PCC discovered previously undisclosed messages between Bryant and Lauren Lowe wherein Lauren Lowe provides Bryant with materially relevant information concerning Ashley Webster that was never provided to trial defense counsel. (*See Exhibits 133 and 138*.)

Evidence of text messages between Chealsi Putnam reveal that Chealsi Putnam was trying for "years and years" to get Maldonado in trouble is new evidence. (*See Exhibit 134.)* Additionally, Lauren Lowe stated, "Chealsi Putman told me that she was in regular

26

communication with Agent Bryant" and that she "would disclose the information she learned about the case "from Agent Bryant "to the attorney for Carole Baskin." (*See Exhibit 133.*)  In another message, Putnam asked, "[w]ho pissed off Jeff Johnson? Matt [Bryant] just told me yesterday that he has to keep him from telling all he might just mess this entire thing up for us all."  This is more corroboration of the federal government seeking to exclude an exculpatory witness, witness collusion and *Brady* violations.

**Lauren Lowe Perjury**

In addition to her perjury regarding the contents of the envelope, Lauren Lowe lied about her relationship with a park employee. In a February 4, 2019 call, (*See Exhibit 126*) Lauren Lowe told Bryant, "I actually gave Beth Corely her (USDA Folder)…Well, I gave it to one of her staff members to give to her, as to what her inventory was, and she's like, 'Holy Shit.' She's like, 'I had no idea this was all my inventory.'"  However, Lauren Lowe testified at trial, "I'd never met her" when asked about Beth Corley during the trial.  Given the February 4, 2019 recording, Lauren Lowe's testimony is false.  Additionally, the Lowe's have both admitted to fabricating evidence and according to this recording, the Lowe's were in possession of the USDA folder <u>before</u> it was given to Beth Corley and produced to trial defense counsel.  Given the recording, Bryant knew Lauren Lowe's testimony regarding Beth Corley was false, yet he let it stand uncorrected.  This also establishes a *Naupe* violation.

**Yurri Schreibvogel Interview**

PCC interviewed Yurri Schreibvogel who provided new evidence related to Bryant, Howard and Carole Baskin and their involvement in the series of events prior to the factual

development of any alleged murder for hire. Specifically, "[t]his shit with Joe, all of it was a bullshit setup. Howard (Baskin) was behind it from day one." (*See Exhibit 135.*)  Mr. Schreibvogel claimed he knew it was going to happen before Joe did it because "Chealsi set his ass up" and Howard Baskin would boast, "I have someone on the inside." And, "I've been in it with Howard since day one." Mr. Schreibvogel claimed there was impropriety between Chealsi Putnam and Bryant. Mr. Schreibvogel claims he had a multiple hour meeting with the U.S. Attorneys and Bryant, which was never made available to trial defense counsel. This is yet another *Brady* violation that requires an evidentiary hearing.

**John Reinke**

PCC interviewed John Reinke on September 14, 2021 and September 15, 2021.  At the conclusion of the September 15, 2021 interview, Reinke completed an Affidavit.  (*See Exhibit 113.)*  Reinke's statements regarding the age and health of the five tigers euthanized by Maldonado contradict testimony by Eric Cowie and Dylan West. Further, according to Reinke's affidavit, "all of the cats but Cuddles were breeders."  He also stated, "The five tigers were NOT shot to make room for the animals from Trey Keys and the Culpepper Merryweather Circus."   Reinke explained, "All five tigers that were euthanized were authorized by the USDA."  Reinke, "tried to tell this to Agent Bryant, Agent Farabow and AUSA Amanda Green, however, they didn't want to know it." Reinke also stated, "the bodies would have revealed evidence that proved euthanization of these tigers was proper as authorized by the USDA."

Additionally, PCC provided Reinke with a copy of a USFWS Report prepared by Special Agent Bryant after Reinke's interview on February 6, 2019.  Reinke stated, "Report #59 does not accurately reflect what I said."   Reinke stated federal agents "changed my testimony in this report to favor the State's case."  This would be another example of Bryant preparing official government reports with misleading and false information.

**The Tigers**

During the trial, the government presented the testimony of Eric Cowie who testified the tigers subject to Counts 3-7 were euthanized because they "were looking for cats who weren't producing any cubs." (Trial Tr. 45: 5-6.) Cowie specifically identified tigers known as "Samson and Delilah." (Trial Tr. 46: 2-8). At no point did the government introduce any evidence other than Cowie's specific identification of the animals.  PCC has discovered this testimony was false.

New evidence from Jeff and Lauren Lowe as well as record from a tiger sanctuary called, "Tiger Haven," reveals two of the tigers allegedly shot and killed by Maldonado survived his conviction. In fact, the public could donate and sponsor "Samson" until December of 2021.[2] Concurrently, Lauren Lowe and her veterinarian have evidence showing the tiger Delilah died after Joe was convicted and that Delilah died with evidence of being able to breed in her body. Thus 2 of the 5 euthanized tigers who were the subject of the indictment are still alive.

**National Geographic**

---

[2] http://www.tigerhaven.org/pic.asp?p=Samson%202#

In the course of re-investigating this case, PCC discovered an article published in the December of 2019 in National Geographic titled *The Tigers Next Door*. (*See Exhibit 110.)* The article spotlighted Garretson and Ringling Animal Care's cub petting business from August of 2018 through March of 2019, which is during both the criminal investigation and the criminal trial. Noteworthy, is that the author, Sharon Guynup, was in communication with Bryant and was specifically aware of the investigation of Maldonado prior to the indictment. However, the extent of their relationship was never disclosed to trial defense counsel, but it significant. A photo shoot was published in March of 2020 by Steve Winter, the photographer from *The Tigers Next Door*, who is also Sharon Guynup's husband. (*See Exhibit 132*.) The photographs featured agents Bryant and Markley posing with tiger skulls. The skulls had been removed from evidence bags and appear chemically treated. The photos were posted in March of 2020, but the caption indicates they were taken in connection with the article published in December of 2019, which was before Maldonado was sentenced.

In an accompanying article entitled, "The Truth about "Tiger King" and Cats in Captivity," Sharon Guynup and Steve Winter were interviewed by PBS.[3] Winter notes, "The U.S. Fish and Wildlife agent called the day they exhumed the tiger carcasses the worst day of his career." This is undisputedly false. Winter has not responded to our inquiries. The Department of Justice will not either. Due to the intentional spoilation of evidence, Maldonado is not able to conduct his own independent examination of the tigers. The

---

[3] https://www.pbs.org/wnet/nature/blog/the-truth-about-tiger-king-and-cats-in-captivity/

access to federal agents and the Department of Justice may have been rewarded with media coverage and glamorous photos, but they also show evidence of an egregious misrepresentation of the truth, malicious prosecution and false arrest.

**Tiger King**

In the initial written contract between Maldonado and Royal Goodes, LLC (hereinafter, "the Producer"), the Producer bought "all rights herein set forth in and to the life story of" the Mr. Maldonado-Passage. (*See Exhibit 1*.) This included all of the "plots, themes, characters, characterizations, events and incidents thereof." It also included a waiver of "any so-called "droit moral" or moral rights of authorship which Maldonado had with respect to the Story, the Picture, and any element thereof." By waiving Moral Rights, Maldonado unknowingly allowed filmmakers to script reality in ways which were unknown to American jurisprudence before *Tiger King*. (*See Exhibits 1 and 149).*

The contract allowed the Producers to gag Maldonado's friends, family and himself, as well as the witnesses to his case. Further, it allowed the Producers to keep proprietary interests in witness statements and interviews captured during the criminal investigation which included now known to be relevant evidence/information they are still holding inviolate to this day. The Producers threatened perceived violators of this agreement with the, "possibly millions of dollars in punitive damages." In other words, the Producers of *Tiger King* valued their movie rights over and above Maldonado's constitutionally protected rights to not be convicted. Unbeknownst to Maldonado, the contract prevented his agents from investigating and denied Maldonado's lawyers access to relevant evidence,

including witness statements.  None of this occurred or was known until after this jury trial concluded.

Although they refuse to cooperate with this investigation, Robert Moor of the Wondery podcast interviewed Mr. Lowe.[4] Before permanently moving to Oklahoma, Mr. Lowe told Mr. Maldonado and the reporter, that he planned to buy neighboring land for a breeding facility.  He said, "I can buy it Friday for a hundred thousand bucks, 10 acres. We put a whole big breeding facility, beautiful place over there." Mr. Lowe admitted Carole Baskin started a petition to stop his "sanctuary" at Beaufort Liquidation and called her, "the devil incarnate." Mr. Lowe bragged he called Carole Baskin before moving and said, "Listen, you bitch, I'm not Joe Schreibvogel. I don't go from paycheck to paycheck. Then I said, will sue your ass." He said, "If I lose, I'll do to you what you did to your husband." Mrs. Baskin's husband was likely murdered. The full context of this recording is needed by all of us.

## BRADY VIOLATIONS

In pretrial proceedings, two joint Statements of Discovery were submitted on October 12, 2018 [DE 20] and November 29, 2018 [DE 35]. During those discovery conferences, trial defense counsel requested, "all notices and discovery to which he is entitled under the Federal Rules of Criminal Procedure, the Local Rules, or any other federal law or rule."  The government noted that it had provided investigative materials to counsel for the defendant and expressly acknowledged a **continuing** responsibility to,

---

[4] https://wondery.com/shows/over-my-dead-body/episode/5718-joe-vs-carole-the-tiger-king/

"disclose any material favorable to the defendant within the meaning of *Brady* that becomes known to the government during the course of these proceedings." (Emphasis added.)

*Brady* safeguards defendants from prosecutorial foul play with respect to favorable evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To establish a *Brady* violation, a defendant must demonstrate that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material to an issue at trial. *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Trammell v. McKune*, 485 F.3d 546, 551 (10th Cir. 2007).

The *Brady* inquiry considers evidence cumulatively, and importantly, imposes on the prosecution a "duty to learn any of the favorable evidence known to others acting on the government's behalf in the case." *Id.* Prosecutors play a special role in the search for truth in criminal trials. *Stickler v. Greene*, 527 U.S. 263, 281 (1991). The prosecutor's interest in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Strickler,* 527 U.S. at 281, quoting *Berger v. United* States, 295 U.S. 78, 88 (1935). A due process violation occurs when evidence suppressed is material to guilt or to punishment, irrespective of good faith or bad faith of prosecution. *Brady at* 87.

The rule is broad in the scope of evidence to which it applies. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The prosecution's duty to disclose evidence favorable to the accused includes the duty to disclose impeachment evidence as well as exculpatory evidence. *Brady* at 89. Exculpatory evidence need not be evidence that would have produced an acquittal. *Kyles* at 434. The evidence only needs to be "favorable to the accused," *Brady* at 87, and

create a "reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 681 (1985). "A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 682. Such evidence is favorable to an accused . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley* at 676.

**Garretson Recorded Calls**

All recordings from Garretson and Lowe were intentionally withheld or destroyed, despite the government's knowledge of the existence of these recordings. Over 389 recordings were not disclosed. The evidence contained in these recordings demonstrates the perjury committed at trial, the witnesses' true motivation in cooperating with the government, the misconduct of the lead investigators and AUSAs, efforts to gain information on trial defense counsel's strategy, promises of immunity and more. If this evidence was properly turned over to trial defense counsel, there is a reasonable probability the outcome would have been different.

Furthermore, In the March 2019 recordings Bryant learned of the existence of undisclosed recordings (*See Exhibit 14-19.*) Rather than collecting the relevant evidence, which he was required to do, Bryant conspired with Garretson to materially alter part of the evidence so that it became favorable to the prosecution.  Unaltered, the recording would have been favorable to Maldonado as a recording of two government witnesses conspiring to murder yet another government witness is relevant. Criminal activity that did not involve Maldonado would have been helpful in Maldonado's defense. This is also a *Naupe*

violation as the testimony stood uncorrected at trial by the federal government who knew of its falsity.

**Government Issued Recorder**

On March 31, 2019, Garretson recorded a call with Johnson.  (*See Exhibit 59*.)  In this call, Garretson told Johnson he had his "government issued recorder still."  Garretson did not return it to law enforcement and said, "I've been trying to pull that off, like, 'Oh, shit. I misplaced it when I moved,' trying to... I'd like to keep it for myself."  The government was aware that Garretson had the government issued recorder in his possession up to and during the trial.  The very recorder that stored videos and recordings obtained by Garretson during the investigation into Maldonado. The fact that Garretson remained in possession of this recorder was not disclosed to trial defense counsel.

The possibility of recordings on this device that would exonerate Maldonado or helped his defense would have affected the outcome of the trial. But we will never know due to Garretson intentional destruction of it. Furthermore, Garretson lied about having the recording device in his possession; bragged about having undisclosed recordings, actively planned how to inappropriately use recordings to discredit witnesses; and even deleted recordings at his discretion.

**Brittany Medina**

Brittany Medina was an undisclosed exculpatory witness for the defendant.  PCC's re-investigation of this case found that Brittany Medina was involved with the federal investigation since Garretson's initial interview with law enforcement on September 14, 2017.  Garretson admitted to such in a March 11, 2021 interview with Netflix producers.

(*See Exhibit 105*.) Medina later stated in a Netflix interview that, "[t]he federal government never called me as a witness."  Medina did not "know why."  She explained that she "had spoken to them. I've met up when they had lunches with James." (*See Exhibit104.*) USFWS nor the FBI ever authored a report about the information Ms. Medina provided regarding their investigation into Mr. Maldonado nor her presence at these meetings. Yet, she was present for and participated in multiple meetings throughout the investigation.  Because trial defense counsel did not have a report documenting her presence and involvement in this conversation, they could not call her as a witness to refute the AUSAs theory that Mr. Maldonado was involved in this first murder for hire plot.

**Ashley Webster**

In February of 2017, the Lowes met Ashley Webster online and eventually invited her to work at the zoo.  During her brief employment, Webster contacted the Baskins and reported alleged threats against Carole Baskin's life.  The threats were turned over the authorities.   Ashley Webster was interviewed by the FBI and would later sit for a deposition.  At no point, was Ashley Webster identified as cooperating witness for the government.

The investigation by PCC exposed two things about Webster.  The first is that Webster was actually working for the government and was not, as portrayed, an independent person working at the zoo. (*See Exhibit 141.*) Additionally, PCC discovered Webster was up until recently involved in a romantic relationship with Glover.  This information, along with Webster's personnel file, was provided to Bryant by the Lowe's in a text message of March 25, 2019. (*See Exhibit 139.*) Neither the text message or personnel

file were turned over to trial defense counsel. Bryant certainly knew of Glover's relationship with Webster as evidenced by the text exchange with Lauren Lowe. Accordingly, under *Brady*, his knowledge is imputed to the government, regardless of the AUSAs apparent lack of knowledge.

**Chealsi Putman**

Ms. Putman is Mr. Maldonado's niece and a personal friend of the Baskins. PCC's investigation revealed that she was working closely with Bryant during the entirely of Mr. Maldonado's criminal investigation and relayed any information she learned directly to the Baskins. In a text exchange with Lauren Lowe, Putman references her cooperation with the federal agent throughout the investigation. Her cooperation is further evidenced by an email exchange between Lowe and Putman wherein they discuss Johnson's jealousy regarding who was more important to Bryant. (*See Exhibit 134 and 142.*) Putnam's involvement is further evidenced by Lauren's Lowe's affidavit. No evidence of Putman's involvement was turned over to trial defense counsel.

**Agent Bryant Communications**

PCC has discovered Bryant failed to produce relevant text message exchanges with cooperating witnesses during pretrial proceedings.  In a series of calls regarding Johnson wanting to murder Lowe, Bryant read Garretson messages he received from Johnson. Those messages were not disclosed.  (*See Exhibits 14-19*.)  Bryant failed to produce text messages from the Lowe's regarding Ashley Webster.  He also failed to report on calls and produce messages exchanged with Glover regarding potential witnesses and Glover's pending court cases.  (*See Exhibits 62, 133, 138, and 139.*) Lastly, he failed to produce

recordings that showed Maldonado had no interest in committing crimes, which Bryant specifically request Lowe to try and obtain. (*See Exhibit 156.*)

During the investigation Bryant offered cooperating individuals, specifically, Garretson, the opportunity to contact him on his personal cell phone. (*See Exhibit 143.*) None of these communications were turned over to trial defense counsel, whether it be text message or phone calls. Trial defense counsel's discovery request encompassed all communications with USFWS agents, yet nothing from Bryant's personal phone was ever turned over by the AUSAs in discovery.

Similarly, text message correspondence involving Bryant appears to be edited or altered in some way. The altered versions do not account for the entirely of the conversations held between Bryant and those he engaged to cooperate with the investigation. PCC retained an expert, Doug Kouns who reviewed the text history between Garretson and Bryant produced in discovery. Kouns noted the texts were provided as screenshots and that many appeared to be edited, altered, or unprofessionally redacted. Many of the text "balloons" were clearly misshapen possibly having been erased with a photo editing program. (*See Exhibit 144.*)  The alteration of messages by Bryant was intentional and the substance of Bryant's text messages are material based on his unethical behavior throughout the entire investigation in concealing, manipulating and fabricating evidence in an effort to secure a conviction against Maldonado.  This evidence of misconduct provides a different context to the altered text messages and is therefore newly discovered evidence that warrants a new trial.

**The Tiger Excavation**

On October 25, 2018, USFWS agents, at the direction of their superiors, excavated the burial site and recovered what was officially reported as five tiger skulls. (*See Exhibits 145 and 146.*) Not present for the excavation was trial defense counsel. (*See Exhibit 147.*) As such, they were forced to rely on the reporting of government officials. Bryant prepared a report entitled, "Details of Investigation." (*See Exhibit 145-146.*) Markley testified "they found **five** tigers lined up side by side" and "there was a "white tarp laid out with **five** individual black plastic bags with skulls." (Trial Tr. 106: 6-8.) (Emphasis added.) (*See Exhibit 166 and 167.*)

PCC's reinvestigation of this case found Bryant's reporting and Markley's testimony at trial regarding this matter to be categorically false as there were six skulls not five. In fact, newly discovered photographs prove **six** tiger skulls were excavated. *(See Exhibits 131, 132, 151, 166 and 167.)* This is further corroborated by a February 18, 2022, Instagram post, "there was a sixth skull on the tarp that Saff placed in a bucket of bleach to clean the meat from." Lowe also admitted Allen Glover, "asked us what was in the white bucket."

Unfortunately, the outrageous conduct does not end there. PCC's investigation found Markley's testimony that the government "didn't have a reason to remove the entire carcass from the ground" was also not accurate and that the government intentionally left the tiger bodies in the ground in an attempt to prevent Maldonado from having the ability to prove the animals were euthanized because of illness. (Trial Tr. 105: 3-4). In his Affidavit, Lowe explained that Bryant was purposeful in the decision to restrict the

exhumation to only the heads of the tigers.  Bryant told Lowe autopsies would confuse the jury and he was worried Joe would argue the tigers had health issues.  Bryant noted, "everyone knows what a shot gun to the head means." (*See Exhibit 125.*)

On December 8, 2018, trial defense counsel submitted a Motion seeking to sever counts 1 and 2 and counts 3-21 of the superseding indictment as evidence of the killing five tigers would unfairly prejudice Maldonado with respect to the murder for hire counts. (Doc. 38) The Government responded on December 14, 2018 by stating the "joinder [would] not result in actual prejudice to [Maldonado] that outweighs the expense and inconvenience of separate trials." (Doc. 44) The Government also noted another reason for the joinder was that cash from the cub sale funded, "the hit on C.B."

On February 13, 2019, Lowe recorded a phone call with Bryant.  (*See Exhibit 128.*) In this call, Bryant admitted the government joined Counts 1 and 2 with 3 – 7, because they wanted to "get some jurors' heartstrings bleeding on shooting those cats and showing pictures of the tiger dig and all that. And they might be prejudicial where we're weak on the murder for hire."  These statements are not conjecture.  These are the exact words used by the federal government in the recording.  The prejudice was not accidental.  It was not the result of spillover.  It was not for judicial economy.  The intent was to inappropriately influence the outcome of the criminal trial.  The duplicitous behavior of the government in this instance cannot go unchecked.  Nor can Maldonado's right to a fair trial go unprotected. Here, the federal government had the ability to collect the tigers in their entirety during the excavation.  Their failure to preserve the tigers and secure relevant evidence was detrimental to Maldonado's defense.

In *United States v. Montgomery*, 676 F. Supp. 2d 1218 (D. Kan. 2009), the U.S. Court of Appeals for the Tenth Circuit identified five factors in establishing bad faith with regarding to the government's pretrial destruction of evidence. The facts herein demonstrate just that, bad faith. The violation was not harmless as the evidence is not recoverable and no comparable evidence exists. Considering Bryant's own statements, there can be no innocent explanation from the federal government as to why the entire bodies were not recovered. The government purposefully failed to recover and examine the bodies of the tigers, which had potentially exculpatory value in that their examination would have corroborated Maldonado and Reinke's claims the animals were of old age, arthritic and declawed. A proper excavation and forensic review of the entirety of the tigers would have shown the animals were not healthy and that the euthanization was humane. It would have refuted the governments theory that it was done to provide money for the zoo.

## <u>OUTRAGEOUS GOVERNMENT CONDUCT</u>

The Supreme Court of the United States has held the conduct of law enforcement agents can be "so outrageous that due process principles would absolutely bar the government from invoking judicial processed to obtain a conviction." *United States v. Russell*, 411 U.S. 423 (1973). In *Russell*, undercover agents supplied the defendant with an essential but difficult to obtain ingredient used in producing methamphetamine. Although the court ruled in the government's favor, Justice Rehnquist noted, "we may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous

that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . ." *Id.* at 431-32.

**Today is that day.**

Since *Russell*, the Tenth Circuit has recognized the viability of the defense. The Tenth Circuit first recognized it in *United States v. Mosley*, 965 F. 2d 906 (10th Cir. 1992), the court held, "when the government's conduct during an investigation is sufficiently outrageous the courts will not allow the government to prosecute offenses developed through that conduct. A defendant may challenge such conduct by means of the outrageous conduct defense, which is predicated on the Due Process Clause of the Fifth Amendment to the United States Constitution."

In *United States v. Harris*, 997 F. 2d 812, 818 (10th Cir. 1993), the Court stated "[a]t a certain threshold, the government's conduct would violate due process." *see United States v. Lacey*, 86 F. 3d 956, 964 (10th Cir. 2013) *see United States v. Dyke*, 718 F. 3d 1282, 1287 (10th Cir. 2013), the Court held "while some circuits have disavowed the defense altogether, other circuits still, and we find ourselves in this camp . . . ." The central question is whether the government agents acted in a way that offends the universal sense of justice regardless of the defendant's predisposition to commit a crime. Federal courts have struggled to define its requirements with any degree of precision, finding instead the inquiry revolves around the "totality of the circumstances." *See Mosley*, 965 F. 2d at 910*; see also Lacey*, 86 F. 3d at 964

However, the Tenth Circuit has held that a defendant asserting the outrageous government conduct defense bears the burden of proving either 1) excessive governmental

involvement in the creation of the crime, or 2) a significant governmental coercion to induce the crime. *Dyke*, 718 F. 3d at 1288.

**The Government Created the Crime**

The government was excessively involved in creation of the crime of which Mr. Maldonado was convicted. There is no bright line test for determining a point at which the government's involvement becomes excessive, but there are a few guiding principles. The government is free to infiltrate an ongoing criminal enterprise, "induce a defendant to repeat or continue a crime or even induce him to expand or extend previous criminal activity." *Mosley*, 965 F. 2d at 911. However, "where the government essentially generates new crime for the purpose of prosecuting it or induces a defendant to become involved for the first time in certain criminal activity, as opposed to merely interposing itself in an ongoing criminal enterprise, such conduct has occasionally been held to be outrageous." *Id.*

The government in this case did not infiltrate an ongoing criminal enterprise, induce the defendant to repeat or continue a crime, or induce him to expand previous criminal activity within the bounds of permissible investigative conduct. Here, prior to the inception of the federal government's undercover operations, there was no criminal enterprise to infiltrate. Mr. Maldonado had not engaged, or even attempted to engage in criminal activity, nor was he manipulated into doing so.

Maldonado was not engaged in criminal activity prior to the government's involvement. While Maldonado's threats to Carole Baskin may be unsettling to some, they must be interpreted with the commands of the First Amendment in mind. Maldonado made

no serious expression of an intent to commit an act of unlawful violence to Ms. Baskin prior to government involvement.

While there is a point at which speech becomes criminal, Maldonado's speech never crossed that line. He had no date, no plan, no means to execute a plan, no materials, no expertise, and no intent to make Carole Baskin feel intimidated or threatened. Prior to the government's involvement, Maldonado had never acted nor attempted to act on any of the ideas he discussed with individuals at the Greater Wynnewood Exotic Animal Park and the mere fantasy- even an unsettling kind- is not without more, criminal. Hence, why Maldonado was never charged in the decade he was doing this prior to the government's involvement.

**Absent The Government's Involvement, No Crime Would Have Occurred**

In *United States v. Twigg*, 588 F. 2d 373 (3d Cir. 1978) that the nature and extent of police involvement was so overreaching as to bar prosecution of two individuals for illegal manufacture of methamphetamine. In that case, the government purchased all of the supplies including the "indispensable ingredient, phenyl-2-propanonewith the exception of a funnel, which was purchased by the defendants at the direction of the government agent. When the defendants had trouble locating a production site, the government, at no cost to defendants, "found the solution by providing an isolated farmhouse well-suited for the location of an illegally operated laboratory." *Id.* The government agent "was completely in charge and furnished all of the laboratory expertise. Neither defendant had the know-how with which to actually manufacture methamphetamine. The assistance they provided was minimal and then at the specific direction of [the agent]." *Id.*

44

Here, the evidence presented at trial shows that Mr. Maldonado was a participant in the plans manufactured and set in motion by the government- not the other way around. Without the government's involvement, Maldonado had no plan to carry out a murder. He was not engaged in or about to engage in any criminal activity, and while he joked of hurting Carole Baskin, he had never taken even the most basic step toward making it a reality.

**Plot One.** When Garretson began contacting Maldonado in his newfound capacity as a confidential informant, it was obvious that Maldonado was not motivated to hire someone to commit a murder, let alone commit a murder. Garretson always used encouragement and prodding. He was under pressure from Bryant. (*See Exhibit 10.*) An important factor in outrageous government misconduct is "how eagerly and actively" the defendant participated in the crime, finding it a "necessary corollary….of our inquiry into whether the government engineered and directed the crime from start to finish. *Id.* The only evidence of Maldonado engaging in a conversation to allegedly murder Baskin is testimony from Glover and Garretson that he "pulled up a map and discussed ways to kill her." However, we now know that it was Lowe who initiated this conversation while Maldonado sat in the back of the office and didn't engage in any conversation. (*See Exhibits 10 and 112.*)

The evidence presented at trial was that Maldonado instructed Glover to travel to Texas to obtain a fake ID in order to buy a bus ticket to Florida. However, we now know of Garretson habit of creating fake IDs and using them to further his criminal enterprise.

45

**Plot Two.**  This plot also failed. And again AUSA Maxfield-Green admits to such in her Netflix interview. In support of Count 2, the government played a recorded cell phone call from December 5, 2017, in which Maldonado-Passage agreed to meet with James and Mark to discuss killing Baskin" At trial, the judge instructed the jury that the cell phone Maldonado was using for this call was a "facility of interstate commerce" in itself. [Appellant's App. vol. 1B at 5]

When using an informant in a murder-for-hire investigation, the government must not manufacture the interstate nexus required for jurisdiction. Such actions may be grounds for reversal. *See, e.g.*, *United States v. Coates*, 949 F. 2d 104 (4th Cir. 1991) (reversal of convictions where only basis for Federal jurisdiction was interstate calls government agent arranged for sole purpose of creating Federal jurisdiction); *United States v. Archer*, 486 F. 2d 670 (2d Cir. 1973). Such cases are typically analyzed by courts as outrageous government misconduct or government overreaching. *See, e.g.*, *United States v. Keats*, 937 F.2d 58, 65 (2d Cir.), *cert. denied*, 112 S.Ct. 399 (1991); *United States v. Bagnariol*, 665 F.2d 877, 898 n.15 (9th Cir. 1981), *cert. denied*, 456 U.S. 962 (1982); *United States v. Hall*, 536 F.2d 313, 327 (10th Cir.), *cert. denied*, 429 U.S. 919 (1976).

Here, the government inserted the UCE when the Allen Glover plot failed. Garretson arranged this call with the UCE at the direction of Bryant and for the sole purpose of creating federal jurisdiction. The evidence presented shows that Garretson made two calls to Maldonado regarding "his guy, but Mr. Maldonado blew it off. He expressed no interest in learning more about him. Growing impatient and under extreme pressure from Bryant to get it done, Garretson engaged in a call to Maldonado while in the presence of

the UCE to set up a meeting. Not at the direction or request of Maldonado, but rather by Garretson's own actions at the direction of Bryant. Bryant specifically instructed Garretson what to say and how to phrase the words in the conversation to make sure he "got the words out of Joe's mouth." When Garretson phrased the way he would initiate the call, Bryant again corrected him.

During this meeting Maldonado never specifically agreed to a plan. He never provided money, a weapon, or a place in furtherance of the plan. Following this meeting, Garretson engaged in over ten communications with Maldonado in an attempt to get him to take the bait. Not once or at any time thereafter did Maldonado engage in an overt act to commit a crime. The conversations leading up to Maldonado's arrest do not support the government's view that Maldonado was an active an eager participant in the crime.

**Plot Three.** Plot one failed. Plot two failed. Bryant was frustrated. The AUSAs were frustrated. Their investigation wasn't going as planned. So, they decided to involve Lowe. It is no mere coincidence that Jeff Lowe gets arrested in Las Vegas, and upon return home to Oklahoma immediately starts working with federal agents to set Maldonado up. In the initial meeting, they discuss ways they can set up Maldonado and certain things they need to be able to prove in order to "make the charges stick." Lowe admits that "Glover would do anything for him." (See Exhibit xx) Suddenly the pieces fit for federal murder-for-hire charges. The cell phone was shipped to Vegas to hide Allen's whereabouts, Allen did, in fact, travel to Florida. The murder for hire money came from a $3,000 cub sale.

However, we now know that Jeff wanted the cell phone shipped and the date it actually arrived is unknown. Allen went to Florida, but with no intent to commit a murder.

In fact, he never intended to commit a murder. (*See Exhibit 112.*) And we know from a recorded call between Bryant and the Lowes, that the federal government knew a cub sale didn't occur to fund the murder for hire. (*See Exhibit 128.*)

Lowe worked with Glover, Garretson and Bryant in order to make the puzzle pieces fit so they could put Maldonado behind bars. The AUSAs and Bryant's persistent efforts to induce Maldonado to commit this crime, combined with them concocting a story to fit all the essential elements of the crime, demonstrate that absent the governments involvement and help from their cooperating witnesses, Maldonado would never have been charged with these crimes.

The confidential informant and undercover agent, acted under pressure and with direction from Bryant and FBI agents - not Maldonado.  Maldonado was an unknowing participant.  He simply answered the phone.

Plot one failed, plot two failed and plot three was created at the hands of the federal government. The totality of the circumstances reveals a sequence of events where the conduct of law enforcement agents is so outrageous that due process principles should absolutely bar the government from invoking the judicial process of this Court to obtain a conviction.

**The recordings**

As outline above, the government was excessively involved in the creation of the crime. Bryant's behavior documented in the recordings is "conduct so shocking, outrageous and intolerable that it offends the universal sense of justice." (*See Exhibit 144.*)

During the investigation and trial, witnesses lied at the behest of Bryant. During the investigation, witnesses fabricated and altered evidence at the behest of Bryant. The false testimony and altered evidence were used against Maldonado in an attempt to make it appear as if he had committed the crimes charged. Bryant's actions had a direct and meaningful impact on the criminal proceedings. And Maldonado is now serving a 21 years sentence. In fact, if the sentence wasn't great enough for the federal government, they were going to go back and try to investigate other crimes in order to put Maldonado away for life. (*See Exhibit 165.*) In viewing the totality of the circumstances and all the new evidence obtained by PCC, this behavior is nothing short of shocking and outrageous.

## **GIGLIO VIOLATIONS**

Mr. Maldonado's PCC discovered new evidence indicating that the government failed to disclose promises made to key witnesses that they would be immune from prosecution if they testified **favorably** for the government. "The suppression of material evidence violate[s] due process and warrant[s] a new trial whether it result[s] from the prosecution's negligence or deliberate deception. *Giglio v. United States*, 405 U.S. 150, 150 (1972). Under *Giglio*, the suppression of material evidence justifies a new trial when the reliability of a given witness is determinative of guilt or innocence."

In *Giglio*, John Giglio was prosecuted federally for negotiating forged money orders. Robert Taliento, a bank teller, helped Giglio commit the crime. Taliento was named as an unindicted coconspirator and testified at trial as a government witness. Neither Giglio nor the trial AUSA knew until after the trial that a different AUSA, the one who had handled the grand jury proceedings, had given Taliento full immunity in exchange for his testimony.

49

The United States Supreme Court decided that the government's failure to disclose the immunity agreement violated due process and overturned Giglio's conviction. The Court explained, "credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."

The purpose of a trial is not to mislead or trick the jury into rendering manipulated verdicts. "The purpose of trials is to find the truth, and to allow the jury -- the people -- to find the truth." *Martin v. City of Albuquerque*, No. CIV 14-1011 JB/GBW, 2015 U.S. Dist. LEXIS 162691, at *28 (D.N.M. Nov. 9, 2015). "The process -- not just the end result -- is important" in determining if "the appearance of justice has been satisfied." *Id.* A prosecutor's knowing use of false testimony involves, not just prosecutorial misconduct, but more importantly the corruption of the truth-seeking function of the trial process." *Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110, 1118 (E.D. Okla. 2019).

Garretson and Bryant are such witnesses. Despite the federal governments knowledge of witnesses engaging in illegal criminal activity throughout the investigation and continuing post-trial, none of these witnesses have been criminally charged. Not one. Yet, the prosecution stands by the fact that they were never offered immunity. This extends beyond Allen Glover's undisclosed immunity for participating in the alleged murder-for-hire to criminal activity involving other witnesses ranging from credit card fraud, prostitution, drug dealing, animal sales, animal transfers and animal abuse. Threatening witnesses was a continuing theme of the federal government in order to indict Mr. Maldonado.

In additional to the Giglio violations noted throughout this Motion, the following additional violations are detailed below:

**Allen Glover**

According to Lowe's Affidavit, Bryant "made some calls" to get Glover's DUI's handled because "a conviction could impugn the credibility" of Glover's statements. (*See Exhibit 125*.)  Glover's undisclosed messages with Bryant document some discussion regarding the DUI's, but in typical Bryant fashion, he says, "We do not need to be texting." (*See Exhibit 122*.)

At trial, Glover was asked by the government if he was promised immunity.  Under direct examination by AUSA Maxfield Green, Glover testified he did not have immunity. (Trial Tr. 650: 1-7).  During PCC's interview with Allen Glover, he stated that three government representatives, AUSA Green, Bryant, and AUSA Green's supervisor (name unknown), informed him during his trial preparation that "If [he] did what they asked then no charges would be brought against me now or in the future." [See Affidavit Allen Glover Ex. 2]. The nondisclosure of these promises, constitutes a violation of due process requiring a vacated conviction and sentence. Bryant also joked about his promises to Glover. (Exhibit 119.)

Similar to *Giglio*, the government's case on the first murder for hire count depended almost entirely on Glover's testimony; without it there could have been no indictment and no evidence to carry the case to the jury.  Therefore, his credibility as a witness was an important issue in the case, and evidence of any understanding or agreement as to a future

prosecution would be relevant to his credibility and the jury was entitled to know of it. But for the false testimony, there would have been no conviction of Mr. Maldonado.

**Dr. JoAnne Green**

In a March 26, 2019 call between Garretson and an unidentified caller, Garretson is heard telling the other caller that he was present when the government called Dr. Joanne Green and said, "if you don't go, you're going to get arrested." (*See Exhibit 43*).   PCC attempted to speak with Dr. Green during their investigation; however, she did not want to get involved again. She was able to confirm some level of coercion to testify.

**James Garretson**

James Garretson testified at trial that he was not offered immunity.  (Trial Tr. 579: 19-25: 580:1-20).  AUSA Amanda Green allowed Garretson's testimony to go uncorrected on direct examination, despite knowledge of its falsity. Forms of immunity/leniency were given for the sale of the lemur, his purchase of tigers, and his operation of Ringling Animal Care. (*See Exhibit 4, 8, 9, 31, 33, 34, and 35*.) Additionally, in Garretson's December 2, 2021 interview with the FBI, he confirmed AUSA Green "told me that I wouldn't be charged for this lemur." (*See Exhibit 152*.)

**John Finlay**

During trial, John Finley was never asked if he was provided immunity, nor was it questioned on cross examination by trial defense counsel. However, newly discovered evidence indicates Finlay was coerced into testifying.   (Exhibits 21, 153, 163 and 171.)

**Jeff Lowe**

While Jeff Lowe did not testify at the trial, he was a cooperating witness for the government. In a call between Garretson and Johnson, Garretson informs Johnson that "[Jeff] got immunity. 100% immunity." (*See Exhibit 30.*) This was further confirmed in a December 5, 2018 phone call that was turned over to PCC wherein Bryant assures Lauren not to freak out because "ya'll are in good shape," and "[l]et it go because of that deal yesterday. It all worked out. We had that talk last night. So, Jeff knows. Don't read into anything if you didn't hear it from me, it ain't right so." (*See Exhibit 126.*) This immunity was also provided to Lauren Lowe as corroborated by this phone call.

## NAUPE VIOLATIONS

The Due Process clause is a procedural shield for defendants against the threat of convictions by false evidence. *Naupe v. Illinois*, 360 U.S. 264, 269 (1959). In *Garcia*, "A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material. *United States v. Garcia*, 793 F. 3d 1194, 1199 (10th Cir. 2015). A conviction obtained through the use of false evidence or testimony is tainted. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence" and it is upon "subtle factors" by a "witness in testifying falsely that a defendant's life or liberty may depend. *Id.* All convictions premises on such evidence are fundamentally unfair and must be set aside. *Id.* The Due Process Clause forbids the knowing use of false, material evidence. *Id.* at 270. The State violates a defendant's due process rights to a fair trial by

using and failing to correct false testimony. The crux of a denial of due process is deliberate deception. *United States ex rel. Burnett v. Illinois*, 619 F. 2d 668, 674 (7th Cir. 1980).  The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. The "standard of fairness is interpreted to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528 (1984). Throughout the review of the new evidence, PCC has discovered several instances where witnesses lied during the criminal trial, and the government failed to correct the testimony.  Included in the potential *Napue* violations previously outlined in this Motion are the following:

**James Garretson**

Bryant knew Garretson was lying and he failed to correct the untruthful testimony. Bryant is a Special Agent with the Department of Fish and Wildlife and "investigative officers are part of the prosecution." *United States v. Buchanan*, 891 F.2d 1436, 1437 (10th Cir. 1989).  Additionally, according to the Department of Justice Manual "Members of the prosecution team include federal, state and local law enforcement officers."[5]  Bryant, as a member of the prosecution team, was present in the court room at the prosecutor's table when Garretson testified.

The false testimony by Garretson outlines herein dramatically altered and limited the effectiveness of Maldonado's defenses at trial. The most rudimentary of the access-to-

---

[5] https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings

evidence cases imposes upon the prosecution a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath.

**Allen Glover**

The federal government had knowledge that Glover was committing perjury throughout the entirety of his testimony. They were aware it was not Engesser who conducted the cub sale in order to have money exchanging hands. (*See Exhibit 128*.)They were also aware Lowe was manipulating calls and texts with Glover, because "Glover would do whatever they wanted." Yet, the federal government encouraged the perjury for their own greed. (*See Exhibit 107.*)

**PROSECUTORIAL MISCONDUCT**

It is clearly established that prosecutorial misconduct, if it occurs, can "create constitutional error in one of two ways." *Matthews v. Workman*, 577 F. 3d 1175, 1186 (10th Cir. 2009). First, prosecutorial misconduct can prejudice 'a specific [constitutional] right. . . as to amount to a denial of that right.'" *Id.* When this occurs, one need not show that his entire trial was rendered fundamentally unfair. *See Dodd v. Trammell*, 753 F. 3d 971, 990 (10th Cir. 2013). Instead, he must show "that the constitutional guarantee was so prejudiced that it effectively amounted to a denial of that right." *Torres v. Mullin*, 317 F. 3d 1145, 1158 (10th Cir. 2003). "Second, even if the prosecutor's improper remarks do not impact a specific constitutional right, they may still create reversible error if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Matthews*, 577 F. 3d at 1186.

A prosecutor's deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with the rudimentary demands of justice. A prosecutor's knowing use of false testimony involves, not just prosecutorial misconduct, but more importantly the corruption of the truth-seeking function of the trial process. *Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110, 1118 (E.D. Okla. 2019). The function of a prosecutor under the federal constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial. *Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110, 1118 (E.D. Okla. 2019)

The following misconduct occurred at the hands of AUSA Amanda Green, AUSA Charles Brown and their direct supervisor: 1) the intentional exclusion of an exculpatory witnesses*; (See Exhibit 14-19.)* 2) the presentation of false evidence to the grand jury regarding a cub sale to indict Mr. Maldonado (*See Exhibit 128.*); 3) demanding souvenirs be collected due to the defendant's notoriety (*See Exhibit 125.); 3)* Allowing a USFWS agent to send personal emails to the CI regarding his initial interview; 4) having a bullseye with the Defendant's face on it in a government office (*See Exhibit 125); 5) a*sking a CI to obtain work product information relating to the defense (*See Exhibit 20 and 21.)* and 6) the suppression of recordings that were the subjects of trial testimony. *(See Exhibit 50.)*

The federal government presented false evidence that Mr. Maldonado conducted a cub sale and used those funds to pay Glover for the alleged murder for hire. The jury likely believed that evidence as illustrated by the guilty verdict, but current post-conviction counsel has demonstrated that evidence was false. AUSA Green presented the case to a

grand jury twice. Each time she did, she knew the statements she made alleging the sale in interstate commerce to fund the alleged murder for hire was false. Federal agents Farabow and Bryant corroborated it, yet she never corrected the testimony.  She knew the only independent fact to corroborate her theory was testimony from Glover and Lowe-individuals who went provided immunity for being on "team government."   Mr. Maldonado's due process rights were violated by the State's presentation of the false evidence and his conviction must be vacated. Mr. Maldonado has conclusively demonstrated that evidence has been established through new information discovered pursuant to post convictions counsel's investigation.

PCC retained Mr. Doug Kouns who is a former Special Agent and Supervisory Special Agent of the FBI.  During his 22 years, Mr. Kouns investigated and supervised investigations related to violations of Federal Crimes. (*See Exhibit 148- CV of Doug Kouns.*) Mr. Kouns provided opinions to a reasonable degree of certainty as an expert in investigatory practices and techniques on errors and misconduct on behalf of the government in this case. (*See Exhibit 144.*)  Kouns noted several violations and examples of those violations follow:  Bryant used his position and authority to intervene in a confidential human source's (CHS) local police matters; Bryant failed to disclose communication between himself and a CHS on his personal cell phone; Bryant interfered with and obstructed another federal agency's investigation by counseling a CHS, Lowe, not to cooperate with the government; Bryant attempted to influence a witness to not disclose his misconduct; Bryant was aware of a conspiracy to commit murder between two CHSs, had a duty as a law enforcement officer to report it, and yet failed to report it; Bryant

and CHS Garretson intentionally mispresented information to influence the court's decision to exclude Johnson as a witness; Bryant was aware of and condoned the use of fake text messages generated by CHS Lowe, calling into question the integrity of any and all text messages produced by CHS Lowe; and Bryant, along with other investigators on the case, may have intentionally discarded/destroyed potentially exculpatory evidence in violation of the OPR.  Kouns noted multiple red flags indicating the witnesses were not being truthful, had their own agendas, and held deep grudges against Maldonado. Attention to the credibility and reliability of the source should be considered by investigators and was not.

Additionally noted was that Bryant and Garretson demonstrated "cherry picking" pieces of conversations that benefit them, while omitting ones that did not and were damaging to the prosecution.  A proclivity to orchestrate a narrative was noted by Bryant and his witnesses by the writer.  This lack of candor is a potential OPR violation.

Kouns noted that it did not appear efforts were made to authenticate unsupervised recorded conversations or that steps were taken to preserve the integrity of electronic evidence.  According to his report, it appears Bryant discounted potentially exculpatory evidence that Glover actually went to visit family in South Carolina using SSI funds in favor of a story that fit his narrative.  Bryant seemed to only consider information that fit his predetermined narrative.

Further, Kouns stated the CHS operations did not all appear to be conducted within DOJ Guidelines.  Additionally,

> "It seems unusual to the writer that only one attempt at contacting the subject by the FBI UC was made. It also seems odd to the writer the FBI played such a small role in this investigation.  It is the writer's <u>opinion</u> the FBI may have intentionally distanced themselves from this sloppy and wholly unprofessional investigation conducted by Bryant."

Bryant actions as a member of the prosecution are imputed to the AUSAs. *Kyles*, 514 U.S. at 437.

Furthermore, during the re-sentencing of Mr. Maldonado, this Court asked if the prosecution had anything to add, and they simply "stood by" the original PSR and their objections and arguments contained therein.  They offered nothing to supplement the information supplied to this Court in previous proceedings.  In that moment, the prosecution "stood by" facts they knew to be false and that the facts relied upon by the probation officer in building his report were based off of the false testimony of Garretson and Glover and the compromised evidence gathered by law enforcement.  They allowed the testimony and evidence to proceed uncorrected before this Court.

We know this because on January 25, 2022, just a few days prior, the prosecution produced the results of their investigation regarding the claims alleged in Mr. Maldonado's Sentencing Memorandum.  The results of which supported the allegations of perjury and misconduct during the criminal trial as outlined in the defendant's Sentencing Memorandum via affidavits, transcripts of phones, and text message receipts. Additionally, on January 26, 2022, post-conviction counsel provided the prosecution with approximately 40 previously undisclosed recordings captured by Garretson during the criminal investigation.  Recordings that the mere existence of unequivocally demonstrated

perjury by Garretson. Yet, two days later, on January 28, 2022, the AUSAs stood before this Court and stood by information they knew to be false. And this was not the first time the prosecution allowed false testimony to proceed uncorrected.  It happened throughout the entirety of the criminal investigation and criminal trial.  The prosecutor should have corrected the trial testimony and the impression it created. The prosecution stood by in silence and that the "silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." *Id.*  And a fair trial is what Mr. Maldonado deserves.

## <u>CONCLUSION</u>

As noted herein, James Garretson, Allen Glover, Jeff Lowe, Lauren Lowe and others have provided terabytes of new data, recorded calls and documents. Maldonado has put the U.S. Attorney's Office on notice of these matters, including past and present crimes, conspiracies, and collusions between the witnesses herein, as well as intermeddling third parties. Maldonado did not even get the courtesy of a response. We attached a letter hereto we sent related to Garretson, Lowe and National Geographic, which further establishes *Brady* collusion by witnesses, substantial government misconduct, witness harassment and extortion and even bribes of payment by the producers of *Tiger King* to "license" evidence away from the public eye and pay witnesses for information even during the trial of this matter. (*See Exhibits 160 – 162.*) This new evidence is of such a serious nature that it justifies the Court's granting of a new trial.

The jury was not given the opportunity to hear important testimony that bore on important issues in the case. The real "controversy" was not fully tried and therefore, a new

trial is required. The integrity of the justice system should afford a jury the opportunity to hear and evaluate the evidence. Here, the new evidence obtained by PCC directly contradicts the government's theory presented at trial, but the jury never heard this testimony. It also shows the level of misconduct that went out throughout the investigation and prosecution. Maldonado respectfully request this Honorable Court consider this Motion, the attached exhibits, order an evidentiary hearing and grant the relief requested herein.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 1, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF and a copy hereof has been furnished to those registered participants of the ECF system.

<u>/s/ Amy M. Hanna</u>
Amy M. Hanna
Florida Bar No.: 0120471
<u>/s/ John M. Phillips</u>
John M. Phillips
Oklahoma Bar No.: 34877
212 N. Laura Street
Jacksonville, FL 32202
(904) 444-4444
(904) 508-0683 (facsimile)
amy@floridajustice.com
jphillips@floridajustice.com

<u>/s/ Molly Hiland Parmer</u>
Molly Hiland Parmer
Georgia Bar No.:  942501
1201 West Peachtree Street
Suite 2300
Atlanta, Georgia 30309
(405) 795-5060
(405) 795-5117 (facsimile)
molly@parmer.law

<u>/s/ Blake Patton</u>
J. Blake Patton
Oklahoma Bar No.: 30673
518 Colcord Drive
Suite 100
Oklahoma City, OK 73102
(405) 605-4440
bpatton@waldingpatton.com