UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JOSEPH MALDONADO-PASSAGE,
a/k/a Joseph Allen Maldonado,
a/k/a Joseph Allen Schreibvogel,
a/k/a Joe Exotic,

    Defendant-Appellant.

CASE NO. 20-6010

---

## AFFIDAVIT OF J. DOUGLAS KOUNS

I, J. Douglas Kouns being duly sworn upon oath, deposes and says:

**Background of Affiant:**

1. On September 10, 2018, I founded Veracity Intelligence, Investigation and Research (Veracity IIR). Veracity IIR is a private firm comprised primarily of former federal law enforcement agents and intelligence analysts. I am a private investigator licensed by the state of Indiana.

2. Veracity IIR's services include, but are not limited to, providing intelligence collection, investigations, and research for law firms, corporations, as well as other private and governmental entities. Veracity IIR also provides consulting, security services, and training to law enforcement agencies and private security services.

1

Exhibit 144

3. From November 12, 1996, to September 10, 2018, I was either a Special Agent or Supervisory Special Agent for the Federal Bureau of Investigation. Over my career with the FBI, I either investigated or supervised investigations related to violations of Federal Crimes including but not limited to: White Collar Crime, Violent Crime, Counterterrorism, and Counterintelligence. I was also a trained and certified member of the Evidence Response Team (ERT) and held a variety of specialty investigative certificates. See full Curriculum Vitae attached.

4. I hold a Bachelor of Science degree in Chemistry and a Master of Business Administration degree. I am also a certified fraud examiner (CFE).

5. All affirmations herein are made on personal knowledge and information provided by others. I am over the age of eighteen and competent to attest to the matters herein.

**Scope and purpose:**

6. Veracity IIR was engaged by attorney John Phillips of Phillips and Hunt in November of 2021. Multiple files containing documents, photographs and recordings were provided to Veracity IIR pertaining to the investigation and trial of Joseph Maldonado-Passage. Some of the files were reported to have been obtained post-trial. It was requested we review, process, analyze and report on any findings of errors or misconduct by the government in its prosecution of Maldonado-Passage.

**Background information:**

7. In 2019, Maldonado-Passage was convicted and sentenced to 22 years in prison on 17 federal charges of animal abuse and two counts of attempted murder for

Exhibit 144

hire for a plot to kill Carole Baskin. Special Agent Matthew Bryant of the United States Fish and Wildlife Service was the lead investigator. Jeff Lowe, Jeff Johnson, James Garretson, and Alan Glover were all cooperative witnesses and/or confidential human sources (CHS) for Bryant and the government.

**Findings:**

8.  **Wildlife Special Agent Matthew Bryant used his position and authority to intervene in a confidential human source's (CHS) local police matters, which is a potential violation of the Office of Professional Responsibility (OPR).**

   a.  A PDF file titled "Jeff Johnson Text" dated 6/28/2017 was reviewed. The conversation appears to be a transcript of a text conversation between United States Fish and Wildlife Special Agent Matthew Bryant (Bryant) and Jeff Johnson (Johnson). Texts from Bryant appear to be indicated by the letter "B." Those from Johnson appear to be indicated by the letter "J." In this document is an exchange where Johnson asks Bryant for assistance in dealing with a local police problem. Johnson is apparently being investigated by the Norman Police Department for stalking and harassing a political candidate, possibly Maldonado-Passage. Bryant agrees to fix this problem and asks Johnson for the appropriate name and contact information of the local investigator. Later in the conversation, it appears Bryant was successful when Johnson texts Bryant, "it's gone!" A federal Agent intervening in a confidential human source's (CHS) local police matters is inappropriate and would be a potential Office of Professional Responsibility (OPR) violation.

   b.  Further, **Bryant may have disclosed Johnson's identity as a federal government CHS, which is another potential OPR violation.** In this same conversation, Johnson asks

Exhibit 144

Bryant if he is also working with "Paul," possibly Paul Malagerio. Bryant goes on to indicate that he is with not-so-subtle inuendo as follows:

> J - It's gone! Just answer one question for me? Are you working closely with Paul?
>
> B - Lol ... 
>
> J - Umm...is that a no?
>
> B- No bud ... I can't say but you can read between the lines. A lot of cooperation between numerous confidential witnesses. If anything got out it would hurt the case and possibly people as you well know

 c. **This is willful misconduct as Bryant clearly knows he should not answer this question but in effect does so. Disclosing the identity of a CHS is a potential OPR violation. Bryant says himself the reason is because it could hurt the case and possibly people.**

 d. There is an appropriate process under the Department of Justice (DOJ) guidelines for opening and operating a CHS. There is also an approval process for a source to commit Otherwise Illegal Activity (OIA) in furtherance of an investigation when appropriate. This authority is granted by the US Attorney's Office. There is also an approval process to disclose the identity of a CHS when and where appropriate. It does not appear Agent Bryant was operating Johnson as an official CHS, had OIA approval nor authority to disclose identities. The only official source appears to be Garretson who is referred to as source symbol CPI-481 in reports. No other source symbols were noted throughout the review.

Exhibit 144

9. **In failing to disclose communication between himself and a CHS on his personal cell phone, Agent Bryant may have intentionally concealed potentially exculpatory information from the defense.**

a. A file titled "J Garretson texts" was reviewed. This appears to be a lengthy text conversation between Garretson and Bryant in 2017. These texts are provided as screenshots. Many appear to be edited, altered, or unprofessionally redacted. Many of the text "balloons" are clearly misshapen possibly having been erased with a photo editing program. The conversations often do not make sense as if they were cut and pasted in the wrong order and / or some content omitted. The time and dates are not always evident. **Communications such as these should be electronically extracted from the source by appropriately trained personnel to preserve the integrity for evidential purposes.** An example of many follows:



Tue, Nov 7, 12:03 PM

Thought they were just bringing money, makes sense though

b. In these conversations, **Bryant provides his personal cell phone number to Garretson**. This would open the door to compelling Bryant to turn over his phone for examination of relevant content to be turned over to the defense for discovery. This does not appear to have happened. If communications with a CHS occur on a personal

Exhibit 144

cell phone, those communications should be turned over for potential relevance and discovery. See below text from Agent Bryant to Garretson:

> Thu, Nov 9, 1:18 PM
>
> For your records and to put in your phone. My personal phone number is 405-513-2424

    c.     The above number was confirmed via a consumer database to be associated with Matthew Medry Bryant. In my opinion, communication with a CHS on a personal phone may be conducted for the specific purpose of concealing inappropriate content. At a minimum it gives the appearance of inappropriateness.

    10.    **Agent Bryant commits another potential OPR violation by interfering with and obstructing another federal agency's investigation by counseling a CHS, Lowe, not to cooperate.**

    a.     A PDF file titled "2.13.2019 Jeff Lowe and Bryant" was reviewed. This is a transcript of a recording which starts mid-conversation. The conversation is Lowe speaking to Bryant about a problem he is having with a United States Department of Agriculture investigation against him. Lowe explains the situation to Bryant. ***Bryant begins with "You're not recording me are you?" to which Lowe responds, "no,".*** Despite concerns about being recorded, Bryant then goes on to advise Lowe on how he should be polite, but *not cooperative* with the USDA investigators. In attempting to make sure he would not be caught by having been recorded, Bryant appears to be engaging in willful misconduct.

Exhibit 144

   b.     There is an appropriate process for de-confliction when law enforcement agencies have overlapping investigations. **Counseling a witness or subject to not cooperate with the other agency is not authorized by that process.**

   11.    **The government, through its AUSAs and Agent Bryant, sought to improperly influence the jury by introducing pictures of the tiger dig, which were admittedly not relevant to the murder for hire charge.**

   a.     Later in the same conversation with Lowe, as referenced above, Bryant begins with **"and keep this to yourself,"** indicating he knows he should not say what he is about to say. Bryant then explains to Lowe the government's strategy of opposing the defense' motion to sever the animal abuse counts from the murder for hire. Bryant goes on to explain how the **prosecution wants to influence the jury by introducing pictures of the tiger dig which will prejudice the jury since they are weak on the murder for hire charge.** This is not only a **potential OPR violation, but it is also an ethical violation in that the government employed a strategy of knowingly and intentionally attempting to influence and prejudice a jury.**

   12.    **Agent Bryant willfully violated a court order, and in doing so, attempted to influence a witness to not disclose his misconduct. This is another potential OPR violation.**

   a.     According to the writer's client, a court order was issued about prohibiting communications with witnesses during the trial.

Exhibit 144

    b.    A PDF file titled "2.20.2019 call Garretson and Bryant" was reviewed. No audio was provided but appears to be a conversation between James Garretson and Agent Bryant. At 7:34 minutes into the conversation, Bryant says:

> *"Me commenting what I told you the other day about that plea, you never heard that."* The conversation continues and Bryant advises *"Yeah, because I'll get my ass in jam."*

    13.    **Agent Bryant was aware of a conspiracy to commit murder between two CHSs, and yet failed to report it. Because Bryant has a duty to report this matter as a law enforcement officer despite it being detrimental to his investigation of Maldonado, this is a potential OPR violation. Agent Bryant committed further violations when he counseled one of the CHSs on how to conceal the conspiracy from authorities.**

    a.    A PDF file titled "2.20.2019 call Garretson and Jeff Johnson" was reviewed. No audio was provided and appears to be a conversation between James Garretson and Jeff Johnson. In the conversation, Johnson advises Garretson he is on his way to the park to kill Jeff Lowe. **Garretson advises Johnson he supports the idea, but he should do it away from the park. Garretson explicitly advises Johnson, "get that dude when he's away from the park." Garretson, a government witness, has conspired to commit murder with Jeff Johnson. This fact became known to Bryant shortly after (described below), yet he failed to report it, nor made any effort to notify or protect Lowe, whose life was in imminent danger.**

Exhibit 144

    b.    A PDF file titled "2.21.2019 call Garretson and Bryant" was reviewed. No audio was provided and appears to be a conversation between Garretson and Bryant. Garretson explained portions of the conversation he had with Johnson about killing Jeff Lowe (described above).

    c.    Agent Bryant counsels Garretson on how to cover himself by making an appearance of trying to report it to the Sheriff. Bryant says, *"that looks bad when you knew somebody was hunting to murder somebody down."* Garretson expresses concern about being considered a co-conspirator in *"whacking him."* Bryant does not appear concerned one of his witnesses, has expressed a desire to kill another one of his witnesses, Lowe; nor is he concerned his CHS is part of the conspiracy. No effort appears to have been made to warn Lowe. Bryant and Garretson continue to strategize on how to best spin the situation. It does not appear any of this was reported to any authorities; local, state, or federal.

    d.    Further, Bryant then realized Johnson had also texted him on 2/21/19, in what he then realized was an effort to set Lowe up to be killed. Johnson asked Bryant if he was willing to ask Lowe to meet Johnson in a public place. **Despite realizing Johnson attempted to use him to commit murder, Bryant still does not appear to have reported this to anyone. His disregard for the safety of Lowe is shocking. This is a potential OPR violation.**

14.    **Agent Bryant and CHS Garretson intentionally mispresented information to influence the court's decision to exclude Johnson as a witness.**

9

Exhibit 144

    a.    On, March 12-14, 2019, recorded calls between Bryant and Garretson indicate that because Johnson has turned on the government, pieces of the above plot will be taken out of context, twisted around, and used against Johnson in an attempt to exclude him as a witness in the trial for making threats against other witnesses.

    b.    Once it behooves them, Garretson discloses to Bryant he has a recording of Johnson's threats against Lowe (described above). These threats are only described to prosecutors as alleged threats made about Johnson "beating his ass." The part where Garretson conspired with Johnson to kill Jeff Lowe and where Bryant failed to intervene is intentionally omitted.

    c.    Because Johnson is now unfavorable to the government's case, Agent Bryant and Lowe have intentionally misrepresented a serious situation to influence the decision to exclude Johnson as a witness. This is a potential OPR violation.

**Note: This strategy was successful, and Johnson was excluded from testifying for that very reason.**

    15.    **Agent Bryant attempted to manipulate and influence CHS Garretson.**

    a.    A PDF file titled "2.26.2019 call Garretson and Bryant" was reviewed. No audio was provided and appears to be a conversation between Garretson and Bryant. Bryant is concerned about a social media post Garretson made about predicting Maldonado-Passage would "walk." Bryant goes on to badger Garretson by explaining to him **four times** about what he <u>**must have meant**</u> with the comment. Garretson does not concede to Bryant's interpretation. Bryant later goes on to advise Garretson how they needed to "spin" things as far as the appearance of his cooperation.

Exhibit 144

16. **Agent Bryant was aware of and condoned the use of fake text messages generated by CHS Lowe, calling into question the integrity of any and all text messages produced by CHS Lowe.**

a. A PDF file titled, "TEXT MESSAGES BETWEEN JEFF LOWE AND SA MATTHEW BRYANT GW EXOTICS INVESTIGATION – 2016202712" was reviewed. Texts from Bryant appear to be indicated by the letter "B" those from Lowe appear to be indicated by the letter "L." In these conversations, **Lowe advises Bryant he faked a text** to appear as if it were from Alan Glover to himself for the purposes of fooling Maldonado-Passage into making admissions.

b. From the totality of the review, **it brings into question if other faked text conversations were produced**. Bryant ultimately condones Lowe's plan to use the fake text. **Knowing Lowe has the capacity to generate fake, self-serving texts which are condoned by Bryant, the integrity of all the text conversations provided by Lowe et. al. is in question.**

17. CHS Lowe requested assistance from Agent Bryant in a civil trial against Carole Baskin. If Agent Bryant provided the requested assistance, this would be a potential OPR violation.

a. Later, in what appears to be the same conversation, Lowe asks Bryant for help with his civil trial against Carole Baskin. Bryant does not commit but agrees to think about it.

Exhibit 144

b.      There is nothing in the material the writer was provided indicating Bryant did or did not help Lowe with his civil trial. **If Bryant did, it would be a potential OPR violation.**

18.     **Agent Bryant, along with other investigators on the case, may have intentionally discarded/destroyed potentially exculpatory evidence in violation of the OPR.**

a.      A PDF file titled, "USFWLS Reports 5" was reviewed. Within the document is a report identified as Report #2016202712R051. The report documents the excavation and recovery of six euthanized tigers pursuant to a consent to search signed by Jeff Lowe.

b.      The tigers are found and **only the heads of these tigers were cut from the carcasses and taken as evidence.** From this, investigators determine the manner of death as a .410 shotgun shot to the tiger's heads. Maldonado-Passage has never denied euthanizing the animals but contends it was medically necessary. The heart of the issue is **not if, but why** he euthanized these tigers.

c.      Without the entire carcasses, an accurate determination cannot be made about the possibility theses tigers were diseased or had physical issues necessitating euthanasia as reported by Maldonado-Passage. It seems investigators only wanted to show cause and manner of death without settling the important question of if it was an appropriate act.

d.      Further, as detailed above, the evidence of Maldonado-Passage euthanizing the tigers, including graphic pictures of the tiger's heads that were severed

12

Exhibit 144

by investigators, was presented to the jury at trial. As described above in #11, it was articulated by Bryant this was intentionally done for the specific purpose of creating prejudice and influencing the jury to rule favorably on the murder for hire case. Bryant is quoted speaking to Garretson:

> *"...we get some jurors' heartstrings bleeding on shooting those cats and showing pictures of the tiger dig and all that. And they might be prejudicial where we're weak on the murder for hire."*

In light of the above comment by Bryant, **investigators may have intentionally not taken the entire carcasses.** Had justification for the euthanasia been found, it would have eliminated their explicitly stated attempt to influence the jury on admittedly "weak" murder for hire charges. The writer is a former member of an FBI Evidence Response Team (ERT). There is no logic in not taking the entire carcass in this situation. It appears the truth is not being sought other than the desired "truth" that supports the prosecution. **Again, willful disregard of exculpatory evidence is a potential OPR matter.**

**General Observations:**

    19. As stated in many of the key findings above, there is documentation of text conversations that appear to be transcriptions rather than downloaded from media. Often, dates, times and even who is texting, is left off these communications. The integrity of these conversation as true and accurate accounts is questionable. **Communications such as these should be electronically extracted by appropriately**

Exhibit 144

**trained personnel to preserve the integrity for evidential purposes. It appears Bryant made no effort to authenticate these materials.**

20. Some text conversations appear to be screenshots. Many appear to be edited, altered, and/or unprofessionally redacted. The text "balloons" are clearly misshapen having been erased with a photo editing program. The conversations often do not make sense as if they were cut and pasted in the wrong order or as if much of the conversation has been removed. The time and dates are not always evident. **Communications such as these should be electronically extracted from the source by appropriately trained personnel to preserve the integrity for evidential purposes. It is likely that additional evidence of wrongdoing may be located on the source(s).**

21. There appears to be no urgency in the investigation if it was believed Maldonado was seriously involved in a plot to kill Baskin. Allegedly, Maldonado had approached five to six people about killing her as reported by Jeff Lowe. It does not appear Title III wiretaps were utilized nor sought on the subject's communication devices nor facilities. There is no documentation that any physical surveillance was conducted. It appears as if the investigators do not really consider this a serious threat based on the apparent lack of utilizing appropriate investigative techniques. Continuous surveillance coverage should have been considered if it was truly believed someone was being targeted for murder. The use of Title III wiretaps on appropriate phones and facilities should have been considered so as not to rely upon witnesses of dubious credibility and suspect motivation. CHS information should be used to develop the probable cause required for approval to employ sophisticated techniques. This type

Exhibit 144

of electronic evidence can also be properly collected and preserved for evidentiary purposes. **None of this appears to have been done in this investigation.**

22. It appears much of the information used in the investigation came primarily from interviews of witnesses and CHS' who have very dubious credibility. Their motivations are also of serious concern. There is no documentation the information collected was properly vetted. Information is often taken at face value when it "fits" and discounted when it does not by Bryant. In review of the material in its entirety, **there are multiple red flags indicating the witnesses are not being truthful, have their own agendas, and hold deep grudges against Maldonado. Attention to the credibility and reliability of the source should be considered by investigators and was not.**

23. Multiple recordings are made by Lowe and Garretson of phone calls and in-person conversations with others involved. Many of these recordings are incomplete, starting mid conversation and ending prior to conclusion. **The recorded calls do not appear to have been supervised by an investigator. No steps were taken to ensure the integrity of the evidence**. Lowe admits he has used fake text conversations in attempts to trick people which Bryant condoned. Partially recorded conversations beg the question of "what is missing?" Taking portions of conversations out of context can completely misrepresent the totality. **As described above, Bryant and Garretson have demonstrated "cherry picking" pieces of conversations that benefit them, while omitting what does not and is damaging. A proclivity to orchestrate a narrative was noted by Bryant and his witnesses by the writer. This lack of candor is a potential OPR violation.**

Exhibit 144

24. There are systems and equipment available to investigators to help ensure the integrity of evidence. The FBI routinely utilizes a service for recording phone calls. A call is made to the service, a code is entered and then the phone call is conducted. The entirety of the conversation is recorded off site and properly preserved as electronic evidence.  Using such services eliminates the uncertainty of what may have been left out or if conversations were staged for effect.  However, unsupervised recorded conversations do happen during investigations and there are means to authenticate them.  I**t does not appear efforts were made to authenticate unsupervised recorded conversations.**

25. Similarly, the FBI uses special body recorders for in-person conversations. These devices can only be turned on and off. The original recordings in their entirety are then properly downloaded by a trained technician and preserved as electronic evidence. **It does not appear steps were taken to preserve the integrity of electronic evidence.**

26.  I reviewed the interview of Allen Glover.  The credibility of his story to investigators is highly suspect. There are multiple indicators of deception. In my opinion, investigators do not adequately press Glover. It does not appear any polygraphs were done in attempts to vet information. Many conflicting statements and discrepancies were found in other witness accounts as well.  Glover, a key government witness has an extreme hatred for Maldonado-Passage.  In his interview with Bryant, Glover discusses his feelings for Maldonado-Passage:

Exhibit 144

> *Allen Glover: That's going to be a bitch. I can sum it up very fucking quick. That dude's a fucking asshole. I hate the guy. I fucking hate the motherfucker. I do. I hate that motherfucker. I've never hated a human being worse than him. Not that he was a faggot. That had nothing to do with it. But, he's just a real fucking prick...But I've had a grudge against the guy, my personal reasons, about that.*

It appears no one considered Glover might lie to incriminate Maldonado-Passage while holding such extreme ill-will. In the FD-302 report reflecting Lowe's interview with Bryant and SA Farabow, it states: "Maldonado did not like Glover and often humiliated him at work." Also, "Lowe told Maldonado he had never seen him act violently and that Glover was the "dumbest person on planet earth." It seems unlikely then, that Maldonado-Passage would trust him to commit murder for hire in my opinion. **Investigators do not adequately consider nor address these red flags.**

27. Further, in Glover's interview with Bryant and Farabow, Glover states Maldonado wanted to give him a rifle to commit the murder of Baskin. Glover says he could not use a rifle because he is a felon and possessing a weapon would put him in jail. **It seems implausible that Glover would be worried about being a felon in possession of a firearm but not about being hired to commit murder via other means.**

28. It was reported by Glover originally, he had traveled to Florida to kill Baskin using funds Maldonado gave him from the proceeds of selling a tiger cub. However, in a text chat between Glover and Garretson that was provided by Garretson to Bryant, Garretson asks Glover: *"When u headed on vacation?"* He replies: *"I'm waiting on a check to come in the mail so I could deposit it before I go on vacation government owes..."* Another text from Garretson to Bryant was reviewed indicated Glover used an SSI check to go to South Carolina to visit family and did not get money from Joe.

Exhibit 144

**This is also seemingly ignored by Bryant as relevant.** The story that Glover went to Florida to kill Baskin using cash Maldonado obtained from the sale of a tiger cub could never be confirmed nor that Glover went to Florida at all. **It appears Bryant discounted potentially exculpatory evidence that Glover actually went to visit family in South Carolina using SSI funds in favor of a story that fit his narrative.**

29. I observed throughout the course of my review where Bryant appears to investigate with the goal of finding and fitting the facts to his foregone conclusion. Witnesses are believed at face value when it fits and accused of lying and discounted when it does not. Evidence is collected and used when it fits and ignored or discarded when it does not. **Bryant seems to only consider information that fits his predetermined narrative.**

30. The information provided by Jeff Lowe throughout my review is very suspect. His motivation is of concern. Lowe complains about Maldonado's embezzlement from the park, his alleged campaign finance fraud, etc... It behooves Lowe to get rid of Maldonado as he wants the park for himself. Lowe states in his interview with Bryant that others did not believe Maldonado was serious. According to Lowe, Maldonado approached Garretson, Glover, Malagerio, Mills, and Thompson all to kill Baskin. None of these claims could be confirmed and were denied by all when directly questioned. As such, the veracity of information from Lowe is highly suspect. A Facebook post written by Lowe was reviewed in which he rants against Maldonado and states: *"I guess the hillbilly didn't know that I have been setting his ass up for almost a year. I'm loaded with knowledge, try me Joe."* A public and overt statement

Exhibit 144

indicating someone has been setting someone up should be of concern for an investigator but does not seem to have been.

    31. **The CHS operations do not all appear to be conducted within DOJ Guidelines**. The following questions arise from the writer: Were CHSs opened and admonished per the guidelines? Was any source validation attempted? Was "Otherwise Illegal Activity" (OIA) requested/granted where illegal activity occurred. Were the sources paid and how much? What were their defined motivations? **Failure to follow the DOJ Guidelines regarding CHS management would be a potential OPR violation.**

    32. The FBI undercover (UC) operation would have had to be proposed and approved which can be an arduous and lengthy process. All UC contacts should have a corresponding document/FD302. Only one encounter was found in the materials provided. **It seems unusual to the writer that only one attempt at contacting the subject by the FBI UC was made. It also seems odd to the writer the FBI played such a small role in this investigation. It is the writer's <u>opinion</u> the FBI may have intentionally distanced themselves from this sloppy and wholly unprofessional investigation conducted by Bryant.**

Exhibit 144

Affirmation

I affirm under penalties of perjury that the foregoing statements are true and accurate to the best of my knowledge and belief.

Date: 2/10/22

J. Douglas Kouns

*Isabelle Loria*
February 10, 2022

ISABELLE LORIA
NOTARY PUBLIC, STATE OF INDIANA
SEAL
My Commission Expires
January 2, 2030
Commission Number NP0738234
Hamilton County

Exhibit 144