## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-18-227-SLP |
| | ) | |
| JOSEPH ALLEN MALDONADO, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R

Before the Court is Defendant Joseph Allen Maldonado's Motion for New Trial [Doc. No. 232]. The Government has responded, *see* [Doc. No. 237], and Defendant has replied, *see* [Doc. No. 240]. Despite Defendant's request, the Court finds a hearing is not necessary to resolve the Motion. For the following reasons, the Motion is DENIED.

## I.  Introduction

Prior to his arrest, Defendant owned and operated the Greater Wynnewood Exotic Animal Park, a roadside zoo that was home to dozens of big cats and other exotic animals. The events leading up to Defendant's arrest have been well documented, so the Court need not recite them in detail here. *See, e.g.*, *United States v. Maldonado-Passage*, 4 F.4th 1097, 1099 (10th Cir. 2021). On September 5, 2018, a federal grand jury returned an indictment against Defendant, charging him with two counts of using interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958(a). *See* Indictment [Doc. No. 1]. About two months later, the grand jury returned a 21-count superseding indictment [Doc. No. 24], which—on top of the two

murder-for-hire counts—charged Defendant with five counts of illegal taking in violation of the Endangered Species Act, one count of illegal offering in violation of the Endangered Species Act, three counts of illegal sale in violation of the Endangered Species Act, and ten counts of false labeling in violation of the Lacey Act. The Government dismissed two of the false labeling counts at trial. *See* Tr. at 854:2–12.

Defendant's seven-day jury trial commenced on March 25, 2019. During its case-in-chief, the Government called nineteen witnesses, including Allen Glover, the would-be hitman who occasionally worked at the zoo,[1] and confidential informant James Garretson. The defense called four witnesses, including Defendant. After brief deliberations, the jury found Defendant guilty on all nineteen remaining counts.

The Court originally sentenced Defendant to 264 months of incarceration. *See* Judgment [Doc. No. 134]. Defendant appealed, and the United States Court of Appeals for the Tenth Circuit affirmed his conviction but vacated his sentence. *See Maldonado-Passage*, 4 F.4th at 1108. On remand, the Court resentenced Defendant to 252 months of incarceration. *See* Am. Judgment [Doc. No. 209]. Defendant appealed this sentence on grounds unrelated to the instant Motion, but the Tenth Circuit rejected his arguments. *See United States v. Maldonado-Passage*, 56 F.4th 830, 834–35 (10th Cir. 2022). Around the time he filed his second appeal, Defendant also moved for a new trial.[2]

---

[1] At trial, Defendant testified that Mr. Glover "made it very clear he wasn't [Defendant's] employee." Tr. at 953:22–954:4.

[2] Defendant initially sought leave to file a 250-page motion. *See* [Doc. No. 211]. The Court denied the request, finding Defendant did not provide adequate justification for such extensive briefing. *See* [Doc. No. 213]. Defendant timely re-urged his request and attached his 202-page

## II.    <u>**Governing Standard**</u>

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The rule provides two different time limits.  A defendant has three years to bring a "motion for a new trial grounded on newly discovered evidence," but a motion seeking a new trial for any other reason "must be filed within 14 days after the verdict or finding of guilty."  Fed. R. Crim.

---

proposed brief.  *See* [Doc. No. 214].  The following day—before the Court ruled on his motion—Defendant filed a 28-page motion for new trial that purported to "incorporate[] and adopt[] all factual and legal arguments" from the 202-page attachment.  [Doc. No. 215] at 5.  The Court struck the new trial motion, recognizing it as an attempt to circumvent the page limit by incorporation.  *See* [Doc. No. 221].  Instead, the Court ordered the Government to respond to Defendant's motion to file an oversized brief.  *See* [Doc. No. 222].  The Government proposed a 50-page limit, but the Court ultimately allowed Defendant to file a 65-page brief.  *See* [Docs. No. 224, 231].  Although he now laments he "cannot possibly outline the significance of every piece of new evidence . . . within the page limit," Defendant's Motion clocks in at just over 61 pages (excluding his cover page, table of contents, table of authorities, signature block, certificate of service, and exhibits).  Mot. [Doc. No. 232] at 7.  It is worth noting that Defendant consistently omits pinpoint citations to his exhibits—a simple addition that would have streamlined the Court's task, clarified his arguments, and complied with his 65-page limit.  For example, a single page of the Motion cites, without particularity: "Exhibits 22, 29, 49, 52, 55, 56, 57, 66, 67, 73, and 80 . . . Exhibits 21, 25-28, 32, 36, 39-42, 45-48, 50, 58, 60, 63, 72, 82, 94, and 95 . . . [and] Exhibits 14, 20, 30, 37, 38, 54, 59, 61, 70, 74, 81, 84, 91 and 169."  *Id.* at 7.  To be clear, a higher page count does correlate with better legal analysis, and the Court is thoroughly unconvinced that the page limit is to blame for the Motion's lack of coherent legal arguments.  For example, most Defendant's arguments are governed by one of two legal standards (*Berry* and *Brady/Giglio*), and many of his claims rely on the same evidence and facts.  Rather than analyzing that evidence within the applicable legal framework, however, Defendant chose to present a jumbled and repetitive series of conclusory statements.   Similarly, this tactic—articulating the legal standard and presenting a deluge of exhibits, but providing no discussion of how the cited exhibits *satisfy* those standards—does not warrant an evidentiary hearing.  Defendant is not entitled to a second opportunity to meet his legal burden simply because he squandered the first.

P. 33(b).  Time limits under Rule 33 are "strictly construed."[3]  *Herrera v. Collins*, 506

U.S. 390, 409 (1993).

The jury returned its verdict on April 2, 2019, and Defendant filed his Motion on

April 1, 2022.  *See* [Docs. No. 113, 232].  Accordingly, his "new trial request may be

granted only on the basis of newly discovered evidence."  *United States v. Quintanilla*,

193 F.3d 1139, 1146 (10th Cir. 1999).  Defendant's newly discovered evidence takes

several forms, including recordings and documents, recantation, government misconduct,

and violations of  *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405

U.S. 150 (1972); and *Napue v. Illinois*, 360 U.S. 264 (1959).  Although newly discovered

evidence may be used to establish violations of *Brady/Giglio* and *Napue*, those claims are

subject to different standards that the remainder of Defendant's evidence, as detailed

below.

### III.  <u>Discussion</u>

Defendant proffers a litany of evidence to support his new trial motion.  The Court

takes each category in turn.

####   A.    **Newly Discovered Evidence**

A defendant seeking a new trial on the basis of newly discovered evidence faces

an uphill battle.  Such motions are "not favorably regarded and should be granted only

with great caution."  *United States v. Jordan*, 806 F.3d 1244, 1252 (10th Cir. 2015)

---

[3] While the Court was finalizing this Order, Defendant filed a Second Motion for New Trial [Doc. No. 246].  This second motion also purports to seek relief under Federal Rule of Criminal Procedure 33, although it was filed nearly 18 months after the deadline set forth in Rule 33(b)(1). Defendant makes no attempt to explain why the Court has authority to consider his untimely second Motion, so the Court DENIES it without further comment.

(quoting *United States v. McCullough*, 457 F.3d 1150, 1167 (10th Cir. 2006)).   In conducting its analysis, the Court begins with "the presumption that the verdict against the defendant is valid." *United States v. Velarde*, 860 F. App'x 132, 137 (10th Cir. 2021) (quoting 3 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 581 (4th ed., Oct. 2020 update)).

When a new trial motion relies on newly discovered evidence, the Court applies "the so-called *Berry* rule, derived from *Berry v. Georgia*, 10 Ga. 511 (1851)." *United States v. Jackson*, 579 F.2d 553, 557 (10th Cir. 1978).   Under this five-part test, a defendant has the burden to prove:

> (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Jordan*, 806 F.3d at 1252 (alteration in original) (quoting *McCullough*, 457 F.3d at 1167). A defendant's proffered evidence must also be admissible.  *United States v. Hill*, 737 F.3d 683, 687 (10th Cir. 2013).

Although Defendant faces a substantial hurdle to show that newly discovered evidence entitles him to a new trial, he makes only a perfunctory attempt to satisfy his burden.  For the most part, Defendant's Motion does not engage with the five *Berry* elements, cite exhibits with particularity, identify which of the nineteen counts (or their elements) are implicated by each piece of newly discovered evidence, or highlight trial

testimony or evidence which is undermined by his newly discovered evidence.[4] Accordingly, none of his allegations, whether taken individually or collectively, warrant a new trial.

### 1. James Garretson's Undisclosed Recordings[5]

During the criminal investigation into Defendant, Mr. Garretson acted as a cooperating individual for the U.S. Fish and Wildlife Service ("USFWS"). *See* Def.'s Ex. 7 [Doc. No. 232-7].[6] In this capacity, he worked closely with USFWS Agent Matthew Bryant. Agent Bryant gave Mr. Garretson a recording device so he could capture phone calls with Defendant, Jeff Lowe, and anyone else who may be relevant to the investigation. *See* Tr. at 552:16–25. Mr. Garretson also used "an app on his phone" to record calls. *Id.* at 553:8–18. When asked at trial whether he gave Agent Bryant "all the conversations that [he] w[as] able to record," Mr. Garretson testified that he had. *Id.* at 553:23–25.

But an investigation by Defendant's post-conviction counsel revealed that Mr. Garretson recorded a plethora of calls that he kept to himself.[7] Defendant has attached

---

[4] When this is not the case, the Court specifically identifies as much.

[5] Because the Court addresses the alleged *Brady* violations related to the recordings below, those arguments are not included here.

[6] Defendant filed some of his exhibits conventionally, so his exhibit numbers do not always match the CM/ECF numbering. For clarity, the Court provides both citations.

[7] Defendant contends his post-conviction counsel "discovered four hundred and seventeen (417) previously undisclosed recordings of phone calls . . . [and] two hundred and sixty-six calls which contained zero (0) data." Mot. [Doc. No. 232] at 10.

transcripts of nearly 100 calls to his Motion.[8]   These transcripts reflect calls that Mr. Garretson recorded between February 2, 2019 and April 3, 2019, none of which were previously provided to Defendant's trial counsel.   With respect to these transcripts, Defendant contends:

> Each of the calls presented within this motion document different aspects of misconduct.   A single recording may have several issues that warrant investigation.   The undersigned cannot lay out the importance of each call due to page constraints, but they are attached hereto and must be viewed in their entirety.

Mot. [Doc. No. 232] at 9 n.1.[9]   To the extent Defendant asks the Court to comb the record and craft arguments he did not make, the request is improper.   *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."), *cited with approval in United States v. Griebel*, 312 F. App'x. 93, 97 (10th Cir. 2008).   Similarly, in reply, Defendant insists "[t]he Court must listen to the recordings and/or read the transcripts to understand the materiality of the information contained therein."   Reply [Doc. No. 240] at 2–3.   But the burden to prove materiality belongs squarely to the Defendant, and any attempt to shift this burden is improper.   The Court will therefore consider *only* the arguments identified and presented in the briefing.

Similarly, several arguments that implicate the recordings are too vague and conclusory for the Court to meaningfully analyze.   For example, the Motion contains the following verbatim arguments, which include neither pinpoint citations to exhibits nor further legal analysis:

---

[8] Not all of the transcripts are cited or discussed in the Motion.

[9] Citations to the parties' briefs and exhibits reflect the CM/ECF pagination.

- [T]he **content** of the recordings demonstrates that during the criminal investigation and trial 1) Garretson lied to government agents regarding aspects of the criminal investigation (*See Exhibits 15, 23, and 59.*); 2) Garretson conspired with the federal government to lie about aspects of the criminal investigation (*See Exhibits 17, 24, and 27.*); 3) Garretson conspired with the federal government to intentionally suppress relevant and exculpatory recordings (*See Exhibits 15-19.*); 4) Garretson conspired with agents for the government to "twist" testimony (*See Exhibit 19 and 31.*); 5) Garretson conspired with law enforcement to fabricate evidence (*See Exhibits 15-19.*); 6) Garretson conspired to murder Lowe (*See Exhibits 14 and 144.*); 7) Garretson engaged in crimes involving identity theft (*See Exhibits 90, 96, 98, 99, and 100.*); 8) Garretson planned to use recordings captured during the investigation to discredit a potential defense witness (*See Exhibits 25, 26, and 32.*); and 9) Garretson planned to lie during the criminal trial. (*See Exhibits 21, 40, 43, 48, 60, 68 and 69.*)[10]

- The recordings demonstrate 1) the federal government, including Bryant, knew undisclosed recordings and messages existed (*See Exhibits 15-19, 26, and 50.*); 2) how Bryant circumvented due process by instructing a confidential informant and other witnesses for the government to lie about aspects of the criminal investigation (*See Exhibits 24 and 37.*); 3) how Bryant willfully refused to collect relevant evidence (*See Exhibits 15-19.*); 4) how Bryant instructed a witness to fabricate evidence (*See Exhibits 15-19.*); and 5) how Bryant used one of the undisclosed recordings as a weapon to exclude a potential defense witness. (*See Exhibits 14-19.*)

- The recordings of Goode[11] (hereafter "Goode") were directly relevant to the issues of the criminal investigation into [Defendant], acts of perjury, trial strategy and collusion of witnesses.  Specifically, how Garretson, Lowe, Lauren Lowe and others conspired to set up [Defendant]. (*See Exhibits 22, 29, 49, 52, 55, 56, 57, 66, 67, 73, and 80.*)

- The recordings of Malagerio[12] were directly relevant to the issues of the criminal investigation into [Defendant].  Malagerio was an unofficial cooperating witness for the government under the direction of Bryant. (*See*

---

[10] This paragraph alone cites 27 exhibits spanning 352 pages without pinpoint citations or highlights.

[11] Eric Goode is a *Tiger King* producer.  *See* Def.'s Ex. 162 [Doc. No. 232-159] at 31.

[12] Paul Malagerio is an exotic animal keeper and associate of Mr. Garretson.  *See* Def.'s Ex. 28 [Doc. No. 232-128] at 1–2.

*Exhibit 28.*)  The discussions captured in the calls between Malagerio and Garretson were centered around the criminal investigation of [Defendant] and life after.   Specifically, perjury, manipulation and fabrication of evidence, witness threats, trial strategy, and other exonerating information. (*See Exhibits 21, 25-28, 32, 36, 39-42, 45-48, 50, 58, 60, 63, 72, 82, 94, and 95.*)

• Garretson's own admissions captured on these recordings regarding twisting testimony and planning testimony with the intent to misrepresent the facts are material and relevant to the criminal case, specifically [Defendant]'s innocence. (*See Exhibits 17, 19, 31, 37, 43, 48, 715, 78, 79, and 87.*)   Had the jury known of this, Garretson's credibility would have been destroyed and the true motive for Glover's fake ID would have been called into question, directly undermining the verdict.

[Doc. No. 232] at 10–12, 16 (all emphasis in original).  Defendant makes no attempt to demonstrate how any of this information could be used for anything other than its impeachment value.  Nor does he detail how the "evidence is material to the principal issues involved."  *Jordan*, 806 F.3d at 1252.  He does not identify a specific count—let alone a particular element—to which any of this evidence would pertain.  Finally, he makes no credible argument that the evidence "would probably produce an acquittal."  *Id.* Defendant's inattention to every element of the relevant legal analysis necessarily means he has not satisfied his burden under the five-part test.  Accordingly, he is not entitled to a new trial on the above points.

But Defendant presents a handful of arguments about the recordings that warrant further discussion.  First, he claims Agent Bryant "attempt[ed] to have [Jeff] Johnson, an exculpatory witness, excluded from testifying at trial."[13]  Mot. [Doc. No. 232] at 12.  As

---

[13] Defendant references Mr. Johnson's purported exclusion several times throughout his Motion. *See* Mot. [Doc. No. 232] at 11–12, 14–15, 30, 32, 61, 63.  Because this claim lacks credibility, the Court disposes of the argument summarily.

an initial matter, there is no evidence in the record that the defense intended to call Mr. Johnson as a witness, or that the prosecution attempted to exclude him.[14]   The prosecution never moved to exclude Mr. Johnson, nor—contrary to Defendant's assertions—did the Court bar Mr. Johnson's testimony.  *See* Mot. [Doc. No. 232] at 63 (referencing "the [C]ourt's decision to exclude Johnson as a witness").  And even if there was some indicia of truth to Defendant's accusation, he provides no analysis under the applicable legal standard.  Defendant does not even specify what Mr. Johnson would have testified about, let alone how his testimony would have satisfied any of the *Berry* elements.

Defendant next cites a flurry of exhibits "that demonstrate Garretson was actively involved in identity theft crimes during the criminal investigation" into Defendant.  Mot. [Doc. No. 232] at 16 (citing Def.'s Exs. 3, 51, 54, 90–91, 96, 98–100, 161).  Again, Defendant does not analyze this evidence within the five-step framework governing newly discovered evidence.  At best, he argues this evidence would have "destroyed" Mr. Garretson's credibility and "call[ed] into question" the "true motive for Glover's fake ID."  *Id.*  But evidence which is offered for its impeachment value is insufficient to warrant the relief Defendant seeks.  *See Jordan*, 806 F.3d at 1252.

Mr. Garretson also claims that prosecutors "used a confidential informant to covertly obtain information regarding trial defense counsel's planned defense strategy."  Mot. [Doc. No. 232] at 15.  But the cited recording shows that the prosecution "didn't get

---

[14] To the contrary, Mr. Johnson claimed defense counsel told him "they didn't think that [he] would need to testify."  Def.'s Ex. 20 [Doc. No. 232-20] at 2; *see also* Def.'s Ex. 21 [Doc. No. 232-21] ("So Jeff Johnson is not testifying for Joe. His lawyers don't want him to.").

anything really good" from this tactic because Mr. Johnson "didn't know anything that's really pertinent for them." Def.'s Ex. 21 [Doc. No. 232-21] at 2. Accordingly, it is unclear how this evidence entitles Defendant to a new trial under the applicable legal test.

In addition to the deficiencies with respect to the *Berry* analysis, the Government argues the transcripts are inadmissible hearsay. *See* Resp. [Doc. No. 237] at 27–28 (citing Fed. R. Evid. 801(c)). In reply, Defendant counters that the recordings are not hearsay because "[t]hey are Mr. Garretson's own statements recorded on his own phone from which authenticity has not been called into question by the government." Reply [Doc. No. 240] at 2. Hearsay, as defined by Federal Rule of Evidence 801(c), is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Mr. Garretson's recordings obviously contain out-of-court statements. It is impossible to analyze the statements under Rule 801(c)'s second prong, however, because Defendant does not identify any statement with particularity or specify the purpose for which it would be offered. Accordingly, Defendant has failed to carry his burden to prove that the recordings entitle him to relief under the *Berry* test.

## 2.    Mr. Garretson's Perjury

Defendant proffers several pieces of evidence that purportedly show Mr. Garretson committed perjury.[15]  First, he claims that Mr. Garretson testified that he cooperated with

---

[15] Although the Government analyzed each of these allegations as *Napue* claims, the Court finds it unnecessary to do so where Defendant has not alleged one of the essential elements of *Napue* claims—that "the prosecution knew the testimony to be false." *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015). Instead, the Court analyzes the perjury accusations as newly

the investigation because it was "[j]ust the right thing to do at the time." Tr. at 552:14–15. Defendant now claims his newly discovered evidence shows Mr. Garretson's true motivations were "money, revenge and a hatred of [Defendant]'s sexuality." Mot. [Doc. No. 232] at 17. But he provides no analysis on how this evidence would be more than merely impeaching, which is insufficient to warrant a new trial.

Next, he claims Mr. Garretson perjured himself with respect to his relationship with Carole Baskin—the target of the two murder-for-hire plots. At trial, he testified that he never met Mrs. Baskin and was unsure if she had ever complained about his facility. Tr. at 530:4–11. But Defendant claims newly discovered evidence reveals he "had a hatred for Baskin" because she played a role in having his USDA license revoked, and that his hatred "carries on to present." Mot. [Doc. No. 232] at 18. Beyond the bare assertion that "Garretson's relationship with the victim, Carole Baskin, is relevant to the principal issues of the criminal case," Defendant makes no attempt to analyze this new evidence in the *Berry* framework. In particular, Defendant fails to establish how this evidence would be anything more than impeaching.

At trial, Mr. Garretson testified about an August 2017 conversation that took place in the zoo's office, which Defendant refers to as the "bike path" conversation. *See* Tr. at 547:20–549:3; Mot. [Doc. No. 232] at 18–19. Mr. Garretson testified that he, Defendant, and former zoo owner Jeff Lowe were present for the conversation. Defendant has now presented evidence that Mr. Garretson's girlfriend, Brittany Medina, was also there.

---

discovered evidence, which is how Defendant characterizes them. In three instances, Defendant specifically claims that the Government knew about Mr. Garretson's perjured testimony and let it stand uncorrected. The Court considers each of those *Napue* claims below.

Because Defendant claims the Government knowingly allowed Mr. Garretson to present false testimony, the Court analyzes this evidence as a *Napue* claim below.

Defendant then argues that Mr. Garretson's testimony "about why [Defendant] would think he knew where to get a fake ID" was false. *Id.* at 20. Mr. Garretson's testimony on direct examination was:

> Q. And finally, did Mr. Passage at the time—in the fall of 2017, did he know that you had owned strip clubs in Dallas, or a strip club in Dallas?
>
> A. I assume, yes.
>
> Q. And did he know that you had owned bars in Dallas?
>
> A. Yes.
>
> Q. And to your understanding, is that why Mr. Passage thought you might know where to get a fake ID?
>
> A. Correct.

Tr. at 608:6–14. Citing several exhibits, Defendant now accuses Mr. Garretson of "actively engag[ing] in identity theft crimes" throughout the investigation. Mot. [Doc. No. 232] at 20. As an initial matter, Mr. Garretson did not perjure himself when he was asked about why he thought *Defendant* believed "[Mr. Garretson] might know where to get a fake ID." Tr. at 608:6–14. There is no indication that Defendant knew about any of Mr. Garretson's purported identity theft during the investigation, so the newly discovered evidence would not change the answer to this question. More importantly, however, Defendant provides no analysis under the *Berry* elements. He relies on the conclusory statement that "[t]he government used testimony regarding the fake ID together with testimony regarding the mailing of the cell phone to 'establish the elements needed to

prove the use of interstate commerce in the commission of a murder for hire.'"[16]  Mot. [Doc. No. 232] at 20.  He also believes the evidence "connects Garretson to Lowe and confirms their co-participation in fraudulent credit card schemes."  *Id.*  But Defendant does not explain why this evidence would have probably produced an acquittal had it been introduced at trial.  First, the jury knew that Mr. Garretson had connections to obtain a fake ID, so the impact of additional evidence of identity theft is unclear.[17]  Second, Defendant alleges that Mr. Garretson used one of his aliases to rent Mr. Lowe's Las Vegas residence.  *See* Def.'s Ex. 64 [Doc. No. 232-64].  The rental agreement is dated several months before Mr. Garretson began cooperating with the Government, however.  *See* Def.'s Ex. 7 [Doc. No. 232-7] at 3.  Defendant has not explained how this fact would have impacted any of the evidence at trial, and the Court declines to speculate.

At trial, Mr. Garretson also testified that between December 2017 and January 2018, "there [we]re some calls [with Mr. Lowe] that were not recorded due to problems [Mr. Garretson] was having with the phone."  *Id.* at 21.  Defendant now points to a post-conviction interview in which Mr. Garretson said he "deleted a lot of Jeff's calls and stuff where we're talking about liquidation loads" and that he deleted calls that he "didn't think [] w[ere] relevant."  Def.'s Ex. 9 [Doc. No. 232-9] at 3.  First, the Court is not convinced that Mr. Garretson's new statement is perjurious, as both statements could be

---

[16] Although Defendant cites Exhibit 107, the quoted material in the previous sentence— "establish the elements needed to prove the use of interstate commerce in the commission of a murder for hire"—appears nowhere in the 106-page exhibit.  The Court admonishes Defendant that his use of the "*see*" citation before this quote is at best confusing, and at worst misleading.

[17] Additionally, Defendant could not rely on this evidence for its impeachment value alone.

true.  Again, Defendant offers no analysis as to why he is entitled to a new trial on this basis.  To the extent he would rely on this evidence for its impeachment value, that approach would fail under *Berry*.

Mr. Garretson also testified about purchasing four tiger cubs from Defendant.  At trial, he claimed to believe the purchases were legal because they were conducted in-state.  *See* Tr. at 533:2–536:9.  Defendant now claims Mr. Garretson committed perjury, but none of the evidence he cites indicates that Mr. Garretson's trial testimony was false.  Indeed, Defendant's evidence appears to corroborate Mr. Garretson's testimony.  *See* Def.'s Ex. 110 [Doc. No. 232-110] at 13 ("Terry's Taxidermy stuffed and displayed these two tigers.  The owner, Terry Mayberry, says he acquired them from an Oklahoma animal park.  Because both businesses are in the same state—and the animals were not transported across state lines—this exchange was not prohibited by the Endangered Species Act.").  Although Defendant lobs multiple accusations at Ringling Animal Care, Mr. Garretson's former cub-petting operation, none of that evidence pertains to the four cub sales that were the subject of Mr. Garretson's testimony.

Mr. Garretson also testified that in the fall of 2017, no one outside of law enforcement knew about his cooperation with the Government.  *See* Tr. at 556:19–25.  Defendant has now presented evidence that several other people knew about Mr. Garretson's involvement, and that the "government knew this statement made under oath was false."  Mot. [Doc. No. 232] at 21.  Because this is a *Napue* claim, the Court addresses it below.

Finally, Defendant makes two conclusory statements that merit little attention from the Court. At trial, Mr. Garretson testified that he "provided some credit for dental work" to former zoo employee Dylan West, and that the credit was legal. Tr. at 599:9–21. Defendant now claims this testimony is "false" in light of the "evidence of on-going participation in criminal identity theft described above together with testimony provided by Reinke regarding Garretson's fraudulent use of medical credit." Mot. [Doc. No. 232] at 20–21. Defendant also claims Mr. "Garretson testified he did not have a financial interest in getting rid of [Defendant]," but newly discovered evidence "exposed Garretson's plans to corner the cub petting market once [Defendant] was safely behind bars." *Id.* at 22. Defendant offers no further detail or analysis related to either of these contentions, so it is unnecessary for the Court to address them further.

Defendant ends this section of his Motion with a description of Mr. Garretson's testimony in the context of the entire trial, claiming:

> Garretson provided uncorroborated eye-witness testimony regarding alleged crimes associated with Counts 1 and 2 of the Superseding Indictment. Garretson's testimony provided context to the recordings of [Defendant] and Glover. Some of the recordings he provided, had no mention of names, dates, places or even what the speaker was talking about. Garretson's testimony filled in those blanks. Garretson has admitted that he could have been planning his own murder for hire. *(See Exhibit 9 and 49.)*

*Id.* Similarly, he argues Mr. Garretson provided necessary context to the second murder-for-hire plot when he testified about references to the undercover FBI agent. *See id.* at 22. Defendant appears to be arguing that the cumulative effect of his perjury allegations is so damaging that the Court must disregard Mr. Garretson's testimony entirely and,

therefore, order a new trial.  But this argument is not procedurally proper, because newly discovered evidence under Rule 33(b) cannot be "merely impeaching." *Jordan*, 806 F.3d at 1252.  And even if this were not the case, most of Defendant's perjury accusations lack merit when the trial testimony and evidence are viewed side-by-side, as detailed above.

### 3.    Recanted Testimony

Defendant claims that two Government witnesses have recanted their trial testimony.  Although this is still newly discovered evidence, its consideration requires a slightly different approach.  First, "recantation of prior trial testimony 'is not looked upon with favor,' but rather with 'downright suspicion.'"  *United States v. Jones*, 315 F. App'x 714, 716 (10th Cir. 2009) (quoting *United States v. Ahern*, 612 F.2d 507, 509 (10th Cir. 1980)).  Second, "[w]hen the motion is based on recanted testimony, the trial court must first be satisfied that the challenged testimony was actually false."  *United States v. Bradshaw*, 787 F.2d 1385, 1391 (10th Cir. 1986).  To make this determination, the Court "ordinarily must conduct an evidentiary hearing to evaluate both the credibility and the impact of a recantation."  *United States v. Page*, 828 F.2d 1476, 1478 (10th Cir. 1987).  This is not always the case, however.  If the "written record allows a district court judge to make credibility findings (and for [the Tenth Circuit] to evaluate such findings), no evidentiary hearing is necessary."  *Jones*, 315 F. App'x at 716 (citing *United States v. Pearson*, 203 F.3d 1243, 1274–75 (10th Cir. 2000)).  Upon careful consideration of both the affidavits and the trial record, the Court concludes no evidentiary hearing is warranted in this case.  Instead, the trial record provides a sufficient basis to reject Defendant's recantation arguments.

### a. *Allen Glover*

First, Defendant contends Mr. Glover, who testified extensively about the first murder-for-hire plot, has recanted his trial testimony.  Defendant proffers four instances of recantation.  *See* Mot. [Doc. No. 232] at 24–25.  First, Mr. Glover testified at trial that Defendant offered to pay him in exchange for killing Mrs. Baskin.  *See* Tr. at 623:20–24. He now claims that he "stole $3,000 from [Defendant]."[18]  Def.'s Ex. 112 [Doc. No. 232-112] ¶ 21.   First, it is not clear that Mr. Glover has recanted his trial testimony. Throughout trial, he consistently maintained that he took the money with no intention actually killing Mrs. Baskin.  For example, on direct examination, Mr. Glover testified:

> Q. So over the course of those conversations, did you tell Mr. Passage that you would murder Carole Baskin if he paid you to do it?
>
> A. Yes, ma'am, I did.
>
> Q. At the time that you told him that, did you intend to actually go kill Carole Baskin?
>
> A. No, ma'am.
>
> Q. What did you actually intend to do?
>
> A. Take his money and run.
>
> Q. Okay. And why would you want to take his money and run?
>
> A. Because the way he treated me and the employees and the way he acted, I was ready to get away from there . . . .

Tr. at 626:8–19.  Indeed, on cross-examination, he testified that he stole the money.  *See id.* at 694:2 ("I didn't realize I made a mistake on stealing that money.").  Mr. Glover has

---

[18] As set forth in his affidavit, Mr. Glover now claims: "I testified at trial that this $3,000 came from the cub sale on November 24, 2017.  This is not accurate as I have no knowledge of the park finances and have no knowledge of where the $3,000 came from that I stole."  Def.'s Ex. 112 [Doc. No. 232-112] ¶ 22.

continued to aver that he took the money without any intention to follow through on the murder.  *See, e.g.*, Def.'s Ex. 112 [Doc. No. 232-112] ¶ 25; Def.'s Ex. 123 [Doc. No. 232-123] at 2; Govt.'s Ex. 28 [Doc. No. 237-28] at 43–44.  But even reading this statement in the way Defendant does, the Court is not convinced Mr. Glover's trial testimony is false.  There is overwhelming corroborating evidence in the record that Defendant paid Mr. Glover $3,000—particularly, his own words.  For example, he testified at trial that he gave Mr. Glover $3,000 from the night deposits at Mr. Lowe's direction.  Tr. at 1004:3–14.  On a recorded phone call, Defendant told Mr. Garretson that he was "waiting on this lady to get this money for these liligers cause that is what [he is] paying for it with."  Govt.'s Ex. 2 [Doc. No. 237-2] at 1.  Ten days later, Mr. Garretson asked Defendant: "You gonna ever send that guy today or is he ever gonna go down there or you just gotta wait for money?" Govt.'s Ex. 5 [Doc. No. 237-5] at 1.  Defendant responds: "I'm figuring that money'll come in today. Then he's gone." *Id.*  Accordingly, to the extent that Mr. Glover has recanted his trial testimony, the evidence already in the record permits the Court to conclude that the recantation is not credible.

Second, Defendant claims Mr. Glover recanted trial testimony that the $3,000 payment came from a November 24, 2017 cub sale.  Although the Government claims Mr. Glover never directly made this claim, the Government is mistaken.  On direct examination, Mr. Glover testified:

> Q. Okay. So you testified that he did eventually give you some money. Where did Joe get the money?
>
> A. From selling that liliger.

Q. Were you there when he sold the liliger?

A. Yes, ma'am. I'm—I was the one who went to the play area to get it.

Q. And did you physically pick up the animal?

A. Yes, ma'am, I did.

Q. And what did you do with it?

A. Took it out to the back parking lot so the deal could be done.

Q. Did you put the cub in the car?

A. Yeah. I handed it to the man and pretty—yeah, pretty much put it in the car.

Q. Did you see the person who was leaving with the cub?

A. Yes, ma'am. I didn't meet him, but I saw him.

Tr. at 637:4–19.  At trial, Mr. Glover identified Robert Engesser as the man who picked up the cub in question.  *See id.* at 684:3–685:6; 882:11–13.  The existing record again permits the Court to make a credibility determination with respect to this recantation, but this time the Court draws the opposite conclusion.  There is strong, consistent evidence in the record that the money at issue did not come from the cub sale that Mr. Glover described.  At trial, Agent Bryant expressed doubts that the money came from Mr. Engesser purchasing a cub.  *See id.* at 909:4–9.  And in private, Agent Bryant told the Lowes that he "d[idn't] believe it was Engesser" who "showed up that day" and "got that liger."  Def.'s Ex. 128 [Doc. No. 232-128] at 14–15.  Indeed, Mr. Engesser himself provided credible testimony that he was not in Wynnewood at any time in November 2017.  Tr. at 883:20–22.

Nevertheless, this recantation does not warrant the relief Defendant seeks.  First, Defendant does not explain why the jury would have probably acquitted had they known a cub sale to Mr. Engesser was not the source of the $3,000.  Indeed, the jury heard much of this evidence at trial and still convicted.  Most importantly, however, Defendant makes no attempt to explain how Mr. Glover's recantation, *when viewed in conjunction with Defendant's own statements*, would have probably changed the outcome of his trial.[19]  Accordingly, this recantation does not entitle Defendant to a new trial.

The third recantation involves Mr. Glover's personal cell phone.  At trial, he testified that Defendant asked Mr. Glover for his personal cell phone at the same time the $3,000 changed hands.  Tr. at 641:22–642:6.  In his affidavit, Mr. Glover now claims that "Jeff Lowe instructed [Mr. Glover] to give [his] phone to [Defendant] and ask him to mail it to Jeff's Las Vegas address."  Def.'s Ex. 112 [Doc. No. 232-112] ¶ 28.  Again, Mr. Glover has not clearly recanted his testimony because both his trial testimony and his new assertion could be—and likely are—true.  On a recorded phone call, Defendant told Mr. Garretson:

> Yeah, what I am doing is having him buy a go-phone down there and Jeff is buying a go-phone so they can communicate and then throw them away. And we are going to over-night his phone to Vegas and Jeff is gonna text pictures every once in a while back to the staff so that way his phone registers in Vegas.

Govt.'s Ex. 2 [Doc. No. 237-2] at 1.  This statement provides credible evidence that Defendant and Mr. Lowe had planned for Mr. Glover to leave his phone in Wynnewood

---

[19] In analyzing the *Giglio* claim related to Mr. Glover, discussed *infra*, the Court details how Defendant's own testimony provides overwhelming evidence of his guilt with respect to each element of the first murder-for-hire count.

before he headed east.  His trial testimony (that Defendant asked for his phone) and his new assertions (that Mr. Lowe told Mr. Glover to leave his phone) are both entirely consistent with the evidence in the record.[20]  Accordingly, the new statement does not provide the foundation for a new trial.[21]

The final recantation involves the "pizza phone" that Mr. Glover took with him after he left the zoo.[22]  At trial, he testified that Defendant *gave* him "a pizza restaurant phone" that "belonged to the park."  Tr. at 642:16–18.  Mr. Glover has now recanted that testimony, claiming that he actually *stole* the pizza phone.  As set forth in his affidavit, Mr. Glover asserts: "[Defendant] did not give me the phone assigned to the Pizzeria.  I took the phone from a recently fired employee named AJ."  Def.'s Ex. 112 [Doc. No. 232-112] ¶ 27.  Upon review of the evidence in the record, the Court finds the recantation to be credible.  First, Mr. Lowe sent a text message to Defendant on December 5, 2017 that said: "Fucking Allen [Glover] stole the pizza phone."  Def.'s Ex. 114 [Doc. No. 232-114] at 2.  One day later, Mr. Glover texted zoo employee Kelci Saffrey[23] from the pizza

---

[20] Nobody disputes the fact that Mr. Glover left his phone at the zoo before he left.  Indeed, Defendant testified that "after [he] gave Alan the money . . . [Mr. Glover] walk[ed] over into the office and he la[id] his cell phone on the desk . . . [a]nd he sa[id], here, we're supposed to mail this to Jeff."  Tr. at 1005:5–12

[21] Additionally, Defendant makes no attempt to explain why the statement probably would have compelled a different outcome.  Indeed, the Court is confident that the new statement would not probably have resulted in an acquittal because it is entirely consistent with the evidence already in the record.

[22] The Court, like the attorneys at trial, refers to this device as the "pizza phone."

[23] Although the contact is labeled as "newest best friend," both parties appear to agree that the text was sent to  Kelci Saffrey.  *See* Mot. [Doc. No. 232] at 24; Resp. [Doc. No. 237] at 38.

phone: "The phone I got AJ said it was hers that's the f****** pizza restaurant phone Joe called me today asking who is this how's the f*** is Alan he's just a pizza restaurant on telephone s*** I got to phone damn."[24]  Def.'s Ex. 115 [Doc. No. 232-115] (spelling and punctuation in original).  That same day, Mr. Glover received a text from Cheryl Ann Maldonado, which read, "I know who's phone you found. . . . I do believe it is AJ's. . . . Heard Joe telling to someone bout it today. . . . Joe told [AJ] someone who used to live there took it."  *Id.*  (spelling and punctuation in original).  All three of these messages provide credible, contemporaneous evidence that Mr. Glover *stole* the pizza phone, and not—as he testified at trial—that Defendant *gave* him the phone.

Nevertheless, this recantation does not entitle Defendant to a new trial because it would not probably produce an acquittal.  To convict on the first murder-for-hire count, the jury had to find beyond a reasonable doubt that, *inter alia*, Defendant "either (i) traveled in or caused another person to travel in interstate commerce or (ii) used or caused another person to use the mail or any facility of interstate commerce."  Jury Instructions [Doc. No. 114] at 31.  The jury was further instructed that "a cellular telephone is a 'facility of interstate commerce.'"  *Id.*  Defendant does not address Mr. Glover's unchallenged testimony that Defendant used the pizza phone—a facility of interstate commerce—to take photos of Mrs. Baskin, which he had pulled up on his computer "so [Mr. Glover] wouldn't kill the wrong person."  Tr. at 642:21–643:5.  Nor does the recanted testimony impact Defendant's statement that he and Mr. Lowe planned

---

[24] As discussed during the trial, Mr. Glover sends most of his text messages using "dictation software on his phone" because his "ability to read is very limited."  Tr. at 612:18–19.

to mail Mr. Glover's phone to Las Vegas, despite the fact that this act would also satisfy the interstate commerce element.   *See* Govt.'s Ex. 2 [Doc. No. 237-2] at 1.   And Defendant does not even attempt to explain how the testimony would probably produce an acquittal in light of the extensive, credible evidence that Defendant caused Mr. Finlay, Mr. Glover, and Mr. Garretson to travel to Dallas to obtain a fake ID.[25]   Accordingly, this recantation does not entitle Defendant to a new trial.

### b.  Lauren Lowe

Defendant next claims that Jeff Lowe's wife, Lauren, recanted two statements she made at trial.   Both recantations involve Mrs. Lowe's testimony that she received a package in the mail shortly after Thanksgiving 2017.   Tr. at 712:15–24.   She testified that the package, which was sent from the zoo and addressed to Jeff Lowe, contained a cell phone and a charger.[26]   *Id.* at 712:25–713:14.   On cross-examination, Mrs. Lowe testified that the package included a phone, a charger, and nothing else.   *Id.* at 723:15–22.

First, Mrs. Lowe now claims she "can not say for certain that the package . . . contained Frank Allen Glover's phone."   Def.'s Ex. 133 [Doc. No. 232-132] ¶¶ 15–16. The evidence in the record permits the Court to conclude that Mrs. Lowe's trial testimony about the inclusion of the phone is not false.   Her contention that she cannot *now* be certain that the package contained Mr. Glover's phone does not actually conflict with her

---

[25] This evidence, which is pertinent to one of Defendant's *Giglio* claims, is discussed in detail below.

[26] As discussed below, other evidence at trial indicated this phone belonged to Mr. Glover.

trial testimony.[27]  *Cf. United States v. DiPaolo*, 659 F. Supp. 120, 122 (W.D.N.Y. Apr.

17, 1987), *aff'd*, 835 F.2d 46 (2d Cir. 1987) ("The 'recantation' is not in fact a

recantation but a statement of lack of present recollection.").  Additionally, Defendant's

own trial testimony supports Mrs. Lowe's original account.  When asked what his

"participation was with respect to this cell phone allegedly being mailed to Mr. Lowe,"

Defendant answered:

> After — after I gave Alan the money, a couple hours later he walks over
> into the office and he lays his cell phone on the desk, and to this day I
> swear it didn't have a charger.  It was just a cell phone.  And he says, here,
> we're supposed to mail this to Jeff.  And I carried it in, and I give it to
> Brenda because I didn't have his address.  And I said, Brenda, Jeff wants
> you to mail this cell phone to him. And that was the end of it.

Tr. at 1005:2–12.  Because the Court is satisfied that Mrs. Lowe's trial testimony is

truthful, her affidavit does not entitle Defendant to a new trial.

Second, Mrs. Lowe has recanted her trial testimony that the package she received

included a phone, a charger, *and nothing else*.  *Id.* at 723:15–22.  As set forth in her

affidavit, she now claims the envelope "contained a summons from PETA regarding Tim

Stark."  Def.'s Ex. 133 [Doc. No. 232-132] ¶ 15.  This assertion is supported by a text

exchange with her husband the day after the package arrived.  She texted him: "Hey, that

package arrived today.  I [sic] had a Peta summons to produce evidence re: Tim

Stark. . . ."  Def.'s Ex. 136 [Doc. No. 232-135].  Mr. Lowe replied, "peta knows my

---

[27] As the Government points out, Mrs. Lowe would be "unavailable" under Federal Rule of Evidence 804(a)(3) because she now claims she does not remember whether the envelope contained the phone.  Accordingly, her earlier statement about Mr. Glover's phone could be introduced to prove the truth of the matter asserted because it was testimony she gave "as a witness at a trial."  Fed. R. Evid. 804(b)(1)(A).

address in vegas.  Wonder why they sent it to the park." *Id.*  Mrs. Lowe told her husband the summons "came in a certified envelope, so someone there must have signed for it." *Id.*  Similarly, Postal Inspector Brian Hess testified that the package scheduled for delivery to the Lowes on November 27, 2018 weighed 4 pounds, 14 ounces, corroborating her assertion that the package contained another item.  Tr. at 731:19–732:7.  Accordingly, the recantation is credible with respect to Mrs. Lowe's testimony that the envelope contained nothing other than the phone and charger.  Nevertheless, this recantation does not warrant a new trial under the five-part *Berry* test.  Defendant makes no argument as to why the presence of the summons was "material to the principal issues involved," or why its presence in the envelope "would probably produce an acquittal." *Jordan*, 806 F.3d at 1252 (quoting *McCullough*, 457 F.3d at 1167).

### 4.    Allen Glover's Affidavit

Defendant next claims he is entitled to a new trial based on several other statements included in Mr. Glover's affidavit.  First, he alleges Mr. Glover "worked with [Jeff] Lowe to fabricate text messages and script[] recorded calls with the intent of falsely implicating [Defendant] in a murder-for-hire that was actually attributed to Lowe."  Mot. [Doc. No. 232] at 23.  Defendant cites to Mr. Glover's affidavit, in which he claims that "Jeff Lowe created the entire murder for hire plot from start to finish."  Def.'s Ex. 112 [Doc. No. 232-112] ¶ 17.  He does not, however, cite to any text messages or phone calls with particularity—let alone any communications that were introduced at trial.  Thus, it is entirely unclear how Mr. Glover's allegation would have probably resulted in an

acquittal.  Indeed, Defendant makes no attempt to argue that these allegations satisfy the *Berry* test.

Similarly, he claims Mr. Lowe "worked with . . . [A]gent Bryant to create, direct and coerce the murder for hire plot."  *Id.* ¶ 11.  Although he cites to the Lowes' affidavits and a recorded phone call between Mr. Garretson and Mr. Johnson, he provides no detail about how any of these exhibits support his claim.  Nor does he analyze his entitlement to relief under *Berry*.  Upon review, no apparent basis for a new trial is clear to the Court.

### 5.  Allen Glover's Relationship with Ashley Webster

Ashley Webster, a former zoo employee, was deposed shortly before trial.  None of that deposition testimony was introduced at trial, nor did she testify live.  Nevertheless, Defendant seeks a new trial based on Mr. Glover's post-conviction admission that "he had a sexual relationship with Ashley Webster while she was living and working at the zoo."[28]  Mot. [Doc. No. 232] at 21.  But because Defendant does not engage with any of the five *Berry* factors, he has failed to satisfy his burden with respect to this evidence.  *See United States v. Cordova*, 25 F.4th 817, 828 (10th Cir. 2022)  (affirming denial of new trial motion "because [defendant] failed to meet his burden on the fifth prong of the test for procuring a new trial based on newly discovered evidence").  The Court will not speculate how Mr. Glover's admission is more than "merely impeaching," why it is "material to the principal issues involved," or why it "would probably produce an acquittal."  *Jordan*, 806 F.3d at 1252 (quoting *McCullough*, 457 F.3d at 1167).

---

[28] Defendant also argues Agent Bryant failed to disclose the relationship between Mr. Glover and Ms. Webster, even though Lauren Lowe "made [him] aware of" it.  Mot. [Doc. No. 232] at 26.  The Court addresses this *Brady* claim below.

### 6. Jeff Lowe Affidavit

Defendant's counsel interviewed former park owner Jeff Lowe four times between May and August of 2021. Mr. Lowe executed an affidavit following the final interview. *See* Def.'s Ex. 125 [Doc. No. 232-125.] Defendant contends Mr. Lowe fabricated evidence by scripting phone calls and text messages with Mr. Glover. Defendant then declares, without a citation, that "[t]hese manipulated recordings and text message exchanges were introduced as evidence [at] trial and used in securing the indictment and verdict." Mot. [Doc. No. 232] at 27. In his affidavit, Mr. Lowe claims he "created . . . and staged" a "February 26, 2018 conversation between [him]self and Alan [sic] Glover regarding the murder for hire of Carole Baskin." Def.'s Ex. 125 [Doc. No. 232-125] ¶ 11. The Court has reviewed the trial transcript, and the only February 26 communication discussed at trial involves text messages between *Defendant* and Mr. Glover. *See* Tr. at 472:9–474:3; 691:12–693:25; 1073:6–13. Although the defense attempted to introduce "a conversation between Mr. Lowe and Mr. Glover" at trial, the Court sustained the Government's hearsay objection. *Id.* at 696:8–699:19. Because Defendant has not identified any other "manipulated" testimony which the Court can analyze under the *Berry* test, he is not entitled to a new trial on this basis.

Finally, Defendant alleges Mr. "Lowe knew Garretson was working as a confidential informant since the beginning, which was not disclosed to trial defense counsel." Mot. [Doc. No. 232] at 27. Defendant provides no analysis about the importance of this information, and the Court declines to speculate.

### 7.    Jeff Lowe Recordings and Electronics[29]

Defendant next references a "phone call between Lowe and a *Netflix* producer wherein Lowe admits to the manipulation and fabrication of evidence to secure the conviction."  Mot. [Doc. No. 232] at 28.  As an initial matter, Defendant's citation does not support this contention.  The statement—that "it was coached and this thing was set up"—came from the producer, not Mr. Lowe.  *See* Def.'s Ex. 159 [Doc. No. 232-156] at 1.  Regardless of who made the statement, Defendant fails to discuss the five-part *Berry* test, which governs his entitlement to relief.

Defendant also references a February 13, 2019 phone call between Agent Bryant and the Lowes.  *See* Def.'s Ex. 128 [Doc. No. 232-128].  Again, he makes no attempt to explain how the call satisfies any part of the *Berry* test.[30]  Nor does the substance of the call support Defendant's characterization that Agent Bryant "interfered and obstructed another federal agency's (USDA) investigation of Lowe" and "asked a government witness to lie about aspects of the criminal investigation."  Mot. [Doc. No. 232] at 28.  In the cited transcript, Agent Bryant gives the Lowes advice about an inspection by the USDA.  Although he characterizes the investigation as "a fishing trip," Agent Bryant suggests the Lowes act in a manner that is "non-threatening, and very cooperative

---

[29] In this section, Defendant also argues that the Government allowed Agent Bryant to present false testimony about a cub transaction.  As this is an alleged *Napue* violation, the Court addresses that argument below.

[30] He contends that Agent "Bryant demonstrated an awareness that his actions were wrong," suggesting the impeachment value of this evidence.  Mot. [Doc. No. 232] at 28.  But, as previously articulated, the evidence must be more than "merely impeaching" to warrant a new trial.  *Jordan*, 806 F.3d at 1252.

without doing [an] affidavit."  Def.'s Ex. 128 [Doc. No. 232-128] at 5.  He elaborates: "Even when it's aggravating, be like, 'Okay, I'm not going to roll over and play dead, but I'm going to be very nice and very cooperative through the process.'"  *Id.*  Defendant makes no attempt to explain why Agent Bryant's advice to the Lowes warrants a new trial.

### 8.    Extortion

Next, Defendant argues that his post-conviction counsel has "discovered extortion on behalf of the cooperating government witnesses throughout this case."  Mot. [Doc. No. 232] at 29.  He first claims, without citation or further explanation, that "[Jeff] Lowe used undisclosed evidence and his authority as employer and landlord to threaten and intimate [sic] witnesses into testifying on behalf of the prosecution."  *Id.*  This bare accusation is insufficient to show his entitlement to a new trial.

The remainder of the section focuses on John Finlay, Defendant's former partner and an ex-zoo employee.  Defendant references a "a compromising video depicting Finlay in a compromising way," which he claims Agent Bryant, Mr. Lowe, and Mr. Johnson then used as "as a means to threaten Finlay into testifying against [Defendant]." *Id.*  The Government contends this evidence is not newly discovered because the video was produced before trial.  *See* Resp. [Doc. No. 237] at 42.  But Defendant's argument does not implicate the video itself; rather, it relies on the communications that (in his view) demonstrate Agent Bryant used the video to coerce Mr. Finlay into testifying. Nevertheless, Defendant provides neither details about the alleged coercion, nor analysis

under the applicable legal framework.  He is therefore not entitled to a new trial on this claim.[31]

Defendant also cites, without discussion, Exhibit 157, which is a video that was filed conventionally.  Upon review, the Court cannot determine who all of the people in the video are, where it was filmed, the context of the discussion, or the relevance of the video under the applicable legal framework.  Defendant also cites two letters that his post-conviction counsel sent to the United States Attorney's office.  *See* Def.'s Ex. 161 [Doc. No. 232-158]; Def.'s Ex. 162 [Doc. No. 232-159].  The Government asks the Court to disregard these letters as "an attempt to avoid [Defendant's] page limit."  Resp. [Doc. No. 237] at 42 n.11.  The letters elaborate on what Defendant describes as the "suspected criminal activity" by Mr. Lowe and Mr. Garretson, and each letter is roughly 30 pages long.  Def.'s Ex. 161 [Doc. No. 232-158] at 1; Def.'s Ex. 162 [Doc. No. 232-159] at 1. The Court agrees the letters are an improper attempt to shoehorn nearly 60 additional pages into the briefing and, upon review, they appear to have very little relevance to the legal framework governing new trials.  Accordingly, the Court disregards these exhibits.

Finally, Defendant claims that Jeff Lowe "offer[ed] a reward for someone to infiltrate" the volunteer program at Carole Baskin's rescue in August of 2017.  Mot.

---

[31] Additionally, the Court has reviewed the relevant exhibits and finds no evidence of actual coercion.  At best, Mr. Garretson paraphrases Mr. Johnson's claim that he "ha[d] texts from Matt [Bryant] saying to get the Finlay video so you can dangle it over his head,' or something like that."  Def.'s Ex. 19 [Doc. No. 232-19] at 2.  There is no additional detail or context provided about *how* Agent Bryant purportedly "dangle[d]" the video over Mr. Finlay's head.  *Id.* Defendant also provides messages between "B" and "J," where B (presumably Agent Bryant) claims he "[k]now[s] a lot about Finlay so be careful trusting him."  Def.'s Ex. 163 [Doc. No. 232-160].  Such a vague reference to Mr. Finlay is wholly insufficient to warrant the relief Defendant seeks here.

[Doc. No. 232] at 30.  In support, Defendant cites the 32-page letter that his post-conviction counsel sent to the United States Attorney's office.  *See* Def.'s Ex. 162 [Doc. No. 232-159].  As previously stated, the Court declines to consider legal arguments developed in this attachment.  Regardless, Defendant provides no analysis of why Mr. Lowe's alleged activities justify a new trial.  The Court is unwilling to speculate about, for example, the materiality of this evidence.

### 9.    Lauren Lowe Affidavit

Defendant then turns to an affidavit that Lauren Lowe executed after trial.  *See* Def.'s Ex. 133 [Doc. No. 232-132].  He first raises the recantation issue, which the Court has disposed of above.  He then makes the blanket statement that the affidavit "consists of statements regarding the fabrication of evidence in an effort to falsely implicate [Defendant] in the crimes charged and statements regarding Bryant illegally breaking into [Defendant's] personal residence and removing evidence."  Mot. [Doc. No. 232] at 30.  Defendant does not further develop this argument or engage with its merits under the *Berry* test.  This bare assertion, without more, is insufficient to warrant relief.

### 10.    Lauren Lowe Text Messages

Relatedly, Defendant claims that a search of Mrs. Lowe's phone revealed undisclosed text messages.  First, Mrs. Lowe texted Agent Bryant (1) photos of Ashley Webster's personnel file; (2) screenshots of social media posts made by Ms. Webster, Defendant, Jeff Johnson, and two other women with no apparent connection to the investigation or trial; and (3) information that Ms. Webster and Mr. Glover had a sexual relationship.  *See* Mot. [Doc. No. 232] at 31 (citing Def.'s Exs. 133 [Doc. No. 232-132];

138 [Doc. No. 232-137]).   The photos of Ms. Webster's personnel file were disclosed before trial, so they are not newly discovered evidence.  *See* Govt.'s Ex. 18 [Doc. No. 237-18].   Similarly, Defendant does not explain why he could not have discovered the social media posts (including some from his own account) before trial.   Finally, Defendant provides no explanation as to why the text message about the sexual relationship is sufficient under the *Berry* test.[32]  As previously noted, Ms. Webster did not testify at trial, nor was her deposition testimony or voicemail presented to the jury. Accordingly, these messages do not entitle Defendant to relief.

Finally, Defendant points to a series of messages between Mrs. Lowe and Chealsi Putman, Defendant's niece.[33]  In one message, Ms. Putman admits she "ha[d] been trying to get [Defendant] in trouble for years and years." Def.'s Ex. 134 [Doc. No. 232-133]. Another text from Ms. Putman reads: "Who pissed off Jeff Johnson matt just told me yesterday that he has to keep him from telling all he might just mess this entire thing up for us all."  *Id.* (punctuation and capitalization in original).   In her affidavit, Mrs. Lowe claims: "Chealsi Putnam [sic] told me that she was in regular communication with Agent Bryant and would exchange information with him.   She also indicated to me that she would disclose the information she learned about the case to the attorney for Carole Baskin."  Def.'s Ex. 133 [Doc. No. 232-132] ¶ 18.   Again, however, Defendant provides no analysis as to how any of these claims entitle him to a new trial under *Berry*.

---

[32] Defendant also claims the failure to produce the message constitutes a *Brady* violation.  The Court addresses this argument below.

[33] The parties use "Putman" and "Putnam" interchangeably.   The correct spelling appears to be "Putman."  *See* Govt.'s Ex. 23 [Doc. No. 237-23].

### 11.    Lauren Lowe Perjury

Defendant next contends that Mrs. Lowe perjured herself when testifying about Beth Corley, one of Defendant's former employees.  Ms. Corley possessed a USDA exhibitor's license, and she testified that Defendant maintained her license after she left the park to keep the animals "protect[ed]" from his lawsuit with Mrs. Baskin.  Tr. at 289:12–291:13.  For her part, Mrs. Lowe testified that she had "never met" Ms. Corley. *Id.* at 711:10–16.  Defendant has now produced a transcript of a phone call between the Lowes and Agent Bryant, in which Mrs. Lowe says: "I actually gave Beth Corely her . . . Well, I gave it to one of her staff members to give to her, as to what her inventory was, and she's like, 'Holy Shit.'  She's like, 'I had no idea this was all my inventory.'"  Def.'s Ex. 126 [Doc. No. 232-126] at 6 (alteration in original).  As an initial matter, this statement does not clearly conflict with Mrs. Lowe's trial testimony.  To be sure, the statement is ambiguous when viewed in isolation.  In the same call, however, Mrs. Lowe tells Agent Bryant she has "never met [Ms. Corley], but all her staff say really positive things about her."  *Id.* at 2.  Nevertheless, Defendant makes no attempt to explain how evidence that Mrs. Lowe had previously met Ms. Corley would have probably produced an acquittal.

### 12.    Yarri Schreibvogel Interview

Next, Defendant cites a transcript between his estranged brother, Yarri Schreibvogel,[34] and his post-conviction counsel.  Defendant identifies several statements

---

[34] Although the Motion refers to Mr. Schreibvogel as "Yurri," it appears the proper spelling of his name is "Yarri."  *See* Govt.'s Ex. 19 [Doc. No. 237-19].

made by Mr. Schreibvogel, including his belief that Carole's husband "Howard [Baskin] was behind it from day one," that he "had been in it with Howard [Baskin] since day one," and that "Chealsi [Putman] set [Defendant's] ass up." [Doc. No. 232] at 33 (quoting, approximately, Def.'s Ex. 135 [Doc. No. 232-134] at 4–6). Defendant makes no attempt to explain how Mr. Schreibvogel's testimony would be admissible, material, or "of such a nature that in a new trial it would probably produce an acquittal." *Jordan*, 806 F.3d at 1252. Accordingly, it moves him no closer to a new trial.[35]

### 13.   John Reinke

Defendant's post-conviction counsel also interviewed former park manager John Reinke, who completed an affidavit following the conversation. *See* Def.'s Ex. 113 [Doc. No. 232-113]. Defendant claims Mr. "Reinke's statements regarding the age and health of the five tigers euthanized by [Defendant] contradict testimony by Eric Cowie and Dylan West." Mot. [Doc. No. 232] at 33. But this evidence fails the *Berry* test because Defendant's trial counsel interviewed Mr. Reinke prior to trial. *See* Def.'s Ex. 113 [Doc. No. 232-113] ¶¶ 4, 62. Defendant makes no attempt to explain why the failure to learn about Mr. Reinke's claims was "not caused by [his] own lack of diligence." *Jordan*, 806 F.3d at 1252; *see also United States v. Vigil*, 506 F. Supp. 2d 571, 579 (D.N.M. 2007)

---

[35] Defendant also claims that Mr. Schreibvogel "had a multiple hour meeting with the U.S. Attorneys and Bryant, which was never made available to trial defense counsel." Mot. [Doc. No. 232] at 33; *see also* Def.'s Ex. 135 [Doc. No. 232-134] at 6. But, as the Government points out, a draft report of this phone call was included in the pretrial discovery. *See* Govt.'s Ex. 19 [Doc. No. 237-19].

("Any failure to ascertain the allegedly new evidence is a result of [defendant's trial counsel's] failure to ask . . . .").

Similarly, Defendant claims the "USFWS Report prepared by Special Agent Bryant after Reinke's interview on February 6, 2019" contained "misleading and false information."  Mot. [Doc. No. 232] at 34.  But again, Defendant fails to show that such inconsistencies could not have been discovered before trial with reasonable diligence.[36] He has therefore failed to establish that this report and any purported inconsistencies it contains are newly discovered evidence under *Berry*.

### 14.   The Tigers

The jury found Defendant guilty of unlawfully shooting and killing five tigers. *See* Superseding Indictment [Doc. No. 24] at 7–8; Jury Verdict [Doc. No. 113] at 2–3.  At trial, former zoo employee Erik Cowie testified Defendant killed the tigers to "make cage space" by shooting "cats who weren't producing any cubs."  Tr. at 45:3–9.  Defendant now claims that "two of the tigers allegedly shot and killed by [Defendant] survived his conviction."  Mot. [Doc. No. 232] at 34.  The Motion baldly asserts that "Lauren Lowe and her veterinarian have evidence showing the tiger Delilah died after Joe was convicted and that Delilah died with evidence of being able to breed in her body."  *Id.*  Defendant cites to no exhibit to support this contention, nor does he elaborate on the alleged evidence, making it impossible to apply the relevant legal framework.

---

[36] He does not contend the report was withheld from his trial counsel.

Next, he provides a link to a website which he claims allowed the public to donate to "Samson"—one of the euthanized tigers—until at least December 2021.[37]  *See id.*  Beyond the name of the tiger, however, he provides no evidence that the "Samson" on the website is the same tiger killed at the park.  Indeed, Mr. Cowie testified that Samson was a "white Bengal[]," Tr. at 45:16–19, but the tiger on the website is orange, *see* [Doc. No. 237-20].[38]  Accordingly, this evidence appears to be irrelevant.

### 15.  National Geographic

Defendant next identifies a National Geographic article, alleging its author contacted Agent Bryant "and was specifically aware of the investigation of [Defendant] prior to the indictment."  Mot. [Doc. No. 232] at 35.  As set forth in the Motion, the article was published in December 2019—after Defendant was found guilty—so it is not evidence that could have been introduced at trial.  *See United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993) ("In general, to justify a new trial, 'newly discovered evidence' must have been in existence at the time of trial. Events and transactions occurring after the trial obviously could not have been the subject of testimony at the trial.").  Similarly, he highlights an accompanying photo in the article but admits it was

---

[37] Mr. Reinke's affidavit also undercuts the assertion that two of the tigers were secretly alive during the trial.  *See* Def.'s Ex. 113 [Doc. No. 232-113] ¶ 33 ("The five cats that were euthanized were Sampson, Delilah, Trinity, Lauren, and Cuddles. . . .").

[38] The Court relies on the Government's exhibit because the link provided in the Motion is no longer active.

not taken until after the trial.[39]  To be sure, the author of the photo emailed Agent Bryant before the trial, but these communications were produced in pretrial discovery.  *See* Govt.'s Ex. 21 [Doc. No. 237-21].  None of this evidence, therefore, entitles Defendant to a new trial.

### 16.  Tiger King

Defendant also relies on the option and purchase agreement that he entered with Royal Goodes LLC.  *See* Def.'s Ex. 1 [Doc. No. 232-1].  This contract is dated November 28, 2017.  *See id.* at 1.  Defendant was therefore aware of the document nearly a year before he was indicted, so the contract itself cannot form the basis for the relief he seeks.

Nevertheless, he argues that producers used the contract "to keep proprietary interests in witness statements and interviews captured during the criminal investigation which included now known to be relevant evidence/information they are still holding inviolate to this day."  Mot. [Doc. No. 232] at 36.  He makes the blanket accusation that "the contract prevented his agents from investigating and denied [his] lawyers access to relevant evidence, including witness statements."  *Id.* at 36–37.  But he does not provide any support for this statement in the record, nor does he identify a single statement or piece of evidence that was withheld.  Accordingly, the Court cannot even attempt to apply the *Berry* elements.  While he cites an email from producer Rebecca Chaiklin that

---

[39]  Although Defendant points out the photos and article were published "before [he] was sentenced," he does not explain the significance of this fact within the applicable *Berry* framework.  Mot. [Doc. No. 232] at 35.

references "four transcripts," *see* Def.'s Ex. 149 [Doc. No. 232-147], the email was sent on February 10, 2022, so it could not have been introduced at trial.[40]

Lastly, he details an interview that a podcast host conducted with Mr. Lowe, in which Mr. Lowe harshly criticizes Mrs. Baskin. Defendant laments that "[t]he full context of this recording is needed by all of us." Mot. [Doc. No. 232] at 37. Because Defendant provides no analysis, however, the importance of the recording within the applicable legal framework appears to be entirely speculative.

### 17. Evidentiary Hearing

Finally, Defendant requests an evidentiary hearing. As an initial matter, Defendant is not entitled to a hearing to further develop legal arguments which were either not raised or only fleetingly addressed.[41] Evidentiary hearings provide the Court with an opportunity to resolve factual disputes; they do not provide counsel with a second chance to develop legal arguments. To hold otherwise would encourage advocates to pack their motions with barebones arguments and vague conspiracies as a placeholder for an eventual hearing. The Court has already explained why it is unnecessary to conduct an evidentiary hearing on the recantation claims. Defendant has provided no additional reasoning—nor is any apparent to the Court—why he is entitled to a hearing on the

---

[40] Additionally, it is entirely unclear what transcripts Ms. Chaiklin is referencing.

[41] The Court is not persuaded that the page limit can be blamed for the Motion's dearth of legal analysis. *See Jolly v. Hoegh Autoliners Shipping AS*, No. 3:20-CV-1150-J-34PDB, 2020 WL 6505037, at *1 (M.D. Fla. Nov. 5, 2020) ("Significantly, the page limit requirement is not designed to burden the parties, but to conserve judicial resources by focusing the parties' attention on the most pressing matters and winnowing the issues to be placed before the Court. . . . Defendants have done no winnowing and instead have engaged in a throw-the-spaghetti-and-see-what-sticks motion practice which leads to imprecise and inartful briefing." (cleaned up)).

remainder of the Motion.   Accordingly, the request for an evidentiary hearing is DENIED.

**B.**     ***Brady/Giglio* Violations**

Defendant next argues he is entitled to a new trial on the basis of improperly withheld evidence.  When the prosecution suppresses material, exculpatory evidence, it commits a *Brady* violation.  *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009).   Impeachment evidence, including immunity agreements, are considered exculpatory for *Brady* purposes.  *Giglio*, 405 U.S. at 155.

In the context of a new trial motion, "*Brady* claims can be a subspecies of newly discovered evidence claims."   *Quintanilla*, 193 F.3d at 1148 n.9.  Unlike other newly discovered evidence, however, alleged *Brady*/*Giglio* violations are not subject to the five-part *Berry* test.  Instead, "the less-demanding *Brady* standard" applies.  *United States v. Torres*, 569 F.3d 1277, 1281–82 (10th Cir. 2009).  This test requires a defendant to show, by a preponderance of the evidence, that "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *Cordova*, 25 F.4th at 826 (quoting *United States v. Ahrensfield*, 698 F.3d 1310, 1319 (10th Cir. 2012)).   "The 'prosecution' includes 'not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office, as well as . . . other arms of the state involved in investigative aspects of a particular criminal venture.'" *United States v. Holloway*, 939 F.3d 1088, 1105 (10th Cir. 2019) (quoting *Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995)).

Materiality in this context means that "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cordova*, 25 F.4th at 826 (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Fontenot v. Crow*, 4 F.4th 982, 1080 (10th Cir. 2021) (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)), *cert. denied*, 142 S. Ct. 2777 (2022). The materiality of withheld evidence is evaluated "in light of the entire record in order to determine if 'the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *Id.* at 1080–81. Although the Court analyzes the individual allegations below, it "do[es] not consider each piece of withheld evidence in isolation." *Id.* (quoting *Simpson v. Carpenter*, 912 F.3d 542, 572 (10th Cir. 2018)). Instead, it "review[s] the cumulative impact of the withheld evidence, its utility to the defense as well as its potentially damaging impact on the prosecution's case." *Id.* (quoting *Simpson*, 912 F.3d at 572). "Whether withheld evidence is material is not a sufficiency-of-the-evidence test." *United States v. Reese*, 745 F.3d 1075, 1084 n.6 (10th Cir. 2014); *see also Kyles v. Whitley*, 514 U.S. 419, 435 (1995) ("One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

### 1.      Insufficiently Raised Claims

Although Defendant faces a less onerous burden to warrant a new trial under the *Brady/Giglio* standard than under the *Berry* test, the burden still belongs to him. Accordingly, the Court can quickly dispose of the claims that Defendant wholly fails to analyze. *See United States v. Moya*, 5 F.4th 1168, 1193 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 385 (2021) ("But to establish a *Brady* violation [defendant] must explain at a bare minimum *why* the requested evidence was favorable to him and demonstrate that it was material, i.e., that the result of the proceeding would have been different if the evidence had been given to the defense.  Because [defendant] doesn't even attempt to establish those necessary criteria, his challenge fails." (citation omitted)).

On four occasions, Defendant identifies newly discovered evidence, claims it was not produced to defense counsel, and concludes with the phrase: "yet another *Brady* violation."  *See* Mot. [Doc. No. 232] at 20 (regarding Mr. Garretson withholding a recording of the "bike path" conversation), 26, (regarding Mr. Glover's text messages to Agent Bryant about his roommate in South Carolina, and "101 text messages between Garretson and Glover"), 33 (regarding Mr. Schreibvogel's claim that "he had a multiple hour meeting with the U.S. Attorneys and Bryant").  The Court cannot assess the merits of these undeveloped claims because doing so would require it to improperly serve in a dual capacity as both advocate (crafting legal arguments on Defendant's behalf) and neutral arbiter (deciding the merits of the arguments it just created).  *See United States v. Madrid*, No. CR 12-128 JB, 2016 WL 9778161, at *6 (D.N.M. Apr. 7, 2016), *report and recommendation adopted*, No. CIV 14-0801 JB/WPL, 2016 WL 4492182 (D.N.M. June

30, 2016) ("Courts do not act as advocates for pro se parties, let alone those represented by counsel." (quoting *In re Onyeabor*, 535 F. App'x. 725, 731 (10th Cir. 2013) (unpublished))).   Accordingly, he is not entitled to a new trial on these grounds.  *See Griebel*, 312 F. App'x at 97 ("We are not willing, nor are we obligated, to forgive [Defendant's] failure to support his assertions by simply indulging his request to assume away all three elements of our established test for evaluation of *Brady* claims.").

### 2.    Mr. Garretson's Undisclosed Recordings

First, Defendant claims "[a]ll recordings from Garretson and Lowe were intentionally withheld or destroyed, despite the government's knowledge of the existence of these recordings."  Mot. [Doc. No. 232] at 39.  By his count, "[o]ver 389 recordings were withheld."  *Id.*  Without identifying a particular call, he asserts:

> The evidence contained in these recordings demonstrates the perjury committed at trial, the witnesses' true motivation in cooperating with the government, the misconduct of the lead investigators and AUSAs, efforts to gain information on trial defense counsel's strategy, promises of immunity and more.   If this evidence was properly turned over to trial defense counsel, there is a reasonable probability the outcome would have been different.

*Id.*  These conclusory statements, which treat 389 calls as a monolith, are insufficient to raise a *Brady* claim.  Apart from the February 20 phone call discussed below, Defendant does not identify any particular call or explain its impact (e.g., by identifying which of the nineteen charges it pertains to or analyzing its favorability or materiality).

He next argues that Agent Bryant "conspired with Garretson to materially alter part of the evidence so that it became favorable to the prosecution."  *Id.*   The Court believes he is referencing the February 20, 2019 phone call between Mr. Johnson and Mr.

Garretson, which he describes as "two government witnesses conspiring to murder yet another government witness." *Id.* As the Government points out, many of the facts underlying the call were produced in pretrial discovery. Prosecutors provided a Garvin County sheriff's report from March 13, 2019. The report includes a summary of the call and mentions that Mr. Garretson's recordings "were preserved to a CD." *See* Govt.'s Ex. 22 [Doc. No. 237-22] at 3. In reply, Defendant argues that "[a] police report mentioning a recording does not equate to the proper pretrial production of a recording captured by a confidential informant during a criminal investigation." Reply [Doc. No. 240] at 3.

A defendant's knowledge does not negate a prosecutor's disclosure obligations under *Brady*. But that knowledge is certainly relevant to the materiality analysis. *Fontenot*, 4 F.4th at 1066 ("[I]f the defense already has a particular piece of evidence, the prosecution's disclosure of that evidence would, in many cases, be cumulative and the withheld evidence would not be material.'" (quoting *Banks v. Reynolds*, 54 F.3d 1508, 1517 (10th Cir. 1995)). Defendant provides no analysis on the materiality of the call, particularly in light of the information contained in the sheriff's report. Similarly, Defendant does not attempt to analyze the favorability of the call. He instead makes the general statement that "[c]riminal activity that did not involve [Defendant] would have been helpful in [Defendant's] defense." Mot. [Doc. No. 232] at 40.[42]

---

[42] Defendant again suggests the call was the basis for excluding Mr. Johnson's testimony. But, as explained above, he provides no evidence that Mr. Johnson's testimony was actually excluded.

### 3.      Mr. Garretson's Recording Device

Next, Defendant claims Mr. Garretson maintained possession of his government-issued recording device "up to and during the trial." *Id.*  According to Defendant, "The possibility of recordings on this device that would exonerate [Defendant] or helped his defense would have affected the outcome of the trial." *Id.*  But Defendant concedes "we will never know" whether the recordings would be favorable because Garretson destroyed the device. *Id.*  He makes no argument that the recorder *itself* was exculpatory evidence.  Instead, his argument centers on the unknown contents of the recorder.  But "[s]peculation is insufficient to establish favorability under *Brady*." *Holloway*, 939 F.3d at 1105.

### 4.      Brittany Medina

Next, Defendant contends that "Brittany Medina was an undisclosed exculpatory witness for the defendant," and that she "was involved with the federal investigation since Garretson's initial interview with law enforcement on September 14, 2017." Mot. [Doc. No. 232] at 40.  He claims Ms. Medina could have "refute[d] the AUSAs['] theory that [Defendant] was involved in this first murder for hire plot." *Id.* at 41.

At trial, Mr. Garretson testified about an August 2017 conversation that took place at the zoo.  When asked who was present, Mr. Garretson testified, "It was me, Jeff Lowe and Joe Passage." Tr. at 548:1–2.  During a post-conviction interview with Mr. Garretson and a *Tiger King* producer, Ms. Medina claimed she was also in the office during the conversation.  For the most part, her account of the conversation matches Mr. Garretson's recollection at trial.  Both Mr. Garretson and Ms. Medina claimed that

Defendant was in the back part of the office while Mr. Lowe pulled up maps of Mrs. Baskin's property—including the bike path she took to work—on his computer and discussed ways to kill her.  *See id.* at 548:4–549:3; Def.'s Ex. 104 [Doc. No. 232-104] at 10–11.

The Government concedes the accounts differ in one respect, however.  At trial, Mr. Garretson testified that when the conversation turned to the fact that "[Defendant] knew everything about Ms. Baskin," Defendant "br[ought] over a big stack of manila folders" that contained "everything about [Mrs. Baskin]."  Tr. at 548:4–10.  He testified to his belief that the folders came from "somebody in the inside of her organization."  *Id.* at 548:11–15.  Ms. Medina's account did not include this detail.[43]  The Government questions the materiality of this difference because evidence FBI Special Agent Mark Williams also testified about Defendant's trove of documents.  At trial, the Government played a recording of a December 8, 2017 meeting between Defendant, Special Agent Williams, and Mr. Garretson.  During the conversation, which took place in an office at the zoo, Special Agent Williams and Defendant had the following exchange:

> [Special Agent Williams]: Yeah, yeah I just need to know, you know, where she lives, where, I mean if y'all have that. Any, any information you got on her so I can make sure…
>
> [Defendant]: [Laughs] How much you need?
>
> [Special Agent Williams]: Holy shit.

---

[43] She maintains that Defendant was "in his little cubicle area, making phone calls, barely having an input in the conversation unless Jeff was asking him questions, or you know when someone jokes and laughs about what they're talking about and then it's like, 'Oh, what do you think, Joe?'"  Def.'s Ex. 104 [Doc. No. 232-104] at 11.

[Defendant]: I got this all outta her office.

Govt.'s Ex. 9 [Doc. No. 237-9] at 19.   At trial, Special Agent Williams testified that Defendant "provided [him] with a number of documents related to [Mrs. Baskin]" at this point in the conversation.   Tr. at 790:3–15.   Accordingly, the materiality of Ms. Medina's omitted testimony appears low, given its cumulative nature.

### 5. Ashley Webster

Defendant attempts to raise two *Brady* claims related to Ms. Webster.   First, he claims the prosecution failed to disclose that Ashley Webster "was actually working for the government and was not, as portrayed, an independent person working at the zoo." Mot. [Doc. No. 232] at 41.   For support, he cites a 20-second video of a woman who says: "Joe gave me a certificate—this was after I left.   I went back down again, and I went to gather more information [to] send it to the FBI, right."   Def.'s Ex. 141 (filed conventionally).   The Government claims that Ms. Webster "never worked for the government," and she did not claim that the prosecution sent her to gather evidence. Resp. [Doc. No. 237] at 50.   Upon review, the video is certainly not sufficient to establish a relationship between Ms. Webster and the FBI.   Nevertheless, he provides no analysis about the materiality of this evidence.

Next, Defendant claims that the prosecution failed to disclose text messages about Ms. Webster pertaining to (1) her personnel file, and (2) information about her relationship with Mr. Glover.   Defendant first cites a string of text messages that include photos of Ms. Webster's personnel file, but these photos were all produced in pretrial discovery.   *Compare* Def.'s Ex. 139 [Doc. No. 232-138], *with* Govt.'s Ex. 18 [Doc. No.

237-18].  But Mrs. Lowe also sent Agent Bryant a text message that said: "OH MY GOD!!!   ALLEN HAD SEX WITH ASHLEY WEBSTER!!!   SHE LIVED IN HIS TRAILER!!!"  Def.'s Ex. 139 [Doc. No. 232-138] at 4 (capitalization and punctuation in original).   Assuming this message was suppressed, Defendant has not attempted to explain either its favorability or materiality.[44]

### 6.     Chealsi Putman

Similarly, Defendant alleges the prosecution did not disclose the cooperation of Ms. Putman, whom he describes as "[Defendant's] niece and a personal friend of the Baskins." Mot. [Doc. No. 232] at 42.  He alleges Ms. Putman worked closely with Agent Bryant during the investigation and "relayed any information she learned directly to the Baskins."  *Id.*   As an initial matter, Defendant's claim that "[n]o evidence of Putman's involvement was turned over to trial defense counsel" is inaccurate.  Mot. [Doc. No. 232] at 42.  The prosecution produced both a letter from Ms. Putman and several pages of text messages with Agent Bryant.  *See* Govt.'s Ex. 23 [Doc. No. 237-23]; Govt.'s Ex. 24 [Doc. No. 237-24].[45]  Defendant relies on a string of text messages between Ms. Putman and Mrs. Lowe "referenc[ing] her cooperation with the federal agent throughout the

---

[44] As the Government points out, "Ms. Webster did not testify and neither her voicemail nor her deposition were admitted into evidence."  Resp. [Doc. No. 237] at 50.

[45] The Government and Defendant cite to the same text message thread between Agent Bryant and a contact named "Chelsea," although the texter appears to be Ms. Putman's husband.  *See* Def.'s Ex. 142 [Doc. No. 232-140]; Govt.'s Ex. 24 [Doc. No. 237-24].  The contact is labeled as "Chelsea," but Agent Bryant's first message addresses "Travis."  Several of the messages to Agent Bryant include the phrase "my wife and I."  *See, e.g.*, Govt.'s Ex. 24 [Doc. No. 237-24] at 6, 10, 12, 20, 23, 42.  Agent Bryant later instructs the texter to "[h]ave Chelsea call [him]."  *Id.* at 40.   Finally, the texter says "[C]healsi and I haven't decided if we are coming."  *Id.* at 45. Nevertheless, both exhibits are Bates-stamped, indicating they were produced in pretrial discovery.

investigation."  *See* Def.'s Ex. 134 [Doc. No. 232-133].  Even assuming the Government suppressed the level of Ms. Putman's purported involvement with the investigation, Defendant makes no attempt to explain the materiality of this evidence.

### 7.    Agent Bryant's Communications

Next, Defendant alleges several *Brady* violations related to Agent Bryant's communications.  First, he claims Agent Bryant "read Garretson messages he received from Johnson," but that those messages were not produced in pretrial discovery.  Mot. [Doc. No. 232] at 42.  Defendant does not cite any of the six supporting exhibits with particularity, but the Court presumes he is referencing (1) a message in which Mr. Johnson asks Agent Bryant "to ask Lowe to meet [Mr. Johnson] in a public place right now," Def.'s Ex. 15 [Doc. No. 232-15] at 5; *see also* Def.'s Ex. 18 [Doc. No. 232-18] at 1; (2) a message in which Mr. Johnson asked to meet with Agent Bryant, but Agent Bryant responded that he was "too busy," Def.'s Ex. 16 [Doc. No. 232-16] at 2; and (3) Mr. Garretson's admission that he recorded the February 20 phone call with Mr. Johnson, *see* Def.'s Ex. 17 [Doc. No. 232-17] at 1; Def.'s Ex. 19 [Doc. No. 232-19] at 1–2.  But, as the Government points out, Defendant "again offers virtually nothing to satisfy his burden" with respect to favorability or materiality.  Resp. [Doc. No. 237] at 50.

Next, he claims "Bryant failed to produce text messages from the Lowe's [sic] regarding Ashley Webster."  Mot. [Doc. No. 232] at 42.  Although he does not cite an exhibit or provide analysis, the Court presumes he is referencing the message about Ms. Webster's sexual relationship with Mr. Glover.  *See* Def.'s Ex. 139 [Doc. No. 232-138] at

4.  The Court has already addressed the insufficiency of that claim above, and Defendant offers no more context here to satisfy his burden under any of the three *Brady* elements.

Defendant next claims Agent Bryant "failed to report on calls and produce messages exchanged with Glover regarding potential witnesses and Glover's pending court cases." Mot. [Doc. No. 232] at 42.  He cites four exhibits in support with no further comment or analysis.  *See id.* (citing Def.'s Ex. 62 [Doc. No. 232-62]; Def.'s Ex. 133 [Doc. No. 232-132]; Def.'s Ex. 138 [Doc. No. 232-137]; Def.'s Ex. 139 [Doc. No. 232-138]).  Defendant's Exhibits 62 and 138 have no apparent relevance to Mr. Glover. Defendant also cites Lauren Lowe's affidavit, in which she claims, "Agent Bryant met with Jeff Lowe and together they called Frank Allen Glover to record a conversation regarding the murder for hire," Def.'s Ex. 133 [Doc. No. 232-132] ¶ 13.  But Defendant provides no further information or context about this call, making it impossible for the Court to assess its materiality under *Brady.*  Defendant again cites Mrs. Lowe's message to Agent Bryant about Ms. Webster and Mr. Glover's sexual relationship, but still provides no analysis under *Brady*.  *See* Def.'s Ex. 139 [Doc. No. 232-138] at 4.

Defendant next claims Agent Bryant "failed to produce recordings that showed [Defendant] had no interest in committing crimes, which Bryant specifically request Lowe to try and obtain." Mot. [Doc. No. 232] at 42–43.  The exhibit contains a recorded phone call between Mr. Lowe and Defendant, although there is no indication that Agent

Bryant orchestrated the recording.  *See* Def.'s Ex. 156 [Doc. No. 232-154].  Nor does Defendant analyze the content of the call under *Brady*.[46]

Defendant next notes that Agent Bryant gave Mr. Garretson his personal phone number—a fact which is corroborated by an exhibit produced in pretrial discovery.  *See* Def.'s Ex. 143 [Doc. No. 232-141] (bearing Bates numbers).  Defendant now contends that "nothing  from Bryant's personal phone was ever turned over."  Mot. [Doc. No. 232] at 43.  He does not identify any specific messages that were withheld, however, but appears to suggest that some unknown messages could be favorable and material.  But such speculation is insufficient.  *See United States v. Garcia-Martinez*, 730 F. App'x 665, 673 (10th Cir. 2018) ("In order to prevail on his or her *Brady* claim, a defendant must marshal arguments that are more than 'merely speculative' that demonstrate by a preponderance of the evidence that the three *Brady* criteria are satisfied . . . ." (quoting *Sandoval v. Ulibarri*, 548 F.3d 902, 915 (10th Cir. 2008)).

Finally, Defendant notes that some of the screenshots of Agent Bryant's text messages "appear[] to be edited or altered in some way."  Mot. [Doc. No. 232] at 43.  He claims Agent Bryant intentionally altered the messages, and that "the substance of Bryant's text messages are material based on his unethical behavior throughout the entire investigation in concealing, manipulating and fabricating evidence in an effort to secure a conviction against [Defendant]."  *Id.*  But the fact that the messages were altered was not

---

[46] Upon review, the call does not appear to support Defendant's contention that he "had no interest in committing crimes."  Mot. [Doc. No. 232] at 43.

suppressed, as the messages Defendant cites were produced in pretrial discovery.[47] *Compare* Def.'s Ex. 144 [Doc. No. 232-142] at 5, *with* Govt.'s Ex. 25 [Doc. No. 237-25] at 5.

### 8.   The Tiger Excavation[48]

During the investigation, the USFWS came to suspect that Defendant unlawfully euthanized tigers and buried them at the zoo.  After conducting a dig operation, USFWS agents collected five tiger skulls, which were sent for testing and ultimately used to secure Defendant's conviction on the five illegal taking charges.  *See* Superseding Indictment [Doc. No. 24] at 7–8.  Defendant now claims "newly discovered photographs" show that a sixth skull was excavated.  Mot. [Doc. No. 232] at 44.  As the Government points out, however, one of the cited photographs was not only produced in pretrial discovery but was also introduced at trial.  *See* Def.'s Ex. 166 [Doc. No. 232-163]; Tr. at 106:3–13.  Defendant does not adequately demonstrate that this evidence was suppressed.

---

[47] Defendant makes no argument that the substance of any individual message (i.e., the words that were altered) forms the basis of a *Brady* violation.

[48] This portion of Defendant's Motion also claims that joinder of the two murder-for-hire counts with the remaining counts was an effort "to inappropriately influence the outcome of the criminal trial."  Mot. [Doc. No. 232] at 45.  He cites to a phone call between Mr. Lowe and Agent Bryant that occurred after this Court denied Defendant's motion to sever.  *See* Def.'s Ex. 128 [Doc. No. 232-128].  During this discussion, Agent Bryant says: "And I don't know. I think what they were thinking is that we get some jurors' heartstrings bleeding on shooting those cats and showing pictures of the tiger dig and all that. And they might be prejudicial where we're weak on the murder for hire."  *Id.* at 9.  Defendant is apparently attempting to use *Brady* to challenge the Court's Order on the Motion to Sever, *see* [Doc. No. 55].  Even assuming this is procedurally proper—a highly dubious prospect—Defendant does not explain how Agent Bryant's unsworn statements about the prosecutors' litigation strategy would have been material to either the Court's decision or the outcome of trial.  Additionally, Defendant provides no evidence that the call was suppressed.  Indeed, it seems unlikely that Agent Bryant would have spoken so candidly had he suspected Mr. Lowe was recording him.

Additionally, it is not clear to the Court how evidence of a sixth dead tiger would have been favorable to the Defendant.  Nor is it clear how this evidence is material, since Defendant was not charged for killing the sixth tiger.  *See* Resp. [Doc. No. 237] at 51 & n.40.

Next, he argues investigators suppressed evidence by separating the tigers' heads from their bodies and taking only the skulls.  He claims that "the government intentionally left the tiger bodies in the ground in an attempt to prevent [Defendant] from having the ability to prove the animals were euthanized because of illness."  Mot. [Doc. No. 232] at 44.  The argument that the tigers' bodies would reveal evidence of infirmity or illness is entirely speculative and, therefore, insufficient to support a *Brady* claim.[49]

### 9.   Allen Glover

Defendant presents two purported *Giglio* violations related to Allen Glover.  First, he contends Agent Bryant agreed to "handle[]" Mr. Glover's DUI to protect his credibility at trial.  Mot. [Doc. No. 232] at 56.  Defendant cites to Mr. Lowe's affidavit, in which Mr. Lowe claims Agent Bryant told him "that a conviction could impugn the credibility of [Mr. Glover's] statements to the government."  Def.'s Ex. 125 [Doc. No. 232-125] ¶ 33.  As an initial matter, the Court is highly skeptical that any such agreement

---

[49] Additionally, Defendant makes no attempt to explain why evidence of arthritis, if it existed, would be material.  The trial testimony establishes that the tigers were euthanized outside of the confines of the provision of care established with Dr. Green.  *See* Tr. at 181:22–187:2 (explaining that amended vet protocol permitted Defendant to euthanize an animal only in case of an extreme emergency); *see also* 16 U.S.C. § 1539(a)(1)(A) (permitting takings that "enhance the propagation or survival" of the tiger species); 50 C.F.R. § 17.3 (defining "enhance the propagation or survival" to include, inter alia, takings that are part of a "[p]rovision of health care").

existed.  *Cf. Baker v. United States*, No. CR H-96-187-2, 2002 WL 35634847, at \*5 (S.D. Tex. Mar. 1, 2002), *aff'd,* 801 F. App'x 309 (5th Cir. 2020) (rejecting *Giglio* claim because "no credible evidence support[ed] [defendant's] claim that the United States concealed the existence of a non-prosecution agreement").   Mr. Glover entered a nolo contendere plea and was convicted on one misdemeanor DUI count on February 28, 2019—about one month before trial commenced.  *See* Govt.'s Ex. 27 [Doc. No. 232-27]. And, as the Government points out, the purported deal is dubious because Federal Rule of Evidence 609(a) would have barred the use of a misdemeanor DUI conviction to impeach Mr. Glover.  *See* Resp. [Doc. No. 237] at 54.

Similarly, Defendant claims that "three government representatives, AUSA Green, Bryant, and AUSA Green's supervisor" told Mr. Glover that if he cooperated, "no charges would be brought against [him] now or in the future."  Mot. [Doc. No. 232] at 56 (quoting Def.'s Ex. 112 [Doc. No. 232-112] ¶ 40).   But, again, the Court doubts the veracity of Mr. Glover's affidavit based on the other evidence in the record.  First, Agent Bryant has submitted a competing affidavit in which he claims that "[t]o his knowledge, no immunity or promise of immunity was offered" to Mr. Glover.  Govt.'s Ex. 23 [Doc. No. 237-29] ¶ 3.  Similarly, Mr. Glover testified at trial that he did not receive an offer of immunity.  Tr. at 650:1–7; *see also United States v. Weeks*, 653 F.3d 1188, 1205 (10th Cir. 2011) ("Solemn declarations in open court carry a strong presumption of verity."). Finally, a recorded phone call between the Lowes and Agent Bryant lends credence to Mr. Glover's trial testimony.  Following the conclusion of Defendant's trial, Mr. Lowe joked that Agent Bryant "ought to go down there, scare the shit out of [Mr. Glover]."

Def.'s Ex. 119 [Doc. No. 232-119] at 6.  Agent Bryant replied, "That poor man. I got to like him throughout the case [crosstalk 00:08:20] and it would scare him to death if I was to go down there and go, well, I tried, buddy. I tried to keep you out of trouble." *Id.* Based on Agent Bryant's candid statement, it appears Mr. Glover still feared prosecution. Additionally, the Government explained that its "decision not to prosecute Mr. Glover resulted from the limited scope of federal law and the evidence that it possessed, not a promise of immunity," a contention which the Court finds credible.  Resp. [Doc. No. 237] at 54 n.16.  Because the evidence at trial consistently showed that Mr. Glover "did not intend to kill Mrs. Baskin," the Government argues, he "did not use any facilities of interstate commerce to facilitate a murder for hire." *Id.*  In reply, Defendant claims that this decision "defies logic," because "[i]f [Defendant] is the Ying [sic] of the murder-for-hire, Mr. Glover was the Yang."  Reply [Doc. No. 240] at 6.  But Defendant does not engage with the consistent evidence that Mr. Glover never intended to murder Mrs. Baskin.  Nevertheless, the Court considers the materiality of the purported immunity agreements below.

### 10.    JoAnne Green

Defendant next alleges a *Giglio* violation with respect to the zoo's veterinarian, Dr. JoAnne Green.  He claims the Government threatened Dr. Green with arrest if she did not testify.  He cites a recording between Mr. Garretson and an unidentified caller.  In this call, Mr. Garretson said: "But see, [Dr. Green] told the government she's not going to go, and the government was like, cause I was there . . . they called her and said if you don't go, you're going to get arrested."  Def.'s Ex. 43 [Doc. No. 232-43] at 5.  At its core,

Defendant's argument appears to be that the Government violated *Giglio* by subpoenaing Dr. Green's testimony. He has provided no analysis showing that fact of Dr. Green's subpoena satisfies any part of the *Brady*/*Giglio* analysis.

### 11.    James Garretson

Defendant next claims the Government failed to disclose its purported immunity agreement with Mr. Garretson. He cites only one conversation with particularity—Mr. Garretson's post-conviction interview with the FBI.[50]   In that interview, he claims that former AUSA "Amanda Green told [him] that [he] wouldn't be charged for this lemur." Def.'s Ex. 152 [Doc. No. 232-150] at 6. But in this same interview, he also states he "was never given immunity," and that he "was told until the day [he] was going to court that [he] could still be charged for the lemur." *Id.* at 6, 24. The Government cites to five other instances where Mr. Garretson denied receiving immunity.[51]   Mr. Garretson testified at trial that he did not receive immunity, *see* Tr. at 579:19–23, even for the lemur, *see id.* at 580:7–23. Accordingly, the Court finds the contention that Mr.

---

[50] Defendant describes this call as taking place on "December 2, 2021." Mot. [Doc. No. 232] at 57. In the cited exhibit, however, the FBI agent states, "The time is 1:36 on Friday, January 7th [inaudible 00:00:27]." Def.'s Ex. 152 [Doc. No. 232-150] at 1. Regardless, it is clear the interview took place after Defendant's trial. *See, e.g.*, *id.* at 24 (referencing the "resentencing on [January] 28th[, 2022]").

[51] *See* Def.'s Ex. 8 [Doc. No. 232-8] at 46 (telling Defendant's post-conviction counsel: "I never had any immunity agreement or nothing. I have no immunity."); Def.'s Ex. 9 [Doc. No. 232-9] at 2, 43 (telling Defendant's post-conviction counsel: "I never had immunity. . . . They'd bring up the lemur all the time, 'Well, we can still charge you for the lemur, we can charge you.' And then up until the Saturday before trial when we were at the trial prep I was told I could still be charged. . . . I was nervous at the fact that I don't have immunity."); Def.'s Ex. 30 [Doc. No. 232-30] at 1 ("I have no immunity."); Def.'s Ex. 91 [Doc. No. 232-91] at 5 ("I didn't even get fucking immunity."); Def.'s Ex. 105 [Doc. No. 232-105] at 4 ("[T]he government gave me no immunity. I was granted no protection from the government.").

Garretson *did* receive immunity to be wholly incredible.  Additionally, Mr. Garretson's statement to the FBI is cumulative, and therefore its impeachment value is slight.  At trial, defense counsel cross-examined Mr. Garretson about the fact that he had not been prosecuted for the illegal lemur purchase.  *Id.* at 580:7–23.

### 12.   John Finlay

As previously discussed, Defendant claims Agent Bryant coerced Mr. Finlay into testifying.  The *Brady* section of the Motion includes the following argument, without further analysis or elaboration: "During trial, John Finley [sic] was never asked if he was provided immunity, nor was it questioned on cross examination by trial defense counsel. However, newly discovered evidence indicates Finlay was coerced into testifying. (Exhibits 21, 153, 163 and 171.)."  Mot. [Doc. No. 232] at 57.  Defendant has not addressed any of the three *Brady*/*Giglio* elements and has therefore not shown his entitlement to relief.

### 13.   Jeff and Lauren Lowe

Finally, Defendant urges the Court to find a *Giglio* violation on the basis that the Government did not identify its immunity agreements with the Lowes.  Neither the prosecution nor the defense called Mr. Lowe to testify at trial, so the materiality of his purported immunity agreement is unclear (nor does Defendant attempt to elucidate it).

Defendant also claims that Mrs. Lowe, who testified during the Government's case-in-chief, had an immunity agreement.  His sole piece of support is a phone call between Mrs. Lowe and Agent Bryant, although the transcript appears to omit the

beginning of the exchange.[52]  *See* Def.'s Ex. 137 [Doc. No. 232-136].  The transcript begins with Agent Bryant saying:

> But no don't read into all that crap. There's nothing. Mark's deal was his boss' [sic] just wanted to know, the city council just wanted to know, what his status was.  He had a subpoena and Jeff and I talked last night and Jeff may still get one, but they're waiting to see this kind of a chess game. They're just waiting to see what the defense does, Jeff and I talked that out for quite a while last night, so y'all are in good shape.

*Id.* at 1.  Later he tells Mrs. Lowe, "Don't freak out because there's, y'all are in good shape," and "Let it go because that deal yesterday. It all worked out. . . . So don't read into anything if you didn't hear it from me, it ain't right so."  *Id.* at 1–2.  Defendant provides no additional context to the recording, which does not by itself establish the existence of an immunity agreement.  Nor does he engage with the applicable legal analysis.

### 14.    Cumulative Effect

Finally, the Court considers the cumulative impact of Defendant's *Brady*/*Giglio* claims in light of the entire record.  As articulated above, Defendant must establish the three *Brady*/*Giglio* elements by a preponderance of the evidence.  For most of his claims, he makes no attempt to address the elements and has therefore not established a *Brady*/*Giglio* violation.  *See Moya*, 5 F.4th at 1193.  Similarly, several of the claims rely on speculation or cite to evidence that was in fact disclosed.  But even upon review of his more detailed claims, it is clear Defendant's "trial result[ed] in a verdict worthy of confidence."  *Fontenot*, 4 F.4th at 1080 (quoting *Strickler*, 527 U.S. at 290); *see also*

---

[52] Defendant cites to Exhibit 126, but he quotes from Exhibit 137.

*United States v. Agurs*, 427 U.S. 97, 112–13 (1976) ("If there is no reasonable doubt about guilt whether or not the additional [evidence] is considered, there is no justification for a new trial.").  For example, evidence about Ms. Medina's recollection of the "bike path" conversation and Mr. Glover's purported immunity agreement are relevant to the two murder-for-hire counts.  But Defendant has failed to show that this evidence is material—i.e., that "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cordova*, 25 F.4th at 826 (quoting *Cain*, 565 U.S. 73, 75 (2012).

To find the Defendant guilty of murder-for-hire, the jury had to find beyond a reasonable doubt that Defendant: (1) "either (i) traveled in or caused another person to travel in interstate commerce or (ii) used or caused another person to use the mail or any facility of interstate commerce"; (2) "did so with the intent that a murder be committed in violation of the laws of any State or of the United States; and"; (3) intended the murder "be committed either (i) as consideration for the receipt of anything of pecuniary value or (ii) as consideration for a promise or agreement to pay anything of pecuniary value." Jury Instructions [Doc. No. 114] at 31.

Defendant claims "the first murder for hire count depended almost entirely on Glover's testimony; without it there could have been no indictment and no evidence to carry the case to the jury."  Mot. [Doc. No. 232] at 56.  But this argument ignores the strongest, most credible evidence against Defendant—his own words.  Even assuming the jury discounted Mr. Glover's credibility, the Court's confidence in the outcome of the

trial is not undermined because Defendant's statements provide overwhelming, powerful evidence of his guilt.

To be sure, several aspects of Mr. Glover's testimony implicated the first element—that Defendant "traveled in or caused another person to travel in interstate commerce," or that he "used or caused another person to use the mail or any facility of interstate commerce." Jury Instructions [Doc. No. 114] at 31. For example, Mr. Glover testified that he gave his personal phone to Defendant. Additional testimony from Inspector Hess and Mrs. Lowe confirm that his phone was then mailed to Las Vegas as part of the scheme Defendant told Mr. Garretson about. Mr. Glover also testified that Defendant used the pizza phone to take photos of Mrs. Baskin to ensure that he killed the right person. While his testimony would have been sufficient to satisfy the first element, it was not necessary.

Instead, it was enough for the jury to believe that Defendant "caused another person to travel in interstate commerce." Jury Instructions [Doc. No. 114] at 31. And the most credible evidence presented at trial with regard to the first element was on this point. Mr. Finlay testified that he took Mr. Glover from Oklahoma to Dallas to get a fake ID at a sign shop. When asked about the purpose of this trip, Mr. Finlay said Defendant directed him to "tak[e] Alan [Glover] down there to get a fake ID so he could go take care of Carole." Tr. at 758:14–17. Special Agent Markley visited the same shop a few days later, *id.* at 11:19—113:10, and the prosecution introduced evidence of Mr. Glover's ID photo from the sign shop, *see* Govt.'s Ex. 15 [Doc. No. 232-15]. The jury also heard a surreptitiously recorded conversation from November 7, 2017, in which Mr. Garretson

asked Defendant whether Mr. Finlay could be trusted to be "pretty quiet about everything." Govt.'s Ex. 2 [Doc. No. 237-2] at 1. Defendant answered, "Yeah, he damn sure don't want to be implicated in it, you know somebody that drove to go get the fake ID for it." *Id.* Finally, Defendant called Mr. Finlay from federal prison after his arrest. That recorded call included the following exchange:

> MALDONADO: And just so you, know Jeff is coming after you too.
> FINLAY: For what?
> MALDONADO: For taking Alan to get that ID in Texas.
> FINLAY: I already, I've already explained all that.
> MALDONADO: To who?
> FINLAY: To the FBI.
> MALDONADO: And what did ya explain.
> FINLAY: Just what went on.
> MALDONADO: That he…he needed it to go to Florida?
> FINLAY: Yeah.
> MALDONADO: Oh, so, so you hung me out to dry? …… Huh?
> FINLAY: No I told the fucking truth, and
> MALDONADO: Well what…
> FINLAY: …and fucking Jeff was in, in my explanation too.
> MALDONADO: Well why am I the one in trouble?

Govt.'s Ex. 14 [Doc. No. 237-14] at 2–3 (alterations in original). Defendant makes no attempt to explain the materiality of Mr. Glover's testimony in light of his own words.

Second, the Government had to prove beyond a reasonable doubt that Defendant's actions in the first element—traveling or causing someone "to travel in interstate commerce," or using or causing someone "to use the mail or any facility of interstate commerce"—were done "with the intent that a murder be committed." Jury Instructions [Doc. No. 114] at 31. Ms. Medina's testimony would have been relevant to the issue of intent. But her account, which is largely consistent with Mr. Garretson's trial testimony, would have been primarily cumulative. And to the extent it omitted a detail that Mr.

Garretson's account included, there was other evidence in the record corroborating Mr. Garretson's testimony.   Mr. Glover's testimony was also relevant to the issue of Defendant's intent.   For example, he testified that Defendant asked him whether he could "get it done," Tr. at 622:4–9, claimed that he and Defendant discussed different ways of killing Mrs. Baskin, *id.* at 624:14–23, and showed him the paths where she walked "that would probably be a good place to do it," *id.* at 625:22–626:1.

But again, the most credible and damning evidence of Defendant's intent was his own words.   In addition to the evidence recounted on the first element, Defendant also told Mr. Garretson:

> Yeah, what I am doing is having him buy a go-phone down there and Jeff is buying a go-phone so they can communicate and then throw them away. And we are going to over-night his phone to Vegas and Jeff is gonna text pictures every once in a while back to the staff so that way his phone registers in Vegas. . . . As long as he don't get caught red-handed, I think, I think we got this. . . . But if they bust him red-handed, me and Jeff are just, we got our story down to where we fired the motherfucker and he just went off the deep end.

Govt.'s Ex. 2 [Doc. No. 237-2] at 1–2.   On a separate phone call on November 17, 2017, Mr. Garretson floats the idea of bringing in a different hitman.   *See* Govt.'s Ex. 5 [Doc. No. 237-5] at 1.   Defendant asks, "How much? How much does he want down?"   *Id.* at 2. He then tells Mr. Garretson, "Oh yeah. Yeah. See, what I was gonna do is send him with four and then give him six when it was done. So if your guy wants to do . . ."   *Id.* (ellipses in original).   In a February 11, 2018 phone call between Defendant and Mr. Garretson, Defendant tells Mr. Garretson, "The last guy went to North Carolina [sic] and drank it

all." Govt.'s Ex. 11 [Doc. No. 237-11] at 1.   And on March 3, 2018, Mr. Garretson

recorded the following exchange with Defendant:

> GARRETSON: Yeah. Just whenever we get our head above water you know, we'll go down and take
>
> MALDONADO: Tell ya what…
>
> GARRETSON: He'll go take care of her.
>
> MALDONADO: You really think you can trust him?
>
> GARRETSON: Oh fucking 100%.
>
> MALDONADO: That one of Jeff's run off with my money and never heard from him again.

Govt.'s Ex. 12 [Doc. No. 232-12] at 1.   Similarly, they had the following recorded

exchange ten days later:

> GARRETSON: So I didn't know if we wanted to pursue with the Baskin shit.
>
> MALDONADO: …[inaudible]… He said he'd take care of Florida for 10 .
> . . .
>
> MALDONADO: How well you trust that guy?
>
> GARRETSON: I've done some shit with him. He's not like that other dipshit, he's . . .
>
> MALDONADO: He took four thousand bucks and never came back.

Govt.'s Ex. 13 [Doc. No. 237-13] at 1 (second alteration in original).   Defendant again

makes no attempt to explain the materiality of either Mr. Glover or Ms. Medina's

testimony in the context of the entire trial record.

Finally, the prosecution had to prove Defendant intended the murder "be

committed either (i) as consideration for the receipt of anything of pecuniary value or (ii)

as consideration for a promise or agreement to pay anything of pecuniary value."  Jury

Instructions [Doc. No. 114] at 31.  At trial, Mr. Glover testified that Defendant paid him

$3,000, which he received from selling a liliger.[53]  Tr. at 637:4–6; 641:15–16.  But, once

again, Defendant's testimony is by far the strongest evidence that he paid Mr. Glover to

carry out Mrs. Baskin's murder.  In addition to the excerpts included above, Defendant

had the following exchange with Mr. Garretson on November 7, 2017:

> GARRETSON: Damn, that's crazy. Ok, cool. Hey, did you get everything
> else handled? Everybody's gone away or you got all that handled?
>
> MALDONADO: I'm waiting on, ah. [inaudible]. Waiting on, waiting on
> this lady to get this money for these liligers cause that is what I am paying
> for it with. Supposed to be here either tonight or first thing here tonight or
> in the morning.
>
> GARRETSON: Gotcha.
>
> MALDONADO: And all of the bills came from Florida, so, as long as I
> don't touch them and he gets busted with it on when … I hope that they are
> all 100 dollar bills out of a bank in Florida.

Govt.'s Ex. 2 [Doc. No. 237-2] at 1.

Upon careful review of the entire trial record, the Court does not find the

*Brady*/*Gilgio* evidence to be material.  To be clear, this conclusion is not based on the

fact that there was *sufficient* evidence in the record to convict Defendant.  Instead, "no

*Brady* violation occurred because there was sufficiently strong evidence on the counts of

conviction to sustain our confidence in the jury's verdict despite the absence of the

impeachment evidence" against Mr. Glover, and Ms. Medina's testimony about the bike

path conversation.  *Reese*, 745 F.3d at 1084 n.6.  The fact that Defendant's Motion does

---

[53] As explained above, Mr. Glover has recanted this testimony.

not engage with the most damning evidence against him is telling.   Contrary to Defendant's assertion, his conviction did not hinge on Mr. Glover's credibility.   Nor did this case present a close call.[54]   Defendant has not shown that the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 435.   Accordingly, it does not entitle him to a new trial.

## C.     *Napue* Violations

A conviction obtained through the prosecutor's knowing use of false testimony violates a defendant's due process rights.  *Napue*, 360 U.S. at 269.   To obtain a new trial based on a *Napue* violation, a defendant must establish that "(1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material."  *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015). *Napue*'s materiality standard is less demanding than *Brady*'s: testimony is material "unless failure to disclose [the perjury] would be harmless beyond a reasonable doubt." *Id.* (alteration in original) (quoting *United States v. Bagley*, 473 U.S. 667, 680 (1985)).   It is immaterial whether the perjured testimony "is relevant to substantive issues or to witness credibility only."  *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002).

---

[54] The jury returned a guilty verdict on all 19 counts after just a few hours of deliberation.  *See* [Doc. No. 112].

### 1.    James Garretson

Defendant claims that the Government knowingly failed to correct several instances of perjury with respect to James Garretson.  First, when prosecutors asked Mr. Garretson whether he gave Agent Bryant "all the conversations that [he] w[as] able to record," Mr. Garretson responded, "Yes."  Tr. at 553:23–25.  Defendant contends that Agent "Bryant knew Garretson was lying and he failed to correct the untruthful testimony."  Mot. [Doc. No. 232] at 59.  He argues that Agent Bryant's knowledge is enough, relying on *United States v. Buchanan*, 891 F.2d 1436, 1442 (10th Cir. 1989).  But *Buchanan* stands for the proposition that "[k]nowledge by police or investigators is therefore imputed to the prosecution under *Brady*."  *Id.*  This is not the case for *Napue* claims.  *See Smith*, 50 F.3d at 831 (imputing detective's personal knowledge to prosecution for *Brady* purposes, but finding it insufficient for *Napue* claim).  Assuming the testimony is false, Defendant presents no evidence that *the prosecution* knew of its falsity.  Accordingly, he is not entitled to relief.

Next, Defendant alleges that Agent "Bryant was present in the court room when Garretson testified" that Mr. Lowe and Defendant were present for the "bike path" conversation, and that "Bryant knew this testimony to be untrue."  Mot. [Doc. No. 232] at 19.  But again, he fails to provide any indication that prosecutors knew about Ms. Medina's presence at the meeting.  Accordingly, he has not established a *Napue* violation.

Finally, Defendant contends Mr. Garretson lied about other people's knowledge of his cooperation at trial.  He testified:

Q. (By Ms. Maxfield-Green) Okay. Mr. Garretson, we were talking about the fall of 2017 when you started recording conversations for the Government, correct?

A. Correct.

Q. And in the fall of 2017, did anybody outside of law enforcement know that you were cooperating with the Government?

A. No.

Tr. at 556:19–25. Defendant now contends "that the government knew this statement made under oath was false," and that "Medina, Lowe, Lauren Lowe, Howard Baskin and Malagerio all knew Garretson was working with the Government" at this time. Mot. [Doc. No. 232] at 21–22. He then cites, without particularity, 293 pages of exhibits. Upon review, none of the evidence supports the contention that prosecutors knew that Mr. Garretson's trial testimony was false. At best, the evidence implicates *Agent Bryant's* knowledge which, again, is insufficient under *Napue*.

### 2.    Lauren Lowe

Defendant claims that "[Agent] Bryant knew Lauren Lowe's testimony regarding Beth Corley was false, yet he let it stand uncorrected." Mot. [Doc. No. 232] at 32. Even making the generous assumption that this testimony would qualify as perjury, the *Napue* claim still fails. Defendant only contends that Agent Bryant knew about the purported falsity, and his knowledge is not sufficient to show a violation of *Napue*.

### 3.    Allen Glover

Defendant next claims the prosecution "w[as] aware it was not Engesser who conducted the cub sale in order to have money exchanging hands." Mot. [Doc. No. 232] at 60. But again, the only cited exhibit to support this claim involves Agent Bryant

67

telling the Lowes he "do[esn't] believe it was Engesser" who purchased the cub.  Def.'s Ex. 128 [Doc. No. 232-128] at 15.  Agent Bryant's subjective belief is not sufficient to establish a *Napue* violation.

Defendant then states, in conclusory fashion, that the prosecution was "aware Lowe was manipulating calls and texts with Glover."  Mot. [Doc. No. 232] at 60.  His lone citation for this proposition is a call between Agent Bryant and the Lowes, in which Mrs. Lowe says Mr. Glover "will bend over backwards for us. . . . [H]e would do anything for us."[55]  Def.'s Ex. 107 [Doc. No. 232-107] at 47–48.  Defendant makes no attempt to satisfy any of the *Napue* elements, and his claim appears to be completely meritless.  Accordingly, it warrants no further discussion.

### D.   Misconduct Allegations

Finally, Defendant raises two challenges involving the Government's conduct during the investigation.

### 1.   Outrageous Government Conduct

First, he urges the Court to find that the prosecution's behavior was "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."[56]  Mot. [Doc. No. 232] at 46 (quoting *United States v.*

---

[55] Defendant provides no pinpoint citation to this 106-page exhibit.  Although his brief includes quoted language, the quote appears nowhere in the exhibit.  The quote provided by the Court appears to be what Defendant is referencing.

[56] As an initial matter, the Court is skeptical that Defendant's argument is procedurally proper in the context of his Rule 33 motion.  Because the outrageous government conduct defense "would absolutely bar the government from invoking judicial processes to obtain a conviction," *United States v. Russell*, 411 U.S. 423, 431–32 (1973), the typical remedy is dismissal of an indictment, *see, e.g.*, *United States v. Varnell*, No. 20-6040, 2021 WL 5875718 (10th Cir. Dec. 13, 2021), at

*Russell*, 411 U.S. 423, 431–32 (1973)).  "When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct because [doing so] would offend the Due Process Clause of the Fifth Amendment."  *United States v. Wagner*, 951 F.3d 1232, 1253 (10th Cir. 2020) (alteration in original) (quoting *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994)).  But "[t]he outrageous conduct defense . . . is an extraordinary defense that will only be applied in the most egregious circumstances." *Pedraza*, 27 F.3d at 1521.  Indeed, its viability has been called into question, and it "has never been applied by [the Tenth Circuit] to strike down a conviction."  *United States v. Varnell*, No. 20-6040, 2021 WL 5875718, at *3 (10th Cir. Dec. 13, 2021).  "To prove outrageous government conduct, the defendant must show 'either (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime.'"  *Wagner*, 951 F.3d at 1253 (quoting *United States v. Dyke*, 718 F.3d 1282, 1288 (10th Cir. 2013)).

Pursuant to Rule 33(b), Defendant is only entitled to relief on the basis of newly discovered evidence.  While that evidence may take different forms—e.g., a recantation, *Brady* violation, or *Napue* violation—it must still form the basis for relief under the rule.

---

*3 (reviewing denial of motion to dismiss indictment); *United States v. Wagner*, 951 F.3d 1232, 1254 (10th Cir. 2020) (same); *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994) (same); *see also United States v. Harris*, 997 F.2d 812, 816 (10th Cir. 1993) ("[D]istrict courts have only utilized the defense a handful of times to dismiss charges." (emphasis added)); *United States v. Lacey*, 86 F.3d 956, 963 (10th Cir. 1996) (recognizing the defense "generally prevents the government from prosecuting a crime developed through egregious investigatory tactics," but that it may also "warrant a downward departure from the sentencing guidelines").  In contrast, Defendant invokes the defense as a mechanism for a new trial.  This relief, as the Government points out, "is fundamentally irreconcilable" with the assertion that the government is barred from invoking the judicial process.  Resp. [Doc. No. 237] at 58.

But most of Defendant's arguments have no connection to newly discovered evidence. For example, he argues that his statements were exaggerations, and that he "made no serious expression of an intent to commit an act of unlawful violence to Ms. Baskin prior to government involvement." Mot. [Doc. No. 232] at 48–49. Similarly, he claims that the December 5, 2017 phone call played at trial was insufficient to satisfy "the interstate nexus required for jurisdiction." *Id.* at 51. Neither of these arguments rely on new evidence, so neither is properly considered in the instant Motion.

Finally, the arguments which are based on newly discovered evidence are underdeveloped and merit little discussion. *See, e.g.*, Mot [Doc. No. 232] at 52 (including quotes with only a citation to "Exhibit xx"). The Motion focuses on the conduct of third parties and includes conspiratorial accusations without supporting exhibits. *See, e.g.*, *id.* ("It is no mere coincidence that Jeff Lowe gets arrested in Las Vegas, and upon return home to Oklahoma immediately starts working with federal agents to set [Defendant] up."); *cf. Varnell*, 2021 WL 5875718, at *5 ("[W]e must examine the government's conduct, not [a paid informant's] conduct." (citing *United States v. Doe*, 698 F.3d 1284, 1293 (10th Cir. 2012))). Thus, assuming the outrageous conduct defense is viable and is properly included in the instant Motion, Defendant has not shown that it is applicable to the facts of this case.

### 2.    Prosecutorial Misconduct

Relatedly, Defendant argues he is entitled to a new trial on the basis of prosecutorial misconduct. But all four of the cases he cites involve litigants challenging the constitutionality of their state convictions under 28 U.S.C. § 2254, not pursuing new

trial motions under Rule 33.   *See* Mot. [Doc. No. 232] at 55–56 (citing *Matthews v. Workman*, 577 F.3d 1175 (10th Cir. 2009); *Dodd v. Trammell*, 753 F.3d 971 (10th Cir. 2013); *Torres v. Mullin*, 317 F.3d 1145 (10th Cir. 2003); *Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110 (E.D. Okla. 2019)).   Accordingly, these cases are inapposite, and the Court considers only whether Defendant has shown entitlement to a new trial on the basis of newly discovered evidence.[57]   *See* Fed. R. Crim. P. 33(b).   Defendant admits his arguments are grounded in newly discovered evidence.   *See* Reply [Doc. No. 240] at 6 ("The bad faith of the AUSAs came to [Defendant]'s attention in June of 2021 when Mr. Garretson provided post-conviction counsel with the phones used during the investigation.").   Nevertheless, he makes no attempt to analyze the newly discovered evidence within the applicable legal framework.

For example, he alleges that prosecutors twice presented false evidence to the grand jury.[58]   Mot. [Doc. No. 232] at 61.   As an initial matter, this claim of misconduct does not appear to be premised on newly discovered evidence.   Defendant's trial counsel examined Agent Bryant about this exact issue, including the fact that prosecutors did not "ask[] [him] any questions in front of the grand jury to advise them that the previous information they received may have been erroneous."   Tr. at 903:13–911:14.   Regardless, Defendant makes no attempt to explain how this evidence satisfies the *Berry* test.

---

[57] Defendant has provided the Court with no authority or reason to depart from the confines of the five-part *Berry* test.

[58] Defendant also argues that the Government intentionally suppressed recordings and excluded Mr. Johnson, an exculpatory witness.   Because the Court has already rejected those arguments, it omits them here.

Similarly, Defendant alleges the Government allowed Agent Bryant "to send personal emails to the CI regarding his initial interview." Mot. [Doc. No. 232] at 61. He provides no citation for this proposition, nor does he identify any emails that Agent Bryant send to Mr. Garretson. Because this evidence appears to entirely speculative, he cannot—nor does he attempt to—analyze it under *Berry*.

He next contends prosecutors "demand[ed] souvenirs be collected due to the defendant's notoriety," and kept "a bullseye with the Defendant's face on it in a government office." *Id.* Although each of these assertions is followed by a lone citation to an exhibit, he makes no effort to analyze *why* this evidence entitles him to relief under the applicable framework—particularly how it is "material to the principal issues involved" or "of such a nature that in a new trial it would probably produce an acquittal." *Jordan*, 806 F.3d at 1252. Conclusory statements like these are not sufficient to warrant a new trial.

Defendant also cites an affidavit sworn by former FBI Special Agent Doug Kouns. *See* Def.'s Ex. 144 [Doc. No. 232-142]. But this affidavit, dated February 10, 2022, did not exist at the time of the trial and is not itself newly discovered evidence.[59] To the extent Defendant seeks to treat the report as a vehicle to present additional claims for relief, the Court rejects the tactic as an improper attempt to exceed his page limit.

Finally, Defendant argues the Government improperly "stood by" the PSR at the January 28, 2022 resentencing despite the fact that Defendant's counsel provided

---

[59] Defendant notes that certain actions could constitute "potential OPR violation[s]" or violations of DOJ guidelines. Mot. [Doc. No. 232] at 63. It is unclear what relevance those allegations have in the context of the instant new trial motion.

undisclosed recordings and "the results of their investigation" on January 25 and 26. Mot. [Doc. No. 232] at 64.   Defendant makes no attempt to explain how the Government's conduct at resentencing—nearly three years after his trial concluded—is relevant under Rule 33(b).

## IV.   Conclusion

After carefully reviewing each argument properly raised by Defendant, the Court is confident that the "interest[s] of justice" do not require a new trial.  Fed. R. Crim. P. 33(a).   Defendant's allegations, whether viewed individually or cumulatively, are incapable of overcoming the strong, credible evidence of guilt set forth in the record. Contrary to his assertions, Defendant received a fair trial, and the jury returned a reasonable and just verdict.

IT IS THEREFORE ORDERED that Defendant's Motion for New Trial [Doc. No. 232] is DENIED.

IT IS FURTHER ORDERED that Defendant's Second Motion for New Trial [Doc. No. 246] is DENIED.

IT IS SO ORDERED this 21st day of November, 2023.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE